Mendel Zilberberg
MENDEL ZILBERBERG & ASSOCIATES, P.C.
6619 Thirteenth Avenue
Brooklyn, New York 11219
Telephone (718) 256-2000
Facsimile (718) 256-7900

Counsel for Creditor Abraham Klein

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:                                                          Chapter 7

      CHRISTINE PERSAUD,                          Case No: 10-44815-ess

           Debtor.
-------------------------------------------------------------x

**CREDITOR ABRAHAM KLEIN'S OBJECTIONS**
**TO THE APPLICATION BY THE CHAPTER 7 TRUSTEE AUTHORIZING RETENTION**
**OF TROUTMAN SANDERS LLP AS SUBSTITUTE GENERAL AND**
**BANKRUPTCY COUNSEL TO THE CHAPTER 7 TRUSTEE**

        MENDEL ZILBERBERG, an attorney duly admitted to practice before this Court, hereby

affirms the following under the penalties of perjury:

1.      I am the attorney for creditor Abraham Klein ("Creditor Klein") in this case, and I am

        fully familiar with the facts and circumstances had herein.

2.      I submit this affirmation, setting forth Creditor Klein's objections to the application by

        John S. Pereira, the Chapter 7 Trustee for the estate of Christine Persaud, authorizing

        retention of Troutman Sanders LLP (hereinafter referred to as "Troutman") as

        substitute General and Bankruptcy Counsel for the Chapter 7 Trustee, pursuant to

        Section 327(a) of the Bankruptcy Code.

## BACKGROUND

3.      On May 26, 2010, Christine Persaud (hereinafter referred to as "Debtor Persaud") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (Case No. 10-44815-ess).

4.      By Court Order dated April 8, 2011, the matter was converted to a case under Chapter 7, and John S. Pereira was appointed as Chapter 7 Trustee for Debtor Persaud.

5.      On May 26, 2010, Liberty Home Care a/k/a Liberty Home Care Nurses Employment Agency, Inc. (hereinafter referred to as "Debtor Liberty" and/or "Liberty Home Care") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (Case No. 10-44799-ess).

6.      By Court Order dated April 8, 2011 the matter was converted to a case under Chapter 7, and Richard E. O'Connell was appointed as Chapter 7 Trustee for Debtor Liberty Home Care.

7.      Mr. O'Connell filed a Notice of Proposed Abandonment of the home health care business Liberty Home Care on May 19, 2011. By Court Order dated July 5, 2011, this Court granted approval of the abandonment.

8.      As such, the assets of Liberty, to some extent, come under the auspices of the Chapter 7 Trustee for Christine Persaud.

9.      Mr. Pereira applied to the Court to approve Pereira & Sinisi to be counsel for the Trustee, which the Court granted on June 30, 2011, and which Creditor Klein did not oppose.

10.     Finding that there are complex factual and legal issues involved, Mr. Pereira seeks the approval of Troutman to act as bankruptcy counsel, and to assist in providing services

in the areas of litigation, corporate, regulatory and tax.

11. Creditor Klein respectfully directs the Court's attention to Creditor Klein's August 4, 2011 motion for an order declaring void and of no effect certain decisions from the Supreme Court of the State of New York, Appellate Division Second Department that were issued in violation of the automatic stay.


## BASIS FOR OBJECTIONS

12. Creditor Klein's objections to these applications are based on his belief that considering the totality of circumstances all that can be expected from the retention of Troutman is protracted litigation that will ultimately not yield any meaningful benefit to the unsecured creditors, but will diminish the potential distribution of any funds to priority and/or secured claims. Furthermore, Creditor Klein is concerned that Troutman is conflicted insofar as they were retained by Abraham Klein with respect to one of the entities that he owns and controls, Global Realty Ventures, which representation may currently be on hold, but said representation is still ongoing.


### Prior communications between the Affiant and John Campo, Esq. of Troutman


13. On July 29, 2011, the Affiant received his first communication from Mr. Campo, of Troutman, asserting that Mr. Pereira, on behalf of the Debtors bankruptcy estate, still holds at least a current 50% ownership interest in Caring Home Care among other issues that were raised in that letter. (Attached hereto as Exhibit 1).

14. Thereafter, on August 1, 2011, the Affiant responded denying the Chapter 7 Trustee's

claim of a current 50% ownership interest in Caring Home Care and answering some of the issues and concerns raised in Mr. Campo's letter of July 29, 2011. (Attached hereto as Exhibit 2).

15.    Shortly thereafter, on the same date of August 1, 2011, at approximately twelve-fifteen in the afternoon, the Affiant had a telephone communication with Mr. Campo. When Mr. Campo demanded that a representative of the Chapter 7 Trustee's office and a representative of the accounting firm that was hired by the Chapter 7 Ttrustee be permitted to enter Caring Home Care premises, the Affiant once again reiterated his position regarding both the claim of current 50% ownership interest of Caring Home Care and his position that the Chapter 7 Trustee did not have the right to visit, inspect or investigate the books and records of Caring Home Care.

16.    Mr. Campo responded that it was not only the Chapter 7's Trustee's right to immediately enter the Caring Home Care premises but that it was his duty and the Chapter 7 Trustee would visit the Caring Home Care premises with Federal Marshall's to gain access to the Caring Home Care premises if access was not granted on a voluntary basis.

17.    The Affiant asked for a few days within which to confer with the client and respond and also advised Mr. Campo of a potential conflict between Creditor Klein and Troutman.

18.    Mr. Campo said that he would respond to the request, and shortly thereafter called and advised that a member of the Chapter 7 Trustee's office and the accountant would visit the Caring Home Care premises between 2:30 and 3:30 pm the afternoon of August 1, 2011, irrespective of Creditor Klein's position.

19.     The Affiant responded to Mr. Campo with a second letter dated August 1, 2011, wherein he once again set forth Creditor Klein's position that the Chapter 7 Trustee did not have any current right to visit, inspect and investigate the books and records of Caring Home Car and/or Caring LHCSA LLC. (Attached hereto as Exhibit 3).

20.     Based on the foregoing, the totality of the priority, secured and unsecured claims; the petitions of Debtor Persaud and Caring Home Care; the subsequent operating reports filed by Debtor Persaud; and the Chapter 7 Trustee (Richard O'Connell) for Debtor Liberty Home Care's Response to Objection of Abraham Klein to Proposed Abandonment of Debtor's Home Health Care Business, it is the Affiants belief that the retention of Mr. Campo and Troutman is directed in whole or in substantial part to attacking the validity of the arbitration award and judgment obtained by Creditor Klein, and thereby reclassifying Creditor Klein's claim as unsecured creditor.  The primary beneficiary of the reclassification would be the Chapter 7 Trustee and Troutman, as opposed to the unsecured creditors which to date, other than Creditor Klein's claim, totals $56,758.07, as set forth in the Claims Register for Debtor Persaud.

21.     Furthermore, as we currently understand the law, the possible benefit to the Chapter 7 Trustee and Troutman would be to the detriment of the priority and secured creditors. "Pursuant to Code §503(b)(4), any fees and expenses incurred by attorneys or accountants employed by the foregoing entities are entitled to administrative expense status if the entity employing them has an allowable administrative expense claim under Bankruptcy Code §503(b)(3)." (2 Norton Bankr.L. & Prac. 3d § 31:2).

**The current status of Creditor Klein's claim against the estate**

22.  On August 4, 2011, Creditor Klein caused to be filed a motion with this Court citing controlling Second Circuit law as well as prevailing law in the Appellate Division Second Department that clearly sets forth that the ruling of the Appellate Division is of no moment and thereby as a matter of law Creditor Klein currently has a confirmed arbitration award and thus a secured claim against Debtor Persaud, and by extension against Debtor Liberty Home Care.

23.  With respect to the Troutman claim that in any event the Arbitration Award and Decision, which is attached hereto as Exhibit 4, awarded Debtor Persaud a current 50% ownership interest in Caring Home Care, the language of the award squarely contradicts  that reading, as *inter alia*, the third order paragraph on page 7 of the decision sets forth,

> "It is further ordered that Klein has a 50% ownership interest in both Caring and Liberty in accordance with the terms of the Agreement, subject to the approvals of the agencies with jurisdiction, which interest in Liberty shall cease as soon as he, or his designee, is approved by the agencies with jurisdiction to be the sole operator of Caring."

