Mendel Zilberberg
MENDEL ZILBERBERG & ASSOCIATES, P.C.
6619 Thirteenth Avenue
Brooklyn, New York 11219
Telephone (718) 256-2000
Facsimile (718) 256-7900

*Counsel for Plaintiff Abraham Klein*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

*In re:*

CHRISTINE PERSAUD,                                     **Chapter 7**
                                                      **Case No: 10-44815 (ESS)**
                  Debtor.

-------------------------------------------------------------------x

**CREDITOR ABRAHAM KLEIN'S FURTHER OBJECTION
TO THE APPLICATION BY THE CHAPTER 7 TRUSTEE
AUTHORIZING RETENTION OF TROUTMAN SANDERS, LLP
AS SUBSTITUTE GENERAL COUNSEL TO THE CHAPTER 7 TRUSTEE.**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUPPLEMENTAL STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    THE TROUTMAN FIRM SHOULD BE PRECLUDED FROM SERVING AS COUNSEL TO
      THE CHAPTER 7 TRUSTEE, PURSUANT TO THE RELEVANT NEW YORK RULES OF
      PROFESSIONAL CONDUCT GOVERNING CONFLICTS OF INTEREST . . . . . . . . . . . . . . 15

      A.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    THE TROUTMAN FIRM SHOULD BE PRECLUDED FROM SERVING AS
            COUNSEL TO THE CHAPTER 7 TRUSTEE, PURSUANT TO THE
            RELEVANT NEW YORK RULES OF PROFESSIONAL CONDUCT
            GOVERNING CONFLICTS OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      C.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II.   THE TROUTMAN FIRM SHOULD BE PRECLUDED FROM REPRESENTING THE
      CHAPTER 7 TRUSTEE PREDICATED UPON THE TROUTMAN FIRM'S VIOLATION OF
      RULE 2014(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE . . . . . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Mendel Zilberberg
MENDEL ZILBERBERG & ASSOCIATES, P.C.
6619 Thirteenth Avenue
Brooklyn, New York 11219
Telephone (718) 256-2000
Facsimile (718) 256-7900
  *Counsel for Plaintiff Abraham Klein*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

*In re:*

CHRISTINE PERSAUD,                                    **Chapter 7**
                                                      **Case No: 10-44815-ess**

                        Debtor.

------------------------------------------------------------------x

### CREDITOR ABRAHAM KLEIN'S FURTHER OBJECTION TO THE APPLICATION BY THE CHAPTER 7 TRUSTEE AUTHORIZING RETENTION OF TROUTMAN SANDERS, LLP AS SUBSTITUTE GENERAL COUNSEL TO THE CHAPTER 7 TRUSTEE.

### PRELIMINARY STATEMENT.

Creditor Abraham Klein ("Creditor Klein"), through his attorneys of record, Mendel Zilberberg & Associates, P.C., hereby respectfully submits this Memorandum of Law in further support of Creditor Klein's opposition to the application by the Chapter 7 Trustee authorizing retention of Troutman Sanders, LLP (the "Troutman Firm") as substitute general counsel to the Chapter 7 Trustee. For the reasons more fully set forth below, we respectfully submit that there is a sound legal and ethical basis for this Court to deny the Chapter 7 Trustee's Application for an Order authorizing retention of the Troutman Firm as substitute counsel for the Chapter 7 Trustee, and to otherwise disqualify the Troutman Firm from representing the Chapter 7 Trustee.

## SUPPLEMENTAL STATEMENT OF FACTS.

Briefly, and only by way of background, on August 15, 2011, Creditor Klein submitted Objections to the Application by the Chapter 7 Trustee Authorizing Retention of Troutman Sanders, LLP as Substitute General and Bankruptcy Counsel to the Chapter 7 Trustee (Creditor Klein's "Objections"). On August 19, 2011, the Chapter 7 Trustee, John S. Pereira submitted a Declaration in Response to the Objection of Abraham Klein to the Trustee's Application to Retain Troutman Sanders, LLP (Trustee's "Response to Objections").

On August 19, 2011, John P. Campo, Esq., on behalf of the Troutman Firm, filed an Affirmation in Response to Creditor Klein's Objections with respect to the retention of the Troutman Firm. On that same date, Mr. Campo also filed a Supplemental Declaration, in accordance with Federal Rule of Bankruptcy Procedure 2014. On August 24, 2011, Mr. Campo filed a Memorandum of Law: (I) in support of Trustee's Response to Objections; and (ii) in response to Creditor Klein's Motion for an Order declaring a post-petition decision of the New York Appellate Division void as a violation of the automatic stay.

We respectfully submit the supplemental factual statements set forth herein, and in the accompanying Affidavit of Creditor Klein, dated September 5, 2011, and the Affirmation of Mendel Zilberberg, Esq., dated September 5, 2011, in further support of Creditor Klein's Objections, and in further opposition to the Trustee's Application to retain the Troutman Firm and the Troutman Firm's ongoing efforts to be appointed as counsel to the Chapter 7 Trustee.

As set forth in Creditor Klein's August 15, 2011 Affidavit, in 2008 Creditor Klein became interested in a joint venture in China relating to the development of certain land (the "China Project"). Creditor Klein formed Global Realty Venture, LLC ("GRV") in anticipation of various

2

potential deals, including the China Project. Creditor Klein sought to obtain legal representation in connection with the China Project, and specifically sought to retain a law firm that would be in a position to work and communicate directly with him and others on his behalf with respect to all issues relating to the China Project; and therefore, Creditor Klein believed it was necessary to ultimately retain a law firm that had an understanding of American law and American and Chinese business norms, as Creditor Klein is a United States resident and subject to United States taxation; accordingly, Creditor Klein also needed the representation of a law firm that would be able to guide him as a United States taxpayer.

There came a point in time when Creditor Klein needed further representation in both the United States and in China, and his brother, Hershel Klein, was in an airport and saw an advertisement for the Troutman Firm. Shortly thereafter, Creditor Klein (or someone on his behalf) contacted the New York based office of the Troutman Firm to discuss the possibility of the Troutman Firm's representation in connection with the GRV China Project. A telephone conference was held between Creditor Klein, his brother, and Aurora Cassirer, Esq., of the Troutman Firm's New York based office to discuss: why it was crucial for Creditor Klein and GRV to have a United States based law firm representing Creditor Klein's needs in the China Project; and why it was crucial to retain a United States based law firm, which had the capabilities to provide legal representation in both the United States and China.

At that time it was clear to the Troutman Firm, that while the name GRV was given to the Troutman Firm, Creditor Klein and/or family members were the beneficial clients of this representation, and that it was not even certain that GRV would be the entity that would ultimately

3

complete the deal. As reflected in the Troutman Firm's Retainer Agreement (Exhibit 1[1]), the Troutman Firm agreed to provide legal representation in connection with the China Project, which legal services included:

> "(a)  preliminary due diligence on the Project and the Chinese party that you are going to cooperate with, including but not limited to:
>
> •  a site visit, inspection of the land of the Project;
>
> •  reviewing all documents relevant to the Project and the Chinese party that are available to us;
>
> •  arranging local agent(s) to make independent searches for all information of the Project and the Chinese party that are publicly accessible; and
>
> •  preparing a preliminary due diligence report and legal advice.
>
> (b)  advising on the feasibility of the Project under PRC laws;
>
> (c)  preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;
>
> (d)  assisting in forming the joint venture and obtaining all necessary licenses and permits; and
>
> (e)  other matters ancillary to the above."

Creditor Klein asked his brother Hershel to deal with the day-to-day details of the China Project and asked to be advised of and consulted regarding important aspects of the China Project. After numerous discussions and/or electronic communications with the Troutman Firm's New York based office, the Troutman Firm's China based office was brought in for the on-the-ground work in

---

[1]All references herein to "Exhibit" refer to Exhibits attached to the accompanying September 5, 2011 Affidavit of Creditor Klein.

4

China.    In terms of confidentiality, this real estate development deal was based on unique connections that Creditor Klein developed during his travels to China.    Creditor Klein understood (and the Troutman Firm apparently knew by virtue of the hurdles that foreign law firms have to jump through to operate in China and the Troutman Firm's representation of other United States based entities seeking to do business in China) that for the China Project to move forward, the deal required having the "right" Chinese partner.    With respect to land development, the "right" partner is typically someone who is politically connected and chooses to (using their political clout) align with a person that they trust.    As to the China Project, as with all Chinese deals, it was of paramount importance that knowledge of the potential development deal not be disseminated before the deal was signed, sealed and delivered.

On July 30, 2008, an email was sent to Creditor Klein's brother, Creditor Klein, and Ms. Cassirer which outlined various financial needs relating to the China Project.    On approximately July 30, 2008, Ms. Cassirer initiated a telephone conference wherein she introduced Creditor Klein to Edward Epstein, Esq., an attorney from the Troutman Firm's China office.    At that time, Ms. Cassirer explained to Mr. Epstein the basic contours of the deal that Creditor Klein was pursuing in connection with the China Project and his needs in general, from the Troutman Firm, and his needs more specifically from the Troutman Firm's China office.

To that end, Creditor Klein furnished the Troutman Firm with confidential and secret information with respect to the development opportunity, and through various emails and telephone calls, sensitive financial information was disclosed to the Troutman Firm.    Thereafter, on August 1, 2008, Creditor Klein received an email from Mr. Epstein from the Troutman Firm's China based

5

office with a recommendation as to how the China part of the representation should proceed and how the initial due diligence would be undertaken.

Mr. Epstein suggested that Real Estate M&A and Financing are key areas of the Troutman Firm's China practice, and recommended that they use Knight Frank for limited initial work, including the discrete collection of information on the proposed master planning of the area, recent land-sales, comparable property transactions, and the general environment. Apparently the Troutman Firm's China based office had discussed this matter in sufficient detail with Knight Frank to allow the Troutman Firm's China based office to quote an approximate price for the Knight Frank work to be performed in connection with the China Project. Thereafter, the same communication furnished an estimate for the legal due diligence to be conducted by the Troutman Firm.

It was, and is, Creditor Klein's understanding that Knight Frank was brought in by the Troutman Firm to do certain preliminary work and that the bulk of the Troutman Firm work would be performed after Knight Frank completed its assignment. The idea that the work of Knight Frank would be front-loaded and the Troutman Firm work would take place thereafter was suggested directly to Ms. Cassirer in an August 4, 2008 email by Hershel Klein, to which Ms. Cassirer, herself, promptly responded with her agreement and queried of Creditor Klein and his brother, if they would like Mr. Epstein of the Troutman Firm's China based office to coordinate this activity. Ms. Cassirer further suggested that Mr. Epstein should weigh in on this issue as he was "on the ground" in China.

Thereafter, on August 5, 2008, Mr. Epstein replied in the affirmative to Creditor Klein's request and endorsement of Ms. Cassirer, of August 4, 2008. It was clear to Creditor Klein from these and other confidential and secret communications between the client and the Troutman Firm that the bulk of the Troutman Firm work was only to occur after Knight Frank had completed its

6

work; and until that time, the Troutman Firm was still retained and Creditor Klein was still a client of the Troutman Firm.  It was also clear to Creditor Klein that Ms. Cassirer was in the loop on any and all significant issues that arose even after Mr. Epstein was brought into this matter, and that Creditor Klein was Ms. Cassirer's client, and she was overseeing all of the Troutman Firm's activities relating to the representation.  In addition, Ms. Cassirer was the partner involved in seeing that the bills were ultimately paid as evidenced by the various emails she was copied on with respect to outstanding balances owed to the Troutman Firm in connection with its legal representation.[2]

Per the outlined plan, the Troutman Firm initially waited on the Knight Frank work to be underway; and, therefore, for a period of time there was limited communication between Creditor Klein and the Troutman Firm.  However, during the first half of November 2008 Creditor Klein communicated directly with Mr. Epstein requesting a telephone conference with respect to the anticipated Memorandum of Understanding, a crucial step in the China Project.  Creditor Klein did not include Ms. Cassirer in that request, as Creditor Klein felt that at this particular stage of the Memorandum of Understanding, Ms. Cassirer's personal involvement or participation at this specific point in time was not warranted or otherwise necessary.  Apparently, Mr. Epstein thought otherwise as in his response, he felt it appropriate to copy Ms. Cassirer on communications.  There are approximately twenty-four emails that were exchanged between Creditor Klein, his brother, and the Troutman Firm which range in dates from July 30, 2008 to December 31, 2008 – and Ms. Cassirer was included in those communications.

---

[2]For purposes of clarity, Creditor Klein asks the Court to note that after Mr. Epstein and the Troutman Firm were retained, Mr. Epstein apparently delegated significant portions of the day-to-day activity to Mr. Tian Wang, a China based attorney at the Troutman Firm – Mr. Wang, in his various communications with Creditor Klein and others, apparently also thought it appropriate to copy Ms. Cassirer on important email correspondence.

