Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    EASTERN DISTRICT OF NEW YORK

4    Case No. 10-44815(ESS)

5

6    - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8

9    CHRISTINE PERSAUD,

10

11              Debtor.

12

13    - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              Conrad B. Duberstein U.S. Bankruptcy Courthouse

17              271 Cadman Plaza East - Suite 1595

18              Brooklyn, NY

19

20              September 15, 2011

21              2:04 PM

22

23    B E F O R E :

24    HON. ELIZABETH S. STONG

25    U.S. BANKRUPTCY JUDGE

Page 2

1

2    ADJOURNED HEARING re Application to Employ Troutman Sanders LLP

3    [228, 230]

4

5    ADJOURNED HEARING re on Application for Order to Show Cause re

6    Motion for 2004 Examination [201]

7

8    ADJOURNED HEARING re on Application for Order to Show Cause re

9    Motion for 2004 Examination [204]

10

11    ADJOURNED HEARING re on Application for Order to Show Cause re

12    Motion for 2004 Examination [202]

13

14    ADJOURNED HEARING re on Application for Order to Show Cause re

15    Motion for 2004 Examination [203]

16

17    ADJOURNED HEARING re on Application for Order to Show Cause re

18    Motion for 2004 Examination [214]

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

Page 3

1

2    A P P E A R A N C E S :

3    TROUTMAN SANDERS LLP

4         Proposed Counsel for Chapter 7 Trustee, John S. Pereira

5         The Chrysler Building

6         405 Lexington Avenue

7         New York, NY 10174

8

9    BY:   LEE W. STREMBA, ESQ.

10        JOHN S. KINZEY, ESQ.

11

12   MENDEL ZILBERBERG & ASSOCIATES, P.C.

13        Attorneys for Creditor Abraham Klein

14        6619 Thirteenth Avenue

15        Brooklyn, NY 11219

16

17   BY:   MENDEL ZILBERBERG, ESQ.

18

19

20

21

22

23

24

25

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 4 of 159 PageID #: 243

Page 4

```
 1

 2    KRINSKY PLLC

 3          Of Counsel for Creditor Abraham Klein

 4          Woolworth Building

 5          233 Broadway

 6          Suite 707

 7          New York, NY 10279

 8

 9    BY:    PERY D. KRINSKY, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 5 of 159 PageID #: 244
CHRISTINE PERSAUD

Page 5

1                   P R O C E E D I N G S

2          THE CLERK:  All right.  Number 1 through 6 on the

3    calendar, all matters regarding Christine Persaud.

4          THE COURT:  All right.  Let's get your appearances on

5    the record, please.

6          MR. STREMBA:  Your Honor, Lee Stremba of Troutman

7    Sanders for the firm.  And I have next to me Mr. John Kinzey,

8    of counsel, assisting me today.  And we also have in the

9    courtroom as witnesses John Campo, a partner of the firm, and

10   Aurora Cassirer, a partner of the firm.

11         THE COURT:  Of course, this is a hearing on the

12   trustee's application to retain the firm.  So I take it, to the

13   extent the trustee is the proponent of the relief, you're also

14   representing the trustee and as proposed counsel?

15         MR. STREMBA:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MR. STREMBA:  And after he testifies, Mr. Campo will

18   also be here in that capacity.  But not until after he

19   testifies.

20         THE COURT:  Okay.  All right.  Thank you.

21         MR. ZILBERBERG:  Good afternoon, Your Honor.  Mendel

22   Zilberberg for creditor Klein with of counsel, Pery Krinsky.

23   We have witnesses, Abraham Klein, Hershel Klein and Professor

24   Bruce Green.

25         THE COURT:  Okay.

1          MR. ZILBERBERG:  Your Honor, also in the courtroom are

2      Sarah Moskowitz who's actually just admitted to the practice of

3      law today in the state system.

4          THE COURT:  Welcome and congratulations.  A new member

5      of the bar.

6          MR. ZILBERBERG:  -- as well as Mr. Benjamin Lambert

7      who's sitting behind me who will be admitted next month to the

8      state.

9          THE COURT:  Congratulations as well.  I'm sure

10     whatever else we disagree on, we agree on the notion that we

11     need the best possible colleagues at the bar in our fine state

12     of New York and here in the federal court.  So I welcome you on

13     behalf of each of all of us.

14          All right.  Mr. Krinsky.  I have your appearances, the

15     identities of your witnesses.  It seems to me that -- and

16     again, I welcome you all and I appreciate greatly the enormous

17     efforts you've been undertaking.  I've been doing my best to

18     keep up and I've read and studied the papers that were filed as

19     much as the time permitted.  I can't say that I'm familiar with

20     all your exhibits but I'm sure you'll take me through that,

21     call my attention to what I need to focus on.  And here's how I

22     propose to proceed as I -- the proponent of the objection is

23     not the proponent of the relief, of course.  This is the

24     trustee's application to retain counsel which is objected to.

25     So I think I need to hear first from the trustee, I supposed,

1    by proposed counsel.  And I'll hear whatever you have to say

2    and you can make the record you need to make.  The standard

3    here, of course, is a standard established by the Bankruptcy

4    Code and the rules with respect to retention and what is and is

5    not satisfactory.  I see we don't have the Office of the United

6    States Trustee.

7              THE CLERK:  Let me call her.

8              THE COURT:  And I know that they have -- they stated

9    on the record their position.  They're always helpful

10   especially in matters of retention.  And so, hopefully, we'll

11   be able to have them as well.  We'll see.  Let's just follow up

12   on that.

13             MR. STREMBA:  Your Honor --

14             THE COURT:  My deputy is going to make an inquiry.

15        (Pause)

16             THE COURT:  I have some -- another heavily annotated

17   copies of some of your pleadings that I'm hoping to grab that

18   apparently I left down on my desk.  Yes?  And apparently, the

19   U.S. trustee is not planning to attend.  If I think it's

20   important to have them here at some point then we'll follow up

21   appropriately.

22             MR. STREMBA:  Your Honor, if I may --

23             THE COURT:  All right.

24             MR. STREMBA:  -- just note that the trustee, John

25   Pereira, will be here.  He's been

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 8 of 159 PageID #: 247
CHRISTINE PERSAUD

Page 8

 1          THE COURT:  Okay.

 2          MR. STREMBA:  -- detained maybe by the weather.  But

 3    he will be here and we don't have to --

 4          THE COURT:  Okay.

 5          MR. STREMBA:  -- stop to wait for him.

 6          THE COURT:  All right.  Well, tell how you -- it's

 7    your application and you have the burden, I think.  Tell me how

 8    you would like to proceed.  Do you have a --

 9          MR. STREMBA:  Your Honor, I --

10          THE COURT:  With all the submissions, I don't know

11    that opening statements are really required.

12          MR. STREMBA:  No.  I just have a couple of -- I guess

13    you'd call them housekeeping issues or issues of process.

14    First, I will present the testimony of Mr. Campo who is the

15    principal attorney for this engagement.  And then I will

16    present the testimony of Aurora Cassirer who is an attorney who

17    had the contacts with Mr. Klein back in the year 2008.  I

18    believe before any of the witnesses testify, we should have

19    them step out and wait until each one is called so that their

20    testimony is their own and not influenced by other testimony.

21          And then I have two issues with respect to the

22    objectors exhibits.  And actually, with respect to the

23    objectors' witness list with respect to their expert.  And I

24    can --

25          THE COURT:  Well, I think we have to take up exhibits

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 9 of 159 PageID #: 248

CHRISTINE PERSAUD

Page 9

1     as they're offered, experts as they're advanced -- as they're

2     offered.  I generally like parties to try and work out any

3     questions as to the admissibility of an exhibit.  And I may

4     give you an opportunity to do so.  I know you've been moving in

5     a fairly fast track here but that doesn't mean that it won't

6     save us all time in order to give you that -- if I give you

7     that chance.  So --

8                 MR. STREMBA:  I don't think we'll have many

9     disagreements on admissibility.  But I believe Mr. Klein's

10    counsel is proposing to have their exhibits submitted under

11    seal.  And so, that raises --

12                THE COURT:  Well, let's take issues up as they arise.

13                MR. STREMBA:  Very good, Your Honor.

14                THE COURT:  Who's your first witness?

15                MR. KRINSKY:  Your Honor, if I may?  I'm sorry.  I do

16    have also several housekeeping --

17                THE COURT:  Well, let's take briefly housekeeping.

18                MR. KRINSKY:  Your Honor, to the extent that exhibits

19    are going to be offered, the issue is -- the core issue before

20    the Court is one of whether or not confidential information was

21    revealed in a substantially related matter at a core base

22    issue.

23                THE COURT:  Well, even the question of substantially

24    related is an issue before --

25                MR. KRINSKY:  Correct.

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 10 of 159 PageID #: 249
CHRISTINE PERSAUD

Page 10

1          THE COURT:  -- the Court.  So please don't assume away

2    anything.

3          MR. KRINSKY:  No.  All three issues are before the

4    Court in terms of attorney/client relationship, revealing

5    confidential information as substantial relationship.  With

6    that being said, because one of those core issues is

7    confidential information, and proving up our side of the case,

8    in a sense, may require certain information to be revealed to

9    the Court in a limited way to explain that relevant

10   confidential information then we'd ask that Ms. Persaud and

11   anybody who's not directly related to the estate or proposed to

12   represent the estate be excluded from the courtroom.

13         THE COURT:  Well, in a general way, this is a public

14   proceeding.  There's been a request to exclude witnesses.  And

15   do the parties agree that your witnesses -- that you will, on

16   an agreed basis, that you will, for any reasons, including the

17   ones you've just noted -- you each noted different reasons --

18   that will exclude witnesses from the courtroom.  It's an

19   unusual thing when the witnesses are also parties.  But the

20   situation proves the party here is somewhat complex.  So my

21   question is will you agree that you will exclude your

22   witnesses.  We can find them a comfortable place to sit,

23   relatively speaking.

24         MR. STREMBA:  Your Honor, we would be prepared to all

25   stay.  I thought that there would be a mutual sense that we

Page 11

1    would want to exclude witnesses.  But if --

2            MR. KRINSKY:  Of course, under Federal of Evidence

3    615, the witnesses themselves, Mr. Campo included, for example,

4    should be excluded if they're going to be testifying.  Same

5    thing -- Ms. Cassirer --

6            THE COURT:  Even parties -- you don't think the

7    parties are actually present?

8            MR. KRINSKY:  To the extent that the testimony -- that

9    they've become witnesses -- first of all, at this point, they

10   are only proposed counsel.  And right now, as they are

11   appearing -- and that's my understanding in terms of why Mr.

12   Stremba, for example, is doing the directs and is handling this

13   side of the case, in a sense, is because you have fact

14   witnesses -- advocates turned fact witnesses.  And until

15   they've at least established or have presented evidence, they

16   are just that:  witnesses and not parties.  The trustee, on the

17   other hand, is a party and certainly he would be permitted --

18   there's no reason for us --

19           THE COURT:  Ms. Persaud?  It's her bankruptcy case.

20   She's the debtor.

21           MR. KRINSKY:  To the extent that Ms. Persaud has an

22   interest -- she's an interested party here, nonetheless, we

23   would ask that she be excluded for us to be able to --

24   otherwise, certain information would have to be presented to

25   Your Honor in camera expert -- at the very least, in camera, if

1    not --

2             THE COURT:  Do you think we can get through the first

3    witness' testimony without these issues?  I think so given that

4    his involvement, as I reviewed the papers that have been filed

5    on the docket without a request -- without any ceiling

6    whatsoever.  Shall we start with Mr. Campo whose testimony may

7    well present none of those issues?

8             MR. KRINSKY:  I think that would --

9             THE COURT:  I'd like to begin to make a record as much

10   as we can, see how far we can go today.

11            MR. KRINSKY:  Then I'd also ask that Ms. Cassirer be

12   asked to exit the courtroom because it is specifically Ms.

13   Cassirer who provided, apparently, information, according to

14   her September 7th declaration, to Mr. Campo upon which, in

15   part, his testimony is going to be based.  So because you have

16   that issue that one is relying on the other, we just ask that

17   Ms. Cassirer be precluded from the courtroom.

18            THE COURT:  Could you point me to a case that supports

19   that?  Because I have to say, you didn't brief it.  We're all

20   working as hard as we can to address this issue as promptly as

21   possible.  But I -- I mean, you're asking me to -- there's a

22   strong bias against ever closing a courtroom in a proceeding.

23   With the question of excluding a witness when the witness is a

24   party, a partner in a firm.  You know, if parties agree,

25   there's no issue.  If it's disputed, I guess I'll hear you.

Page 13

1    And I can tell you, we'll only go so far today.  We're not

2    trying this case all night.  And so, you're choosing yourselves

3    where to spend your time and money in how you proceed.

4           So do you have case for me?

5           MR. KRINSKY:  Your Honor, I don't.  Only Federal of

6    Evidence 615 which allows because Ms. Cassirer -- she is not

7    only not an attorney working on the trustee matter -- in fact,

8    the representations have been made that she is not involved at

9    all in the trustee matter to the extent of marshaling in

10   information for determining conflicts related matters which are

11   being brought to the Court's attention.  So she's not an

12   attorney seeking an application to represent the trustee.  The

13   firm is.

14          MR. STREMBA:  Your Honor, we have not excluded Ms.

15   Cassirer from this representation.  In fact, to the extent that

16   there's litigation involved, she is one of our senior

17   litigators.  She's here to testify about her discussions with

18   Mr. Campo, her recollection --

19          THE COURT:  Just to be clear, it is your firm's

20   position that the lawyer who was involved with the contacts

21   with Mr. Klein and Mr. Klein and GRV in 2008 will be part of

22   the team involved in the representation of the trustee?  Is

23   that what you just said, Mr. Kinzey (sic)?

24          MR. STREMBA:  Mr. Stremba, yes.

25          THE COURT:  I'm sorry.  My notes are a mess here for

Page 14

1    names.

2              MR. STREMBA:  Not the attorney who --

3              THE COURT:  Yes.

4              MR. STREMBA:  -- actually performed the services, Your

5    Honor.  Ms. Cassirer arranged to have Mr. Klein speak to the

6    attorneys in our Shanghai office --

7              THE COURT:  I saw that in the papers.

8              MR. STREMBA:  -- where the work was done.

9              THE COURT:  But she's been referred to several times

10   now by the parties as the attorney who provided the services

11   and the like.

12             MR. STREMBA:  Well, that's not the case, Your Honor.

13   So that will appear in the testimony.

14             Ultimately, Your Honor, our position is that the prior

15   representation, whether it was of Mr. Klein or GRV, bears no

16   relationship at all to the present engagement nor was there any

17   information imparted to the firm whether it was to Ms. Cassirer

18   or to our Shanghai attorneys that is conceivably -- could

19   conceivably be used against Mr. Klein in this proceeding.  And

20   therefore, we believe that Ms. Cassirer would not be

21   disqualified from working on litigation matters.

22             THE COURT:  Do you object to her stepping out of the

23   courtroom?

24             MR. STREMBA:  No, Your Honor.  I'm simply looking for

25   mutuality here.

1              THE COURT:  Okay.

2              MR. STREMBA:  We could have Ms. Cassirer wait outside

3      as long as the objectors' witnesses are outside.

4              THE COURT:  This is what I'm going to do.  I'm going

5      to give you a few minutes to confer on that and try to come up

6      with something that makes sense for both sides.  I know I had

7      you pretty busy on everything else here.  And so, I'm going to

8      let you do what lawyers often do best, to see if you can work

9      this out.  Otherwise, I'll give you my best effort at some

10     guidance as promptly as I can.  I think this is the right way

11     to proceed.  All right.  Let's --

12             THE CLERK:  All rise.

13             THE COURT:  -- be in recess for this moment.  Second

14     call.

15         (Recess from 2:19 p.m. until 2:39 p.m.)

16             THE CLERK:  All rise.

17             THE COURT:  Thank you.  Please be seated.  Let's do

18     it.

19             THE CLERK:  Second call on Christine Persaud matters.

20             MR. KRINSKY:  Your Honor, I --

21             THE COURT:  Let's see if we can get any further.

22     Please.

23             MR. STREMBA:  Your Honor, we don't have an

24     understanding.  I have proposed that the witness list stay

25     outside and then as each witness testifies, they be allowed to

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 16 of 159 PageID #: 255
CHRISTINE PERSAUD

Page 16

1    remain thereafter.  Mr. Krinsky would like the parties to stay

2    but we have a disagreement as to who the parties are.  I

3    believe the parties include the trustee, Troutman Sanders,

4    which has a distinct interest in the outcome of the

5    proceedings, and Mr. Klein and the debtor, of course.  And if

6    those parties are allowed to stay, I have no objection to that,

7    either as a list of parties.  And that would include as

8    Troutman Sanders, Mr. Campo and Ms. Cassirer.

9            MR. KRINSKY:  And, Your Honor, our only position as to

10    how we're defining parties, we view the trustee as the party,

11    the debtor certainly in that respect, and Mr. Klein.  To the

12    extent that Mr. Campo is going to be testifying, Ms. Cassirer

13    is going to be testifying, they aren't parties as the rule is

14    intended under 615.  And therefore -- and there is issues of

15    credibility and hearsay and those types of things.

16            THE COURT:  You're saying they are parties.  I want to

17    be sure I'm hearing you correctly.

18            MR. KRINSKY:  They are not parties.

19            THE COURT:  I'm sorry?

20            MR. KRINSKY:  They are not parties.

21            THE COURT:  All right.  Who would you say is a party

22    here?

23            MR. KRINSKY:  My understanding is it would be the

24    trustee, the debtor and there would be an interested party -- I

25    guess Mr. Klein would be considered an interested party as a

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 17 of 159 PageID #: 256
CHRISTINE PERSAUD

Page 17

1    proponent of the objection.  But Troutman Sanders -- they have

2    not yet -- whether or not they're defined as a party or

3    otherwise, right now you have a potential law firm or a law

4    firm that's potentially going to represent a trustee.  And

5    right now, they're just that, a potential counsel in this case.

6    And Mr. Campo is here as a witness.  Ms. Cassirer is here as a

7    witness.  And therefore, to the extent that their testimony is

8    essentially what is going forward on the basis, in large part,

9    for this Court's decision presumably, at least in part, take

10   them like you would any other witness, one at a time, witnesses

11   outside the room and we proceed -- we have no objection to the

12   trustee or the debtor with the exception of the issue of

13   confidentiality which we noted before, putting that issue

14   aside.

15           THE COURT:  All right.  I'm --

16           MR. KRINSKY:  Your Honor, if I could make just one,

17   actually, other point.  We'd -- in any event, we'd ask the

18   Court to limit -- address the limiting instruction to Mr. Campo

19   that he be permitted to only testify to those facts that he has

20   personal knowledge of.  And I bring that to the Court's

21   attention because in a supplemental affidavit submitted by Ms.

22   Cassirer on September 7, paragraph 2, it specifically states --

23   and this is Klein Exhibit 123.  It states specifically, "In his

24   papers, Mr. Klein questions the ability of my partner, John

25   Campo, to speak to the facts concerning Troutman Sanders'

Page 18

1    representation of Global Realty Ventures, LLC ("GRV"), an

2    entity in which Mr. Klein has an interest.  I" -- Ms.

3    Cassirer -- "was Mr. Campo's source of information concerning

4    this prior representation, and I can confirm that the

5    information Mr. Campo has provided to the Court is accurate."

6         It seems as though we have hearsay within hearsay on

7    multiple levels which I can get into later.  But at the very

8    least, the source of the information -- Mr. Campo's declaration

9    and statements to the Court, was, in fact, Ms. Cassirer, which

10   further, we respectfully submit, warrants that Ms. Cassirer be

11   excluded while Mr. Campo testifies and Mr. Campo be only

12   permitted to testify as to those facts he has personal

13   knowledge of.

14        THE COURT:  I think in the ordinary course, it's best

15   to interpose an objection following a question as opposed to in

16   a general way.  You did not make an in limine motion.  There is

17   none before me.  It seems to me that had you made one, I

18   probably would have suggested that we take it step by step,

19   question by question.  I think anyone looking at this record

20   would be constrained to conclude that the configuration of

21   parties, as it often is in a bankruptcy matter, is a bit

22   different than in a lawsuit by Smith v. Jones, party A v. party

23   B.  This comes up in many contexts in bankruptcy practice.  It

24   certainly comes up in context with respect to how Courts have

25   to look at their own issues in recusal and the like, some

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 19 of 159 PageID #: 258
CHRISTINE PERSAUD

Page 19

 1    issues that I am not unfamiliar with.  I am reviewing the very

 2    helpful bankruptcy evidence manual provided by -- authored by

 3    the very experienced and well respected Judge Barry Russell.

 4    This is out of the Central District of California.  And Judge

 5    Russell, formerly Chief Judge Russell, does lay out some of the

 6    law which is helpful with respect to the section that you've

 7    pointed me to.  I'm looking for a practical way to move through

 8    this mindful that we are spending the assets of the parties and

 9    of this Chapter 7 estate and that, at some point, the fact that

10    the trustee's business judgment in retaining counsel -- I

11    gather we have three partners here from your firm -- many

12    counsel here, an expert witness, waiting in the audience that

13    the cost and burdens of this proceeding to the parties are

14    significant.  It's incumbent upon me to be both, I'll say,

15    thorough and practical in how we proceed.  I invited you to

16    come up with a way to proceed that would make sense.  I asked

17    if you had a case and you don't.  I don't think the issue is a

18    surprise.  So you are leaving me without the kinds of tools

19    that I would typically have to address this sort of situation.

20    The proponent of the retention will go first so the question

21    first comes up with Mr. Campo to be called as a witness,

22    whether Ms. Cassirer should be excluded.  I've asked whether

23    she will step out on a consensual basis as an accommodation to

24    the situation.  And I guess you are counsel to the firm so it's

25    not a question you aren't.  It seems to me that might be a

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 20 of 159 PageID #: 259
CHRISTINE PERSAUD

Page 20

1    practical solution.

2         MS. CASSIRER:  That's not contested, Your Honor.  That

3    is fine.

4         THE COURT:  Why don't we do that.  We'll see if we can

5    find you a comfortable place to sit.  And I think we can

6    proceed step wise.  I note that there is some considerable law

7    about how many individuals, natural persons, may be designated

8    as the representative of a party.  Let's assume for these

9    purposes that the prerogative to be in the room would be

10   because you're a party and it seems to be that the better law

11   is one.  So -- and I say this based on a fairly brief review of

12   Judge Russell's 2010/2011 edition of his bankruptcy evidence

13   manual.

14        So I think we now have a way to proceed.  You can call

15   your first witness.  That's Mr. Campo, is that right?

16        MR. STREMBA:  Your Honor, does that mean that we are

17   excluding nonparty witnesses for now?

18        THE COURT:  Let's see.  There are other witnesses

19   here.  I think nonparty witnesses in the ordinary course on

20   request -- and I can read the rule into the record -- I'm

21   thinking just with respect to your side of the room.  But let's

22   think about who our other nonparty witnesses are.

23        MR. STREMBA:  That would be Hershel Klein --

24        THE COURT:  Okay.  I think that's right.

25        MR. STREMBA:  -- and Mr. Green.

Page 21

1          MR. KRINSKY:  Your Honor, we would have no objection

2      to Mr. Klein being excluded --

3          THE COURT:  All right.

4          MR. KRINSKY:  -- to the extent that the Court deems it

5      appropriate consistent with Federal Evidence 702, 703, et

6      cetera, to have Mr. Green in the -- Professor Green in the

7      room.  We would encourage that because we do believe it would

8      be helpful and consistent with prior suggestions by the Court

9      as to perhaps the helpfulness of expert testimony.  But, of

10     course, whatever the Court deems appropriate.

11         THE COURT:  All right.  Using the same -- I'll say

12     following the same path, I think it makes sense for -- whether

13     the party is GRV or Mr. Abraham Klein that you've identified as

14     the client of the firm from the 2008 period, I think it makes

15     sense under any interpretation to ask Mr. Hershel Klein, with

16     the greatest respect, to step out as a witness who is on your

17     list -- witness list.

18         And that brings us to the question of Professor Green.

19     The rule speaks to witnesses and does not make a distinction

20     between fact and expert. I think the issues are different with

21     an expert witness.  Are you seeking the exclusion of Professor

22     Green as well?

23         MR. STREMBA:  Yes to --

24         THE COURT:  It seems to me that they will be in a

25     different category.  And it would not be an unusual situation

1    that an expert would actually be asked to review a transcript

2    of testimony and disclose the basis for -- or an opinion

3    including perhaps that testimony.

4           MR. STREMBA:  Your Honor, since the issue has come up,

5    I have a number of problems with Mr. Green's participation in

6    the manner that's been proposed.

7           THE COURT:  Well, the question is very limited right

8    now.  We'll have --

9           MR. STREMBA:  Right now --

10          THE COURT:  He'll be called as a witness.  There'll be

11   a proffer.  There'll be -- he'll testify as to his

12   qualifications perhaps or he'll be proffered as an expert.

13   You'll have an opportunity to voir dire on those issues and

14   I'll make a determination.  But that's not the question we're

15   dealing with right now.

16          MR. STREMBA:  No.  The question right now is whether

17   he should listen to the testimony.

18          THE COURT:  Yes.

19          MR. STREMBA:  He has -- Mr. Klein has proffered as an

20   exhibit an affidavit of Mr. Green which I view as really a

21   notarized memo of law.  But it is based upon a certain set of

22   assumed facts.  This exhibit was forwarded to me yesterday at

23   2:00 as pages 850 or so of an 899-page -- 889-page email.  Mr.

24   Krinsky sent me an email that simply said "Proposed exhibits"

25   that included this -- what I now have as a binder of 988 pages

Page 23

1    without reference to the Green affidavit.  And only by

2    scrolling through those 988 pages did I eventually learn

3    yesterday afternoon that there was a Green affidavit as part of

4    this exhibit list.

5            Today, when we get to court, Your Honor, and for the

6    first time, see an exhibit index, lo and behold, Mr. Green's

7    affidavit, which had been about 118 on the hit parade, is now

8    number 1.  It is now a prominent importance on the exhibit

9    list.  So I have a big problem on the manner in which this

10   expert has been proffered to the Court and to us.

11           On the other hand, Your Honor, I would like to make

12   this as streamlined as possible.  And since I view Mr. Green's

13   affidavit as nothing more than a memorandum of law based upon

14   an assumed set of facts, I would be perfectly happy to do one

15   of two -- well, I would be perfectly happy to have his

16   affidavit admitted as a memorandum of law subject to a

17   responding memorandum of law if Your Honor deems it necessary

18   rather than have Mr. Green repeat the material in his

19   affidavit.  And I will not question his credentials.  His

20   resume would take longer than  this afternoon to go through.  I

21   will simply agree that he's an expert and that he has submitted

22   his view of the law based upon an assumed set of facts.

23           So I object to the testimony because I object to the

24   manner in which he's been proffered.  But I would be prepared

25   to accept the admission of the affidavit as the sum and

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 24 of 159 PageID #: 263
CHRISTINE PERSAUD

Page 24

1    substance of Mr. Green's testimony.  And in that way, we can

2    dispense with the whole process of direct and cross.

3            THE COURT:  You're going to put in your case as you

4    see fit.  So is your adversary.  That's how I intend to conduct

5    this proceeding.

6            MR. STREMBA:  Very good, Your Honor.

7            THE COURT:  The issue before me is rather precise.

8    It's not addressed with the clarity I might have expected in

9    the rule which is does the exclusion of witnesses on request

10   provided by the rule with a special treatment for parties apply

11   and, if so, how to expert witnesses.  Now I don't see any

12   indication in the rule, although I haven't read the advisory

13   committee note, of guidance on that issue.  And I recall from

14   many settings, and I'll say different places in the

15   courtroom -- and I've occupied over the last many years -- is,

16   in fact, often done that both experts, when both sides retain

17   experts, are present in court.  Now whether or not the

18   testimony in the affidavit is expert testimony that I should

19   admit as evidence is not the question of the moment.  Rather,

20   the question is who should be in the room when Mr. Campo

21   testifies.  It seems to me that it may well be the better view

22   of the law informed only by my review of the rule, my

23   reflection on many, many, many, many, many hours in court and

24   my review of the discussion in the bankruptcy evidence manual

25   but without notice from the parties, briefs from the parties or

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 25 of 159 PageID #: 264
CHRISTINE PERSAUD

Page 25

 1    a single citation to authority from the parties -- my

 2    impression is that the risks that fact witnesses may align

 3    their stories through hearing them, whether consciously or

 4    subconsciously, to the detriment of the ability of the trier of

 5    fact to make a good conclusion -- and that's me -- that those

 6    same issues are not present with an expert witness who is not,

 7    after all, testifying as to facts and is not -- and will remain

 8    under oath accountable to identify each and everything the

 9    expert relied upon as a basis for their opinion, if we get to

10    that point.  So based on all of that, I'm inclined to think

11    that the better view of the law is that the rule does not

12    require exclusion of the witness.  At the same time, you and I

13    have a common interest in the best possible record and clean

14    record.  And so, if it was the end of the day, I would say this

15    is one more issue I'm going to look closely at and I invite

16    your briefs on so that we don't get this one wrong if there's

17    no consent.

18         I appreciate that you're going to object perhaps, not

19    to the expertise of the identified expert but whether there

20    should be -- whether he should be qualified as an expert and

21    the subject that expert testimony is being proffered on, I take

22    it, is more the subject whether it meets that standard of

23    useful to the trier of fact.

24         So as I look at it, it seems to me that the

25    requirement as articulated -- as explained by the Third Circuit

Page 26

1    that witnesses be excluded so they cannot hear the testimony of

2    other witnesses is not implicated here.  It's -- I don't know

3    if it's mandatory whenever evidence is actually being given.  I

4    think it may be the more cautious course and risk the prospect

5    of error that would require us to have to revisit all of this

6    and if it proves that Mr. or Professor Green -- I'll say it

7    either way.  It's not to enhance or take away from his

8    credentials or persuasiveness -- should be in the room.  I

9    don't want to add a problem to the record.  I take it you

10   object to the presence or you object to having an expert at

11   all.

12            MR. STREMBA:  Well --

13            THE COURT:  With the stipulation that Mr. Green would

14   not be proffered as a fact witness under any circumstances, can

15   we proceed with him in the courtroom?  I think it may save some

16   time.

17            MR. STREMBA:  As Your Honor indicates, the issue right

18   now is his presence in the courtroom.  I object to that.  But

19   if Your Honor believes his presence is appropriate then we'll

20   proceed.

21            THE COURT:  I need to hear from you if there's

22   anything I'm missing as to my assessment of the rule on

23   exclusion, 615.  I can read it into the record.

24            MR. STREMBA:  No, Your Honor.

25            THE COURT:  It's not a question of fact witness.  All

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 27 of 159 PageID #: 266
CHRISTINE PERSAUD

Page 27

1   right.  I'm going to suggest then let's proceed.  And that

2   there is -- that you do not object to Professor Green being

3   present to the extent that he would only be testifying as an

4   expert in the case and not conceding that he should testify as

5   an expert in the case and reserving all of your rights to

6   object to his testifying as an expert in the case.  Have I got

7   it right?

8              MR. STREMBA:  No, Your Honor.  I was objecting to his

9   presence in the courtroom until he should be called as a

10  witness --

11             THE COURT:  Oh.

12             MR. STREMBA:  -- because I believe he was offered

13  based upon an opinion based upon facts that he has already been

14  given.  And I think his testimony will be given based on the

15  facts that we have already been told.

16             THE COURT:  All right.  Now we're going to move this

17  matter forward as -- with the greatest prospect of minimizing

18  the issues to those that are absolutely necessary, I think it

19  makes sense to ask Professor Green to step out.  If it's

20  appropriate for him to review a transcript, counsel can work

21  through that in the appropriate time and place.  I apologize

22  for taking so long to get to that point but I'm eager to

23  minimize the issues to the extent possible.  And I am

24  constrained to read the mandatory language of Rule 615 which

25  does not distinguish between a fact and expert witness as I

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 28 of 159 PageID #: 267
CHRISTINE PERSAUD

Page 28

1    welcome any submissions the parties would like to put in

2    between now and whenever we continue this proceeding, if we

3    don't finish today, on the question of exclusion.  All right?

4    And -- I think he's already gone?

5              MR. STREMBA:  He asked --

6              THE COURT:  He left?  All right.

7              MR. STREMBA:  He got --

8              THE COURT:  We're running -- we may be running out of

9    rooms in the courthouse but it's a big place.  We'll find room.

10   May we now call the first witness?  Does that resolve any house

11   -- any of the necessary housekeeping issues?

12             MR. STREMBA:  I believe so, Your Honor.

13             THE COURT:  Okay.  Yes from the proponent of the

14   retention.

15             MR. STREMBA:  I call --

16             THE COURT:  And the objector to the retention, does

17   that resolve any housekeeping issues?

18             MR. KRINSKY:  The only question I --

19             THE COURT:  -- that needs to be addressed before Mr.

20   Campo begins his testimony?

21             MR. KRINSKY:  Putting aside the Bruce Green

22   affirmation, I do join in opposing counsel in suggesting to the

23   extent the Court want -- that Your Honor thinks it's -- it

24   would save time that if there are no objections to the

25   exhibits -- we'll address them in due course, but rather than

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 29 of 159 PageID #: 268
CHRISTINE PERSAUD

Page 29

