Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   EASTERN DISTRICT OF NEW YORK

4   Case No. 10-44815(ESS)

5

6   - - - - - - - - - - - - - - - - - - -x

7   In the Matter of:

8

9   CHRISTINE PERSAUD,

10

11           Debtor.

12

13  - - - - - - - - - - - - - - - - - - -x

14

15           United States Bankruptcy Court

16           Conrad B. Duberstein U.S. Bankruptcy Courthouse

17           271 Cadman Plaza East - Suite 1595

18           Brooklyn, NY

19

20           September 20, 2011

21           2:02 PM

22

23  B E F O R E :

24  HON. ELIZABETH S. STONG

25  U.S. BANKRUPTCY JUDGE

Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 2 of 116 PageID #: 434

Page 2

1

2    [201] ADJOURNED HEARING on Application for Order to Show Cause

3    (RE: related document(s)[198] Motion for 2004 Examination

4    Adjourned from:  9/8/11, 9/13/11

5

6    [204] ADJOURNED HEARING on Application for Order to Show Cause

7    (RE: related document(s)[195] Motion for 2004 Examination

8    Adjourned from:  9/8/11, 9/13/11

9

10   [228, 230] ADJOURNED HEARING (RE: related document(s)[182]

11   Application to Employ Troutman Sanders LLP

12   Adjourned from:  9/8/11

13

14   [202] ADJOURNED HEARING on Application for Order to Show Cause

15   (RE: related document(s)[199] Motion for 2004 Examination

16   Adjourned from:  9/8/11, 9/13/11

17

18   [214] ADJOURNED HEARING on Application for Order to Show Cause

19   (RE: related document(s)[196] Motion for 2004 Examination

20   Adjourned from:  9/8/11, 9/13/11

21

22

23

24

25

Page 3

1

2    [203] ADJOURNED HEARING on Application for Order to Show Cause

3    (RE: related document(s)[197] Motion for 2004 Examination

4    Adjourned from:  9/8/11, 9/13/11

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 4 of 116 PageID #: 436

Page 4

1

2    A P P E A R A N C E S :

3    TROUTMAN SANDERS LLP

4        Proposed Counsel for Chapter 7 Trustee, John S. Pereira

5        The Chrysler Building

6        405 Lexington Avenue

7        New York, NY 10174

8

9    BY:   LEE W. STREMBA, ESQ.

10        JOHN S. KINZEY, ESQ.

11

12   PEREIRA & SINISI, LLP

13        Chapter 7 Trustee

14        The Chrysler Building

15        405 Lexington Avenue

16        7th Floor

17        New York, NY 10174

18

19   BY:   JOHN S. PEREIRA, ESQ.

20

21

22

23

24

25

Page 5

1

2   MENDEL ZILBERBERG & ASSOCIATES, P.C.

3        Attorneys for Creditor Abraham Klein

4        6619 Thirteenth Avenue

5        Brooklyn, NY 11219

6

7   BY:   MENDEL ZILBERBERG, ESQ.

8

9   KRINSKY PLLC

10        Of Counsel for Creditor Abraham Klein

11        Woolworth Building

12        233 Broadway

13        Suite 707

14        New York, NY 10279

15

16   BY:   PERY D. KRINSKY, ESQ.

17

18

19

20

21

22

23

24

25

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 6 of 116 PageID #: 438
CHRISTINE PERSAUD

Page 6

1                    P R O C E E D I N G S

2            THE CLERK:  63 through 68 on the calendar, all matters

3    regarding Christine Persaud.

4            THE COURT:  Good afternoon again.  Let's get your

5    appearances on the record.

6            MR. STREMBA:  Your Honor, Lee Stremba of Troutman

7    Sanders for the trustee and Troutman Sanders.

8            THE COURT:  Thank you.

9            MR. CAMPO:  John Campo of Troutman Sanders on behalf

10   of the trustee and Troutman Sanders.

11           MR. ZILBERBERG:  Mendel Zilberberg on behalf of

12   Creditor Klein with Harry Krinsky, of counsel.

13           MR. KRINSKY:  Good afternoon, Your Honor.

14           THE COURT:  Welcome back.  All right.  I think we're

15   beginning with objectors to the proposed retention.

16           MR. KRINSKY:  Your Honor, before we call our first

17   witness --

18           THE COURT:  Is it housekeeping?

19           MR. KRINSKY:  -- one brief issue which we had

20   communicated with Your Honor's chambers yesterday.  And I

21   believe Mr. Zilberberg's office had submitted a brief letter.

22           THE COURT:  There is a brief letter suggesting there

23   is a discovery issue.

24           MR. KRINSKY:  There is, Your Honor.  And very briefly,

25   I have gone ahead and as of Friday, and in a formal letter on

Page 7

1    Sunday, I had, late -- granted, very late -- and again, Monday

2    morning, I discussed with Mr. Stremba our request for a series

3    or several categories of information.  And we've actually

4    narrowed it down to what I believe six to eight e-mails,

5    specifically e-mails that were testified to or documents

6    testified to by Mr. Campo regarding the conflicts checks that

7    were performed in connection with this matter and as it relates

8    to Abraham Klein.  We've asked for those e-mails -- and, again,

9    putting aside the broader categories, we've narrowed it down.

10   And we've asked for those e-mails because we believe,

11   respectfully, that they are directly related to the issues that

12   have been brought to this Court's attention and, specifically,

13   to the issue of the adequacy of the conflicts checking system

14   which, as Your Honor noted on page 44 of the transcript of the

15   last hearing -- and I do have copies for the Court -- when I

16   objected specifically to the relevance of the issue of the

17   conflicts checking system which I said is not at issue, Your

18   Honor responded that you had respectfully disagreed for the

19   following reasons, that they have the burden of proof.  These

20   are elements.  They have to be satisfied in order to be

21   retained in a bankruptcy case.  And Your Honor went on.

22        They have certainly raised the issue, at the very

23   least at this point, that there are substantial doubts as to

24   the adequacy of the conflicts checking system and as to whether

25   or not they have met their burden in satisfying the

Page 8

1    requirements under --

2            THE CLERK:  Please speak into the microphone.

3            MR. KRINSKY:  I'm sorry.

4            THE COURT:  Don't forget the microphone.

5            MR. KRINSKY:  I'm sorry.

6            THE COURT:  Thank you.

7            MR. KRINSKY:  -- as to whether or not they had

8    satisfied the requirements under Section 2014(a).

9            THE COURT:  Well, let's talk about what it is you're

10   looking for and whether it exists and what the objection is to

11   producing it.  But we have very skilled counsel at both counsel

12   table.  And if your view is that they will fall short in

13   meeting their burden if they do not produce something, it seems

14   to me that risk is on their table.  So -- well, I want a full

15   record and I want to make a good decision.  Whether or not the

16   fact that they are less likely to carry their burden does not

17   strike me as your most persuasive argument.

18           MR. KRINSKY:  Your Honor, because they've already

19   rested, we would argue that they've already failed to meet

20   their burden.  And to the extent that they're not going to

21   produce that document then, in turn, we'd ask for an adverse

22   inference specifically on the failure because they opened the

23   door as to whether or not they did what they were supposed to

24   do.

25           THE COURT:  Opening the door and the question of the

1    adverse inference do come up in some context.  I don't see this

2    as an adverse inference situation where a Court is asked to

3    draw an adverse inference from spoliation or obstruction or --

4    in a civil context, the assertion of a constitutional privilege

5    or immunity.  But we aren't really there yet.  I understand

6    there's some e-mails you'd like to have produced.  Who's going

7    to speak to this?  Is this your file or Mr. Zilberberg's?

8    You're looking for some discovery.  You say there's five e-

9    mail's you'd like.  They have to do with the adequacy of the

10   conflicts check, the subject that was the subject of extensive

11   testimony and more than a few e-mails produced.  Let's see if

12   we can just be practical here.  Are you still seeking the

13   production of five e-mails?

14          MR. KRINSKY:  How ever many e-mails there are.  We

15   think based upon the testimony of Mr. Campo, it's somewhere --

16          THE COURT:  So there --

17          MR. KRINSKY:  -- between four and six or four and

18   eight.

19          THE COURT:  So there are some relevant but unproduced

20   e-mails, in your view, responsive to an outstanding request?

21          MR. KRINSKY:  No, Your Honor.  On Friday, I brought it

22   to Mr. Stremba's attention.  Sunday, I sent -- late Sunday

23   night, I sent the letter and followed up Monday morning.  It

24   was specifically in response to Mr. Campo's testimony on

25   Thursday that I've asked for these documents based upon

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 10 of 116 PageID #: 442
CHRISTINE PERSAUD

Page 10

1    statements that were made to the Court.

2              THE COURT:  Is there a written request for the

3    documents?

4              MR. KRINSKY:  Yes, there is, Your Honor.

5              THE COURT:  I don't think it's in that letter.  The

6    letter is very concise.

7              MR. KRINSKY:  It is not, Your Honor.  We believe that

8    it was premature at this point --

9              THE COURT:  I'm just --

10             MR. KRINSKY:  -- to include it --

11             THE COURT:  -- just trying to find it.

12             MR. KRINSKY:  -- until -- I do have a copy.  It's

13   already been sent to Mr. Stremba.  I have a copy I can

14   certainly pass up to the Court.

15             THE COURT:  Any objection?  Let's see if we can solve

16   this problem.  You can pass it to my courtroom deputy, she who

17   calls the cases, among many, many, many other things.

18             MR. KRINSKY:  Your Honor, and subsequent to sending

19   that letter --

20             THE COURT:  One moment, please.

21        (Pause)

22             THE COURT:  Well, the first request, read literally,

23   calls for any communications with respect to any company trying

24   to retain the Troutman firm for any matter --

25             MR. KRINSKY:  Your Honor.

1              THE COURT:  -- which is certainly not what you seek.

2              MR. KRINSKY:  Your Honor, because of the voluminous

3       nature and perhaps any questions or issues in the time frame, I

4       immediately followed that on Monday with several e-mails to Mr.

5       Stremba and said, put aside the letter --

6              THE COURT:  Let's focus on the precise request with

7       respect to what you're seeking.  This is rather voluminous, I

8       think.

9              MR. KRINSKY:  That --

10             THE COURT:  And that first one, read literally, is

11      asking for every document concerning a retention of the firm by

12      anybody --

13             MR. KRINSKY:  Your Honor --

14             THE COURT:  -- which I'm sure you don't mean.

15             MR. KRINSKY:  And that's why we wanted to move it

16      along as quickly as possible.  I said to Mr. Stremba in the e-

17      mail --

18             THE COURT:  I'll pass the letter back.

19             MR. KRINSKY:  -- putting aside all the things we've

20      asked for, what we are focused on is, simply, the four to six

21      or six to eight e-mails specifically referenced by Mr. Campo in

22      his testimony when Mr. Campo said he sent an e-mail request to

23      the conflicts checking department as to Abraham Klein.

24             THE COURT:  Mr. Stremba, can I hear from you as to

25      whether there are any e-mails that were referenced by Mr. Campo

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 12 of 116 PageID #: 444
CHRISTINE PERSAUD

Page 12

1    in his testimony which have not been produced by the firm, to

2    your knowledge?

3            MR. STREMBA:  I don't know the answer to that

4    question, Your Honor.  There has been no request until Sunday

5    evening for any e-mails.  And the request that we were just

6    addressing relates to a conflicts check in July through

7    December 2008.  That's the engagement relating to the Chinese

8    project, the ancient history from three years ago.

9            I would like to make three points before we go further

10   in trying to come up with a practical solution because I am

11   afraid, Your Honor, when you start out looking for a practical

12   solution, it necessarily means that we would give in to a

13   request which, I believe, is fundamentally improper and

14   untimely.  And I would like you to consider the context of this

15   request before we talk about what burden or lack of burden

16   there may be in producing something 'cause I don't think the

17   burden is the issue.  We could clearly look for e-mails and

18   whether there are three or ten, I can find them this evening,

19   if I have to.  But we are halfway hopefully through a hearing

20   which began as an objection to a retention.  The objection was

21   filed five weeks ago.  The objector is represented by a special

22   ethics and conflicts counsel who, in turn, has hired an expert

23   on these subjects.  There was no impediment to their making a

24   request for relevant documents five weeks ago.  And the

25   documents they're asking for now clearly were not difficult to

Page 13

1    formulate a request for.

2         This request now comes after Troutman has closed its

3    affirmative case.  And, frankly, there can be no purpose in

4    this request other than stretching this hearing out for another

5    day which, I submit, Your Honor, is simply a way to make this

6    process even more expensive and torturous for the trustee.

7         THE COURT:  Well, we need to focus on the issues as

8    they come up, of course, in the context of the bigger issues

9    and perhaps against a background of whatever strategic purpose

10    may be served.  That is, the question of a strategic purpose in

11    any position taken in litigation is really rarely, if ever, it

12    seems to me, an appropriate act for a Court to consider in

13    discerning the claim, the elements, the record, all the facts

14    in making a good decision.

15         MR. STREMBA:  Your Honor --

16         THE COURT:  It sounds like, based on the testimony,

17    there may have been identified a few additional e-mails that

18    concern the conflicts process.  They -- the suggestion is that

19    they were requested -- the letter that was shown to me is quite

20    broad indeed and doesn't seem targeted to that, in particular.

21    I reviewed it only very briefly.  I would have to go back into

22    the record to satisfy myself that I appreciate what the parties

23    have previously been directed to produce.  And if there are --

24    if there was identified in testimony some kind of a document

25    that is within the ambit of what was previously requested and

1    what would be logical to have produced at this point.  And then

2    I think we take it from there.  But --

3              MR. STREMBA:  Your Honor --

4              THE COURT:  -- I have to say right now, neither party

5    is speaking to that issue.  You are speaking to your

6    dissatisfaction with the process which I understand.

7              MR. STREMBA:  Your Honor, there have been no --

8              THE COURT:  That's not the point right now.

9              MR. STREMBA:  Okay.  There have been no requests

10   during the course of this process until Sunday night at 10 p.m.

11   at which point I got the request.  I didn't actually see it

12   then but it was e-mailed to me.  I believe, in line with your

13   comment of taking matters in a logical order, Your Honor

14   pointed out toward the end of the last session that you hadn't

15   heard any evidence on a significant issue which is the

16   substantial relationship of the old engagement to the new one.

17   And I submit, Your Honor, that before we extend this process by

18   sanctioning any type of discovery that we have the objector

19   present their witnesses.  And then if you believe, Your Honor,

20   that there's enough evidence to keep this going for an

21   additional day, we can produce whatever record we have of those

22   -- the conflicts check.

23              And I will say, Your Honor, that without any request,

24   as I believe you know, we obtained just before -- when this

25   hearing was scheduled, we obtained our file from China and

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 15 of 116 PageID #: 447
CHRISTINE PERSAUD

Page 15

 1    without request, we turned that file over to the objector.  And

 2    that file, in fact, included the records showing the opening of

 3    the client and matter in 2008 and who the client was and who

 4    the related parties were.  We haven't been holding out.  We've

 5    been providing documents without request.  Now we have a

 6    request that I believe is extremely untimely.  Obviously, Your

 7    Honor, if you believe that we should produce documents, we can

 8    do that.  It will not be a burden in terms of the difficulty of

 9    finding whatever there is.  I think it's just a burden because

10    it prolongs this process.

11            THE COURT:  All right.  Well, I agree that it's in

12    everyone's interest to move this along.  We're really doing no

13    more than conferencing on the prospect of an issue at this

14    point because the request that is before me is to hold a

15    conference as opposed to a document request as to which there

16    has been an objection or failure to respond.  I can tell you in

17    a general way that if an e-mail on the conflicts process was

18    sufficiently of consequence in the process to be referenced by

19    one of your firm's witnesses in his or her testimony, it's

20    likely to be the kind of thing that if it can be obtained

21    without undue burden perhaps should be produced.  But the

22    question has not been put to me for a determination, so I share

23    it in the same way that you've shared your general views as to

24    what you'd like and your concerns about it in the discovery

25    process.  I share my general sense of how we might proceed in

1    that regard.

2          What I'd like to do today with the scarce time that we

3    have -- and it is scarce because this is not the only matter on

4    the afternoon calendar.  We are fitting this in as best we can

5    amidst any other matters.  I think it does make sense for you

6    to call your next witness -- for you to call your first

7    witness.  It's not a surprise that some of these issues haven't

8    come up yet because we haven't had the objector's testimony

9    yet.  And we'll come back to the question of -- which is your

10   primary focus -- the production of the e-mails identified or

11   described in the testimony of Mr. Campo after you've been able

12   to make the best use of your time by getting some testimony in.

13   All right?

14          MR. KRINSKY:  And, Your Honor, we'll certainly move

15   on.  I do need to just correct the record for a moment.  No

16   disrespect to Mr. Stremba.  My letter, in fact, said to him, I

17   discussed with you briefly on Friday these e-mail requests.

