Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  EASTERN DISTRICT OF NEW YORK

4  Case No. 10-44815-ess

5  - - - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  CHRISTINE PERSAUD,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - - - - - -x

13

14              U.S. Bankruptcy Court

15              271 Cadman Plaza East

16              Brooklyn, New York

17

18              September 21, 2011

19              3:22 PM

20

21  B E F O R E:

22  HON. ELIZABETH S. STONG

23  U.S. BANKRUPTCY JUDGE

24

25

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 2 of 57 PageID #: 552

Page 2

```
 1
 2    Matter:  [204] Adjourned Hearing on Application for Order to
 3    Show Cause (RE:  related document(s) [195] Motion for 2004
 4    Examination, Adjourned from:  9/8/11, 9/13/11, 9/20/11
 5
 6    Matter:  [201] Adjourned Hearing on Application for Order to
 7    Show Cause (RE:  related document(s) [198] Motion for 2004
 8    Examination, Adjourned from:  9/8/11, 9/13/11, 9/20/11
 9
10    Matter:  [202] Adjourned Hearing on Application for Order to
11    Show Cause (RE:  related document(s) [199] Motion for 2004
12    Examination, Adjourned from:  9/8/11, 9/13/11, 9/20/11
13
14    Matter:  [228, 230] Adjourned Hearing (RE:  related document(s)
15    [182] Application to Employ Troutman Sanders LLP, Adjourned
16    from 9/8/11, 9/20/11
17
18    Matter:  [214] Adjourned Hearing on Application for Order to
19    Show Cause (RE:  related document(s) [196] Motion for 2004
20    Examination, Adjourned from:  9/8/11, 9/13/11, 9/20/11
21
22    Matter:  [203] Adjourned Hearing on Application for Order to
23    Show Cause (RE:  related document(s) [197] Motion for 2004
24    Examination, Adjourned from:  9/8/11, 9/13/11, 9/20/11
25    Transcribed by:  Aliza Chodoff
```

Page 3

1

2    A P P E A R A N C E S :

3    MENDEL ZILBERBERG & ASSOCIATES, P.C.

4         Attorneys for Abraham Klein

5         6619 Thirteenth Avenue

6         Brooklyn, NY 11219

7

8    BY:    MENDEL ZILBERBERG, ESQ.

9

10

11    PEREIRA & SINISI, LLP

12         Attorneys for Chapter 7 Trustee

13         405 Lexington Avenue

14         7th Floor

15         New York, NY 10174

16

17    BY:    JOHN S. PEREIRA, ESQ.

18

19

20

21

22

23

24

25

Page 4

 1

 2    KRINSKY PLLC

 3         Attorney for Of Counsel to Creditor Abraham Klein

 4         233 Broadway

 5         Suite 707

 6         New York, NY 10279

 7

 8    BY:   PERY D. KRINSKY, ESQ.

 9

10

11    TROUTMAN SANDERS LLP

12         Attorneys for Chapter 7 Trustee, Mr. Pereira, and

13            Troutman Sanders LLP

14         405 Lexington Avenue

15         New York, NY 10174

16

17    BY:   JOHN P. CAMPO, ESQ.

18

19

20

21

22

23

24

25

                         P R O C E E D I N G S

1
2            THE CLERK:  Numbers 5 through 10 on the calendar; all

3    matters regarding Christine Persaud.

4            THE COURT:  Can I get your appearances on the record,

5    please?

6            MR. CAMPO:  Yes, Your Honor.  John Campo with Troutman

7    Sanders for the trustee and for Troutman Sanders.

8            MR. PEREIRA:  John S. Pereira, the Chapter 7 trustee.

9            THE COURT:  Thank you, thank you.

10           MR. ZILBERBERG:  Mendel Zilberberg for creditor Klein

11   with of counsel Pery Krinsky.

12           THE COURT:  All right.  Thank you all.

13           MR. KRINSKY:  Good afternoon.

14           MR. ZILBERBERG:  Good afternoon, Your Honor.

15           THE COURT:  Good afternoon.  We were, through

16   yesterday afternoon, continuing the hearing of testimony from

17   the objector to the retention, the creditor Klein.  Do you have

18   another witness to call?  And in advance of that, do we have

19   any housekeeping to attend to?

20           MR. CAMPO:  Your Honor, there are two housekeeping

21   issues that we would like to attend to --

22           THE COURT:  Okay.

23           MR. CAMPO:  -- if it's okay.

24           THE COURT:  That's good.

25           MR. CAMPO:  Thank you.  First, Your Honor, there was a

CHRISTINE PERSAUD

Page 6

1    request that was made by Mr. Krinsky for certain information in

2    connection with the Troutman conflict analysis that was done

3    for the hearing in connection with our retention.

4           THE COURT:  Yes.

5           MR. CAMPO:  And we have advised Mr. Krinsky that with

6    respect to the e-mails that pertain to our conflict analysis

7    for the retention in this case, which were all e-mails that

8    were generated post-August of 2011, that we have no problem

9    with providing those e-mails to counsel.  There -- and to the

10   Court.  There are some minor issues that have to be dealt with.

11          For example, Your Honor, when the reports come back

12   internally, which I'm sure Your Honor is well aware of, having

13   been at a big firm, they will show information concerning every

14   conceivable matter that refle -- that is reflective of any

15   party who you hit -- who you asked to be checked.  So there's

16   information that is really confidential.  It's confidential

17   between Troutman and other clients, which is the existence of

18   matters that have been done for other creditors in this case

19   that were -- or other hits that may have come up, most of which

20   are all closed matters.

21          However, because of the confidential nature of the

22   description of the matter, et cetera what we're prepared to do

23   is provide Mr. Krinsky with the e-mails, provide Mr. Krinsky

24   with the reports that came back as to creditor Klein, and

25   hopefully that resolves the issue because we do not want to

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 7 of 57 PageID #: 557

CHRISTINE PERSAUD

Page 7

 1    provide Mr. Krinsky with the information that came back

 2    concerning other Troutman engagements, whether they be open or

 3    close.

 4            THE COURT:  I think that sounds like a sensible way to

 5    proceed.  And whether there's some electronic or redacting type

 6    methodology you can employ or some other way to produce the

 7    responsive information in an electronically complete document,

 8    it's seems to make sense to me.  Mr. Krinsky, does that sound

 9    like a logical first step, and hopefully the logical last step

10    in dealing with this?

11            MR. KRINSKY:  Your Honor, one hundred percent.  And

12    just briefly, there were -- just to start back for a moment,

13    there were two categories of information that I'd requested.  I

14    do have copies of my request that were sent over to the

15    Troutman Sanders firm.  It's very simple and very straight

16    forward.  I can pass up to Your Honor a copy of that request to

17    the extent that it's helpful to the Court, because there does

18    appear to be one dispute, though as to a separate category of

19    information that we asked --

20            THE COURT:  All right.  So --

21            MR. KRINSKY:  -- for.

22            THE COURT:  -- the first issue sounds like we're done,

23    at least we have a -- when do you think you can get that to Mr.

24    Krinsky?

25            MR. CAMPO:  Well, Your Honor, we'll go ba --

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 8 of 57 PageID #: 558
CHRISTINE PERSAUD

Page 8

 1            THE COURT:  The question of the e-mails.

 2            MR. CAMPO:  We'll attempt to get that com -- you know,

 3    all those e-mails to Mr. Krinsky by the end of the week or

 4    by --

 5            THE COURT:  Excellent.

 6            MR. CAMPO:  -- Monday.  I don't believe -- I know Your

 7    Honor had indicated there wasn't going to be any continuation

 8    of the hearing after today until sometime next week anyway, but

 9    we'll certainly try to get it to him by Friday or Monday at the

10    latest.

11            THE COURT:  That sounds fine.

12            MR. KRINSKY:  And the only question I had; in speaking

13    with Mr. Campo outside, as Mr. Campo was explaining to me, I

14    know not in graphic detail, but it seems to be there is an

15    informal conflicts checking system and a formal conflicts

16    checking system.  And my request is not making a distinction

17    between the two that whether it's considered an informal or a

18    formal, and I'm not sure if I'm using that word correctly, it

19    would simply be any conflicts check that was done here.

20            THE COURT:  You asked for the e-mails referenced in

21    the testimony.  It sounds like that's what they focused on.