24.  Thereafter, in the twelfth order paragraph on page 8, the Award continues,

> "It is further ordered that if Persaud works at and for the benefit of Caring during the pendency of the license transfer, for and at the offices of Caring, for a minimum of 30 hours per week, she will be entitled to compensation of $1,000 per week and no more for any reason until the provisions of this Award are fully complied with and thereafter she has no residual interest or rights in Caring."

25.  If there is any question left as to the intent of the Arbitrator, in the section setting forth the findings of fact, the Arbitrator found in paragraph 25, "It is impossible for the

parties to work together based upon the actions of Persaud in the days up to the arbitration." The Arbitrator continues, "It is appropriate to unwind the relationship of these parties in a matter that comports with the Public Health Law."

26.    In any event, the 50% claim (which we believe in light of the clear language of the Arbitration Award would be subject to a Federal Rule of Civ. Proc. Rule 11 Motion) cannot be asserted by the Chapter 7 Trustee without a judicial determination, and it is Affiant's understanding that, based on the Rooker-Feldman Doctrine, that determination would be properly made by the State Supreme Court judge, Justice Arthur Schack. [1]

27.    The Chapter 7 Trustee's assertion that the Arbitration Award and Decision granted Debtor Persaud a current 50% ownership interest in Caring Home Care, is squarely contradicted by the fact that Debtor Persaud's Bankruptcy Petition dated May 26, 2010, where in Schedule B she values her interest in the sole proprietorship known as Caring at 0.00 (despite a claim of $900,000.00 being due to her from Caring, which she did not act on in the almost one-year until her case was converted to a Chapter 7 proceeding);

28.    Moreover, Debtor Persaud's attorney, Mathew Naparty, Esq. of Mauro Goldberg & Lilling, LLP, admitted in a Reply Affirmation of May 7, 2009 filed with the Appellate Division Second Department wherein he admits that, "despite this express limitation on damages, the Arbitrator awarded $2,172,607.78, *plus 100% ownership in Caring* after Klein receives all necessary state approvals." (Attached hereto as Exhibit 5).

29.    This admission that Creditor Klein was awarded 100% ownership interest in Caring

---

[1] If the Court would like this matter or any other matter further briefed, Affiant respectfully requests a scheduling order for the Chapter 7 Trustee and Creditor Klein to submit their respective briefs before the retention of Troutman is decided.

Home Care is binding on Debtor Persaud. "Judicial admissions are 'formal concessions [that are] binding upon the party making them." <u>Maurizio v. Goldsmith</u>, 84 F. Supp.2d 455, 464 (S.D.N.Y.), <u>aff'd</u> 230 F.3d 518 (2d Cir. 2000). ("Formal judicial admissions take the place of evidence and are concessions, for the purpose of the litigation, of the truth of a fact alleged by an adversary.") (<u>D&L Holdings, LLC v. RCG Goldman Co.</u>, 287 A.D.2d 65,72, 734 N.Y.S.2d 25, 31 (1st Dep't 2001), <u>leave to appeal denied,</u> 97 N.Y.2d 611, 742 N.Y.S.2d 604 (2002) ("It is of no moment that the remarks were made by counsel rather than [another party] representative.").

30.    Even if the Chapter 7 Trustee elected and was successful in lifting the automatic stay pursuant to 11 U.S.C § 362,  and thereafter if the Chapter 7 Trustee brought the appeal, at which time Creditor Klein would have the record enlarged[2] to include all of the relevant evidence before the Appellate Division, and even if the Chapter 7 Trustee was successful on the appeal, despite, inter alia, the evidence that the claim of forgery relied on statements by Debtor Persaud that were contradicted by a handwriting expert and the reliance on the sworn affidavit of Samuel Reiff, Esq., which was later recanted at Mr. Reiff's deposition, ultimately, there would be a confirmation hearing which in the normal course of events would reinstate the confirmation of the arbitratral award to the pre-petition date. [3]

31.    Assuming *arguendo* that after protracted and expensive litigation, somehow Creditor Klein's claim was reclassified as unsecured, the Affiant questions who the ultimate

---

[2] The substance of the after-acquired evidence that Creditor Klein would seek to enlarge the record with, as well as the reasons why said enlargement was not sought previously as well as why Creditor Klein feels that the evidence would be outcome determinative are fully set forth in the Motion for Reargument submitted to the Appellate Division Second Department and included herein as <u>Exhibit</u> 6.

[3]  See Fn 2.

beneficiary of this victory would be.

32.    As it currently stands, there are priority claims against Debtor Persaud, as set forth in the Claims Register,[4] in the amount of $399,026.28; there are secured claims against Debtor Persaud totaling $2,19,0148.51,  of which Creditor Klein is listed as having a secured claim of $1,942,469.14; and as such other than Creditor Klein there are secured claims of $247,679.37.  Accordingly, there are a total of $646,705.65 of priority and secured claims other than the claims of Creditor Klein.

33.     Additionally, the unsecured claims listed against Debtor Persaud total $719,702.82, of which Creditor Klein is listed as having an unsecured claim of $662,994.75, and as such other than Creditor Klein there are unsecured claims in the amount of $56.758.07.

34.    Therefore, if Creditor Klein's claim is ultimately upheld as a secured claim, the Chapter 7 Trustee would have to raise $2,589,174.79 (the total of the secured and priority claims listed against Debtor Persaud) plus administrative and legal fees before the unsecured creditors would get any distributions.

35.    In the unlikely event of the Chapter 7 Trustee recovering enough to satisfy all of the priority and secured creditors as well as recover enough to pay for the administrative expenses, the benefit to the unsecured creditors other than Creditor Klein would be less than 8% of the unsecured distribution.

36.    Conversely, in the unlikely event that after protracted and expensive litigation Creditor Klein's claims were deemed to be unsecured, the Chapter 7 Trustee would have to

---

[4] The analysis set forth below is based on an examination of the Claims Register for Debtor Persaud. Furthermore, to the extent that Creditor Wells Fargo Home Mortgage may be able to recover from the Florida property, the total secured claims (other than those of Creditor Klein) would be significantly reduced and the total of the unsecured claims might increase, but these changes would in the Affiants opinion not materially alter the analysis in this affirmation.

recover $646,705.65 plus administrative expenses, before any monies were available to the unsecured creditors and the unsecured creditors other than Creditor Klein would receive a little over 2% of the distribution.

37.     Considering that the Chapter 7 Trustees obligation and mandate is primarily to collect money for the unsecured creditors of the estate, as set forth in In re Balco Equities Ltd., Inc., 323 B.R. 85 (Bankr.S.D.N.Y. 2005) wherein the court notes that, "Although a Chapter 7 trustee is a fiduciary obligated to treat all parties fairly, his primary duty is to the estate's unsecured creditors." (See also In re Ngan Gung Rest., 254 B.R. 566, 570 (Bankr.S.D.N.Y 2000). The obvious conclusion is that by retaining Troutman, or any firm of its size and customary billing rates for this litigation, the retention will ultimately lead to an improvident use of the estates assets.

38.     This assertion is further bolstered by the general rule that the fees incurred by the trustees counsel are administrative expenses enjoying a very high priority such that there is a possibility that any action against Creditor Klein will be to the direct detriment of the secured and priority claims without a corresponding benefit to the unsecured claims because the chances of a recovery are remote. [5]

**There are virtually no claims pursuant to which the Chapter 7 Trustee can recover that would allow for a distribution to the unsecured claims.**

---

[5]  While Creditor Klein's opposition relates to the retention of Troutman, it is significant to note that even if Troutman is retained, the issue of their ability to recover professional fees is subject to the same analysis set forth by Affiant. In assessing the award of professional fees, "courts objectively consider whether the services rendered were reasonably likely to benefit the estate from the perspective of the time when such services were rendered." *In re Value City Holdings, Inc.,* Case No. 08–14197–JMP, 2010 WL 3705285, at *3 (Bankr.S.D.N.Y. Sept.22, 2010), cited to in In re Acme Cake Co., Inc. 08-41965-CEC, 2010 WL 4103761 (Bankr. E.D.N.Y. October 18, 2010).