7

In his August 19, 2011, Supplemental Declaration (para. 8), Mr. Campo states, in relevant part:

> "*[The China Project] was handled exclusively though the Troutman office in Shanghai.* Contrary to Klein's assertions, Aurora Cassirer, the managing partner of Troutman's New York office, was not the 'point person' on the [China Project]. *Ms. Cassirer never billed attorney time to the matter, never actually met Klein, and never spoke to Klein* after putting him in contact with Edward Epstein, Esq., the managing partner in [the] Troutman's Shanghai office." (Emphasis added.)

Without in any way seeking to besmirch the character of either Mr. Campo or the Troutman Firm, we are constrained to note that Mr. Campo's statement is lacking in candor and is somewhat deceptive for the following reasons:

- *First*, while Creditor Klein may not have met in person with Ms. Cassirer, neither did Creditor Klein meet in person with Mr. Epstein – a fact that is conspicuously omitted from Mr. Campo's Supplemental Declaration – and therefore Creditor Klein does not think that the question of who Creditor Klein retained is determined by whom he met. (See Supplemental Klein Aff., para. 35a.)

- *Second*, the participation of Ms. Cassirer, both passively and actively, after the initial introduction to Mr. Epstein is supported by documentary evidence that renders Mr. Campo's Declaration to be, at a minimum, less than candid, and to Creditor Klein's mind deceptive and not true. (See Supplemental Klein Aff., para. 35b.)[3]

_____

[3]In light of the factual disagreements that exist as between Mr. Campo and Creditor Klein and which are very relevant to the issue of disqualification, as a preliminary point, we begin by, most respectfully, reminding the Court of the fundamental precept that the "Court has every right, indeed it has the obligation, to assess the credibility of the parties who appear and testify in contested matters before it." In re Olsen, 358 B.R. 609, 626 (Bankr. S.D.N.Y. 2007) (Blackshear, J.), quoting Liteky v. United States, 510 U.S. 540, 551 (1994). In the matter now before this Court, we respectfully submit that the pendulum of credibility swings in favor of precluding the Troutman Firm from representing the Chapter 7 Trustee. Indeed, common sense and the law reflect the principle of "falsus in uno, falsus in omnibus." That is, when an individual is not truthful concerning any material matter, the finder of fact has "a right to distrust such witness' testimony in other particulars (continued...)

8

In this regard, it is also particularly curious and somewhat troubling that in Mr. Campo's initial Declaration (para. 6) and Supplemental Declaration (para. 6) to the Court, he states that the "Troutman [Firm] ceased work on the Global Realty Matter in *December 2008* and the matter is closed." (Emphasis added). We say *curious* and *somewhat troubling* because, the Retainer Agreement (albeit belatedly executed), was not signed on behalf of GRV and returned to the Troutman Firm until *December 29, 2008*; and that Retainer Agreement was executed after specific requests were made to do so by the Troutman Firm as late as *December 19, 2008*.

From Creditor Klein's perspective, the request by the Troutman Firm for a signed Retainer Agreement, as late as December 19, 2008, further evidences an ongoing representation – not, as Mr. Campo now claims, the closing of a file. It is clear that Creditor Klein's expectation was that the Troutman Firm continued to represent Creditor Klein in the ongoing matter of the China Project; and that, if anything, as of December 2008, the China Project was picking-up momentum as evidenced by the Troutman Firm's very words and actions – that is, at that exact same point in time, in December 2008, when the Troutman Firm expressed the belief that it was important to have GRV

--------

(...continued)

and ... may reject all the testimony of that witness...." Devitt, Blackmar and Wolff, "Witness Credibility: Impeachment – Inconsistent Statements Or Conduct – Falsus in Uno Falsus in Omnibus," Federal Jury Practice and Instructions (Civil), Vol. 3, Section 73.04 (4th ed. 1987). This principle has been embraced by New York Federal and State Courts in both civil and criminal cases. See Zheng v. Gonzales, 500 F.3d 143, 146-47 (2d Cir. 2007) (relying on the doctrine of falsus in uno, falsus in omnibus to conclude that the finder of fact may decline to credit documentary evidence submitted by a person who was found not credible), citing Siewe v. Gonzales, 480 F.3d 160, 170 (2d Cir. 2007) (doctrine of falsus in uno, falsus in omnibus supported a general adverse credibility finding based on a determination that the petitioner had submitted a fraudulent document – noting that "a single false document or a single instance of false testimony may (if attributable to the petitioner) infect the balance of the [petitioner's] uncorroborated or unauthenticated evidence.").

execute the Retainer Agreement in connection with Troutman Firm's representation of GRV in connection with the then-pending China Project.

Stated another way, it appears as though Mr. Campo is asserting that the manner in which he and the Troutman Firm close a file and terminate and conclude representation is by stressing the importance to the client of having the client execute a Retainer Agreement. Moreover, if for whatever reason the Troutman Firm, in fact, understood that it was closing its file in connection with the China Project and at that point in time only then discovered that it was missing the executed Retainer Agreement, the least that Creditor Klein, as a client should expect from their attorneys is a letter explaining that although the representation was ending, it was nevertheless important to have a signed retainer on file. However, this was not the case.

Furthermore, there were numerous queries from Knight Frank to the developer during 2009 questioning when the developer expected the project to resume. Creditor Klein was thereafter kept abreast of the Knight Frank communication with the developer. It is clear to Creditor Klein that not only did he reasonably understand that the China Project and related representation were ongoing, but independent of that belief, Knight Frank also shared that same reasonable belief that the China Project and related representation were ongoing.

In his August 24, 2011 Supplemental Declaration (para. 9), Mr. Campo further claims that, supposedly:

> "*During the course of the prior representation, [the] Troutman [Firm] did **not** become privy to any confidential information that would have any bearing on this case and the disputes herein.*" (Emphasis added.)

10

We respectfully submit that Mr. Campo's general, *ipse dixit*, denial of ever having received confidential information relevant to this matter is simply not credible. Mr. Campo's statement raises certain very real questions with respect to how the Troutman Firm handles confidential communications in sensitive matters, as in the case of the China Project, as well as the adequacies of the Troutman Firm's screening and conflicts-checking systems. Moreover, in connection with the Troutman Firm first "vetting," or otherwise screening for conflicts in connection with, the China Project and later the case involving Caring Home Care ("Caring"), and thereafter in connection with preparing his Declarations to this Court – presumably, Mr. Campo would have had to first discuss certain very sensitive details of the Caring case with the Troutman Firm's staff who, at a minimum, would have also had access to the details of the China Project and related representation.

It is respectfully submitted that the question before the Court is how, while seeking to be retained as counsel for the Chapter 7 Trustee, was Mr. Campo permitted to delve into the particular circumstances of the China Project once the issue of at least a potential conflict was raised. Alternatively, if Mr. Campo did not obtain, or was otherwise not knowledgeable as to the details of both the China Project and the Caring Case, then the question must be asked:

> How is it possible that Mr. Campo is in a position to duly submit Affirmations and/or Declarations to this Court about matters about which he, apparently, has insufficient knowledge – including the statement that Mr. Campo makes in his August 24, 2011 Supplemental Declaration (para. 8), "the prior representation of Global Realty was completely unrelated to Klein's current disputes with the Debtor and the Trustee on behalf of the Debtor's estate"?

With respect to the relation between Caring and the China Project, Creditor Klein respectfully asks the Court to take notice that Creditor Klein proposed a financial arrangement to Debtor Persaud wherein GRV would purchase the receivables of Caring. This agreement went through several draft

11

revisions, at least a portion of which were forwarded to Debtor Persaud's attorney for review. These proposals were rejected by Debtor Persaud and her counsel.

It was clear to Creditor Klein that the proposed claim between Caring and the China Project was, in Debtor Persaud's opinion, a significant event relating to the disputes between Creditor Klein and Debtor Persaud with particular emphasis on the Caring dispute. To wit, Debtor Persaud stated in an interview with the www.Examiner.com, which was published on October 22, 2009, that:

> "In October, 2008, I was at a festival in New Jersey. I got a phone call from Mr. Klein, and he told me that he wants to see me. I told him that I am in New Jersey at a family outing and I don't want to meet to discuss any business, but he insisted to see me. He told me that he is leaving to China in a few hours but he must see me before he leave. He came to meet me. He bought a two page document from First Republic Bank in Manhattan; he had a paper for me to sign. He wants me to sign a seven million dollar document a lien on my company Caring. He stated that he needs the money to build some houses in China and he must get this money. I did not sign the paper. Since then, Mr. Klein has been very upset with me."

While Creditor Klein does not agree with many of the details in the statements made by Debtor Persaud (set forth above and below), it is clear that Debtor Persaud feels that the proposed deal between GRV and Caring was at least in part a reason for the Caring issues. If there is any doubt regarding Debtor Persaud's position with respect to the issues she has with Creditor Klein and how GRV is involved and/or responsible for the issues, Debtor Persaud further clarified her stated position in the Black Star News, which was published on May 10, 2010, and stated that:

> "Persaud says her dispute with Klein began when he approached her in October 2008, for a $7 million line of credit through Caring Home Care, to finance expansion of a business he said he operated in China. Since she knew nothing about the business, she declined, she says."

It is clear to Creditor Klein that GRV and Caring are inter-related matters both from the perspective of the Debtor and by virtue of the fact that there was a contemplated deal between both entities.  Once again, in a sworn Affidavit made by Debtor Persaud to the Supreme Court of the County of Kings dated April 21, 2009, Debtor Persaud swore:

> "That it has only recently come to my attention through a forensic accountant that Mr. Klein and his agents have misappropriated hundreds of thousands of dollars from the account of 'Caring' to a company owned by Mr. Klein known as Trade Fame Group Ltd.[4] Without my knowledge permission or authority. The reports giving these findings can be presented to the court at a hearing to dismiss the 'arbitrators' award."

We respectfully submit that it is simply not credible for the Troutman Firm to now claim that, as the attorney of the Chapter 7 Trustee, absolutely no conflict of interest exists if the Troutman Firm has a duty to pursue, or at least investigate, all potential claims on behalf of the Chapter 7 Trustee. Presumably, that duty would extend to the Troutman Firm investigating Debtor Persaud's allegation of improper financial dealings with respect to funds allegedly being transferred from Caring to Creditor Klein's company, Trade Fame Group, which entity was involved with Creditor Klein's dealings in China.

In his Supplemental Affidavit accompanying this Memorandum of Law, Creditor Klein further attests to the following relevant and significant facts:

- There is ample evidence that the Troutman Firm's representation in connection with the China Project did not end on December 31, 2008 – notwithstanding the Troutman Firm's assertions to the contrary;

- As a new client of the Troutman Firm, Creditor Klein expected, and it was in fact the case, that the Troutman Firm's New York office would be involved in the China Project representation.

---

[4]Trade Fame Group Ltd., is an offshore entity related to Creditor Klein's dealings in China.

13

- The China Project and its related representation were ongoing until Creditor Klein was notified that the Troutman Firm was ending its representation in connection with the China Project, which Creditor Klein presumed the Affirmations and Declarations of Mr. Campo would indicate as of August 2011;

- Ms. Cassirer was involved in the China Project and related representation after the introduction of Mr. Epstein – notwithstanding the Troutman Firm's assertions to the contrary;

- There is a nexus between GRV and Caring – notwithstanding the Troutman Firm's assertions to the contrary;

- Confidential and secret information was transmitted and otherwise provided to the Troutman Firm – notwithstanding the Troutman Firm's assertions to the contrary; and

- As a client of the Troutman Firm, it was reasonable to believe, and Creditor Klein did believe, that the Troutman Firm would have discovered the conflict of interest in connection with the Troutman Firm's representation of Creditor Klein's company, GRV, in connection with the China Project, and the Troutman Firm's representation of the Chapter 7 Trustee.

For all of these reasons, and as more fully set forth in Creditor Klein's accompanying Supplemental Affidavit and the various submissions now already before this Court, we respectfully submit that there is a sound legal and ethical basis for this Court to deny the Chapter 7 Trustee's Application for an Order authorizing retention of the Troutman Firm as counsel for the Chapter 7 Trustee.

14

# I.

## THE TROUTMAN FIRM SHOULD BE PRECLUDED FROM SERVING AS COUNSEL TO THE CHAPTER 7 TRUSTEE, PURSUANT TO THE RELEVANT NEW YORK RULES OF PROFESSIONAL CONDUCT GOVERNING CONFLICTS OF INTEREST.