```
 1    go into the ordinary proffering of those exhibits, just for

 2    purposes of expediency, we have no objections to their exhibits

 3    and vice versa just for expediency.  But, of course, whatever

 4    Your Honor --

 5              THE COURT:  I'd like it in writing.

 6              MR. KRINSKY:  The agreement?

 7              THE COURT:  Whatever agreement -- whatever stipulation

 8    as to the admissibility of eviden -- of exhibits identified by

 9    number and brief descriptions so there's no ambiguity.  I'll

10    take whatever stipulation as to no objection to admissibility

11    you're prepared to proffer, you're prepared to submit.  And, of

12    course, admissibility is ultimately my determination even if

13    you both agree it's admissible if I don't think it's

14    admissible.  That's probably pretty final.  You should be

15    mindful, of course, that the standard for admissibility in a

16    bench trial is a relaxed standard in most settings.  And so,

17    that -- I would encourage you having that in mind to be as

18    productive as possible in terms of what you agree to admit.

19    All right -- or agree not to object to.  You're agreeing

20    whether to object; I'm deciding whether to admit.

21              All right.  Anything -- any further housekeeping

22    antecedent to the -- and taking of the stand by Mr. Campo?

23              MR. KRINSKY:  Nothing further from us.

24              THE COURT:  Wonderful.

25              MR. STREMBA:  That's it.
```

Page 30

```
 1              THE COURT:  Good.  We're making progress.  Mr. Campo?
 2              THE WITNESS:  Thank you.
 3              THE CLERK:  Please stand.  Raise your right hand.
 4         (Witness sworn)
 5              THE CLERK:  You may be seated.  State and spell your
 6    name for the record.
 7              THE WITNESS:  My name is John Campo.  That's
 8    C-A-M-P-O.
 9    DIRECT EXAMINATION
10    BY MR. STREMBA:
11    Q.   Mr. Campo, will you tell us what your position in the
12    Troutman Sanders firm which is proposed counsel to the trustee?
13    A.   Excuse me.  Yes.  I am a partner in the bankruptcy group.
14    Q.   How long have you been a partner of Troutman Sanders?
15    A.   Since October 1 of 2010, just a little less than a year.
16    Q.   How long have you been practicing as an attorney?
17    A.   Since 1981.  I started in the Department of Justice.  And
18    I worked in the Office of the U.S. Trustee.  I worked there
19    until 1987.  After that, I went to LeBoeuf Lamb where I was a
20    partner at LeBoeuf Lamb for almost twenty years.  I've since
21    left LeBoeuf and I'm now at Troutman.
22    Q.   Since the time you were working with the Office of the
23    United States Trustee, have you consistently been practicing in
24    the area of bankruptcy?
25    A.   Yes.  Bankruptcy and bankruptcy litigation.
```

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 31 of 159 PageID #: 270
CHRISTINE PERSAUD

Page 31

1    Q.    Can you tell me how you came to be in contact with Mr.

2    Pereira regarding a possible retention in this case?

3    A.    Yes.  I've known Mr. Pereira for many years.  I have

4    represented or -- through the firms that I've been with, I've

5    represented Mr. Pereira for well over twenty years -- actually,

6    since about 1988.  And Mr. Pereira contacted me and advised me

7    that he had been appointed as a trustee in the matter of

8    Christine Persaud.  He asked me whether we would be interested

9    in being retained as his counsel.  He advised me that he had

10   been -- he had retained his own firm as counsel to him when he

11   became the interim trustee.  And he advised me that he had been

12   to a 341 meeting in which certain facts had come to his

13   attention that caused him to believe that he needed to retain a

14   larger firm with more -- a wider breadth of experience in order

15   to represent him in connection with the issues in the case.

16   That happened in late July of this year.

17   Q.    And following that discussion, did you then seek to

18   determine whether Troutman Sanders could or should seek to

19   represent the trustee in this matter?

20   A.    I did.  And I did what I standardly do in all of these

21   cases and what I've done for the last twenty plus years since

22   I've been in private practice at least, which is to run the

23   names of all of the various creditors, parties in interest, the

24   debtor, the debtor's lawyers and others who we knew to be

25   involved in the case or adverse through the -- in this case, I

Page 32

1    ran it through the conflict --

2            MR. KRINSKY:  Objection.

3    A.   -- and client database.

4            MR. KRINSKY:  Objection as to the term of "we".  Who

5    is now speaking on behalf of?  Himself, his firm or the

6    trustee, so the record's --

7            THE COURT:  He's under oath.  I think the witness is

8    entitled to use the words that work for him.  You can cross-

9    examine.  Overruled.

10           THE WITNESS:  Okay.

11           THE COURT:  But thank you.  And I'm grateful for the

12   opportunity to explain the way I'm going to think about that

13   kind of thing on that.

14           THE WITNESS:  Thank you.

15           THE COURT:  All right.  Thank you.

16   A.   So I contacted the -- so again, my standard practice has

17   been that I run -- now when I say "we", I refer to the firm.  I

18   run it.  I contact somebody in our conflicts and database

19   department, provide them with a list of all of the creditors,

20   the known parties in interest, the known adverse parties that

21   are involved in the case, and I ask them to run the names

22   through the conflict database to determine whether there are

23   any hits.  In this case, I ran the names that were here through

24   the database.

25   Q.   When you say the names that were here, how did you develop

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 33 of 159 PageID #: 272
CHRISTINE PERSAUD

Page 33

1    the list --

2    A.    The names that were --

3    Q.    -- to provide --

4    A.    -- involved in the case which were the names of the

5    creditors who were on the debtor's schedules, the debtor's

6    names, the debtor's lawyers' names, the names of the adverse

7    parties --

8              MR. KRINSKY:  Objection.  Hearsay.

9    A.    -- as we knew them.

10             THE COURT:  Here's what I'm going to ask.  Objections

11   are directed to questions.  Please do not interrupt an answer

12   unless you see a risk of the kind of disclosure of information

13   that could so taint a process that it must be done.  I caution

14   and remind the parties -- we're very sophisticated lawyers.

15   This is not a deposition and there is no jury.  So interrupting

16   the witness in order to interpose an objection is generally not

17   going to be productive.  And I'm going to give the same caution

18   in both directions, you can be absolutely sure.  That being

19   said, I will say, the witness, please, let the lawyer finish

20   the question so that if there is an objection, we can get it.

21   And with respect to the next question, you're going to be sure

22   the witness has finished.  I had a trial earlier this week

23   where there was an overlap, I think, almost every time because

24   there was such interest in the subject.  I appreciate that.

25   And, finally, again I will remind you that our setting is a

1    bench trial.  And so, the kinds of things that would require

2    the highest scrutiny in terms of what should come before a

3    jury, it's a different body of law.  That's the last thing I'll

4    say to the witness and to any witness.  Do, of course, listen

5    carefully to the question.

6            THE WITNESS:  Thank you, Your Honor.

7            THE COURT:  Remember you're under oath.

8            THE WITNESS:  I --

9            THE COURT:  Answer the question.  Choose your words

10    with care and we'll make a good record.  Thank you very much.

11    BY MR. STREMBA:

12    Q.    I believe you were telling us how you formulated the list

13    of names that you submitted to our conflicts department.

14    A.    Yes.  I had a list prepared from the schedules of the

15    debtor's assets and liabilities and the petitions of all of the

16    creditors, the debtor's name, the names of the attorneys who

17    represented the various -- the debtor.  And I also obtained an

18    information from Mr. Pereira concerning who he believed to be

19    adverse parties in the case.  And I ran those names through the

20    conflict list -- through the conflict system.

21    Q.    Do you know whether you had the conflict system run

22    Abraham Klein's name?

23    A.    It did.

24    Q.    And did it also --

25            MR. STREMBA:  Strike that.

1  A.    It ran --

2  Q.    Other than run the names of creditors through the

3  conflicts system at Troutman Sanders, was there any other step

4  you took to determine whether Troutman Sanders could undertake

5  the engagement?

6  A.    Initially, I certainly wanted to understand what the

7  nature of the engagement was, and we had the breadth and

8  expertise that Mr. Pereira was looking for, in particular,

9  since it involved the healthcare industry -- I should say home

10  care.  So I certainly confirmed that we had regulatory

11  attorneys as well.  Having determined that I thought we were

12  qualified, I ran all of those names through and then examined

13  the results of the report.

14  Q.    And having done that, did you reach any conclusion as to

15  whether there was any impediment to Troutman Sanders

16  representing the trustee?

17  A.    I did.  I reached the conclusion that there was no

18  impediment.  We did not represent anyone who came through on

19  the conflict check.  We didn't represent any creditors.  We

20  didn't represent the debtor.  We also, as part of what I did to

21  confirm that we were disinterested, was I go through the

22  standards of disinterestedness as set forth in the Bankruptcy

23  Code, to, for example, confirm that we weren't an insider of

24  the debtor; we had never represented the debtor, et cetera.

25  And I believe that's all set forth in my declaration, which is

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 36 of 159 PageID #: 275
CHRISTINE PERSAUD

Page 36

1    attached to the trustee's application to retain my firm.

2            MR. STREMBA:  Your Honor, am I correct that the

3    submissions in support of the application for retention are

4    part of the record on this motion now?  Is it necessary, in

5    other words, for Mr. Campo to repeat his affirmation, or could

6    we agree that the parties' submissions are admitted in this as

7    exhibits?

8            THE COURT:  Let's do this.  In the ordinary course,

9    you might show Mr. Campo his affirmation.  You might ask him if

10   he recognizes it.  He can identify it.  You might offer it in

11   evidence, if you can.  And there might be no objection, and

12   then I would receive it in evidence.

13           It is also and separately filed on the record of the

14   case.  Sometimes there's a reference to judicial notice of such

15   things.  In fact, that is a technically imprecise use of the

16   concept of judicial notice, which has to do with record facts

17   in the case, not a filing in the case.  But I think that would

18   be a fine way to proceed with the affirmation of Mr. Campo.

19           MR. STREMBA:  Your Honor, if I may, then, I will show

20   Mr. Campo his declaration and ask him to identify it for us.

21           MR. KRINSKY:  I'm sorry, which exhibit are you showing

22   Mr. Campo?

23           MR. STREMBA:  We haven't listed this one.  This is --

24           THE COURT:  You need always to speak in a microphone,

25   or we will not have a good record.

1          MR. STREMBA:  I'm sorry.  This was not listed as an

2     exhibit, because it was part of our submission in the

3     application.

4          MR. KRINSKY:  Do you have an additional copy for

5     counsel?  It's okay, I have one.

6          MR. STREMBA:  Thank you.

7          MR. KRINSKY:  Just, can you give us a date, though,

8     because we don't have a copy.  I believe there are multiple --

9          MR. STREMBA:  Yes, yes.  This is --

10          MR. KRINSKY:  -- submissions.

11          MR. STREMBA:  -- this is --

12          THE COURT:  So let's keep with testimony.  Is there a

13     question for the witness?

14     BY MR. STREMBA:

15     Q.   Mr. Campo, I've shown you a copy of a document entitled

16     "Declaration of John P. Campo in Accordance with Federal Rule

17     of Bankruptcy Procedure 2014", which is dated August 9, 2011,

18     and is attached to the application for order authorizing

19     retention of Troutman Sanders, LLP as substitute general and

20     bankruptcy counsel for the Chapter 7 trustee.  Can you identify

21     the declaration?

22     A.   I can.  That is my declaration under Rule 2014, which was

23     annexed to the application.  And it was sent -- it was annexed

24     in support of the application to reflect my firm's

25     disinterestedness and qualifications to represent the trustee.

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 38 of 159 PageID #: 277
CHRISTINE PERSAUD

Page 38

1          MR. STREMBA:  Your Honor, I move to have Mr. Campo's

2     declaration deemed to be an exhibit in the record.

3          THE COURT:  All right.  The affirmation of John Campo,

4     which is document 191 on the docket of the case and dated

5     August 19th -- do we have the right one here?

6          MR. STREMBA:  No, Your Honor --

7          THE WITNESS:  No, Your Honor, it's the --

8          MR. STREMBA:  -- it's document 182.  It is -- it is

9     the exhibit to document 182, which is the retention

10     application.

11          THE COURT:  And what is the date?

12          MR. STREMBA:  August 9, 2011.

13          THE COURT:  The date of the -- oh, wait.

14          MR. STREMBA:  That's the date of the --

15          THE COURT:  As opposed to the affirmation in response

16     to the objection.  I'm sorry.

17          MR. STREMBA:  Yes, Your Honor, that's later.

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  Then I need to ask you if -- I suspect

20     there is a copy here.

21          MR. STREMBA:  It would be part of the application.

22          MR. KRINSKY:  Your Honor, I have additional copies for

23     the Court and opposing counsel that have already been pre-

24     marked.  They're cross-examination materials, but I can

25     certainly --

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 39 of 159 PageID #: 278
CHRISTINE PERSAUD

Page 39

1          THE COURT:  Here we are.

2          MR. KRINSKY:  -- pass it up.

3          THE COURT:  All right.  Well, I have it.  We'll

4   appropriately get copies to have a clear record.  I see,

5   though, a declaration as opposed to the affirmation.  Number

6   182, that'll be received in evidence, and we will reference it

7   simply as the Campo declaration, the other document being the

8   Campo affirmation, if we get there.

9   (Campo declaration of 8/9/11 was hereby received into evidence

10  as of this date.)

11         THE COURT:  Please proceed.

12         MR. STREMBA:  Thank you, Your Honor.

13  BY MR. STREMBA:

14  Q.   Mr. Campo --

15         THE COURT:  Excuse me.  Any objection?  I apologize.

16         MR. KRINSKY:  No objection.

17         THE COURT:  Without objection, it'll be received in

18  evidence.

19  Q.   Mr. Campo, I direct you to paragraph 5 of your

20  declaration, and I ask you if you can tell us what information

21  you provided in this portion of your declaration?

22  A.   In this portion of the declaration, I've provided

23  information to the Court that we investi -- again, Troutman

24  investigated the relationships by me causing it to cause the

25  conflict information to be reviewed; that we investigated the

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 40 of 159 PageID #: 279
CHRISTINE PERSAUD

Page 40

1    relationships with the debtor's creditors and parties-in-

2    interest, to which we would be adverse through the conflicts

3    system.  And we then determined, based on the results of those

4    searches, that the various things in connection with our

5    disinterestedness and qualifications under Rule 2014.  Those

6    are the things that are set forth in the affidavit.

7    Q.    Thank you.  Following the submission of your

8    application -- sorry, the trustee's application and your

9    declaration, which is now an exhibit, were there subsequent --

10   any subsequent submissions made by you in connection with the

11   retention application?

12   A.    Yes, there was a supplemental declaration that I filed in

13   accordance with Bankruptcy Rule 2014, which was supplemented --

14   supplemented the initial declaration, and it was filed in

15   response -- partially in response to the objection that had

16   been raised by creditor Klein.

17   Q.    And do you have a -- are you looking at that document?

18   A.    Yes, I am.

19   Q.    And what is the document number for that declaration?  Do

20   we have it?

21   A.    That declaration is -- you mean what is the exhibit

22   number?

23   Q.    No, I'm asking whether there's any indication of the

24   docket number for that item?

25   A.    It's not on this copy, but I know it's docketed.  And it

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 41 of 159 PageID #: 280
CHRISTINE PERSAUD

Page 41

1    was dated August 19, 2011.

2            THE COURT:  Would this be docket number 191 filed

3    August 24, dated August 19th?  And I say this only because it

4    may help identify it -- it's called the affirmation?

5            THE WITNESS:  No, Your Honor, that's a separate

6    document.  There's an addition to the -- there's a supplemental

7    declaration under Rule 2014.

8            THE COURT:  I will track that one down.

9            THE WITNESS:  As well as that affirmation that Your

10   Honor is referring to.

11           THE COURT:  What number of the docket?

12           MR. KRINSKY:  Your Honor, it's dockets number 190 and

13   191.

14           THE COURT:  I'm looking at 190.

15           MR. KRINSKY:  The supplemental declaration is 190.

16           THE COURT:  I have it.  Thank you.  It was right in

17   front of me.

18   BY MR. STREMBA:

19   Q.   Mr. Campo, I refer you to the document called "Affirmation

20   of John P. Campo in Response to the Objection of Abraham Klein"

21   dated August 19, 2011, which I believe is docket number 191 in

22   the case.

23   A.   Yes.

24           MR. STREMBA:  Is that what you just --

25           MR. KRINSKY:  Correct, the affirmation?

Page 42

1        MR. STREMBA:  Yes.

2        MR. KRINSKY:  The affirmation is 191.  The declaration

3    is 190, yeah.

4    Q.   Yes, which is docket number 191.  Is this a copy of an

5    affirmation that you prepared and filed in this case?

6    A.   Yes, it is.

7        MR. STREMBA:  Your Honor, I move to have docket

8    numbers 190 and 191, Mr. Campo's supplemental declaration and

9    his affirmation deemed to be exhibits in evidence.

10       THE COURT:  So you're offering them in evidence?

11       MR. STREMBA:  Yes, Your Honor.

12       THE COURT:  Yes, any objection?

13       MR. KRINSKY:  Putting aside the technical offering and

14   going through the steps, we have no objection.

15       THE COURT:  It's been offered.  Without objection,

16   it'll be received.

17   (Supplemental declaration of Mr. Campo dated 8/19/11 was hereby

18   received into evidence as of this date.)

19   (Campo affirmation was hereby received into evidence as of this

20   date.)

21       MR. STREMBA:  Thank you, Your Honor.

22   Q.   Mr. Campo, putting aside the written submissions, can you

23   tell us about what occasioned the filing of your supplemental

24   declaration and your affirmation?  Could you tell us the

25   purpose of those filings and what they -- the subject matter?

1   A.   The supplemental declaration and the affirmation were

2   prepared to respond to the objection of creditor Klein to the

3   retention of Troutman Sanders.  They were -- the supplemental

4   declaration specifically was prepared in accordance with

5   Bankruptcy Rule 2014, to disclose the firm's prior relationship

6   with Global Realty Ventures, which was the entity that Troutman

7   had represented in the -- and that -- in a matter involving the

8   Shanghai office in China.   That disclosure -- the disclosure

9   of all of the facts in the declaration, which are somewhat

10  repeated in the affirmation -- and the affirmation goes into

11  issues beyond just the disinterestedness question that was

12  raised -- but the reason for the disclosure was to respond to

13  creditor Klein's objection, in which he stated that Troutman

14  was not qualified to represent the trustee because it wasn't

15  disinterested, because he contended that it represented -- that

16  Troutman represent himself -- represented Mr. Klein.

17  Q.   So both of these submissions took into account the

18  objection filed by Mr. Klein?

19  A.   Yes.  The original objection.  When you say both of these

20  submissions, the supplemental declaration and the affirmation

21  both --

22  Q.   Yes.

23  A.   -- took into account what had now been raised by creditor

24  Klein in his objection.

25  Q.   Now, how did you, or --

Page 44