18   Mr. Stremba asked me to put it in letter form; I did.  And,

19   Your Honor, this was just brought up on Thursday.  To the

20   extent -- we'll proceed in whatever, obviously, course the

21   Court prefers.  We obviously don't want to waste more funds and

22   money from both sides to engage in motion practice.  We are

23   talking about four to six e-mails.  One simple e-mail search

24   does that.  But I will speak with Mr. Stremba afterwards to see

25   if there's a way perhaps that we can work that out amongst

Page 17

1    ourselves so I can proceed now with our first witness.

2         THE COURT:  Call your first witness.

3         MR. KRINSKY:  Your Honor, at this time, we call

4    Hershel Klein.

5         THE CLERK:  Raise your right hand.

6       (Witness sworn)

7         THE CLERK:  You may be seated.  State and spell your

8    name for the record.

9         THE WITNESS:  Hershel Klein, H-E-R-S-H-E-L,

10   K-L-E-I-N.

11        MR. KRINSKY:  May I inquire, Your Honor?

12        THE COURT:  Please proceed.

13   DIRECT EXAMINATION

14   BY MR. KRINSKY:

15   Q.   Sir, what do you do for a living?

16   A.   Vice president of Flexo Craft Prints Company in Harrison,

17   New Jersey.  We sell mostly retail and gift packaging.

18   Q.   In addition to Flexo Craft, do you have any other

19   professional or business affiliations with any other companies?

20   A.   We also -- and Flexo Craft is a d/b/a of Laser Master

21   International.  Laser Master has several investments in

22   different real estate projects in the USA and currently in

23   Canada.

24   Q.   Who is Abraham Klein?

25   A.   Abraham Klein is the president of Flexo Craft Prints.

Page 18

1   Q.    And in addition to the business affiliations you just

2   mentioned, do you and your brother have other business

3   interests in other companies or financial dealings?

4   A.    Yes, we do.

5   Q.    And generally speaking, what type of business dealings are

6   those?

7   A.    Real estate investments, home care facilities.

8   Q.    Okay.  I'd like to draw your attention to why we're here

9   today.  Did there come a point in time in 2008 that you

10  contacted the Troutman Sanders law firm?

11  A.    Yes.

12  Q.    Please describe the circumstances that led you to contact

13  the Troutman Sanders firm.

14  A.    In summer of 2008, Abraham approached me that he came upon

15  a potential real estate project in China on one of his trips to

16  China for the company.  He asked me if we can find a law firm

17  that will do the legal work for this potential real estate

18  project.

19        In one of my trips to China for the company, I saw the

20  award for the firm, Troutman Sanders, which was, as advertised,

21  a company that has offices in USA and in China, amongst other

22  countries.  When we discussed this particular real estate

23  project, we realized that while we had law firms that we used

24  on the corporate level or for different litigation matters, we

25  also had law firms that we used in China for different matters.

1    For this particular project, we were going to use a law firm

2    that has a global presence who can protect our interests and is

3    familiar with the USA laws and also with the Chinese laws.

4    Q.    So did there actually come a point in time in the summer

5    of 2008 where you actually reached out to the Troutman Sanders

6    firm?

7    A.    Yes.

8    Q.    And when was that?

9    A.    On July 30, 2008.

10   Q.    And please describe what happened when you reached out to

11   the Troutman Sanders firm on July 30th.

12   A.    I put in a call to the number that I had on file for the

13   Troutman Sanders firm.  Somebody picked up the phone and asked

14   me what this call is all about.  I told them that I'm looking

15   for a law firm to represent us in a potential real estate

16   investment in China.  And they put me in touch with an

17   attorney, Aurora Cassirer.

18   Q.    By the way, the first person that you spoke to who you

19   mentioned to you possibly needed representation, do you know

20   who that person is?

21   A.    No.  Whoever picked up the phone.

22   Q.    Okay.  And once you were referred over to Ms. Cassirer,

23   what happened then?

24   A.    When Ms. Cassirer came to the phone, she asked me what

25   this is about.  I told her that we're dealing with a potential

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 20 of 116 PageID #: 452
CHRISTINE PERSAUD

Page 20

1    real estate project in China with the potential investors

2    coming from USA.  She asked me about the size of the project.

3    And she asked me what else we do in addition to this particular

4    project.  She asked me about my company, our sales volume.  She

5    asked me if we have any prior real estate history.  And I gave

6    her some information about our company.

7    Q.    I'm going to stop you there.  Without stating specifically

8    what you said to Ms. Cassirer, please describe the general

9    categories of information that you provided to Ms. Cassirer on

10   the telephone on July 30th, 2008 in response to her questions.

11   A.    I gave her the size of our firm -- I mean, the size of our

12   company, our sales volume, our assets.  I pointed her -- Flexo

13   Craft, for instance, is a publicly traded company.  So I gave

14   her the ticker symbol for our company so that she could look it

15   up.  And she also asked me what prior experience I have with

16   different law firms.

17        I gave her information on the law firm that we use on a

18   corporate level.  I also gave her information on the law firm

19   that we use for litigation matters.  I told her it's Mendel

20   Zilberberg.  And she told me that Mendel Zilberberg is her

21   cousin.

22   Q.    When was the next time that you communicated?  After this

23   telephone conversation, when was the next time you communicated

24   with Ms. Cassirer?

25   A.    She asked me that I send her over -- when I was on the

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 21 of 116 PageID #: 453
CHRISTINE PERSAUD

Page 21

1    phone with her, she asked me that I send her over information

2    about myself so that she has my information.  I sent her my

3    profile and we exchanged phone numbers.

4    Q.    Okay.  After you sent her this information, did there come

5    a point in time where you sent her additional information or

6    additional communications?

7    A.    Yes.  When we spoke on the phone, she asked me if I could

8    send her over an outline of the project so that she'd have the

9    outline of the project.  And then she can set up a conference

10   call at night with her Chinese partner, Edward Epstein.

11        So after I hung up the phone, I started writing up an

12   outline -- a rough outline of the project.  While I was doing

13   that, I realized that when I was going to send her the

14   information on the project, there was a lot of confidential

15   information that was involved in it, confidential information

16   about the project itself, the partners, confidential

17   information on the source of funds that we were going to use

18   for the project.  So I sent her an e-mail telling her that I'm

19   extremely conscious about keeping the information that I would

20   be giving her confidential and information that I would give

21   her will be kept confidential.

22        I did not get an immediate response from her.  So I just

23   sent her over a rough draft of the information without

24   specific -- a lot of confidential information like names,

25   contacts, real source of funds, how much money is available and

Page 22

1    all that -- and where the money is sitting and all that stuff.

2    She sent me back an e-mail a little bit later telling her that,

3    as being my attorney, there is no concern and all information

4    that I share with her will be kept confidential.

5    Q.   Okay.  I'd ask you to please turn, in the exhibit book,

6    the very large one that you see in front of you, I'd ask you

7    that you please turn to tab 9.  Okay?  Tab 9.

8            MR. KRINSKY:  Your Honor, pursuant to the amended

9    joint prehearing statement submitted by opposing counsel and

10   myself to Your Honor yesterday, opposing counsel and myself

11   have agreed in writing that there are no objections with the

12   exception of two which we aren't addressing right now.  There

13   is no objection to Creditor Klein's proposed exhibits.  And

14   there is no objection to the admissibility of those documents.

15   And therefore, I can certainly walk through the groundwork and

16   the foundation for those.  For purposes of expediency and time,

17   at least as to this document because there's certainly no issue

18   as I understand it, we'd ask that it be moved into evidence at

19   this time what was previously marked as Creditor Klein Exhibit

20   number 9 for identification as Creditor Klein Exhibit number 9.

21           THE COURT:  So you're offering Exhibit 9 and you

22   anticipate no objection.  Any objection?

23           MR. STREMBA:  No objection.

24           THE COURT:  Without objection, it will be received.

25   (Klein Exhibit 9, e-mail sent by Ms. Cassirer to Hershel Klein

Page 23

1    dated 7/30/08 at 6:56 p.m., was hereby received into evidence

2    as of this date.)

3    BY MR. KRINSKY:

4    Q.   Now specifically looking at Klein Exhibit 9, I would like

5    you to first look from the top of the page about a third of the

6    way down, there is an e-mail -- there is a statement, an e-

7    mail, from -- it appears to be yourself to Ms. Cassirer.  Can

8    you please tell us who that e-mail is from and to and the time

9    of that e-mail?

10   A.   This was an e-mail from myself to Aurora Cassirer, 4:20

11   p.m. in the afternoon.

12   Q.   Specifically, what was the purpose behind sending this e-

13   mail?

14   A.   I was trying to make sure, or rather going to make sure,

15   that before I give any information to anybody about the project

16   itself and about any sources of financing for the project that

17   all the information was going to be kept confidential.

18   Q.   Now if we could just back up for a brief moment, you said

19   about this project.  Was this your project or was this -- the

20   China project we're talking about -- or was it someone else's

21   project that you were working on?

22   A.   This was the project that Abraham brought to me so it was

23   Abraham's project.

24   Q.   And what was, in a sense, your affiliation or relationship

25   to the project that was being done?

Page 24

1    A.    I was working as his agent.

2    Q.    And when you say his agent, are you saying that as sort of

3    a legal term or do you mean simply you were assisting him in

4    the project?

5    A.    Right, from a practical term.

6    Q.    Okay.  In response to this e-mail that you sent to Ms.

7    Cassirer at 4:20 p.m. on July 30th, 2008, did Ms. Cassirer

8    respond to that e-mail?

9    A.    Yes.

10    Q.    And is that reflected in Exhibit 9?

11    A.    Yes.

12    Q.    And what did she respond to you?

13    A.    She said that she does not believe that I need a

14    confidentiality agreement because as Mrs. Cassirer being our

15    attorney, all information that I give to her is bound to be

16    kept confidential.

17    Q.    Okay.  And I'd like to actually quote it for a moment.  "I

18    do not believe that you need a confidentiality agreement with

19    your attorney since we are bound to keep your communications

20    with us confidential."  Did I read that correctly?

21    A.    Yes.

22    Q.    The statement with "your attorney", what did you

23    understand that to mean?

24    A.    Abraham and myself and whatever legal structure was going

25    to be set up to use for this project.

1    Q.    And the statement "with your attorney", who did you

2    understand "your attorney" to mean?

3    A.    Aurora Cassirer or Troutman Sanders, whatever attorney is

4    going to be working in Troutman Sanders for this project.

5    Q.    Okay.  And based upon that e-mail to you, what did you do

6    in turn or what was the next communication you had with Ms.

7    Cassirer and/or her firm?

8    A.    The next communication was a conference call that was set

9    up for the night of July 30, 2008 between Aurora Cassirer, her

10   colleague in China, Edward Epstein, Abraham Klein and myself.

11   Q.    By the way, Mr. Klein, in anticipation of that telephone

12   call, were there also some additional e-mail communications by

13   and between yourself, your brother and the Troutman Sanders

14   firm?

15   A.    Yes.

16   Q.    With respect to the telephone call that you just referred

17   to, did there come a point in time on July 30th, 2008 that a

18   telephone conference call took place between you and others?

19   A.    Right, the telephone call on the night of July 30, 2008.

20   Q.    Who was present for that telephone call?

21   A.    From the Troutman Sanders side, it was Edward Epstein and

22   Aurora Cassirer.  And then it was Abraham Klein and myself.

23   Q.    Without disclosing the specific content of what you said

24   or your brother said, please describe the general categories of

25   information requested by the Troutman Sanders firm during that

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 26 of 116 PageID #: 458
CHRISTINE PERSAUD

Page 26

1    telephone call and the general categories of information you

2    provided or your provided to the Troutman Sanders firm.

3    Q.    We reviewed the spreadsheet that I sent over to the firm

4    which included a rough outline of the project, projected cost

5    of the project, projected revenue, total profits, where the

6    project is actually located, how much funds will be needed from

7    the developer side, how much funds will be needed from the

8    Klein side and where the money would be coming from, how much

9    money is available and how much money will still be needed to

10   be raised through different avenues.

11   Q.    At any point in time during this conversation, this

12   conference call, on July 30th, 2011 (sic) --

13          MR. KRINSKY:  Withdrawn.  I'd like to just go back for

14   one brief moment.

15   Q.    During your earlier conversation with Ms. Cassirer on July

16   30th when it was just you and her, at any point in time, was

17   the name "GRV" discussed?

18   A.    No.

19   Q.    At any point in time, was the name "Global Real Estate

20   Ventures" discussed?

21   A.    No.

22   Q.    Now moving your attention to the conference call, you were

23   just discussing, July 30th, 2008 at night, at any point in time

24   during that conversation, did you or anybody else mention the

25   name or the letters "GRV"?

Page 27

1    A.    No.

2    Q.    At any point during that conversation, did you or anybody

3    else mention the name "Global Real Estate Ventures"?

4    A.    No.

5    Q.    During that conversation on July 30th, 2008 with members

6    of the Troutman Sanders firm, did you reveal confidential

7    information regarding the proposed project in China?

8    A.    Yes.

9    Q.    And again, without disclosing specifically what that

10   information was, please describe the general categories of

11   confidential information disclosed to the Troutman Sanders

12   firm.

13   A.    We discussed the information on the developer's side on

14   the project in China, where the project is, who the contact is,

15   the developer.  And we also discussed, on our side, where the

16   money was going to be coming from, how much money we have

17   available, where the money is sitting and how much money was

18   still -- we were -- that we'll still need to raise and

19   potential avenues how we think we can raise it.

20   Q.    And I've just been -- I want to make a slight modification

21   to a question I asked you.  I called it "Global Real Estate

22   Ventures".  Did the name "Global Realty Ventures" -- was that

23   name ever used in any conversation with you, your brother,

24   anybody from the Troutman Sanders firm at any point in time on

25   July 30th, 2008?

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 28 of 116 PageID #: 460
CHRISTINE PERSAUD

Page 28

1    A.    No.

2    Q.    How did this July 30th conference call at night -- how did

3    that conclude?

4    A.    We discussed what we are looking for the law firm to

5    provide to us.  And Troutman Sanders represented to us what

6    they can do.  We said we need a law firm that will do all the

7    legal due diligence.  We need a law firm that will set up the

8    legal structure of the company.  And then we would also need

9    the firm to do the feasibility due diligence of the project.

10        Troutman Sanders that night suggested that we take a

11   different firm to do the feasibility due diligence of the

12   project and that we can use Troutman Sanders for all the legal

13   work, setting up the legal structure, setting up the structure

14   between the developer, setting up the legal structure between

15   the investors and possibly also assisting us in raising funds

16   if we fall short of what we need for the project.

17   Q.    And when you said a moment ago "another firm", are you

18   referring to a law firm or another type of firm?

19   A.    A real estate type of due diligence firm.

20   Q.    Okay.  After this telephone call concluded on July 30th,

21   2008, did there come a point in time where you received

22   additional information from Edward Epstein about this China

23   project?

24   A.    Yes.  When we concluded the call, they said they were

25   going to send us a preliminary e-mail outline of what needs to

Page 29

1    be done from a law firm or a real estate due diligence firm and

2    the approximate cost.  July 31st, 2008, I followed up with an

3    e-mail to Aurora Cassirer asking her if I can expect to get any

4    information.  She said she was going to send it to me.  On that

5    night, which is already August 1st in China, Edward Epstein

6    sent us over an e-mail with an outline of what they envisioned

7    that we need to do as preliminary due diligence in order to be

8    able to move forward with the project.  Now they can assist us

9    in doing that.

10   Q.   Referring your attention, if you would please turn to tab

11   number 19 --

12        (Pause)

13   Q.   Without actually referring to the exhibit yet -- I

14   apologize -- did there actually come a point in time where the

15   Troutman Sanders firm did send you a letter outlining what they

16   could potentially do for you?

17   A.   Well, they sent us this particular e-mail, Exhibit --

18   Q.   Referring to Exhibit 19?

19   A.   Exhibit 19.  And they also sent us brochures on their

20   company of what they can do.

21        MR. KRINSKY:  Your Honor, at this time, we offer into

22   evidence Klein Exhibit 19 previously marked for identification

23   as Klein Exhibit 19.  It is my understanding, based upon the

24   amended joint pre-hearing statement, that there is no

25   objection.  We offer this document, however, with the caveat

Page 30

1   that it does not constitute a waiver of confidentiality with

2   respect to statements that were made to the Troutman Sanders

3   firm or statements made by the Troutman Sanders firm to the

4   Kleins.

5            THE COURT:  All right.  There are -- the documents

6   that have been put in the binder is an e-mail plus a number of

7   attachments and references to omitted attachments.

8            MR. KRINSKY:  Yes.

9            THE COURT:  And I take it you're offering it in the

10  form that has been presented to the Court for identification?

11           MR. KRINSKY:  Yes, we are.  And I've explained the

12  specific documents that were removed just because of the

13  voluminous nature and what it entailed.  I discussed this with

14  Mr. Stremba.  And again, it is my understanding that there is

15  no objection to the way that this has been presented or the way

16  that we have proposed offering it as evidence.