22    But let's --

23            MR. CAMPO:  Whatever e-mails were referenced --

24            THE COURT:  -- get to that stop --

25            MR. CAMPO:  -- in the testimony is what will be

 1   provided to the extent they're in e-mail form.  Now --

 2            THE COURT:  That makes sense.

 3            MR. CAMPO:  -- I will say this, though, Your Honor

 4   that Mr. Krinsky and I -- I must apologize because I haven't

 5   seen his most recent letter to Mr. Stremba.  However -- and he

 6   would have addressed that to Mr. Stremba as general counsel to

 7   the firm.  I just want to clarify; he had asked for any and all

 8   communications, I believe, between ourselves and Mr. Pereira as

 9   well.  Is that --

10            MR. KRINSKY:  That is --

11            MR. CAMPO:  That's -- that was in the original.

12   That's not --

13            MR. KRINSKY:  That was in the --

14            MR. CAMPO:  -- there?

15            MR. KRINSKY:  -- original, and that's --

16            MR. CAMPO:  That's gone?

17            MR. KRINSKY:  I have two requests --

18            MR. CAMPO:  Okay.

19            MR. KRINSKY:  -- the first one we've dealt with, which

20   is the 2011 conflicts checking.  And it seems as though -- and

21   certainly, we were sensitive to whatever needs to be redacted

22   for purposes of preserving confidential information, of course.

23            The second category of information that we requested

24   is specifically also referenced in part in the testimony is

25   whatever conflict checks were done in 2008 when Mr. Klein or

Page 10

```
 1    GRV, depending on what the argument is, when either Mr. Klein

 2    or Mr. -- or GRV retained the Troutman Sanders firm.  And the

 3    request is very simple as to why.  The testimony was when they

 4    first ran in 2011 the conflicts check Abraham Klein's name did

 5    not appear.  When it was rerun, using either a different

 6    factors or under a different construct, the name did appear.

 7           To quote district court Judge Naomi Buchwald, who

 8    recently said in a conflicts case dealing with Anthony

 9    Seminerio, she said "When it comes to conflicts checking

10    systems, garbage in, garbage out."  And she did not mean that

11    in a disparaging way.  She said the information that you get

12    out of the conflicts checking system, at the end of the day, is

13    only as good as the information that you put into it.

14           Unfortunately, I was on the opposite side of that

15    decision that Judge Buchwald wrote referring to my client, who

16    didn't give the proper information to begin with.  That is the

17    very -- in part, the very question that's been raised.  With

18    all due respect, when Mr. Campo testified that Mr. Klein's name

19    did not appear at first, and then --

20           THE COURT:  Mr. Krinsky, we're talking housekeeping

21    here.  Is there a document request --

22           MR. KRINSKY:  Yes, there is.

23           THE COURT:  -- that you've made that you'd like to

24    follow up on?

25           MR. KRINSKY:  Yes, it is --
```

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 11 of 57 PageID #: 561

CHRISTINE PERSAUD

Page 11

1          THE COURT:  That would be helpful.  And in general,

2     when you do quote from a case, it's good to have the case name

3     and the citation, although this is not argument.  You don't

4     need to supplement now.  There can be no doubt that we all

5     appreciate the importance of the issues.  That's what under

6     way, and I'll be curious to have a cite to the case.  That's

7     also an interesting case.

8          MR. CAMPO:  And Your Honor, I don't --

9          THE COURT:  What's the request that's at issue?  What

10     is the second request?

11          MR. KRINSKY:  The second request is any communications

12     requesting a conflicts check made by the Troutman Sanders firm

13     and the response received by the Troutman Sanders firm in

14     2000 -- July of 2008 to December 2008 as to Abraham Klein,

15     Global Realty Ventures, and/or Flexo Craft.  And I have copies

16     of the requests --

17          THE COURT:  Okay.

18          MR. KRINSKY:  -- if Your Honor --

19          THE COURT:  Are there -- and are there particular

20     documents that being the request?  Mr. Campo, has --

21          MR. CAMPO:  Your Honor, first off --

22          THE COURT:  -- the firm --

23          MR. CAMPO:  -- I -- I'm --

24          THE COURT:  -- responded to that request?

25          MR. CAMPO:  Yeah, I -- well, if I could, I just want

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 12 of 57 PageID #: 562
CHRISTINE PERSAUD

Page 12

1    to clarify one thing, and then I -- and I'd like to just let

2    the record reflect that Mr. Krinsky's testi -- or -- I'm sorry,

3    his recitation of what I testified to is actually not accurate.

4    But the record speaks for itself.  I'll just leave it at that.

5    But the issue with respect to 2008; one, it's not at a time

6    when I was at the firm.  And two; I am not able to say where --

7    what the status of that is because I believe Mr. Stremba is

8    general counsel is dealing with that issue.

9          I'm comfortable, however, knowing what I did and that

10   I can produce what I certainly did and the documents that I

11   testified to.

12         THE COURT:  So this is the --

13         MR. CAMPO:  So I guess --

14         THE COURT:  -- conflicts --

15         MR. CAMPO:  -- the issue --

16         THE COURT:  I'm sorry.  The conflicts check done in

17   2008 with respect to the potential retention by GRV, which I

18   think is undisputed --

19         MR. CAMPO:  Right.

20         THE COURT:  -- and the one or the other or both of the

21   Kleins, which is very much disputed, that conflicts check;

22   those documents -- I want to come back to the question of --

23   you made a request.  You've received documents.  Is there an

24   issue there that you're conferencing that the Court can assist

25   with?

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 13 of 57 PageID #: 563

CHRISTINE PERSAUD

Page 13

 1           MR. CAMPO:  I don't believe it's an issue that we're

 2     conferencing, Your Honor.  It's just that I -- as I was very

 3     clear to Mr. Krinsky before the hearing and again earlier today

 4     when we had spoken this afternoon that I had no issue with

 5     respect to the 2011 conflict check request as they pertain to

 6     this matter.  I couldn't speak to what was done in 2008; only

 7     Mr. Cassirer can speak to that and partners who were here at

 8     the firm.  And that's why Mr. Stremba is dealing with that.

 9     I'm not -- I don't whether those e-mails exist.

10           I can only speak to what I testified to, and I don't

11     believe Ms. Strem -- Ms. Cassirer testified to anything with

12     respect to e-mails anyway.  This is something that Mr. Krinsky

13     came up with afterwards when he said I'd like the e-mails that

14     you testified to, and then said and by the way, I want any and

15     all e-mails and conflict information concerning the 2008 e-

16     mails --

17           THE COURT:  It seems to me --

18           MR. CAMPO:  -- or the 2008 matter.

19           THE COURT:  -- that this is an issue not before the

20     Court by motion, still perhaps a productive topic for

21     conferencing between counsel.  We are using up our scarce time

22     this afternoon in a direction that seems to me unlikely to

23     resolve any issues because you're not done yet exchanging the

24     information that will lead you to figure out whether there's

25     either documents to be produced or documents that are being

Page 14

1    withheld from production.  That'll put us at the one to discuss

2    something.

3            MR. CAMPO:  And --

4            THE COURT:  Because I have another matter on at 4

5    o'clock on which I was in the courtroom here until

6    approximately 8:45 last night.  I would like to commence the

7    testimony as promptly as possible.  If there's anything

8    necessary to commencing that testimony that we need to under --

9    to address, let's focus on that.  Otherwise, I'm going to urge

10   you to follow up directly with counsel.  See if you can solve

11   it the same way you've solved this first production issue --

12           MR. CAMPO:  We will, Your Honor.

13           THE COURT:  -- which you've done productively.  And I

14   appreciate it.

15           MR. CAMPO:  And Your Honor, the only other matter

16   that's housekeeping pertains to the -- Your Honor, at the

17   conclusion of yesterday's hearing -- or actually at the -- yes,

18   it was at the conclusion, but after Mr. Pereira had left when

19   we had adjourned, and then he was not able to come back because

20   of a prior commitment.  We had asked -- made inquiry about the

21   2004 orders, and Your Honor rightfully said well, is Mr. Per --

22   you asked whether Mr. Pereira was prepared to handle --

23           THE COURT:  Can I ask --

24           MR. CAMPO:  -- those --

25           THE COURT:  I'm going to --

Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 15 of 57 PageID #: 565

CHRISTINE PERSAUD

1          MR. CAMPO:  -- 2004s --

2          THE COURT:  -- interrupt you for the following reason:

3     we have counsel and a witness here.  Does this need to be

4     addressed before we take the testimony?