39.     Based on the various petitions and schedules filed by Debtors Persaud and Liberty with this Court, it appears that the most significant asset of Debtor Persaud was Liberty Home Care, which Chapter 7 Trustee for Debtor Liberty, Mr. O'Connell, explained would reasonably upon liquidation not be able to yield enough money to cover the claims by the secured creditors and therefore he abandoned the asset recognizing that it is not the job of the Chapter 7 trustee to collect money for secured creditors and that by abandoning the asset, he was allowing the secured creditors the ability to collect.

40.     However, Debtor Persaud is subject to an individual Chapter 7 proceeding, the asset that was abandoned, for the benefit of secured creditors, has now become subject to Chapter 7 Trustee for Debtor Persaud, Mr. Pereira's purview. [6]

41.     As set forth in Chapter 7 Trustee for Debtor Liberty Home Care's Response to Object of Abraham Klein to Proposed Abandonment of Debtor's Home Health Care Business dated June 15, 2011,

> "I noted my business judgment that the home health care business was burdensome to the bankruptcy estate and of inconsequential value to the estate. The bases for that business judgment include the fact that, in view of the very substantial secured, administrative and priority tax claims filed in this case, the debtor's home health care business can neither be sold nor operated so as to benefit the bankruptcy estate and its general unsecured creditors."

42.     In a footnote, Mr. O'Connell noted that,

> "…further because a large portion of the assets that comprise the home health care business appear to include cash collateral of the IRS and/or the New York State Department of Taxation, I cannot, consistent with Bankruptcy Code §§ 721 and 363(c) (2), make

---

[6] The question of Debtor Persaud's ownership of Liberty Home Care was never determined, insofar as her sworn affidavit dated April 22, 2010, in the New York Supreme Court, set forth that she did not own Liberty Home Care, her Bankruptcy Petition filed less than one month later, set forth that she is the owner of Liberty Home Care, and her testimony under oath at the 341 Creditors Meeting held on July 13, 2010 was that she was the sole shareholder of Liberty Home Care for a number of years.

application to this Court for leave to operate the debtor's business."

43.    Additionally, Mr. O'Connell opined that,

> "The abandonment of the debtor's health care business will remove most if not all of the obstacles posed to creditors by the automatic stay under Bankruptcy Code 362....the stay of an act against property of the estate....'continues until such property is no longer property of the estate,' and thus will cease to apply with respect to acts against the home health care business once the proposed abandonment is effective."

44.    Based on an examination of Debtor Liberty's secured, administrative and priority tax obligations, Mr. O'Connell asserted that,

> "Even if I were able to sell the business for more than $2,400,000.00 the sale would confer no benefit on the estate and its general unsecured creditors until it yielded at least a further three-quarters of a million dollars, such that administrative and priority claims could be satisfied and some benefit could flow to holders of unsecured claims."

45.    After Mr. O'Connell set forth his position, Creditor Klein withdrew his objection.

46.    Furthermore, if after protracted and expensive litigation Creditor Klein's position was upheld as a secured creditor, there would reasonably be no distribution to the unsecured creditors and even if the Chapter 7 Trustee and Troutman were successful and Creditor Klein's claim was reclassified as unsecured, he would still get approximately 98% of any unsecured creditor distributions to the extent that the distribution was made on a pro rata basis. The other unsecured creditors would in all likelihood receive a *de minimis* amount.

47.    With respect to potential claims that Chapter 7 Trustee could assert on behalf of Debtor Persaud there are similarly no reasonable paths that would yield enough money to make any distribution to the unsecured creditors.

48.     The largest potential claim that Debtor Persaud listed was in her Liberty Home Care Bankruptcy Petition, namely, a potential malpractice claim against Eugene Levy, Esq. for over two-million dollars. One can only assume that this claim would be based on Mr. Levy's culpability in Debtor Persaud's not attending the arbitration or the confirmation hearing. However, at Mr. Levy's deposition, which is still ongoing, when asked with respect to both the arbitration and the confirmation hearing, if it was solely his decision not to attend, he refused to answer the question claiming attorney-client privilege and shortly thereafter asked to adjourn the deposition so that he could consult with his malpractice carrier. If Debtor Persaud instructed Mr. Levy not to attend either the arbitration or the confirmation hearing, one can only wonder how there can be a successful malpractice claim against him. (Attached hereto as <u>Exhibit</u> 7).

49.     With respect to Debtor Persaud's claim that she is owed $900,000 from Caring Home Care, despite the fact that in the almost one year from the filing of her Chapter 11 Proceeding until its conversion, the claim was never pursued which gives some indication as to its validity, the fact is that said claim is clearly contradicted by the arbitration award, which as stated *supra*, Creditor Klein contends that as a matter of law he currently has a confirmed award. In any case it would not yield a meaningful benefit to the unsecured creditors.

50.     One can only wonder where the Chapter 7 Trustee expects to marshall sufficient assets to provide for the secured and priority creditors, the administrative expenses, and still have any money left for a distribution to the unsecured creditors, other than if after protacted litigation they are able to get Creditor Klein's claim reduced to an unsecured claim and after recovering $646,705.65 for the remaining priority and secured claims

and recovering enough for the cost of the administration of the estate and the attendant litigation they would have benefitted the unsecured creditors other than Creditor Klein with approximately 2% of the distribution.

**There is a clear conflict of interest between Creditor Klein and Troutman Sanders LLP**

51.    Pursuant to 11 U.S.C. 327(a), "The trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested person, to represent or assist the trustee in carrying out the trustee's duties under this title."

52.    The Court in In re Angelika Films 57th, Inc., 227 B.R. 29 (Bankr. S.D.N.Y. 1998) aff'd, 246 B.R. 176 (S.D.N.Y. 2000), sets forth the standard for defining the conflict professionals.[7] "The Code defines a 'disinterested person' as one who is not a creditor, equity shareholder, or insider, and who 'does not have an interest materially adverse to the interest of the estate or any class of creditors ...' § 101(14)(A) & (E). The latter portion of the definition ... is sufficiently broad to include *any professional with an 'interest or relationship that would even faintly color the independence and impartial attitude required by the Code*.' " (emphasis added). (See also Kravit, Gass & Weber v. Michel (In re Crivello), 134 F.3d 831, 835 (7th Cir.1998) (citing In re BH & P, Inc., 949 F.2d 1300, 1308 (3d Cir.1991)). Furthermore, the court noted that whether an

_____

[7] While this case refers to the attorneys hired by a debtor in possession, the courts analysis of Section 327(a) applies to professionals hired by the trustee as well.

attorney is disinterested depends on whether that attorney has "an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one." Id. Moreover, a disinterested person, "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." (Id). (See also In re Project Orange Assoc., LLC, 431 BR 363 (Bankr. S.D.N.Y, 2010).

53.    As set forth in Creditor Klein's Affidavit, Creditor Klein, as the owner of Global Realty Ventures, retained the services of Troutman on November 24, 2008. (Klein Affidavit ¶ 3).

54.    According to Creditor Klein, while said representation is currently on hold because of certain economic down-turn, the representation has not been concluded and is still ongoing.

55.    The Affiant notified Mr. Campo in a telephone conversation on August 1, 2011, that a potential conflict existed.

56.    Creditor Klein, sets forth that Troutman may in fact have to investigate the very acts of Creditor Klein for which he has retained their services, or alternatively if Troutman concludes, as Creditor Klein has, that the China issues are not related to the instant matter and that the potential claims raised by Debtor Persaud are without merit, other creditors of Debtor Persaud may feel that the failure of Troutman to investigate the issue was because of their ongoing attorney-client relationship with Creditor Klein. In either case, there is a clear conflict.

57.    The facts presented by Creditor Klein go much further than the standard of a "perception of disinterestedness" as set forth in In re Angelika Films 57th, Inc., 227

B.R. 29, 38 (Bankr. S.D.N.Y. 1998) <u>aff'd,</u> 246 B.R. 176 (S.D.N.Y. 2000), or the standard that the professional "should be divested of any scintilla of personal interest which might be reflected in his decision concerning estate matters." (<u>Id</u>).

58.    In the Chapter 7 Trustee's application set forth that to the extent there is any conflict Pereira & Sinisi would be available to render legal services. The Affiant believes that the potential conflict with Creditor Klein should have been disclosed to the Court and not glossed over in this manner.

59.    Furthermore, the Affiant believes that there is an inherent lack of efficiency and necessary duplication of effort in using two law firms where one law firm without any conflict could be retained. [8]

## **NOTICE**

60.    Creditor Klein has served notice of this motion on the Debtor's counsel, counsel for the Chapter 7 Trustee, the Office of the United States Trustee, and all parties who have requested notice in this case.