### A.    INTRODUCTION.

For the reasons more fully set forth below, we respectfully submit that the Troutman Firm should be precluded from serving as counsel to the Chapter 7 Trustee, pursuant to the relevant New York Rules of Professional Conduct governing conflicts of interest, and the relevant cases that have interpreted and applied those Rules.[5]  This conclusion, we respectfully submit, is warranted based upon the following factors:

(1)    The Troutman Firm's conduct violated the ethical standards which governed its conduct by engaging in impermissible conflicts of interest, in violation of Rule 1.7 and Rule 1.9 of the New York Rules of Professional Conduct ("N.Y. R.P.C.");

(2)    The Troutman Firm's conduct raises the appearance of impropriety; and

(3)    In order to avoid the significant risk of tainting the integrity of the pending Chapter 7 proceeding, including any and all potential claims by creditors, and in order to preserve the confidential information provided to the Troutman Firm by Creditor Klein and others in connection with the China Project, the Troutman Firm should be disqualified from representing the Chapter 7 Trustee.

---

[5]We respectfully submit that the Troutman Firm should also be precluded from representing the Chapter 7 Trustee, predicated upon the Troutman Firm's ongoing conflict of interest, pursuant to 11 U.S.C. § 327. See In re AroChem Corp., 176 F.3d 610, 625 (2d Cir. 1999); In re Mercury, 280 B.R. 35, 55 (Bankr. S.D.N.Y. 2002); In re Southern Kitchens, Inc., 216 B.R. 819, 827-28 (Bankr. D. Minn. 1998). However, because Section 327's conflict of interest provision is, in effect, already encompassed in the relevant New York Rules of Professional Conduct governing conflicts of interest, it is not necessary to separately address herein disqualification pursuant to Section 327.

15

An additional brief introductory point is appropriate.  The authority of courts to disqualify counsel derives from their inherent power to preserve the integrity of the adversary process. Hempstead Video Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005). As the Second Circuit has observed, "[t]he preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount." Hull v. Celanese Corp., 513 F.2d 568, 572 (2d Cir. 1975) aff'g Hull v. Celanese Corp., 375 F. Supp. 922 (S.D.N.Y. 1974). Although courts may be reluctant to disqualify counsel, consideration of a party's right to have counsel of its own choice "must yield ... to considerations of ethics which run to the very integrity of our judicial process." Id.  "Thus, even the appearance of impropriety requires prompt remedial action by the court." Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 565 (2d Cir. 1973).[6]

Concededly, disqualification is a severe remedy "which should only be done in cases where counsel's conduct will *probably* 'taint the underlying trial.'" Mancheski v. Gabelli Group Capital Partners, Inc., 22 A.D.3d 532, 534 (2d Dept. 2005) (emphasis added; internal citations omitted); Raiola v. Union Bank of Switzerland, LLC, 2002 WL 1484394, *6 (S.D.N.Y. July 10, 2002) (a risk of taint exists where an attorney is "potentially in a position to use privileged information 'obtained through prior representation' thus giving [the attorney's] present client an unfair advantage"; internal

---

[6]See generally Matter of Kelly, 23 N.Y.2d 368, 376 (1968) (court opined that "with rare and conditional exceptions, the lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship"); H&H Acquisition Corp. v. Financial Intranet Holdings, 2000 WL 502869, *1 (2d Cir. Apr. 27, 2000) (same).

citations omitted).[7] For the reasons more fully set forth below, in light of the nature of the Troutman

Firm's conduct, we respectfully submit that disqualification is warranted.

**B.    THE TROUTMAN FIRM SHOULD BE PRECLUDED FROM SERVING AS COUNSEL TO THE CHAPTER 7 TRUSTEE, PURSUANT TO THE RELEVANT NEW YORK RULES OF PROFESSIONAL CONDUCT GOVERNING CONFLICTS OF INTEREST.**

It is well-settled that the New York Rules of Professional Conduct ("New York Rules") apply

to matters involving ethical disputes and, more specifically, attorney disqualification predicated upon

conflicts of interest.  The use of the New York Rules of Professional Conduct (formerly the New

York Lawyers Code of Professional Responsibility) compliment the few attorney conflict provisions

contained within the relevant bankruptcy rules, namely 11 U.S.C. 327 and Rule 2014(a) of the

Federal Rules of Bankruptcy Procedure.  Indeed, historically, "Courts look to the Code of

Professional Responsibility in analyzing conflicts under the Bankruptcy Code."  In re Allboro

Waterproofing Corp., 224 B.R. 286, 291, n.3 (Bankr. E.D.N.Y. 1998) (Feller, J.) (other internal

footnotes and citations omitted), quoting In re Caldor Inc., 193 B.R. 165, 178 (Bankr. S.D.N.Y.

1996); Kittay v. Kornstein, 230 F.3d 531, 538 (2d Cir. 2000) ("Federal bankruptcy courts sitting in

---

[7]See also Mitchell v. Metropolitan Life Ins. Co., Inc., 2002 WL 441194, *3 (S.D.N.Y. Mar. 21, 2002) (an attorney should be disqualified "when the facts concerning the lawyer's conduct pose a significant risk of trial taint" [internal citations omitted]); see also Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983), citing Board of Educ. of the City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979) (the objective of the disqualification rule is to preserve the integrity of the adversary process and the attorney-client relationship); European Community v. RJR Nabisco, Inc., et al., 134 F. Supp.2d 297, 303 (E.D.N.Y. 2001) (Garaufis, J.) (same [internal citations omitted]); Solow v. W.R. Grace & Co., 83 N.Y.2d 303 (N.Y. 1994) (explaining, generally, that: "If an attorney has represented a client in an earlier matter and then attempts to represent another in a substantially related matter which is adverse to the interests of the former client, *the presumption of disqualification is irrebuttable*." [emphasis added]).

New York apply [the New York Rules] to ethical disputes."), citing <u>Allboro Waterproofing</u>, 224

B.R. at 291, and <u>In re Caldor</u>, 193 B.R. at 178.

As this Court previously noted, with particular relevance here:

> "New York's Code of Professional Responsibility ... not only provides guidance to attorneys by promoting a policy of unswerving loyalty to one's client, it also provides guidance to courts when asked to resolve a litigant's request for a lawyer's disqualification....Canon 5, entitled 'A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client,' provides that
>
>> [t]he professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.
>
>> ... The Code of Professional Responsibility further provides, in its disciplinary rules which describe ethical behavior beneath which no lawyer should fall, that '[a] lawyer shall not continue multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests....' <u>Id.</u> [Disciplinary Rule] 5-105(B). The Code of Professional Responsibility defines the term 'differing interests' broadly, encompassing 'every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest.'..."

<u>In re Allboro Waterproofing Corp.</u>, 224 B.R. 286, 291 (Bankr. E.D.N.Y. 1998) (Feller, J.) (internal

footnotes and citations omitted).

- The Troutman Firm's conduct violated N.Y. R.P.C. 1.7[8], which states:

    "a)    Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either:

    (1)    the representation will involve the lawyer in representing differing interests; or

    (2)    there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

    (b)    Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

    (1)    the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

    (2)    the representation is not prohibited by law;

    (3)    *the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal*; and

    (4)    each affected client gives informed consent, confirmed in writing." (Emphasis added.)

---

[8]As noted earlier, Mr. Campo's initial Declaration (para. 6) and Supplemental Declaration (para. 6) to the Court, he makes the curious and somewhat troubling claim that the "Troutman [Firm] ceased work on the Global Realty Matter in *December 2008* and the matter is closed." (Emphasis added). Notwithstanding the credibility of this claim, Mr. Campo has raised the issue of whether Creditor Klein and GRV are current or former clients of the Troutman Firm; therefore, we address in this Memorandum of Law the Troutman Firm's conflict of interest pursuant to both: N.Y. R.P.C. 1.7, governing "Conflict Of Interest: Current Clients"; and N.Y. R.P.C. 1.9, governing "Duties To Former Clients."

- The Troutman Firm's conduct violates N.Y. R.P.C. 1.9, which states that:

  "(a)    A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

  (b)    Unless the former client gives informed consent, confirmed in writing, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client:

  (1)    whose interests are materially adverse to that person; and

  (2)    about whom the lawyer had acquired information protected by Rules 1.6[9] or paragraph (c) of this Rule that is material to the matter.

  (c)    A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

  (1)    ***use confidential information of the former client protected by Rule 1.6 to the disadvantage of the former client,*** except as these Rules would permit or require with respect to a current client or when the information has become generally known; or

---

[9]As further discussed, below, N.Y. R.P.C 1.6 governs a lawyer's duty to, inter alia, safeguard confidential information," which, as defined by N.Y. R.P.C 1.6(c), consists of:

  "information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential. 'Confidential information' does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates."

> (2)    reveal confidential information of the former client protected
> by Rule 1.6 except as these Rules would permit or require
> with respect to a current client." (Emphasis added.)

A party seeking disqualification of its adversary's lawyer, pursuant to N.Y. R.P.C. 1.7 and

1.9, based upon the facts of this matter, must prove: (1) that there was an attorney-client relationship

between the moving party and opposing counsel; (2) that the matters involved in both representations

are substantially related; and (3) that the interests of the present client and former client are

materially adverse.[10]  For the reasons discussed below, we respectfully submit that Creditor Klein

has satisfied the three-prong test, thus warranting the Troutman Firm's disqualification.  If the

Troutman Firm were permitted to represent the Chapter 7 Trustee in an adverse claim against

Creditor Klein and GRV, the Troutman Firm would be in a position to use confidences and secrets

it acquired from its former client GRV – in connection with a substantially related matter – against

GRV and without GRV's informed consent.

*First*, the preliminary question that must be addressed in evaluating the ethics-related

disqualification claims, is whether GRV was and/or is a "client" of the Troutman Firm.  See

Mancheski v. Gabelli Group Capital Partners, Inc., 22 A.D.3d 532, 534 (2d Dept. 2005) (party

seeking to disqualify attorney must establish existence of prior attorney-client relationship), citing

Solow v. W.R Grace & Co., 83 N.Y.2d 303 (1994) (same).  The key to whether an attorney-client

---

[10]Schertz v. Jenkins, 4 Misc.3d 298, 299 (Civ. Ct. City of N.Y.), citing and quoting Jamaica
Public Service Co. LTD v. AIU Insurance Co., 92 N.Y.2d 631, 636 (1998); see also Kinlay v.
Henley, 7 Misc.3d 1017(A), 801 N.Y.S.2d 235, 2005 WL 1021570, *2 (Sup. Ct. N.Y. Co. Mar. 21
2005) ("The purpose of the substantial relationship test is to protect 'a client's secrets and
confidences by preventing *even the possibility* that they will subsequently be used against the client
in related litigation." [emphasis added; internal citations omitted]).

21

relationship exists is "the intent of the client and whether he reasonably understood the conference to be confidential." United States v. Dennis, 843 F.2d 652, 656-57 (2d Cir. 1988).

Any doubts about whether an attorney-client relationship existed should be resolved against the attorney. Howard v. Murray, 43 N.Y.2d 417, 422 (1977). As a noted ethics expert explained, in order to form a privilege-protected attorney-client relationship, *all that must be shown* is "that a person consulted the lawyer confidentially for the purposes of obtaining personal legal services." Charles W. Wolfram, Modern Legal Ethics, p. 251, Section 6.3.2 (West. Publ., Hornbook Series, 1986); see also Westinghouse Electric v. Kerr-McGee, 580 F.2d 1311, 1317 (7th Cir. 1987) ("A professional [attorney-client] relationship is not dependent upon the payment of fees nor, as we have noted, upon the execution of a formal contract." [footnotes omitted]).[11]

_____

[11]The Westinghouse case has been cited by New York courts as well as other jurisdictions for the proposition that:

> "The disqualification of an attorney by reason of conflict of interest will not be denied solely because there is no actual attorney-client relationship between the parties. A 'fiduciary obligation or an implied professional relationship' may exist in the absence of a formal attorney-client relationship [citing Westinghouse]. It is clear that where an attorney receives confidential information from a person who, under the circumstances, has a right to believe that the attorney, as an attorney, will respect such confidences, the law will enforce the obligation of confidence irrespective of the absence of a formal attorney-client relationship."

Talvey v. American Red Cross, 1994 WL 316046 at *3 (Sup. Ct. N.Y. Co. 1994) (Lebedeff, J.), rev'd on other grounds 205 A.D.2d 143 (1st Dept. 1004).

An attorney-client relationship forms when a client reasonably believes that he or she is consulting a lawyer in that capacity and has manifested an intention to seek professional legal advice. A formal agreement to retain an attorney is not an essential element of the attorney-client relationship. Instead, courts look at the words and conduct of the parties. United States v. Devery, 1995 WL 217529, *5 (S.D.N.Y. Apr. 12, 1995) ("The focus of the inquiry at hand is thus whether (continued...)

Upon the formation of the attorney-client relationship between GRV and the Troutman Firm, the Troutman Firm owed GRV a duty of loyalty and confidentiality. See In re Hayes, 183 F.3d 162, 168 (2d Cir. 1999) ("The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interests over the lawyer's."), quoting In re Cooperman, 83 N.Y.2d 465, 472 (1994). Specifically, the duty of loyalty prohibits a lawyer, here the Troutman Firm, from "employ[ing] advantages arising from the client-lawyer relationship in a manner adverse to the client." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, Section 16(3), cmt. "e" (2000) (noting that attorney's duties of loyalty generally "prohibit the lawyer from harming the client" and "are enforceable in appropriate circumstances by remedies, such as disqualification").