```
 1            MR. STREMBA:  Strike that.

 2   Q.   What steps did you take, if any, to look into the charges

 3   made by Mr. Klein, before you prepared your supplemental

 4   declaration and affirmation?

 5   A.   Well --

 6            MR. KRINSKY:  Your Honor, I'm going to object at this

 7   point.  I apologize.  There's a whole question of relevance.

 8   The issue of their conflict checking system is not the issue.

 9   It's whether or not there's an attorney-client relationship.

10   And this person --

11            THE COURT:  I respectfully disagree for the following

12   reason.  They have the burden on retention.  There are elements

13   to be -- that have to be satisfied in order to be retained in a

14   bankruptcy case.  That's the record they need to make.  You've

15   objected on disinterestedness.  I think it's appropriate and

16   relevant to establish -- and it's usually uncontroversial,

17   because there's usually no objection -- the system is pretty

18   good at ferreting out problems -- what was done.  Remember

19   they've got the burden, so overruled, and those are the reasons

20   why.  Thank you.

21   A.   I think in order to --

22            THE COURT:  Let me just add one more comment.  The

23   point being of the objection, which I have overruled, it may go

24   to the question of how much time you choose to spend on that.

25   Lawyers are in charge of that, virtually exclusively, in my
```

Page 45

1    court.

2                MR. KRINSKY:  Yes, Your Honor.

3                THE COURT:  Thank you very much.  Please proceed.

4                THE WITNESS:  Okay.

5    A.   So --

6                THE COURT:  I'll say, so far it's been certainly

7    within any boundaries that's helpful to the Court.  It's still

8    helpful to the Court to hear what the steps were.

9    A.   The submissions of the supplemental declaration were

10   precipitated by the objection.  When the original declaration

11   was submitted, okay, we had completed -- I had reviewed all of

12   the conflicts information and found no representations to

13   Abraham Klein.

14       After the objection was filed, we ran through again and

15   we -- I made further inquiry within the office.  It was all

16   predicated on what was disclosed in the objection and what we

17   figured we would -- we went back and tried to understand what

18   the allegations of the objection were, because they didn't make

19   any sense.  And this really all started with a conversation

20   that I had had with Mr. Zilberberg right after we had been

21   retained by Mr. Pereira, but before our retention submission

22   had gone to the court.

23   Q.   Who is Mr. Zilberberg?

24   A.   Mr. Zilberberg was Mr. Klein's lawyer.

25   Q.   And how did that communication come about?

Page 46

1    A.    After Mr. Pereira contacted us at the end of July and

2    asked us to become involved, and while we were running our

3    initial conflicts check, issues came up with respect to Mr.

4    Pereira wanting to inspect the debtor's business locations at

5    Liberty and what the trustee believed was -- at least what the

6    trustee believed was the debtor's interest at that time in

7    connection with Caring, which was a business that Mr. Klein was

8    running.  And I contacted Mr. Klein's lawyer, Mr. Zilberberg,

9    and requested that he allow us, consensually, to look at Caring

10   and to get some information.

11   Q.    And what was discussed -- what did you say and what did he

12   say during that discussion?

13           MR. KRINSKY:  Objection, hearsay.

14           THE COURT:  What did you say?

15           MR. KRINSKY:  The question was what did you say and

16   what did -- what did you say to Mr. Zilberberg, and what did

17   Mr. Zilberberg say in response.

18           THE WITNESS:  He's here.

19           THE COURT:  Would you like to respond.

20           MR. STREMBA:  Your Honor, it's in essence a discussion

21   of counsel to the objector.  I think it's -- whatever he said

22   is in the nature of an admission and therefore admissible

23   without regard to the hearsay rule.

24           THE COURT:  I take it that it is not being offered for

25   the truth of the matter asserted.

Page 47

1          MR. KRINSKY:  Your Honor, if not's offered for the

2     truth of the matter asserted, then we would object on

3     relevance.

4          THE COURT:  Overruled --

5          MR. KRINSKY:  It does not go to the --

6          THE COURT:  -- as to relevance.  Overruled.

7          MR. STREMBA:  Your Honor, the point here is what

8     triggered the additional reviews within the firm which led to

9     the subsequent submission.  It --

10         THE COURT:  I think the process is, broadly speaking,

11    relevant to whether we should proceed.  I note that a failure

12    to disclose, if I remember correctly, is a part of your

13    objection, is it not?

14         MR. KRINSKY:  I was about to say, I withdraw the

15    objection, now that I understand where he's going.

16         THE COURT:  If the objection is withdrawn, we can

17    continue.  Thank you.

18         Do you have the question in mind?

19    BY MR. STREMBA:

20    Q.   Can you relate the conversation, Mr. Campo?

21    A.   Yes.  Mr. Zilberberg, after we exchanged hellos and other

22    pleasantries, said to me that he thought that there might be a

23    conflict in the case.  And I asked him what he was referring

24    to, and he told me that he thought that his client, Mr. Abraham

25    Klein, said that he thought that he had retained our law firm.

1    And I said in connection with what; and he said he didn't know.

2        So I probed him a little further and I asked him what was

3    it -- the nature of the representation, and he said he didn't

4    know.  I asked him -- I told him I had run our conflicts check

5    and had not run -- and not found any connection to Mr. Klein's

6    name.  And then I asked him if he could find out from his

7    client what he was referring to.

8        I then went back to my conflicts department and asked --

9    Q.    Excuse me.  Just to be clear; and that was the end of the

10   conversation?

11   A.    That was -- well, at that point I had said to Mr. Klein

12   (sic), I said, is this a current or a closed representation.

13   He said he didn't know.  And I said well, if it's a closed

14   representation, obviously there wouldn't be a conflict.  And he

15   said he agreed with me, but I said I'll look into it further,

16   and I asked him if he would advise me further as to what

17   specifics he had on that, because I couldn't find Abraham Klein

18   as a client of the firm.

19   Q.    So following that conversation then, what did you do?

20   A.    We just went back to the conflicts department and ran the

21   name Klein again.  Again, didn't find any connections to it at

22   all.  And then I went and spoke with my managing partner,

23   Aurora Cassirer.

24   Q.    And why did you do that?

25   A.    Because Mr. Zilberberg had indicated to me that he knew

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 49 of 159 PageID #: 288
CHRISTINE PERSAUD

Page 49

1    Aurora.  In fact he told me that he was married to her cousin.

2    And that I should, you know -- just in general, that, you know,

3    I should say hello to her.  But at this point, I certainly went

4    back to her and I said that Mr. Zilberberg had indicated that

5    he thought we represented Abraham Klein.  I said, and I don't

6    find anything about it.  Can you help me out; do you know

7    anything about it?

8    Q.  And what did Ms. Cassirer say about --

9    A.  Well, we ran the conflicts check again.  And then she

10   said, well Abraham Klein is a very common name.  But then she

11   said -- when I told her the nature of the matter, she said that

12   she thought that we might have done some matter involving a

13   real estate venture in China in which there could have -- in

14   which there was an Abraham Klein involved, and perhaps that's

15   what Mr. Zilberberg was referring to.

16          MR. KRINSKY:  Objection.  Move to strike everything

17   after "Ms. Cassirer said to me".  Hearsay.

18          THE COURT:  Grounds?

19          MR. STREMBA:  Your Honor --

20          MR. KRINSKY:  Hearsay.

21          MR. STREMBA:  -- Your Honor, once again, as you

22   pointed out, we're not talking about the truth of these

23   statements.  We're trying to find out what acts Mr. Campo did

24   to determine whether there was any substance to Mr. Klein's

25   complaints.  And one of the things he did was to talk to Ms.

Case 1-10-44815-ess Doc 238 Filed 09/19/11 Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG Document 1-22 Filed 07/05/12 Page 50 of 159 PageID #: 289
CHRISTINE PERSAUD

Page 50

1    Cassirer.  And the information she provided is part of Mr.

2    Campo's analysis.  I don't think it's a hearsay question.

3            MR. KRINSKY:  Objection withdrawn.

4            THE COURT:  You may proceed.  Thank you.

5    Q.   So, what did Ms. Cassirer say about the engagement?

6    A.   Well, I went back and we ran Klein's name again, and found

7    that there was a -- Klein had been listed as an officer or a

8    shareholder or something to that effect, in connection with a

9    matter for Global Realty Ventures, which was handled out of the

10   Shanghai office.

11   Q.   So he wasn't a client, but he was somehow related to a

12   client?

13   A.   Yes.

14           MR. KRINSKY:  Objection.  Leading.  It goes to the

15   ultimate issue.

16           THE COURT:  Overruled.

17   Q.   In the Troutman conflicts system, how was Mr. Klein

18   reflected in connection with the engagement?

19   A.   The engagement was reflected as an engagement for Global

20   Realty Ventures.  And Mr. Klein was listed as a -- as some type

21   of an interested party.  He was designated as officer/director.

22   Q.   Did you and Ms. Cassirer have any further discussion about

23   the prior Troutman engagement?

24   A.   Yes.

25   Q.   And could you relate that discussion to us?

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 51 of 159 PageID #: 290
CHRISTINE PERSAUD

Page 51

1    A.    Well, I asked Ms. Cassirer what was the prior engagement

2    about, because I wanted to confirm that it had nothing to do

3    with this matter.

4              THE COURT:  I need to remind everyone --

5              THE WITNESS:  I'm sorry.

6              THE COURT:  -- to stay close enough to a microphone to

7    make a good record.

8              THE WITNESS:  I apologize, Your Honor.

9              THE COURT:  Thank you.

10   A.    Again, I asked Ms. Cassirer what the engagement was about,

11   because I wanted to make sure that it had no relation to this

12   bankruptcy matter.  And she advised me that it involved a real

13   estate transaction in China, and that it has been handled out

14   of the Shanghai office.  She also advised me that she checked

15   to determine that the matter indeed was closed, which is how it

16   had been reflected in the conflicts system, and that she also

17   said that she went back and looked at the billing record for

18   the matter and determined that no time had been billed to it

19   since December of 2008.

20       I then asked her whether she thought that this

21   involvement, whether she knew anything about what it involved,

22   and she said only an investment in real estate in China.  And I

23   said, well, I don't think that has anything to do with the

24   Caring home care business, Ms. Persaud, Liberty, or this

25   bankruptcy.

1           THE WITNESS:  I think I'm getting too close, Your

2     Honor. I apologize.

3           THE COURT:  Yes.

4     A.   And as a result, I determined that there was no conflict.

5     We didn't represent Mr. Klein, and Global Realty wasn't a

6     creditor in the case.  I had never heard back from Mr.

7     Zilberberg after I had asked him whether there was any issues

8     concerning our retention, and we went ahead, and I prepared and

9     finalized our retention papers, including the initial

10    declaration of disinterestedness.

11    Q.   Did you requisition or try to look at the actual closed

12    file for the prior engagement?

13    A.   No.

14    Q.   Other than what you've told us, did Ms. Cassirer provide

15    you with any other information regarding the prior engagement?

16    A.   No.

17    Q.   Following that discussion, was there anything else that

18    you did to prepare your supplemental declaration and

19    affirmation?

20    A.   Well, after the -- the discussion I'm referring to was

21    before we filed our original papers.

22    Q.   Oh, I see.

23    A.   We filed our original papers, retention papers that

24    reflected we didn't represent anybody.  Mr. Zilberberg had not

25    gotten back to me telling me any information about what he

Page 53

1    believed -- what he said might be a conflict.  And Mr.

2    Zilberberg had also, in the interim, served papers in the case,

3    involving a motion to vacate a -- the decision of the appellate

4    court that had reversed a state court judgment, and he served

5    those papers on me as counsel to the trustee.  And that was

6    before our retention was filed.  So I presumed that Mr.

7    Zilberberg, like myself and Ms. Cassirer, had confirmed that

8    the representation was of -- was not of any significance, that

9    it was closed, and it wasn't a representation of Klein.

10   Q.    Mr. Campo, do you know of any information imparted to

11   Troutman Sanders in its prior representation relating to an

12   entity called Trade Fame Group, Ltd.

13   A.    No.

14   Q.    Do you have any reason to believe that Troutman received

15   information concerning a company called Caring, in connection

16   with its prior representation?

17   A.    Absolutely have no reason to believe it.

18   Q.    Do you have any reason to believe that Troutman Sanders

19   was provided information relating to any business dealings,

20   proposed or consummated, between Trade Fame Group and Caring?

21   A.    No.  I only saw the name Trade Fame Group when it was

22   raised in the objections of Mr. Klein.  I had never heard of it

23   before.  Although we did run its name after Mr. Klein raised it

24   in its objection, and it came back with no hits as well.  And

25   by the way, I had already run the Caring name, and it had no

Page 54

1    hits.

2    Q.   Mr. Campo, I assume you've carefully reviewed all of the

3    submissions made by Mr. Klein in connection with the

4    opposition.  Is that correct?

5    A.   I have.

6    Q.   And have you reviewed the three sworn statements that you

7    filed in this case and which have been marked as exhibits

8    prior -- in anticipation of this hearing?

9    A.   Yes, I have.

10   Q.   And is there anything in your three sworn statements that

11   you believe is no longer true?  In other words, do you still

12   stand by your three submissions?

13   A.   I thought that's what you meant by the question.  Yes, I

14   still stand by the submissions and the accuracy thereof.

15   Q.   I think I asked this, but just to make sure.  Based upon

16   your analysis and investigation, as you've described it this

17   afternoon, did you reach any conclusion as to whether any --

18   there was any relationship between Troutman Sanders' prior

19   representation and the representation of the trustee in this

20   case?

21   A.   Yes.

22   Q.   And what was that conclusion?

23   A.   I concluded, based on all the information before me, I

24   couldn't -- that there was no relationship.  I discussed this

25   and the prior representation of the Global Realty entity with

Page 55

1    Mr. Pereira, and he agreed with me.  And of course, I had

2    discussed it with Ms. Cassirer, and she also agreed that there

3    was no conflict, there was no relationship.

4          MR. STREMBA:  Your Honor, I have no more questions on

5    direct.

6          THE COURT:  You may cross-examine.

7       (Pause)

8          MR. KRINSKY:  Your Honor, just for the sake of

9    convenience, would it be permissible for me to just put this on

10   the well of the witness' podium so --

11         THE COURT:  Could you state for the record what it is?

12         MR. KRINSKY:  Sure.  The exhibit book for creditor

13   Abraham Klein and the proposed hearing exhibits.

14         THE COURT:  Like the big one I have right here?

15         MR. KRINSKY:  It is.  Just for convenience, we've also

16   provided one to opposing counsel.

17         THE COURT:  Any objection?  It seems to make sense.

18         MR. STREMBA:  Objection to placing it on the -- no,

19   no.

20         THE COURT:  Providing it -- what we're doing is

21   providing all the exhibits to the witness.

22         MR. STREMBA:  Yes.

23         THE COURT:  It seems to make sense.  There's no

24   objection.

25         MR. STREMBA:  No objection.

Page 56

1            THE COURT:  Without objection, you may do so.

2            Mr. Campo, here come one hundred and something

3    exhibits.

4            THE WITNESS:  Thank you, Your Honor.

5            THE COURT:  In what may be the biggest binder I've

6    ever seen.

7            Mr. Campo, I regret that you are not among those

8    permitted to object.

9            All right.

10           MR. KRINSKY:  May I proceed, Your Honor.

11           THE COURT:  This is a serious matter, and of course, I

12   make a light comment only because it's a number of pages that

13   are involved.

14           Yes, please proceed with your cross-examination.

15   CROSS-EXAMINATION

16   BY MR. KRINSKY:

17   Q.   Mr. Campo, you mentioned a moment ago that you had

18   submitted a number of documents in connection with your

19   obligations, pursuant to Rule 2014(a) and disclosure

20   requirements.  Is that correct?

21   A.   I think that's what I said, yes.

22   Q.   And part of those 2014(a) disclosure requirements,

23   requires you to reveal certain information for the court, to

24   determine whether or not there is a conflict or whether or not

25   you are a disinterested person being retained in connection or

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 57 of 159 PageID #: 296
CHRISTINE PERSAUD

Page 57

1    on behalf of the trustee.  Is that right?

2    A.   That's what the rule says.

3    Q.   Well, is that your understanding of the rule?

4    A.   Yes, it is.

5    Q.   Okay.  And as you testified, you have a conflicts checking

6    system that you've used for many, many years, to ensure that

7    the standards are met pursuant to 2014(a).  Isn't that right?

8    A.   Well, I testified that I reviewed the conflicts system at

9    Troutman, where I've been for less than a year.  So I haven't

10   used that for many, many years.  But I've been a partner in a

11   major law firm for the majority of my career, and I've used

12   various conflicts systems in addition to the one at Troutman.

13   Q.   And part of the obligation under 2014(a) that you have is

14   to disclose, for example -- you have to set forth any persons'

15   connections that you have with either the debtor, the creditor

16   or any other party-of-interest.  Is that right?

17   A.   I believe so.  Do you have the rule in front of you?

18   Q.   Well, I do.  I'm asking you if that's your understanding

19   of what the rule says?

20   A.   I don't have the rule directly in front of me, but I'm

21   pretty sure that's a fair -- but if you want -- you could show

22   it to me, though.

23   Q.   Is that a fair understanding that you have, sir?

24   A.   That you are supposed to --

25   Q.   That you're supposed to disclose -- set forth -- any

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 58 of 159 PageID #: 297
CHRISTINE PERSAUD

Page 58

1   person's -- meaning you -- any connection with the debtor,

2   creditors, or any other party-of-interest.  Is that right?

3          MR. STREMBA:  Your Honor, object.  I'm not sure what

4   the purpose of a question is.  He's asking whether the witness

5   has memorized the Code?

6          THE COURT:  No, this Bankruptcy Rule, is of course

7   implicated in the issues raised in the objection, and I think

8   the question, on its face, is in substance, is it your

9   understanding that the Rule requires the following.  I think

10   it's permissible cross-examination.

11          I'm going to overrule the objection.  I urge counsel

12   and the witness to listen carefully to the questions and the

13   answers, and be productive, and remember that arguing -- there

14   will be time for lawyers to argue this matter.  This is not

15   that time, of course.

16          Do you have the question in mind, Mr. Campo.

17          THE WITNESS:  No.  Could you state it again?

18          THE COURT:  Could you repeat and perhaps restate the

19   question?  Let's try to move along.

20   Q.  Is it your understanding that your obligation under

21   2014(a) was to provide -- to disclose any connection that your

22   firm has with debtor, creditors or any other party-of-interest

23   in submitting the 2014(a) papers to the Court?

24   A.  Yes.

25   Q.  Okay.  That's all.  So one of the things that you had to

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 59 of 159 PageID #: 298
CHRISTINE PERSAUD

Page 59