17           THE COURT:  And attachments 1, 2, 3 and 4 are

18  omitted --

19           MR. KRINSKY:  Your Honor, we've actually updated Your

20  Honor's exhibit book.  So -- this afternoon after discussing it

21  with Mr. Stremba.  So Exhibit 3 is now in the exhibit -- or

22  attachment 3.

23           THE COURT:  All right.  Any objection?

24           MR. STREMBA:  Your Honor, I have no objection to the

25  admission but I have not agreed that --

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 31 of 116 PageID #: 463
CHRISTINE PERSAUD

Page 31

```
 1              THE CLERK:  Excuse me.  You have to talk into the

 2    microphone.

 3              THE COURT:  Microphone.

 4              MR. STREMBA:  Oh, I'm sorry.  I have no objection to

 5    the admission but I have not agreed that the use of this

 6    document does or does not constitute a waiver of

 7    confidentiality.

 8              THE COURT:  All right.  Well, there's an e-mail

 9    followed by a reference to attachment 1, company brochure;

10    attachment 2, Juancheng; then attachments 1 and 2 omitted.  And

11    then the document -- it is not clear whether it is attachment 1

12    or attachment 2 but something which is an Abe Klein headed

13    Friday, August 1, 2008, 3:47 a.m. e-mail.  Is this 1 or 2?

14              MR. KRINSKY:  The only attachment that is contained to

15    the document is attachment 4, the "Real Estate Experience in

16    Mainland China Brochure of the Troutman Sanders Firm".

17              THE COURT:  So is the e-mail from Mr. Slevin to Mr.

18    Epstein erroneously included?  It's all right.  I just want to

19    be sure --

20              MR. KRINSKY:  It is, Your Honor.

21              THE COURT:  So shall I remove those pages or attempt

22    to remove those pages?  So attachments 1 and 2 remain omitted.

23    Attachment 3, "Master Case Studies - China", then a page

24    labeled "Attachment 4", then a page that says attachments 3 and

25    4 omitted.  And then the same e-mail -- I'm sorry -- a
```

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 32 of 116 PageID #: 464
CHRISTINE PERSAUD

Page 32

1    different e-mail, this one from Mr. Epstein -- it appears to be

2    the same e-mail that begins the exhibit, is that correct, in my

3    copy so perhaps a duplicate also in error?  And then another

4    reference to attachment 1, the company brochure.  May I suggest

5    that I pass you my copy of the exhibit and you can correct the

6    copy that was given to the Court?  I think I have many things

7    twice, some things not at all, references to things that are

8    missing that are not missing.  I know how confusing it can be

9    when there are many exhibits and attachments.  Why don't you

10   just take a moment and review it also with counsel for the

11   Troutman firm?

12        (Pause)

13        THE COURT:  And then we'll all conform -- you have a

14   copy as well, right?  Then we'll conform the copy with my law

15   clerk as well.

16        (Pause)

17        MR. KRINSKY:  Your Honor, may I approach?

18        THE COURT:  Yes.  To my deputy.  Thank you.  Thank

19   you.

20        MR. KRINSKY:  Your Honor, I think we've resolved the

21   problem.  It is -- we've agreed -- I've agreed with Mr. Stremba

22   that it is the e-mail itself, attachments 1, 2 and 3 are

23   excluded or omitted, and attachment 4 is included.

24        THE COURT:  Okay.  And that's what is in the paper

25   that you've just handed to me, is that correct?

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 33 of 116 PageID #: 465
CHRISTINE PERSAUD

Page 33

1           MR. KRINSKY:  Yes, it is, Your Honor.

2           THE COURT:  Okay.  Thank you very much for

3    straightening that out.  All right.  Please proceed.

4           MR. KRINSKY:  Your Honor, has the Exhibit 19 been

5    received into evidence?

6           THE COURT:  We were in the process of working that

7    through.  It's been offered.  I understand there's on

8    objection?

9           MR. STREMBA:  No objection, Your Honor.

10          THE COURT:  Without objection, it will be admitted.

11   (Klein Exhibit 19, e-mail from Edward Epstein to Abraham Klein

12   cc'ing Hershel Klein dated 8/1/08, was hereby received into

13   evidence as of this date.)

14          THE COURT:  September 20th.  All right.  Please

15   proceed.

16   BY MR. KRINSKY:

17   Q.   Mr. Klein, referring to Exhibit 19 in the binder book in

18   front of you, and specifically the e-mail that begins "Dear

19   Abe", did you receive a copy of that e-mail from Edward

20   Epstein?

21   A.   Yes.

22   Q.   And based upon -- and did you have an opportunity to read

23   it?

24   A.   Yes.

25   Q.   At the time it was received?

1    A.    Yes.

2    Q.    Okay.  And based upon your having received and read that

3    e-mail, what, if any, conclusions did you reach with respect to

4    proceeding with Troutman Sanders as counsel?

5    A.    Based on the information that they provided and the

6    outline of what they do, which includes creating the

7    appropriate agreements, legal structures on the developer side

8    and on the investor side, and based on their costs that they

9    projected, we decided that we will move forward with Troutman

10   Sanders and also what they proposed as using Knight Frank.

11        What we proposed is using -- is doing the Knight Frank

12   part, which is the feasibility due diligence part, first and

13   then create the legal structure after we know that it makes

14   sense to go into the project.

15   Q.    And was there anything in particular in the materials that

16   Troutman Sanders sent you that had an impact on the decision

17   that you were making -- or that you and your brother were

18   making with respect to retaining the Troutman Sanders firm?

19   A.    Yes.  Troutman Sanders represented themselves as creating

20   -- being able -- or doing those agreements on the developer

21   side and on the investor side and also being able to assist in

22   raising the funds if needed.

23   Q.    And specifically, if you would point us out where in the

24   materials you were just referring to, specifically where in the

25   brochure Troutman Sanders stated that they have those

Page 35

1    capabilities or abilities.

2    A.    Page 3 --

3    Q.    And you're referring to --

4    A.    -- of the brochure.

5    Q.    -- page 3 of which document?

6    A.    Page 3 of the attachment 4, "Real Estate Experience in

7    Mainland China" brochure.

8    Q.    Okay.  And what specifically on page 3 were you referring

9    to?

10   A.    Of the things that Troutman Sanders mentioned that they

11   do.  One of them is development agreements.  Skipping one, the

12   next one would be financing structures and agreements.  And

13   then the last one on the page is project finance and asset

14   securitizations.

15   Q.    And although this document was received on August 1st as

16   you testified, without specifically stating what was said, were

17   those three categories of information discussed by you, your

18   brother and the Troutman Sanders firm during the telephone

19   conference on July 30th, 2008?

20   A.    Yes.

21   Q.    After you received this August 1st document, what happened

22   next?

23   A.    Abraham and myself discussed the projected costs.  And we

24   decided that it would make sense to do the Knight Frank

25   feasibility study first and do the legal structure second.  So

Page 36

1    I sent an e-mail to Aurora telling her what we think would

2    work.  And Aurora sent us back an e-mail that she thinks that

3    is the proper approach and she would consult with Edward

4    Epstein in China to get his opinion on this matter.

5        Edward Epstein sent us an e-mail at night saying that he

6    believes the approach is a good approach and offered to

7    coordinate the setup between us and Knight Frank and that he

8    would bill us on an hourly rate.

9    Q.   Specifically turning your attention to tab number 24 --

10   tab 24 --

11       (Pause

12   Q.   When you said a moment ago that Mr. Epstein had sent you

13   an e-mail talking about charging you on an hourly basis, is

14   this the e-mail you were referring to?

15   A.   Yes.

16       MR. KRINSKY:  Your Honor, I ask that Klein Exhibit 24

17   previously marked for identification be accepted into evidence

18   as Klein Exhibit 24.  It is my understanding that opposing

19   counsel has no objection based upon the amended joint pre-

20   hearing statement.

21       MR. STREMBA:  No objection, Your Honor.

22       THE COURT:  Without objection, Exhibit 24 for

23   identification will be received.

24   (Klein Exhibit 24, e-mail from Edward Epstein to Abraham Klein

25   cc'ing Aurora Cassirer and Hershel Klein dated 8/5/08, was

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 37 of 116 PageID #: 469
CHRISTINE PERSAUD

Page 37

1    hereby received into evidence as of this date.)

2    Q.   At this point in time, based upon Mr. Epstein's statement,

3    "I will charge you at our hourly rates to do so" -- first of

4    all, what was your understanding of what Mr. Epstein and the

5    Troutman Sanders firm's role was going to be as of August 5th,

6    2008?

7    A.   The same thing that I thought that it will be from July

8    30th which was being our attorneys for this project.

9    Q.   And specifically, what role as of August 5th -- what role

10   at that point in time did you expect Troutman Sanders to take

11   at that point?

12   A.   Being our attorneys for the project.

13   Q.   Okay.  And at that point in time, what were the specific

14   tasks that they were offering to do for you and your brother

15   and that you expected them to do?

16   A.   At that particular time, since we were going to move the

17   Knight Frank part of the project first, they were going to

18   coordinate with Knight Frank, sending Knight Frank, providing

19   Knight Frank the information that we already provided to

20   Troutman Sanders previously on July 30th and coordinating with

21   Knight Frank so that Knight Frank can send us the proposal and

22   move forward on the project -- on the feasibility part of the

23   project.

24   Q.   As of August 5th, 2008, when Mr. Epstein said that he

25   would charge Abraham Klein at his, Mr. Epstein's, hourly rate,

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 38 of 116 PageID #: 470
CHRISTINE PERSAUD

Page 38

1    did you and your brother expect to be charged by Troutman

2    Sanders for the legal work they were performing?

3    A.    Yes.

4    Q.    At this point in time, as of August 5th, 2008, was the

5    name or the letters "GRV" by either you or your brother ever

6    stated, mentioned or disclosed to the Troutman Sanders firm?

7    A.    No.

8    Q.    Was the name "Global Realty Ventures" up until this point

9    in time, had it ever been mentioned by either you or your

10   brother to the Troutman Sanders firm to your knowledge?

11   A.    No.

12   Q.    What happened after August 5th, 2008 when Mr. Epstein

13   agreed to charge you at his hourly rate to assist and

14   coordinate the efforts with Knight Frank?

15   A.    After Epstein contacted Knight Frank and provided Knight

16   Frank with the information on the project, Knight Frank sent us

17   a proposal for their work for this project.

18   Q.    And at that point in time, did you understand that

19   everything that you were providing to Knight Frank, separate

20   and apart, was also confidential and that it would not be

21   disclosed to others?

22   A.    Yes.

23   Q.    Take us through the process briefly as to what Knight

24   Frank was going to do for you and did for you.

25   A.    Knight Frank was going to do the due diligence on the

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 39 of 116  PageID #: 471
CHRISTINE PERSAUD

Page 39

1   project to make sure that the project is a viable project, that

2   whatever the developer told us that can be built over there can

3   actually happen, that there was actually a demand for the

4   residential and commercial or whatever was proposed in the

5   project, that the actual costs are costs that are within range,

6   that the selling prices, our selling prices, that are within

7   range; basically, making sure that the project makes sense from

8   a profit and loss point of view and then from a practical,

9   viable point of view.

10  Q.   Did there come a point in time where Knight Frank

11  completed the work that they had been tasked to perform in

12  connection with the China project?

13  A.   There came a time when they completed the preliminary part

14  of the due diligence which was on about November 11 of 2008.

15  Knight Frank sent us a report, a preliminary report, on the

16  project which basically confirmed whatever the developer

17  presented to us.

18  Q.   And what happened on November 11th, 2008?

19  A.   We contacted Troutman Sanders again telling them that we

20  were at the point where we would need to draft a letter of

21  intent with the developer.

22  Q.   And do you recall who sent that communication, whether it

23  was yourself, Abraham Klein or someone on your behalves?

24  A.   I believe I sent that communication.

25  Q.   And when you say you believe, is there something perhaps

Page 40

1    that would refresh your recollection as to whether or not it

2    was you or Abraham Klein?  Let me rephrase it.

3         Do you specifically recall whether it was you or your

4    brother who had sent the e-mail?

5    A.    Not specifically recall.

6    Q.    I'd like you to turn to tab number 30.  I'd like you look

7    at that document and look up when you are finished.

8    A.    Okay.

9    Q.    Has your recollection been refreshed as to who sent the

10   communication to Troutman Sanders?

11   A.    Yes.  It was actually Abe copying me in.

12   Q.    Okay.  And at that point in time, what were you and your

13   brother asking the Troutman Sanders firm to do in connection

14   with the China project?

15   A.    We asked them to draft a letter of intent to be sent to

16   the developer that will be a base for this -- to move forward

17   on this project.

18   Q.    And what actually is -- if you could describe, what is a

19   letter of intent?

20   A.    A letter of intent was going to be an agreement that will

21   give us the sole right to move forward on the due diligence on

22   the project from a legal point of view and be secure that the

23   developer was not going to try to find different partners in

24   the deal until we finish our due diligence.

25   Q.    Okay.  Prior to November 11th, 2008, did either you or

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 41 of 116 PageID #: 473
CHRISTINE PERSAUD

Page 41

1    your brother, to your knowledge, ever disclose the name or the

2    initials "GRV" to the Troutman Sanders firm.

3    A.    No.

4    Q.    Did -- to your knowledge, did either you or your brother

5    ever disclose the name "Global Realty Ventures" to the Troutman

6    Sanders firm prior to November 11th, 2008?

7    A.    No.

8    Q.    To your knowledge, when was the first time that the

9    letters or the name "GRV" was disclosed to the Troutman Sanders

10    firm?

11    A.    On November 11 when we sent over the information to

12    Troutman Sanders asking them to draft the letter of intent.  We

13    included a list --

14    Q.    And without telling me specifically what is contained in

15    the list, because it is not a document that is in evidence,

16    describe the general category of information which resulted in

17    disclosing the letters or the name "GRV".

18    A.    It was a list of points that will need to be verified and

19    that if all those points actually check out then we will move

20    forward with the project and have the sole right to do so.

21    Q.    And was it within the context of those points that the

22    name "GRV" was disclosed for the first time to the Troutman

23    Sanders firm?

24    A.    Yes.

25    Q.    Subsequent to November 11th, 2008, what happened next?

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 42 of 116 PageID #: 474
CHRISTINE PERSAUD

Page 42

1    A.    Troutman Sanders sent us back a draft letter of intent

2    based on the discussions that we had with them that particular

3    night on November 11th, 2008.  We had a conference call the

4    night of November 11, 2008 discussing all the details of the

5    project and in more detail what we think the project was going

6    to be like and what we think this -- the -- where we think the

7    money was going to be coming from, how much money we have

8    available and how much money will we need to raise and that we

9    need a document to be drafted and try to be worked in a way

10    that it will fit based on what our funds available are.

11    Q.    And did there come a point in time where the Troutman

12    Sanders firm, in fact, provided you with this letter or

13    agreement that you're referring to?

14    A.    Yes.

15    Q.    And when did that happen?

16    A.    The following day, November 12th.

17    Q.    Did you have a copy -- or did you have an opportunity on

18    November 12th, 2008 to review that letter that you're referring

19    to?

20    A.    Yes.

21    Q.    And based upon your review of that document, at that point

22    in time, was there any mention at all by Troutman Sanders that

23    the China project was to involve in any way "GRV" or "Global

24    Realty Ventures"?

25    A.    No.

Page 43

1    Q.   Based upon your review of that document, again without

2    disclosing particular content, what was Troutman Sanders'

3    position with respect to who the deal was between?

4    A.   Troutman Sanders sent us a letter of intent using the

5    company name that I provided originally in my profile to Aurora

6    Cassirer which was the name of Flexo Craft Prints and then also

7    suggesting that Flexo Craft Prints may not be the right company

8    to use for this particular agreement and that we may -- and

9    that we possibly will need to set up offshore companies or

10   different structures to use for this project.

11   Q.   And who specifically was it that suggested that perhaps

12   there should be an offshore company or a different company used

13   other than Flexo Craft to do the China project?

14   A.   Troutman Sanders.

15   Q.   And in response to the Troutman Sanders' initial draft

16   letter in which they used Flexo Craft Prints as the company and

17   their suggestion about perhaps using another company, what, if

18   anything, did either you or your brother do in responding to

19   their comments?

20   A.   We sent back the following day the letter of intent with

21   our comments on it and we changed Flexo Craft Prints to Global

22   Realty Ventures or GRV as part of other comments on the

23   document.

24   Q.   And at that point in time, when you switched it from Flexo

25   to GRV, what was the intent behind doing so?

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 44 of 116 PageID #: 476
CHRISTINE PERSAUD

Page 44

1   A.    We did not feel that Flexo Craft is the appropriate name

2   to use for this particular project.  And we used -- for all our

3   real estate investments, we used different company names that

4   was set up for each particular project based on what our

5   attorney set it up for us.  We had Global Realty Ventures which

6   was a company, based on Abe's information, that was going to

7   have funds from his company called Caring.  So since part of

8   the funds from this project was going to come from that company

9   called Caring and he was working on trying to get those funds

10  into the company, GRV, we thought that as an initial start, we

11  will use the name GRV up until the point where Troutman Sanders

12  was going to set up the legal structure properly based on all

13  the final partners, investors and whatever who was going to be

14  part of this deal at the end.