5          MR. CAMPO:  It --

6          THE COURT:  I don't think so, Mr. Campo.

7          MR. CAMPO:  Well, Your Honor, only --

8          THE COURT:  We're losing our --

9          MR. CAMPO:  -- only to the extent --

10         THE COURT:  -- window here.

11         MR. CAMPO:  -- that -- I understand.  But it is the

12    same counsel, and Mr. Pereira is here.  And I want to clarify

13    that when I -- when you asked the question yesterday, I wasn't

14    able to address it.  But Mr. Pereira has advised me, and he

15    wants to advise the Court, and he will, that he does want to

16    conduct the 2004s.  And we'll step aside from it until Your

17    Honor determines whether or not we are able to be retained or

18    if there's any issues with us --

19         THE COURT:  So the trustee would --

20         MR. CAMPO:  -- being adverse to Klein.

21         THE COURT:  -- proceed on those --

22         MR. CAMPO:  Well he's -- his firm --

23         THE COURT:  -- with his own firm as counsel?

24         MR. CAMPO:  -- his firm as counsel.

25         THE COURT:  Well that puts --

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 16 of 57 PageID #: 566
CHRISTINE PERSAUD

Page 16

1          MR. CAMPO:  And Your Honor --

2          THE COURT:  -- him in a different posture that would

3    still not --

4          MR. CAMPO:  -- and he has a forensic --

5          THE COURT:  -- predate the --

6          MR. CAMPO:  -- accountant as well.

7          THE COURT:  I'm sorry?

8          MR. CAMPO:  And he also has already retained his

9    forensic accountant, BDO Seidman.  So he would like to get the

10   2004 orders entered so that the documents are starting to be

11   produced and he can start to have --

12         THE COURT:  We're not going to --

13         MR. CAMPO:  -- access to the info.

14         THE COURT:  Okay.  We're not going to argue that

15   matter now.  It's good to know that the sequencing of the

16   matters is such that we don't need to deal with the counsel

17   issue first.  And that's helpful because it's going to take

18   some time to close out this record, it seems.  I think -- any

19   further housekeeping from your table?

20         MR. CAMPO:  Not on my --

21         THE COURT:  Mr. --

22         MR. CAMPO:  -- part, Your Honor.

23         THE COURT:  -- Krin -- okay, thank you, Mr. Campo.

24         From the creditor Klein's standpoint?

25         MR. ZILBERBERG:  Your Honor, we are not looking to

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 17 of 57 PageID #: 567
CHRISTINE PERSAUD

Page 17

1    necessarily argue this issue today.  We're here with the --

2            THE COURT:  All right.  Well, I don't --

3            MR. ZILBERBERG:  Yes.

4            THE COURT:  -- play the here today, so that's a good

5    thing.

6            MR. ZILBERBERG:  But I will ask the Court --

7            THE COURT:  We're on the same page.

8            MR. ZILBERBERG:  I would ask the Court before any 2004

9    motions go, we have issues from a conflict side that Mr.

10    Krinsky can speak to.  We have other concerns that I can.  I

11    don't think that this is what's on the calendar today.

12            THE COURT:  It happens that it is all on the calendar.

13            MR. ZILBERBERG:  I don't mean --

14            THE COURT:  But I would like to take the testimony.  I

15    have had a preliminary hearing on the 2004 exam and have some

16    concerns about whether it's best to do it all at once or to

17    proceed stepwise.  It's an often useful approach, I find, to go

18    in steps with partial relief, and I'm considering that here.

19    You should know that.

20            But what I'd like to do now is ask if you have another

21    witness to call your witness.  All right.

22            MR. ZILBERBERG:  Your Honor, at this time we call

23    Abraham Klein.

24            THE COURT:  Thank you.

25        (Witness Sworn)

1              THE CLERK:  Please be seated, and state your name and

2       spell your name for the record.

3              THE WITNESS:  Abraham Klein, A-B-R-A-H-A-M K-L-E-I-N.

4              MR. KRINSKY:  May I inquire, Your Honor?

5              THE COURT:  Please.  Thank you very much, and I've got

6       your -- I've got the two exhibit books here on my bench.

7       DIRECT EXAMINATION

8       BY MR. KRINSKY:

9       Q.    Mr. Klein, what do you do for a living?

10      A.    I run a few companies.  One of them is Flexo Craft, one of

11      them is Caring Home Care, and then some other investments in

12      real estate.

13      Q.    The real estate investments that you're referring to, what

14      type of investments are those?

15      A.    Real estate holdings.

16      Q.    Okay.  Do they include, for example, development deals?

17      A.    Development deals, yes.

18      Q.    Okay.  Do they include, for example, buying property --

19             MR. CAMPO:  Object, Your Honor.  Leading.

20             THE COURT:  I'm sorry.  We need ques -- we need a

21      complete question and pause, and an opportunity for an

22      objection, and then a ruling.  I'll say in a general way that

23      when questions are of a nature that the answers are yes, no,

24      and the substance is more in the question than in the answer,

25      then even if not objectionable I'll say it is somewhat less

Case 1-10-44815-ess   Doc 250   Filed 10/05/11   Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 19 of 57 PageID #: 569
CHRISTINE PERSAUD

Page 19

1    helpful at times to the finder of fact.

2    Q.   Please describe for the Court, generally speaking, the

3    type of real estate ventures that you've been a part of in the

4    past?

5    A.   Real estate developments; some in New York, some in

6    different states.  And there are real estate developments, land

7    developments.

8    Q.   A moment ago, you said that you have a number of interests

9    in different companies.  What is Flexo Craft?

10   A.   Flexo Craft is a company that produces gift packaging and

11   retail packaging for major chains in the United States.

12        THE COURT:  Excuse me for just one second.  We're

13   going to see if we can reorient some equipment here.  The

14   design of the courtroom is such that my law clerk is unable to

15   see the witness.  We struggle with ways to make this better as

16   it was better for everyone.  Everyone can see.  Thank you very

17   much.  The chair is very close to the edge now.  All right.

18        All right, I'm sorry.  Please resume.

19   Q.   I'm sorry.  You were describing Flexo Craft --

20        THE COURT:  Yes.

21   Q.   -- please describe your position or your involvement with

22   the company.

23   A.   My position in the company; I'm the president of the

24   company, and I'm mostly involved in operations, in the

25   production side, on the sales side.  We produce packaging and

Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 20 of 57 PageID #: 570

CHRISTINE PERSAUD

Page 20

1    gift packaging for major chains, major retail chains in the

2    United States, most of which is produced overseas in China

3    where we have alliances with factories that produce our

4    products, which we import and mostly presold custom made for

5    our clients in the U.S.

6    Q.    And what is Laser Master?

7    A.    Laser Master is the parent company of Flexo Craft.

8    Q.    And what involv -- excuse me.  What involvement do you

9    have with Laser Master?

10   A.    Laser Master is the parent company of Flexo Craft, and I'm

11   the president of Laser Master.

12   Q.    In addition to Flexo Craft and Laser Master, are you

13   involved with any other particular companies?

14   A.    In the -- in Flexo, in the Laser side or --

15   Q.    Any other companies other than Flexo Craft and Laser

16   Master?

17   A.    Caring Lixa (ph.) is a company that I'm the president of,

18   and then there's some other comp -- development companies that

19   I -- and then there's real estate development company in which

20   I -- again, I'm the president of.

21   Q.    Okay.  And we'll come back to those real estate

22   development companies in a moment.  Did there come a time in

23   the summer of 2008 where you considered investing in a real

24   estate project in China?

25   A.    Yes.

Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 21 of 57 PageID #: 571

CHRISTINE PERSAUD

1    Q.    Please describe for us that project.

2    A.    In the summer of 2008 I was -- I met a person that

3    introduced me to a real estate develop in China, which that

4    consisted of redeveloping an ancient city in China into

5    commercial and residential -- into reside -- real estate

6    development; residential housing as well as commercial

7    property.

8         To that effect, we -- I had some meetings with a developer

9    and -- to get to know the project.  Once I -- we got to know

10   the project and within my ability that I was able to understand

11   I felt it's something that I should look into.

12   Q.    And when you say look into, what were the first steps, if

13   any, that you took to look into this project?

14   A.    I -- one of the first steps I did was -- I felt at that

15   time that in order to do that we would be needing two -- one of

16   them would be the investment part, which is the finances, and

17   the other part would be to understand the structure -- the

18   legal structure in China as well as the project viability.  And

19   there -- to -- therefore, we decided to -- that we need to have

20   a firm that would be able to handle the project and our

21   interest on both ends of the world, so to speak.

22   Q.    And when you say a firm, are you talking about -- what

23   type of firm are you talking about?