## **NO PREVIOUS REQUEST**

61.    No previous relief for the request sought in this motion has been made by Creditor Klein to this or any other court of competent jurisdiction.

---

[8] Affiant understands Trustee Pereira and Mr. Campo enjoy a very good working relationship as of the approximately twenty-one reported cases for Trustee Pereira, Mr. Campo was the chosen counsel. However, a good working relationship is not sufficient to allow a law firm that is even potentially conflicted.

**WHEREFORE**, Creditor Klein respectfully requests that the Chapter 7 Trustee's application be denied, together such other and further relief that the Court deems just and proper.

Dated: Brooklyn, New York.
August 15, 2011

MENDEL ZILBERBERG & ASSOCIATES, P.C.
*Attorneys for Creditor Abraham Klein*

By:    s/ Mendel Zilberberg
Mendel Zilberberg (MZ-6625)
6619 Thirteenth Avenue
Brooklyn, New York 11219
Telephone (718) 256-2000
Facsimile (718) 256-7900
Email: mz@amalgamail.com

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

    *In re:*

        CHRISTINE PERSAUD,

                                Debtor.

        Chapter 7

        Case No: 10-44815-ess

-------------------------------------------------------------x

**CREDITOR ABRAHAM KLEIN'S OBJECTIONS**
**TO THE APPLICATION BY THE CHAPTER 7 TRUSTEE AUTHORIZING**
**RETENTION OF TROUTMAN SANDERS LLP AS SUBSTITUTE GENERAL**
**TO THE CHAPTER 7 TRUSTEE**

# EXHIBITS 1 - 7

**\*\*\*Please be advised that**
**the exhibits are available upon request\*\*\***

**MENDEL ZILBERBERG & ASSOCIATES, P.C.**
*Attorneys for Creditor Abraham Klein*

6619 Thirteenth Avenue
Brooklyn, New York 11219
Telephone (718) 256-2000

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re:                                                            Chapter 7
                                                                  Case No: 10-44815

     CHRISTINE PERSAUD,
                                                                  **AFFIDAVIT OF**
                                                                  **CREDITOR KLEIN**

             Debtor.
-----------------------------------------------------------x

     Abraham Klein, an Orthodox Jew, for religious reasons hereby affirms the following under penalties of perjury:

1.     I am a Creditor of Debtor Christine Persaud, and unless stated otherwise, I have personal knowledge of the facts set forth herein.

2.     I submit this Affidavit in opposition to the retention of Troutman Sanders, LLP as substitute general and bankruptcy counsel for the Chapter 7 Trustee.

3.     On or about November 24, 2008 I retained the law firm of Troutman Sanders LLP to provide legal services to me in connection with a proposed real estate project named as Global Realty Ventures. (Attached hereto as Exhibit 1 is the retainer).

4.     I am the Owner of Global Realty Ventures.

5.     I have had numerous communications with Troutman Sanders, LLP in conjunction with my retention of the firm.

6.     My primary point of contact at Troutman Sanders LLP was Aurora Cassirer, Esq. who I believe is the managing partner of the Troutman Sanders LLP New York office.

7.     While the actual work on the China project has been temporarily suspended because of the economic downturn, etc., the representation by Troutman Sanders

LLP is still ongoing. (Attached hereto as <u>Exhibit</u> 2 is correspondence between Troutman Sanders LLP, Knight Frank, and myself).

8.  In addition, at a certain point in dealing with Christine Persaud, prior to the arbitration, I approached Christine Persaud to obtain her agreement to allow me to attempt to secure favorable financing for the benefit of Caring Home Care, in conjunction with my attempt to finance the China deal, this offer was rejected by Christine Persaud's attorney, Samuel Reiff, Esq. (Attached hereto as <u>Exhibit</u> 3).

9.  In a sworn affidavit made by Christine Persaud to the Supreme Court of the County of Kings dated April 21, 2009, Ms. Persaud swore that, "That it has only recently come to my attention through a forensic accountant that Mr. Klein and his agents have misappropriated hundreds of thousands of dollars from the account of 'Caring' to a company owned by Mr. Klein known as Trade Fame Group Ltd. Without my knowledge permission or authority. The reports giving these findings can be presented to the court at a hearing to dismiss the 'arbitrators' award." (Attached hereto as <u>Exhibit</u> 4).

10. Trade Fame Group Ltd., is an entity related to my dealings in China.

11. I am concerned and believe that Troutman Sanders, LLP should not be approved as the Chapter 7 Trustee's counsel for a number of reasons.

    a.  It appears that they will be initiating litigation against me while at the same time representing my interests;

    b.  Because the point person on my China representation, Aurora Cassirer, Esq., is the managing partner of the New York office, I believe that she

will be involved at some level with the representation of the Chapter 7

Trustee in the instant action;

c. As my interests in China intersected with my interests in Caring Home

Care, in the attempt to arrange for financing, and Christine Persaud raised

certain allegations, which I deny, it is reasonable to assume that there is a

possibility that Troutman Sanders LLP will, on behalf of the Chapter 7

Trustee investigate and/or litigate matters, the very same matters for which

I have retained them to represent me;

d. Conversely, if they choose not to investigate the China matters, as I

believe there is no basis for Christine Persaud's allegations, other creditors

of Debtor Persaud may feel that the reason the China issues were not

investigated was because of Troutman Sanders. LLP's loyalty to me as a

client.

12.    For the foregoing reasons I believe that Troutman Sanders, LLP should not be

approved as counsel for the Chapter 7 Trustee.

WHEREFORE, I respectfully request that this Court deny the Chapter 7 Trustee's Application for an Order Authorizing Retention of Troutman Sanders LLP as Substitute General and Bankruptcy Counsel for the Chapter 7 Trustee.

Dated: Brooklyn, New York

August 15, 2011

Abraham Klein

Affirmed before me this
15th date of August 2011

Notary Public

MORDECHAI FREUND
Notary Public State of New York
No. 01FR6098424
Qualified in Kings County
My Commission Expires Sept 8, 2011

Exhibit 1

# TROUTMAN SANDERS LLP

### A T T O R N E Y S    A T    L A W
#### A LIMITED LIABILITY PARTNERSHIP

BANK OF AMERICA PLAZA
600 PEACHTREE STREET, N.E. - SUITE 5200
ATLANTA, GEORGIA 30308-2216
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Edward Epstein
edward.epstein@troutmansanders.com

Direct Dial:  +86-21-6133-8998
Direct Fax:  +86-21-6137-8998

November 24, 2008

Mr. Abraham Klein
1260 57th Street,
Brooklyn, NY 11219,
USA

Dear Abe,

**RE:**    **Engagement of Troutman Sanders LLP by**
**Global Realty Ventures ("GRV")**
**Retainer Letter –**
**Project Juancheng**

This letter will confirm our agreement for the provision of legal services by Troutman Sanders LLP (the "**Firm**") to you and secure your approval of the fee arrangement and other conditions of our representation.    We are very pleased that you have retained us and will, of course, answer any specific questions that you may have about these arrangements.

1.    <u>Scope of Legal Services</u>

The Firm has been retained by you to provide legal services in connection with your proposed investment in a real estate project in Juancheng, Shandong Province (the "Project"), such representation may include:

(a)    preliminary due diligence on the Project and the Chinese party that you are going to cooperate with, including but not limited to:

■    a site visit, inspection of the land of the Project;

■    reviewing all documents relevant to the Project and the Chinese party that are available to us;

■    arranging local agent(s) to make independent searches for all information of the Project and the Chinese party that are publicly accessible; and

■    preparing a preliminary due diligence report and legal advice.

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 2 of 7

(b)    advising on the feasibility of the Project under PRC laws;

(c)    preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;

(d)    assisting in forming the joint venture and obtaining all necessary licenses and permits; and

(e)    other matters ancillary to the above.