In applying the principles of duty of loyalty to the attorney-client relationship, courts have typically granted disqualification in two situations – both of which are applicable to Creditor Klein's objection to the Troutman Firm's representation of the Chapter 7 Trustee: (1) where there is a conflict of interest that undermines the court's faith in an attorney's ability to represent his or her client; and (2) when an attorney has put himself or herself in a position to use the other side's privileged information. Best Western Int'l, Inc. v. CSI Int'l Corp., 1995 WL 505565, *1 (August

---

[11](...continued)

the putative client reasonably believed he was engaging in confidential communications with potential counsel."). The law is clear that the existence of the attorney-client relationship is determined by the reasonable belief of the putative client. Devery, 1995 WL 217529, *5. An attorney-client relationship arises when a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person and the lawyer consents to do so; and a lawyer may implicitly consent to the attorney-client relationship by performing the services requested by the client. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, Section 14, cmt. "e" (2000).

23

25, 1995) (S.D.N.Y. 1995).  Accordingly, we address below both of these bases for disqualification as they apply Creditor Klein's objection to the Troutman Firm's representation of the Chapter 7 Trustee.

In his August 24, 2011 Supplemental Declaration (para. 9), Mr. Campo further claims that, supposedly:

> *"During the course of the prior representation, [the] Troutman [Firm] did **not** become privy to any confidential information that would have any bearing on this case and the disputes herein."* (Emphasis added.)

We respectfully submit that Mr. Campo's general, <u>ipse dixit</u>, denial of ever having received confidential information relevant to this matter is simply not credible.  Mr. Campo's statement raises certain very real questions with respect to how the Troutman Firm handled confidential communications in sensitive matters, as in the case of the China Project, as well as the adequacies of the Troutman Firm's screening and conflicts checking systems.[12]  Moreover, in connection with

---

[12]In this regard, during the relevant period of time, the Troutman Firm was obligated to implement a proper conflicts-checking system that complied with (now-former) New York Lawyer's Code of Professional Responsibility Disciplinary Rule ("D.R.") 5-105 and its successor N.Y. R.P.C. 1.10, which provides, in relevant part:

> "(a)    While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8 or 1.9, except as otherwise provided therein.
>
> ....
>
> (e)    A law firm shall make a written record of its engagements, at or near the time of each new engagement, and shall implement and maintain a system by which proposed engagements are checked against current and previous engagements....

(continued...)

the Troutman Firm first "vetting," or otherwise screening for conflicts in connection with the China

Project and later the case involving Caring Home Care ("Caring"), and thereafter in connection with

preparing his Declarations to this Court – presumably, Mr. Campo would have had to first discuss

certain very sensitive details of the Caring case with the Troutman Firm's staff who, at a minimum,

would have also had access to the details of the China Project and related representation.

Moreover, as the Second Circuit explained:

> "The dynamics of litigation are far too subtle, the attorney's role in that process far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. *These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.*"

Emle Industries, 478 F.2d at 571 (emphasis added); see also Flores v. Willard Price Associates, LLC,

20 A.D.3d 343, 345 (1st Dept. 2005) (in granting motion to disqualify attorney, court explained that

———————————————

[12](...continued)

> (f)      Substantial failure to keep records or to implement or maintain a conflict-checking system that complies with paragraph (e) shall be a violation thereof regardless of whether there is another violation of these Rules.

> (g)      Where a violation of paragraph (e) by a law firm is a substantial factor in causing a violation of paragraph (a) by a lawyer, the law firm, as well as the individual lawyer, shall be responsible for the violation of paragraph (a)."

See also N.Y. City Bar Op. 2003-03 (2003) (discussing former D.R. 5-105[E], now RPC 1.10[e], and various categories of information that should be included in a law firm's records maintained as part of the law firm's conflicts checking system); Prof. Roy Simon, Simon's New York Rules of Professional Conduct Annotated (2008 Edition), "Commentary" to D.R. 5-105(E), pp. 997-98 (West Publ. 2008) (same).

the "prophylactic measure" is necessary in order to fully protect "a client's secrets and confidences by preventing even the possibility that they will subsequently be used against the client).

Courts have applied this prophylactic rule and disqualified attorneys in a variety of different types of cases.[13]  For example, in <u>Ackerman v. Nat'l Property Analysts, Inc.</u>, 887 F. Supp. 510 (S.D.N.Y. 1993), the court disqualified plaintiffs' lawyers on the grounds that they had received information from a lawyer, Hirschhorn, who had worked in-house for one of the defendants.  The court presumed that Hirschhorn had disclosed confidences to plaintiffs' counsel because, even though Hirschhorn had not appeared as either a party or counsel in the litigation, the court found that he was serving as the plaintiffs' "insider" and "assisting in the representation of plaintiffs" by, among other things, providing factual information to support plaintiffs' pleadings.  <u>Id.</u> at 512, 515-16.

Significantly, in the <u>Ackerman</u> case, the court concluded that it was immaterial that Hirschhorn claimed that he had only disclosed to plaintiffs' counsel information that he had obtained in his capacity as a business person and had been careful not to disclose any information that was protected by the attorney-client privilege.  <u>Ackerman</u>, 887 F. Supp. at 517.  The court explained that, even if Hirschhorn had not disclosed his former clients' confidential information, he nevertheless

---

[13]<u>See</u>, <u>e.g.</u>, <u>NCK Organization Ltd.</u>, 542 F.2d 128, 135 (2d Cir. 1976) (disqualifying law firm that consulted with adversary's former in-house counsel notwithstanding absence of evidence that firm received confidential information); <u>Hull</u>, 513 F.2d at 569 (disqualifying law firm that consulted with adversary's former corporate lawyer even though court credited law firm's claim that it had avoided the receipt of confidences); <u>Best Western</u>, 1995 WL 505565, <u>supra</u> (disqualifying law firm that inadvertently acquired access to adversary's privileged documents through representation of adversary's former non-lawyer employee without finding that adversary was actually prejudiced); <u>MMR/Wallace Power & Industrial, Inc. v. Thames Assocs.</u>, 764 F. Supp. 712 (D. Conn. 1991) (disqualifying law firm that merely consulted with adversary's former non-lawyer employee who had knowledge of issues in litigation).

violated his ethical obligations by sharing any information which was detrimental to his former client that he had obtained in his professional capacity.  Ackerman, 887 F. Supp. at 517.[14]

The court in the Ackerman case further noted, with reasoning particularly relevant to Creditor Klein's objection to the Troutman Firm serving as counsel to the Chapter 7 Trustee, that information in Hirschhorn's possession could be used to harm the defendants even in the absence of disclosure:

> "Adverse use of confidential information is not limited to disclosure. It includes knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject."

Id., quoting Ulrich v. The Hearst Corp., 809 F. Supp. 229 (S.D.N.Y. 1992) (Leval, J.).

Finding that one law firm "knew or should have known" that it was talking to an attorney who had previously represented certain defendants, and that a second law firm took "no steps" to insulate itself from the "tainted" information, the court in Ackerman disqualified both law firms from further participation in the litigation.  Moreover, in light of plaintiffs' extensive reliance on information from Hirschhorn to support their allegations, the court imposed the additional remedy of dismissing the complaint against all defendants.

In short, because Creditor Klein's justifiable concern that GRV will be harmed in connection with the Chapter 7 Trustee matter by the use of GRV's own confidential information that it provided to the Troutman Firm, Creditor Klein and GRV strongly oppose the Troutman Firm serving as counsel to the Chapter 7 Trustee.  Moreover, absent GRV's consent, and based on N.Y. R.P.C. 1.7

---

[14]Courts will also disqualify counsel where, for example, an attorney has claimed "memory failure" to avoid complying with the lawyer's duty of confidentiality, pursuant to Canon 4 of the Code.  See, e.g., United States v. Uzzi, 549 F. Supp. 979, 983 (S.D.N.Y. 1982) (court disqualifies defense counsel, and rejects the "novel and unsupported proposition that the attorney's present alleged memory failure can avoid the mandate of Canon 4").

and 1.9 and the cases that have interpreted those Rules, we respectfully submit that the Troutman

Firm's disqualification is warranted.

An additional point must be made with respect to the confidential information that GRV

shared with the Troutman Firm – confidences and secrets that are *not* fully set forth in Creditor

Klein's papers objecting to the Troutman Firm serving as counsel to the Chapter 7 Trustee. To the

extent that any further revelation of confidences and secrets in support of the Creditor Klein's

opposition are required to be made to this Court, those further disclosures should be made <u>in camera</u>

and <u>ex parte</u>. It is well-settled law in New York that in connection with disqualification motions,

the moving or objecting party (here Creditor Klein and GRV) *does not* have the burden of proving

the "possession of confidences by its counsel-turned-adversary," nor that the moving party conveyed

confidences and secrets to the counsel-turned-adversary (here the Troutman Firm) – but, rather, it

is assumed that confidences were disclosed to former counsel. <u>NCK Organization Ltd. v. Bregman</u>,

542 F.2d at 135; <u>Emle Industries v. Patentex, Inc.</u>, 478 F.2d 562, 571 (2d Cir. 1973).

As the Second Circuit has explained:

> "*The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. [The Court] will not inquire into their nature and extent*. Only in this manner can the lawyer's duty of absolute fidelity be enforced....
>
> ....
>
> ... the court need not, *indeed cannot*, inquire whether the lawyer did, *in fact*, receive confidential information during his previous employment which might be used to the client's disadvantage. *Such an inquiry would prove destructive* of the weighty policy considerations that serve as the pillars of Canon 4...."

28

Emle Industries, 478 F.2d at 571 (emphasis added in part; internal citations omitted); see also Cheng v. GAF Corp., 631 F.2d 1052, 1056 (2d Cir.1980) vacated on other grounds, 450 U.S. 903 (1981) ("To require proof of access to privileged information would 'put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether.'"; citations omitted); DeFazio v. Wallis, 459 F. Supp.2d 159, 165 (E.D.N.Y. 2006) (Spatt, J.) (in connection with motion to disqualify, court stated that "where the same individual lawyer participated in the prior and current representation, the movant is not required to make a specific showing that confidences were passed to counsel.  Instead, *the movant is entitled to the benefit of an irrebuttable presumption that confidences were shared*." [emphasis added]).

The fulcrum upon which Creditor Klein's objection rests is exceedingly simple and straightforward:  if there is "any possibility, however slight," that the Troutman Firm's client, the Chapter 7 Trustee, will use confidential information that was acquired by the Troutman Firm from its former client, GRV – then the Troutman Firm's disqualification in connection with the Chapter 7 Trustee matter is warranted.  Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562, 571 (2d Cir. 1973).  In addressing this issue, as further discussed below, the law in New York is clear that "in the disqualification situation, any doubt is to be resolved in favor of disqualification."[15]

_____

[15]Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975) (internal citation omitted), aff'g Hull v. Celanese Corp., 375 F. Supp. 922 (S.D.N.Y. 1974) (Owen, J.); Correspondent Services, Corp. v. J.V.W. Investment, Ltd., 2000 WL 1174980, *10 (S.D.N.Y. Aug. 18, 2000) (Although moving party has burden of proof as to motion to disqualify, "[a]ny doubt as to the existence of a conflict of interest, however, is to be resolved in favor of disqualification."); Pastor v. T.W.A., 951 F. Supp. 27, 31 (E.D.N.Y. 1996) ("because of the importance assigned to the observance of an attorney's ethical obligations, once a probable conflict is demonstrated, a court should resolve any doubts in favor of disqualification.").

(continued...)

*Second*, turning to the next disqualification trigger of N.Y. R.P.C. 1.7 and 1.9 (i.e., a substantial relationship between the former and present matters): there is a substantial relationship between two matters when they "have a common subject matter" (Anonymous v. Anonymous, 262 A.D.2d 216 (1st Dept. 1999); the "central issues are common to both cases" (Pastor v. T.W.A., 951 F. Supp. 27, 31 (E.D.N.Y. 1996); the "witnesses, testimony, and other evidence germane to one action are likely to be similar to the other" (id.; internal citation omitted); or "[t]here is more than a passing relationship between [the matters]." Kaufman Organization v. Graham & James LLP, 263 A.D.2d 440 (1st Dept. 1999).