```
 1    do was, as I think you mentioned, you had to get a list of sort
 2    of all the interested parties, the creditors, the debtors, and
 3    you did that, correct?
 4    A.    Um-hum.  I did.
 5    Q.    And it was the trustee that provided you with this list?
 6    A.    No.  I got it from the public docket.  He provided me with
 7    the names of the other parties who he knew he was adverse to.
 8    Q.    Other than Abe Klein --
 9          MR. KRINSKY:  Or, I'm sorry, withdrawn.
10    Q.    Abe Klein, was he on the list that was publicly available
11    to you?
12    A.    He was on the list that we submitted.  I don't remember
13    where I got his name from.  His name was submitted, Abraham
14    Klein.
15    Q.    And you then went ahead and, as I think you said, you
16    submitted that list through your conflicts -- your firm's
17    conflicts checking system.  Is that right?
18    A.    That's right.
19    Q.    The first time --
20          MR. KRINSKY:  Withdrawn.
21    Q.    How many times did you submit the names to your conflict
22    checking system?
23    A.    I submitted it the first time, and then we went back and
24    said double-check Mr. Klein, because of the conversation I had
25    with Mr. Zilberberg.
```

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 60 of 159 PageID #: 299
CHRISTINE PERSAUD

Page 60

1    Q.   Was the first time that you checked the conflicts checking

2    system, was that before or after you spoke with Mr. Zilberberg?

3    A.   It was before.

4    Q.   So the first time, before you spoke to Mr. Zilberberg, did

5    Abraham Klein's name come up on your firm's conflict checking

6    system?

7    A.   No.

8    Q.   Prior to speaking with Mr. --

9    A.   I'm sorry.  I put his name into the conflicts system.

10   Q.   And no results came back from your conflicts --

11   A.   It did not come back with any results.  It came back with

12   no hits for Abraham Klein.

13   Q.   At that point in time, you said you then had a

14   conversation with Mr. Zilberberg?

15   A.   Correct.

16   Q.   Mr. Zilberberg said to you that he believed -- or that it

17   was known that Abraham Klein was --

18        MR. KRINSKY:  Withdrawn.

19   Q.   -- that Abraham Klein believed that he'd been represented

20   by your firm?

21   A.   Correct.

22   Q.   And at that point you decided to go back and check --

23   check the conflicts checking system again?

24   A.   Correct.

25   Q.   And on the second conflicts check, his name did come up.

Page 61

1    Is that right?

2    A.   Well, I said specifically, run the name of Klein and find

3    out if there's anything that hits for Klein again.

4    Q.   Well, let's go back.  The first time you ran the check --

5    A.   Correct.

6    Q.   -- did the name Klein at all come up?

7    A.   It came up with no hits.

8    Q.   And the second time it came up with multiple hits with the

9    name Klein?

10   A.   No, it didn't come up with any hits under Klein.

11   Q.   So the second time you ran it, what did come up?

12   A.   What came up was, I asked them to check all closed

13   matters, and see if there's any connection to a name Klein.

14   Q.   Well, the first time, when you ran the conflicts check,

15   did you check open and closed matters or just open matters?

16   A.   I don't know what they checked.  I asked them to check

17   through the conflicts check.  Normally, it would show closed

18   matters.  But it didn't hit him.

19   Q.   So it was your assumption that they checked closed

20   matters?

21   A.   Certainly as of the second one it was, because I

22   specifically said make sure you check all closed matters as

23   well, for Abraham Klein.

24   Q.   Well, let's go back for a moment, because you said a

25   moment ago that you had your own conflicts checking system that

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 62 of 159 PageID #: 301
CHRISTINE PERSAUD

Page 62

1   you used and had used for many, many years at your prior firm

2   and at this firm.

3   A.   No, that's not my own conflict system.  That's not what I

4   said.

5   Q.   When you -- okay.   When you did ask them to run the

6   conflicts check --

7   A.   I --

8   Q.   -- did you say run past and present clients of the firm?

9   A.   My understanding is you always run past and present.  I

10  gave them a list and said run this through conflicts.

11  Q.   So the first time it doesn't show up with Klein, but the

12  second time you it -- you --

13  A.   The second time --

14  Q.   -- asked them to run Klein.

15  A.   -- I said specifically hone in on this name Abraham Klein,

16  because Mr. Zilberberg claims that there's a represen -- or

17  there could have been a representation here, and they said they

18  ran it again and they found in a closed matter, a name for an

19  Abraham Klein -- didn't know if it was the same one -- listed

20  as an officer.

21  Q.   Who was this person that you were speaking to, by the way?

22  A.   It's a computer.  It's all done through --

23  Q.   So who was the person that you were e-mailing with

24  about --

25  A.   I e-mailed the conflicts department.

Page 63

1    Q.    And who did you speak wi -- e-mail at the conflicts

2    department?  Were you speaking -- were you e-mailing a live

3    person?

4    A.    Well, my secretary actually e-mails the list.

5    Q.    Okay.  So it wasn't --

6    A.    And they didn't get a hit.

7    Q.    -- you, it was your secretary -- I'm sorry, continue.

8    A.    But I reviewed the list before my secretary e-mailed it.

9    Q.    So when you got the second list, and it did have Abraham

10   Klein's name in connection with the closed matter, did you turn

11   to someone and say, what happened?  We didn't get this same the

12   first time?

13   A.    Did I what?

14   Q.    Sure.  Let me rephrase it.  When you got Abraham Klein's

15   name the second time the conflicts check was run --

16   A.    Right.

17   Q.    -- in connection with that closed matter, did you turn to

18   someone in the conflicts checking department and did you say,

19   that's strange, we didn't get his name the first time on the

20   hit?

21   A.    No, I didn't.  I can't recall if I did or I didn't.  All I

22   know is we now had a hit that said that there was a closed

23   matter in which he was an officer or a director.

24   Q.    Well, sir, when you say you don't recall, you did

25   submit --

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 64 of 159 PageID #: 303
CHRISTINE PERSAUD

Page 64

```
 1              MR. KRINSKY:  Withdrawn.

 2     Q.    You testified a moment ago that -- under oath, that you

 3     did not get a hit the first time around, right?

 4     A.    That's correct.

 5     Q.    The second time you did, correct?

 6     A.    Yes.

 7     Q.    Is your testimony you did or didn't ask someone the

 8     question hey, why didn't Abraham Klein's name show up the first

 9     time?

10     A.    I didn't have that specific question with anyone.  I was

11     more concerned with the fact that we now had the information

12     that Mr. Zilberberg was trying to impart that we had a

13     representation.

14     Q.    And it was your view that, well, it was a closed matter.

15     Isn't that right?

16     A.    Well, it was more than that.

17     Q.    Well, let's start with closed matter.  Right, it was a

18     close matter?  Right?

19     A.    A) We determined that it was a closed matter.

20     Q.    When was the initial case, as you put it for GRV, when was

21     that happened?

22     A.    I don't recall, but I think it was sometime in 2008.

23     Q.    Well, did you ask someone when it was first opened?

24     A.    I saw the information that showed that it was an open

25     matter that was in -- it was opened in 2008 and it was closed
```

1    in -- it was closed as of the end of 2008, was when the last

2    services were rendered.

3    Q.   Did you ask anybody whether or not there was a retainer

4    agreement that had ever been signed?

5    A.   With respect to that matter?

6    Q.   Yes.

7    A.   No.  When I got -- when I found -- when the hit came back

8    for Abraham Klein as an officer of Global, I went and spoke

9    with Aurora Cassirer.

10   Q.   Did you ask her, Ms. Cassirer, when was this matter

11   opened?

12   A.   I may have asked her that, but I think I could tell that

13   from the information that came back on the Global report.

14   Q.   Do you recall if it was in November of 2008 when --

15   A.   I think that's correct.  It was shown as opened in

16   November of 2008.

17   Q.   And based upon what you know about this case, the November

18   2008 would be consistent with the billing that began or the

19   billing that was charged to GRV in connection with whatever

20   work the Troutman Sanders firm did.  Is that right?

21   A.   It's consistent, yes.

22   Q.   Okay.  And you've had an oppor --

23   A.   I mean, I haven't really reviewed the file.

24   Q.   I understand you haven't reviewed the file.  Have you

25   reviewed the billing, though?

Page 66

1    A.    I haven't reviewed the billing personally.  I just know

2    that I've seen the invoices that you attached.

3    Q.    So you have had an opportunity to go through these

4    exhibits, at least?

5    A.    I haven't gone through these exhibits, but I know I've

6    seen that there were invoices that were sent to Mr. -- that

7    were sent to GRV.

8    Q.    When you were speaking with Ms. Cassirer about this

9    matter, did you ask her who the point person was on the case?

10   A.    Yes.

11   Q.    And did she tell you that it was Mr. Epstein?

12   A.    She did.

13   Q.    And this is Mr. Epstein who's a partner in the Shanghai

14   office.  Is that right?

15   A.    Edward Epstein.  That's correct.

16   Q.    After she said to you that Edward Epstein was the point

17   person, did you pick up the telephone and call Mr. Epstein?

18   A.    Ms. Cassirer did.

19   Q.    That wasn't my question.  My question was did you pick up

20   the phone?

21   A.    Did I call him?

22   Q.    Yes.

23   A.    Personally, no.

24   Q.    Okay.  Did you review past e-mails or other correspondence

25   that was available through the firm, to determine what that

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 67 of 159 PageID #: 306
CHRISTINE PERSAUD

Page 67

1    matter was about?

2    A.   No, I spoke with Ms. Cassirer about what that matter was

3    about.

4    Q.   And she advised you that it had to do with a real estate

5    project going on in China.  Is that correct?

6    A.   She advised me that it was a -- that's correct.

7    Q.   And she advised you that it was being done through an

8    entity called GRV.  Is that correct?

9    A.   Well, that's what the conflicts system told me too.

10   Q.   I'm asking you what Ms. Cassirer said?

11   A.   Yes.  She consistently said yes.  It was -- consistent

12   with that, she told me it was Global Realty Ventures.

13   Q.   Did you say to Ms. Cassirer, or did you ask Ms. Cassirer,

14   you know, Mendel Zilberg called me up and told me that our

15   firm represented Abr -- now or in the past, our firm

16   represented Abraham Klein?

17   A.   Yes, I did.

18   Q.   And did you ask her, what is that all about?

19   A.   I sure did.

20   Q.   And what did she say to you?

21   A.   She said we never represented Abraham Klein.

22   Q.   Did you ask her to send over any documentation to support

23   what Ms. Cassirer was saying to you?

24   A.   I didn't ask her to send any -- I had the conflicts report

25   that supported what Ms. Cassirer said to me.  The conflicts

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 68 of 159 PageID #: 307
CHRISTINE PERSAUD

Page 68

1    report didn't reflect Mr. Abraham Klein as a client, past,

2    present.  It reflected only that he was an officer of Global

3    Realty.

4    Q.    Okay.  And when you saw Global Realty, did you inquire

5    from Ms. Cassirer or anyone else, as to the corporate structure

6    of GRV, Global Realty?

7    A.    Well, I didn't ask about the specific corporate structure,

8    no.

9    Q.    How about --

10   A.    But I did know --

11   Q.    -- generally?

12   A.    -- I did know that it was listed in Global Realty -- in

13   the matter, Mr. Klein was listed as an officer/director.  I

14   didn't ask anything more about its corporate structure, no.

15   Q.    Sitting here today, do you know that GRV, Global Real

16   Estate (sic) Ventures, is an LLC?

17   A.    I may -- I don't know if I know if it's an LLC, no.  I

18   can't say for sure.

19   Q.    Well, did you ask Ms. Cassirer who the principal is of

20   GRV?

21   A.    Of course.

22   Q.    Did you ask her if there were any board members?

23   A.    I don't remember that.

24   Q.    How long ago did this conversation take place between you

25   and Ms. Cassirer?

Page 69

1   A.   It took place right after my conversation with Mr.

2   Zilberberg.

3   Q.   Have you subsequently spoken with Ms. Cassirer in

4   connection with preparing for your testimony today?

5   A.   I've not spoken with her about preparation, no.  But I

6   have spoken with her about the objection.

7   Q.   Did you speak with her about the facts of the firm's prior

8   representation or present representation, for that matter, of

9   GRV?

10  A.   I spoke with her about the past representation to confirm

11  that it had no connection to this case.  I did that after Mr.

12  Zilberberg said my client thinks you're representing him.  And

13  I went to Ms. Cassirer and I said I don't believe -- she said

14  there's no representation of Mr. Klein.  What is he referring

15  to?  And I'm sorry, Mr. Zilberberg said he may be represented.

16  Q.   Okay.  It's your position that the Troutman firm owes no

17  fiduciary -- no duty of loyalty to Abraham Klein.  Is that

18  correct?

19  A.   Um --

20  Q.   It's a yes or no question, sir.

21  A.   It's --

22        THE COURT:  I'm going to caution all examining counsel

23  that in my view, only the witness is under oath, and the

24  witness, being under oath, and subject to the penalties of

25  perjury, may choose the words that work for the witness.

Page 70

 1          MR. KRINSKY:  I apologize, Your Honor.

 2          THE COURT:  There's no need to apologize.  I just need

 3   to clarify that.  It may save us some time going forward.  That

 4   is a rule of consistent application in this courtroom.

 5          MR. STREMBA:  Your Honor, I also object in that the

 6   question is asking for a conclusion of law.

 7          THE COURT:  He can pose the question -- restate the

 8   question.

 9          MR. KRINSKY:  Sure.

10          THE COURT:  I was concerned to address that issue.

11   I'm going to give a broad berth to -- because of the particular

12   nature of the testimony topic here, it may be that questions

13   that to a nonprofessional witness about a different kind of a

14   situation that that kind of question is a different kind than

15   the question -- the kind of fact question for this fact witness

16   that you've presented may be appropriate.

17          Please proceed.

18   BY MR. KRINSKY:

19   Q.   Sir, there's actually a document before the Court that's

20   already been admitted, document 191, which was your prior

21   affirmation.  Do you remember stating "Troutman owes no duty of

22   loyalty to Klein," referring to Abraham Klein?

23          THE COURT:  Could you indicate the paragraph, please?

24          MR. KRINSKY:  Sure.  I apologize. It is page 3,

25   paragraph 7 last sentence.

1          THE COURT:  Of the initial declaration?

2          THE WITNESS:  Can you show me what you're referring

3   to?

4          MR. KRINSKY:  It's the August 19, 2011 affirmation of

5   John Campo in response to objection.  Yes, sir.

6          THE COURT:  I have it, thank you.

7          THE WITNESS:  It was here before.  Can you bring me --

8   can I have that binder?

9          MR. KRINSKY:  You don't have it?

10          THE WITNESS:  No.

11          MR. KRINSKY:  Here, I have a copy for you.

12          THE WITNESS:  Oh, here it is.  No, he removed it.

13   That's why.

14          MR. KRINSKY:  I have a copy for you.

15          May I approach the witness?

16          THE COURT:  You can give him back the other binder.  I

17   think it would be best to have all the exhibits.  It was there

18   before, I think.

19          MR. KRINSKY:  What is the exhibit number?

20          THE WITNESS:  I can find it.  Go ahead.  What is

21   your -- if you're referring to the affirmation?

22   BY MR. KRINSKY:

23   Q.   Referring to document 191, affirmation of John P. Campo in

24   response to objection --

25   A.   Got it.

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 72 of 159 PageID #: 311
CHRISTINE PERSAUD

Page 72

1    Q.    -- dated 8/19.

2    A.    Um-hum.

3    Q.    Referring your attention specifically to page 3 paragraph

4    7.

5    A.    Yes.

6    Q.    Last sentence.

7    A.    Correct.

8    Q.    "Troutman owes no duty of loyalty to Klein."  Did I read

9    that correctly?

10   A.    That's correct.

11   Q.    And the basis of that statement is that you did not -- or

12   your firm, Troutman Sanders, did not represent Abe Klein

13   individually, but rather GRV.  Is that correct?

14   A.    Well, there's two bases.  There's the basis -- that's one

15   of the bases, meaning that we didn't represent Mr. Klein

16   personally when we represented GRV.  The second basis is that

17   that representation of GRV is concluded.  The GRV

18   representation is concluded.

19   Q.    Assume for a moment that the GRV representation was not

20   concluded but it was unrelated.  Would your position be that

21   you have no duty of loyalty to GRV after representation is

22   ended?  I'll rephrase it.

23   A.    I don't understand you.

24   Q.    Sure.  Is it your position that there is no duty owed to a

25   former client after the representation is over?

Page 73

1    A.    No.  That's not my position.

2    Q.    So there is a -- you accept the proposition --

3    A.    It's not my position that there's no duty of loyalty owed

4    to a former client.

5    Q.    So --

6    A.    It's not my position.

7    Q.    -- so you recognize that there is, in circumstances, a

8    duty of loyalty owed to former clients?

9    A.    Yes, of course there is.

10   Q.    Did you ask Ms. Cassirer in your discussions with her

11   about the conversation she had with Mr. Klein -- Abraham Klein,

12   on July 30th?

13   A.    Excuse me?

14   Q.    Sure.  Did you ask --

15   A.    You said on July 30th?

16   Q.    Did you ask --

17   A.    Do you have a year?

18   Q.    I'll reph --

19   A.    I don't understand the question.

20   Q.    Sure.  Did -- in your discussions with Ms. Cassirer

21   regarding conflict, did you ask her about the conversation she

22   had with Abraham Klein on July 30, 2008?

23   A.    First off, which conversation?

24   Q.    Any conversations?

25   A.    Ultimately, yes.  After the -- after the objection was

Page 74

1    filed, and it attached e-mails that went back and forth with

2    Ms. -- that had Ms. Cassirer copied on them, I went back to Ms.

3    Cassirer and said that they're contending that you're the point

4    person in that representation.  So generally, I did discuss

5    with her what her role in that representation was, only from

6    her telling me I had no involvement other than I really was the

7    liaison person who put Mr. Klein in contact with Mr. Epstein.

8    Q.   Let me ask --

9    A.   I didn't ask about any specific conversation that you're

10   referring to, I assume on -- I think I've seen that e-mail.

11   There's some e-mail of July 30, 2008 in which there's a

12   discussion about, nice to speak to you; I'm referring this to

13   Ed Epstein.  That e-mail -- if that's the e-mail you're

14   referring to, yeah, I guess I had some general conversations

15   with her about it, yes.  Not the context of her conversations

16   with Klein, but just I had to respond to the allegations that

17   were put forth by Klein in his objection to the retention.  So

18   in that context, I did speak to her, yes.  But not about any

19   information that was imparted from Klein to her, but just he's

20   saying you're the point person; what's the story.

21   Q.   Well, did you ask Ms. Cassirer whether or not she ever

22   gave Mr. Abraham Klein or his brother Herschel Klein the

23   confidentiality agreement they asked about back on July 30,

24   2008?

25   A.   I never asked them that.

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 75 of 159 PageID #: 314
CHRISTINE PERSAUD

Page 75

1    Q.    Okay, well --

2    A.    I don't think I had seen that.

3    Q.    I'm sorry?

4    A.    I said I never heard anything about that at the time.

5    Q.    Well, as you sit here today, do you know anything about

6    that?

7    A.    Only from the fact that you raised it the last time we

8    were here in court, you raised that there was some e-mail

9    regarding confidentiality.  That was the first time I heard

10    about it.

11    Q.    In response to my raising it with you, did you go back and

12    did you say to Ms. Cassirer, Ms. Cassirer, you know, Klein's

13    counsel, they're raising this issue about a confidentiality

14    agreement, did you ever give Klein one of these agreements back

15    in July of 2008?  Did you ever say that to Ms. Cassirer?

16    A.    No, because you didn't identify who the lawyer was.  You

17    told me you had -- I think your statement to the Court was that

18    you had some new evidence that had shown up.  I had never seen

19    the e-mail.

20    Q.    So did you say to Ms. Cassirer, even though Krinsky didn't

21    actually point out the e-mail --

22    A.    You never told me it was Ms. Cassirer.

23    Q.    -- well, did you --

24         THE COURT:  I'm going to remind you both to let each

25    other finish before you begin to speak.

Page 76

1          THE WITNESS:  I'm sorry, Your Honor.

2    Q.   Did you ask anybody other than Ms. Cassirer about the

3    confidentiality agreement?

4    A.   I spoke with the firm's general counsel about it.

5    Q.   Well, how about Mr. Epstein?

6    A.   I didn't speak to Mr. Epstein directly about it, no.

7    Q.   Did you ask Ms. Cassirer to speak to Mr. Epstein about a

8    confidentiality agreement?

9    A.   No, I did not.  But I read the e-mail eventually.

10   Q.   When you say "eventually", when did you read the

11   confidentiality e-mail that we're talking about here?

12   A.   I think I saw it -- I may have seen it yesterday or the

13   day before.

14   Q.   And in response to seeing it, did you, again, raise the

15   question to anybody at your firm, where's this confidentiality

16   agreement that they're referring to?

17   A.   No, because when I read the e-mail, it seemed pretty

18   obvious to me that there wouldn't have been a confidentiality

19   agreement.

20   Q.   Why wouldn't there have been a confidentiality agreement?

21          THE COURT:  Please don't forget the microphone.

22          THE WITNESS:  I'm sorry.

23          MR. KRINSKY:  I apologize.

24          THE WITNESS:  Go ahead.

25          THE COURT:  No, this is to examining counsel.

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 77 of 159 PageID #: 316
CHRISTINE PERSAUD

Page 77

1    Q.   When you say that it seemed that it was pretty clear there

2    wouldn't have been one, what do you mean?  Sir I'm not

3    referring to any exhibits right now.

4    A.   Oh, okay.

5    Q.   I'm asking you about the statement you just made, it

6    seemed pretty clear there would not have been a confidentiality

7    agreement?

8    A.   My understanding of the project is is that there was some

9    project that they were investing in in China and that there was

10   information that was being imparted to help them do due

11   diligence.  If you go to a lawyer and you ask the lawyer gee,

12   could you help me find a due diligence person and you say sure,

13   and you give them the information, I assume that the financial

14   expert would sign a confidentiality agreement so that they know

15   that they don't go tell somebody else about an opportunity.

16        When I saw the e-mail I said to myself, why would you ask

17   the person who you're giving it to under confidence -- you're

18   sending documents to a lawyer.  I didn't think -- I don't think

19   you would need a confidentiality agreement when you send

20   something to a lawyer.  At least I don't.

21   Q.   And is your basis for that understanding because if you're

22   represented and there's an attorney-client relationship,

23   there's confidentiality within that relationship?

24   A.   My basis for that understanding is my own ethical

25   standards that if somebody tells me I'm going to give you a

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 78 of 159 PageID #: 317
CHRISTINE PERSAUD

Page 78

1    piece of information, I'm going to keep it confidential,

2    whether you retain me or not.

3    Q.   Is that for clients, potential clients, or anybody who

4    gives you a piece of papers?

5    A.   If -- well, it isn't for anybody.  I mean, if you hand me

6    a piece of paper tomorrow, Pery, I can't guarantee I wouldn't

7    disclose it to somebody.  It would depend on what it was.

8    Q.   So how do you --

9         MR. KRINSKY:  Withdrawn.

10   Q.   Sir, are you aware that Abraham Klein asked Troutman

11   Sanders to put together the legal structure for a deal in

12   China?

13   A.   I've become aware of that through the pleadings that Mr.

14   Klein has filed, yes.

15   Q.   Are you aware that Abraham Klein consulted with your firm

16   and asked your client (sic) for assistance on how to assist him

17   in ultimately financing that deal?  How to set the financing

18   up?

19   A.   No, I'm not aware of that.

20   Q.   Are you aware that in response to a request for a

21   confidentiality agreement, Ms. Cassirer said you don't need

22   one, period?

23   A.   Yes, I'm aware that she said you don't need one.

24        MR. STREMBA:  Objection, Your Honor.  It wasn't "you

25   don't need one, period."  If you're going to quote, please

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 79 of 159 PageID #: 318
CHRISTINE PERSAUD

Page 79

1    quote.

2            MR. KRINSKY:  I apologize.

3    Q.   Are you aware that Ms. Cassirer responded, "I do not

4    believe that you need a confidentiality agreement with your

5    attorney, since we are bound to keep your communications with

6    us confidential"?

7            THE COURT:  Could I ask you to clarify that question

8    in the following way.  That statement's in the papers.  It's in

9    exhibits to the papers, some of which papers are attested to.

10   So it might be one kind of question if you're saying did you

11   read at some point in 2011 these papers and become aware that

12   that statement is made in the papers.  It would be quite a

13   different matter indeed if the question is, in 2008, were you

14   aware from your personal knowledge -- which is what a fact

15   witness is testifying about -- that this was said by this

16   person to that person.

17           Setting aside any hearsay implications of your

18   contemplated question, I think the ambiguity is significant.

19   There's quite a lot of material that's been brought forward in

20   the arguments, in the opposition and now in the exhibits.  And

21   I think the line between what someone knows through personal

22   knowledge because they were a participant and what they have

23   seen in papers and what they have seen in exactly the matter at

24   issue here in dealing with the retention, seeking the

25   retention, addressing the objection to retention, formulating

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 80 of 159 PageID #: 319
CHRISTINE PERSAUD

Page 80

1    the opposition to the retention, those are two different kinds

2    of things.

3           Those may not be differences without a distinction as

4    we move through the issues here.  So I ask you to keep your

5    questions clear in that regard.  I think the difference is

6    important.

7           I also note in a general way that while I appreciate

8    there is a form of cross-examination in the nature of:  and did

9    you know; and did you know; the fact that a witness did or did

10   not know something in response to a question like that may only

11   be so helpful if that as to which you are posing the question

12   is itself controverted.  So keep that in mind as you -- and

13   then what I'd really like most to ask you, and it's in the

14   context of the most productive use of all of our time is, how

15   much more cross examination do you think you have for this

16   witness?  I'm trying to plan how we're going to move through

17   the rest of today's session.

18           MR. KRINSKY:  I'm going to attempt to be very, very

19   brief.

20           THE COURT:  I need a number.

21           MR. KRINSKY:  Five minutes.

22           THE COURT:  Five -- okay.  Thank you.  Please proceed.

23   You can have the time you need.  You should take the time you

24   need.  But I take it that you --

25           MR. KRINSKY:  Can I amend that then to under ten

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 81 of 159 PageID #: 320
CHRISTINE PERSAUD

Page 81

 1   minutes?

 2            THE COURT:  An estimate.  And I'm familiar with the --

 3   I'll put it this way.  You are not under oath so it's your best

 4   estimate and I appreciate that.  All right.  Now, ask your next

 5   question.

 6   BY MR. KRINSKY:

 7   Q.   In connection with your disclosures to the Court pursuant

 8   to 2014(a), did you investigate Troutman Sanders firm's prior

 9   representation of GRV?

10   A.   Of -- yes.

11   Q.   In connection with that investigation, did you ever ask

12   Ms. Cassirer whether or not Abraham Klein had disclosed any

13   information during its prior representation about Caring?

14   A.   And just so we're clear, we're talking about at any time

15   meaning since Mr. Klein has filed his oppositions and

16   objections to the extent I've spoken with Ms. Cassirer?

17   Q.   Yes.

18   A.   Okay.  I'm sorry.  And then I can -- would you mind

19   repeating that question one more time now?

20   Q.   During your investigation pursuant to 2014(a) and your

21   obligations, did you at any time ask Ms. Cassirer about the

22   existence of any relationship between Caring and Abraham Klein?

23   A.   Did I -- Caring and Abraham Klein?

24   Q.   Yes.

25   A.   I didn't ask Ms. Cassirer about relationships between

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 82 of 159 PageID #: 321
CHRISTINE PERSAUD

Page 82

1    Caring and Abraham Klein.  I already knew there were

2    relationships between Caring and Abraham Klein.  They were all

3    over the record of this case.

4    Q.    Did you ask Ms. Cassirer whether or not Abraham Klein or

5    anybody on his behalf ever provided Troutman Sanders back in

6    2008 with information about Caring?

7    A.    I asked Ms. Cassirer what the nature of that

8    representation was and she explained to me that it was a -- a

9    real estate investment or potential investment in real estate,

10   I think is more accurate, in China.  I asked her would it have

11   had anything to do with the healthcare agency business here in

12   New York, the one that's at issue here in Queens, did it have

13   anything to do with any disputes between Mr. -- between -- any

14   disputes with Christine Persaud or anything to that effect.  I

15   asked her all of those questions.

16   Q.    And, specifically, did you ask the question of Ms.

17   Cassirer back in 2008 did Abraham Klein give you any

18   information about Caring?

19   A.    Well, I knew that there were no -- there was nothing -- we

20   had nothing to do with Caring so I presumed we didn't receive

21   anything about Caring.

22   Q.    I'm asking beside -- I'm sorry.  Were you finished with

23   your answer?

24   A.    I said -- yes, I'm finished.

25   Q.    I'm going to ask you to now put aside what you presumed to

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 83 of 159 PageID #: 322
CHRISTINE PERSAUD

Page 83

1    have been the case and to address did you ask the question, Ms.

2    Cassirer, did you ever have any discussions with Abraham Klein

3    back in 2008 about Caring?

4    A.    I don't cross-examine my partners.  So, perhaps, maybe if

5    I may I could tell you that I had discussions with Ms. Cassirer

6    and we thoroughly vetted the issues and we discussed could

7    there have been anything out of that venture that had any

8    connection to Caring, et cetera.  And absolutely we discussed

9    it and she said to me, no.

10   Q.    Prior to your discussions with her you just alluded to, to

11   your knowledge did Ms. Cassirer know what Caring was?

12   A.    Prior to my discussions --

13   Q.    Prior to your discussions with Ms. Cassirer as part of

14   your conflicts checking, to your knowledge, do you know if Ms.

15   Cassirer --do you know if Ms. Cassirer ever heard of Home

16   Caring prior to these conflicts checks?

17   A.    Whether she had known about Home Caring?

18   Q.    Yes.

19   A.    When I discussed the original case with Ms. Cassirer --

20   Q.    Which original case?

21   A.    When Mr. Pereira contacted us about the representation, I

22   discussed the representation with Ms. Cassirer.

23   Q.    And at that time --

24   A.    We discussed -- at that time I said it involves Abraham

25   Klein, a dispute with Caring and the Home Care agency, et

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 84 of 159 PageID #: 323
CHRISTINE PERSAUD

Page 84

1    cetera.  That's -- I mean I discussed the nature of the

2    representation of -- I mean I -- I'm not trying to -- I think

3    that's responsive to your question, I should say, I think.

4    Q.    When you do conflicts checks on the computer, you said you

5    send them to a conflicts checking department.

6    A.    An e-mail gets mailed out from -- on my behalf by my

7    secretary to the conflicts department to run names.

8    Q.    I'm sorry.  By your department?  I'm sorry.

9    A.    An e-mail gets sent out to the conflicts department to run

10   names.  There are -- by the way, the conflicts department has

11   people that are alive that work there too.

12   Q.    And does the conflicts checking department, do they

13   eventually send you back a report?

14   A.    They do.

15   Q.    And in this case, you ran two conflicts or three?

16   A.    I ran one initial conflict check that had the names.

17   Q.    That was the initial but then you ran a supplement, right?

18   A.    No.  What happened was is that when there were no hits,

19   okay, which showed matters -- open matters for anybody

20   involving Klein or any other hits involving Klein and then I

21   spoke with Mr. Zilberberg I went back and I said there's --

22   he's saying there's something here and they said that there

23   was -- they discovered the matter of Global in which he was

24   listed -- a closed matter in which he had been listed as an

25   officer.

Case 1-10-44815-ess    Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 85 of 159 PageID #: 324
CHRISTINE PERSAUD

Page 85

1  Q.   And that was in a second e-mailed report -- conflicts

2  report that they e-mailed back to you?

3  A.   Yes.  They would have e-mailed me a second report that

4  showed -- because I asked well what's the nature of that

5  representation and then I -- they said well, it's -- it's

6  something called Global Realty and I said, well, mail it to me,

7  and they mailed me the information.

8  Q.   And in determining whether or not your firm had any

9  connection to any of the creditors or debtors or others --

10 connection with the trustee matter, did you determine who had

11 paid the bills in the GRV matter?

12 A.   No.

13 Q.   Did you ask anybody?

14 A.   No, I didn't.

15        MR. KRINSKY:  Your Honor, may I have a brief moment to

16 confer with co-counsel?

17        THE COURT:  Yes, you may.

18 Q.   Just briefly to go back for one moment --

19        MR. KRINSKY:  I'm sorry.  May I proceed, Your Honor?

20        THE COURT:  Yes, you may.  Thank you.

21 Q.   At some point you said you were consulted by the trustee

22 about possibly being retained as counsel or being appointed as

23 counsel in connection with this matter, is that right?

24 A.   Yes.

25 Q.   And this certainly was not the first time that you had

Page 86

1    been consulted about being retained in a legal matter?

2    A.    Absolutely not.

3    Q.    And in connection with being retained in a legal matter,

4    you've consulted with prospective clients before, is that

5    right?

6    A.    Yes.  But I've represented Mr. Pereira in other matters

7    before as well.

8    Q.    Okay.  And when sitting down and talking with a

9    prospective client, you understand that it's important to go

10   through the conflicts checking protocol that's required by the

11   ethics rules in New York, don't you?

12   A.    Yes.  I go through what's required by the bankruptcy.

13   Q.    All right, but --

14         THE WITNESS:  I'm sorry.

15         THE COURT:  -- microphone, please.

16         THE WITNESS:  Oh, I'm sorry.

17         THE COURT:  Microphone, please.

18   A.    I said yes and I go through what's required to determine

19   disinterestedness in this -- in a fiduciary representation.

20   Q.    And separate and apart from the disinterested you're

21   referring to, you understand that there are certain rules that

22   govern their conduct in federal bankruptcy proceedings,

23   correct?

24   A.    The disinterestedness rules under the Bankruptcy Code,

25   yes.

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 87 of 159 PageID #: 326

CHRISTINE PERSAUD

Page 87

 1   Q.   And there are also rules that govern your conduct as an

 2   admitted New York lawyer, correct?

 3   A.   Correct.

 4   Q.   And you understand that separate and apart from the

 5   bankruptcy provisions that as a lawyer in New York you have an

 6   obligation to run a conflicts check before agreeing to

 7   represent, or potentially to represent, any new client.  Is

 8   that right?

 9   A.   Yes.

10   Q.   And in connection with that process or that protocol, it's

11   important to ask questions such as what is the name of a

12   potential client, correct?

13   A.    If you're referring to an interview process?

14   Q.   When you're sitting down and talking to a prospective

15   client about possible representation, you have to do a

16   conflicts check, right?

17   A.    Sure.

18   Q.   In connection with that conflicts check you understand

19   that it's important to ask questions such as what's the

20   potential client's name.  Correct?

21   A.   Correct.

22   Q.   Who are the -- you understand it's important to ask

23   questions such as who is the adversary on the other side?

24   A.   Yes, of course.

25   Q.   If it's a corporate client, it's important to ask

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 88 of 159 PageID #: 327
CHRISTINE PERSAUD

Page 88

1   questions such as is it a publicly traded company, correct?

2   A.   Yes.

3   Q.   It would also be important to understand the corporate

4   structure of any entity.  Is that right?

5   A.   For determining conflicts?

6   Q.   Yes.  I'm sorry.

7   A.   To determine -- yes, yes.

8           MR. KRINSKY:  I have no further questions, Your Honor.

9           THE COURT:  Thank you.  Redirect.  Would you like a

10   moment?

11          MR. STREMBA:  No, Your Honor.  No redirect.

12          THE COURT:  All right.  Thank you.  Mr. Campo, you are

13   excused.

14          THE WITNESS:  Thank you.

15          THE COURT:  Let's do a little planning.  No one

16   else -- no other parties but just to be sure, no other

17   questions for the witness?  All right.  Mr. Campo, you are

18   excused.

19          Would you like to call -- how long do you anticipate

20   for the testimony of Ms. Cassirer?  Could you say her name

21   carefully?  Cassirer?  Cassira?

22          MR. STREMBA:  Cassirer.

23          THE COURT:  Cassirer.

24          MR. STREMBA:  And I apologize.  I probably butchered

25   that.

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 89 of 159 PageID #: 328
CHRISTINE PERSAUD

Page 89

1              THE COURT:  With a name like Stong, I'm very attuned

2      to these issues and I try to be both respectful and accurate.

3              How long do you anticipate?

4              MR. STREMBA:  I would say between thirty and forty

5      minutes, something on that order.

6              THE COURT:  All right.  Let's see the prospect would

7      be -- I'll assume a comparable amount of cross.  Let's do our

8      best to be efficient and see if we can finish for today and if

9      I decide that we need to stop at some point, I'll let you know.

10     Would you please go get her?

11             MR. KRINSKY:  Your Honor, before we do so, just one

12     quick question for Professor Green.  He actually -- he

13     unfortunately he's teaching at, I believe, 6 o'clock at the New

14     York City Bar CLE Ethics Program and he's asked me to convey

15     that just for purposes of determining the schedule in terms

16     of --

17             THE COURT:  All right.  So, he has a conflict this

18     evening, so to speak.  Let's look back at possible dates which

19     I do with some trepidation in the absence of my courtroom

20     deputy.  This evening will come to close at some point.

21     Tomorrow's a very difficult day for me unless you're available

22     remarkably early in the morning or quite late in the afternoon

23     which I think is probably not -- Friday afternoon is not going

24     to be practical.  So, I'm looking at the possibility of

25     resuming with the witnesses -- and the ability to take all the

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 90 of 159 PageID #: 329
CHRISTINE PERSAUD

Page 90