15  Q.    And again, without telling me specifically what was said

16  by you to Troutman Sanders, in connection with the redrafting

17  and your inclusion of GRV, what were the general categories of

18  information that were provided by you and/or your brother to

19  the Troutman Sanders firm in connection with making the change

20  from Flexo, or Flexo Craft, to GRV?

21  A.    We discussed how much money we currently have available

22  for the project and where the money was sitting and how much

23  money we think we'll still need to raise through different

24  avenues maybe possibly using Laser Master as a publicly traded

25  company or different private funds or private investors.

Page 45

1    Q.    Throughout August and September 2008, you previously

2    testified there had been no mention of GRV, is that right?

3    A.    Correct.

4    Q.    Do you have an understanding one way or the other as to

5    how Troutman Sanders -- as you sit here today, how Troutman

6    Sanders viewed or was titling this project?

7    A.    Yes.

8    Q.    And what is that understanding?

9    A.    As a Flexo Craft project.

10   Q.    And since this matter began, have you had an opportunity

11   to review certain documents that were produced by Troutman

12   Sanders which further confirmed that the title was in fact

13   Flexo Craft project in Heze?

14   A.    Yes.

15   Q.    I'm going to ask you to please turn to tab 111.  Tab 111.

16         MR. KRINSKY:  And, Your Honor, for purposes of saving

17   time, with Your Honor's permission, I would like to group tab

18   111 through tab 114 together.  They're all being offered for

19   the very same point.  And I can do it with one question as

20   opposed to going through piecemeal each one, one by one.  And

21   as I understand it, Mr. -- opposing counsel has no objection

22   pursuant to the amended joint pre-hearing statement filed with

23   the court to these documents.

24         THE COURT:  All right.  Well, let's wait -- are you

25   offering them presently?

1           MR. KRINSKY:  I would offer, Your Honor, previously

2    marked Klein Exhibit 111 through 114 for identification, 111

3    through 114 for identification.

4           THE COURT:  All right.  These four exhibits are being

5    offered.

6           MR. KRINSKY:  And again, these were the documents

7    produced by Troutman Sanders via the file that was obtained by

8    Troutman Sanders from their Shanghai office and then turned

9    over to my office pursuant to my request.

10          THE COURT:  Any objection?

11          MR. STREMBA:  No, Your Honor.

12          THE COURT:  Without objection, the four documents will

13   be received in evidence as numbers 111, 112, 113 and 114.

14   (Klein Exhibit 111, e-mail from Edward Epstein to Andrew Slevin

15   dated 9/1/08 (from Troutman Sanders file produced on 9/14/111),

16   was hereby received into evidence as of this date.)

17   (Klein Exhibit 112, e-mail from Edward Epstein to Andrew Slevin

18   dated 8/13/08 (from Troutman Sanders file produced on 9/14/11),

19   was hereby received into evidence as of this date.)

20   (Klein Exhibit 113, e-mail from Edward Epstein to Aurora

21   Cassirer dated 8/1/08 (from Troutman Sanders file produced on

22   9/14/11), was hereby received into evidence as of this date.)

23   (Klein Exhibit 114, e-mail from Edward Epstein to Andrew Slevin

24   dated 8/8/08 (from Troutman Sanders file produced on 9/14/11),

25   was hereby received into evidence as of this date.)

Page 47

1    BY MR. KRINSKY:

2    Q.   Mr. Klein, just very briefly, you testified a moment ago

3    that Troutman Sanders had referred to the China project as the

4    Flexo Craft project in Heze and that you reviewed some

5    documents that confirm that.  Were these documents that you

6    referred to or that you reviewed and that confirmed that fact?

7    A.   Yes.

8    Q.   I'd also like to turn your attention to what has been

9    previously marked as Klein Exhibit 110.  Klein Exhibit 110 for

10   identification.  Have you had an opportunity to look at that

11   document?

12   A.   Yes.

13   Q.   Okay.  First, was this also a document that you had an

14   opportunity to review when addressing the question of whether

15   it was the Flexo Craft project?

16   A.   Yes.

17          MR. KRINSKY:  Your Honor, I offer into evidence what

18   was previously marked as Klein Exhibit 110 for identification

19   as Klein Exhibit 110 which, as I understand it, pursuant to the

20   amended joint pre-hearing statement, opposing counsel also has

21   no objection.

22          MR. STREMBA:  Your Honor, I have no objection to the

23   admission of this as a document in the file produced from the

24   Shanghai office.  This witness is not competent to testify

25   about what it means.  But it is a document on file --

Page 48

1                THE CLERK:  Excuse me.  You need to speak into the

2       microphone.

3                THE COURT:  I think it might be helpful to have you

4       stand and use the microphone.  And I note that in my binder,

5       Exhibit 110 is a page of handwritten notes and then many pages

6       of e-mails some of which might duplicate the e-mails we just

7       looked at, though I can't be sure.  I don't know how much of

8       this you intend on offering.

9                MR. KRINSKY:  Your Honor, I will apologize again for

10      the error in late night photocopying.  It is only the first

11      page, the handwritten notes, that we are offering into -- or

12      proposing to offer into evidence.

13               THE COURT:  And I'm not trying to --

14               MR. KRINSKY:  And, Your Honor, I can pass up a copy to

15      the Court.

16               THE COURT:  So this is a handwritten page that begins

17      "Responsible partner" Flexo Craft Prints is crossed out and

18      Global Realty Ventures is written, underscored three times and

19      checked off on the left and right?

20               MR. KRINSKY:  Yes, it is, Your Honor.  And again --

21               THE COURT:  And nothing else.

22               MR. KRINSKY:  Correct.

23               THE COURT:  I shall recycle the other pages.  All

24      right.  Without objection, the page will be received.  Thank

25      you.

Page 49

1    (Klein Exhibit 110, handwritten notes from Troutman Sanders

2    file produced on 9/14/11, was hereby received as of this date.)

3    BY MR. KRINSKY:

4    Q.    Now, Mr. Klein, I'd like to go back in time for a moment

5    to where we had left off a moment ago.  In November of 2008,

6    after there was an exchange of draft letter of intents between

7    yourself, your brother and the Troutman Sanders firm, what

8    happened next?

9    A.    There was a bunch of discussions on the letter of intent

10    going back and forth and redrafting and redrafting up until the

11    point where it was ready to be presented to the developer.

12    Q.    In addition, you said "back and forth".  What were the

13    forms of communications with respect to the back and forth

14    between yourself, your brother and the Troutman Sanders firm?

15    A.    We had communications via e-mail and we also had

16    communications via phone conferences at night with Troutman

17    Sanders.

18    Q.    Who specifically from the Troutman Sanders participated in

19    this communications during this period of time in November and

20    December 2008 with respect to the letter of intent draft?

21    A.    It was Edward Epstein and an attorney, Mr. Wang, in the

22    Troutman Sanders firm.

23    Q.    Did there come a point in time where the letter of intent

24    was finalized or finalized in principle?

25    A.    Yes.

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 50 of 116 PageID #: 482
CHRISTINE PERSAUD

Page 50

1    Q.    And when was that?

2    A.    In December of 2008.

3    Q.    In the conversations which you just described a moment ago

4    both through e-mail and telephone calls, without describing

5    specific or stating specifically what was said, please describe

6    the general categories of information that were disclosed by

7    both you and your brother to the Troutman Sanders firm during

8    the drafting process of the letter of intent in November and

9    December 2008.

10    A.    We described again the sources of funds and how much funds

11    we have available.  Troutman Sanders assisted us in trying to

12    suggest different ways of forming the project so that we can

13    start the project at least with the funds that we currently

14    have available and then continue on with different funds that

15    we will raise in different ways.

16    Q.    Okay.  Leading up to the finalizing of the letter of

17    intent, were there any meetings that took place between either

18    yourself, your brother or members of the Troutman Sanders firm

19    outside of the United States?

20    A.    Yes.  There was a meeting with Troutman Sanders and my

21    brother, Abraham, in China.

22    Q.    Do you recall approximately when that meeting took place?

23    A.    Beginning of December --

24    Q.    Okay.

25    A.    -- of 2008.

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 51 of 116 PageID #: 483
CHRISTINE PERSAUD

Page 51

1    Q.    Leading up to that meeting, did you and/or your brother

2    have communications, whether an e-mail or by telephone, with

3    members of the Troutman Sanders firm regarding the nature of

4    that meeting to take place in China?

5    A.    Yes.

6    Q.    And without disclosing the specific content of those

7    meetings or communications, describe generally the categories

8    of information that were provided by either you or your brother

9    to the Troutman Sanders firm with respect to this upcoming

10   meeting.

11   A.    Since this was going to be a meeting with Troutman Sanders

12   and then a follow-up meeting with Troutman Sanders and the

13   developer, again, it was discussed, in addition to all the

14   details of the project, the funds available and where they

15   would be coming from and how much would be available when so

16   that the structure with the developer should be set up in a way

17   that will match with -- based on our funds schedule.

18   Q.    You said a moment ago with respect to the structuring and

19   the financing.  Was this confidential information that both you

20   and your brother disclosed to the Troutman Sanders firm?

21   A.    Yes.

22   Q.    After you disclosed this confidential information on

23   structuring and financing, what happened after that had

24   occurred in China?

25        MR. KRINSKY:  Let me rephrase it if I could.

Page 52

1    Q.   First of all, did a meeting actually take place

2    subsequently in China between either yourself, your brother and

3    members of the Troutman Sanders firm?

4    A.   Yes.  There was a meeting between my brother and Troutman

5    Sanders.

6    Q.   At any point in time, did anybody else participate in this

7    meeting, to your knowledge?

8    A.   Then there was a meeting with Troutman Sanders, my brother

9    and the developer.

10   Q.   To your knowledge, who specifically from the Troutman

11   Sanders firm attended this joint meeting and met with your

12   brother individually, if you recall?

13   A.   I was not part of that meeting but I believe it was Mr.

14   Wang.

15   Q.   Okay.  Do you know one way or the other whether Mr.

16   Epstein had participated in those meetings?

17   A.   I know that Mr. Epstein did not participate.  He sent an

18   e-mail saying that he's ill or something and that he can't make

19   the meeting.

20   Q.   Okay.  After the meeting in China between Mr. Wang of the

21   Troutman Sanders firm, your brother and then others, what

22   happened next in the drafting process and the overall project

23   that was being proposed?

24   A.   At a point of time, the letter of intent was drafted and

25   finalized and ready to be sent to the developer for signing.

Page 53

1    Q.    Do you remember approximately or recall approximately when

2    that was?

3    A.    The end of December 2008.

4    Q.    To your knowledge, was the letter of intent ever executed

5    and finalized in that respect?

6    A.    No, it was not.

7    Q.    Okay.  Why was that?

8    A.    When the letter of intent was finally ready to be signed,

9    the real estate market did not perform the way it did when the

10   project was initially presented to us.  So the developer said

11   that he would like to put the project on hold up until the

12   market is going to turn around or whatever that we'll be ready

13   to move forward on this project.

14   Q.    And essentially, the end of December 2008, what was your

15   understanding as to the status of what has been referred to as

16   the China project?

17   A.    That we will -- that it's our last project and we will be

18   waiting when the project is ready to move forward and move

19   forward accordingly.

20   Q.    Would it be fair to say that essentially it was in a

21   holding pattern?  There was no active work, in a sense, being

22   done on it?

23   A.    Correct.

24   Q.    Okay.  And at that point in time, based upon

25   communications that you had had, did you believe that the

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 54 of 116 PageID #: 486
CHRISTINE PERSAUD

Page 54

1    Troutman Sanders firm had completed what it had agreed to do on

2    behalf of yourself and your brother or on behalf of your

3    brother?

4    A.    No.

5    Q.    Well, at any point in time, had you received, either

6    individually or on behalf of your brother, a retainer agreement

7    or letter from the Troutman Sanders firm?

8    A.    Yes.

9    Q.    Do you recall approximately when that was?

10   A.    Middle to end of November 2008.

11   Q.    And in connection with that retainer agreement, what was

12   your understanding as to what the Troutman Sanders firm had

13   agreed to do with respect to legal work on behalf of your

14   brother and yourself?

15   A.    Everything that we initially discussed which was setting

16   up the legal structure and the legal agreements between us and

17   the developers and between all the investors.

18   Q.    And at the point in time in December of 2008 when, as you

19   described it, the project was essentially put on hold, was it

20   your understanding, one way or the other, as to whether the

21   representation of Troutman Sanders had ended at that point?

22   A.    It did not end, in my understanding.

23   Q.    And what was your basis for that understanding -- for your

24   understanding?

25   A.    In the retainer agreement, it was based that they will do

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 55 of 116 PageID #: 487
CHRISTINE PERSAUD

Page 55

1    certain pieces of work which was doing the legal work, setting

2    up the appropriate legal structures.  And since that didn't

3    happen, the work was never ended.

4    Q.    Well, when you say it was never ended, did they, at any

5    point in time, in either 2008, 2009 or 2010, did the Troutman

6    Sanders firm ever send or, to your knowledge, your brother a

7    letter stating that the representation has been terminated or

8    concluded?

9    A.    No.

10   Q.    Mr. Klein, prior to receiving the November 24th, 2008

11   retainer letter from the Troutman Sanders firm, what was your

12   understanding with respect to who Troutman Sanders represented?

13   A.    It was my understanding that they represented Abe, myself

14   and whatever legal structure will be set up for this project.

15   Q.    And what was the basis for that understanding?

16   A.    In the initial e-mail that Aurora Cassirer sent to me.

17   And since at that point there was no -- based on the

18   discussions, we did not know how we will move forward or how

19   the legal structure will be set up.  We were actually looking

20   forward for the advice of Troutman Sanders for them to set up

21   the legal structure for us.  It was actually us doing the

22   project and keeping all the information that we sent them for

23   this project confidential and then they will set up the legal

24   structure for this project based on how the investor pool will

25   work at the end.

Page 56

1   Q.   And prior to November 11th, 2008, when you said GRV was

2   mentioned for the first time, prior to that, did you provide

3   confidential secret information to the Troutman Sanders firm

4   regarding the China project?

5   A.   Yes.

6   Q.   And did you do so with the belief that Troutman Sanders

7   firm was representing your brother and, in turn, your interests

8   in connection with the China project?

9   A.   Yes.

10       MR. KRINSKY:  May I have a moment to confer with co-

11   counsel?

12       THE COURT:  Yes, you may.

13       (Pause)

14   Q.   Just briefly, to go back for a moment to put the

15   information you provided the Court into context, just briefly

16   without disclosing specific details, generally describe the

17   size of the proposed project in China.

18   A.   It was a project that was in the range of about ninety to

19   a hundred million dollars total sales -- total revenue for this

20   project.

21   Q.   And in connection with the financing and structuring of

22   this project, did you and/or your brother have discussions with

23   the Troutman Sanders firm regarding equity, equity positions

24   and ownership interest in the project?

25   A.   Yes.  Our portion of equity in this project was roughly

Page 57

1    approximately going to be about six million dollars, a little

2    bit short of six million dollars.  And based on that, we

3    provided information to Troutman Sanders as to how much money

4    we currently have available and where it was sitting and how

5    much money we will still need to raise.

6    Q.   And without disclosing any of the specific facts that

7    either you or your brother revealed to the Troutman Sanders

8    firm, generally, did you provide information regarding your

9    financial dealings with Caring in connection with the funding

10   of the China project?

11   A.   Yes.  Abraham provided that information --

12             MR. STREMBA:  Your Honor, I object to that --

13   A.   -- while I was on the conference calls.

14             THE COURT:  All right.  The question was did you.

15   Your answer was Abraham did.  I take it you did not but Abraham

16   did.  Is that your answer?

17             THE WITNESS:  I know, in general, how much money he

18   has available from Caring available to provide for this

19   project.  But the exact details of how, when and where of how

20   we would get it out of Caring was something that he provided.

21             THE COURT:  The question is pretty specific about who

22   provided information or, even more specifically, what

23   information you provided.  And your answer is that he provided

24   certain information some of which you were also familiar with,

25   is that right?

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 58 of 116 PageID #: 490
CHRISTINE PERSAUD

Page 58

1          THE WITNESS:  Correct.

2          THE COURT:  Thank you.  You may ask your next

3    question.

4    Q.   Were you present for some of the discussions in which

5    Abraham Klein, your brother, provided that financial

6    information to the Troutman Sanders firm?

7    A.   Yes.

8    Q.   And were you there, essentially, as his representative

9    working with Abraham Klein on this project?

10   A.   Yes.

11   Q.   And at the time you were on those conference calls, was it

12   your understanding that that information would be kept secret

13   and confidential?