24   A.    A law firm.

25   Q.    And did there come a point in time where you reached

1    out -- or someone reached out on your behalf to a law firm

2    regarding this project?

3    A.    Yes.   After discussion with my brother, Hershel, he told

4    me that he has a recollection or written down from a point in

5    time that he has seen advertised, I believe, of the Troutman

6    Sanders law firm.   And that's -- would seem to be that it's a

7    possibility that they might be able to do it, and he's going to

8    give them a call and see if they feel that they can handle that

9    project.

10   Q.   After you had this discussion with your brother, what

11   happened next?

12   A.   My brother contacted the Troutman Sanders firm, and he was

13   put in contact with Ms. Cassirer.   And I -- he basically

14   explained to her the outline of the project and what we were --

15   what we would be looking for in a firm.   And from that point

16   on, she started making some arrangements in order to be able to

17   speak to attorneys in both ends of the world from that company.

18   Q.   Did there come a point in time on July 30th, 2008 in

19   connection with your brother's conversations with the Troutman

20   Sanders firm that you had an opportunity to speak to your

21   brother about issues of confidentiality?

22           MR. CAMPO:   Objection, Your Honor.   That's leading.

23           THE COURT:   I'm going to overrule the objection.

24   Q.   You may answer.

25   A.   Confidentiality for this particular project was extremely

Page 23

1   important from the outset for multiple reasons.  As big as

2   people think China might be, it's really a small country.  And

3   everybody knows everything, and it was extremely important,

4   first of all, for the project itself for it to be confidential,

5   because if the project would prove to be as lucrative as it was

6   presented confidentiality would be very important.  That's from

7   the project side.

8        And from the point of view of the financing side, becau --

9   to a degree it was some -- was known, some was unknown.  It was

10  extremely important for that to be confidential as well.

11  Q.   And this issue of confidentiality, was it something that

12  you actually discussed with Hershel Klein, your brother?

13  A.   Correct.

14  Q.   As a result of that discussion --

15       MR. KRINSKY:  Withdrawn.

16  Q.   Let me step back for a moment.  In discussing the issue of

17  contacting Troutman Sanders with your brother, what role did

18  your brother have in connection with this project?

19  A.   My brother started the communication.  And before sending

20  them -- or -- the confidential information that we intended to

21  discuss or send them, he had asked if we need with them a

22  confidentiality agreement.  They did it in an e-mail.  And Mr.

23  Cassirer responded that it's not necessary to have a

24  confidentiality agreement with our attorneys.

25       MR. CAMPO:  Your Honor, I'm going to object and move

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 24 of 57 PageID #: 574
CHRISTINE PERSAUD

Page 24

1    to strike.  That wasn't even responsive to the question.

2         THE COURT:  I do want to encourage -- I'm going to let

3    testimony stand, but it's not the first answer that has been

4    perhaps a bit more in the nature of a statement or comment than

5    in response to the question.  So I want you to listen very

6    carefully to the questions you're asked.  You've been here for

7    these proceedings.  You're aware of the issues that the lawyers

8    are focusing on, but your role is different now.  Your role is

9    witness.

10        You're being asked questions under oath.  You need to

11   answer them to the best of your recollection and accurately and

12   precisely.  I know you're trying hard to do that, but it will

13   make a better record and help me more as the finder of fact for

14   you to listen carefully to the questions, answer the question,

15   and know that your lawyers are here to make -- to ask you the

16   questions they think are important and then later to make the

17   arguments that need to be made.  So that would be some general

18   guidance for going ahead.

19   Q.   Specifically, turning your attention to what has already

20   in evidence in the exhibit book in front of you, behind tab

21   number 9.  If you would please turn your attention to that

22   document; Klein Exhibit 9, which has already been accepted by

23   the Court into evidence.

24        Mr. Klein, a moment ago you mentioned an email and a

25   request made by your brother regarding confidentiality.  The

CHRISTINE PERSAUD

Page 25

1    document that you have in front of you, have you seen that

2    document prior to today?

3    A.    Yes.

4    Q.    When was the first time that you saw that document?

5    A.    Some time, I believe, in July 30th.

6    Q.    And who showed you this document?

7    A.    My brother, Hershel, either showed it to me, or it

8    eventually came through in a copy of an e-mail.

9    Q.    When you saw this document back on July 30th, 2008, what

10   was your understanding -- your personal understanding at that

11   point in time as to what -- first, what your brother was asking

12   for?

13   A.    My brother was asking for -- my brother was asking if we

14   need to have a specific confidentiality agreement because he

15   was going to send them confidential information.

16   Q.    And specifically, the confidential information that you're

17   referring to was in connection with what?

18   A.    The confidential information was in connection with the --

19   this particular project in China and anything else that the

20   firm would need to know about it.

21   Q.    And when Ms. Cassirer responded -- again, referring to

22   Klein Exhibit 9, the top portion of the document -- when she

23   responded to your brother, "I do not believe that you need a

24   confidentiality agreement with your attorney since we are bound

25   to keep your communications with us confidential."  What did

Case 1-10-44815-ess   Doc 250   Filed 10/05/11   Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 26 of 57 PageID #: 576
CHRISTINE PERSAUD

Page 26

1    you understand that statement to mean on July 30th, 2008?

2    A.    That all the information that we would be giving them

3    would be kept confidential.

4    Q.    And when you say giving them, who are you referring to?

5    A.    Our attorney.

6    Q.    When you say your attorney, who specifically are you

7    referring to?

8    A.    Ms. Cassirer and the Troutman Sanders firm.

9    Q.    On July 30th, 2008, at any point in time, to your

10   knowledge, that either you or your brother at that point ever

11   mention the letters or the word GRV?

12   A.    No.

13   Q.    On July 30th, 2008, at the point in time in which this e-

14   mail was sent by Ms. Cassirer, at 6:56, did you or your

15   brother, to your knowledge, ever mention the name Global Realty

16   Ventures?

17   A.    No.

18   Q.    In response to this e-mail or --

19         MR. KRINSKY:  Withdrawn.

20   Q.    After this e-mail was sent by Ms. Cassirer, stating we are

21   bound to keep your communications with us confidential, what

22   happened next?

23   A.    After this e-mail, we went on -- Ms. Cassirer went on to

24   set up a conference call with Mr. Epstein over in Shanghai,

25   which took place July 30th at night.

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 27 of 57 PageID #: 577

CHRISTINE PERSAUD

Page 27

1    Q.    Did that conference call actually take place on July 30th,

2    2008?

3    A.    Yes.

4    Q.    Who was part of -- who was -- who participated in that

5    conference call?

6    A.    Mr. Epstein, Ms. Cassirer, my brother and myself.

7    Q.    Was this the first time that you had spoken with Mr.

8    Epstein?

9    A.    Yes.

10   Q.    And was this the first time that you had spoken with Ms.

11   Cassirer?

12   A.    Yes.

13   Q.    During that telephone conversation, how did you introduce

14   yourself to Ms. Cassirer and Mr. Epstein?

15   A.    As Abraham Klein.

16   Q.    During that conversation, did you discuss with them any

17   affiliations that you had with any companies?

18   A.    Yes.  We had a long conversation, and the conversation was

19   about our -- my -- the companies that I was affiliated with,

20   overall company finances, the company wherewithals, as well as

21   questions pertaining to the project in China.  That was the

22   general nature of that -- of my introduction of myself.

23   Q.    In discussing those companies that you had an affiliation

24   with during the July 30th, 2008 conference call, did you or

25   your brother ever mention the letters or the word GRV?

Case 1-10-44815-ess   Doc 250   Filed 10/05/11   Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 28 of 57 PageID #: 578
CHRISTINE PERSAUD

Page 28

1   A.   No.

2   Q.   At any point during that July 30th, 2008 conference call

3   did you or your brother ever mention the words or name Global

4   Realty Ventures?

5   A.   No.

6   Q.   During that conference call, without stating specifically

7   what it is that you said, please describe the categories of

8   information that you personally discussed with Mr. Epstein and

9   Ms. Cassirer.

10  A.   I discussed the project in China as the information that

11  was given to us.  And I -- we -- and I discussed the financial

12  abilities that I have at that time -- at that point in time in

13  order to start the project.

14  Q.   Mr. Klein, in discussing --

15       MR. KRINSKY:  Withdrawn.

16  Q.   Who raised the issue during that conversation of financial

17  abilities to participate in this project in China?