2.    <u>Fees and Payment Provisions</u>

The Firm's fees will be charged on an hourly basis for all time actually expended, and will be billed monthly. The hourly rates assigned to the attorneys in our Firm will vary according to the level of experience and expertise of the attorney. The work will be primarily handled by our commercial attorneys in our Representative Office in Shanghai, under my supervision; and assisted by our colleagues in US (if necessary). Set forth below are the 2008 rates for various levels of timekeepers who will be responsible for assisting the Target with its legal affairs in China:

| Position | 2008 RMB Rate |
|---|---|
| Partner | ¥4,000 - ¥5,500 |
| Associate | ¥2,800 - ¥3,500 |
| Senior Legal Consultant | ¥2,200 - ¥2,800 |
| Legal Consultant | ¥1,600 - ¥1,800 |
| Legal Assistant/Paralegal | ¥1,100 - ¥1,200 |
| Legal Translator | ¥950 - ¥1,100 |

We would recommend a budget of between USD 25,000 and USD 35,000 for our fees for

50217-1                                    2

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 3 of 7

services to GRV for the Project set out in 1.(a) and (b) above, and these fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of USD 2,000 to USD 5,000), travel to and accommodation in Juancheng (estimated to be in the range of USD 600 to USD 1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into English (which will be quoted separately if required).

We would recommend a budget of between USD 100,000 and USD 150,000 for our fees for services to GRV for the Project set out in 1.(c) and 1. (d) above, and these fees will also not include any government fees, local agent's fees, travel to and accommodation in Juancheng or other places, or translation of any government documents into English.

The fees for the Project are based on the current state of law and policy and local practices in China, which are liable to change quickly and without prior notice. If the services we have undertaken to supply based on this estimate become impossible, more difficult or expensive due to changes in law, policy or practices, we will inform you. You will have the option to terminate our services based on the work already completed on a time-cost basis at our current billing rates (not to exceed the quoted fee) or to request us to provide additional services based on what is required by the changes in the law, policy and/or practices. If we agree to provide such services, and we shall be under no obligation to do so, we shall provide such additional services on a time cost basis at our current billing rates or on an agreed fee basis. Additional government fees, agent's fees and disbursements shall be billed and paid by you separately. Where such additional services are required in these circumstances, we do not guarantee an outcome within a specific time frame, or that the outcome will be successful at all. In such circumstances, you shall be entitled to terminate such additional services at any time with prior written notice and your liability for fees will be limited to the time-costs incurred by us in providing the additional services to you at our current billing rates up to the date you notify us in writing, as well as any applicable government fees, agent's fees and disbursements incurred as of such date of notice.

You will find that our rates are quite competitive in this market.  Hourly rates are reviewed and, when appropriate, adjusted to reflect increases in seniority and experience as well as inflationary factors. Such increases are ordinarily made on an annual basis, effective as of the beginning of each calendar year. We do not generally send any notice of a change in hourly rates.

You will be responsible for reimbursement of costs incurred on its behalf and invoiced to the Firm by third parties. Costs billed to the Firm by parties who supply goods or services related to our work on your behalf will be billed to you at the actual out-of-pocket cost

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 4 of 7

that the Firm pays to the third party on your behalf. We will use our best professional judgment in determining when to seek your permission prior to incurring expenses with third parties. You will not be billed for any internal Firm costs incurred on your behalf, such as telephone (including long distance charges), telecopy charges, word processing, secretarial overtime, firm couriers, postage (including FedEx, UPS or similar overnight delivery services), printing and photocopying performed in-house, and access to computer legal research.

We will bill you on a monthly basis for both fees and disbursements with the understanding that the bills will be paid in full upon receipt.  Unless otherwise agreed, our billing statements will contain an itemized description of the services rendered and costs invoiced to us during the period covered by the statement.

You may pay us in China in RMB in which case we will add any local taxes (including business tax) to the billed amount to be paid by you and we will issue you a local tax invoice (fapiao). If you choose to pay us in the United States, we expect payment of the full amount billed in US dollars at the exchange rate prevailing at the time of payment in available currency.

Please review our bills carefully when rendered.  You agree that all questions and disputes will be brought to our attention promptly so that they can be addressed and resolved to our mutual satisfaction. Billing mistakes may occur on occasion, and we will be pleased to correct any that you might identify. Please feel free to discuss with me any questions regarding our statements.

3.    Conflict Provisions

Our Firm's policies and applicable professional rules of conduct concerning conflicts of interest are designed to protect the confidences, rights and interests of our clients, while permitting the Firm to advise and represent many different people and organizations.   In order to assure that you and the Firm have the same understanding of the effects of our engagement concerning potential conflicts of interest, we include below relevant considerations and understandings.

As we have discussed, neither you nor this Firm is aware of any actual conflict of interest in our representing the Target at this time. Our Firm is, however, a large one with offices in more than one location, and we represent many other companies and individuals, some of whom we have represented for many years in connection with a great variety of matters. As with your engagement of the Firm in this matter, our ongoing relationships with those clients are important to us and to them. It is possible that some of our present

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 5 of 7

or future clients will have disputes or transactions with you during the time that we are representing you. You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse including, for example, representing adverse parties in litigation, arbitration, or other forms of dispute resolution. We agree, however, that your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a non-public nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage, unless we have screened our lawyers, paralegals and staff who have such information from any involvement in the adverse representation.

For the purposes of determining whether a conflict of interest exists, it is only GRV we will represent and not other entities in your corporate family, stockholders, officers, directors, employees or agents ("**affiliates**"). You have agreed that you will not give us confidential information regarding your affiliates. While we recognize that to act adversely to any affiliate could jeopardize your continuing engagement of the Firm to handle matters on your behalf, which we would naturally be reluctant to see happen, for conflict of interest purposes, we reserve the right to represent another client with interests adverse to any affiliate without obtaining consent from you or your affiliates.

4.    Termination of Engagement

Upon our completion of the services for which you have engaged us, our attorney-client relationship will be terminated. If you should thereafter engage us to perform further or additional services, our attorney-client relationship will be revived, subject to these and any supplemental terms of engagement. Further, either of us may terminate the engagement at any time for any reason by written notice, subject on our part to applicable Rules of Professional Conduct. In the event that we terminate the engagement, we will take such steps as are reasonably practicable to protect your interests in the above matter.

You are engaging the Firm to provide legal services in connection with a special matter. After completion of the matter, changes may occur in the applicable laws or regulations that could have an impact on your future rights and liabilities. Unless you engage us to provide additional advice, the Firm has no continuing obligation to advise you with respect to future legal developments. Further, the fact that we may inform you from time to time of developments in the law which may be of interest to you, by newsletter or otherwise, should not be understood as a revival of an attorney-client relationship. Moreover, we have no obligation to inform you of such developments in the law unless

50217-1                                          5

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 6 of 7

we are engaged in writing to do so.

Except to the extent other arrangements are specifically made for this matter, our document retention practice will be as follows:    We will retain your papers and property provided to us until termination of this engagement.    Following termination of the engagement, we will return those of your papers and property which you may request within thirty (30) days of termination.    With respect to all other material, including documents and data created by us and received from others, we reserve the right to retain or dispose of such material as we determine appropriate.

5.    PRC Legal Opinions, Certifications and Representation in Proceedings

In common with all foreign law firms licensed in China, we are permitted to provide information on the influence of the PRC legal environment and we do so only in our capacity as international, multi-jurisdictional lawyers experienced in international business transactions. If you require a formal PRC legal opinion or certification on a specific application of PRC law to conduct or events, we shall be pleased to refer you to any one of the several PRC law firms who work with us for this purpose or engage one on your behalf. We will provide you with our specialist understanding of the relevant law and wealth of our experience in representing foreign companies in China. However, as PRC law is still in a state of evolution and because of the highly regulated nature of the Chinese system of foreign investment, our views may require confirmation from the relevant PRC authorities. In common with all foreign law firms licensed in China, we are required by law to inform you that we are not permitted to engage in Chinese legal business and although some of our employees may have PRC lawyer qualifications they cannot practice as licensed PRC lawyers.

Although it is possible for us to represent you as an agent *ad litem* in a Chinese litigation, because of the nature of the Chinese civil process we always work together with PRC lawyers in litigation involving our clients in China. In Chinese international arbitration proceedings, however, we can and do represent our clients without the participation of a PRC law firm.

6.    Acceptance

This letter constitutes the entire understanding between you and Troutman Sanders LLP with respect to this matter and supersedes all prior understandings, written or oral, as to its subject matter. Any change must be made or confirmed in writing. If this letter correctly reflects your understanding of the terms and conditions of our engagement, we request that you have an appropriate authorized officer of the corporation indicate its consent by having the duplicate originals of this letter executed in the space provided

50217-1                                    6

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 7 of 7

below. You should retain one of these duplicate originals for your records and return the other to me for our records.