The issue of law that underpins the disqualification is the issue of whether a "*substantial relationship*" exists, pursuant to N.Y. R.P.C. 1.7 and 1.9, between: the various claims to be made by the Troutman Firm as counsel to the Chapter 7 Trustee; and the Troutman Firm's representation of GRV in the China Project, in connection with which the Troutman Firm was provided with certain confidential information that is now likely to be used by the Troutman Firm for the benefit of its new client against Creditor Klein and GRV. In this regard, courts have recognized that:

> "'[i]t is the congruence of *factual* matters, rather than areas of law,
> that establishes a substantial relationship between representations for
> disqualification purposes.' [United States Football League v. Nat'l

---

[15](...continued)

In this regard, the Troutman Firm's conduct was also governed by the more generalized limitation that a lawyer is required to avoid the appearance of impropriety. See Funds of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d, 225 227 (2d Cir. 1977) (attorney required to avoid even the appearance of impropriety); see generally HRH Construction LLC v. Palazzo, 15 Misc.3d 1130(A), 2007 WL 1299232 (Sup. Ct. N.Y. Co. May 4, 2007) (discussing same). Concededly, the appearance of impropriety alone does not warrant disqualification. See Jamaica Public Service Co. LTD v. AIU Insurance Co., 92 N.Y.2d 631, 638 (1998) (appearance of impropriety alone does not warrant disqualification, movant must offer more). However, as further discussed below, in the context of the type of serious conflicts of interest in which the Troutman Firm has engaged, the appearance of impropriety can play a role in warring disqualification.

> Football League, 605 F.Supp. 1448,] 1460 n.26 (emphasis in
> original). To prevail on the basis of such a former relationship, a
> movant therefore must show that 'the later litigation puts in issue the
> entire background of the movant.' Id. at 1459. 'Thus, knowledge of
> a former client's financial and business background is not in itself a
> basis for disqualification if the client's background is not in issue in
> the later litigation.' Id. at 1460."

Dominic Management, Inc. v. American University of Antigua College of Medicine, 2005 WL

1423338, *5 (S.D.N.Y. 2005).

In the words of the Dominic Management case, there is a clear "congruency of factual

matters" (2005 WL 1423338 at *5) as evidenced by the facts set forth above, including:

- The Troutman Firm agreed to, and did represent Creditor Klein and GRV in connection with the China Project;

- The Troutman Firm led Creditor Klein and GRV to believe that the Troutman Firm represented Creditor Klein and GRV in connection with the China Project, and based upon that reasonable belief, Creditor Klein and GRV shared confidential information with the Troutman Firm in connection with the China Project; and

- The Troutman Firm now seeks to represent the Chapter 7 Trustee in connection with various claims for benefit of the Chapter 7 Trustee and the creditors – which includes various claims against the Troutman Firm's former client, GRV, before this Court, in which GRV's interests are clearly adverse to those of the Chapter 7 Trustee.

***Third***, we respectfully submit that the Troutman Firm has violated: N.Y. R.P.C. 1.7(b)(4)

and 1.9(b), which prohibit a lawyer from opposing a former client (here GRV) in a substantially

related matter *without the former client's informed consent*; and N.Y. R.P.C. 1.9(c)(1), which

prohibits a lawyer from using a former client's confidential information unless the client consents

or the information is generally known. Here, the Troutman Firm dropped GRV as a client and

simultaneously sought to represent the Chapter 7 Trustee in connection with various claims, which

31

will necessarily include claims against the Troutman Firm's former client, GRV, before this Court, in which GRV's interests are clearly adverse to those of the Chapter 7 Trustee.

Whether the Troutman Firm viewed GRV as a current or former client, pursuant to N.Y. R.P.C. 1.7(b)(4) and 1.9(b) – before seeking to serve as counsel to the Chapter 7 Trustee in a substantially related matter that is potentially or actually adverse to GRV – the Troutman Firm was obligated to obtain its clients' consent "after full disclosure of the implications of simultaneous representation and the advantages and risks involved." See Hall Dickler Ken Goldstein & Wood LLP v. McCormick, 36 A.D.3d 757 (2d Dept. 2007) (court concluded that the requirements of D.R. 5-105[C] had been satisfied by virtue of the fact that all parties had provided informed consent to potential conflict of interest after full disclosure to parties); cf. Matter of Kelly, 23 N.Y.2d 368, 376, 378 (1968) (simultaneous representation of multiple clients in the same case is fraught with potential conflicts, which full disclosure may not cure).

There is no question that the Troutman Firm did not seek to obtain, nor did it obtain, the consent of GRV to now represent the Chapter 7 Trustee in connection with potential claims that are adverse to GRV. See generally Professor Roy D. Simon, Simon's New York Code Of Professional Responsibility Annotated (2008 Edition), Commentary to D.R. 5-105(C), p. 924 ("A lawyer who wants to undertake multiple representation may not do so unless each affected client consents. The consent of only one affected client is like the sound of one hand clapping – it doesn't mean anything."); Flamm, Law Disqualification, Conflicts of Interest And Other Bases, Section 4.1, "Multiple Representation...." pp. 63-64 (explaining that courts permit a lawyer to "engage in multiple representation, even when there is a potential for conflict .... as long as [the attorney] secures [each client's] informed consent to represent them jointly" [internal footnotes and citations omitted]).

32

In this regard an additional point is appropriate.  The Troutman Firm, agreed to, and did, represent Creditor Klein and GRV in connection with the China Project – and, apparently, *without GRV's knowledge*[16], the Troutman Firm has now, in effect, dropped GRV, in order to represent the Chapter 7 Trustee (including representing the Chapter 7 Trustee in connection with a potential adverts claim against GRV, Creditor Klein or a related entity).  The Troutman Firm's conduct in this regard is particularly troubling – that is the Troutman Firm's apparent willingness to drop one client for more favorable client.

As the Association of the Bar of the City of New York in Opinion 2005-5 (2005), explained:

> "under the so-called 'hot-potato' rule, a lawyer or law firm should not ordinarily be permitted to abandon one client in order to take on the representation of a more lucrative client, where representing both would create a conflict of interest."

Citing Hartford Accident and Indemnity Co. v. RJR Nabisco, Inc., 721 F. Supp. 534, 540 (S.D.N.Y. 1989) (finding against disqualification, but discussing rule, "Clearly, no court should condone such

---

[16]Notwithstanding the Troutman Firm's claim that, supposedly, it no longer represented Creditor Klein or GRV in connection with the China Project, at a minimum GRV was a former client, and we respectfully submit that, in fact, was a current client at the time the Troutman Firm sought to become counsel to the Chapter 7 Trustee.  In this regard, courts typically consider a variety of factors to determine whether an attorney-client relationship exists.  See Medical Diagnostic Imaging, PLLC v. Carecore National, 542 F. Supp.2d 296, 307 (S.D.N.Y. 2008) (Katz, J.) ("six factors [are] relevant to determining whether an attorney-client relationship exists ... '1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.'"; internal citations omitted).  Based upon the facts of this matter, as set forth above, Creditor Klein, on behalf of GRV, reasonably believed that the Troutman Firm continued to serve as counsel in connection with the China Project – and previously provided no notice whatsoever to Creditor Klein or GRV that the Troutman Firm was going to cease representing GRV (that is until the Troutman Firm sought to be appointed as counsel to the Chapter 7 Trustee).

33

conduct [dropping the disfavored client in attempt to avoid disqualification motion]; it smacks of disloyalty where loyalty is owed, and notwithstanding the apparent elimination of the conflict, there remains the possibility that former client confidences will be abused."); see also In re Wingspread Corp., 152 B.R. 861, 864 (Bankr. S.D.N.Y. 1993) (ruling against disqualification, but discussing rule); AmSouth Bank, N.A. v. Drummond Co., 589 So. 2d 715, 721-722 (Ala. 1991) (finding against disqualification, but discussing rule: "a law firm should not be allowed to abandon its absolute duty of loyalty to one of its clients so that it can benefit from a conflict of interest that it has created").

*Third*, and finally, where an attorney has confidential information material to the litigation at issue, allowing the law firm, here the Troutman Firm, to continue the representation would create an intolerable appearance of impropriety. Cf. Kassis v. Teacher's Insur. and Annuity Assoc., 93 N.Y.2d 611, 616-17 (1999) ("In addition to ensuring that attorneys remain faithful to the fiduciary duties of loyalty and confidentiality owed by attorneys to their clients, the rule of imputed disqualification reinforces an attorney's ethical obligation to avoid the appearance of impropriety."); see Funds of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 227 (2d Cir. 1977); Rose Ocko Foundation, Inc. v. Liebovitz, 155 A.D.2d 426, 427-28 (2d Dept. 1989) (In granting motion to disqualify, the court explained: "It is axiomatic that an attorney must avoid even the appearance of a conflict of interest ... The lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship....Moreover, it is well settled that doubts as to the existence of a conflict of interest must be resolved in favor of disqualification" [internal citations omitted]).

34

As noted earlier, rarely will the appearance of impropriety alone warrant disqualification. However, in the context of the type of serious conflicts of interest in which the Troutman Firm has engaged, which raises the appearance of impropriety – *and because the Troutman Firm's continued efforts to represent the Chapter 7 Trustee, which will necessarily require the Troutman Firm to assert adverse positions against its former client, GRV* – the Troutman Firm's disqualification is necessary in order to preserve the integrity of the Chapter 7 Trustee matter.

We respectfully submit that this Court should send a message to the legal community that the Rules of Professional Conduct must be taken seriously. The message should be clear and strong so that it can have a deterrent effect. Under all these circumstances, the well-settled principle that any doubt must be resolved in favor of disqualification is especially appropriate here. See Cheng, 631 F.2d at 1055; Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975).

C.    CONCLUSION.

For the reasons set forth herein, we respectfully submit that this Court should prelude the Troutman Firm from presenting the Chapter 7 Trustee predicated upon the following factors: (1) the Troutman Firm's conduct violated the ethical standards which governed its conduct as an attorney by engaging in impermissible conflicts of interest; (2) the Troutman Firm's continued efforts to represent the Chapter 7 Trustee in a matter directly, and materially, averse to the Troutman Firm's former client, GRV, violates N.Y. R.P.C. 1.7 and 1.9; (3) the Troutman Firm's conduct raises the appearance of impropriety; and (4) therefore, in order to avoid the significant risk of tainting the integrity of the pending Chapter 7 Trustee matter and in order to preserve the confidential information provided to the Troutman Firm by Creditor Klein and GRV, the Troutman Firm should be disqualified from further seeking to represent the Chapter 7 Trustee.

35

## II.

### The Troutman Firm Should Be Precluded From Representing The Chapter 7 Trustee Predicated Upon The Troutman Firm's Violation Of Rule 2014(a) Of The Federal Rules Of Bankruptcy Procedure.

We respectfully submit that the Troutman Firm should be precluded from representing the Chapter 7 Trustee predicated upon the Troutman Firm's violation of Rule 2014(a) of the Federal Rules of Bankruptcy Procedure ("Rule 2014(a)"). Had the Troutman Firm adhered to the strict requirements of reporting any actual or potential conflicts of interest under Rule 2014(a), the Troutman Firm would have been disqualified ab initio. In their Affidavit in support of appointment, the Troutman Firm was legally and ethically obligated, pursuant to Rule 2014(a), to disclose "all ... connections with the debtor, creditors [or] any other party in interest ...." The relationship between the Troutman Firm as counsel to Creditor Klein (a creditor of the Chapter 7 Estate), and in connection with GRV and the China Project, is clearly a connection between the Troutman Firm and a "party in interest" as envisioned by Rule 2014(a). Thus, the Troutman Firm should have disclosed their relationship with Creditor Klein in the required affidavit – *inexplicably, they failed to do so.*

Rule 2014(a) is straightforward, and "mandates that prospective counsel disclose all of [its] 'connections with the (debtor), the creditors, or any other party in interest, and their respective attorneys and accountants.'" Matter of Futuronics Corp., 655 F.2d 463, 469 (2nd Cir. 1981) (same, applying former Code), citing generally Matter of Arlan's Dept. Stores, Inc., 615 F.2d 925, 933-34 (2nd Cir. 1979), and In re Rogers-Pyatt Shellac Co., 51 F.2d 988, 991-992 (2nd Cir. 1931); In re Granite Partners, L.P., 219 B.R. 22, 40-41 (Bankr. S.D.N.Y. 1998) (same); In re Bruno, 327 B.R. 104, 110 (Bankr. E.D.N.Y. 2005) (Craig, C.J.) ("Bankruptcy Rule 2014 disclosure requirements are

strictly construed. ...  All facts that may have any bearing on the disinterestedness of a professional

must be disclosed.") Referencing In re Leslie Fay Cos, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994);

In re Arlan's Dep't Stores, Inc., 615 F.2d 925, 933 (2d Cir. 1979).

Rule 2014(a) states, in relevant part:

> "An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1114 of the Code shall be made only on application of the trustee or committee....The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."

In the oft-cited case, Matter of Futuronics Corp., the United States Court of Appeals for the

Second Circuit emphasized the very real obligation of disclosure, independent of the Code's

requirement:

> "We emphasized in Arlan's that the duty of counsel for the debtor in a bankruptcy proceeding to disclose fully to the court all connections that may exist between counsel and the debtor, the creditors, any party in interest, and their respective attorneys arises not solely by reason of the bankruptcy rules, but also is founded upon '*the fiduciary obligation owed by counsel for the debtor to the bankruptcy court*.'"