```
 1    witnesses they would be slight anyway with three more.  I am

 2    looking at the possibility of Tuesday at about 1:30 to resume.

 3    All right.  But assuming that we get in both witnesses from the

 4    proponents of the retention today.  All right?  Tuesday at 1:30

 5    thereabouts will be our resume time.  I'll confirm that with

 6    Ms. Jackson and advise you appropriately.

 7              MR. KRINSKY:  Would it then be permissible or okay --

 8              THE COURT:  You can excuse Mr. Green -- Professor or

 9    Mr. Green.

10         (Pause)

11              THE COURT:  Is she going to -- is Ms. Cassirer ready

12    to take the --

13              MR. STREMBA:  Yes, she's here.

14              THE COURT:  All right.  I need just a moment to confer

15    and I think it's best if I do it -- if we step out with my

16    courtroom deputy and my staff if we're planning today and

17    tomorrow.  So, we're going to go very briefly off the record.

18    You should not stand down unduly because it's really just to

19    accommodate my conferring on multiple other matters that have

20    been active today and they're active in the scheduling process

21              I am keen to both begin and complete the testimony of

22    Ms. Cassirer today so I want you to ask every single question

23    that is required to be asked but also be mindful of ground

24    that's already well plotted.  All right.  Be right back.

25              THE CLERK:  All rise.
```

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 91 of 159 PageID #: 330
CHRISTINE PERSAUD

Page 91

```
 1            (Recess from 4:23 p.m. until 4:38 p.m.)

 2                 THE COURT:  Thank you.

 3                 THE CLERK:  Third call on all Persaud matters.

 4                 THE COURT:  Everyone is here who should be here and no

 5      one who should not be here is here.

 6                 MR. KLEIN:  I understand Mr. Campo is outside.

 7                 THE COURT:  Let's get counsel -- let's get counsel in

 8      place.  Very gracious of you, Mr. Klein.  Thank you very much.

 9          (Pause)

10                 THE COURT:  All right.

11                 MR. STREMBA:  Your Honor, I call Aurora Cassirer to

12      the stand.

13                 THE COURT:  All right.  Could you swear the witness

14      please?

15                 THE WITNESS:  May I affirm please?

16                 THE COURT:  I'm sorry.  You may affirm the witness.

17          (Witness affirmed)

18                 THE CLERK:  You may be seated.  State and spell your

19      name for the record.