14   A.   Yes.

15          MR. KRINSKY:  Your Honor, I have no further questions

16   at this time.

17          THE COURT:  All right.  How long do you anticipate for

18   cross?

19          MR. STREMBA:  I would say about forty-five minutes

20   maybe.

21          THE COURT:  Here's what we're going to do.  We're

22   going to take a very short break.  I need to take another

23   matter that my understanding is will not take an enormous

24   amount of time.  At least, that's how I think we're proceeding.

25   And then we'll resume.

1        In fact, we're going to start the cross now and then

2    we'll break when we need to to pick up the other matter.

3    There's some consultation that's going on between parties and

4    the Office of the United States Trustee which gives us a little

5    more time since we all have the same interest which is to make

6    as much of our record as promptly as we can.

7            MR. STREMBA:  Your Honor, may I provide the witness

8    with a copy of the trustee's exhibit binder?

9            THE COURT:  Yeah.  Of course you may.

10        (Pause)

11   CROSS-EXAMINATION

12   BY MR. STREMBA:

13   Q.   Mr. Klein, in connection with your preparation for

14   testifying today, did you review any of the e-mail

15   correspondence between Troutman Sanders and you and your

16   brother during the period from July through December of 2008?

17   A.    Yes.

18   Q.   Would you say that you reviewed all of the documents that

19   your counsel put into the binder of exhibits that they have

20   proposed for this hearing?

21   A.    No.

22   Q.   How did you --

23           MR. STREMBA:  Strike that.  I'm sorry.

24   Q.   Did you review the engagement letter that was signed in

25   connection with what we've been calling the China project?

Page 60

1    A.    Briefly.

2    Q.    Did you review the affirmations or affidavits that your

3    brother, Abraham, has filed in connection with his objection to

4    the retention of Troutman Sanders?

5    A.    No.

6    Q.    Have you ever reviewed them?

7    A.    No.

8    Q.    You mentioned at the beginning of your testimony that you

9    are the vice president of Flexo Craft Prints, is that --

10   A.    Right.

11   Q.    Were you the vice president during 2008?

12   A.    Yes.

13   Q.    And I believe you testified that your brother, Abraham, is

14   the president of Flexo Craft?

15   A.    Correct.

16   Q.    And was he the president in 2008?

17   A.    Yes.

18   Q.    Do you have any equity interest in Flexo Craft,

19   individually?

20   A.    I'm a shareholder of Flexo Craft.

21   Q.    And does your brother, Abraham, own shares in Flexo Craft?

22   A.    No.

23   Q.    You mentioned a company called Laser something.  Could you

24   repeat the name of that company?

25   A.    Laser Master International.

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 61 of 116 PageID #: 493
CHRISTINE PERSAUD

Page 61

1    Q.    And that company owns Flexo Craft or is the same?  I

2    wasn't clear.

3    A.    Flexo Craft is a d/b/a of Laser Master International.

4    Q.    And you said Laser Master is a public company?

5    A.    Correct.

6    Q.    Is that a United States company?

7    A.    Yes.

8    Q.    Where is that formed?

9    A.    New York.

10    Q.    Do you or members of your family own a majority of the

11    stock of Laser Craft (sic)

12            MR. KRINSKY:  Your Honor, I'm going to object --

13            MR. STREMBA:  I'm sorry.

14            MR. KRINSKY:  -- on relevance and ask for an offer of

15    proof as to where we're going.

16            MR. STREMBA:  Your Honor, this is the basic structure

17    of the entities that we've been hearing testimony about for the

18    last forty-five minutes.  I'm trying to find out what the

19    position is of the parties who contacted Troutman Sanders.

20            THE COURT:  I'm going to overrule --

21            MR. KRINSKY:  The parties --

22            MR. STREMBA:  And it --

23            THE COURT:  -- the objection and allow the testimony.

24    Q.    Do you have a -- does your family have a majority interest

25    in Laser -- the Laser entity?

1    A.   We own fifty-one percent.

2    Q.   And does Flexo Craft have investments in real estate

3    projects?

4    A.   Laser Master does.

5    Q.   Laser Master does.  And I think you said those were in the

6    United States and Canada, is that right?

7    A.   Correct.

8    Q.   Okay.  Do you know when Global Realty Ventures LLC was

9    formed?

10   A.   Yes.

11   Q.   When was that?

12   A.   In July of 2008.

13   Q.   And who caused that entity to be formed?

14   A.   Abraham.

15   Q.   Did he use a service or counsel or lawyers to have that

16   entity formed?

17   A.   I don't know.

18   Q.   Do you know whether that entity was formed, in whole or

19   part, for the purpose of entering into the real estate

20   investment in China that you were testifying about earlier?

21   A.    There were several real estate developments on the table

22   at that time.  And he formed Global Realty Ventures to

23   potentially possibly use for those projects.

24   Q.   At the time when you first contacted Troutman Sanders in

25   July of 2008, do you have an understanding as to what entity

Page 63

1    was going to be used or was intended to be used for the

2    investment in the China project if that went forward?

3    A.   We were looking for Troutman Sanders to set up the legal

4    structure for us based on what they were thinking would be the

5    right thing, at the end of the day, when we would have the

6    final pool of investors knowing how it needs to be set up.

7    Q.   Did you believe in July of 2008 that you individually

8    would have an interest in the China project?

9    A.   We didn't know how exactly this project was going to be

10   set up at that point since we didn't secure all the funds at

11   that time.

12   Q.   So you think there was a possibility that you individually

13   would be entering into an agreement with the developer?

14   A.   Partially.  Possibly.

15   Q.   You mentioned that you used law firms in the United States

16   on corporate matters -- or a law firm.  Would you identify the

17   firm or firms that you were referring to?

18   A.   We used Pryor Cashman.

19   Q.   And that's for corporate type matters?

20   A.   Correct.

21   Q.   What entity has engaged Pryor Cashman?

22   A.   Laser Master International.

23   Q.   I'm sorry.  I didn't hear you.

24   A.   Laser Master International.

25   Q.   For how long has Laser Master engaged the services of

1    Pryor Cashman?

2    A.    Probably since about 2005.

3    Q.    And I believe you mentioned that --

4          THE COURT:  Excuse me for one second.  I need to

5    confer with my deputy.

6        (Pause)

7          THE COURT:  I'm sorry.  Trying to handle a number of

8    matters.  In a -- once I understand that we're ready to proceed

9    with the next matter, which is not yet, then I'll give you a

10   couple of minutes to get to the end of whatever line of

11   questioning you're in the midst of and we'll take a short break

12   at that point.

13         MR. STREMBA:  When that happens, Your Honor, do we

14   clear out or do we leave --

15         THE COURT:  We'll have to figure that out.

16         MR. STREMBA:  Okay.

17         THE COURT:  There's certainly no need to clear out in

18   the sense of clearing the courtroom.  There will be a need to

19   make space available at counsel table.  And we'll find a

20   productive and collaborative way to undertake that, I'm sure.

21         Back to your questions.  I apologize for the

22   interruption.  I'm sorry.  Especially to the witness.

23   BY MR. STREMBA:

24   Q.    I believe you indicated that you've engaged or had the

25   representation of Mr. Zilberberg on litigation matters?

Page 65

1    A.    Correct.

2    Q.    And for how long has Mr. Zilberberg been engaged by you or

3    one of your companies to do litigation work?

4    A.    Since 2000.

5    Q.    You testified that the China project was Abe's project and

6    that you were assisting him informally -- your phrase was as

7    his agent.  If it was Abe's project, why would you say that you

8    may have been signing individually on a contract with the

9    developer?

10    A.    Depending on how I will assist in the project will

11    determine as to what my capacity will be as a partner in the

12    project.

13    Q.    You said several times during your testimony that you

14    disclosed confidential information to Troutman Sanders

15    regarding how much funds were available for the investment in

16    China and the timing of those, when the funds would be

17    available.  Are you aware of any place, in any e-mail or other

18    correspondence, where any such information was provided to

19    Troutman Sanders?

20    A.    What was the question again?

21    Q.    Are you aware of any e-mail or other correspondence with

22    Troutman Sanders in which you provided information regarding

23    the amount of money available to your investors and the timing

24    of when the money would be available?

25            MR. KRINSKY:  Objection, Your Honor.

Page 66

1           THE COURT:  Grounds?

2           MR. KRINSKY:  Calls for confidential information which

3    is specifically why the general categories of information were

4    discussed rather than actually marking or moving into evidence

5    the very documents that he was referring to earlier.

6           MR. STREMBA:  Your Honor, we've heard --

7           THE COURT:  You're certainly in charge of your own

8    questioning but your questioning does not necessarily delimit

9    the questioning in cross-examination.  It cannot be sufficient

10   to -- and can't -- the phrase "confidential information" and

11   leave it full stop.  At the same time, you should not have to

12   waive confidentiality, though your position is you have already

13   provided this information, so I don't see how it would be

14   waived, in order to prove it.  It's a difficult issue.  I think

15   we're going to need to take it up.  But it will not be

16   sufficient simply to say without telling me what it was, was

17   there confidential information and then raise a barrier to

18   questions on cross-examination as to whether in fact it was

19   confidential, was kept confidential before or after, or is

20   reasonably to have been viewed as confidential.  With your

21   experience in the field, I'm sure you must agree that those are

22   going to be the principles upon which we move forward.

23          MR. KRINSKY:  And, Your Honor, that's exactly why in a

24   situation like this, Courts have said throughout, both New York

25   and elsewhere, that the appropriate means --

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 67 of 116 PageID #: 499
CHRISTINE PERSAUD

Page 67

1              THE CLERK:  Speak into the mic, please.

2              MR. KRINSKY:  I'm sorry.

3              THE COURT:  Don't forget to use the microphone.  We

4      need to make a clear record.

5              MR. KRINSKY:  Your Honor, that's exactly why Courts,

6      both in the eastern district, the southern and the Second

7      Circuit, said where the issue of conflict arises, and the

8      question is one of confidences and secrets under the former

9      Code, 4101, and the current Code, 1.6.  The objective is, is to

10     essentially take the Court up to the point where the

11     information has been revealed.  And to the extent that the

12     Court requires additional information, for that information to

13     be provided to the Court ex-camera -- or, sorry -- in-camera,

14     ex-parte for the purposes of preserving that information.

15             THE COURT:  How can the process of

16     cross-examination -- I think you're referring to case law that

17     arises in the context of document production more often than in

18     the context of testimony at trial.

19             MR. KRINSKY:  Your Honor --

20             THE COURT:  You'll have to point me to the trial

21     testimony cases and I will need to pay close attention to how

22     they deal with the problem of cross-examination because it

23     simply cannot be that an ex-parte review of document -- of

24     information believed to be confidential, presumably in all good

25     faith, provides an adequate opportunity for cross-examination.

Page 68

1    It's a difficult issue.  I'll welcome you to tell me the

2    citations to the one or two cases you think are most on point

3    specifically in the context of testimony not in the context so

4    often comes up of the production of documents or information

5    including confidential business information and trade secrets.

6    It has to be the courtroom context.  It has to be at the point

7    of taking testimony and cross-examination.  It may be that this

8    is a good point to take our very short break -- Ms. Jackson,

9    are you ready to set up for the next matter?  Oh, I think we

10   still need a little time.  Is there a different -- well --

11          MR. STREMBA:  Your Honor, I --

12          THE COURT:  So here's the interesting issue.  I'd like

13   to go as far as we can.  But I appreciate the difficulty here.

14   And I can tell you, it's hard for me to see that the law will

15   support or the fact-finding process could divide dropping the

16   curtain at the point of confidential information without regard

17   or going into the detail of what it is.  I did not raise this

18   when you were questioning your witness.  It would not have been

19   appropriate.  You're entitled to make your case and you will

20   succeed or fail.  But I don't think you will succeed if your

21   closing argument is my witness said it was confidential and

22   that's enough.  I don't think it is.  I don't think the law

23   supports that.

24          MR. STREMBA:  Your Honor, I was only asking about a

25   category of information which --

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 69 of 116 PageID #: 501
CHRISTINE PERSAUD

Page 69

1          THE COURT:  Well, let's see if we can start that way.

2     That may help.

3          MR. STREMBA:  I --

4          THE COURT:  Could I have the question repeated on the

5     record, please?  Something like if confidential information was

6     provided in any e-mail or correspondence to Troutman Sanders

7     whether or not as opposed to what.  Something like that?

8          MR. STREMBA:  Yes, Your Honor.

9          THE COURT:  All right.  I'm going to ask you to put

10    the question again to the witness.  Best when they come from

11    counsel.

12    BY MR. STREMBA:

13    Q.   Mr. Klein, are you aware of any e-mail or other

14    correspondence with Troutman Sanders in which you or your

15    brother provided information with respect to funds available

16    for the investment proposed in China?

17    A.   Not in an e-mail format.

18    Q.   Am I correct that the letter of intent, at various times

19    in draft form, was transmitted to the developer, Mr. Zhang, for

20    his review?

21    A.   Yes.

22    Q.   And the version of the letter of intent as it existed at

23    the end of December which you said was in final form as far as

24    your side was concerned, that was transmitted to Mr. Zhang?

25    A.   Yes.

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 70 of 116 PageID #: 502
CHRISTINE PERSAUD

Page 70

1    Q.    Does the letter of intent contain any information with

2    respect to what funds are available to your side of the

3    transaction?

4    A.    No.

5    Q.    Does it contain any information with respect to where your

6    funds would come from?

7    A.    No.

8    Q.    I believe you indicated that you reviewed the engagement

9    letter for your preparation.  Is there anything in the

10   engagement letter indicating that Troutman Sanders was retained

11   to assist Global Realty in obtaining funds to invest in the

12   China project?

13   A.    I did not read every word of the engagement letter in

14   preparation for this --

15   Q.    I'd like to refer you to what has been marked as Trustee

16   Exhibit 1 -- I'm sorry -- Exhibit A in the binder that I've

17   provided.

18        MR. STREMBA:  Your Honor, this is a copy of the

19   engagement letter.  I would move for its admission in evidence.

20   And I believe there is no objection thereto by Mr. Klein.

21        THE COURT:  You've directed the witness' and the

22   Court's attention to Trustee Exhibit A for identification,

23   which is an exhibit dated November 24, 2008 on its first page.

24   It appears to be an engagement letter.  Is that right?

25        MR. STREMBA:  Yes, Your Honor.

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 71 of 116 PageID #: 503
CHRISTINE PERSAUD

Page 71

1          THE COURT:  Okay.  Thank you.  Any objection?

2          MR. KRINSKY:  No objection with the caveat that it is

3    our position that this does not waive the -- consenting to the

4    admission of the document does not waive the attorney/client

5    privilege.

6          THE COURT:  Well, the question is do you object.  I

7    take it there's no objection.  Without objection, it will be

8    received in evidence.

9    (Trustee Exhibit A, engagement letter dated 11/24/08 between

10   Abraham Klein and Troutman Sanders, was hereby received into

11   evidence as of this date.)

12   BY MR. STREMBA:

13   Q.   Mr. Klein, please look at what has been marked and

14   admitted as Trustee Exhibit A and tell me whether you can

15   identify this as a copy of the engagement letter that was

16   signed on behalf of Global Realty Ventures?

17   A.   It was signed on behalf of myself and any entity that will

18   be the final entity doing the real estate project.

19   Q.   Do you know who signed the document on page 7?

20   A.   Myself.

21   Q.   And when you signed the document, did you make any changes

22   to the document?  Did you note any changes in the document?

23   A.   No.

24   Q.   And you did realize that it begins the RE -- the re line

25   is "Engagement of Troutman Sanders LLP by Global Realty

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 72 of 116 PageID #: 504
CHRISTINE PERSAUD

Page 72

```
 1    Ventures ('GRV') - Retainer Letter/Project Juancheng" or

 2    something to that effect.  Did you note that when you signed

 3    the letter or before?

 4    A.   Yes.

 5    Q.   Now, Mr. Klein, the letter begins with a Section 1, "Scope

 6    of Services".  And I'd ask you to look at that section and tell

 7    me whether Troutman Sanders engagement letter provides that

 8    Troutman Sanders will render services in connection with

 9    obtaining funding for Global Realty Ventures in connection with

10    the China project?

11         MR. KRINSKY:  Objection, Your Honor.  Question:  is

12    this being asked to define future representation after November

13    24th or what the representation was since July 30th for which

14    there was no retainer agreement?

15         MR. STREMBA:  Your Honor, the question relates to what

16    Troutman Sanders undertook to provide in the engagement letter

17    at any time after the engagement letter.

18         THE COURT:  Do you withdraw the objection?

19         MR. KRINSKY:  I withdraw the objection.

20         THE COURT:  Do you have a question in mind?

21    A.   Well, the engagement letter that's signed December 29,

22    2008 --

23    Q.   Yes.

24    A.   -- does not mention anything about them raising funds for

25    this project.
```

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 73 of 116 PageID #: 505
CHRISTINE PERSAUD

Page 73

1    Q.    Or assisting Global Realty in raising funds?

2    A.    In raising funds.

3    Q.    Or you or your brother in raising funds?

4    A.    Correct.

5    Q.    How many times would you say during the course of

6    communications with Troutman Sanders between July 2008 and

7    November 24th, 2008 you or your brother had discussions with

8    Troutman Sanders about raising funds for the China project?

9    A.    Probably every time we spoke to them.

10    Q.    And yet, this is not mentioned in the engagement letter.

11    Can you -- do you have any idea --

12    A.    Of them raising or us raising?

13    Q.    About Troutman Sanders representing Global Realty in

14    connection with raising funds.