18  A.   Between Mr. Epstein and Ms. Cassirer there was many

19  questions asked as to where funding would come -- where funding

20  would start coming for the particular project.  And we

21  responded to many of those questions as well explaining to them

22  what our current limitations are and what we would still need

23  to somehow figure out to raise in the future.

24  Q.   And based upon the questions that both Ms. Cassirer and

25  Mr. Epstein were asking you, what was your understanding on

1    July 30th, 2008 as to why they were asking you those questions

2    regarding your financial capabilities?

3    A.    My understanding was that they wanted to know whether we

4    can actually support this type of a program.  It was quite a

5    large project.

6    Q.    When you say quite a large project, describe briefly, if

7    you would, sort of the nature of it; size, dollars, et cetera.

8    A.    It was roughly a hundred-million dollar project.  And the

9    investment that the partners would have to actually come up

10   with would be in the roughly eighteen million dollars.

11              MR. CAMPO:  I'm sorry, Your Honor.  I'm --

12              THE COURT:  What's the question, Mr. Campo?  I don't

13   hear you.

14              MR. CAMPO:  I'm -- I -- the -- I can't hear what the

15   witness -- the number the witness said.  Did he say eight or

16   eighty?

17              THE COURT:  Could you restate -- I heard eighteen

18   million, but let's hear it from the witness.

19              THE WITNESS:  Eighteen million.

20              MR. CAMPO:  Eighteen.

21   Q.    And was there an understanding back in July -- on July

22   30th, 2008 as to potentially how much you personally would be

23   responsible for investing or potentially investing in this

24   project?

25   A.    We would have to invest in this project about six million

1    dollars, roughly.

2    Q.    And during the course of July 30th, either via e-mail or

3    in telephone calls, were those numbers discussed with the

4    Troutman Sanders firm?

5    A.    On July 30th, most of the numbers were discussed, yes.  We

6    discussed it in RMB terms, which is the Chinese money rather

7    than U.S. dollars, which is -- rather than U.S. dollars.

8    Q.    And the information that you provided to the Trou -- you

9    personally provided to the Troutman Sounders, specifically Ms.

10   Cassirer and Mr. Epstein, during the conference call on July

11   30th, did you view that information as confidential?

12   A.    Yes.

13   Q.    There's been a question raised regarding the e-mail that

14   was sent by Ms. Cassirer.  Absent that e-mail being sent, would

15   you have provided the information to the Troutman Sanders firm

16   on the night of July 30th, 2008?

17   A.    No.

18   Q.    Why is that?

19   A.    The information that we provided them was highly sensitive

20   and confidential on the project side as well as the financial

21   side.

22   Q.    Why did you view that information -- because one of the

23   issues that the Court is ultimately going to have to address is

24   whether it really was confidential and what it related to.  So

25   could you please explain why you viewed that information as

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 31 of 57 PageID #: 581
CHRISTINE PERSAUD

Page 31

 1    confidential?

 2    A.    On the financial side, I explained to the Troutman Sanders

 3    the areas where I have money sitting -- money, and how --

 4    and -- or the direction of what I might have to do to get the

 5    money out.  And from the project side, it was confidential

 6    because we did not want anybody to know of this project

 7    existing.

 8    Q.    Why is that?

 9    A.    Well, it was prior to any agreements with the other side,

10    with the developer and without any prior -- without any

11    commitments that we didn't want the pro -- to either lose the

12    project or do any work on the project with a potential of not

13    actually having the opportunity to be the partners.

14    Q.    Fair to say you didn't want to lose this potential deal

15    and opportunity?

16    A.    Right.

17    Q.    And you didn't want anybody stealing it from you?

18    A.    Correct.

19          MR. CAMPO:  Your Honor, they're leading questions

20    again.  We just asked counsel to refrain from it.

21          MR. KRINSKY:  Your Honor, I'm just -- I apologize.

22    I'm just trying to speed it along.  And I -- but I'll

23    certainly --

24          THE COURT:  I would again offer the same observation.

25    To the extent that you are asking -- that a lawyer asks a

Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 32 of 57 PageID #: 582

CHRISTINE PERSAUD

1    witness to agree or not with a statement, it has a certain

2    level of persuasive and probative value.  To the extent that a

3    lawyer asks a witness what they recall about something or what

4    they did, it's in a different category with respect to making a

5    record.  And so, it's up to you, within the boundaries of

6    permissible testimony, but you don't -- there is that aspect.

7             Now, please proceed.  And I misspoke.  I should say

8    more precisely I was wrong when I said 4 o'clock.  It's 4:30

9    that we have the next matter scheduled, and so --

10            MR. CAMPO:  Your Honor --

11            THE COURT:  -- we have more time.

12            MR. CAMPO:  -- I'm sorry.  But yesterday, you had

13   indicated --

14            THE COURT:  Please --

15            MR. CAMPO:  I apologize.

16            THE COURT:  I -- thank you.

17            MR. CAMPO:  Yesterday, you had indicated that we had a

18   4:15 hard stop, and I've made a doctor's appointment on Long

19   Island for 5:30.  So --

20            THE COURT:  Okay.

21            MR. CAMPO:  -- I mean, that's what --

22            THE COURT:  We'll work around all the requirements

23   with counsel.  Let's have the next question --

24            MR. CAMPO:  Okay.

25            THE COURT:  -- and get as much as done as possible.

1              MR. CAMPO:   Thank you.

2    BY MR. KRINSKY:

3    Q.   In connection with this proposed -- with the China

4    project, as we've been referring to it as, after this July

5    30th, 2008 telephone conference, what happened next?

6    A.   After the July 30th conference call, we were waiting for

7    the Troutman Sanders to send us a -- for Troutman Sanders to

8    send us back a proposal of the work -- of the gen -- the

9    general calls of the work that would need to be done on this

10   project; for the due diligence part and how they see the

11   pro -- the due diligence being done.

12         On August 1, Mr. Epstein sent us a proposal outlining how

13   they would be doing -- they would be executing the due

14   diligence on this project in a detailed outline.

15   Q.   Okay.  Just to briefly step back for a moment, prior to

16   receiving this document on August 1st you just referred to,

17   prior to that, did you have an understanding after the July

18   30th, 2008 conference call what it was or what aspects it was

19   that the Troutman Sanders firm was prepared to assist you on in

20   connection with the China project?

21   A.   The Troutman Sanders firm was -- my understanding was that

22   they will be -- they would be doing the due diligence on the

23   project.  The due diligence had two -- the project basically

24   had two prongs to it.  One of them was the viability of the

25   project itself, and the other part was the legal structure of

1    the project -- or the legal structure of that joint venture.

2    Q.    You mentioned a moment ago that you eventually received a

3    document from Mr. Epstein.  I'd like to refer your attention to

4    the document behind tab 19, which is Klein Exhibit 19 already

5    entered into evidence.  Klein 19.  Sir, briefly look at that

6    document, and look up when you're done.

7         First, do you recognize that document?

8    A.    Yes.

9    Q.    Have you seen that document before?

10   A.    Yes.

11   Q.    What is that document, sir?

12   A.    That is the proposal from Edward Epstein as to doing the

13   due diligence for the project.  It's a proposal.  It's their --

14   it's also -- they also sent along some brochures and stuff with

15   it in reference to what the company does in reference to what

16   we discussed a few days earlier.

17   Q.    And I'd like to briefly just break that up.  First, with

18   respect to Mr. Epstein's e-mail cover letter, if I can call it

19   that, what, if anything, indicated -- what, if anything,

20   confirmed, based upon his letter, your understanding of what

21   Troutman Sanders' role would be in representing you?

22   A.    In the second paragraph in that document, where it says

23   real estate MAA and financing are the key areas of what -- of

24   their practice.

25   Q.    And during your discussions on July 30th, 2008 with Mr.

1    Epstein, did you discuss these two particular areas of what

2    they firm could do for you?

3    A.   Yes, we did.

4    Q.   Turning your attention to the fourth complete paragraph

5    that begins as for the legal due diligence, do you see that?

6    A.   Yes.

7    Q.   Specifically turning your attention to the third to last

8    of that paragraph, on the ride side, I'm going to read for a

9    moment, "meetings or negotiations with the Chinese partner or

10   other third parties".  Did I read that correctly?

11   A.   Yes.

12   Q.   What was your understanding as to what that statement

13   meant with respect to the services to be provided by Troutman

14   Sanders?

15        MR. CAMPO:  Objection, Your Honor.  Mr. Krinsky is

16   reading a select part of a sentence.  And for the record to be

17   clear, he should actually read the entire sentence.  He's

18   choosing to read into the record.