We look forward to working with you. I hope that you will let me know if at any time you feel that the service we are rendering or the manner or promptness with which we are responding to your requests for service can be improved. On behalf of Troutman Sanders LLP, I want to sincerely thank you for the opportunity to be of service.

Very truly yours,

TROUTMAN SANDERS LLP

By: _____

Edward J. Epstein

**Global Realty Ventures**    agrees to the foregoing terms

_____

Date:

# TROUTMAN SANDERS LLP

**Payment Remittance Address**
Troutman Sanders LLP
P.O. Box 933652
Atlanta, Georgia 31193-3652

ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP
FEDERAL ID NO. 58-0946915

**Office Address**
23rd Floor, Citic Square
1168 Nanjing West Rd
Shanghai 200041
CHINA

BILLING INQUIRIES:
LOCAL 86-21-6133-8989
USA (404) 885-2508

Global Realty Ventures
Attn: Abraham Klein
1260 57th Street
Brooklyn, NY 11219

| | |
|---|---|
| Invoice Date | 10 December 2008 |
| Submitted by | E Epstein |
| Direct Dial | 404-885-2646 |
| Invoice No. | 957931 |
| File No. | 234545.000001 |

RE:    **Project Juan Cheng**

Fees for Professional Services Rendered Through 11/30/08                    $10,573.50

**Total Amount of This Invoice**      **$10,573.50**

## Troutman Sanders Operating Account Wire Instructions

**For Payments Made inside USA**
Beneficiary's Name:        Troutman Sanders LLP
Bank's Address:            600 Peachtree Street
                           Atlanta, Georgia 30308
Bank Name:                 Wachovia
Bank Address:              999 Peachtree Street
                           Atlanta Georgia 30309
Account Number:            2052700305792
ABA Number:                061000227
Reference Attorney:        Epstein
Reference Client:          234545

**For Payments Made outside USA**
Beneficiary's Name:        Troutman Sanders LLP
Bank's Address:            600 Peachtree Street
                           Atlanta, Georgia 30308
Bank Name:                 Wachovia
Bank Address:              999 Peachtree Street
                           Atlanta Georgia 30309
Account Number:            2052700305792
Swift Address/Code:        PNBP US 33
Reference Attorney:        Epstein
Reference Client:          234545

# TROUTMAN SANDERS LLP

|  | ATTORNEYS AT LAW | |
|---|---|---|
| **Payment Remittance Address** | A LIMITED LIABILITY PARTNERSHIP | **Office Address** |
| Troutman Sanders LLP | FEDERAL ID NO. 58-0946915 | 23rd Floor, Citic Square |
| P.O. Box 933652 | | 1168 Nanjing West Rd |
| Atlanta, Georgia 31193-3652 | | Shanghai 200041 |
| | | CHINA |

BILLING INQUIRIES:
LOCAL 86-21-6133-8989
USA (404) 885-2508

| | | |
|---|---|---|
| Global Realty Ventures | Invoice Date | 15 January 2009 |
| Attn: Abraham Klein | Submitted by | E Epstein |
| 1260 57th Street | Direct Dial | 404-885-2646 |
| Brooklyn, NY 11219 | Invoice No. | 964438 |
| | File No. | 234545.000001 |

RE:    **Project Juan Cheng**

| | |
|---|---|
| Fees for Professional Services Rendered Through 12/31/08 | $6,075.50 |
| Costs and Expenses Through 12/31/08 | $292.80 |
| **Total Amount of This Invoice** | **$6,368.30** |

## Troutman Sanders Operating Account Wire Instructions

**For Payments Made inside USA**

| | |
|---|---|
| Beneficiary's Name: | Troutman Sanders LLP |
| Bank's Address: | 600 Peachtree Street |
| | Atlanta, Georgia 30308 |
| Bank Name: | Wachovia |
| Bank Address: | 999 Peachtree Street |
| | Atlanta Georgia 30309 |
| Account Number: | 2052700305792 |
| ABA Number: | 061000227 |
| Reference Attorney: | Epstein |
| Reference Client: | 234545 |

**For Payments Made outside USA**

| | |
|---|---|
| Beneficiary's Name: | Troutman Sanders LLP |
| Bank's Address: | 600 Peachtree Street |
| | Atlanta, Georgia 30308 |
| Bank Name: | Wachovia |
| Bank Address: | 999 Peachtree Street |
| | Atlanta Georgia 30309 |
| Account Number: | 2052700305792 |
| Swift Address/Code: | PNBP US 33 |
| Reference Attorney: | Epstein |
| Reference Client: | 234545 |

Exhibit 2

| From: | Epstein, Edward J. |
|---|---|
| To: | abe@flexocraft.com |
| Cc: | hershel@flexocraft.com; Cassirer, Aurora |
| Subject: | Heze Project |
| Date: | Friday, August 01, 2008 7:42:43 AM |
| Attachments: | company brochure.pdf |
| | Shandong (2.62 MB).msg |
| | Master Case Studies China Focus 20071212 small (NXPowerLite).pdf |
| | Real Estate Experience in Mainland China Brochure.pdf |

<<company brochure.pdf>> <<Shandong>> <<Master Case Studies China Focus 20071212 small (NXPowerLite).pdf>> <<Real Estate Exoerience in Mainland China Brochure.pdf>>

Dear Abe:

It was very nice to talk to you and Hershel yesterday about the real estate project in Heze Shandong China, which you may be interested in pursuing, subject to preliminiary due diligence into the land development issues and pricing.

Real estate M&A and financing are key areas of our practice in Shanghai. I have attached a brochure which sets out our capability in this area and representative transactions.

I have also spoken to Knight Frank, which is one of the international real estate consultancies we work with in China on real estate valuations and project assessments. I have also attached their particulars and recommend that you work with them on assessing the project. They can offer a range of services in this regard but it seems from our call that at this preliminary stage you would only need them to send a team to Heze backed by office based researchers. This team would discreetly collect information on the proposed masterplanning for the area, recent land sales, comparable property transactions and the general development environment. The deliverables would be a summary of this information together with a commentary on the overall viability of the project. Their fees for this service would be RMB40,000 ($6,000 approx.) plus RMB10,000 in expenses ($1,500 approx.) The can also deliver you a comprehensive project analysis, the details and fees for which are set out in the attached e-mail from Andrew Slevin, who is the Managing Director of their Shanghai office. I have also attached Knight Frank China's company brochure and a slide presentation on their methodology in China.

As for the legal due diligence, we estimate that our fees for a preliminary legal due diligence into the site at Heze and advice on the feasibility of the project as proposed by your potential joint venture partner will be in the range of $25,000 to $35,000. Our fees will include a site visit, inspection of Heze government land and planning records, review of current ownership records and records of existing corporate owners (if any), preparation of a preliminary due diligence report and legal advice. These fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of $2,000 to $5,000), travel and accommodation to Heze (estimated to be in the range of $600 to $1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into Chinese (which will be quoted separately if required).

Therefore, including Knight Frank's report, we would recommend that you budget between $45,000 to $50,000 to determine the feasibility of the Heze project. We realize that this budget is considerably higher than you might budget for a similar project in the US but as you have considerable experience in doing business in China, you will appreciate that China

is far less transparent and its legal system is still developing so that these tasks all require a higher level of difficulty in China than in the US.

Please let us know if you would like to proceed on this basis

Best regards.

Edward

_____

**Edward J. Epstein** | Managing Partner, Shanghai | **Troutman Sanders LLP** | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

_____

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited

| | |
|---|---|
| **From:** | Abe |
| **To:** | "Ken Yip" |
| **Subject:** | RE: Shandong Juancheng Investment |
| **Date:** | Friday, March 06, 2009 9:45:14 AM |

I met Mr. Zhang in the USA two weeks ago, and basically, it's on hold now, due to the economic turmoil in the world, just to play safe

---

**From:** Ken Yip [mailto:ken.yip@cn.knightfrank.com]
**Sent:** Friday, March 06, 2009 3:57 AM
**To:** abe@flexocraft.com
**Subject:** RE: Shandong Juancheng Investment

Dear Abe,

Haven't spoken to you for a while, how is your project with SIG progressing along?