Matter of Futuronics Corp., 655 F.2d at 470, citing and quoting Matter of Arlan's Dept. Stores, Inc.,

615 F.2d at 937 (emphasis added; other internal citations omitted).  Furthermore, Chief Judge Craig

of the Bankruptcy Court for the Eastern District of New York has said, the "failure [of an attorney]

to properly review his firm's files and [the attorney's] unfamiliarity with the Code does not excuse

[the attorney or his law firm] from the disclosure requirements of Rule 2014." In re Bruno, 327 B.R.

37

at 111, citing In re Park Helena Corp., 63 F.3d 877 (9th Cir. 1995) cert. denied 516 U.S. 1049

(1996).

In Futuronics Corp., 655 F.2d at 469, the Second Circuit stated that it "has long been the

practice in this Circuit to deny compensation to counsel who failed to comply' with the disclosure

provisions contained in former Bankruptcy Rule 215, which superseded General Order 44, and

preceded current Bankruptcy Rule 2014(a)":

> "Bankruptcy Rule 215, as made applicable to Chapter XI proceedings
> by Rule 11-22, provides that no attorney shall be employed by the
> debtor except upon order of the bankruptcy court, and mandates that
> prospective counsel disclose all of his "connections with the (debtor),
> the creditors, or any other party in interest, and their respective
> attorneys and accountants." In In re Rogers-Pyatt Shellac Co., 51 F.2d
> 988, 992 (2d Cir. 1931), this Court stated that lawyers "who seek
> appointment as counsel for an officer of the court owe the duty of
> complete disclosure of all facts bearing upon their eligibility for such
> appointment.... If the rule is to have vitality and the evils against
> which it is aimed are to be eliminated, it should be enforced literally."

In the seminal case of In re Rogers-Pyatt Shellac Co., 51 F.2d 988, 991-992 (2d Cir. 1931),

the Court held that a similar failure to disclose an existing relationship with a debtor or creditor

"should, and doubtless would, have precluded their appointment":

> "Mr. McMahon's affidavit stated that neither the affiant nor his firm
> 'represent said alleged bankrupt,' and that 'he and they are in no way
> connected with said alleged bankrupt; they represent no interests
> adverse to ... the Receiver in Bankruptcy of the above named estate,
> and deponent knows of no reason why they should not act as
> attorneys and counsel for said receiver in this proceeding.' ... A
> creditor whose claim is disputed and doubtful certainly has an interest
> adverse to the trustee and to the other creditors. [The fact that Mr.
> McMahon represented directors and stockholders of the bankrupt
> corporation] should have been disclosed in the affidavit, and, had they
> been, the affidavit would not have made the showing required by
> General Order 44 to authorize the appointment of the appellants as
> attorneys for the receiver; for there is a plain implication in the

> language of the general order that an attorney employed by any person
> having an interest adverse to the receiver, trustee, or creditors is not
> to be appointed counsel for the receiver. ... Hence the appellants
> obtained the order authorizing their appointment by a suppression,
> however innocent and inadvertent, of facts which, if disclosed,
> should, and doubtless would, have precluded their appointment ...."

In <u>Rogers</u>, had the appellants filed the required affidavit, they would have disclosed that two

of the petitioning creditors whom they represented were directors and stockholders of the bankrupt

corporation.  Even assuming that the Rule would have permitted the court to authorize their

employment, this could only have been for good cause shown by such attorney's affidavit; and no

such showing was made.  Nor did the record disclose any reason why the firm in question, rather

than other attorneys of equal professional standing and competence, should have been chosen to

represent the receiver, except the reason that they already represented the petitioning creditors.  But

that fact is a reason for not employing them, which may be overcome only for good cause.  Thus,

even if they had made the appropriate disclosure, the firm would still have been disqualified from

representing the Trustee.  <u>See</u> <u>Rogers</u>, 51 F.2d at 991-92.

Although concededly strong, the Second Circuit's language in the <u>Rogers</u> case is particularly

relevant to the matter now before this Court:

> "Attorneys who seek appointment ... owe the duty of complete
> disclosure of all facts bearing upon their eligibility for such
> appointment.  If that duty is neglected, however innocently, surely
> they should stand no better than if it had been performed. ... ***If the
> rule is to have vitality and the evils against which it is aimed are to
> be eliminated, it should be enforced literally***."

51 F.2d at 992 (emphasis added); <u>see</u> <u>also</u> <u>In re H.L.Stratton, Inc.</u>, 51 F.2d 984 (2d Cir.1931)

(emphasizing the need for rigorous compliance with General Order 44 and local rules in this regard

but where, again, strict compliance would have resulted in the disqualification of attorneys ab initio, had proper application been made).

In Granite Partners, L.P., 219 B.R. 22, 40-41 (Bankr. S.D.N.Y. 1998), the United States Bankruptcy Court for the Southern District of New York, held "the failure to make proper disclosure may itself warrant disqualification":

> "*In this regard, the failure to make proper disclosure may itself warrant disqualification and partial or complete denial of compensation.* ... cf. In re Crivello, 134 F.3d 831, 839 (7th Cir. 1998) (court should punish a wilful failure to disclose connections required by Federal Bankruptcy Rule 2014(a) as severely as a fraud on the court) (dicta). *Attorneys who seek appointment owe a duty of full disclosure.* 'If that duty is neglected, however innocently, surely they should stand no better than if it had been performed.' In re Arlan's Dep't Stores, Inc., 615 F.2d 925, 933 (2d Cir.1979).....' (Internal citations omitted; emphasis added.)

Accordingly, we respectfully submit that as reporting the conflict "would have resulted in the disqualification of [these] attorneys ab initio, had proper application been made" – "the failure [by the Troutman Firm] to make proper disclosure may itself warrant disqualification." Rogers, 51 F.2d at 991-992; Granite Partners, L.P., 219 B.R. at 40-41; see Futuronics Corp., 655 F.2d at 469; Piecuil, 145 B.R. at 779-781.

40

## CONCLUSION.

WHEREFORE, Creditor Abraham Klein respectfully requests that the Court preclude Troutman Sanders, LLP from representing the Chapter 7 Trustee, and grant such other and further relief that the Court deems just and proper.

Dated: Brooklyn, New York.
      September 6, 2011

<div style="margin-left:40%">

MENDEL ZILBERBERG & ASSOCIATES, P.C.
*Attorneys for Creditor Abraham Klein*

By:    s/ Mendel Zilberberg
        Mendel Zilberberg (MZ-6625)
        6619 Thirteenth Avenue
        Brooklyn, New York 11219
        Telephone (718) 256-2000
        Facsimile (718) 256-7900
        Email:  mz@amalgamail.com

KRINSKY PLLC
*Of Counsel*

By:    s/ Pery D. Krinsky
        Pery D. Krinsky (PK-8046)
        Woolworth Building
        233 Broadway, Suite 707
        New York, New York 10279
        Telephone (212) 543-1400
        Facsimile (212) 380-8171
        Email:  pkrinsky@krinskypllc.com

</div>

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                                          Chapter 7
                                                                Case No: 10-44815
         CHRISTINE PERSAUD,
                                                                **SUPPLEMENTAL
                                                                AFFIDAVIT OF
                                                                ABRAHAM KLEIN**
                        Debtor.
------------------------------------------------------------x

Abraham Klein, an Orthodox Jew, for religious reasons hereby affirms the following to

be true under penalties of perjury:

1.     I am a Creditor of Debtor Christine Persaud, and unless stated otherwise, I have
       personal knowledge of the facts set forth herein.

2.     I submit this Affidavit in further opposition to the retention of Troutman Sanders,
       LLP as substitute general and bankruptcy counsel for the Chapter 7 Trustee.

3.     As set forth in my affidavit dated August 15, 2011, in 2008 I became interested in
       a joint venture in China relating to the development of certain land (hereinafter
       referred to as the "China Project").

4.     I formed Global Realty Venture, LLC (hereinafter referred to as "GRV") in
       anticipation of various potential deals, including the China Project.

5.     I sought to obtain legal representation in connection with the China Project, and
       specifically sought to retain a law firm that would be in a position to work and
       communicate directly with me and others on my behalf with respect to all issues
       relating to the China Project; and therefore, I believed it was necessary to
       ultimately retain a law firm that had an understanding of American law and
       American and Chinese business norms, as I am a United States resident and

subject to United States taxation; accordingly, I also needed the representation of a law firm that would be able to guide me as a United States taxpayer.

6.      Their came a point in time where I needed representation in both the United States and China and my brother, Hershel Klein, was in an airport and saw an advertisement for Troutman Sanders LLP.

7.      Shortly thereafter, I (or someone on my behalf) contacted the New York based office of the Troutman Sanders LLP (hereinafter referred to as the "Troutman Firm") to discuss the possibility of the Troutman Firm's representation in connection with the GRV China Project.

8.      A telephone conference was held between myself, my brother, and Aurora Cassirer, Esq., of the Troutman Firm's New York based office, about my needs both in China and the reasons why it was crucial for us to have a United States based law firm representing my needs in the China Project, and why it was crucial to retain a United States based law firm, but which law firm had the capabilities to provide legal representation in both the United States and China.

9.      At that time it was clear to the Troutman Firm , that while the name GRV was given to the Troutman Firm, I and/or family members were the beneficial client of this representation, and that it was not even certain that GRV would be the entity that would ultimately complete the deal.

10.     As reflected in the Troutman Firm's Retainer Agreement (attached hereto as "Exhibit 1"), the Troutman Firm agreed to provide legal representation in connection with the China Project, which legal services included:

"(a)    preliminary due diligence on the Project and the Chinese party that you are going to cooperate with, including but not limited to:

- a site visit, inspection of the land of the Project;

- reviewing all documents relevant to the Project and the Chinese party that are available to us;

- arranging local agent(s) to make independent searches for all information of the Project and the Chinese party that are publicly accessible; and

- preparing a preliminary due diligence report and legal advice.

(b)    advising on the feasibility of the Project under PRC laws;

(c)    preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;

(d)    assisting in forming the joint venture and obtaining all necessary licenses and permits; and

(e)    other matters ancillary to the above."

11.    I asked my brother Hershel to deal with the day to day details of the China Project and asked to be advised of and consulted regarding important aspects of the China Project.

12.    After numerous discussions and/or electronic communications with the Troutman Firm's New York based office, the Troutman Firm's China based office was brought in for the on-the-ground work in China.

13.    In terms of confidentiality, this real estate development deal was based on unique connections that I developed in my travels to China.

14.    I understood (and the Troutman Firm apparently knew by virtue of the hurdles that foreign law firms have to jump through to operate in China and the Troutman

representation of other United States based entities seeking to do business in China), that for the China Project to move forward, the deal required having the "right" Chinese partner.

15. With respect to land development, the "right" partner is typically someone who is politically connected and chooses to (using their political clout) align with a person that they trust.

16. As with the China Project and as with all Chinese deals, it was of paramount importance that knowledge of the potential development deal not be disseminated before the deal was signed, sealed and delivered.

17. On July 30, 2008, an email was sent between my brother, myself, and Ms. Cassirer which outlined various financial needs relating to the China Project.

18. On, approximately July 30, 2008 Ms. Cassirer initiated a telephone conference where she introduced me to Edward Epstein, Esq., an attorney from the Troutman Firm's China office.  At that time, Ms. Cassirer explained to Mr. Epstein the basic contours of the deal that I was pursuing in connection with the China Project and my needs in general, from the Troutman Firm, and my needs more specifically from the Troutman Firm's China office.

19. To that end, I furnished the Troutman Firm with confidential and secret information with respect to the development opportunity, and through various emails and telephone calls sensitive financial information was disclosed to the Troutman Firm.

20. Thereafter, on August 1, 2008 I received an email from Mr. Epstein from Troutman Firm's China based office with a recommendation as to how the China

part of the representation should proceed and how the initial due diligence would be undertaken.

21.    Mr. Epstein suggested that Real Estate M&A and financing are key areas of the Troutman China practice, and recommended that we use Knight Frank for limited initial work, including the discrete collection of information on the proposed master planning of the area, recent land-sales, comparable property transactions, and the general environment.

22.    Apparently the Troutman Firm's China based office had discussed this matter in sufficient detail with Knight Frank to allow the Troutman Firm's China based office to quote us an approximate price for the Knight Frank work to be performed in connection with the China Project.

23.    Thereafter, the same communication furnishes an estimate for the legal due diligence to be conducted by the Troutman Firm.

24.    It was, and is, my understanding that Knight Frank was brought in by the Troutman Firm to do certain preliminary work and that the bulk of the Troutman Firm work would be performed after Knight Frank completed its assignment.