20                 THE WITNESS:  Aurora Cassirer, A-U-R-O-R-A

21      C-A-S-S-I-R-E-R.

22      DIRECT EXAMINATION

23      BY MR. STREMBA:

24      Q.  Ms. Cassirer, could you tell us, please, your position

25      with the applicant, Troutman Sanders?
```

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 92 of 159 PageID #: 331
CHRISTINE PERSAUD

Page 92

1    A.    I'm a partner in the law firm of partners -- of Troutman

2    Sanders.  I'm also the managing partner of the New York office

3    and I'm a litigator there.

4    Q.    How long have you been practicing law?  You can give the

5    year or --

6    A.    1976.

7    Q.    And in what year did you become a partner of a law firm?

8    A.    I became a partner in a law firm called Parker Chapin

9    Flattau & Klimpl in 1984.

10   Q.    And have you been a litigator since the beginning of your

11   law firm career?

12   A.    Yes, I have been.

13   Q.    At what -- when, approximately, did you become the

14   managing partner of the New York office?

15   A.    I became the managing partner of the New York office of

16   Troutman when we joined Troutman in 19 -- I'm sorry -- 2005, I

17   think.

18   Q.    Yes.

19   A.    Right?

20   Q.    Yes.

21   A.    April of 2005.

22   Q.    And before that, I'll just advise the Court, the same

23   office was a part of another firm called Jenkins & Gilchrist.

24   Were you also managing partner of the New York office --

25   A.    At some point when we -- when Parker Chapin merged into

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 93 of 159 PageID #: 332

CHRISTINE PERSAUD

Page 93

1    Jenkins & Gilchrist and became Jenkins & Gilchrist, Parker

2    Chapin, I became co-managing partner with Mark Abramowitz who

3    was then the managing partner and then I became managing

4    partner in the last year or so, I believe, sole managing

5    partner at Jenkins & Gilchrist, Parker Chapin.

6    Q.    And so, in -- during the year 2008 you were at that time

7    the managing partner of the New York office?

8    A.    Yes, I was.

9    Q.    Do you recall in or about July 2008 taking a call from Mr.

10   either Hershel Klein or Abraham Klein?

11   A.    I recall that I received a call from one or both of them.

12   And they stated that they had seen Troutman Sanders -- I

13   believe that the call was forwarded to me by the receptionist

14   that they had seen an ad by Troutman Sanders in, I think,

15   LaGuardia Airport or one of the airports and they wanted to

16   know whether we had a China office.

17   Q.    Can you explain why that call was forwarded to you?

18   A.    Routinely, the calls to the office are forward -- if they

19   don't ask for a specific attorney and they ask for

20   representation are forwarded to me as managing partner so that

21   I can basically pass them onto the right person.  So, for

22   example, a corporate matter would go to a corporate lawyer, a

23   real estate matter would go to a real estate lawyer, something

24   that was outside the New York office would go to someone

25   outside that office.

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 94 of 159 PageID #: 333
CHRISTINE PERSAUD

Page 94

1    Q.    In this case, relate to us whatever you can recall of that

2    initial conversation or communication.

3    A.    What I recall about that conversation and -- is that they

4    told me that they were in -- they had some sort of real estate

5    either investment or opportunity or venture, I'm not clear on

6    what it was at this point, somewhere in China and they needed

7    counsel in China.  They needed to speak to someone.  As I

8    recall, I told them that we had a Shanghai office and that if

9    they were interested they -- you know, I would put them in

10   touch with the managing partner there who was someone named

11   Edward Epstein.

12   Q.    And what did they say during the conversation?

13            MR. STREMBA:  Strike that.

14   Q.    Do you recall, in fact, whether you spoke to Abraham or

15   Hershel or both?

16   A.    I don't.

17   Q.    Okay.

18   A.    I don't.

19   Q.    So, during that conversation after you indicated that you

20   could put one or both of the Mr. Kleins in contact with Edward

21   Epstein, what was their response?

22   A.    I think they said they were interested.  At some point

23   during that conversation or maybe the next one, we probably had

24   one or two short conversations.  I just don't know at this

25   point.  I asked them who they were represented by in the United

Page 95

1    States and essentially who they were because it was a cold

2    call.  And they told me the name of their counsel in New York

3    and I called him and asked whether -- and I bought -- was able

4    to get in touch with him and I asked who they were and

5    essentially what kind of client they were.

6    Q.    And who was that counsel?

7    A.    Mr. Mendel Zilberberg.

8    Q.    And from -- may I just lead you to suggest that you knew

9    Mr. Zilberberg previously?

10   A.    I did know Mr. Zilberberg previously.  He is married to my

11   cousin and so I kind of laughed when they referred to him.  And

12   I called and essentially he said -- as I recall one of the

13   areas of conversation was, "So, you ought to know they pay

14   their bills."  And I said, "Yes, I do."  And he said that they

15   do pay their bills and I believe it was after that that I kind

16   of made the introduction to Mr. Epstein.

17   Q.    Did Mr. Zilberberg indicate how long he had been an

18   attorney for the Kleins?

19   A.    He gave me the impression that he had represented them in

20   many deals and that he was almost their general counsel but I

21   can't tell you specifically that he told me how many years he

22   had represented them or in what transactions.

23   Q.    And so following that conversation, what was the next step

24   in the process of communications between the Kleins and the

25   Troutman office?

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 96 of 159 PageID #: 335
CHRISTINE PERSAUD

Page 96

1    A.    To the best of my recollection and mostly based on the

2    documents that were submitted, frankly, right now in this

3    litigation by the Kleins, there was some e-mail communication.

4    We had a phone call with Edward Epstein.  And I think after

5    that basically I turned it over to Edward and had nothing much

6    to do with it.  I may have been copied on some e-mails but I

7    just saw it as a Shanghai project.

8    Q.    Is it common for you to be copied on e-mails where you're

9    not doing substantive work on a matter?

10   A.    In a situation like this, yes, because at the beginning

11   during the introductory phase everyone sort of thinks that if

12   there's some interpretation or some kind of -- I guess just

13   communication, you know, it -- you know, I probably should be

14   in the loop but I usually stay out of it unless I'm needed.  So

15   in this case, I really stayed out of it and Edward handled it.

16   Q.    For the time that you devoted to making this connection

17   between the Kleins and Mr. Epstein did you -- did you enter

18   that time as a billable matter?

19   A.    They were not a client.  I did not enter it as a billable

20   matter.  It was a prospective client and I was talking to them

21   as a prospective client essentially.  So, no, I did not open a

22   matter and I did not enter the time.

23   Q.    Just for the sake of expediency, I'm going to read to you

24   a sentence from an e-mail communication that you had with

25   Hershel Klein.  This is something that is in the objector's

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 97 of 159 PageID #: 336

CHRISTINE PERSAUD

Page 97

1    statement of facts.  It's not a controversial --

2            THE COURT:  Could you indicate a bit more precisely

3    what you're reading from?  It would help.

4            MR. STREMBA:  Yes, Your Honor.

5            THE COURT:  Thank you.

6    Q.    It's actually in the joint pre-hearing statement and it's

7    on page 4 which is part of the objector's statement of facts.

8    Paragraph 4 summarizes an e-mail communication between Ms.

9    Cassirer and Hershel Klein in which Ms. Cassirer states, "I do

10   not believe that you need a confidentiality agreement with your

11   attorney since we are bound to keep your communications with us

12   confidential."

13        I ask you, Ms. Cassirer, whether you recall that exchange

14   with Mr. Klein?

15   A.    Now that someone's shown it to me, I recall it but I

16   didn't recall it independently.  But certainly, that's fine.

17   Q.    Can you tell us what your thinking was at that time?

18   Expound upon or expand upon the statement you made or explain

19   what you were thinking in more detail.  What question were you

20   answering and what did you think you were saying?

21   A.    Well --

22            MR. KRINSKY:  Objection.

23            THE COURT:  Grounds?

24            MR. KRINSKY:  Calling for the witness's state of mind

25   which is irrelevant.

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 98 of 159 PageID #: 337
CHRISTINE PERSAUD

Page 98

1          THE COURT:  I think the question goes to the context

2     and circumstances of the statement that both parties have

3     focused on.  I'll say you've been much focused on.  It's not a

4     question of an out-of-court statement by a witness who cannot

5     be cross-examined.  I think that --

6          MR. KRINSKY:  You're Honor --

7          MR. LANDAU:  -- it's -- I think it's within the --

8     somewhere inside the outer parameter of what would be

9     permissibly relevant.

10         MR. STREMBA:  Your Honor, they've asked Mr. Campo

11    about this statement and he didn't even write it.  I think it's

12    proper to ask Ms. Cassirer what she meant if there was more to

13    it when she wrote it.

14         MR. KRINSKY:  If she explained that to somebody else.

15    If it's an internal thought.  Then why is her state of mind

16    relevant?  The words speak for themselves.

17         THE COURT:  Well, let's see if you can rephrase the

18    question so that it's consistent with a fact witness's

19    recollection --

20    Q.   Ms. Cas --

21         THE COURT:  -- as a subject of testimony.

22         MR. STREMBA:  Yes, Your Honor.

23    BY MR. STREMBA:

24    Q.   Ms. Cassirer, at the time when you communicated that

25    statement to Mr. Klein, what was the -- was there a -- had

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 99 of 159 PageID #: 338
CHRISTINE PERSAUD

Page 99

1    Troutman been engaged by a client?

2    A.    Troutman had not been engaged by a client at the time.

3    Q.    Is it your understanding that when a lawyer receives

4    information from a prospective client that the lawyer --

5    A.    Yes, it is.

6    Q.    -- must hold that --

7              MR. KRINSKY:  Objection.

8    Q.    -- must hold that --

9              THE COURT:  Let me --

10   Q.    -- information --

11             THE COURT:  -- may I remind each of you that the

12   objection interrupted the question, the answer interrupted the

13   question and then the question proceeded to ride over, I think,

14   both of those.  So, let's start from the beginning.  Could you

15   state the question from the outside?  I'll ask each of you to

16   wait till it's quiet to speak.  We'll have a question, an

17   opportunity for objection, and determination then an answer.

18   Q.    Ms. Cassirer, is it your understanding that when a lawyer

19   receives information from a prospective client that the client

20   indicates is confidential that the lawyer must hold that

21   information in confidence?

22             MR. KRINSKY:  Objection.

23             THE COURT:  Grounds?

24             MR. KRINSKY:  Time frame.  Is she asking when a

25   communication was made in '08 or today?  What is her

1    understanding?

2              MR. STREMBA:  My -- I'm sorry.  The question is --

3              THE COURT:  Please clarify the question by putting a

4    time frame.  You've asked about the witness's understanding --

5              MR. STREMBA:  Yes, Your Honor.

6              THE COURT:  -- then now both times --

7              MR. STREMBA:  Yes, Your Honor.

8              THE COURT:  -- I think the clarification --

9              THE WITNESS:  May I answer your question?

10             THE COURT:  -- can't hurt given that the issue's been

11   raised.  Let's have a new question, please.

12   Q.   Ms. Cassirer, in or about July of 2008 when you made the

13   e-mail statement to Mr. Klein regarding holding documents in

14   confidentiality, was it your understanding that an attorney

15   must preserve the confidentiality of documents provided by a

16   prospective client?

17   A.   Yes, it was.

18   Q.   And is that still your understanding today?

19   A.   Yes, it is.

20   Q.   What was your --

21             MR. STREMBA:  Strike that.

22   Q.   Did you have an understanding in July of 2008 as to who

23   the client would be in the event of an engagement as described

24   by Mr. Klein?

25   A.   Sitting here today, I'm not sure that I knew who was the

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 101 of 159 PageID #: 340

CHRISTINE PERSAUD

Page 101

1    client was going to be but I have to tell you that my

2    impression was that it was going to be some entity whether a

3    corporation or LLC or something.  I can't tell you today

4    whether that was because they told me that or whether in all my

5    years of practice I've never seen somebody invest in a real

6    estate transaction in their own individual name.  My experience

7    may be limited in that area but generally speaking they don't

8    want individual liability in that kind of context.  And I had

9    no reason to believe otherwise here.

10   Q.   What can you recall -- what information can you recall

11   either of the Kleins providing to you in the early discussions

12   of July or August of 2008?

13   A.   I really -- the information that I recall is that it was a

14   real estate investment somewhere in China.  I don't know the

15   city.  I do recall based on what I saw now that was submitted

16   by Mr. Klein in this -- in the original objection or the --

17   some objection that there was some one-page description,

18   further description, of the real estate transaction and that's

19   pretty much all I know about the transaction.  All I recall

20   about the transaction, I should say.

21   Q.   Do you recall receiving any information about the Kleins

22   personally?

23   A.   None whatsoever.

24   Q.   Do you recall receiving any information from the Kleins

25   regarding a company called Caring?

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 102 of 159 PageID #: 341
CHRISTINE PERSAUD

Page 102

1    A.    No.   I did not receive such information.

2    Q.    Did you receive any information from the Kleins regarding

3    a company called Trade Fame Group, Limited?

4    A.    No, I did not.

5    Q.    And then following --

6          MR. STREMBA:   Strike that.

7    Q.    Did you thereafter actually arrange a conversation between

8    the Kleins and Mr. Epstein?

9    A.    I believe I did.

10   Q.    And do you recall approximately when that occurred?

11   A.    I think that was within a couple of days of the initial

12   phone call.

13   Q.    And after that conversation or communication, did you have

14   any direct contact with either Abraham or Hershel Klein?

15   A.    Not to my recollection, I did not.

16   Q.    You were, however, copied on some e-mails relating to the

17   engagement?

18   A.    It appears that I was, yes.

19   Q.    Can you explain why you were copied on e-mails?

20   A.    The only explanation that I have is that -- is the one,

21   the normal one which is that I would be normally copied on e-

22   mails as I transition a project to someone else after the call.

23   The other reason that I would have been copied on e-mails,

24   frankly, to some extent is a courtesy on the part of my partner

25   in Shanghai if he was the one doing the copying just to let me

1    know, you know, that if something was happening.

2           MR. KRINSKY:  Objection.  Move to strike.

3    Speculation.

4    Q.   Is your testimony --

5           THE COURT:  Overruled.  I'm going to allow the

6    testimony.  There's no jury.  I appreciate that the question is

7    explicitly on its face saying why would somebody copy you as

8    the managing partner of a firm and I think the witness has

9    personal knowledge in a general way of why as was indicated,

10   she does testify under oath why that could happen.  I also am

11   well reminded that the risks associated with -- with the jury's

12   finder of fact are not present here.  It does also, I'll say,

13   go to the weight when a -- though not the admissibility when a

14   witness is asked why someone else might have done something.

15   So, maybe -- I think the record is fine as far as it goes.  I

16   don't know how much we'll need in this direction.

17   Q.   Ms. Cassirer, do you know when --

18          MR. STREMBA:  Strike that.

19   Q.   Following those --

20          THE COURT:  I should remind the parties that we are

21   not striking anything --

22          MR. STREMBA:  I'm sorry.  It's a habit, Your Honor.

23          THE COURT:  I appreciate it.  You are not surprised if

24   you see a transcript.

25          MR. STREMBA:  That's fine, Your Honor.

Page 104

1  Q.   Ms. Cassirer, do you have any knowledge of what services

2  were actually performed by Troutman on behalf of either GRV or

3  the clients?

4  A.   To some extent, yes.  I saw -- looked in this -- in

5  connection with this matter, I looked at the billing records

6  probably within the last few weeks and it appears that we --

7  several months later we were retained to do some work in

8  connection with the real estate venture.  It looked like it was

9  some sort of LOI or MOU and that's about all I know.  It was in

10  a two month period.

11       MR. KRINSKY:  Objection.  Move to strike.

12  Speculation.  Lack of personal knowledge.  Essentially, the

13  witness has said she is guessing based upon some documents that

14  she read and the documents are the best evidence in any event.

15       THE COURT:  Overruled.

16  Q.   Ms. Cassirer, did you have any personal involvement in

17  services that were rendered by Troutman Sanders on behalf of

18  either GRV or the clients?

19  A.   No, I did not.

20  Q.   Do you recall having any involvement in the billing or

21  collection of bills in connection with the engagement?

22  A.   I don't think so.

23  Q.   Did you bill any time to the engagement?

24  A.   No.

25  Q.   And just to be clear, in the records of Troutman Sanders,

Page 105

1    who is -- who was reflected as the client in this matter?

2    A.    Global Realty Ventures.

3            MR. KRINSKY:    Objection.    Sorry to interrupt.    Now,

4    time before response.    Objection.    Hearsay.

5            THE COURT:    Overruled.

6    Q.    Did there come a time when you had one or more

7    conversations with John Campo regarding Troutman Sanders

8    representation of GRV?

9    A.    Yes.

10   Q.    When approximately did those conversations begin?

11   A.    Okay.    What happened, and I'll just -- if you don't mind

12   I'll do it in sort of --

13   Q.    If you can just remember when it started I'd like to key

14   in the date.

15   A.    Okay.    I think it started sometime in this past August or

16   early September.

17   Q.    August or September of 2011?

18   A.    Correct.

19   Q.    Between -- do you recall any contact with GRV regarding

20   Troutman's engagement between December 2008 and the period of

21   August or September 2011?

22   A.    No, I do not.

23   Q.    Now, relate to us, if you can, or to the extent that you

24   can the communication you had with Mr. Campo?

25   A.    Mr. Campo told me that Mr. John Pereira had been named as

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 106 of 159 PageID #: 345
CHRISTINE PERSAUD

Page 106

1    a trustee in a matter involving, I believe, Christine Persaud,

2    if that's the right pronunciation, and wanted to retain our

3    services.  He asked whether I would help.  I would -- you know,

4    I said sure, if you need me I'll be there.  He then said to me,

5    at some point either in that conversation or later, by the way

6    the attorney for one of the creditors knows you.  I said, who

7    is that?  He said Mr. Mendel Zilberberg.  I said, oh yes, he's

8    married to my cousin.

9         And then he described the situation a little bit,

10   something about an appellate division reversal and in the

11   next -- thereafter, sometime later, I don't know if it was a

12   few days later or a day or so later or a week later, he said

13   Mr. Zilberberg told me that we may have represented the clients

14   or Mr. Klein.  I said, I don't know, it's a common name, I

15   wouldn't know.  Let's check the -- did you do a conflicts

16   search?  He said yes.

17        We then went back and ultimately he discovered or I

18   discovered that this had to do with Global Realty Ventures.

19   Pulled the billing records, realized that the matter was

20   closed.  Realized that it had absolutely nothing to do with

21   this bankruptcy and that's, sort of, the scenario.

22   Q.   Did you provide Mr. Campo with any materials from the file

23   relating to the former representation?

24   A.   I didn't have the file.  The file was in Shanghai.

25   Q.   Did you obtain any materials from the file for Mr. Campo?

CHRISTINE PERSAUD

1    A.   I did not.  I did give him a copy of the billing records

2    or showed them to him.

3    Q.   As you sit here today, do you recall any information that

4    you received from either of the client that you think is

5    entitled to confidential treatment?

6    A.   Well, I don't think I received any confidential

7    information from them.  I also don't go around talking about

8    what anybody tells me, in the context, you know, of a

9    conversation in the office.  So no, I did not receive any

10   confidential information, that I'm aware of, from any of them,

11   either or.

12   Q.   Have you reviewed the submissions made by Mr. Klein in

13   support of his objection to Troutman Sanders retention?

14   A.   I believe so.

15   Q.   Having reviewed them, are you aware of any information

16   that you or Troutman Sanders obtained in the prior

17   representation that would be relevant to the current

18   bankruptcy?

19   A.   No.  I'm totally not.

20        MR. STREMBA:  No further questions, Your Honor.

21        THE COURT:  You may cross examine.

22        MR. KRINSKY:  Your Honor, may I have a brief --

23   briefly, one minute?

24        THE COURT:  Yes, you may.

25        (Pause)

Page 108

1          MR. KRINSKY:  May I proceed, Your Honor?

2          THE COURT:  Yes.  Please proceed.

3     CROSS-EXAMINATION

4     BY MR. KRINSKY:

5     Q.    Good afternoon, Ms. Cassirer.

6     A.    Good afternoon.

7     Q.    You stated just a brief moment ago that the firm had

8     previously represented GRV, do you remember that?

9     A.    Yes.

10    Q.    When did the firm cease representing GRV, to the best of

11    your recollection?

12    A.    My recollection is based upon the documents, the billing

13    records that I just told you about.  And it looked like it was

14    a two-month representation, November and December of 2008, and

15    the file was closed in early 2011.

16    Q.    In early 2011, do you remember when in 2011?

17    A.    I think January.

18    Q.    Do you know what prompted the file to be closed in

19    January -- approximately January of 2011?

20    A.    I don't know but I could speculate.

21    Q.    Without speculating, did you ask anybody prior to

22    appearing today?

23    A.    Yes, I did.

24    Q.    And what were you told?

25    A.    I was told that accounting generally cleans up files where

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 109 of 159 PageID #: 348
CHRISTINE PERSAUD

Page 109

1    there's been less -- no communication for about a year.

2    Q.   Okay.  In connection with preparing for today, did you go

3    back and look at the original retainer agreement that was

4    entered into by the firm and Abraham Klein?

5    A.   I looked at it.

6    Q.   Are you aware --

7    A.   Wait a second.  There was no retainer agreement between

8    the firm and Abraham Klein.  There was a retainer agreement

9    between the firm and GRV.

10   Q.   Do you recall who that retainer agreement was sent to?

11   A.   It was sent to GRV.

12   Q.   What is GRV?  What is your understanding of GRV?

13   A.   I don't know what it is.  It's an entity, Global Realty

14   Ventures.

15   Q.   When was the -- I'm sorry?

16   A.   Global Realty Ventures.

17   Q.   And when was the first time you heard of GRV?

18   A.   I don't know.

19   Q.   Well, was it more than six months ago?

20   A.   Yes, it had to be.

21   Q.   Was it more than a year ago?

22   A.   Yes.

23   Q.   Was it more than two years ago?

24   A.   Yes.

25   Q.   When you said a moment ago it had to be, what did you mean

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 110 of 159 PageID #: 349
CHRISTINE PERSAUD

Page 110

```
 1    by that?

 2    A.    What I meant by that was that I think that -- now you're

 3    testing my memory but I believe that there was at least one e-

 4    mail when the representation actually started that I was copied

 5    on, in connection with a Shanghai matter.

 6    Q.    And is that the first time that GRV was mentioned?

 7    A.    I don't know.  I really don't know.

 8    Q.    When was the first time -- putting aside e-mails, do you

 9    recall the first time you remember hearing the name GRV?

10    A.    No, I don't.

11    Q.    Let's go back for a moment.  You said July 30th you got a

12    telephone call from --

13    A.    I said July.

14    Q.    I'm sorry?

15    A.    I said July.

16    Q.    I apologize.  July of 2008 you had received a telephone

17    call from either Abraham Klein or Hershel Klein, is that

18    correct?

19    A.    Yes.

20    Q.    And they wanted --

21    A.    Both.

22    Q.    I'm sorry?

23    A.    They may both have been on the phone, I don't know.  I

24    don't remember.

25              THE COURT:  Sorry for the precision of our sound
```

Page 111

1    system, but I do need to remind that you -- if you aren't a

2    little closer to the mic we probably will not make a good

3    record.

4            THE WITNESS:  I'm sorry.

5            THE COURT:  I have a microphone right here.  Mine is

6    not visible, it's not a good reminder to you.  But thank you

7    very much.  I thank you both.  Same thing for counsel.  Next

8    question, please.

9    Q.    When a phone call came in from either Abraham or Hershel

10   Klein, you had been connected to that telephone from the

11   reception, correct?

12   A.    I believe so.

13   Q.    And it was about potential representation, is that right?

14   A.    Yes, or an inquiry about potential representation.

15   Q.    What is the distinction, for you, between inquiry for

16   potential representation and a telephone call about potential

17   representation?

18   A.    I get a lot of crackpot phone calls too.  And sometimes --

19   I mean, frankly if I hadn't been sitting at my desk she had

20   instructions -- she would have passed the phone along to --

21   yeah, she would have just left a message and I may or may not

22   have called back.  So I don't take these as inquiries about

23   real potential representation, most of the -- as potential

24   representation.  I mostly take these calls, a call like this,

25   as a courtesy.

Page 112

1    Q.    You said the word, was it, crackpot?

2    A.    Uh-huh.  That's the word I used.

3    Q.    What do you mean by that?

4    A.    Well, for example, I get calls from people who have called

5    sixty other attorneys and take the calls from the Internet or

6    Martindale Hubble and say could you represent me in my

7    employment case, you know, the whole world is against me.  Or

8    you get -- I used to get calls about habeas corpus matters,

9    stuff like that.

10   Q.    So it would be a fair statement to say that when you get -

11   -

12   A.    That's the only call I got -- sorry.  Go ahead.

13   Q.    No, please continue.

14   A.    No, no, no.  Never mind.

15   Q.    When you got this phone -- when you get these types of

16   telephone calls, therefore you want to verify who it is that

17   you're speaking to and whether or not they can be a potential

18   client of the firm?

19   A.    Yes.

20   Q.    As I think you mentioned before on direct, it's important,

21   for example, to verify whether or not it's going to be a paying

22   client, a client that can afford Troutman Sanders rates, right?

23   A.    Well, I didn't say it was important but I did want to

24   verify who these people were and whether they could pay, yes.

25   Q.    Would you agree that it is, in fact, important when you

Page 113

1   are screening clients to determine whether or not they have the

2   financial capability to pay the firm?

3   A.   Yes.

4   Q.   And as a managing partner, you said a moment ago, I think,

5   you get phone calls all the time about potential clients or

6   inquiries about potential clients, right?

7   A.   I get such phone calls.

8   Q.   And when you get these phone calls, sometimes you take

9   them, sometimes you don't, is that right?

10  A.   Yes.

11  Q.   And when you do take them you typically ask the person on

12  the other end, you ask them information, right?

13  A.   I -- yes.

14  Q.   You want to know their name, for example, right?

15  A.   Yes.

16  Q.   Who they were previously represented by?

17  A.   I usually never get that far.

18  Q.   You'd want to know if they work for a company or if

19  they're an individual client, is that right?

20  A.   If I get that far, yes.

21  Q.   When you say if you get that far, what do you mean?

22  A.   Most of the time when they start -- if I get a phone call

23  that is of the ilk described previously, I usually say we don't

24  do that kind of work and I say good luck, you know, I hope you

25  find someone else.

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 114 of 159 PageID #: 353
CHRISTINE PERSAUD

Page 114

1    Q.   And in those instances where you don't say something to

2    that effect and you see them as a potential client, what do you

3    do next?

4    A.   I usually find out who they are and who they're

5    represented by.

6    Q.   When you say you find out who they are, what types of

7    questions do you actually ask?

8    A.   Where do you work?  What company are you with?  You know,

9    what kind of matter is it?  And the other question I ask,

10   frankly, if it's a litigation I want to know who they want to

11   sue.  And if it's a transaction, you know, I want to know what

12   kind of transaction.

13        You really -- okay, it is.

14   Q.   And when you ask about transactional matters do you ask

15   questions such as who's on the other side of the transaction?

16   A.   I would if it went that far.

17   Q.   Well, in the case of Abraham Klein and Hershel Klein

18   calling you, did it go that far?

19   A.   Not on my end.  Not -- I don't believe so.

20   Q.   Ms. Cassirer, in your conversations with either Hershel or

21   Abraham Klein on July 30th, didn't Hershel Klein send you his

22   profile advising you as to who he was?

23   A.   I don't remember him doing so.

24   Q.   I'd ask that you refer to the larger exhibit book.

25   A.   Yeah.

1    Q.   Specifically returning your attention to what has been

2    previously marked for identification as Klein Exhibit 2.

3    A.   I'm sorry.  Klein Exhibit 2 is -- okay.  I see it says

4    profile.

5    Q.   Before discuss --

6    A.   On the subject matter it says profile.

7    Q.   Before discussing the content, Ms. Cassirer, do you

8    recognize that document?

9    A.   As I'm looking at it now, I mean it's an e-mail,

10   apparently from Hershel Klein, to me.

11   Q.   Okay.  Do you dispute that that e-mail was sent to you?

12   A.   No.

13        MR. KRINSKY:  Your Honor, I offer into evidence what

14   has previously been identified as Klein Exhibit 2, as Klein

15   Exhibit 2.

16        MR. STREMBA:  Your Honor, it's not a complete

17   document.  At least the -- if there was an attachment it's not

18   here and it doesn't actually say there's an attachment, it just

19   says "Subject Profile".  So is this a whole document or --

20        MR. KRINSKY:  That's the entire document as it exists

21   on your system, as it exists in our system.

22        THE COURT:  You need to speak into the microphone.

23   I'm sure you want to be cautious not to testify as well.

24        MR. STREMBA:  Your Honor, I think we need some

25   foundation for this document, to know what it is.  Ms. Cassirer

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 116 of 159 PageID #: 355
CHRISTINE PERSAUD

Page 116

1    says she doesn't dispute seeing it but she can't authenticate

2    it.

3            THE COURT:  Do you object to the admission of the

4    document?

5            MR. STREMBA:  I object to admission of a less-than-

6    complete document.

7            THE COURT:  I'm going to sustain the objection subject

8    to your supplementing or providing a better foundation for the

9    document and I invite you to do so at our continued hearing.

10   So perhaps I'll just leave the question open, but I can tell

11   you that there's a serious question in my mind as to whether a

12   document that the witness doesn't recall receiving and that's

13   inconsistent, so far, with her testimony, that she can only

14   acknowledge is in a form that is an e-mail form and that it

15   seems, by your questioning, you're suggesting was forwarding

16   something that is -- but there's no reference to an attachment,

17   that just says profile, profile best regard.  You know, I think

18   we need to hear a little more about this.

19           I'm going to reserve subject to your supplementing the

20   record.  But I'm not satisfied there's much of a basis here to

21   take this as evidence.  You can certainly ask Mr. Hershel

22   Klein, and I suspect you will, about the document.  Maybe that

23   will help.

24           MR. KRINSKY:  To the extent that opposing counsel had

25   indicated before --

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 117 of 159 PageID #: 356
CHRISTINE PERSAUD

Page 117

1            THE COURT:  I don't think there's a basis to admit it

2     presently.

3            MR. KRINSKY:  To the extent that opposing counsel had

4     indicated before that there were no objection -- evidentiary

5     objections to the exhibits, putting aside Green, Greens -- Mr.

6     Green's affirmation, otherwise we would have specifically

7     subpoenaed the file to avoid these types of evidentiary issues.

8            If that is the case, Your Honor, we submit an oral

9     application requesting of the Court direct the firm to search

10    its records and to provide all documents so that we can avoid

11    these types of evidentiary issues, to the extent that they

12    don't exist and my understanding was they didn't exist.

13           THE COURT:  The parties need to get to work on the

14    exhibits, I told you that when we began.  You need to review

15    the exhibits; you need to advise me exhibit by exhibit.  We

16    spoke about this previously, you were here --

17           MR. KRINSKY:  Right.

18           THE COURT:  -- that you're going to advise the Court

19    those exhibits that you can consent to the admission of.  Let's

20    move on.  I want to use the witness' time well.  How much more

21    cross examination do you have?

22           MR. KRINSKY:  I have at least a half an hour to forty-

23    five minutes.

24           THE COURT:  Ask your next question.

25    BY MR. KRINSKY:

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 118 of 159 PageID #: 357
CHRISTINE PERSAUD

Page 118

```
 1    Q.   Ms. Cassirer, isn't it true that you received several e-

 2    mails and communications from Hershel Klein and Abraham Klein

 3    on July 30th, 2008 about inquiries about possible

 4    representation of the Troutman firm?