15    A.    That was only in the initial conversation that I had with

16    Aurora and with Edward Epstein on July 30th, 2008.  And --

17    Q.    Now you said that -- I'm sorry.  Were you finished?

18    A.    No.

19    Q.    Did I cut you off?  I'm sorry.

20    A.    -- and in November 11, 12 of 2008.

21    Q.    You've testified that the name, Global Realty Ventures, or

22    GRV, was not mentioned to Troutman Sanders until November of

23    2008.  So in the discussions you had with Troutman Sanders in

24    July, whose funds were you referring to when you talked about

25    funds that were available?

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 74 of 116 PageID #: 506
CHRISTINE PERSAUD

Page 74

1    A.    Abe's funds, funds possibly being raised through Flexo

2    Craft or funds coming in from different sources.

3    Q.    Now without telling me how much or what the information

4    was, what was the --

5          (Pause)

6    Q.    Was there any discussion as to where Abe had obtained the

7    funds which he currently had?

8    A.    Say that again.  I'm sorry.

9    Q.    You mentioned that there was a discussion of how much

10   money Abraham had available to him.

11   A.    Correct.

12   Q.    Was there any discussion as to where those funds had come

13   from?

14   A.    Yes.

15   Q.    Where had they come from?

16   A.    Caring, a company that he owned or whatever he had some --

17   Q.    And you discussed that with Troutman Sanders?

18   A.    Yes.

19   Q.    Oh.  You said Caring or whatever company he owns?

20   A.    No.  I said Caring, a company that he owns.  But then I

21   said whatever ownership he had in that.  I'm not exactly sure

22   of how his ownership structure was in Caring.

23          THE COURT:  I need to remind each of you that in order

24   to make a clear record, you need to speak distinctly and close

25   to the microphone.  You each have fairly low voices and I'm not

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 75 of 116 PageID #: 507
CHRISTINE PERSAUD

Page 75

1   used to hearing low voices in court.  But I do need to ask you

2   to be sure that we're making a good record.  Thank you.

3   Q.   Mr. Klein, are you aware of any place in any of the

4   e-mails or other correspondence with Troutman Sanders in which

5   Caring -- a company called Caring was mentioned?

6   A.   No.

7   Q.   Was Caring, to your knowledge, ever considered as a

8   possible vehicle for the investment in China?

9   A.   Not that I know of.

10       (Pause)

11   A.   Let me --

12   Q.   Did you or Abraham provide financial statements for --

13   either you or Abraham provide to Troutman Sanders?

14   A.   Originally, when I contacted Aurora, I provided my

15   financial statements from Laser Master to her.  I pointed her

16   to the ticker symbol, LMTI.  She looked us up trying to figure

17   out, preferable in some balance sheets, trying to figure out

18   who we are.

19   Q.   So you're referring to the public company, the balance

20   sheets that she could access online.

21   A.   Online, correct.

22   Q.   Anything else?

23   A.   As far as formal financial statement?

24   Q.   Yes.  Any listing of assets of liabilities.

25           THE COURT:  Could we have -- it may be that it's clear

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 76 of 116 PageID #: 508

CHRISTINE PERSAUD

Page 76

1    to the witness and to the lawyer examining, but I'm not sure

2    that it's clear to me.  Whose financial statements do you have

3    in mind?

4              MR. STREMBA:  Well --

5              THE COURT:  I think a complete question will help with

6    a complete record.  And I say that as your finder of fact.

7              MR. STREMBA:  Yes, Your Honor.

8              THE COURT:  Thank you very much.

9    Q.   The question actually was whether you had provided any

10   financial statement either for you or Abraham rather than the

11   company.  Let's focus on that question first.  Any personal --

12   did you or Abraham provide any personal financial statements to

13   Troutman Sanders?

14   A.   Not a formal financial statement.  We did provide

15   financial projections and funds but not a formal financial

16   statement.

17   Q.   In other words, some indication that you would be able to

18   enter into this China project if it got off the ground.

19   A.   Well, we discussed how much funds will be available, when,

20   how it would be coming in.  And based on that, there was e-

21   mails creating the letter of intent, accordingly, with certain

22   percentages mentioned in the e-mails of how much funds would be

23   available now or can be put into the deal right now and how

24   many months we'll need to try to get to the rest.

25   Q.   As of July through November of 2008, were you -- did you

Page 77

1    participate in any discussions with representatives of Caring

2    with regard to obtaining funds for the China project?

3    A.    No.

4    Q.    Are you familiar with a company called Trade Fame Group,

5    Ltd.?

6    A.    No.

7          (Pause)

8    Q.    Are either you or Abraham an attorney?

9    A.    No.

10         (Pause)

11   Q.    You testified concerning the time period when the initial

12   discussions with Troutman took place and it was decided that

13   the Knight Frank firm would do the preliminary due diligence

14   work before Troutman Sanders addressed the structuring of the

15   deal and, specifically, referred to an e-mail from Edward

16   Epstein indicating that he would bill by the hour for

17   coordinating communications between Knight Frank and your side.

18   Is it your understanding that you accepted Mr. Epstein's

19   proposal that he bill by the hour for coordinating those

20   communications?

21   A.    That he would bill me by the hour for whatever he was

22   going to do.

23   Q.    And what was your understanding of what he was going to

24   do?

25   A.    In that particular moment, set up the coordination with

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 78 of 116 PageID #: 510
CHRISTINE PERSAUD

Page 78

1    Knight Frank.

2    Q.    What did you expect him to do after the initial phone call

3    or e-mail establishing the communications between you and

4    Knight Frank?

5    A.    Well, all the information that Knight Frank received came

6    from Troutman Sanders not from us, initially.

7    Q.    So you understood that Troutman Sanders would be

8    forwarding that information?

9    A.    Giving them the information.

10    Q.    And how much time did you think that would all take?

11    A.    I did not project that.

12    Q.    Did you expect it to take more than an hour to set up that

13    phone call and forward that material?

14            MR. KRINSKY:  Objection.  Relevance.  Speculation.

15            THE COURT:  If he had an expectation, he can testify

16    to it.  Overruled.

17    A.    I'm not trying to be funny.  I've spent a lot of money on

18    legal fees in my life, a lot more than I usually think the

19    lawyers would charge for anything that they need to do.  So I

20    have no projection of how much they would actually spend or

21    need to do or review our engagement with Knight Frank to make

22    sure it's done right.

23    Q.    But didn't you, by e-mail, tell Mr. Epstein that he should

24    not continue coordinating between Knight Frank and you after

25    the initial communication was established --

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 79 of 116 PageID #: 511
CHRISTINE PERSAUD

Page 79

1    A.    No.  The --

2    Q.    -- because it would cost too much?

3    A.    I didn't tell him that.  I told him I don't want every

4    e-mail to be or every communication to be filtered through

5    Troutman Sanders, that it will cost too much.

6    Q.    Mr. Klein, I'd like you to take a look at what has been

7    marked by your counsel as Klein Exhibit 25.

8         (Pause)

9    Q.    Do you see that e-mail?

10   A.    Yes.

11   Q.    Who is it to and who is it from?

12   A.    Edward Epstein.  And it was from myself.

13   Q.    And could you read that for me?

14   A.    "Edward, I think that is a good idea" -- just the top

15   part?

16   Q.    Go ahead.  Yes.  That's just -- just the top part.

17   A.    "I think that is a good idea that you set it up with them

18   but I don't think it is beneficial to filter all back and forth

19   through you as it would ring up unnecessary legal fees."

20   Q.    And did Mr. Epstein agree that that was a reasonable

21   approach?

22   A.    Yes.

23   Q.    And Ms. Cassirer agreed that that would be a reasonable

24   approach?

25   A.    Yes.

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 80 of 116 PageID #: 512
CHRISTINE PERSAUD

Page 80

```
 1   Q.   And so, as of August 5, the sum total of Troutman Sanders'
 2   work on the project was supposed to be setting up a
 3   communication between Knight Frank and your side, is that
 4   correct?
 5   A.   No.
 6   Q.   Was there anything else that Troutman Sanders was asked to
 7   do, as of April 5, 2008, that it had not done?
 8   A.   Say that again.
 9   Q.   As of August (sic) 5, 2008, was there anything that
10   Troutman Sanders was asked to do, other than set up the
11   communications between Knight Frank and your side?
12   A.   We relied on Troutman Sanders to --
13   Q.   Could you please answer the question?  Was there anything
14   that they were asked to do --
15        MR. KRINSKY:  Opposing counsel has asked a question.
16        THE COURT:  Let's have a complete question and if you
17   view it as objectionable you can interpose your objection.
18   Please state the question again.
19   Q.   As of August 5, 2008 was there anything that Troutman
20   Sanders was asked to do, other than set up the communication
21   with the Knight Frank firm?
22   A.   That was the only thing they were going to do that day.
23        (Pause)
24   Q.   You had testified concerning Klein Exhibit 19, which was
25   an e-mail from Edward Epstein.  Could you please take a look at
```

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 81 of 116 PageID #: 513
CHRISTINE PERSAUD

Page 81

1    that?  Mr. Klein, do you have Klein Exhibit 19 open?

2    A.    Yes.

3    Q.    This is the e-mail that Mr. Epstein sent to Abraham and

4    yourself.  Was there any information or pro -- sorry.  Was

5    there any proposal in this e-mail concerning work that Troutman

6    Sanders might do with respect to obtaining funding for your

7    side's participation in the project?

8    A.    Yes.

9    Q.    And could you point that to me, please?

10    A.    The second paragraph, Real Estate M&A and financing are

11    key areas of our practice in Shanghai.

12    Q.    So Mr. Epstein attached a brochure with regard to the

13    firm's expertise, including real estate M&A and financing.  Let

14    me just quote it so we're clear.  It says, "Real estate, M&A

15    and financing are key areas of our practice in Shanghai.  I

16    have attached a brochure which sets out our capability in this

17    area and representative transactions".

18          Is that the statement which related to raising funds?

19    A.    Yes.

20    Q.    Is there anything else in this e-mail?

21    A.    If there's anything else in the e-mail?

22    Q.    Yes.

23    A.    Relating to?

24    Q.    Troutman Sanders providing services with regard to raising

25    funds for the project.

1    A.   It's not mentioned again.

2    Q.   I'd like you to also referred to as what's been entered as

3    Klein Exhibit 30.  Do you have that in front of you?

4         THE COURT:  The notes are not clear as to whether

5    Exhibit 30, which was referenced, was offered in evidence.  So

6    I -- let me ask Mr. Krinsky so that I can make an accurate

7    note, of course the transcript will speak for itself.  Was this

8    document offered in evidence?

9         MR. KRINSKY:  It was not, Your Honor.

10   Q.   Do you recognize this e-mail, Mr. Klein?

11   A.   Yes.

12   Q.   And you were copied on the e-mail?

13   A.   Yes.

14   Q.   I note that it says, in part, "If all turns out to be

15   correct, we will invest the required funds of RMB forty million

16   in twelve weeks".  Is there anything in this e-mail that

17   indicates where those funds will come from?

18        MR. KRINSKY:  Objection.  Document is not in evidence.

19        THE COURT:  Would you like to offer the document to

20   eliminate --

21        MR. STREMBA:  Your Honor, I would like -- I will offer

22   the document in evidence.

23        THE COURT:  Any objection?  It's your exhibit.

24        MR. KRINSKY:  No objection other than the standing

25   objection as our consent does not waive confidentiality.

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 83 of 116 PageID #: 515
CHRISTINE PERSAUD

Page 83

1          THE COURT:  Now there is an attachment, is this

2     correctly attached?  I have three pages in my Exhibit 30.  I

3     have a reference in the e-mail doc4.dotx, so it seems that it's

4     intended to be a complete document, is that right?

5          MR. KRINSKY:  That is correct, Your Honor.

6          THE COURT:  Okay.  Thank you.  And without objection,

7     it'll be received.

8     (Klein Exhibit 30, e-mail from Abraham Klein to Edward Epstein

9     cc'ing Hershel Klein dated 11/11/08, was hereby received into

10    evidence as of this date.)

11    Q.   Mr. Klein, is there any indication in this e-mail,

12    including the attachment, as to where the funds will come from

13    to make this forty million RMB investment?

14    A.   Yes.

15    Q.   Where is that?

16    A.   In the attachment, line 28.

17    Q.   Yes.  Could you read that?

18    A.   I mean line 27.

19    Q.   Yes.

20    A.   It mentioned GRV will provide forty percent of the

21    projected capital investment of RMB forty million.  GRV, at

22    that point, was a -- in the process of arranging some sort of

23    an agreement with Caring to get at least part of the funds

24    needed for this project.

25    Q.   What knowledge did you have, as of November 11, 2008,

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 84 of 116 PageID #: 516
CHRISTINE PERSAUD

Page 84

1    concerning a proposed arrangement with Caring?

2    A.    Whatever Abraham told me.

3    Q.    Is Caring mentioned in this e-mail or attachment, Mr.

4    Klein?

5    A.    No.

6    Q.    Was Troutman Sanders asked to perform any services in

7    connection with any proposed financing arrangement with Caring?

8    A.    The exact details of the legal structure of how things

9    will be structured was up to Troutman Sanders.  We gave them

10   the pieces of information where we thought the money would be

11   coming from that was available to us -- the information that

12   was available to us as the information came in.

13        This particular thing of GRV dealing with Caring and

14   setting up some sort of an agreement to secure some sort of

15   funds was part of the discussions.  Exactly how the legal

16   structure will be set up to do that, that was really something

17   we looked out for Troutman Sanders to do for us.

18   Q.    Was there another law firm representing GRV or you or your

19   brother to obtain financing from Caring?

20   A.    I was not involved in that part.

21   Q.    Okay.  Mr. Klein, do you have a position with GRV?

22   A.    No.

23   Q.    Did you have a position with GRV in December of 2008?

24   A.    No.

25   Q.    Did you have any equity interest in GRV in 2008?

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 85 of 116 PageID #: 517
CHRISTINE PERSAUD

Page 85

1    A.   Depending on how the final structure of this particular

2    project will be and how things will fall out and depending what

3    my particular equity would be in this project, that would

4    determine what my equity would be in any legal structure that

5    will finally be set up by Troutman & Sanders for this project.

6    Q.   When GRV was formed in July of 2008, was Abraham Klein the

7    sole member of that entity?

8    A.   Yes.

9    Q.   And is Mr. Klein still the sole member of that entity?

10   A.   I assume so.

11   Q.   I take it, though, that you do not have an equity interest

12   in that entity?

13   A.   Correct.

14   Q.   Do you know whether GRV conducts any business today?

15   A.   No.

16   Q.   You don't know or it doesn't?

17   A.   I don't know what Abraham does with GRV today.

18   Q.   You testified that at the end of December 2008 the

19   developer advised your side that the developer was putting the

20   matter on hold because of the downturn in the real estate

21   market, is that correct?

22   A.   Yes.

23   Q.   Do you have any -- have you followed the real estate

24   market in China since December of 2008 to see whether it's been

25   going up or down?

1    A.    Yes.

2    Q.    And how did it go in 2009 and 2010?

3    A.    We had several discussions with the developer since

4    December of 2008.  First he said he was going to put the

5    project on hold for a couple of months.  We contacted him after

6    a couple of months.  He said he thinks it's still not the right

7    time.  And we had several conversations after that up until

8    recently, like two, three months ago.

9    Q.    The question I asked was whether you tried to follow the

10    real estate market in China during 2009 and 2010.

11    A.    Yes, through this developer.  He was updating us on the

12    real estate market in China.

13    Q.    And during 2011, have you continued to be in communication

14    with the developer?

15    A.    As I mentioned before, we followed up with the developer

16    as recently as a couple of months ago.

17    Q.    And has the developer actually acquired the land that was

18    going to be developed as part of this project?

19    A.    He had an agreement with the city that secured the land

20    for him.  I'm not exactly sure on the details of the

21    securement, that was something we looked out for Troutman

22    Sanders to advise us on and that was part of the discussions we

23    had with Troutman & Sanders.  But the developer did send us a

24    document in Chinese, that was the document that they acquired

25    the land for this development.

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 87 of 116 PageID #: 519
CHRISTINE PERSAUD

Page 87

1    Q.    Have you -- when did you receive that document?

2    A.    Part of the initial documents we received from the

3    developer was a document that they gave us in Chinese, which

4    was supposed to be the agreement that he has with the city on

5    acquiring the land.