19        MR. KRINSKY:  Your Honor, the document is in the

20   record, but I'll certainly go through and read the entire

21   statement.

22        THE COURT:  You can accommodate the request.  I think

23   that'd be nice, also certainly is appropriate grounds for

24   cross-examination.  But you can rephrase your question if you'd

25   like.

Case 1-10-44815-ess   Doc 250   Filed 10/05/11   Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 36 of 57 PageID #: 586
CHRISTINE PERSAUD

Page 36

1    Q.   In looking at this paragraph, please describe what it

2    was -- or what your understanding was back on July -- August

3    1st, 2008, when you received it; what it was that Troutman

4    Sanders was going to be doing for you?

5              THE COURT:   And just for a complete question, could

6    you indicate again which paragraph?

7    Q.   Specifically referring to the fourth complete paragraph

8    that begins as for the legal due diligence.

9    A.   They were going to -- they were going to do whatever is

10   necessary for this project, which is negotiate with the

11   partners or the developers in this deal.   They would deal with

12   any third parties that are necessary to come in to do

13   additional work on the project, whether it's from any point of

14   view, whether it's from financing or from project viability.

15   And they were going to handle the whole package.

16   Q.   When you say negotiations as to financing, what are you

17   specifically referring to?

18   A.   There was a certain amount of money that had to be put

19   into the project, and there were certain amounts of money that

20   we had.   And we needed to make sure that the deal can be worked

21   out, that the mo -- all the monies can be put into the project

22   in a way that we can sustain it.

23   Q.   Mr. Klein, were you doing -- or were you contemplating

24   this China project without any expectation of making money off

25   of it?

1    A.    No.

2    Q.    In your mind back on July 30th, 2008, what was the single

3    greatest consideration in terms of going into this deal?

4    A.    Making money.

5    Q.    Did you have -- did you discuss with the Troutman Sanders

6    firm back in July and August 2008 that consideration?

7              MR. CAMPO:  Your Honor.

8              MR. KRINSKY:  May I respond, Your Honor?

9              THE COURT:  Yes.

10              MR. KRINSKY:  It's not leading.  The question was did

11    you.  Either he did or he didn't.  If he didn't, then the

12    answer's no.  If he did --

13              THE COURT:  I think a foundation has been laid through

14    the prior question and answer of what was the single greatest

15    consideration, and the answer making money.  Did you discuss

16    that with the firm; I'm going to overrule the objection.  I'm

17    not quite sure where this is going.

18              MR. KRINSKY:  Your Honor, it's --

19              THE COURT:  But that -- I'll await your next

20    questions.  That will show me.  Actually, I prefer not to have

21    you tell me where it's going.  I prefer you to show me where

22    it's going.  Best for all.

23              Ask your next question.  I've overruled the objection.

24    You can answer.

25    Q.    Do you recall the question?

Page 38

1    A.   No.

2         THE COURT:  Did you discuss it with the Troutman

3    Sanders firm?

4         THE WITNESS:  You got to go back.  I don't remember it

5    all.

6         THE COURT:  Did you discuss the objective of the

7    project in your mind was to make money?  Did you discuss that

8    specifically with the Troutman Sanders firm?

9         THE WITNESS:  I discussed -- on July 30th, I discussed

10   everything in detail with the Troutman firm; what monies we

11   have to put into the project according to what -- what's

12   presented to us by the developer, what monies we have available

13   sitting currently, what monies we would have to raise, and --

14   which would constitute our complete and total investment into

15   the project, and what the project is projected to return.

16        MR. CAMPO:  Your Honor, the --

17        THE COURT:  Mr. Klein, the objection -- the question,

18   which I restated -- or I think stated almost in the same words

19   per counsel was did you discuss that your primary objective was

20   to make money.  Is that your answer to that question?

21        THE WITNESS:  Yes.

22        THE COURT:  Okay.  You can ask your next question.

23   Q.   You also mentioned a moment ago that in addition to Mr.

24   Epstein's letter of August 1st there was a brochure that was

25   attached to it.  The brochure you're referring to, is that the

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 39 of 57 PageID #: 589
CHRISTINE PERSAUD

Page 39

1    document that's actually attached as part of Exhibit 19 that

2    you have in front of you?

3    A.    Yes.

4    Q.    Was there anything in particular within the brochure that

5    further confirmed the services that Troutman Sanders was going

6    to be providing to you in connection with the China project?

7         (Pause)

8    A.    Can you re -- can you ask me the question again, please?

9    Q.    With respect to the brochure you referred to, was there

10   anything in particular in the brochure that confirmed the types

11   of services that you expected the Troutman Sanders firm to

12   provide to you?

13   A.    Yeah, one of the services they were going to provide to us

14   or presented that they can provide to us is arrange some --

15   certain financing.

16   Q.    Okay.  And where specifically are you referring to in the

17   brochure just so that the record is clear?

18   A.    It's on page 3 of the brochure, the last bullet point,

19   where it says project finance and asset securitizations.

20   Q.    And when you said a moment ago that -- I believe your

21   words were that they had agreed to provide, who were you

22   referring to?

23   A.    Troutman Sanders.

24   Q.    And specifically, the Troutman Sanders as a law firm, was

25   there a specific person?

1    A.    Mr. Epstein.

2    Q.    And when did Mr. Epstein agree to provide those services

3    to you in connection with the China project?

4    A.    That -- those services was presented to me on July 30th in

5    the phone conference.

6    Q.    At the time that the August 1st e-mail is sent to you by

7    Troutman Sanders, had the name or the letters GRV ever been

8    mentioned by you or your brother, to your knowledge, to Mr.

9    Epstein or Ms. Cassirer?

10   A.    No.

11   Q.    At the point in time that the August 1st, 2008 e-mail is

12   sent to you by Mr. Epstein, to your knowledge, had either you

13   or your brother ever used the name of the phrase Global Realty

14   Ventures to either Ms. Cassirer or Mr. Epstein?

15   A.    No.

16   Q.    After you first received this August 1st, 2008 e-mail,

17   what happened next?

18   A.    After we received this August e-mail, we have continuous

19   conversations with the Troutman law firm in reference to the

20   project.  And so -- and in -- a couple of days later, Ms. --

21   Mr. Epstein presented to us that he would -- actually, a couple

22   days later, Knight Frank contacted us in reference to doing

23   certain parts of the due diligence.

24   Q.    When you say conversati -- or communica -- I believe you

25   said communications had occurred.  Between what period of time

Case 1-10-44815-ess   Doc 250   Filed 10/05/11   Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 41 of 57 PageID #: 591
CHRISTINE PERSAUD

Page 41

1    are you referring to with respect to those communications

2    between you and the Ep -- the Troutman Sanders firm?

3    A.   Between August 1 and a few days later.  I think it was

4    August 5 or 8.

5    Q.   And the communications that you're referring to, what mode

6    of communication did that take place; written or other -- or

7    otherwise?

8    A.   Both written and phone.

9    Q.   And the telephone conversations that you're referring to,

10   who were those telephone conversations between?

11   A.   Myself, Mr. Epstein.  There was also written communication

12   between Ms. Cassirer, Hershel, myself.

13   Q.   And in those telephone conversations, again without

14   telling me specifically what was said, did you provide certain

15   information to the Troutman Sanders regarding the China

16   project?

17   A.   Yes, I did.

18   Q.   And again, without telling me specifically what was said,

19   please describe the general categories of information that were

20   provided by you to the Troutman Sanders firm?

21   A.   In general, it was project related.  It was related to

22   finance.  That's the two general categories.

23   Q.   Did you view that information that you were sharing with

24   the Troutman Sanders firm as confidential?

25   A.   Yes.

Case 1-10-44815-ess   Doc 250   Filed 10/05/11   Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 42 of 57 PageID #: 592
CHRISTINE PERSAUD

Page 42

1    Q.    During the period of time between August 1 and August 5,

2    2008 that you just referred to, did you or, to your knowledge,

3    your brother ever mentioned the letters or the word GRV to

4    Troutman Sanders?

5    A.    No.

6    Q.    During that period of time between August 1 and August 5,

7    2008, did you or, to your knowledge, did your brother ever

8    mention the phrase or the words Global Realty Ventures?

9    A.    No.

10   Q.    Briefly describe, at this point in time in early August,

11   2008, what was your understanding as to the role that Troutman

12   Sanders was going to play at this point in time in the

13   potential deal in China.