Regards,
Ken Yip

---

**From:** abe@flexocraft.com [mailto:abe@flexocraft.com]
**Sent:** 2008年12月8日 10:38
**To:** Ken Yip
**Subject:** Re: Shandong Juancheng Investment

Finishing off the LOI, and then you are good to go, few more days

---

From: Ken Yip
Date: Mon, 8 Dec 2008 09:47:10 +0800
To: <abe@flexocraft.com>
Subject: Shandong Juancheng Investment
Hi Abe,

We haven't heard from you for a while. How is the project progressing at your end?

Regards,
Ken Yip
Senior Manager APIA
Professional Services

Knight Frank
Unit 1208,Evergo Tower, 1325 Middle Huai Hai Road
Shanghai 200031, PRC
Tel: +86 21 6445 9968 ext 839
Fax: + 86 21 6445 9965
Mobile: 159 2125 1735
www.knightfrank.com.cn

Click here to download our research reports.
Check with Knight Frank before distributing.
Please consider the environment before printing this email.

| | |
|---|---|
| **From:** | Ken Yip |
| **To:** | abe@flexocraft.com |
| **Cc:** | "Andrew Slevin"; kevin.yuan@cn.knightfrank.com |
| **Subject:** | RE: Juancheng Project |
| **Date:** | Friday, November 28, 2008 3:48:10 AM |

Unfortunately I will be in Suzhou tomorrow for work. However, do keep us in the loop with the result of that meeting.

Thanks and regards,
Ken Yip
Senior Manager APIA
Professional Services

Knight Frank
Unit 1208, Evergo Tower, 1325 Middle Huai Hai Road
Shanghai 200031, PRC
Tel: +86 21 6445 9968 ext 839
Fax: + 86 21 6445 9965
Mobile: 159 2125 1735
www.knightfrank.com.cn

Click here to download our research reports.
Check with Knight Frank before distributing.
Please consider the environment before printing this email.

---

**From:** abe@flexocraft.com [mailto:abe@flexocraft.com]
**Sent:** 2008年11月28日 16:39
**To:** Ken Yip
**Subject:** Re: Juancheng Project

Just the I was going to write an email to.

The people from Troutman Sanders, and me will have a meeting with Mr. Zhang on Monday afternoon in Jinan. This meeting was just confirmed a few minutes ago. I set it up, since I am china now, and can hopefully get through the legal framework while here, rather that the email sessions that has been going on for the last two weeks.

I was going to write to you if you fell it would be beneficial to join in the meeting, so as to be able to have. Clear understanding of what is being covered, and therefore help in your DD going forward.

We are trying to create the framework of the deal, which will be the basis of the legal DD, which might effect the financial part as well. And based on this framework if as we hope it makes legal sense, we will have you continue with all that in mind.

The meeting will be in Jinan Crown Plaza at 2pm monday.

Regards
Abe

---

From: Ken Yip <ken. yip@cn. knightfrank. com>

| | |
|---|---|
| **From:** | Wang, Tian |
| **To:** | abe@flexocraft.com |
| **Cc:** | Epstein, Edward J.; Wang, Tian |
| **Subject:** | RE: Project Juancheng-Letter of Intent-EN (3) |
| **Date:** | Wednesday, December 31, 2008 2:32:40 AM |

Abe,

I called Mr. Zhang early this afternoon but he did not answer the phone, so I called Ms. Wang. Ms. Wang told me that they are basically fine with the LOI, but Mr. Zhang wants to hold up this deal for another two or three months due to the current economic downturn. We agreed to pass this information along to you.

Please let us know if you need us to do anything.

Regards.

---

Tian Wang | Legal Consultant | **Troutman Sanders LLP** | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8955 | Fax: +86-21-6137-8188

> -----Original Message-----
> **From:** Abe [mailto:abe@flexocraft.com]
> **Sent:** Wednesday, December 31, 2008 4:19 AM
> **To:** Wang, Tian
> **Cc:** Epstein, Edward J.
> **Subject:** RE: Project Juancheng-Letter of Intent-EN (3)
>
> OK, Thanks, please explain to him, that we are trying to have this complete so as to be able to give this framework to Knight Frank, so that they should be able to right away resume their work and complete their DD, so we should not hold anything up.
>
> **From:** Wang, Tian [mailto:Tian.Wang@troutmansanders.com]
> **Sent:** Tuesday, December 30, 2008 4:54 AM
> **To:** abe@flexocraft.com
> **Cc:** Epstein, Edward J.; Wang, Tian
> **Subject:** RE: Project Juancheng-Letter of Intent-EN (3)
>
> Abe,
>
> I talked to Mr. Zhang this afternoon, and he promised to review the LOI and get back to me as soon as possible. I will call him to check the status tomorrow if I did not receive any response by today.
>
> Regards.

---

Tian Wang | Legal Consultant | **Troutman Sanders LLP** | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai

| From: | Ken Yip |
|---|---|
| To: | abe@flexocraft.com |
| Subject: | RE: Contact mr zhang |
| Date: | Monday, February 02, 2009 10:56:32 PM |

hi abe, happy new year to you.

we spoke to Mr Zhang yesterday, he reckons that he needs 2 to 3 more months to observe the market before he moves further to the next step. He said that since he has good support/relationship from the government, he is in no hurry to rush into this project and would rather not make a rash decision.

for your info, i think he is flying to america today.

Regards,
Ken Yip

-----Original Message-----
From: Abe [mailto:abe@flexocraft.com]
Sent: 2009年2月3日 11:34
To: Ken Yip
Subject: Contact mr zhang

Ken, happy new year.

Did you ever contact Mr. Zhang before CNY? Any response?


This email is sent on behalf of Knight Frank.  Any files transmitted are intended solely for the use of the individual or entity to whom they are addressed.  The contents are confidential and may be legally privileged.

Any unauthorised access, disclosure, use or copying is strictly prohibited and may be unlawful.  If you have received this email in error, please notify the originator. For more information about Knight Frank, please visit www.knightfrank.com.

PRIVACY: It may be necessary to monitor emails sent and/or received through the Knight Frank mail servers to ensure their efficient operation.

| | |
|---|---|
| **From:** | Cassirer, Aurora |
| **To:** | abe@flexocraft.com; hershel@flexocraft.com |
| **Subject:** | Re: |
| **Date:** | Wednesday, July 30, 2008 9:04:41 PM |

I have asked my partner Edward Klein to get back to me as soon as possible. I will let you know as soon as I hear from him. R
------------------------
Sent from my BlackBerry Wireless Handheld

**From:** Abe
**To:** 'Hershel Klein' ; Cassirer, Aurora
**Sent:** Wed Jul 30 20:32:54 2008
**Subject:** RE:

Land purchase is 150mm, it shows in the excel sheet as 120mm, and there is a reason. But the contract calls for 150mm

**From:** Hershel Klein [mailto:hershel@flexocraft.com]
**Sent:** Wednesday, July 30, 2008 5:42 PM
**To:** 'Cassirer, Aurora'
**Cc:** abe@flexocraft.com
**Subject:**

Aurora,

Please see attached docs.

Highlights of project;

City gives the land – 710,000 sq meters and we need to pay 150,000,000 RMB
we need to pay relocate residents and demolish for a total of 260,000,000 RMB
total construction costs is 458,000,000 RMB
Total cost 838,000,000 rmb

Total revenue from selling apartments/shops is 1,302,000,000 rmb
Government pays us back 150,000,000 rmb for infrastructure
Total revenue 1,452,000,000 rmb

Total cost to invest is 100,000,000 rmb
Mr Zheng (Chinese guy) is looking for us to invest 40% and get 40% of the profit and he will invest 60% and get 60% of the profit

Mr Zheng claims that project will pre-sell and therefore only 100,000,000 rmb is needed to take this project to completion
Mr Zheng claims that we can force the residents to relocate for a cost included in excel sheet
Mr Zheng claims that the total cost and sell numbers are accurate based on current market conditions and demand

We need Due diligence to be done to verify **all** the expense and revenue numbers are accurate
We need due diligence to be done to verify that all the logistical things are correct that all the details that need to happen to make this project happen in reality actually can happen.
And last but not least we will need the legal structure to be set up in a way that it will work and have everybody protected.

Best regards,
Hershel

~~~~~~~~~~~~~~~~~~~~
*Hershel Klein*
*Flexo Craft Prints*
*1000 First St.*
*Harrison NJ 07029*
*800-785-2737 ext 125*
*Fax: 973-482-9574*
*Private Fax: 800-599-2334*
~~~~~~~~~~~~~~~~~~

---

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.