25.    The idea that the work of Knight Frank would be front loaded and the Troutman Firm work would take place thereafter was suggested directly to Ms. Cassirer in an August 4, 2008 email by Hershel Klein, to which Ms. Cassirer, herself, promptly responded with her agreement and queried of us if we would like Mr. Epstein of the Troutman Firm's China based office to coordinate this activity. Ms. Cassirer further suggested that Mr. Epstein should weigh in on this issue as he is "on the ground" in China.

26.    Thereafter on August 5, 2008, Mr. Epstein replied in the affirmative to our request and endorsement of Ms. Cassirer, of August 4, 2008.

27.    It is clear to me from these and other confidential and secret communications between the client and the Troutman Firm that the bulk of the Troutman Firm work was only to occur after Knight Frank had completed its work, and until that time, the Troutman Firm was still retained and I was still a client of the Troutman's Firm.

28.    It was also clear to me that Ms. Cassirer was in the loop on any and all significant issues that arose even after Mr. Epstein was brought into this matter, and that I was Ms. Cassirer's client and she was overseeing all of the Troutman Firm's activities relating to the representation. In addition, Ms. Cassirer was the partner involved in seeing that the bills were ultimately paid as evidenced by the various emails she was copied on with respect to outstanding balances owed to Troutman Firm in connection with its legal representation.

29.    For purposes of clarity, I ask the Court to note that after Mr. Epstein came on board, he apparently delegated significant portions of the day-to-day activity to Mr. Tian Wang, a China based attorney for Troutman's Firm, who in his various communications with us also thought it appropriate to copy Ms. Cassirer on important email correspondence.

30.    Per the outlined plan, the Troutman Firm initially waited on the Knight Frank work to be underway and therefore for a period of time there was limited communication between us and the Troutman Firm.

31. However, during the first half of November 2008 I communicated directly with Mr. Epstein requesting a telephone conference with respect to the anticipated Memorandum of Understanding, a crucial step in the China Project. I did not include Ms. Cassirer in that request, as I felt that at this particular stage of the Memorandum of Understanding, Ms. Cassirer's personal involvement or participation at this specific point in time, was not warranted or otherwise necessary.

32. Apparently, Mr. Epstein thought otherwise as in his response, he felt it appropriate to copy Ms. Cassirer.

33. There are approximately twenty four emails that were exchanged between us and the Troutman Firm which range in dates from July 30, 2008 to December 31, 2008 – and Ms. Cassirer was included in those communications.

34. Mr. Campo, in his Supplemental Declaration dated August 19, 2011 states that, "Ms Cassirer never billed attorney time to the matter, never actually met Klein, and never spoke to Klein after putting him in contact with Edward Epstein, Esq., the managing partner in [the] Troutman's [Firm's] Shanghai office." (¶ 8).

35. I respectfully submit that Mr. Campo's statement is lacking in candor and to my mind is deceptive.

   a. While I may not have met in person with Ms. Cassirer, I also did not meet in person with Mr. Epstein—a fact that is conspicuously omitted from Mr. Campo's Supplemental Declaration- and therefore I do not think that the question of who I retained is determined by who I met.

      b.   The participation of Ms. Cassirer, both passively and actively, after the initial introduction to Mr. Epstein is supported by documentary evidence that renders Mr. Campo's Declaration to be, at a minimum, less than candid, and to my mind deceptive and not true.

36.    Mr. Campo's Initial and Supplemental Declaration to the Court sets forth that, "Troutman [Firm] ceased work on the Global Realty Matter in ***December 2008*** and the matter is closed." ( ¶ 6 emphasis added). It is interesting to note that the Retainer Agreement for this representation was signed by the client and returned to the Troutman Firm on ***December 29, 2008*** based on requests by the Troutman Firm to have the retainer executed and returned, the latest the Troutman Firm request was on ***December 19, 2008***.

37.    From my perspective, the request by Troutman for a signed retainer further evidences an ongoing representation, not, as Mr. Campo would have this Court believe, the closing of a file.

38.    It is clear that my expectation was that the Troutman Firm continued to represent us in the ongoing matter of the China Project; and that, if anything, as of December 2008, the China Project was picking up momentum as evidence by the Troutman Firm's very words and actions that the Troutman Firm believed that it was important at that precise point in time, December 2008, to have the Retention Agreement executed.  Apparently, Mr. Campo wants this Court to believe that the manner in which he and the Troutman Firm close a file and terminate and conclude representation is by stressing the importance to the client of having the client execute a Retainer Agreement (thereby confirming the representation).

39.    In addition, if for whatever reason the Troutman Firm in fact understood that it was closing its file in connection with the China Project and at that point in time only then discovered that it was missing the executed Retainer Agreement, the least that I, as a client should expect from their attorneys' is a letter explaining that although the representation was ending, it was nevertheless important to have a signed retainer on file. However, this was not the case.

40.    Furthermore, there were numerous queries from Knight Frank to the developer during 2009 questioning when the developer expected the project to resume. I was thereafter kept abreast of the Knight Frank communication with the developer.

41.    It is clear to me that not only did I reasonably understand that the China Project and related representation were ongoing, but independent of that belief, Knight Frank also shared that same reasonable belief that the China Project and related representation were ongoing.

42.    Mr. Campo's statement in his Supplemental Declaration paragraph 9 dated August 24, 2001, that, "During the course of the prior representation, [the] Troutman [Firm] did not become privy to any confidential information that would have any bearing on this case and the disputes herein," necessitates Mr. Campo having discussed all of the details of the Caring case with the Troutman Firm's staff who know all of the details of the China Project and related representation to enable Mr. Campo to address the totality of both cases in his Declarations to the Court.

43.    It is respectfully submitted that the question before the Court is how, while seeking to be retained as counsel for the Chapter 7 Trustee, was Mr. Campo

permitted to delve into the particular circumstances of the China Project once the issue of at least a potential conflict was raised.

44.     Alternatively, if Mr. Campo did not obtain, or was otherwise not knowledgeable as to all of the details of both the China Project and the Caring Case, then how can Mr. Campo properly submit Affirmations and/or Declarations about matters that he does not possess the requisite knowledge to affirm or declare, as he does in paragraph 8 of his Supplemental Declaration dated August 24, 2011 that, "the prior representation of Global Realty was completely unrelated to Klein's current disputes with the Debtor and the Trustee on behalf of the Debtor's estate."

45.     With respect to the relation between Caring and the China Project, I respectfully ask the Court to take notice that I proposed a financial arrangement to Ms. Persaud wherein GRV would purchase the receivables of Caring. This agreement went through several draft revisions, at least a portion of which was forwarded to Debtor Persaud's attorney for review. These proposals were rejected by Debtor Persaud and her counsel.

46.     While it is clear to me that the proposed claim between Caring and the China Project was in Debtor Persaud's opinion a significant event relating to the disputes between Creditor Klein and Debtor Persaud with particular emphasis on the Caring dispute. To wit, Debtor Persaud stated in an interview with the Examiner.com which was published on October 22, 2009 that:

> "In October, 2008, I was at a festival in New Jersey. I got a
> phone call from Mr. Klein, and he told me that he wants to see me.
> I told him that I am in New Jersey at a family outing and I don't

want to meet to discuss any business, but he insisted to see me. He told me that he is leaving to China in a few hours but he must see me before he leave. He came to meet me. He bought a two page document from First Republic Bank in Manhattan; he had a paper for me to sign. He wants me to sign a seven million dollar document a lien on my company Caring. He stated that he needs the money to build some houses in China and he must get this money. I did not sign the paper. Since then, Mr. Klein has been very upset with me."

47.    While I do not agree with many of the details in the statements Persaud (set forth above and below), it is clear that Debtor Persaud feels that the proposed deal between GRV and Caring was at least in part a reason for the Caring issues.

48.    If there is any doubt regarding Debtor Persaud's position with respect to the issues she has with me and how GRV is involved and/or responsible for the issues, Debtor Persaud further clarified her stated position in the Black Star News which was published on May 10, 2010 and stated that,

"Persaud says her dispute with Klein began when he approached her in October 2008, for a $7 million line of credit through Caring Home Care, to finance expansion of a business he said he operated in China. Since she knew nothing about the business, she declined, she says."

49.    It is clear to me that GRV and Caring are inter-related matters both from the

perspective of the Debtor and by virtue of the fact that there was a contemplated

deal between both entities.

50.    Once again, in a sworn affidavit made by Debtor Persaud to the Supreme Court of

the County of Kings dated April 21, 2009, Debtor. Persaud swore that:

> "That it has only recently come to my attention through a
>
> forensic accountant that Mr. Klein and his agents have
>
> misappropriated hundreds of thousands of dollars from the
>
> account of 'Caring' to a company owned by Mr. Klein known
>
> as Trade Fame Group Ltd. Without my knowledge permission
>
> or authority. The reports giving these findings can be presented
>
> to the court at a hearing to dismiss the 'arbitrators' award.'"

51.    Trade Fame Group Ltd., is an offshore entity related to my dealings in China.

52.    I do not understand how the Troutman Firm can, as the attorney of the Chapter 7

Trustee, claim that there is no conflict if (as I understand it), the Troutman Firm

would have a duty to pursue, or at least investigate all potential claims on behalf

of the Chapter 7 Trustee, presumably, that duty would clearly extend to

investigating Debtor Persaud's allegation of improper monies transferred from

Caring to Trade Fame Group, an entity that is related to my dealings in China.

53.    I believe:, (1) that there is ample evidence that my representation by Troutman did

not end on December 31, 2008 notwithstanding the Troutman Firm's assertions to

the contrary, (2) that the China Project and its related representation is ongoing

until I am notified that the Troutman Firm is ending its representation in

connection with the China Project, which I presume the Affirmations and Declarations of Mr. Campo would indicate as of August 2011, (3) that it is inappropriate for a firm to end the representation of a client because they feel that there is a new client waiting in the wings that is more advantageous or profitable to the firm, (4) that Ms. Cassirer was involved in the China Project and related representation  after the introduction of Mr. Epstein notwithstanding the Troutman Firm' assertions to the contrary, (5) that there is a nexus between GRV and Caring despite Troutman's assertions to the contrary, (6) that confidential and secret information was transmitted and otherwise provided to the Troutman Firm notwithstanding the Troutman Firm's assertions to the contrary, and (7) new client, particularly one with adverse interest, where there is ample evidence of such, it was my reasonable expectation that the Troutman Firm's New York office would be involved in the China Project representation.

54.    In summary, I believe that there are real issues of conflict and separate and apart from the issues of conflict there are issues relating to, at a minimum, the lack of candor by Troutman and Mr. Campo in their affirmation and declaration to the Court which are, individually and collectively, ample reason for this Court to deny their application for retention.

WHEREFORE, I respectfully request that this Court deny the Chapter 7 Trustee's Application for an Order Authorizing Retention of Troutman Sanders LLP as Substitute General and Bankruptcy Counsel for the Chapter 7 Trustee.

Dated: Brooklyn, New York

September 5, 2011

Abraham Klein

Affirmed before me this
_____ date of September 2011

Notary Public

MENDEL ZILBERBERG
NOTARY PUBLIC, State of New York
No. 01ZI5049141
Qualified in Kings County
Commission Expires March 19, 20 14

Exhibit 1

# TROUTMAN SANDERS LLP

### ATTORNEYS AT LAW
#### A LIMITED LIABILITY PARTNERSHIP

BANK OF AMERICA PLAZA
600 PEACHTREE STREET, N.E. · SUITE 5200
ATLANTA, GEORGIA 30308-2216
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Edward Epstein
edward.epstein@troutmansanders.com

Direct Dial:  +86-21-6133-8968
Direct Fax:  +86-21-6137-8968

November 24, 2008

Mr. Abraham Klein
1260 57th Street,
Brooklyn, NY 11219,
USA

Dear Abe,

**RE:    Engagement of Troutman Sanders LLP by**
**Global Realty Ventures ("GRV")**
**Retainer Letter –**
**Project Juancheng**

This letter will confirm our agreement for the provision of legal services by Troutman Sanders LLP (the "**Firm**") to you and secure your approval of the fee arrangement and other conditions of our representation.   We are very pleased that you have retained us and will, of course, answer any specific questions that you may have about these arrangements.

1.    <u>Scope of Legal Services</u>

The Firm has been retained by you to provide legal services in connection with your proposed investment in a real estate project in Juancheng, Shandong Province (the "Project"), such representation may include:

(a)    preliminary due diligence on the Project and the Chinese party that you are going to cooperate with, including but not limited to:

- a site visit, inspection of the land of the Project;

- reviewing all documents relevant to the Project and the Chinese party that are available to us;

- arranging local agent(s) to make independent searches for all information of the Project and the Chinese party that are publicly accessible; and

- preparing a preliminary due diligence report and legal advice.