 5    A.   Well, if I can look at your exhibit.

 6         THE COURT:  Well, the question is do you recall it, in

 7    substance.  Whether something might refresh your recollection

 8    is a different question, has not been asked.

 9         THE WITNESS:  Okay.  I recall that I received a couple

10    of e-mails.  What exactly they said or what they were about, I

11    don't know.

12    Q.   Other than those e-mails, is there any --

13    A.   Other than which e-mails?

14    Q.   Other than the communications which you were just

15    referring to.

16    A.   Okay.

17    Q.   Is there any doubt in your mind that Abraham Klein and

18    Hershel Klein were contacting you about possibly retaining the

19    Troutman Sanders firm?

20    A.   They were asking about our capabilities in China with --

21    probably in order to see whether they wanted to retain the

22    firm.

23    Q.   So when you say probably, there's a question in your mind

24    as to whether they were actually calling to retain the firm, as

25    you sit here today?
```

Page 119

1    A.    No, the question in my mind is whether they were calling

2    other firms as well.  I mean, frankly, they didn't know us.  We

3    had absolutely no connection to them; they had no connection to

4    us.  They saw this billboard in an airport.

5          So, you know, I don't know how many other lawyers they

6    were contacting at the same time, you know.

7    Q.    Did you ask them that question?

8    A.    No.

9    Q.    When you called --

10   A.    I wouldn't ask any client that question or perspective

11   client that question, or anyone for that matter.

12   Q.    But you do ask clients, perspective clients, who they're

13   currently being represented by?

14   A.    I was basically asking for a reference.

15   Q.    And did you get a reference?

16   A.    Yes, I got Mr. Zilberberg.

17   Q.    Okay.  And when you spoke to Hershel or Abraham Klein, did

18   you ask them about their financial capabilities to pay the

19   firm?

20   A.    No.

21   Q.    Did you ask them about the extent to which they needed

22   financial or -- they needed legal counsel?

23   A.    I don't think so.

24   Q.    Is it customary in practice of the Troutman Sanders firm,

25   when screening a potential client, to determine in advance what

Case 1-10-44815-ess  Doc 238  Filed 09/19/11  Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG  Document 1-22  Filed 07/05/12  Page 120 of 159 PageID #: 359
CHRISTINE PERSAUD

Page 120

1  the potential dollar amount of client services needed will be?

2  A.   I'm sorry; could you ask that question again?

3  Q.   Sure.  In the context of screening potential clients, is

4  it the custom and practice of the Troutman Sanders firm to

5  determine the perspective legal needs of a client in dollar

6  amount?

7  A.   I don't know that that's customary.  I mean, I don't know

8  that it's, frankly, obvious at the beginning to either the

9  client or to Troutman what the client -- what kind of

10  representation or work the client would need.  And, you know, I

11  mean, if you're asking do we ask for a financial statement?

12  No, certainly not in an early conversation.  I mean, you're

13  talking about someone, you know, really early conversation.

14  Q.   During early conversations do you ask questions or does

15  the firm ask questions to perspective clients to determine

16  their annual dollar amount legal needs?

17  A.   I don't.

18  Q.   Does the firm, to your knowledge?

19  A.   I don't know.

20  Q.   How long have you been the managing partner of the

21  Troutman Sanders firm New York office?

22           MR. STREMBA:  Your Honor, this is an argument.  He

23  just asked if the firm does something.  The firm doesn't do

24  anything.

25           THE COURT:  Well the question is how long have you

Page 121

1    been managing partner, I think this subject was actually

2    addressed in the context of this firm, a predecessor firm, a

3    predecessor firm with a different name, a merged firm and I

4    think we did go through that.  But if it moves us along, the

5    question should be answered, how long have you been the

6    managing partner of the firm -- of a firm with the title

7    Troutman Sanders, as opposed to the predecessor entity, you can

8    answer the question.  I'm going to overrule the objection.

9            THE WITNESS:  I've been the managing partner of the

10   New York office of Troutman Sanders since April 1, 2005.

11           THE COURT:  Thank you.

12   BY MR. KRINSKY:

13   Q.   And over the course of the last, approximately, six years

14   you've had an opportunity to sign up clients in the past,

15   correct?

16   A.   I'm not quite sure what you mean by signing up clients.

17   Q.   You've had an opportunity to interview perspective

18   clients, correct?

19   A.   I've had an opportunity to meet with perspective clients

20   and been lucky enough to be retained by them, yes.

21   Q.   And in the course of that process the firm requires that a

22   client informational sheet be prepared, isn't that right?

23   A.   What do you mean by a client informational sheet?

24   Q.   Sure.  If you would please, in your exhibit book, refer to

25   what has been previously marked for identification as Klein

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 122 of 159 PageID #: 361
CHRISTINE PERSAUD

Page 122

1    Exhibit 107.

2    A.    Yes.

3    Q.    Do you recognize that document?

4    A.    Yes.

5    Q.    Do you recognize that document because it's a document

6    that the firm uses in connection with being retained by new

7    clients?

8    A.    It's a document that the firm uses when it opens new

9    files.

10   Q.    And is this, in fact, the document that was used in

11   connection with opening up the new file in connection with, as

12   it says on the top, name Global Realty Ventures?

13   A.    Yes, it looks that way.

14           MR. KRINSKY:  I offer into evidence what was

15   previously marked for identification as Klein Exhibit 107, as

16   Klein Exhibit 107.

17           MR. STREMBA:  No objection, Your Honor.

18           THE COURT:  Without objection it'll be received.

19   (Klein Exhibit 107, form used by Troutman Sanders for retaining

20   GRV, was hereby received into evidence as of this date.)

21   Q.    If you would please turn to what has been marked for

22   identification as Klein Exhibit 108, the next document.  You

23   recognize that document as well, correct?

24   A.    I recognize the form, yes.

25   Q.    And that's the type of form that's been used in the

Page 123

1   regular course of business of the Troutman Sanders firm?

2   A.   Yes.

3   Q.   And that's the type of document that would have been kept

4   in the regular course of business and made in the regular

5   course of business by the Troutman Sanders firm?

6   A.   Yes.

7   Q.   And in fact that document was made and kept in the regular

8   course of business of the Troutman Sanders firm?

9   A.   I believe so.

10  Q.   When you say believe so, in connection with this matter,

11  did you request from Shanghai the file in connection with what

12  is called here, at least, the Global Realty Ventures project?

13  A.   I requested it but I didn't look at it.

14  Q.   As you sit here today, do you have any reason to doubt

15  that the document that's marked as Klein 108 was contained in

16  the package of information that was sent from Shanghai?

17  A.   I don't know what was in it, I really don't.

18  Q.   Okay.  Turn your attention, please, to what has been

19  previously marked --

20  A.   Let me just correct something that I actually didn't

21  realize was.  This document indicates that I'm the responsible

22  attorney.

23  Q.   Uh-huh.

24  A.   And I thought that it was Edward Epstein.  I just want to

25  just indicate that I was mistaken, obviously.  The forms must

Page 124

```
 1    have reflected that I was the responsible attorney.  I was not

 2    aware of that.

 3    Q.   By the way, what does responsible attorney mean?

 4    A.   It just means that you touched the file first,

 5    essentially.  That you originated the client.  It means that I

 6    got the first phone call.

 7    Q.   Does it -- is there any financial significance attached to

 8    that word, responsible attorney?

 9    A.   Not really.

10    Q.   When you say not really, what do you mean?

11    A.   It means that if I don't work on the file that I just,

12    kind of, touched it, there are other categories of also which

13    would be in the Troutman system.  Everybody shares, you know,

14    the responsibility.  So if someone else works the file, they

15    basically get a -- you know -- and there's nothing formal about

16    compensation.  Compensation in the Troutman system is

17    subjective.

18    Q.   Okay.  Turn your attention to what was previously marked

19    for identification as Klein Exhibit 110.

20    A.   Yes.

21         THE COURT:  You're not offering 108, is that right?

22         MR. KRINSKY:  Your Honor, to the extent that there

23    have been questions raised, today for the first time or

24    objections raised today for the first time by opposing counsel

25    on admissibility, I will reserve and speak to opposing counsel
```

Page 125

1    to see if those issues can be worked out, consistent with the

2    pre-hearing memo that had been sent to Your Honor stating there

3    were no evidentiary or we didn't foresee any evidentiary

4    issues.

5             THE COURT:  By the pre-hearing memo do you mean the

6    response to the pre-hearing statement that I issued?

7             MR. KRINSKY:  Yes, Your Honor.

8             THE COURT:  Proceed.

9    BY MR. KRINSKY:

10   Q.    Referring your attention to what has been marked as Klein

11   Exhibit 110, tab 110.

12   A.    Yes.

13   Q.    You recognize that document, don't you?

14   A.    You're talking about the first page?

15   Q.    Yes.

16   A.    No, I don't, actually.

17   Q.    You've never seen that document before?

18   A.    I don't believe so.

19   Q.    Okay.  Edward Epstein was the lawyer that you referred

20   Hershel and Abraham Klein in Singapore, correct?

21   A.    In Shanghai.

22   Q.    In Shanghai, correct?

23   A.    Yes.

24   Q.    Flexo Craft Prints, do you know who that is?

25   A.    No.

Page 126

```
1    Q.    Never heard of them before?

2    A.    Well, no.  I'm not going to say I never heard of them.  I

3    think that the e-mail address that the clients gave me was at

4    Flexo Craft.

5    Q.    Did you ever ask, back in July of '08 or August or

6    September of '08 who is Flexo Craft?

7    A.    I don't recall doing so.

8    Q.    Well, let's go back to that time period again in July.

9    When you first spoke to Abraham or Hershel Klein did you ask

10   them what company do you represent?

11   A.    I think that they told me they were essentially -- I got

12   the impression, either because they told me or because Mr.

13   Zilberberg told me, was that they did real estate deals.

14   Q.    Did you ask them what company through which do they do

15   real estate deals, back in July of '08?

16   A.    I don't remember.

17   Q.    Okay.  Did you ask them -- putting aside the deal itself,

18   did you ask them if they're associated with any publicly traded

19   companies?

20   A.    No, I don't think so.

21   Q.    When did you perform, back in July of '08 when you first

22   spoke to Abraham or Hershel Klein, when did you actually

23   perform a conflicts check for the firm?

24         MR. STREMBA:  Object to the form of the question, Your

25   Honor.
```

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 127 of 159 PageID #: 366
CHRISTINE PERSAUD

Page 127

1           THE WITNESS:  I usually don't perform --

2           THE COURT:  What's the form issue, I'm not sure I

3     understand the -- in fact, I'm sure I don't understand the

4     objection.

5           MR. STREMBA:  There was an assumption in the question.

6           THE REPORTER:  Excuse me, I can't hear you.

7           MR. STREMBA:  There's an assumption in the question.

8     I think the proper question is whether --

9           THE COURT:  I take that to be objection, lack of

10    foundation.

11          MR. STREMBA:  Yes, Your Honor.

12          THE COURT:  Would you restate the question and try to

13    address the issue?

14          MR. KRINSKY:  Sure.

15    BY MR. KRINSKY:

16    Q.   You understand -- we're not referring to the exhibits just

17    yet.

18    A.   Oh, okay.

19    Q.   You understood, back in July of '08, that you had an

20    obligation, when speaking to potential clients, to run a

21    conflicts check in connection with possibly representing that

22    client?

23    A.   I understood -- the time when I understand that I have an

24    obligation to run a conflicts check is either before I'm

25    retained or before I'm given certain information that would

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 128 of 159 PageID #: 367
CHRISTINE PERSAUD

Page 128

1    merit that kind of check.

2    Q.    When you see --

3    A.    That doesn't mean that every time I talk to a client --

4    have a conversation for the first time I immediately run to do

5    a conflict check or have to run a conflict check.

6    Q.    So when you say before you're provided certain

7    information, what information are you referring to?

8    A.    Information that would point to who the person on the

9    other side is or the entity on the other side is.

10    Q.    So before you have to run a conflicts check -- you don't

11    have to run a conflicts check until you receive information

12    about who's on the other side?

13    A.    I said -- how am I going to -- I'm not sure I understand

14    your question.  Obviously not.

15    Q.    You said a moment ago that you don't have to run a

16    conflicts check until you receive certain information.

17    A.    Are you asking me whether I should --

18         THE COURT:  Let's -- may I remind the witness and

19    counsel that we'll -- it will be more helpful to the Court, as

20    the finder of fact, if you ask a question, reflect on whether

21    you can answer the question from your personal knowledge and

22    recollection, answer the question, wait for the next.  Question

23    -- an answer such as are you asking me that or for that matter

24    what do you mean when you say is not nearly as likely to lead

25    to evidence that is probative, on any disputed issue

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 129 of 159 PageID #: 368
CHRISTINE PERSAUD

Page 129

1    whatsoever, and therefore not nearly as likely to be usable to

2    the Court.

3            Ask your next question, please.

4    Q.    The Troutman Sanders firm has a conflicts checking

5    protocol in place, correct?

6    A.    Yes.

7    Q.    What is that conflicts checking protocol?

8    A.    Before we take on a representation we do a conflicts

9    check.

10   Q.    What does that conflics check entail?

11   A.    Generally speaking you send the name of the perspective

12   client and perspective -- as much information as you have and

13   perspective adver -- other side, to a person who is in charge

14   of checking conflicts.

15   Q.    When you say as much information as you have, it's the

16   attorney's obligation to collect that information to perform

17   the conflicts check, isn't that right?

18   A.    Yes.

19   Q.    So you have to ask questions regarding corporate entities,

20   names of potential clients, right?

21   A.    Yes.

22   Q.    How -- according to the firm's policy, how soon after

23   first being contacted are you required to perform that

24   conflicts check?

25   A.    I believe that the firm's policy is, to the extent that I

Page 130

1    know it, is that you're supposed to perform the conflicts check

2    before taking on a representation.

3    Q.   Referring your attention to what has been marked as Klein

4    Exhibit 7 for identification.

5    A.   Yes.

6    Q.   And I do apologize for the voluminous nature in terms of

7    how they flip.

8              THE COURT:  Is this Exhibit 7?

9              MR. KRINSKY:  Yes.

10             THE COURT:  Wednesday, July 30th, yes.

11   Q.   Ms. Cassirer, you in fact recognize that e-mail as being

12   sent to you?

13   A.   I recognize that it was an e-mail that was sent to me,

14   yes.

15   Q.   Okay.

16             THE COURT:  I'll note for the record that this is a

17   string of e-mails, one of which you previously put before the

18   Court.  There's an objection to production, I sustained the

19   objection, at least I deferred ruling on the objection until

20   there could be a more full submission.

21             THE WITNESS:  May I --

22             THE COURT:  I would invite you not to do through the

23   back door what you weren't able to complete through the front

24   door.

25             MR. KRINSKY:  Your Honor, I apologize.  I was not -- I

Page 131

1    would even offer a redacted version as I was only referring to

2    the top portion of the e-mail itself, which is information that

3    opposing counsel had elicited during direct examination.

4              THE COURT:  Please proceed having a focus on the first

5    segment down to Best HK, does that work?

6              MR. KRINSKY:  Yes, Your Honor.

7              MR. STREMBA:  I have no objection to that, Your Honor.

8              MR. KRINSKY:  Your Honor, I offer into evidence what

9    has previously been marked as Klein Exhibit 7 with the

10   provision that the balance of the document is redacted from HK

11   down, for the balance of --

12             THE COURT:  With the consideration of which is

13   deferred pending resolution of this issue, which I trust will

14   be resolved.  Any objection?  It seems -- I think I heard no

15   objection?

16             MR. STREMBA:  Yes, Your Honor.

17             THE COURT:  All right.  Thank you.  Yes, there's no

18   objection.  Without objection it will be received, subject to

19   the additional issue we've indicated and preserved for the

20   record.  And, I mean, not in the sense of preserving for the

21   record in some kind of appellate sense, I mean in the sense of

22   we'll come back to it when we can come back to it on our

23   continued day.

24             All right.  All right.  Please proceed.

25   Q.   Ms. Cassirer --

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 132 of 159 PageID #: 371
CHRISTINE PERSAUD

Page 132