6    Q.    I understand.  And when was the last time you communicated

7    with the developer?

8    A.    Abraham communicated with the developer -- Abraham told me

9    he communicated with the developer two, three months ago.

10   Q.    Did you advise Troutman Sanders of any of the

11   communications you've had with the developer over the last few

12   years, since December of 2008?

13   A.    No.

14   Q.    To your knowledge, has GVR (sic) invested in any real

15   estate in China since 2008?

16   A.    GVR?

17   Q.    GRV.

18   A.    Actually invested?

19   Q.    Yes.

20   A.    No, not to my knowledge.

21   Q.    To your knowledge, has Flexo Craft invested in real estate

22   in China since 2008?

23   A.    No.

24   Q.    To your knowledge, has the -- has Lazar -- I'm sorry.  I

25   forgot.  Laser's full name is --

1    A.    Laser Master International.

2    Q.    Has Laser Master International invested in real estate in

3    China since 2008?

4    A.    No.  Let me rephrase that.  There are certain agreements

5    that Laser Master has with certain factories on securing

6    certain spaces and joint ventures and producing product.  So

7    maybe part of that there is some real estate.

8    Q.    What type of product is that?

9    A.    Gift wrap, gift packaging.

10         MR. STREMBA:  Your Honor, if I might just take two or

11   three minutes to look through my notes.

12         THE COURT:  You may confer and consult your notes.

13        (Pause)

14         THE COURT:  Are you ready to proceed?

15         MR. STREMBA:  Yes, Your Honor.

16         THE COURT:  Let's proceed.

17         MR. STREMBA:  Just two or three.

18         THE COURT:  I'll wait.

19   Q.    Mr. Klein, I had asked you whether you had provided any

20   personal financial statements to Troutman Sanders but I didn't

21   proceed to ask you whether your or Abraham provided any

22   financial statements of GRV to Troutman.

23   A.    Yeah.  There was no formal financial statements but based

24   on the setup of whatever Abraham was doing between GRV and

25   Caring there were certain financial figures coming out of that

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 89 of 116 PageID #: 521
CHRISTINE PERSAUD

Page 89

1    transaction that was provide Troutman

2    Q.    In other words, you told Troutman when money would b

3    available for the investment in China?

4    A.    Part of what we told them, amongst other things.

5    Q.    Did you or Abraham provide any financial statements of

6    Caring to Troutman?

7    A.    Again, I'm not -- I didn't provide any financial

8    statements from Caring.  However, gave financial pieces of

9    information of funds that were projected to come from Caring

10   into GRV for this particular project with certain timelines.

11   Q.    Did you give any explanation of how funds would come from

12   Caring to the -- to whoever was to make the investment in

13   China, that is whether it was pursuant to a contract or some

14   other mechanism?

15   A.    Yes.

16   Q.    What did you tell them?

17           MR. KRINSKY:  Objection.

18           THE COURT:  Grounds.

19           MR. KRINSKY:  Calls for the revealing of confidential

20   information.

21           MR. STREMBA:  Your Honor, I think the witness can say

22   whether there was a contract or some other arrangement without

23   disclosing details.  But frankly, if there was a contract

24   between Caring and GRV, for example, it wouldn't be a

25   confidential matter.

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 90 of 116 PageID #: 522
CHRISTINE PERSAUD

Page 90

 1          MR. KRINSKY:  Your Honor, the question --

 2          MR. STREMBA:  Let's -- we can avoid the detail.

 3     Q.   If you can just tell me whether there was some disclosure

 4     of the mechanism whereby Caring would provide funding to

 5     whoever would participate in this China investment.

 6     A.   Yes.

 7     Q.   And what was that?  What was the mechanism?

 8     A.   Some sort of factoring agreement between GRV and Caring.

 9     Q.   Was this an agreement that was in existence?

10     A.   It was in the process of being negotiated between Caring

11     and Abe, GRV.

12     Q.   Was there an attorney representing Abe or GRV in

13     connection with that proposed transaction?

14     A.   Yes.

15     Q.   And what --

16     A.   I was not part of it.

17     Q.   What's your understanding?

18     A.   Yes.

19     Q.   What attorney?

20     A.   I don't know.

21     Q.   And do you know whether such a factoring agreement was

22     ever entered into?

23     A.   I don't know.

24          MR. STREMBA:  Your Honor, I have no more questions.

25          THE COURT:  Redirect?

1        MR. KRINSKY:  Thank you, Your Honor.

2    (Pause)

3        MR. KRINSKY:  May I proceed, Your Honor?

4        THE COURT:  Please.

5  REDIRECT EXAMINATION

6  BY MR. KRINSKY:

7  Q.   Mr. Klein, do you recall opposing counsel asked you

8  several questions regarding a November 24th, 2008 retainer

9  agreement that Troutman Sanders had sent you?

10 A.   Yes.

11 Q.   Specifically referring your attention to Trustee Exhibit

12 A, in the smaller binder book.  If you would open that please,

13 refer to Exhibit A.

14 A.   Okay.

15 Q.   All right.  First of all, when did you first receive this

16 document?

17 A.   Mid to end November, 2008.  November 24.

18 Q.   2008?

19 A.   Correct.

20 Q.   By that point in time, on November -- by November 24th,

21 2008 had Troutman Sanders performed any legal work on behalf of

22 either yourself, Abraham Klein or in connection with the China

23 project?

24 A.   Yes.

25 Q.   To your knowledge, approximately how much work had been

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 92 of 116 PageID #: 524
CHRISTINE PERSAUD

Page 92

1    done?  If you know.

2    A.    You mean in hours?

3    Q.    Well, based upon the preliminary work that Troutman

4    Sanders had agreed to do, by November 24th do you know

5    approximately -- if you could quantify it in percentage, what

6    percentage of work had been done by that point?

7    A.    About fifty percent.

8    Q.    And prior to November 11th, the first time GRV had ever

9    been mentioned, had Troutman Sanders performed any legal work

10   on behalf of you, your brother or in connection with the China

11   project?

12   A.    Yes.

13   Q.    At the time that you received this November 24th, 2008

14   retainer agreement, did Troutman Sanders, anybody from Troutman

15   Sanders, talk to you about limitations as to who they were

16   representing?

17   A.    No.

18   Q.    No.

19   Q.    Who actually forwarded the retainer agreement on November

20   24th, when you received it?  Who forwarded it to you?  I

21   apologize.

22   A.    Abe.

23   Q.    Okay.  And you signed it, is that right?

24   A.    Yes.

25   Q.    At the time you signed it; did you have any conversations

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 93 of 116 PageID #: 525
CHRISTINE PERSAUD

Page 93

1    with Mr. Epstein or anybody else about limiting the rule of who

2    it is that Troutman Sanders was going to represent?

3    A.    No.   The conversations were actually that Troutman Sanders

4    were going to be the ones to set up whatever legal structures

5    they need to do for us.

6    Q.    And when you say legal structures or whatever needed to be

7    done for you, was that based upon your understanding and prior

8    communications that you had had with Troutman Sanders with

9    respect to what you wanted done?

10   A.    Yes.

11   Q.    Referring your attention to Exhibit 15, specifically 15,

12   Klein Exhibit 15 which is already in evidence.   Referring to

13   the second page of the document --

14            THE COURT:   I'm sorry.   Just to be clear, this is the

15   e-mail string that says Abe Klein at the top and begins with an

16   e-mail from Ms. Cassirer dated July 30th, 2008, 9:40 p.m.

17            MR. KRINSKY:   Yes, it is, Your Honor.

18            THE COURT:   Do you know, was that offered today?

19            MR. KRINSKY:   I believe -- number 15.

20            THE COURT:   I have not indicated that that was

21   received in evidence.   I don't anticipate any issues.   I have

22   no reason to anticipate issues but you indicated it was part of

23   the evidence.

24            MR. KRINSKY:   Your Honor, I offer it into evidence.

25            THE COURT:   And for the sake of clarity, this is a

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 94 of 116 PageID #: 526
CHRISTINE PERSAUD

Page 94

1   three-page e-mail string numbered 1, 2 and 3?

2          MR. KRINSKY:  Yes it is, Your Honor.

3          THE COURT:  All right.  Any objection?

4          MR. STREMBA:  No objection.

5          THE COURT:  All right.  It's received in evidence

6   without objection.

7   (Klein's Exhibit 15, three-page e-mail string from Aurora

8   Cassirer to Abraham Klein cc'ing Edward Epstein dated 7/30/08,

9   was hereby received into evidence as of this date.)

10         THE COURT:  Please proceed.

11  Q.   Please look at this document briefly, specifically page 2,

12  and then look up when you are done.

13      Mr. Klein, as early as July 30th, during your initial

14  conversations with the Troutman Sanders firm, was there ever an

15  expression by you or your brother as to investing in the need

16  for assistance from Troutman Sanders with respect to setting up

17  legal structure and the financing of this China project?

18  A.   Yes.

19         MR. STREMBA:  Leading the witness, Your Honor.

20         THE COURT:  I'm sorry.  Could you repeat that?

21         MR. STREMBA:  He's leading the witness, Your Honor.

22         THE COURT:  Could you restate that question?

23         MR. KRINSKY:  I'll try and do it exactly.

24  Q.   Was there -- was there ever an indication from Troutman

25  Sanders or was there ever an indication from you to Troutman

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 95 of 116 PageID #: 527
CHRISTINE PERSAUD

Page 95

```
 1   Sanders about the financing of the China deal and the need for

 2   Troutman Sanders to assist you in setting up the legal

 3   structure with respect to that deal?

 4            MR. STREMBA:  Your Honor, I object.  The question is

 5   compound and confusing.

 6            THE COURT:  You need to pull that microphone.  The

 7   problem is the exhibit binders and the microphone.

 8            MR. STREMBA:  Your Honor, I object.  The question

 9   conflated the issue of financing and structure and was

10   therefore improper.

11            THE COURT:  I'm going to sustain the objection and ask

12   you to rephrase the question.

13            MR. KRINSKY:  Sure.

14            THE COURT:  It's most helpful to have the testimony

15   come in response to questions from counsel.

16   BY MR. KRINSKY:

17   Q.   Did you ever communicate to Troutman Sanders, in July

18   2008, that there's going to be a need for assistance with

19   respect to setting up a legal structure for the project in

20   China?

21   A.   Yes.

22   Q.   Specifically looking at Klein Exhibit 15, page 2, where,

23   if any, does it indicate that that was assistance that you

24   needed from Troutman Sanders?

25   A.   It's in the last line of the e-mail, "Last but not least
```

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 96 of 116 PageID #: 528
CHRISTINE PERSAUD

Page 96

1    we will need the legal structure to be set up in a way that it

2    will work and have everybody protected".

3    Q.    Did you also indicate to Troutman Sanders, in July of

4    2008, that you were going to be investing in the China project?

5    A.    Yes.

6    Q.    And where specifically, if at all, in the July 30th, 2008

7    e-mail does it indicate that?

8    A.    It says, Mr. Zhang is looking for us to invest forty

9    percent.

10   Q.    And when it states us, first of all are you the author of

11   this e-mail?

12   A.    Yes.

13   Q.    So when you said us, what were you referring to?

14   A.    Abe, myself and wherever we will get the funds that we

15   will need to raise for this project, in addition to what Abe

16   already had.

17   Q.    Subsequent to sending this e-mail, you mentioned before

18   that there was a July 30th, 2008 telephone call conference with

19   Mr. Epstein, Ms. Cassirer, yourself and your brother, do you

20   recall that?

21   A.    Yes.

22   Q.    In that conversation or in that telephone conference, did

23   you have discussions regarding, first of all, who the us was

24   and what the investment would be from your side?

25   A.    Well, in addition to this e-mail there was an attachment

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 97 of 116 PageID #: 529
CHRISTINE PERSAUD

Page 97

1    and the attachment said Klein will invest forty percent.  And

2    we discussed the possible avenues of how the funds will come

3    in, through what we already actually had and what we were

4    thinking to raise, either through our public company or other

5    ways.

6    Q.   In addition, you state in that e-mail "We need the legal

7    structure to be set up in a way that it will work and have

8    everybody protected".  When you stated everybody protected,

9    what did you mean?

10   A.   Everybody from our side that will eventually end up being

11   partners for this project and however Troutman Sanders will set

12   it up, investors specifically.

13   Q.   And when you talk about how it will be set up, do you

14   recall being asked certain questions on cross examination

15   regarding Caring and certain financial documents?

16   A.   I'm sorry; say that again.

17   Q.   Sure.  Do you recall being asked certain questions as to

18   whether or not you produced certain financial documents to

19   Troutman Sanders concerning Caring?

20   A.   Yes.

21   Q.   And also do you remember or recall being asked certain

22   questions regarding producing certain GRV financial related

23   documents?

24   A.   Yes.

25   Q.   At the time at which this deal was being considered, was

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 98 of 116 PageID #: 530
CHRISTINE PERSAUD

Page 98

1  there any definitive decision made as to where the actual money

2  was going to be coming from?

3  A.   No.

4  Q.   Was that an issue that was going to be addressed in the

5  first stage or the second stage of the deal?

6  A.   It was something that was discussed all along.

7  Q.   And ultimately, if the deal was going to go forward, when

8  would the particulars have been dealt with, in the first stage

9  or the second stage or both?

10  A.   It was all along but the final would be as you get closer

11  to putting the project together.

12  Q.   In discussing with Mr. Epstein, in particular, his

13  questions concerning how the deal would be financed, do you

14  know, sitting here today --

15       MR. KRINSKY:  Withdrawn.

16  Q.   In having the discussions in July and November with Mr.

17  Epstein regarding how the deal would be financed, do you know

18  why he was asking you those questions?

19       MR. STREMBA:  Objection, Your Honor.

20       THE COURT:  It does seem to call for whether -- for

21  what this witness knows about why someone else did something.

22  It's -- it's infrequently the subject of accurate factual

23  testimony.  But if you know why you can answer.

24       MR. KRINSKY:  And I'll rephrase it, actually.

25  Q.   Did Mr. Epstein, in discussing the financing of the

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 99 of 116 PageID #: 531
CHRISTINE PERSAUD

Page 99

1    project, did he ever explain why he was asking about the

2    sources of money and how the deal would be structured?

3    A.    Well, there were several reasons that was obvious when the

4    questions were asked.  Originally, when I spoke to Aurora, she

5    asked very rough numbers on the project and asked what we'll

6    need from them and if we actually have the funds to do the

7    project, when the discussions came up what we can do, can't do

8    and what Troutman Sanders can actually do to offer additional.

9         When the discussions came up as to what work they will

10   need to do and that they will need to set up the legal

11   structure, in those discussions they always asked what do we

12   anticipate where would the money be coming from and how the

13   legal structure will need to work.  Or we would tell them that

14   we anticipate doing this, this and that and therefore creating

15   the quote accordingly outlining what we think we need to do in

16   order to raise the money.

17   Q.    Referring your attention Klein Exhibit 25, that has

18   already been admitted into evidence -- it's in your binder.

19   Opposing counsel asked you certain questions regarding limiting

20   the work that Troutman Sanders was going to be doing.  First,

21   about the time that this e-mail was sent by you to Edward

22   Epstein, did Mr. Epstein ever express to you, one way or the

23   other, limitations on what the Troutman Sanders firm could or

24   could not do with respect to providing you with legal services?

25   A.    They never said what they cannot do.  What they did say is

Page 100

1    that they think we should hire a firm to do the feasibility

2    part of the project.  But on the legal side they never

3    mentioned anything they cannot do.

4    Q.   Okay.  And at the time that this e-mail was sent to you,

5    did you understand that Mr. Epstein would have some involvement

6    now but that he would essentially pick up the project once

7    Knight Frank did their work?

8    A.   Correct.

9    Q.   And did that actually happen?

10   A.   Yes.

11   Q.   And to your knowledge, did Mr. Epstein liaise with Knight

12   Frank in marshalling through the information that you gave to

13   Mr. Epstein and pass that information to Knight Frank?

14   A.   Yes, they did.

15   Q.   And was that the confidential information that you were

16   referring to before, that you had disclosed during certain

17   discussions on July 30th, 2008 in other communications?

18   A.   Part of that information.  Part of that confidential

19   information.

20   Q.   Okay.  Referring your attention back to Exhibit A, the

21   retainer statement, if you would please, who is that retainer

22   agreement directed to?

23   A.   Abraham Klein.

24   Q.   And who is it actually addressed to?  It says "Dear" who?

25   A.   Dear Abe.

1    Q.    Okay.  And did you have a chance to actually review this

2    document before today?

3    A.    Yes.

4    Q.    Okay.  Can you please point out where, if anywhere, in the

5    document it states that the work done prior to this retainer

6    agreement is somehow no longer confidential?

7    A.    It doesn't mention that.  When --

8    Q.    I'm sorry.  Please continue.

9    A.    When I originally contacted Aurora I asked her if the

10   information that I would give her will be confidential because

11   it was so important to us that everything stays confidential.

12   And she assured me that all information that I give her stays

13   confidential without any limitations.