14   A.    Troutman Sanders was going to play the central role.  They

15   were going to handle all aspects of the project.  They were

16   going to coordinate whatever is necessary to be coordinated.

17   They were going to be dealing with the -- they were going to be

18   dealing with the developer.  They were going to be dealing with

19   other agents that might have to do certain things.  They were

20   going to work out a somewhat of an agreement if the product --

21   if the project would be viable with the other -- with the

22   developer.  And they would be dealing on the fina -- with the

23   finances.

24   Q.    Mr. Klein, when you say if the deal was viable, what do

25   you mean by that?

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 43 of 57 PageID #: 593

CHRISTINE PERSAUD

Page 43

1    A.    At that point in time we only had figures that was given

2    to us by the developer, and those figures would have to be --

3    they basically had a story at that time from the developer.  We

4    had to do some preliminary due diligence to find out what --

5    and if this is a viable project.

6    Q.    Who, if anyone, was going to do that preliminary due

7    diligence?

8    A.    Troutman Sanders suggested that Knight Frank should do

9    that due diligence.  It's a company they're working with.

10    Q.    Do you know if in fact Troutman Sanders communicated with

11    Knight Frank regarding this potential deal in China?

12    A.    Yes.

13    Q.    Do you recall or do you know when that was?

14    A.    I believe sometime before August 8.

15    Q.    Who eventually, by the way, did the due diligence that

16    you're referring to -- the preliminary due diligence?

17    A.    Knight Frank.

18    Q.    At the time at which Troutman Sanders spoke to Knight

19    Frank had you authorized Troutman Sanders to speak with Knight

20    Frank?

21    A.    Not specifically.

22    Q.    Referring your attention to the tab marked 29 -- tab 29,

23    marked for identification as Klein Exhibit 29.

24          THE COURT:  This appears to be a one-page e-mail

25    followed by an attachment one followed by a three-page letter.

Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 44 of 57 PageID #: 594

```
 1    Is that right?

 2           MR. KRINSKY:  Yes, it is, Your Honor.

 3           THE COURT:  Then, my copy is what you intended to be.

 4    Please proceed.

 5    Q.   First, I'd like you to just look through that document.

 6    And when you're done, please look up indicating that you're

 7    finished.  Sir, do you recognize that document?

 8    A.   Yes.

 9    Q.   How do you recognize that document, sir?

10    A.   I've seen it in the past.

11    Q.   Do you recall the first time that you saw this document?

12    A.   Somewhere around August 8th, I guess.

13    Q.   And how did you come to first see this document?

14    A.   Either it was shown to me or I got a copy of the e-mail.

15    Q.   Do you recall who showed it to you or who gave you a copy

16    of the e-mail?

17    A.   It would have been Hershel.

18           MR. KRINSKY:  Your Honor, I offer into evidence what

19    was previously marked as Klein Exhibit 29 for identification as

20    Klein Exhibit 29; however we ask that on page 3 of the

21    document, which is -- the document says in the right-hand

22    corner Knight Frank, on the left side; reference number private

23    and confidential.  We ask that everything beginning with Dear

24    Mr. Klein be redacted for confidentiality purposes.

25           THE COURT:  I don't understand the request to the
```

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 45 of 57 PageID #: 595
CHRISTINE PERSAUD

Page 45

1    Court to redact a document.  It's not part of my job.  You're

2    either offering the document or you're not.  If you'd like to

3    offer it in a different form, I'll consider that.  But I --

4    I'm -- I don't understand the request you've made to the Court.

5    It's not my job to redact.

6            MR. KRINSKY:  Your Honor, I offer Klein Exhibit 29,

7    marked for identification, but only the first page of the

8    document.

9            THE COURT:  Okay.

10           MR. KRINSKY:  And it's my understanding, based upon

11   the pre-hearing submission, that opposing counsel did not have

12   an objection to the entire document.  I don't know if they have

13   an objection to just the first page of the document.

14           THE COURT:  Let me hear from Mr. Campo.  All that's

15   being offered is the first page.  There's a question in my mind

16   as to how useful that's going to be to the Court since it is a

17   transmittal, appears to be in substance, but is sometimes

18   described as a transmittal memo or a transmittal e-mail

19   attached to what appears to be some kind of a proposal or

20   marketing letter.  But I await the testimony of the witness if

21   you intend to question about this.

22           MR. KRINSKY:  Your Honor --

23           THE COURT:  But the only offer is for the document

24   which is the portion of the exhibit.  Mr. Campo, do you object?

25           MR. CAMPO:  Your Honor, my only que -- I mean, I --

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 46 of 57 PageID #: 596
CHRISTINE PERSAUD

Page 46

1    the issue obviously is, is that you're offering a transmittal

2    letter.  You're not offering anything else.

3            MR. KRINSKY:  Your Honor, opposing --

4            MR. CAMPO:  It's an incomplete document.

5            MR. KRINSKY:  -- opposing counsel's a hundred percent

6    right.  We're right now in the process of redacting the

7    document given the confidential nature of it.  If the Court

8    would be willing to accept the document as it's being redacted

9    for just expediency of moving things along and certainly --

10           THE COURT:  You want the Court not to see this?  I'm

11   very confused by what you're saying.  This is not document

12   production.  This is an evidentiary hearing.

13           MR. KRINSKY:  Your Honor --

14           MR. ZILBERBERG:  Your Honor, may I speak with my co-

15   counsel?

16           THE COURT:  Why don't you confer?  And it's 4:26,

17   which is after our hard stop of 4:15.  It's clear we're not

18   going to finish, and I regret this greatly.  We're not going to

19   finish the direct testimony.  Maybe this is a point to pause.

20           You need to work on this issue, I think, and come up

21   with what you'd like to offer.  there's a bigger issue here,

22   though, which is that you are in substance asking me to make

23   some determinations based on a contested retention, contested

24   in who is doing the retaining, contention per -- contested

25   perhaps in the nature of scope.

CHRISTINE PERSAUD

 1          It -- it's possible -- it's certainly suggested by

 2     your submissions to date, by the exhibits you've put before the

 3     Court, including this very exhibit, that the work done on the

 4     one hand by Knight Frank and on the other by Troutman Sanders

 5     may be informative as to the nature and extent of the work that

 6     the firm proved to be retained to do.  You have put into

 7     evidence an e-mail that indicates that the Troutman firm was

 8     asked not to be involved in certain things.  You're risking

 9     painting a fairly incomplete picture, but the risk is yours.

10     It is your job to put in your case.

11          I -- if you'd like to offer the one -- the incom --

12     the single page, we'll deal with that.  We can come back to the

13     question of whether and how to proceed with the rest, either

14     from your offer or from Mr. Campo's offer.  Again, whether

15     you -- do you wish it to be redacted from the Court's eyes as

16     well?  You've given it to me.  I assume anything given to me I

17     can look at.

18          So Mr. Krinsky, first of all, do you intend for the

19     Court not to see it, because it should not be in your binder if

20     that's your intention?

21          MR. KRINSKY:  Your Honor, we have no objection to the

22     Court seeing it.  However, to the extent that opposing counsel

23     may argue that the production of any of these documents to the

24     Court somehow waives the issue of confidentiality that was the

25     sole purpose behind making that request as opposed to going

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 48 of 57 PageID #: 598
CHRISTINE PERSAUD

Page 48

1    through the formal process perhaps of a sealing order or

2    some -- or a request for a sealing order or some other means of

3    doing that.

4          But since Your Honor indicated that we're at a

5    breaking point, perhaps if I speak with co-counsel --

6          THE COURT:  It's your stopping point.

7          MR. KRINSKY:  -- perhaps I could speak with my co-

8    counsel, and we could perhaps address that issue in a more --

9          THE COURT:  Look for something else.

10         MR. KRINSKY:  -- productive way.

11         THE COURT:  We're back to the issue that has surfaced

12   from time to time, both in theory and in substance with the

13   nature of the issues here.  So we'll pause at the point where

14   the witness has identified -- I think you've identified this

15   document that's marked for identification only so far as

16   Exhibit 29.  Let's take pause in this direct testimony.  I

17   think that's the only thing we really can do at this point.

18         And I don't know yet.  I don't know.  I'm trying to

19   find out what the schedule is and see what's up in terms of

20   where we go next.  All right?