**EXHIBIT 3**

**From:**      Sam Rieff
**To:**        abe@flexocraft.com
**Subject:**   [SPAM] RE: Bank line
**Date:**      Tuesday, September 16, 2008 2:58:43 PM

Abe,   To use the vernacular: "It ain't happening."

Sam

_____

From: abe@flexocraft.com
To: samrieff@hotmail.com
Subject: Bank line
Date: Tue, 16 Sep 2008 14:40:51 -0400

Hi Sam

No wanting to bother you with many phone calls, I figured to just write a quick note.

Any updates? Can we make something happen?

Thanks

Abe

_____

Get more out of the Web. Learn 10 hidden secrets of Windows Live. Learn Now
<http://windowslive.com/connect/post/jamiethomson.spaces.live.com-Blog-
cns!550F681DAD532637!5295.entry?ocid=TXT_TAGLM_WL_getmore_092008>

| | |
|---|---|
| **From:** | Abe |
| **To:** | "samrieff@hotmail.com" |
| **Subject:** | Bank line |
| **Date:** | Thursday, September 11, 2008 3:41:45 PM |

Sam

It was nice talking to you.

I will explain the deal we discussed on the phone as brief as possible.

When Christine & I joined as partners in May of 07, Caring did just about 3 million a year (pro-rated).
12 months later, Caring did over 5 Million
As of August, Caring is did 6.5 Million, and growing.
At growth rate I figure Caring will be doing a minimum of 12 Million by May 09.

Not bad at all.

As of today I have over 1.5 million in cash in the company, which means that according to our growth rate, we will need to have at least 3 million by the time we reach  12 million in billing, which I expect to be happening before April 09. Now with the addition of JCAHO accreditation, it would make it possible to accelerate the growth with new opportunities.

 Needless to say, to do all this we will need more $$$$$ in the company.

Therefore, I am working to get a line of credit with extremely favorable rates to help caring grow. After all research, a line of credit seems to be the most economic way to go, as we can use it only as needed, therefore reducing unnecessary interest payments, which I am responsible for.

I now have an opportunity with a bank, (actually favorable offers from two), that because of other business I have, will make money available for Caring to sustain the continuous growth.

The calculation of 12% on the document is as follows;
The 1.5 million is made up of the actual cash I deposited into the company, as well as the reinvestment of any revenues derived from it. This amounts to close to 13% of gross. This percentage will go up as the business grows, therefore causing the overhead (which I pay) to go down as a percentage, by amortizing it over  more billing.

In  order to make sure that this document for the purpose we need it, does not in anyway leverage anything but only my equity, I lowered the percentage to only 12%.

This is somewhat time sensitive, and to make this all happen, I need to get the document signed after you go over it with Christine.

The sooner this is done the sooner I can move ahead to the next step with the bank.

Exhibit 4

**EXHIBIT 4**

SUPREME COURT OF THE STATE OF NEW YORK    Index No. 8007/09
COUNTY OF KINGS
_____X

In the Matter of the
Arbitration of
ABRAHAM KLEIN,

              Plaintiff,

           v.

CHRISTINE PERSAUD and CARING
HOME CARE AGENCY

             Defendant,
_____X

AFFIDAVIT IN SUPPORT OF
AN ORDER TO SHOW CAUSE
To   Vacate a Default
Judgment

State of New York,
County of Queens ss.:

CHRISTINE PERSAUD, being duly sworn, deposes and says:

1. I am the defendant in the above matter , sole owner of Caring Home Care Agency and I am making this affidavit in support of the Order to Show Cause to vacate a default judgment in this case.

2. 1 did not appear on April 17,2009 because of the following reasons:

    a.  My attorney Mr. Levy advised me that his office had contacted this court with regard to a scheduling conflict he had with another matter also scheduled for the same date and time and been advised that the matter would be adjourned to June 19,2009.

    b.  My attorney advised me that his office had contacted Mr. Klein's attorney Mendel Zilberberg and advised them by leaving several messages on their voice mail of his scheduling conflict. That he had served an Affirmation of Engagement on Mr. Klein's attorney giving several dates for the adjournment with an affidavit of service provided to this court

    c.  I was told that the Court granted a judgment on default.

       I am requesting that the Court vacate this default judgment to prevent a fraud being

       perpetrated by the Petitioner Abraham Klein and his associates.

3.  I have the following meritorious defenses:

    a. The agreements put forth by Mr. Abraham Klein were not signed by me and on April

      19, 2009, I received a report from ALR Forensic Document Solutions verifying that

      fact. (See Exhibit __A__ )

    b. The very basis of the underlying action is based on this fraud.

    c. Caring Home Care Agency, is licensed by the State of New York and I am the only

      person who has been authorized to own and operate this home health care agency.

    d. The Petitioner and his agents have never applied for or received clearance from the

      New York State Department of Health to own any interest in Caring Home Care Agency.

    e. Without such approvals the Petitioner and his agents cannot own operate or have

      control over a company whose mission is the care of the elderly and infirm.

    f. It would be a violation of Health Insurance Portability and Accountability Act (HIPAA)

      regulations to give Mr. Klein and his agents access to patient files which contain their

      health records, treatment plans and other personal information.

    g. That it has only recently come to my attention through a forensic accountant that Mr.

      Klein and his agents have misappropriated hundreds of thousands of dollars from the

      accounts of "Caring" to a company owned by Mr. Klein, known as Trade Fame Group

      Ltd. without my knowledge, permission or authority.  (See Exhibit __B__ ) The reports

      giving these findings can be presented to the court at a hearing to dismiss the

      "arbitrators" award.

FURTHERMORE, I would never enter into an Agreement and have any disputes resolved by arbitration, conducted by an individual with a personal and/or business relationship with the other party and his attorney.

WHEREFORE, I request that the court vacate the default judgment, allow an Answer to be filed within twenty (20) days of the signing of an Order, and for the court to issue an Order temporarily restraining Petitioner from:

      a. Interfering with the daily operation of "Caring"

      b. Having any financial control over the assets, accounts, checking accounts and other financial records of "Caring".

      c. That Mr. Klein and his agents be restrained from contacting the Certified Home Health Care Agencies who provide patient assignments for "Caring"which he has done prior to court order,

      d. Removing any patient records from the "Caring" offices, and for such other, additional and further relief as to this court my seem just and proper.

Dated: Kew Gardens, New York

      April 21, 2009

                                   CHRISTINE PERSAUD

Sworn to before me this 2( day of April, 2009

                                   Notary

EUGENE F. LEVY, ESQ.
NOTARY PUBLIC, State of New York
No. 4663871
Qualified in Nassau County
Commission Expires May 31, 2010

Exhibit B  Exhibit C  Exhibit D  Exhibit E  Exhibit F

480. -
600. -
4,000. -
800. -
11,741.44

12/31/07 - 41,488.20
12/28/07 - 19,144.75
12/26/07 - 51,008.50

T clm
S 84

Invoices Earner

PAYEES: THUNDERFLAME GROUP LTD.

242,902.61
231,068.81
+ 3,913.77
9,323.05

252,225.66
264,305.63

@ 125,000
127,225.66
÷ 3
42,408.55

@ 42,000
@ 43,000
@ 42,225.66
@ 127,097.97

CARING 3439

INTEREST EXPENSE 125,000.00

| | | | |
|---|---|---|---|
| 12/31/07 | 3439 | TRADEFAME GROUP LTD | $125,000.00 |

DELUXE BUSINESS FORMS 1-800-328-0304 www.deluxeforms.com

Exhibit C Exhibit D Exhibit E

3443

42,000.00

$42,000.00

TRADEFAME GROUP LTD

INTEREST EXPENSE

3443

12/31/07

Deluxe Business Forms  1 1 800-328 0304  www.deluxeforms.com

CARING

Exhibit C        Exhibit D        Exhibit E

INTEREST EXPENSE

TRADEFAME GROUP LTD

3442

12/31/07

Deluxe business forms · 1 (800)-328-0304 · www.deluxeforms.com

CARING

INTEREST EXPENSE

TRADEFAME GROUP LTD

3441

12/31/07

Deluxe business forms · 1 (800)-328-0304 · www.deluxeforms.com