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 2 of 7

    (b)    advising on the feasibility of the Project under PRC laws;

    (c)    preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;

    (d)    assisting in forming the joint venture and obtaining all necessary licenses and permits; and

    (e)    other matters ancillary to the above.

2.    <u>Fees and Payment Provisions</u>

The Firm's fees will be charged on an hourly basis for all time actually expended, and will be billed monthly. The hourly rates assigned to the attorneys in our Firm will vary according to the level of experience and expertise of the attorney. The work will be primarily handled by our commercial attorneys in our Representative Office in Shanghai, under my supervision; and assisted by our colleagues in US (if necessary). Set forth below are the 2008 rates for various levels of timekeepers who will be responsible for assisting the Target with its legal affairs in China:

| Position | 2008 RMB Rate |
| --- | --- |
| Partner | ¥4,000 - ¥5,500 |
| Associate | ¥2,800 - ¥3,500 |
| Senior Legal Consultant | ¥2,200 - ¥2,800 |
| Legal Consultant | ¥1,600 - ¥1,800 |
| Legal Assistant/Paralegal | ¥1,100 - ¥1,200 |
| Legal Translator | ¥950 - ¥1,100 |

We would recommend a budget of between USD 25,000 and USD 35,000 for our fees for

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 3 of 7

services to GRV for the Project set out in 1.(a) and (b) above, and these fees will not
include government fees (estimated to be nominal), local agent's fees (estimated to be in
the range of USD 2,000 to USD 5,000), travel to and accommodation in Juancheng
(estimated to be in the range of USD 600 to USD 1,000), meetings or negotiations with
the Chinese partner or other third parties (not anticipated at this stage), or translation of
records into English (which will be quoted separately if required).

We would recommend a budget of between USD 100,000 and USD 150,000 for our fees
for services to GRV for the Project set out in 1.(c) and 1. (d) above, and these fees will
also not include any government fees, local agent's fees, travel to and accommodation in
Juancheng or other places, or translation of any government documents into English.

The fees for the Project are based on the current state of law and policy and local
practices in China, which are liable to change quickly and without prior notice. If the
services we have undertaken to supply based on this estimate become impossible, more
difficult or expensive due to changes in law, policy or practices, we will inform you. You
will have the option to terminate our services based on the work already completed on a
time-cost basis at our current billing rates (not to exceed the quoted fee) or to request us
to provide additional services based on what is required by the changes in the law, policy
and/or practices. If we agree to provide such services, and we shall be under no
obligation to do so, we shall provide such additional services on a time cost basis at our
current billing rates or on an agreed fee basis. Additional government fees, agent's fees
and disbursements shall be billed and paid by you separately. Where such additional
services are required in these circumstances, we do not guarantee an outcome within a
specific time frame, or that the outcome will be successful at all. In such circumstances,
you shall be entitled to terminate such additional services at any time with prior written
notice and your liability for fees will be limited to the time-costs incurred by us in
providing the additional services to you at our current billing rates up to the date you
notify us in writing, as well as any applicable government fees, agent's fees and
disbursements incurred as of such date of notice.

You will find that our rates are quite competitive in this market. Hourly rates are
reviewed and, when appropriate, adjusted to reflect increases in seniority and experience
as well as inflationary factors. Such increases are ordinarily made on an annual basis,
effective as of the beginning of each calendar year. We do not generally send any notice
of a change in hourly rates.

You will be responsible for reimbursement of costs incurred on its behalf and invoiced to
the Firm by third parties. Costs billed to the Firm by parties who supply goods or services
related to our work on your behalf will be billed to you at the actual out-of-pocket cost

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 4 of 7

that the Firm pays to the third party on your behalf. We will use our best professional judgment in determining when to seek your permission prior to incurring expenses with third parties. You will not be billed for any internal Firm costs incurred on your behalf, such as telephone (including long distance charges), telecopy charges, word processing, secretarial overtime, firm couriers, postage (including FedEx, UPS or similar overnight delivery services), printing and photocopying performed in-house, and access to computer legal research.

We will bill you on a monthly basis for both fees and disbursements with the understanding that the bills will be paid in full upon receipt.   Unless otherwise agreed, our billing statements will contain an itemized description of the services rendered and costs invoiced to us during the period covered by the statement.

You may pay us in China in RMB in which case we will add any local taxes (including business tax) to the billed amount to be paid by you and we will issue you a local tax invoice (fapiao). If you choose to pay us in the United States, we expect payment of the full amount billed in US dollars at the exchange rate prevailing at the time of payment in available currency.

Please review our bills carefully when rendered.   You agree that all questions and disputes will be brought to our attention promptly so that they can be addressed and resolved to our mutual satisfaction. Billing mistakes may occur on occasion, and we will be pleased to correct any that you might identify. Please feel free to discuss with me any questions regarding our statements.

3.    Conflict Provisions

Our Firm's policies and applicable professional rules of conduct concerning conflicts of interest are designed to protect the confidences, rights and interests of our clients, while permitting the Firm to advise and represent many different people and organizations.   In order to assure that you and the Firm have the same understanding of the effects of our engagement concerning potential conflicts of interest, we include below relevant considerations and understandings.

As we have discussed, neither you nor this Firm is aware of any actual conflict of interest in our representing the Target at this time. Our Firm is, however, a large one with offices in more than one location, and we represent many other companies and individuals, some of whom we have represented for many years in connection with a great variety of matters. As with your engagement of the Firm in this matter, our ongoing relationships with those clients are important to us and to them. It is possible that some of our present

50217-1                                4

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 5 of 7

or future clients will have disputes or transactions with you during the time that we are representing you. You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse including, for example, representing adverse parties in litigation, arbitration, or other forms of dispute resolution. We agree, however, that your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a non-public nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage, unless we have screened our lawyers, paralegals and staff who have such information from any involvement in the adverse representation.

For the purposes of determining whether a conflict of interest exists, it is only GRV we will represent and not other entities in your corporate family, stockholders, officers, directors, employees or agents ("**affiliates**"). You have agreed that you will not give us confidential information regarding your affiliates. While we recognize that to act adversely to any affiliate could jeopardize your continuing engagement of the Firm to handle matters on your behalf, which we would naturally be reluctant to see happen, for conflict of interest purposes, we reserve the right to represent another client with interests adverse to any affiliate without obtaining consent from you or your affiliates.

4.    Termination of Engagement

Upon our completion of the services for which you have engaged us, our attorney-client relationship will be terminated. If you should thereafter engage us to perform further or additional services, our attorney-client relationship will be revived, subject to these and any supplemental terms of engagement. Further, either of us may terminate the engagement at any time for any reason by written notice, subject on our part to applicable Rules of Professional Conduct. In the event that we terminate the engagement, we will take such steps as are reasonably practicable to protect your interests in the above matter.

You are engaging the Firm to provide legal services in connection with a special matter. After completion of the matter, changes may occur in the applicable laws or regulations that could have an impact on your future rights and liabilities. Unless you engage us to provide additional advice, the Firm has no continuing obligation to advise you with respect to future legal developments. Further, the fact that we may inform you from time to time of developments in the law which may be of interest to you, by newsletter or otherwise, should not be understood as a revival of an attorney-client relationship. Moreover, we have no obligation to inform you of such developments in the law unless

50217-1                                          5

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 6 of 7

we are engaged in writing to do so.

Except to the extent other arrangements are specifically made for this matter, our document retention practice will be as follows: We will retain your papers and property provided to us until termination of this engagement. Following termination of the engagement, we will return those of your papers and property which you may request within thirty (30) days of termination. With respect to all other material, including documents and data created by us and received from others, we reserve the right to retain or dispose of such material as we determine appropriate.

5.    PRC Legal Opinions, Certifications and Representation in Proceedings

In common with all foreign law firms licensed in China, we are permitted to provide information on the influence of the PRC legal environment and we do so only in our capacity as international, multi-jurisdictional lawyers experienced in international business transactions. If you require a formal PRC legal opinion or certification on a specific application of PRC law to conduct or events, we shall be pleased to refer you to any one of the several PRC law firms who work with us for this purpose or engage one on your behalf. We will provide you with our specialist understanding of the relevant law and wealth of our experience in representing foreign companies in China. However, as PRC law is still in a state of evolution and because of the highly regulated nature of the Chinese system of foreign investment, our views may require confirmation from the relevant PRC authorities. In common with all foreign law firms licensed in China, we are required by law to inform you that we are not permitted to engage in Chinese legal business and although some of our employees may have PRC lawyer qualifications they cannot practice as licensed PRC lawyers.

Although it is possible for us to represent you as an agent *ad litem* in a Chinese litigation, because of the nature of the Chinese civil process we always work together with PRC lawyers in litigation involving our clients in China. In Chinese international arbitration proceedings, however, we can and do represent our clients without the participation of a PRC law firm.

6.    Acceptance

This letter constitutes the entire understanding between you and Troutman Sanders LLP with respect to this matter and supersedes all prior understandings, written or oral, as to its subject matter. Any change must be made or confirmed in writing. If this letter correctly reflects your understanding of the terms and conditions of our engagement, we request that you have an appropriate authorized officer of the corporation indicate its consent by having the duplicate originals of this letter executed in the space provided

50217-1                                              6

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 7 of 7

below. You should retain one of these duplicate originals for your records and return the other to me for our records.

We look forward to working with you. I hope that you will let me know if at any time you feel that the service we are rendering or the manner or promptness with which we are responding to your requests for service can be improved. On behalf of Troutman Sanders LLP, I want to sincerely thank you for the opportunity to be of service.

Very truly yours,

TROUTMAN SANDERS LLP

By: _____

Edward J. Epstein

**Global Realty Ventures**   agrees to the foregoing terms

Date: 12/29/08

50217-1

7

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                  Chapter 7
                                                        Case No: 10-44815

      CHRISTINE PERSAUD,
                                                        **AFFIRMATION OF**
                                                        **MENDEL ZILBERBERG**

           Debtor.
-------------------------------------------------------------x

      MENDEL ZILBERBERG, an attorney duly admitted to practice before this Court, hereby affirms the following under the penalties of perjury:

1.      I am the attorney for creditor Abraham Klein ("Creditor Klein") in this case, and I am fully familiar with the facts and circumstances had herein.

2.      I respectfully submit this affirmation in response to the Affirmation of John P. Campo in response to the Objection of Abraham Klein to the Trustee's Application to Retain Troutman Sanders LLP dated August 19, 2011 (hereinafter referred to as "Campo Affirmation").

3.      I feel compelled, legally and ethically, to submit this very limited Affirmation to address the statement contained in paragraph 3 of Campo's Affirmation– but in any way attempting to become a witness in this matter or to otherwise insert my personal beliefs or credibility as it relates to the current Objection of Abraham Klein to the Trustee's Application to Retain Troutman Sanders LLP (hereinafter referred to as the "Troutman Firm").

4.      Without in any way attempting to besmirch the character of Mr. Campo or the Troutman Firm, I most respectfully submit, that the statements attributed to me in paragraph 3 of Mr. Campo's Affirmation are, in part inaccurate, and in part taken out

of context.

5.    Because the issues raised in paragraph 3 of Mr. Campo's Affirmation are not necessarily germane to the application of Troutman Sanders LLP and/or Mr. Campo, I do not go believe it ethically or legally appropriate or necessary to address the specific facts and circumstances of my discussion with Mr. Campo, which make it clear that the statements attributed to me in paragraph 3 of Mr. Campo's Affirmation are, in part, inaccurate and, in part taken out of context.

6.    Suffice it to say, based on Mr. Campo's prior assertions it is clear that as of at least August 1, 2011, Mr. Campo and thereby the Troutman Firm was aware if not actual conflict of interest between the representation that the Troutman Firm sought and the representation of Abraham Klein and/or entities with which he was affiliated.

7.    As more fully discussed in the accompanying Memorandum of Law, a minimum, knowledge of a potential, if not actual, conflict of interest required Mr. Campo and the Troutman Firm to take certain steps, legally and ethically, to safeguard the interests of current (and even former) clients, such as Abraham Klein and/or entities with which he was affiliated.

8.    From the initial Affirmation and the Supplemental Declaration of Mr. Campo, both dated August 19, 2011, as well as the other now-historic facts and circumstances relating to these matter, it appears that Mr. Campo and the Troutman Firm did not take the necessary steps, legally and ethically, to safeguard the interests of current (and even former) clients, such as Abraham Klein and/or entities with which he was affiliated, in the context of dealing with the potential, or actual, conflict of interest that now exists in connection with these matters.

Dated: Brooklyn, New York.

September 5, 2011

MENDEL ZILBERBERG & ASSOCIATES, P.C.
*Attorneys for Creditor Abraham Klein*

By:    **/s/** Mendel Zilberberg
       Mendel Zilberberg (MZ-6625)
       6619 Thirteenth Avenue
       Brooklyn, New York 11219
       Telephone (718) 256-2000
       Facsimile (718) 256-7900
       Email: mz@amalgamail.com