```
 1            THE COURT:  I should say without objection it is
 2    admitted as indicated on the record.
 3    (Klein's Exhibit 110, e-mail dated 7/30 sent to Ms. Cassirer,
 4    was hereby received into evidence as of this date.)
 5    Q.   Ms. Cassirer, isn't it true that Mr. Hershel Klein asked
 6    you whether he needed a confidentiality agreement from your
 7    firm before providing you certain information?
 8    A.   That's what the e-mail says.  Yes.
 9    Q.   And isn't it true that Hershel Klein expressed to you that
10    he was very conscious about keeping this project, referring to
11    the China project, confidential?
12    A.   That's what the e-mail says, yes.
13    Q.   At some point you responded to Hershel Klein's e-mail, is
14    that correct?
15    A.   Yes.
16    Q.   Referring your attention to what has been previously
17    marked as Klein Exhibit 9 for identification.
18            MR. KRINSKY:  And Your Honor, I ask that the witness
19    look at this document but the witness does not look at the
20    document below Best, HK.
21            THE COURT:  It's not a question of looking or not.
22    It's a question of the issues -- the evidence issue.  You're
23    asking previously have admitted the portion that begins July
24    30th, 4:20 p.m.  You're now looking to focus on the next
25    portion?
```

Page 133

1          MR. KRINSKY:  Yes, Your Honor.

2          THE COURT:  Top portion, July 30th, 6:56 p.m.?

3          MR. KRINSKY:  Yes, Your Honor.

4          THE COURT:  All right.

5     BY MR. KRINSKY:

6     Q.   And specifically looking at the top portion of Klein

7     Exhibit 9 for identification, specifically Wednesday, July

8     30th, 2008, 6:56 p.m., that portion.  Do you see what I'm

9     referring to?

10    A.   Yes.

11    Q.   And you recognize that top portion of that document?

12    A.   Yes.

13    Q.   And that's, in fact, the document or the response that you

14    sent back to Hershel Klein in response to his earlier e-mail

15    about confidentiality?

16    A.   Yes.

17          MR. KRINSKY:  I offer what's been marked for

18    identification as Klein Exhibit 9, as Klein Exhibit 9, the top

19    portion with the bottom portion redacted subject to Your

20    Honor's prior rulings.

21          MR. STREMBA:  No objection, Your Honor.

22          THE COURT:  Without objection, the portion indicated

23    will be received in evidence.

24    (Klein's Exhibit 9, e-mail sent by Ms. Cassirer to Hershel

25    Klein on 6/30, was hereby received into evidence as of this

Page 134

1    date.)

2              THE COURT:  We will revisit the question of the

3    balance of the document at our next proceeding.

4    Q.   Ms. Cassirer, after this e-mail was sent did you send

5    Hershel Klein an e-mail saying, by the way, Troutman Sanders we

6    don't represent you?

7    A.   I don't think so.

8    Q.   Did you send Abraham Klein an e-mail, after July 30th,

9    2008, stating, by the way, Abraham Klein, we don't represent

10   you?

11   A.   They didn't retain us.

12   Q.   Did you send GRV a letter after July 30th, 2008 saying we

13   don't represent you?

14   A.   They didn't retain us.

15   Q.   Did you send Flexo Craft, another entity, a letter saying,

16   after July 30th, we don't represent you?

17   A.   No, I did not.  There was no reason to do so.

18   Q.   Subsequent to sending this July 30th, 2008 e-mail at 6:56,

19   did you say to Abraham Klein, in an e-mail, by the way we can't

20   hold your information confidential because we're not your

21   attorneys?

22   A.   As I testified earlier, I view the obligation of

23   confidentiality to extend to perspective clients as well.

24   Q.   Okay.

25   A.   If they shared something with me.

CHRISTINE PERSAUD

1    Q.    Subsequent to July 30th, 2008, did you say to Abraham

2    Klein we can't keep your information confidential, you haven't

3    retained us yet?

4    A.    No.

5    Q.    Did you say to --

6            MR. KRINSKY:  Your Honor, if I could just group it all

7    together.

8    Q.    Did you send any letter to anybody, e-mail or any

9    communication after July 30th, saying -- to Abraham Klein,

10   Hershel Klein or anybody related to them, we can't hold your

11   information confidential because you haven't retained us?

12   A.    No, I did not.

13   Q.    Subsequent to July 30th, 2008, did you speak with Abraham

14   and Hershel Klein regarding the potential deal in China?

15   A.    I think I did in early August.

16   Q.    Isn't it a fact that you spoke with Abraham and Hershel

17   Klein on the evening of July 30th, 2008 in a joint conference

18   call with Edward Epstein?

19   A.    I actually don't know but possible.

20   Q.    Would it be fair --

21   A.    Do you want to show me some e-mails to that effect?

22   Q.    Would it be a fair statement that if you don't recall

23   whether you had that telephone call, you wouldn't --

24   A.    I don't recall the date of that telephone call.

25   Q.    Okay.  Did you share with Mr. Campo every telephone call

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 136 of 159 PageID #: 375
CHRISTINE PERSAUD

Page 136

1    you had with Abraham Klein and Hershel Klein regarding the

2    China project?

3    A.    No.

4    Q.    Did you share with Mr. Campo every conversation Edward

5    Epstein had with Abraham or Hershel Klein regarding the China

6    project?

7    A.    No.

8    Q.    In July of 2008, isn't it true that you were informed that

9    Hershel and Abraham Klein needed legal advice from the Troutman

10   Sanders firm on how to set up a legal structure that protects

11   all their interests in connection with the China project?

12   A.    I don't recall what was said in that conversation but I do

13   recall see -- or in an e-mail.  I do recall seeing some e-mail

14   to that effect, just recently, in preparation for this.

15   Q.    In Klein Exhibit 9, you state "I do not believe that you

16   need a confidentiality agreement with your attorney."  It goes

17   on but did I read that portion of it correctly?

18   A.    What it says is "Hershel, I do not believe that you need a

19   confidentiality agreement with your attorneys since we are

20   bound to keep your communications with us confidential."

21   That's correct, yes.

22   Q.    Did you explain to either Hershel Klein or Abraham Klein

23   at that point, any limitations on what you were bound to keep

24   confidential?

25   A.    No.

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 137 of 159 PageID #: 376
CHRISTINE PERSAUD

Page 137

1    Q.    And when it refers to your attorney, who are you referring

2    to when you make that statement?

3    A.    Any attorney.  It's a theoretical statement.

4    Q.    So this statement wasn't about the Troutman Sanders firm;

5    it was about any law firm that you -- that is retained by a

6    client?

7    A.    You know, if I look at the direct response, it's in

8    response to his question of is it necessary to do a

9    confidentiality agreement before I send the information to you.

10   So I was responding to his question that he didn't need one if

11   he sends it to me.

12   Q.    And why wouldn't he need one if he sends it to you?

13   A.    Because he's a prospective client doing it in the context

14   of exploring the retention of us as an attorney and retaining

15   us as an attorney.

16   Q.    What is your understanding -- what's the basis for the

17   duty of confidentiality to prospective clients?

18   A.    I don't know if I understand that question.

19   Q.    Sure.  You said back in July of 2008, you believed that

20   you owed a duty of confidentiality to prospective clients,

21   right?

22   A.    Yes.

23   Q.    What was the basis for that obligation?

24   A.    That's my understanding of what my obligations are as an

25   attorney.

Page 138

1   Q.    Okay.  What is the firm's policy with respect to providing

2   clients with retainer agreements?

3   A.    We try to do so.

4   Q.    What's the policy in terms of timing?  When do you have to

5   do that, according to the firm policy?

6   A.    According to the firm policy, we're supposed to do it as

7   soon as -- as soon as possible after the client engages us.

8   Q.    Do you know when the retainer agreement -- when a retainer

9   agreement was sent to Abraham Klein in connection with the

10  China project?

11  A.    I saw that one was sent out sometime in November of 2008.

12  Q.    Back in July and August, was it anticipated, to your

13  knowledge, whether or not the Troutman Sanders firm was going

14  to be performing hourly work for Abraham and Hershel Klein?

15  A.    I don't know.  I don't think the client had retained us at

16  that time.

17  Q.    The question was actually a little bit different.  Was it

18  anticipated, in July or August of 2008, that the firm would be

19  doing hourly work on behalf of either Hershel or Abraham Klein?

20           MR. STREMBA:  Question's been answered, Your Honor.  I

21  object.

22           THE COURT:  I'm concerned about an ambiguity and maybe

23  it's just the lateness of the hour.  By "on behalf of" do you

24  mean for?  It's not clear to me and I want to avoid argument

25  after the fact that could be avoided by clarification --

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 139 of 159 PageID #: 378
CHRISTINE PERSAUD

Page 139

1           MR. KRINSKY:  Sure.

2           THE COURT:  -- of the question at present.

3           MR. KRINSKY:  Sure.

4           THE COURT:  So I'm going to ask you to restate the

5    question.  Do your best to eliminate any ambiguity about what

6    precisely you are asking.

7    Q.    In August of 2008, did the firm expect to be performing

8    hourly work for Abraham Klein in connection with the China

9    project?

10   A.    I can't answer that question in the way that's it's

11   phrased.  I mean, he was talking to us about a China project.

12   If he would have retained us, then it would have anticipated

13   doing hourly work.  He didn't retain us at the time.

14   Q.    So if the firm agreed to do hourly work, that would be the

15   start of the retention, right?

16   A.    Yes.

17   Q.    And if the firm agreed to do hourly work and said listen,

18   we're going to charge you by the hour, Abraham Klein, in your

19   mind back in July of '08, would that have been a retention?

20   A.    I don't know.

21   Q.    As you sit here today --

22   A.    I can't answer that question right now.

23   Q.    As you sit here today, if you say Abraham Klein, I'm going

24   to do hourly work for you --

25   A.    That's not the way it works.

Case 1-10-44815-ess   Doc 238   Filed 09/19/11   Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG   Document 1-22   Filed 07/05/12   Page 140 of 159 PageID #: 379
CHRISTINE PERSAUD

Page 140

1    Q.   Well, what would have to happen to bring -- to actually

2    formalize that agreement?

3            MR. STREMBA:  Your Honor, this is all hypothetical.

4    Can we just stick to what the client -- what the witness

5    recalls?

6            THE COURT:  I'd like to remind you that with a fact

7    witness, the job is to ask questions that elicit recollection

8    from the witness' own knowledge and experience.  This is not

9    here as an expert.  You've objected to speculative questions

10   and answers in the prior testimony.  I know it's been a long

11   couple of days for all of you and how hard you're working but I

12   wonder whether this is straying into arguing your points as

13   opposed to asking this witness about the facts of the

14   situation.

15           MR. KRINSKY:  Your Honor --

16           THE COURT:  So you can ask your next question.

17   There's no need to argue with me.

18   Q.   Isn't it a fact, in August of 2008, your firm agreed to

19   provide hourly legal services to Abraham Klein?

20   A.   I don't think so.  I mean, I think that that happened in

21   August -- I mean, in November to Realty Ventures -- Global

22   Realty Ventures.  Not to Abraham Klein.

23   Q.   Is it your testimony that you don't know or that it didn't

24   happen?

25   A.   I'm not aware of the fact that that happened.

Page 141

1    Q.    Is there something that might refresh your recollection?

2    A.    If you showed me a document.

3    Q.    Refer your attention to what has previously been marked as

4    Klein Exhibit 24 for identification.

5          THE COURT:  For the sake of methodical record, I'm

6    going to ask you to get to a good stopping point in a couple of

7    minutes.  I've a couple of housekeeping matters I'd like to

8    take up and -- well, tell me how much longer you need to

9    complete this exam.  You're -- I think you're at the outer

10   perimeter of your prior estimate.  Although I understand

11   sometimes things take longer than a lawyer thinks they will.

12         MR. KRINSKY:  If there is no issue as to exhibits,

13   then I'd be probably twenty minutes away but because the

14   exhibits -- because of the issues with exhibits, I have to go

15   about the examination differently.  Otherwise, for example,

16   this exhibit would be entered, I'd ask her a question and I'd

17   move on.  So I -- therefore, I'm still --

18         THE COURT:  There have been very few objections since

19   the objection to Exhibit -- I'm not sure I understand your

20   point.  My question is straightforward in all events.  How much

21   more time do you need for this cross?

22         MR. KRINSKY:  Forty minutes.

23         THE COURT:  I'd like very much to finish it.

24         MR. KRINSKY:  A half an hours.

25         THE COURT:  Half an hour.  See how much you can do in

Page 142

1    the next few minutes.

2    BY MR. KRINSKY:

3    Q.   Referring your attention to Klein Exhibit 24 marked for

4    identification.

5    A.   Yes.

6    Q.   If you would, please, turn to that exhibit and read

7    silently and when you're done -- the top portion, just the top

8    portion.  And please look up when you are finished reading.

9    A.   Okay.

10   Q.   Does that refresh your recollection, Ms. Cassirer?

11   A.   Not completely but to some extent.

12   Q.   Okay.  Isn't it true that on August 5th, 2008, your firm

13   agreed to provide hourly services to Abraham Klein?

14   A.   Edward Epstein offered to coordinate certain things for

15   him at hourly rates and asked that Mr. Klein let him know if he

16   wanted him to go ahead.  I don't know that there was a response

17   to it.

18   Q.   After Mr. Epstein agreed to provide hourly rate -- hourly

19   services, did the firm provide, in August of 2008, Abraham

20   Klein or Hershel Klein with a retainer agreement?

21   A.   Not to my knowledge.

22   Q.   When you say not to your knowledge, have you reviewed the

23   firm's records to determine if one was provided in August of

24   2008?

25   A.   I have not.  However, they didn't appear as clients in our

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 143 of 159 PageID #: 382
CHRISTINE PERSAUD

Page 143

1    client base.

2    Q.   And the basis for it not appearing in the client database

3    is because there was no retainer agreement?

4    A.   No.  Because they didn't become clients.  And presumably

5    because it was -- it's -- if they had clients, there should

6    have been a retainer agreement.  They didn't become clients.

7    It certainly -- it just didn't happen.

8    Q.   That they didn't become clients of the firm.

9    A.   They did not become clients.  And I -- to my -- I

10   certainly am not aware of any retainer agreement being sent to

11   them at that time.

12   Q.   We talked before.  You said that you protect confidential

13   information for prospective clients, do you remember that?

14   A.   Yes.

15   Q.   What do you consider confidential information?

16   A.   I just don't discuss what a prospective client tells me

17   about a matter with outsiders.   Period.

18   Q.   Does that mean everything a prospective client tells you

19   is confidential?

20   A.   It -- I -- it means that I am duty bound to keep it

21   confidential.  It doesn't mean that it's some sort of top

22   secret in the client's mind.

23        MR. KRINSKY:  Your Honor, may I have a brief moment to

24   confer with co-counsel?

25        THE COURT:  Yes, you may.

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 144 of 159 PageID #: 383
CHRISTINE PERSAUD

Page 144

1          (Pause)

2     Q.    In connection with this trustee matter, Mr. Campo

3     consulted with you regarding conflicts, is that right?

4     A.    He consulted with me with whether we had -- as to whether

5     we had represented anyone in -- yes.

6     Q.    About the prior representation.

7     A.    Yes.

8     Q.    Okay.  When we say prior representation, he also asked you

9     about conflicts, right?

10    A.    He asked me whether -- I guess so, yes.  I mean, that's a

11    very general question.  I find it difficult to answer.

12    Q.    Well, when he asked you about the prior representation,

13    did you turn to him and say Mr. Campo, John, why do you need

14    this information?

15    A.    No, I -- he -- he told me why he needed this information,

16    yes.

17    Q.    And he said he needed it for conflict-checking purposes,

18    right?

19    A.    He told me that Mr. Zilberberg had told him that the

20    clients thought that we may have done some work for them.  That

21    the clients thought that we may have done some work for them.

22    His clients, yeah.

23    Q.    You've previously agreed, in connection with this matter,

24    this possible resolution to put an ethical wall around Mr.

25    Epstein in your firm, isn't that right?

Case 1-10-44815-ess    Doc 238    Filed 09/19/11    Entered 09/19/11 12:07:44
Case 1:12-cv-03337-JG    Document 1-22    Filed 07/05/12    Page 145 of 159 PageID #: 384
CHRISTINE PERSAUD

Page 145

1    A.    I don't know.

2    Q.    When you say you don't know --

3    A.    Where have I agreed to that?

4    Q.    Did you ever make -- I'll rephrase it.  Did you ever make

5    an offer or did you ever agree to put an ethical wall around

6    Mr. Epstein?

7    A.    I personally?

8    Q.    You.  Yes, you.

9    A.    If I did, it was in my affirmation that I previously put

10   in.

11   Q.    So I ask again, did you --

12   A.    I haven't reviewed my affirmation.  Could you please show

13   it to me?

14   Q.    Separate and apart from your affidavit, did you have

15   conversations with Mr. Campo about putting an ethical wall

16   around Mr. Epstein?

17   A.    I may have, yes.

18   Q.    Did you have conversations with other people in your firm

19   about putting a wall around Mr. Epstein?

20   A.    I don't think so.

21   Q.    Other than Mr. -- did you -- did you have a conversation

22   with Mr. Epstein about putting a wall -- an ethical wall around

23   him?

24   A.    The only conversations I have with Mr. Epstein were in

25   connection with -- actually, they were asking him to just send

CHRISTINE PERSAUD

Page 146

1    us a copy of the file.

2    Q.   Did you say to Mr. Epstein before sending that file don't

3    look at it?

4    A.   No.

5    Q.   Did you say to Mr. Epstein's assistant Mr. Epstein can't

6    look at it?

7    A.   The -- the G -- the Global Realty Venture file?  No.

8    Q.   No.  The firm requested that Mr. Epstein send along the

9    file from Shanghai, the GRV file.

10   A.   Yes.

11   Q.   Did you ask for that file to be sent over?

12   A.   Yes.

13   Q.   Did you say to Mr. Epstein you can't look at the file

14   before sending it?

15   A.   No.

16   Q.   Did you say to Mr. Epstein you've got to put the file in a

17   lockbox so that nobody else looks at it from the Troutman

18   Sanders firm?

19   A.   No.

20   Q.   Did you say to Mr. Epstein you've got to put up an

21   electric wall around the computer system to ensure that nobody

22   has access to electronic documents in connection with what

23   we've been describing as the GRV matter?

24   A.   No, I did not.

25   Q.   When the file came over to New York, this -- from

Page 147

1    Shanghai?

2    A.   Yes.

3    Q.   From Shanghai, as managing partner of the New York office,

4    did you immediately send out a notice to everybody in the firm

5    that nobody is to have access to the GRV file?

6    A.   What I did -- I did not -- the file came and I instructed

7    my assistant not to open it and to give it to Mr. Stremba.

8    Q.   Did you also advise anybody that Mr. Stremba was not to

9    give it to Mr. Campo?

10   A.   Mr. Stremba is our associate legal counsel.  I did not do

11   that.  But Mr. Stremba knows what to do.

12   Q.   Is it that he knows what to do because you told him what

13   to do?

14   A.   I did not tell him what to do.

15   Q.   Okay.  In New York, as managing partner, did you

16   immediately put in to play -- did you institute digital

17   protocols to insure that nobody in the New York office had any

18   access whatsoever to any electronic, digital or other type of

19   file maintained by the New York office, relating to GRV?

20   A.   No.

21   Q.   Ms. Cassirer, is your testimony that you never became

22   privy to any confidential information from Abraham Klein?

23   A.   I don't think I did, yes.

24   Q.   When you say you don't think you did, are you a hundred

25   percent sure that you did not?

Page 148

1    A.    Sitting here today, I am not aware of any confidential

2    information that I received from Mr. Klein.

3              MR. KRINSKY:  I have no further questions, Your Honor.

4              THE COURT:  Thank you.  Redirect?

5    REDIRECT EXAMINATION

6    BY MR. STREMBA:

7    Q.    Ms. Cassirer, I'd like to direct you to Klein Exhibit 25

8    in the binder --

9    A.    Yeah.

10   Q.    -- which comes directly after Klein Exhibit 24, the e-mail

11   concerning doing work at hourly rates.

12   A.    Yes.

13   Q.    Could you -- do you recall seeing a copy of Klein 25 in or

14   around August of 2008?

15   A.    I must have seen it.

16   Q.    Do you recall?

17   A.    No.  But it does refresh my recollection, looking at it

18   now, that, essentially, Mr. Klein was going to deal with some

19   consultants in China first, before coming back to us, and

20   didn't want us to filter it at an hourly rate.

21   Q.    And why was that?

22   A.    Didn't want to ring up unnecessary legal fees, according

23   to this e-mail.

24             MR. STREMBA:  Your Honor, I'd like to have Klein

25   Exhibit 25 introduced into evidence.  If Klein --

Page 149

1          THE COURT:  Any objection?  It's your exhibit.

2          MR. KRINSKY:  No.

3          MR. STREMBA:  let me amend that to -- in line with our

4    prior practice here, Your Honor, I'd like to introduce into

5    evidence the upper portion of the first page of Exhibit 25 down

6    to the line "best regards, HK."  Frankly, I haven't had enough

7    time to look through these e-mails to tell whether there's

8    anything at the end of this chain that may be inadmissible but

9    I can certainly proffer the first paragraph.

10          THE COURT:  All right.  Well, so the -- what appears

11   to be the e-mail message sent at August 5th, 2008 at 5:25 p.m.

12   is offered and, without objection, will be admitted.

13   (Klein's Exhibit 25, e-mail message sent August 5th, 2008, was

14   hereby received into evidence as of this date.)

15          THE COURT:  Please proceed.

16   BY MR. STREMBA:

17   Q.   Does Klein Exhibit 25 refresh any recollection as to

18   whether Troutman Sanders was engaged to do hourly work in

19   August of 2008?

20   A.   It confirms that we were not engaged to do hourly work in

21   August 2008.

22   Q.   Do you know whether, in fact, Troutman Sanders billed any

23   hours to either Mr. Klein or GRV in August of 2008?

24   A.   We did not.

25          MR. STREMBA:  No more questions, Your Honor.

1          THE COURT:  Any recross?  Confined, of course, to the

2   scope of the redirect.

3          MR. KRINSKY:  Yes, Your Honor, briefly.

4   RECROSS-EXAMINATION

5   BY MR. KRINSKY:

6   Q.   Ms. Cassirer, on July 30th -- in connection with the

7   questions that were just asked of you, on July 30th, 2008, did

8   Hershel Klein say to you we want to send you confidential

9   information?

10  A.   You showed me an e-mail that said that.  I don't know

11  whether he said that to me in the conversation.

12  Q.   Did he send you a communication saying we want to send you

13  confidential information?

14  A.    That's what that e-mail says, yes.

15         THE COURT:  Just for a clear record, could you

16  indicate which e-mail you are referring to.

17         MR. KRINSKY:  7 and 8.

18         THE WITNESS:  Okay.

19         THE COURT:  Thank you.

20         MR. KRINSKY:  Or 7 and 9, I'm sorry.

21         THE COURT:  Thank you.

22         MR. KRINSKY:  9 is the continuation.

23         THE COURT:  7.  All right.

24         THE WITNESS:  Yes, that's Exhibit 7.  The top --

25         THE COURT:  Thank you.

Page 151

1            THE WITNESS:  -- e-mail.

2   Q.   Ms. Cassirer, very simply, did you say don't send us

3   confidential information, we're not your lawyers?

4   A.   I told him that I would keep any information he sent me

5   confidential.  That's what I told him.

6            THE COURT:  I'm going to remind you of the need to

7   stay -- both because of the hour and because of a good record,

8   I think this is well traveled ground and you should ask all the

9   questions you would like to ask, I'm not instructing you

10  otherwise, but do recall the limited scope of the redirect.

11           MR. KRINSKY:  I have no further questions, Your Honor.

12           THE COURT:  All right.  Any other questions for this

13  witness?

14           MR. STREMBA:  No, Your Honor.

15           THE COURT:  You are excused.  Thank you very much.

16           THE WITNESS:  Thank you, Your Honor.

17           THE COURT:  Do you have any further witnesses from the

18  firm?

19           MR. STREMBA:  I'm sorry?

20           THE COURT:  I'm sorry for my low voice.  Any further

21  witness from the firm?

22           MR. STREMBA:  No, Your Honor.

23           THE COURT:  I should say from the trustee's proponent

24  of the retention.  All right.  I'm going to ask you to -- A bit

25  of housekeeping now.  I'd like you to submit, as we've

1    indicated, a description of those exhibits that you are

2    requesting the admission of and whether or not it is consented

3    to.  That's different than an index.  Hopefully, the days

4    proceedings have, to some extent, helped you focus on those

5    exhibits marked and bindered and tabbed for identification.  If

6    you'd like to offer it, and it's consented to, let us know

7    that.  I'm looking for a single submission that would be a

8    supplement in the nature of the -- a joint supplemental pre-

9    hearing statement.  I'm also going to ask you to reconsider

10   that which you were unable to agree to.  For example, as I read

11   1(a)1, does Klein dispute that on or about July 30, 2008, Mr.

12   Abraham Klein contacted Aurora Cassirer of Troutman Sanders

13   concerning a potential representation?  Is that disputed?

14            MR. KRINSKY:  Your Honor?

15            THE COURT:  I --

16            MR. KRINSKY:  I can answer it very simply.  Without

17   becoming a witness here, the question was Hershel or Abraham

18   and to the extent that that matters here or that has been

19   raised as an issue --

20            THE COURT:  Fair point.  It's a fair point.

21            MR. KRINSKY:  -- you heard the ambiguity --

22            THE COURT:  Okay.

23            MR. KRINSKY:  -- today in the testimony.  It was one

24   or the other and we had a very particular view on that.

25            THE COURT:  All right.  Well, I -- what I would like

1    to know if whether, in the supplemental version, whether you

2    have been able, with the additional time, to indicate any

3    agreement involved.  If every single one of these matter is, in

4    fact, genuinely disputed, I -- then that's where we are.  The

5    segregation of legal and factual issues to be decided by the

6    Court between the trustee's version in part A and Klein's

7    version, part B, is a good start.  There too I'd like you to

8    try to do what I asked you to do which is to give me a joint

9    submission.  And I think, hopefully, you'll be able to make

10   some progress on that.

11         I'm going to need to update with respect to the length

12   of the evidentiary hearing.  I have a good sense of that.  We

13   have the parties' disparate statements with respect to attempts

14   at resolution.  Let me come back to that briefly.  And that'll

15   be helpful.  I take it your witnesses are the same --

16         MR. KRINSKY:  Yes, Your Honor.

17         THE COURT:  -- for objectors.  Mr. Klein, Mr. Klein

18   and Professor Green.  All right.  We have a day and time.

19   We're lucky because we had some shifts in my calendar today

20   of -- a couple of hours ago some time freed up so we have this

21   opportunity on Tuesday afternoon to have you back.  I'd like

22   those new -- I'd like those things from you the -- well. Call

23   it the second joint pre-hearing statement which will reflect,

24   perhaps, more collaborately will reflect as a joint document

25   where you agree and what you agree on, address the other things

Page 154

1    I have indicated and will address the exhibits, will identify

2    those exhibits that you are, in fact, offering and asking the

3    Court to consider and whether the admission is consented to.

4              We're going to resume on the 20th.  I think I'd like

5    this by -- I'll give you until the 19th.  I'm going to say

6    noon, all right?  I think --

7              MR. STREMBA:  At what time, Your Honor?

8              THE COURT:  I'm going to say 12 noon.

9              MR. STREMBA:  12 noon.

10             THE COURT:  4 became 7.

11             MR. KRINSKY:  I'm sorry, Your Honor.  Was it --

12             THE COURT:  It was --

13             MR. KRINSKY:  -- 12?  You said 12 noon for the

14   submission or 12 noon for the hearing?

15             THE COURT:  No, no.  The hearing is on the 20th at 1.

16   For timing and things like that, let's go off the record.

17        (Whereupon these proceedings were concluded at 6:13 p.m.)

18

19

20

21

22

23

24

25

1

2                         I N D E X

3

4                     T E S T I M O N Y

5

6   WITNESS                EXAM BY              PAGE    LINE

7   John Campo             Mr. Stremba           30       9

8   John Campo             Mr. Krinsky           56      15

9   Aurora Cassirer        Mr. Stremba           91      22

10  Aurora Cassirer        Mr. Krinsky          108       3

11  Aurora Cassirer        Mr. Stremba          148       5

12  Aurora Cassirer        Mr. Krinsky          150       4

13

14

15                     E X H I B I T S

16

17  TRUSTEE      DESCRIPTION                    ID.     EVID.

18  ---          Campo declaration of 8/9/11             39

19  ---          Supplemental declaration of Mr.         42

20               Campo dated 8/19/11

21  ---          Campo affirmation                       42

22

23

24

25

Page 156

1

2                    I N D E X, cont'd

3

4                     E X H I B I T S

5

6    KLEIN        DESCRIPTION                        ID.      EVID.

7    107          Form used by Troutman Sanders               122

8                 for retaining GRV

9    110          E-mail dated 7/30 sent to Ms.               132

10                Cassirer

11   9            E-mail sent by Ms. Cassirer to              133

12                Hershel Klein on 7/30

13   25           E-mail message sent 8/5/08                  149

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB (CET**D-486)

9    AAERT Electronic Certified Transcriber

10

11   eScribers, LLC

12   P.O. Box 7533

13   New York, NY 10116

14

15   Date:  September 18, 2011

16

17

18

19

20

21

22

23

24

25

# United States Bankruptcy Court

Eastern District of New York
271 Cadman Plaza East, Suite 1595
Brooklyn, NY 11201–1800

---

IN RE:                                                        CASE NO: 1–10–44815–ess

    Christine Persaud

SSN/TAX ID:                                                  CHAPTER: 7

    xxx–xx–0247

           DEBTOR(s)

---

## NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

Notice is hereby given that:

A transcript of the proceeding held on September 15, 2011 was filed on September 19, 2011 .

The following deadlines apply:

The parties have until September 26, 2011 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a Transcript Redaction Request is October 11, 2011.

If a Transcript Redaction Request is filed, the redacted transcript is due October 20, 2011.

If no such Notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is December 19, 2011 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber Veritext (888–706–4576) or you may view the document at the public terminal at the Office of the Clerk.

Dated: September 21, 2011

For the Court, Robert A. Gavin, Jr., Clerk of Court

**BLnftrans.jsp** [Notice of Filing Transcript and Deadlines to Restriction and Redaction rev. 11/21/08]

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0207−1 | User: btaylor | Date Created: 9/21/2011 |
| Case: 1−10−44815−ess | Form ID: 295 | Total: 5 |

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | | |
|---|---|---|---|---|---|
| db | Christine Persaud | 86−25 Van Wyck Expressway, Apt. 506 | Jamaica, NY 11435 | | |
| aty | Troutman Sanders LLP | The Chrysler Building | 405 Lexington Avenue | New York, NY 10174 | |
| aty | Mendel Zilberberg | 6619 13th Avenue | Brooklyn, NY 11219 | | |
| aty | Samuel J. Landau | 250 West 57th Street | New York, NY 10107 | | |
| | Pery D Krinsky, Esq. | Krinsky PLLC | Woolworth Building | 233 Broadway | Suite 707 |
| | New York, NY 10279 | | | | |

TOTAL: 5