14   Q.    Specifically referring your attention to page 4 of the

15   agreement, there's a paragraph titled "Conflict Provisions".

16   Do you see that?

17   A.    Yes.

18   Q.    Referring to paragraph 2, "As we have discussed," first of

19   all, do you know who the word "we" is referring to?

20   A.    It's Troutman Sanders and Abe.

21           MR. STREMBA:  Your Honor, the entire document is in

22   evidence.  Is there any purpose of belaboring this by reading

23   each sentence?

24           THE COURT:  It is in evidence and it is not addressed

25   to this witness, though it is signed by him on behalf of the

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 102 of 116 PageID #: 534
CHRISTINE PERSAUD

Page 102

1    entity.

2            MR. KRINSKY:  And opposing counsel specifically asked

3    the question have you read it and is attempting to hold Abraham

4    Klein responsible for Hershel Klein having signed the document.

5            I only have a couple very brief questions.

6            THE COURT:  See if we can move this -- and I'm not

7    going to constrain you.  It's a central document.  It is a

8    retention agreement that I've spent a fair amount of time

9    looking at.  I'm sure the parties have too.  I note the issues

10   identified.  Please proceed with your question.  If that was an

11   objection, it's overruled.

12   Q.   There's a statement that says, "As we have discussed,

13   neither you nor this firm is aware of any actual conflict of

14   interest in our representing the target at this time."  Did I

15   read that correctly?

16   A.   Yes.

17   Q.   Who's the target?

18   A.   The target was going to be whatever legal structure we

19   believed Troutman Sanders will set up at the end of the day.

20   It was Abe, myself or the investors, whoever will be a part of

21   this.

22   Q.   And that -- your understanding, what is that based upon?

23   A.   Based on my initial contacts and conversations with

24   Troutman Sanders, Aurora.

25   Q.   Referring your attention to page 5, second complete

Page 103

1    paragraph.  "For the purposes of determining whether a conflict

2    of interest exists, it is only GRV we will represent and not

3    other entities in your corporate family, stockholders,

4    officers, directors, employers or agents ('affiliates')."  Did

5    I read that correctly?

6    A.    Yes.

7    Q.    First of all, GRV, what is the structure of the company?

8    A.    It's a single-member LLC with Abraham being the single

9    member.

10   Q.    Are there any stockholders or directors or employees or

11   agents?

12   A.    No.

13   Q.    The next statement says, "You have agreed that you will

14   not give us confidential information regarding your

15   affiliates."  Did I read that correctly?

16   A.    Yes.

17   Q.    Mr. Klein, before you received this November 24th

18   document, did you disclose confidential information to the

19   Troutman Sanders firm regarding this deal?

20   A.    Yes, a whole bunch of it.

21   Q.    Did the Troutman Sanders firm ever call you up -- ever

22   call you up and say, by the way, because of this agreement,

23   everything else that you've told us is no longer confidential?

24   A.    They never said that to me.

25         MR. KRINSKY:  Your Honor, I have no further questions.

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 104 of 116 PageID #: 536
CHRISTINE PERSAUD

Page 104

 1           THE COURT:  Any recross?  Would you like a moment?

 2           MR. STREMBA:  Yes, Your Honor.

 3      (Pause)

 4           MR. STREMBA:  No more questions, Your Honor.

 5           THE COURT:  All right.  Thank you.  In the absence of

 6  further questions, you are excused.  Do you have a next

 7  witness?

 8           MR. KRINSKY:  We do, Your Honor.  Just one small

 9  housekeeping matter because Professor Green is here and I was

10  just wondering what -- if I may ask, what the Court's

11  anticipated schedule is so that -- because Professor --

12           THE COURT:  As soon as this other matter is ready to

13  take up, we'll need to do so.  It seems to me I'm being advised

14  it's a question of minutes.  Of course everything's a question

15  of minutes; we'll follow up on that.

16           I have my own housekeeping question, as I've been

17  trying to keep up with the filings and study those matters that

18  you've put before me.  I did note what may be a typographical

19  error.  If it is, I invite you to say so on the record; if it

20  is not, I await the testimony.

21           At paragraph 21 of Professor Green's affidavit, it

22  states, "Troutman Sanders provided further assistance in

23  connection with a letter of intent through late December 2011."

24           MR. KRINSKY:  I'm sorry, Your Honor.  I --

25           THE COURT:  "Troutman Sanders provided further

Case 1-10-44815-ess   Doc 244   Filed 09/22/11   Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 105 of 116 PageID #: 537
CHRISTINE PERSAUD

Page 105

1    assistance in connection with the letter of intent through late

2    December 2011."  Following references to 2008, the documents

3    consistently refer to a time period bounded at its outer

4    extreme by the end of 2008.

5            MR. KRINSKY:  Your Honor, it's indeed a typographical

6    error.

7            THE COURT:  That certainly simplifies my assessment of

8    the record, looking for those additional years of contact that

9    seemed not to be reflected elsewhere.  All right.  Ms. Jackson,

10   are we able to proceed in a few minutes?  We're doing our best

11   to -- we do have two more witnesses, isn't that right?

12           MR. KRINSKY:  It is, Your Honor.  I was just speaking

13   with Mr. Stremba regarding timing.  And just for purposes -- I

14   know that Professor Green is due to the city bar tonight, I

15   believe, to teach.  And so, does Your Honor anticipate that we

16   will have time to take him as a witness?  He was slated to go

17   number three after the fact witnesses.  And after speaking with

18   Mr. Stremba, we suspect, I think, that the same time frame will

19   be needed for Abraham Klein as was needed for Hershel Klein.

20   And if we don't --

21           THE COURT:  So that's a couple of hours.  It seems

22   unlikely that we would get to Professor Green.  I have to say,

23   it seems unlikely that we'll finish the testimony of Mr.

24   Abraham Klein.  And it is my earnest hope to start that

25   testimony and I can't even guarantee that in view of the time

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG    Document 1-25    Filed 07/05/12    Page 106 of 116 PageID #: 538
CHRISTINE PERSAUD

Page 106

1    of day and the other matters on the calendar.

2          So let's do this.  I understand we may be very, very

3    close.  I'm going to suggest that we take just a couple minutes

4    break to let the appropriate conferences take place among my

5    courtroom deputy and the various counsel to see if we are in

6    fact ready to proceed -- ready to proceed in 8710 now or very

7    soon?

8          UNIDENTIFIED SPEAKER:  Yes, Your Honor.  We are ready

9    to go.

10          THE COURT:  Ready to proceed.  All right.  So we're

11    going to take a brief pause in this matter, appropriately

12    between witnesses, and we'll move to the confirmation hearing

13    in 8710.  We'll be back in just a few moments to take that up.

14    Thank you very much.

15          THE CLERK:  All rise.

16       (Recess from 4:50 p.m. until 6:18 p.m.)

17          THE COURT:  All right.  Second call in the Persaud

18    matters.  Thank you for your gracious accommodation of my long

19    calendar today.  Please be seated.  Let me navigate back to

20    your matters, one of the many files here on my bench.

21          All right.  I'd like to hear from the parties as to

22    how you propose to proceed.  I may have some time tomorrow,

23    depending on how long our morning hearing is and in the

24    afternoon.  For certain, I would have some time -- I have other

25    matters that are quite active these days, as no doubt you can

Case 1-10-44815-ess    Doc 244    Filed 09/22/11    Entered 09/22/11 16:06:23
Case 1:12-cv-03337-JG   Document 1-25   Filed 07/05/12   Page 107 of 116 PageID #: 539
CHRISTINE PERSAUD

Page 107

1    tell from the activity in the courtroom and sidebar.

2            I'd like to hear, I guess, from objector's counsel.

3    It's your turn; you're presenting your witnesses.  I've

4    reviewed a lot of things to get ready to resume again today, as

5    you could tell by the question I had about the affidavit from

6    Professor Green, although that was something I had noted

7    before.  I was mindful of both the big issues and the

8    practicalities.  I remain concerned that an enormous amount of

9    time and effort is being spent by the parties on an enormously

10   important issue, which is the prerogative of a trustee to

11   retain counsel of trustee's choice and the prerogative of the

12   client because there was a client here.  There is no doubt,

13   there's a dispute as to who it was.  There may or may not be a

14   dispute as to whether he's present or former.  There's a

15   dispute as to whether substantially related but there was a

16   client.

17           There are a lot of ways to proceed.  We have testimony

18   that we need to resume, I think.  But starting a new witness at

19   this point -- Mr. Klein, I have the greatest respect for your

20   time and your attention here.  And you've been here now two

21   days to watch others testify but in a matter that's very

22   important to you and I appreciate that.  So shall we resume --

23   how do you propose to proceed?  Let me hear from counsel.

24           MR. KRINSKY:  Your Honor, although there are certain

25   things that Mr. Stremba and I certainly disagree on, this is

Page 108

1    certainly, I think, one that we both do agree on, that if it

2    were okay with the Court, we would like to resume or begin Mr.

3    Klein's testimony on a day other than right now.  I think, just

4    from a time standpoint, to try and do it perhaps all at once,

5    Mr. Stremba -- and again, we debate many things but this one

6    we're hopeful that Your Honor will agree with us on that

7    perhaps it makes sense for us to come back.

8              In terms of schedules, Mr. Stremba and I didn't have a

9    chance to talk about additional days and whatever Your Honor is

10   going to propose.  I will only speak for myself.  I am

11   available and I will make sure that Mr. Klein is available

12   tomorrow.  But I also know that other people have other

13   schedules and I don't want to suggest --

14             THE COURT:  We have a lot of schedules in play here.

15   All right.  It sounds like it would be the consensus of the

16   parties that starting more testimony at this point is not a

17   good use of time and that's fine with me.  We could see if we

18   can get the direct in, something like that.  But -- and you've

19   been efficient in your questioning and I admire and respect

20   that.

21             One possibility for me would be tomorrow afternoon or

22   tomorrow morning, if you want to come back that soon.  Another

23   possibility, and this is something I've haven't thought about

24   until this moment, is whether there's any way through this

25   thicket that would be more productive.  I have a very limited

CHRISTINE PERSAUD

1    ability to conference the issues with the parties but we have

2    a -- we do have a panel of neutrals, generally referred to as

3    mediators.  But I'm thinking there's a lot of different ways in

4    which mediation takes place, at least some of whom have

5    significant experience in large firm practice and dealing with

6    the kinds of complex conflicts issues and complex matters that

7    come up from time to time, as anyone who practices in that

8    setting or with lawyers who practice in that setting as

9    clients -- and I think I've now covered the universe of counsel

10   in the room.  Do you think anything like that would have any

11   prospect of being useful here?  To have somebody else who can

12   function as a neutral different than I, not to decide, of

13   course, but to try to come up with some way to proceed among

14   the parties in mediation or telephonic consultation or other

15   kind of process?  I'm just -- because I know the panel fairly

16   well because I have a role in approving the new members here

17   for our court.

18            You know, I rule nothing out when it comes to problem

19   solving techniques and that's -- I'll do whatever I can within

20   the boundaries of my job, my jurisdiction, the Code, the rules

21   and our local rules to make progress here, including -- I see

22   Mr. Pereira's left but including to help facilitate the

23   productive administration of a Chapter 7 case.

24            MR. STREMBA:  Your Honor --

25            THE COURT:  Any chance something like that could be

Page 110

1    useful?  I'm happy to conference on the administrative side off

2    the record if that makes sense and we can also talk about

3    scheduling off the record.  Does that make sense?

4              MR. STREMBA:  Your Honor, I think we're about half way

5    to the finish line here.

6              THE COURT:  Usually a good place to think about these

7    things.

8              MR. STREMBA:  Yeah.  I just -- it just seems to me

9    that initiating a new process with an uninitiated mediator

10   would just slow us down.

11             THE COURT:  Slow you down.  It's possible.

12             MR. STREMBA:  I think so.

13             THE COURT:  All right.  Let's talk about scheduling

14   because it's sometimes best to do this off the record so you

15   can all compare notes on this and that date and time.  Let's go

16   off the record and work on it.

17             MR. STREMBA:  I think we're flexible about the time.

18   I think the question is when Your Honor could string together

19   probably about three hours.

20        (Off the record)

21        (Whereupon these proceedings were concluded at 6:24 p.m.)

22

23

24

25

1

2                          I N D E X

3

4                     T E S T I M O N Y

5

6    WITNESS                EXAM BY              PAGE    LINE

7    Hershel Klein          Mr. Krinsky           16     13

8    Hershel Klein          Mr. Stremba           58     13

9    Hershel Klein          Mr. Krinsky           90      7

10

11

12                     E X H I B I T S

13

14   KLEIN      DESCRIPTION                  ID.     EVID.

15   9          E-mail sent by Ms. Cassirer to         21

16              Hershel Klein dated 7/30/08 at

17              6:56 p.m.

18   19         E-mail from Edward Epstein to          32

19              Abraham Klein cc'ing Hershel Klein

20              dated 8/1/08

21   24         E-mail from Edward Epstein to          35

22              Abraham Klein cc'ing Aurora Cassirer

23              and Hershel Klein dated 8/5/08

24

25

```
 1

 2                     I N D E X, cont'd

 3

 4                      E X H I B I T S

 5

 6    KLEIN         DESCRIPTION                    ID.      EVID.

 7    111           E-mail from Edward Epstein to            45

 8                  Andrew Slevin dated 9/1/08 (from

 9                  Troutman Sanders file produced on

10                  9/14/111)

11    112           E-mail from Edward Epstein to            45

12                  Andrew Slevin dated 8/13/08 (from

13                  Troutman Sanders file produced on

14                  9/14/11)

15    113           E-mail from Edward Epstein to            45

16                  Aurora Cassirer dated 8/1/08 (from

17                  Troutman Sanders file produced on

18                  9/14/11)

19    114           E-mail from Edward Epstein to            45

20                  Andrew Slevin dated 8/8/08 (from

21                  Troutman Sanders file produced on

22                  9/14/11)

23    110           Handwritten notes from Troutman          47

24                  Sanders file produced on 9/14/11

25
```

Page 113

```
 1

 2                    I N D E X, cont'd

 3

 4                    E X H I B I T S

 5

 6   KLEIN        DESCRIPTION                      ID.     EVID.

 7   30           E-mail from Abraham Klein to Edward        82

 8                Epstein cc'ing Hershel Klein dated

 9                11/11/08

10   15           E-mail string from Aurora Cassirer         93

11                to Abraham Klein cc'ing Edward Epstein

12                dated 7/30/08 at 9:40 p.m.

13

14   TRUSTEE      DESCRIPTION                      ID.     EVID.

15   A            Engagement letter dated 11/24/08           70

16                between Abraham Klein and Troutman

17                Sanders

18

19

20

21

22

23

24

25
```

Page 114

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a

true and accurate record of the proceedings.


_____

LISA BAR-LEIB (CET**D-486)

AAERT Electronic Certified Transcriber


Veritext

200 Old Country Road

Suite 580

Mineola, New York 11501


Date:   September 22, 2011

# United States Bankruptcy Court

Eastern District of New York
271 Cadman Plaza East, Suite 1595
Brooklyn, NY 11201–1800

---

IN RE:                                                    CASE NO: 1–10–44815–ess

   Christine Persaud

SSN/TAX ID:                                               CHAPTER: 7

   xxx–xx–0247

       DEBTOR(s)

---

## NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

Notice is hereby given that:

A transcript of the proceeding held on September 20, 2011 was filed on September 22, 2011 .

The following deadlines apply:

The parties have until September 29, 2011 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a Transcript Redaction Request is October 13, 2011.

If a Transcript Redaction Request is filed, the redacted transcript is due October 24, 2011.

If no such Notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is December 21, 2011 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber Veritext (888–706–4576) or you may view the document at the public terminal at the Office of the Clerk.


Dated: September 23, 2011



For the Court, Robert A. Gavin, Jr., Clerk of Court


**BLnftrans.jsp** [Notice of Filing Transcript and Deadlines to Restriction and Redaction rev. 11/21/08]

# Notice Recipients

| District/Off: 0207–1 | User: btaylor | Date Created: 9/23/2011 |
|---|---|---|
| Case: 1–10–44815–ess | Form ID: 295 | Total: 6 |

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | | |
|---|---|---|---|---|---|
| db | Christine Persaud | 86–25 Van Wyck Expressway, Apt. 506 | Jamaica, NY 11435 | | |
| tr | John S. Pereira | Pereira &Sinisi | The Chrysler Building | 405 Lexington Avenue | 7th Floor    New York, NY 10174 |
| aty | Troutman Sanders LLP | The Chrysler Building | 405 Lexington Avenue | New York, NY 10174 | |
| aty | Mendel Zilberberg | 6619 13th Avenue | Brooklyn, NY 11219 | | |
| aty | Samuel J. Landau | 250 West 57th Street | New York, NY 10107 | | |
| | Pery D Krinsky, Esq. | Krinsky PLLC | 233 Broadway | Suite 707 | New York, NY 10279 |

TOTAL: 6