21         We need a continued date.  I have a possibility of

22   time available on Monday.  I don't know yet.  We'd have to let

23   the parties know.  Are you available on Monday, because if you

24   are not then there's no need for me to address the issue with

25   the parties and try to resolve my own schedule issues?

```
 1              MR. CAMPO:  Your Honor, I'm available in the

 2     afternoon.  I have a hearing at 10 and 11 in the morning in the

 3     Southern District, but I don't see any reason why we

 4     couldn't --

 5              THE COURT:  Yeah, with a question --

 6              MR. CAMPO:  -- meet here at 2.

 7              THE COURT:  -- mark.  Would the afternoon --

 8              MR. KRINSKY:  Your Honor, unfortunately I'm before the

 9     disciplinary committee all day on inquiry.

10              MR. CAMPO:  I'm sorry to hear it.

11              THE COURT:  Representing client, of course?

12              MR. KRINSKY:  Of course.

13              THE COURT:  That was important to let you clarify that

14     on the record.

15              MR. KRINSKY:  Mr. Campo did it --

16              THE COURT:  All right.

17              MR. KRINSKY:  -- for me, though.

18              THE COURT:  Okay.  It's --

19              MR. KRINSKY:  Thank you.

20              THE COURT:  For scheduling purposes, let's go off the

21     record.  I just think that's better.  It's -- we can go off the

22     record now.

23         (Recess from 4:30 p.m. until 4:39 p.m.)

24              THE COURT:  Okay.  Do we have everybody?

25              MR. CAMPO:  Your Honor, one of the things that we
```

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG   Document 1-27   Filed 07/05/12   Page 50 of 57 PageID #: 600
CHRISTINE PERSAUD

Page 50

1     could consider would be an --

2             THE COURT:  I don't think this makes sense.

3             MR. CAMPO:  -- entering an order approving the

4     retention at this point as general in bankruptcy counsel, but

5     carving out, if we can --

6             THE COURT:  Well then, it's not --

7             MR. CAMPO:  -- momentarily --

8             THE COURT:  -- retention, Mr. Campo.  It's a --

9             MR. CAMPO:  Well --

10            THE COURT:  -- it's a -- it's the retention for those

11    purposes.

12            MR. CAMPO:  -- well, Your Honor, actually what we're

13    really saying is a little bit different.  What we're saying is,

14    is that I don't think there's any objection to us acting as

15    general in bankruptcy counsel.  The only question they've

16    raised is, is we can't be adverse to Mr. Klein.  So what if we

17    are general in bankruptcy counsel?  And in the interim, until

18    Your Honor decides the issue of whether there is a conflict

19    with Mr. Klein, Mr. Pereira's firm will handle those matters.

20    And we can be retained, but we'll agree that we won't --

21            THE COURT:  I -- you know, it seems --

22            MR. CAMPO:  -- handle those other --

23            THE COURT:  -- to me to address completely the

24    situation that we're in, and I can't rule out the possibility

25    that in a month the trustee may modify his retention

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 51 of 57 PageID #: 601

CHRISTINE PERSAUD

Page 51

1    application and we'll proceed that way until we need to come

2    back to these issues because it's -- I -- my -- one of the

3    trustee's many jobs is to be smart about how he spends his --

4    the estate's money.  And --

5        MR. CAMPO:  I think that's --

6        THE COURT:  -- this is an --

7        MR. CAMPO:  -- that's right.

8        THE COURT:  -- this is an expensive proceeding.

9        MR. CAMPO:  And Your Honor, I don't to put anyone on

10    the spot right now, but I thought at one point it was an issue,

11    at least something raised, with Mr. -- between myself and Mr.

12    Krinsky concerning whether or not we would be involved in

13    connection with allegations that Mr. Klein -- allegations by

14    Ms. Persaud, by the way.  And Your Honor, they're only mere, at

15    this point, allegations, but apparent allegations by Ms.

16    Persaud that Mr. Klein took money -- took money out of Caring

17    and put it into the China project.

18        So -- I mean, if we're really -- we can almost narrow

19    it down even more with respect to that type of a carve-out.

20        MR. ZILBERBERG:  Your Honor, if I may speak for a

21    moment?

22        THE COURT:  Well, it may come back to that when I

23    render a decision.  But I -- yeah, do we have the parties on

24    the line?

25        THE CLERK:  Ms. Martin's also coming down.

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 52 of 57 PageID #: 602
CHRISTINE PERSAUD

Page 52

1          THE COURT:  Okay.  So let's get Ms. Martin.

2          All right.  Mr. Zilberberg, you've asked for -- you've

3     asked for me basically to continue this matter in November.

4     I -- what I'm inclined to do is approve the retention to the

5     extent not objected to and ask the trustee's purposed counsel

6     to settle on an appropriate order.

7          MR. ZILBERBERG:  Can I -- if I could have a moment

8     just to be very clear?  I believe that the Court alone before --

9     Your Honor said that it would be any claims against Klein or

10    any of his entities.  As I understand that, that would include

11    Caring.  And --

12         THE COURT:  Well -- and the objection is only for Mr.

13    Klein, so I should say I misspoke.  There is no objection by an

14    entity.  There's only objection from Mr. Klein, and you have

15    been litigating this proceeding emphasizing the distinction

16    between his entity and himself.  So I think I would go back --

17    I would have resort back to the source of the objection, and I

18    would be focusing the objector.

19         And I think at this point that may well be a

20    productive way to proceed.  to the extent that the retention is

21    unobjected to that I would view the time that's going to be

22    required to close out the evidentiary record here that the

23    unobjected to retention scope, it seems to be, should be

24    approved and that a proposed order to that effect -- and I

25    don't want this over lawyered.  I'm looking for something that

Case 1-10-44815-ess    Doc 250    Filed 10/05/11    Entered 10/05/11 12:14:40
Case 1:12-cv-03337-JG    Document 1-27    Filed 07/05/12    Page 53 of 57 PageID #: 603
CHRISTINE PERSAUD

Page 53

1    will be a clear boundary that errs on the side of clarity as

2    opposed to creation of issues.  That's what I'd like to see.

3            I'd like you to work on what that language might be as

4    I take this next matter, understanding that we've also got

5    someone who needs to finish up as soon as possible.  You're on

6    second call for those purposes.

7        (Whereupon these proceedings were concluded at 4:43 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 54

1

2                         **I N D E X**

3

4    WITNESS                 EXAMINATION BY      PAGE

5    Abraham Klein       Mr. Krinsky          18

6

7                            RULINGS

8                                          Page      Line

9    Application to Employ Troutman Sanders LLP    52        4

10   Granted in part

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1

2                       C E R T I F I C A T I O N

3

4       I, Aliza Chodoff, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7

8       _____

9       ALIZA CHODOFF

10

11      Veritext

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15

16      Date:  October 5, 2011

17

18

19

20

21

22

23

24

25

# United States Bankruptcy Court

Eastern District of New York
271 Cadman Plaza East, Suite 1595
Brooklyn, NY 11201–1800

---

IN RE:                                                    CASE NO: 1–10–44815–ess

   Christine Persaud

SSN/TAX ID:                                                    CHAPTER: 7

   xxx–xx–0247

        DEBTOR(s)

---

## NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

Notice is hereby given that:

A transcript of the proceeding held on September 21, 2011 was filed on October 5, 2011 .

The following deadlines apply:

The parties have until October 12, 2011 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a Transcript Redaction Request is October 26, 2011.

If a Transcript Redaction Request is filed, the redacted transcript is due November 7, 2011.

If no such Notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is January 3, 2012 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber Veritext (888–706–4576) or you may view the document at the public terminal at the Office of the Clerk.

 Dated: October 7, 2011

        For the Court, Robert A. Gavin, Jr., Clerk of Court

**BLnftrans.jsp** [Notice of Filing Transcript and Deadlines to Restriction and Redaction rev. 11/21/08]

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0207−1 | User: btaylor | Date Created: 10/7/2011 |
| Case: 1−10−44815−ess | Form ID: 295 | Total: 6 |

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

db       Christine Persaud      86−25 Van Wyck Expressway, Apt. 506      Jamaica, NY 11435
tr       John S. Pereira      Pereira &Sinisi      The Chrysler Building      405 Lexington Avenue      7th
       Floor      New York, NY 10174
aty       Troutman Sanders LLP      The Chrysler Building      405 Lexington Avenue      New York, NY 10174
aty       Mendel Zilberberg      6619 13th Avenue      Brooklyn, NY 11219
aty       Samuel J. Landau      250 West 57th Street      New York, NY 10107
       Pery D Krinsky, Esq      Krinsky PLLC      233 Broadway      Suite 707      New York, NY 10279

TOTAL: 6