Page 1

1                  UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF NEW YORK
2

      KLEIN,                        .    Case No. 10-01228
3                                   .    Adversary No. 10-44815
      v                             .
4                                   .    New York, New York
      CHRISTINE PERSAUD.            .    Monday, November 14, 2011
5                                   .    9:26 a.m.
                                    .
6                                   .

7     . . . . . . . . . . . . . .

           BEFORE THE HONORABLE JUDGE ELIZABETH STONG
8               UNITED STATES BANKRUPTCY JUDGE

9

10        [1] ADJOURNED PRE-TRIAL CONFERENCE RE: COMPLAINT
      ADJOURNED FROM: 10/19/10 11/4/10 12/14/10 1/5/11 2/2/11 3/10/11
11       4/7/11 5/20/11 6/17/11 8/16/11 9/27/11 10/28/11 11/8/11

12        [187,228] ADJOURNED HEARING (RE:RELATED DOCUMENT(S) [182]
      APPLICATION TO EMPLOY TROUTMAN SANDERS ADJOURNED FROM 9/27/11
13                     10/28/11 11/8/11

14        [204] ADJOURNED HEARING ON APPLICATION FOR ORDER TO SHOW CAUSE
      (RE: RELATED DOCUMENT(S)[195] MOTION FOR 2004 EXAMINATION OF
15       MELQUISEDEC ESCOBAR ADJOURNED FROM 9/8/11 9/13/11 9/20/11
                        9/22/11 10/28/11 11/8/11

16        [293] HEARING ON THE RECONSIDERATION OF THE ORDER TO SHOW CAUSE
       APPLICATION (RE: RELATED DOCUMENT(S) [195] MOTION FOR 2004
17                  EXAMINATION OF MELQUISEDEC ESCOBAR

18        [214] ADJOURNED HEARING ON APPLICATION FOR ORDER TO SHOW CAUSE
       (RE: RELATED DOCUMENTS(S) [196] MOTION FOR 2004 EXAMINATION OF
19     PHILIP GOTTEHRER ADJOURNED FROM 9/8/11 9/13/11 9/22/11 10/28/11
                              11/8/11
20

21        [295] HEARING ON THE RECONSIDERATION OF THE ORDER TO SHOW CAUSE
       APPLICATION (RE: RELATED DOCUMENT(S) [272] ORDER TO SCHEDULE
22     HEARING (GENERIC), [196] MOTION FOR 2004 EXAMINATION OF PHILIP
                              GOTTEHRER
23

24        [203] ADJOURNED HEARING ON APPLICATION FOR ORDER TO SHOW CAUSE
       (RE: RELATED DOCUMENTS(S) [197] MOTION FOR 2004 EXAMINATION OF
      JOEL KLEIN ADJOURNED FROM 9/8/11 9/13/11 9/20/11 1028/11 11/8/11
25

Page 2

1  [292] HEARING ON THE RECONSIDERATIO OF THE ORDER TO SHOW CAUSE
   RE: RELATED DOCUMENT(S) [197] MOTION FOR 2004 EXAMINAITON OF
2                    JOEL KLEIN

3  [201] ADJOURNED HEARING ON APPLICATION FOR ORDER TO SHOW CAUSE
   (RE: RELATED DOCUMENT(S) [198] MOTION FOR 2004 EXAMINATION OF
4  CARING HOME AGENCY ADJOURNED FROM 9/8/11 9/13/11 9/20/11 9/22/11
                    10/28/11 11/8/11

5

6  [296] HEARING ON THE RECONSIDERATION OF TE ORDER TO SHOW CAUSE
    APPLICATION (RE: RELATED DOCUMENT(S) [198] MOTION FOR 2004
7              EXAMINATION OF CARING HOME CARE AGENCY

   P202] ADJOURNED HEARING ON APPLICATION FOR ORDER TO SHOW CAUSE
8  (RE: RELATED DOCUMENT(S) [199] MOTION FOR 2004 EXAMINATION OF
                    ABRAHAM KLEIN
9

10 [294] HEARING ON THE ORDER TO SHOW CAUSE APPLICATION AND HEARING
        ON THE RECONSIDERATION OF THE ORDER TO SHOW CAUSE
11      APPLICATION(RE: RELATED DOCUMENT(S) [199] MORTION FOR 2004
               EXAMINATION OF ABRAHAM KLEIN

12 [179] ADJOURNED MOTION FOR VIOLATION OF AUTOMATIC STAY AND TO
   VOID CERTAIN DECISIONS OF THE STATE SUPREME COURT ISSUED IN
13       VIOLATION ADJOURNED FROM 9/27/11 10/28/11 11/8/11

14 [1] ADJOURNED PRE-TRIAL CONFERENCE RE: COMPLAINT ADJOURNED FROM
                    10/28/11 11/8/11
15
                ADJOURNED MEDIATION CONFERENCE
16  ADJOURNED FROM 6/28/11 7/5/11 7/7/11 7/27/11 9/7/11 9/28/11
                    10/25/11
17

18 APPEARANCES:

19 For Creditor Klein:          MENDEL ZILBERBER & ASSOCIATES
                                BY: MENDEL ZILBERBERG
20                              JOEL LEWITTES, Of Counsel
                                6619 Thirteenth Avenue
21                              Brooklyn, New York 11219

22 For Creditor Kline:          KRINSKY PLLC
                                BY:  PERY KRINSKY
23                              BY:  SARAH MOSKOWTIZ
                                Woolworth Building
24                              233 Broadway, Suite 707
                                New York, New York 10279
25

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 3 of 119 PageID #: 811

Page 3

```
 1   For Chapter 7 Trustee:          PEREIRA & SINISI, LLP
                                     BY:  JOHN S. PEREIRA
 2                                   The Chrysler Building
                                                            th
                                     405 Lexington Avenue, 7  Flr.
 3                                   New York, New York 10174

 4   For the Trustee:                TROUTMAN SANDERS, LLP
                                     BY:  LEE W. STREMBA
 5                                   BY:  JOHN R. CAMPO
                                     The Chrysler Building
 6
                                     405 Lexington Avenue
                                     New York, New York 10174
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20
     Transcription Service:          Associated Reporters Int'l., Inc.
21
                                     P.O. Box 165
22                                   Massena, New York  13662

                                     (315) 769-6429
23

24
     Proceedings recorded by electronic sound recording;
25
```

Page 4

1      BROOKLYN, NEW YORK, MONDAY, NOVEMBER 14, 2011, 9:26 A.M.

2              THE COURT:  Please be seated.

3              MR. CAMPO:  Good morning.

4              MR. STREMBA:  Good morning.

5              MR. PEREIRA:  Good morning.

6              THE COURT:  I apologize for my voice.  I'm working

7      on it.  Let's get your appearances for the record, please.

8              MR. STREMBA:  Your Honor, Lee Stremba with Troutman

9      Sanders for the Trustee and the firm.

10             MR. CAMPO:  John Campo with Troutman Sanders, Your

11     Honor, for the Trustee and the firm.

12             MR. PEREIRA:  John S. Pereira, the Chapter 7

13     Trustee.

14             MR. ZILBERBERG:  Mendel Zilberberg for creditor

15     Klein with, of Counsel, Joel Lewittes, and of Counsel, Pery

16     Krinsky, as well as Sarah Moskowitz.  Thank you, Your Honor.

17             THE COURT:  All right.

18             MR. KRINSKY:  Good morning, Your Honor.

19             THE COURT:  Thank you.  And I apologize for the

20     later-than-expected start.  Unanticipated matters that had to

21     be taken care of first thing this morning.

22             So I believe we are here to resume the testimony of

23     Mr. Klein, is that right, first and foremost?

24             MR. KRINSKY:  Yes, Your Honor.

25             THE COURT:  Okay.  Mr. Klein, you can take the

Page 5

1    stand.   All right.   You may be seated.

2              MR. KRINSKY:   May I inquire, Your Honor?

3              THE COURT:   Yes, you may.   I remind you that you

4    have -- your affirmation continues in effect.

5              ABRAHAM KLEIN; Previously sworn.

6                        DIRECT EXAMINATION

7    BY MR. KRINSKY:

8         Q.   Good morning, Mr. Klein.

9         **A.   Good morning.**

10        Q.   Mr. Klein, did there come a time in the summer of

11   2008 that you contemplated investing in China?

12        **A.   Yes.   In July of 2008, we were thinking of possibly**

13   **investing in a real estate development in China.**

14        Q.   And did there come a point in time that you sought

15   to retain, and did retain, counsel in connection with that

16   project?

17        **A.   Yeah, right around the same time in July of 2008,**

18   **we reached out to Troutman Sanders for potential**

19   **representation in the matter of the real estate investment in**

20   **China.**

21        Q.   Did there come a point in time that you actually

22   did retain the Troutman Sanders firm in connection with the

23   China project?

24             MR. STREMBA:   Your Honor, leading question.

25             THE COURT:   Did there come a time -- overruled.   You

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 6

1    may answer.

2         **A.    In July -- end of July and beginning of August, we**

3    **retained Troutman Sanders in connection with the project in**

4    **China.**

5    BY MR. KRINSKY:   (Cont'g.)

6         Q.    In connection with that retention, what, if any,

7    services -- legal services did the Troutman firm agree to

8    provide to you in connection with the China project?

9         **A.    They agreed to provide legal due-diligence, project**

10   **due-diligence, negotiations -- contract negotiations,**

11   **finance-related services, and -- and as well as possibly also**

12   **raising capital, the general -- the general categories.**

13        Q.    Okay.  And specifically, with respect to those

14   services, who, if anyone, from the Troutman Sanders firm

15   provided those services to you in connection with the -- in

16   connection with the China project?

17        **A.    Mr. Epstein.  We discussed those issues on July**

18   **30th on the conference call.  We also basically discussed**

19   **that later on, and it was Mr. Epstein, I guess, Aurora**

20   **Cassirer.**

21        Q.    Beginning in the summer of 2008 until December of

22   2008, did you have discussions with Mr. Epstein or other

23   members of the Troutman Sanders firm regarding the China

24   project?

25        **A.    Yeah.  We had discussions with Mr. Epstein and Mr.**

Page 7

1    Wang (phonetic spelling) in reference to the China project,

2    and we discussed the different categories that we originally

3    discussed.

4        Q.    When you refer to Mr. Wang, who is -- just for all

5    of our benefit, who is Mr. Wang?

6        A.    Mr. Wang is an attorney in the Troutman Sanders

7    firm in Shanghai, and he seemed to be doing a lot of the work

8    on the project.

9        Q.    After you retained -- you retained the Troutman

10   Sanders firm, what were the subject matters that were

11   discussed with the Troutman Sanders firm regarding the China

12   project?

13       A.    We discussed the legal due-diligence, the project

14   due-diligence, we discussed contract negotiations, we

15   discussed financing-related matters.    That was the general

16   categories.

17       Q.    Okay.    First, I'd like to talk to you briefly with

18   respect to the issue of legal due diligence, what were the

19   issues discussed with the Troutman Sanders firm regarding the

20   China project?

21       A.    China, I guess, being somewhat different than our

22   general understanding, we needed to make sure that whatever

23   was being presented to us from the developer's side on the

24   project would actually fit within the China legal system.    We

25   needed to also make sure that monies invested, specifically

Page 8

1    because of being foreign currencies, that it would be able to

2    be legally invested into the country and eventually

3    repatriated into the original currencies.  And we had to make

4    sure that it would fit into the legal system.

5         Q.   You mentioned a moment ago also the issue of

6    corporate structuring.  Generally speaking, what were the

7    issues discussed with respect to corporate structuring with

8    the Troutman Sanders firm in connection with the China

9    project?

10        A.   Very similar.  In order to make the investment, we

11   would have to set up a corporate structure that would fit

12   within the legal system that would allow for foreign

13   currencies specifically to be injected into the company and

14   later on repatriated into its original currencies.

15        Q.   You also mentioned a moment ago contract

16   negotiations.  What were the discussions that you had

17   generally about contract negotiations with the Troutman

18   Sanders firm in connection with the China project?

19        A.   One example we were working on the letter -- a

20   letter of understanding with the developer, and that was a

21   big part of the negotiations of making sure that the whole

22   understanding is right.

23        Q.   And lastly, you mentioned the issue of injecting

24   currency.  What were, if any, the discussions that you had

25   with the Troutman Sanders firm about -- with respect to

Page 9

1    financing of the China project?

2        A.    There's a -- I guess in the -- in the China system,

3    somewhat, there is more than just making a company and

4    investing money through the company into the project.  There

5    are many rules of how to fund the company or of funding that

6    needs to be done within a certain amount of time not even

7    related to the actual funding of the project.  And because of

8    that, we needed to make sure that the funding is there in

9    order to make the company work as well as structure the

10   company according to whatever funding was actually available

11   and what we still would need to raise.

12       Q.    Did there come a point in time that you discussed

13   with the Troutman Sanders firm a company called Caring?

14       A.    Yes.  It was in relation to the different vehicles

15   that we discussed that we were thinking of -- we would be

16   able to invest funds through those different vehicles.

17       Q.    By the way, when I say discussions with the

18   Troutman Sanders firm specifically in connection with Caring

19   and those discussions, who did you have those discussions

20   with about Caring?

21       A.    With Mr. Epstein and Mr. Wang.

22       Q.    And a movement ago, you mentioned different

23   vehicles -- financial vehicles.  What were, if any, the

24   different financial vehicles that were discussed as

25   possibilities for investing in China?

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 10 of 119 PageID #: 818

1      **A.    Flexocraft, which is one of the companies I'm**

2    **affiliated with, was a potential vehicle as a public company**

3    **and being able to possibly raise funds, venture capital, and**

4    **that we discussed with Troutman Sanders was a potential**

5    **vehicle as well as my personal finances or my personal**

6    **monies, which a big portion of that was in Caring.**

7          MR. KRINSKY:   In discussing your ownership interest

8    in Caring, without telling us specifically what was said --.

9          MR. STREMBA:   Objection, Your Honor.   There's no

10   such testimony.

11         THE COURT:   Well, let's have a complete question.

12   It'll help me assess an objection.

13   BY MR. KRINSKY:   (Cont'g.)

14     Q.   You mentioned a moment ago your ownership interest

15   in Caring.   Without telling us specifically what you said,

16   what categories of information did you provide to the

17   Troutman firm regarding that ownership interest?

18         THE COURT:   You may answer.

19     **A.   I discussed with them my investment in Caring.   I**

20   **-- I discussed with them, which was -- at that time, I**

21   **accrued profits in Caring, my ownership rights, and I**

22   **discussed with them different -- a way that I would have to**

23   **get the money out from Caring in order to invest in the China**

24   **project.**

25   BY MR. KRINSKY:   (Cont'g.)

Page 11

1      Q.   Mr. Klein, when you say different ways to get your

2  money out of Caring to invest in the China project, what

3  specifically do you mean?

4      **A.   I was working on a factoring agreement in order to**

5  **leverage my ownership rights and equity in Caring, therefore**

6  **being able to invest in China.**

7            MR. KRINSKY:  Mr. Klein, putting aside for a moment

8  the factoring agreement, when, if ever, did you have

9  discussions with the Troutman firm regarding simply

10  liquidating your interest and investing in the China project

11  yourself?

12            MR. STREMBA:  Your Honor, objection.  Where was that

13  from?

14            THE COURT:  I have to say that question seems to me

15  to go beyond the boundaries of what's been the witness'

16  testimony.  I'm going to encourage you to ask questions in

17  the nature of questions seeking direct testimony and not to

18  provide information not previously set forth in the witness'

19  testimony in your answers.  Can you rephrase that question,

20  please?

21  BY MR. KRINSKY:  (Cont'g.)

22      Q.   Did there come a point in time where you had

23  discussions with Troutman Sanders regarding how to invest

24  monies in the China project?

25      **A.   I would discuss that in the beginning in July.  And**

Page 12

1    in August, we discussed it -- of how we would invest monies

2    in -- in -- in Caring and where -- I'm sorry -- in China and

3    where the money would be coming from.

4             MR. KRINSKY:  And did you discuss with Troutman

5    Sanders --?

6             THE COURT:  Excuse me for one second.  I need to

7    confer with my deputy.  May we go briefly off the record?

8             (Off the record)

9             THE COURT:  Okay.  Mr. Krinsky, for the sake of a

10   smooth record, I'm going to ask you to restate your pending

11   question -- or state again, I should say, your pending

12   question.

13   BY MR. KRINSKY:  (Cont'g.)

14        Q.   Did there come a point in time -- withdrawn.

15             During the period of the summer of '08 to December

16   of '08, did you have occasion to discuss with the Troutman

17   Sanders firm the possible financial investment vehicles for

18   the China project?

19        A.   Yes, I discussed it with them.  In -- in July, I

20   discussed it with them.  You know, basically it was part of

21   the discussion every time we spoke, November, December, every

22   time we spoke about this.

23        Q.   Just go back for a moment.  And specifically what

24   was the financial investment vehicle that was discussed

25   during these conversations with Troutman Sanders?

Page 13

1      A.    There were a couple of financial investment

2   vehicles.  And one -- one of them was my personal monies that

3   I had in Caring, which I needed to get out from Caring in

4   order to invest in China.

5      Q.    When you say get out of Caring, what do you mean?

6      A.    It wasn't -- wasn't that simple.  We -- I needed

7   to find a creative way to do that, and so I came up with this

8   factoring -- idea of a factoring agreement in order to

9   leverage my equity in the company.

10     Q.    Again, without telling us specifically what was

11  said, with respect to the factoring agreement, what, if any,

12  discussions did you have with the Troutman Sanders firm

13  regarding your financial interests in Caring?

14     A.    I discussed with them my ownership rights.  I

15  discussed with them the monies that I invested in the

16  company.  I discussed with them my profits at that time and

17  what it would -- what would be the -- the potential profit at

18  the time that we'd -- we would get to the point of closing

19  the China deal.  I discussed with them issues that I had at

20  that moment whereby I couldn't just simply write a check from

21  the company in order to invest in the China project.

22     Q.    Mr. Klein, with respect to this factoring

23  agreement, did the Troutman Sanders firm have any direct

24  involvement in the drafting or negotiating of this factoring

25  agreement you refer to?

Page 14

1    **A.    No.**

2    Q.    Well, if they didn't have any direct involvement

3    in drafting or the negotiating of it, what was the nature,

4    then, of the discussions with the Troutman Sanders firm about

5    the factoring agreement?

6    **A.    They needed to know where monies were coming from.**

7    **They needed to know the timeframe of any and all monies in**

8    **order to be able to, number one, I guess, structure the --**

9    **the -- do the corporate structure in order to work along with**

10   **the financial abilities and as well as they needed to know**

11   **where it was coming from because investment -- investing**

12   **foreign funds as well as repatriation of funds was an issue**

13   **in a China company structure.**

14   Q.    Okay.    I'd like to focus a little bit more on that for

15   a moment.    If you would please turn to the exhibit book to

16   tab one two four in the Klein exhibit book, one two four.

17   Mr. Klein, I'd like you to briefly look down at that

18   document, briefly look through it, and when you're done

19   flipping through it, please look up.    When you're done

20   flipping through, if you would just look up just so we know

21   you're ready.

22   **A.    The -- through the first part or all of them?**

23   Q.    When you're done flipping through the document, if

24   you would please look up.    Mr. Klein, do you recognize that

25   document?

Page 15

1      A.    Yes.

2      Q.    How do you recognize that document?

3      A.    **That's from -- one of the e-mails from -- that was**

4  **written to me.**

5      Q.    Okay.  And what do you recognize that document to

6  be?

7      A.    **It's a letter from Mr. -- Mr. Wang on November 24.**

8      Q.    Okay.  And Mr. Wang is, just so the record's

9  clear?

10     A.    **From Troutman Sanders.**

11          MR. KRINSKY:  Your Honor, I offer into evidence what

12  was previously marked as Klein Exhibit One Twenty-four as

13  identification as Klein Exhibit One Twenty-four.

14          MR. STREMBA:  No objection, Your Honor.

15          THE COURT:  Without objection, it will be received

16  in evidence.

17          (Klein Exhibit One Twenty-four is admitted in

18     evidence.)

19          THE COURT:  The copy that I have is a two page e-

20  mail -- excuse me -- a three page e-mail followed by the

21  November 28th, 2008, seven page letter, is that correct?

22          MR. KRINSKY:  It is, Your Honor.

23          THE COURT:  Thank you.  Please proceed.

24  BY MR. KRINSKY:  (Cont'g.)

25     Q.    Mr. Klein, a moment ago, you had mentioned that

Page 16

1  you had -- that you had been discussing with the Troutman

2  Sanders firm issues of investing in China.  Please take us

3  through, if you would, this e-mail very briefly noting to the

4  Court where, if at all, those discussions are reflected in

5  this -- in this particular e-mail.

6      **A.    Something very specific?  That's all -- it's all**

7  **about investing in China.**

8      Q.    Well, specifically can you cite some examples for

9  us specifically where you're discussing G.R.V. and the issues

10  of investing in China?

11      **A.    It's about paragraph three, where I'm -- where**

12  **we're discussing G.R.V. and the investment in China and how**

13  **it works with foreign investments.**

14      Q.    So for example, referring to the paragraph that

15  begins T-S, about halfway down on the page, do you see that?

16      **A.    Yes.**

17      Q.    Okay.  Specifically referring your line -- your

18  attention to line four -- this document's already in evidence

19  -- specifically where it begins to discuss, quote, "The China

20  law does not permit a guarantee for the fixed return under a

21  Sino-foreign investment corporation."  Did I read that

22  correctly?

23      **A.    Correct.**

24          THE COURT:  Could you say again what paragraph

25  you're reading from?

Page 17

1          MR. KRINSKY:  Sure.  This is under the paragraph

2     that's labeled two.  It is the paragraph that begins T-S.

3          THE COURT:  Yes, okay.

4          MR. KRINSKY:  Okay.

5     BY MR. KRINSKY:  (Cont'g.)

6          Q.  Specifically referring to the fourth line down,

7     approximately four -- four words from the left of the page,

8     the China law.

9          A.   Yes, I see.

10          Q.   Okay.  In your discussions with the Troutman

11     Sanders firm, what, if anything, did you discuss with respect

12     to difficulties in China and investments?

13          A.   **There's different rules and regulations in the**

14     **China law which we were not very familiar with, and we were**

15     **looking for them -- for Troutman to advise us.  And what we**

16     **discussed in general were that where the funds would be**

17     **coming from, through which vehicles we might be bringing the**

18     **funds to this project, and how that would be able to be**

19     **injected as foreign currencies into the -- into this China**

20     **project as well as being able to get it back out in the same**

21     **currencies.**

22          Q.   I'm going to refer your attention to the last

23     sentence of that same paragraph that begins after "Obtaining

24     more information."  Do you see that?  Same paragraph that

25     begins T-S, colon, very last sentence, beginning after

Page 18

1    "Obtaining more information."  Do you see where I am?  Okay.

2    I'd like you to read that out loud for us.

3         A.    (Reading) **"After obtaining more information about**

4    **this project and Mr. Zhang's company, we will advise you**

5    **whether there are any possibilities to lawfully set up an**

6    **effective guarantee structure.  And we are, of course, open**

7    **to any suggestions from Mr. Zhang."**

8         Q.    In connection with this e-mail or other

9    communications that you had, did you discuss other

10   possibilities with the Troutman Sanders firm of how to

11   structure a deal in China using your monies?

12        A.    **I don't understand the question.**

13        Q.    Sure.  During your discussions with the Troutman

14   Sanders firm, did you have a dialogue regarding the possible

15   vehicles to invest in China?

16        A.    **Yes.**

17        Q.    Okay.  In addition to this e-mail, did you have

18   other communications with either Mr. Wang or Mr. Epstein

19   regarding those possible vehicles?

20        A.    **Yes, we did.**

21        Q.    Okay.  And what was the form of those

22   communications?  For example, in writing, verbally, or

23   otherwise?

24        A.    **Much -- a lot of it in -- verbally.**

25        Q.    And those verbal communications, were they by

Page 19

1    telephone or in person?  What was the actual form of those

2    conversations?

3        **A.    By telephone and in person.**

4            THE COURT:  Mr. Krinsky, in a general way, I will

5    note that your questions have included many components of

6    potential answers.  It will help me more if the questions are

7    more open-ended, in the nature of what happened next, what

8    did you do, things like that.  It -- it -- it simply will

9    give me a better record upon which to assess the -- the facts

10   and also the witness' credibility.

11           But your questions are unobjected to, and of

12   course, I'm not objecting.  I'm just offering some general

13   guidance.  Please continue.

14           And -- and I will say in a general way that

15   applies to any attorney questioning any witness on direct.

16   BY MR. KRINSKY:  (Cont'g.)

17       Q.    In November 2008, take us through, if you would,

18   the discussions you had generally with the Troutman Sanders

19   firm regarding the investment in the China project.

20       **A.    There were -- in general, there -- there was this**

21   **China project where company structures needed to be set up.**

22   **The company structure needed to be set up in a way that would**

23   **work within the realities of our existing financing as well**

24   **as any additional financing -- or additional funds as well as**

25   **any additional financing that we would have to raise one way**

Page 20

1    or another.

2         One had an effect on the other, so that was a continuous

3    conversation of what funds we have, the timing of the funds,

4    where the funds are coming from so as to be able to build or

5    set up the company structure in a way that would fit those

6    realities.

7         In addition to that, there were potential different

8    avenues or different vehicles through which we would be able

9    to potentially raise funds, and they -- those -- all of those

10   would have to fit into the same eventual corporate structure.

11   All of that had to fit in within the China legal system,

12   which has, I guess, a whole bunch of restrictions that have

13   to be taken into account.  All that had to be worked in

14   within the -- the letter of intent that was basically the

15   framework of something the -- the real estate developer would

16   have to agree with and which would work within the realities

17   of what existed on my side.

18        Q.   When you say into the realities of what existed on

19   your side, what specifically are you referring to?

20        A.   Funding.  A significant portion of the funding,

21   roughly thirty percent of it, as we -- as I calculated at

22   that time, would have come from my investment in Caring.  And

23   -- and there was an issue of getting the money out as well as

24   the timing of getting that issue resolved.  And that was an

25   important and significant part in this investment.  Without

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 21

1    that, this whole potential China deal -- it -- it's a

2    possibility we wouldn't be able to pull it off.

3        Q.    In connection with the Troutman Sanders firm

4    representing you, what, if any, discussions did you have with

5    the Troutman Sanders firm regarding specific investment

6    vehicles?

7        A.    I discussed with them -- my Flexocraft was an

8    investment vehicle as well as my funds in Caring that we

9    needed to get out of Caring into a -- somehow into an

10   intermediate vehicle in order for us to -- so I should be

11   able to leverage those funds and be able to get money or a

12   loan based on what I -- the -- based on the equity that I

13   would leverage into this intermediary company, which was --

14   we tried to use G.R.V.

15       Q.    Now specifically, without telling us what you said

16   and what they said to you, what were the general categories

17   of information that you provided to Troutman Sanders and

18   Troutman Sanders asked you for with respect to Caring?

19       A.    The general information was in reference to my

20   ownership rights, the issues that I was having of why I can't

21   seem to just take the money out, the delay -- delay in -- in

22   licensing, which was part of the issue or the issue actually,

23   my profits, my investments in the company, and even the -- to

24   the point of -- of how the money would accrue or accrues and

25   how it would get to a particular two point two million or

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 22

1    something at a particular point in time.

2         Q.    You mentioned a moment ago G.R.V.  During this

3    period of time that you were discussing Caring, the China --

4    and the China project with the Troutman Firm, what was the

5    value of the company G.R.V.?

6         A.    G.R.V. had no value.

7         Q.    Mr. Klein, help us to understand.  If G.R.V. had

8    no value, how could G.R.V. be used as an investment vehicle

9    to invest in China?

10        A.    Without the factoring agreement, it wouldn't be

11   able to.

12        Q.    And the factoring agreement that you're referring

13   to specifically relates to what company and what ownership

14   interests?

15        A.    The factoring agreement relates to my ownership

16   interest in Caring at that time.

17        Q.    During what period of time were you engaged --

18   withdrawn.

19              You mentioned a moment ago that you were engaged

20   in negotiations over a factoring agreement.  During what

21   period of time did those negotiations take place?

22        A.    From the summer of '08 until about January '09, I

23   think.  End of January '09, I believe.

24        Q.    That had to do with the factoring agreement.  Now

25   during what period of time was Troutman Sanders actively

Page 23

1    pursuing your interests in connection with the China project

2    that you referred to?

3         A.    **The same timeframe, from summer '08 until end of**

4    **December.**

5         Q.    To your knowledge, did Ms. Persaud know about the

6    China project that you were negotiating or working on during

7    this period of time?

8         A.    **Yes, she did.  I told her about it.**

9         Q.    What did you say to her generally, and what did

10   she say to you generally?

11        A.    **In general, it was about negotiating with her in**

12   **reference to the factoring agreement that I wanted her to**

13   **sign and therefore be able to leverage my equity in Caring in**

14   **order to be able to use it for the China project.  I**

15   **basically told her that I am looking to get a loan on a line**

16   **of credit based on my equity in Caring.  And therefore, I**

17   **would need to make a factoring agreement in order to be able**

18   **do that.**

19        Q.    Were the discussions that you had with Ms. Persaud

20   regarding your ownership interest in Caring to be used for

21   China?  Is that the same information that you provided to

22   Troutman Sanders during confidential communications?

23        A.    **Pretty much the same.**

24             MR. STREMBA:  Objection, Your Honor.  I -- I can't

25        --.

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud Associated Reporters Int'l., Inc.

Page 24

1          THE COURT:  Sustained.  You can restate that

2    question.  It contains a number of conclusions.  I think if

3    you break it down, it will be more helpful.

4          MR. KRINSKY:  Your Honor, may I have a moment to

5    confer with co-counsel?

6          THE COURT:  Surely.  If you're unable to restate the

7    question, I'll -- I'll give you an opportunity to respond.

8    It seemed to me a situation best addressed by a restated

9    question.

10   BY MR. KRINSKY:  (Cont'g.)

11        Q.    You testified earlier regarding confidential

12   information that you provided to the Troutman Sanders firm.

13   Do you recall those questions?

14        **A.    Yes.**

15        Q.    Mr. Klein, as you sit here today, why is it that

16   you don't want the Troutman Sanders firm representing the

17   Trustee?

18        **A.    During the Troutman Sanders representation and me**

19   **working with them, I gave them a lot of information -- a lot**

20   **of confidential information in relation to my dealings, my**

21   **finance, my thinking, essentially giving them a roadmap to**

22   **everything about my finances specifically related to Caring.**

23   **If they would be allowed to represent the Trustee, they would**

24   **be able to use that information to help the Trustee try to**

25   **take away my rights or ownership rights in Caring.  I don't**

Page 25

1    **think that's right.**

2              MR. KRINSKY:  I have no further questions.

3              THE COURT:  Thank you.  You may -- you may inquire.

4                        RECROSS EXAMINATION

5    BY MR. STREMBA:

6         Q.    Mr. Klein, did you ever provide to Troutman

7    Sanders a personal balance sheet?

8         **A.    No.**

9         Q.    Did you ever provide Troutman Sanders with a

10   personal income statement or other financial statement?

11        **A.    No.**

12        Q.    Did you ever provide Troutman Sanders with any

13   personal tax returns?

14        **A.    No.**

15        Q.    Did you ever provide Troutman Sanders with any

16   personal bank statements, brokerage statements, or credit

17   card statements?

18        **A.    No.**

19        Q.    Did you ever provide Troutman Sanders with any

20   balance sheet for Caring Home Care Agency?

21        **A.    No.**

22        Q.    Did you ever provide Troutman Sanders with any

23   income statements or other financial statements of Caring?

24        **A.    No.**

25        Q.    Any tax returns of Caring?

800.523.7887                11-14-2011, New York, NY, In the Matter of C. Persaud    Associated Reporters Int'l., Inc.

Page 26

1      **A.**    **No.**

2      Q.    Any bank statements, brokerage statements, credit

3      card statements of Caring?

4      **A.**    **No.**

5      Q.    Any accounting records of Caring?

6      **A.**    **No.**

7      Q.    Any contracts to which Caring was a party?

8      **A.**    **No.**

9      Q.    Did you provide Troutman with any list of

10     transfers that was -- that were made by Caring to any other

11     party?

12     **A.**    **No.**

13     Q.    Did you provide any documentation of any transfers

14     made by Caring to any other party?

15     **A.**    **No.**

16     Q.    Did you provide Troutman Sanders with copies of

17     any proposed contracts between Caring and any other party?

18     **A.**    **No.**

19     Q.    Specifically, did you provide Troutman Sanders

20     with a copy of any proposed factoring agreement with Caring?

21     **A.**    **I don't believe so.**

22     Q.    Did you provide Troutman Sanders with any

23     documentation of the ownership of Caring?

24     **A.**    **No.**

25     Q.    Did you provide Troutman Sanders with any balance

Page 27

1    sheet for Trade Fame Group, Limited?

2        **A.    No.**

3        Q.    Did you provide any income statement or other

4    financial statements of Trade Fame Group?

5        **A.    No.**

6        Q.    Any tax returns of Trade Fame Group?

7        **A.    No.**

8        Q.    Any bank statements, brokerage statements, credit

9    card statements?

10       **A.    No.**

11       Q.    Any accounting records?

12       **A.    No.**

13       Q.    Any contracts to which Trade Fame Group was a

14    party?

15       **A.    No.**

16       Q.    Any list of transfers made by Trade Frame -- Trade

17    Fame Group to any other party?

18       **A.    No.**

19       Q.    Documentation of any transfers made to Trade Fame

20    Group by any other party?

21       **A.    No.**

22       Q.    Any proposed contracts between Trade Fame Group

23    and any other party?

24       **A.    Documentation?**

25       Q.    Yes.

Page 28

1      **A.      No.**

2      Q.      Mr. Klein, did you ever ask Troutman Sanders to

3      assist you in obtaining financing for the China Project?

4      **A.      Yes.**

5      Q.      And what did you ask them to do?

6      **A.      We -- we explained to them our financial position,**

7      **and they offered that they do financing-related venture**

8      **capital, raising funds, and that they might be able to help**

9      **us in that regard.**

10            MR. STREMBA:  I move to strike the answer.  Mr.

11     Klein, what did you ask Troutman Sanders to do in connection

12     with obtaining financing?

13            THE COURT:  Wait.  There's -- there's -- there's no

14     jury.  I'm going to -- I'm going to let the answer stand.

15     You can -- you can follow up.

16     BY MR. STREMBA:  (Cont'g.)

17     Q.      Specifically, Mr. Klein, what services did you ask

18     Troutman Sanders to render in connection with obtaining

19     financing for the China Project?

20     **A.      They actually offered us that they would be able**

21     **to --.**

22     Q.      Mr. Klein?

23     **A.      Yes?**

24     Q.      What did you ask Troutman Sanders to do?

25     **A.      Based on our existing financing, if they would be**

Page 29

1    **able to raise capital in order to potentially fill in the**

2    **gap, if there would be, in fact, a gap.**

3        Q.    Did you ask Troutman Sanders to review any draft

4    contracts between Caring and any other party?

5        **A.    No.**

6        Q.    Did you ask Troutman to communicate on your behalf

7    with -- with anyone with respect -- I'm sorry -- with anyone

8    on behalf of Caring?

9        **A.    No.**

10       Q.    You indicated that you were having discussions

11   during the summer and into -- through December with Caring

12   with regard to a possible factoring agreement, correct?

13       **A.    Correct.**

14       Q.    With whom were you communicating with regard to --

15   to the possible factoring agreement?

16       **A.    On my side --**

17       Q.    Yeah.

18       **A.    -- or with Troutman's side?**

19       Q.    No, not with Troutman.  Who -- with whom on behalf

20   of Caring were you communicating?

21       **A.    Christine Persaud.**

22       Q.    Were you also having communications with an

23   attorney representing Caring?

24       **A.    Yes.**

25       Q.    And who was that?

Page 30

1      **A.    Sam Reif (phonetic spelling).**

2      Q.    And did you ask Troutman to speak to Mr. Reif on

3    your behalf with respect to a factoring agreement?

4      **A.    No.**

5      Q.    Were you represented by any counsel in connection

6    with your proposed factoring agreement?

7      **A.    The factoring agreement was drafted by counsel,**

8    **yes.**

9      Q.    And which counsel was that?

10     **A.    Paul Salazar (phonetic spelling), among others.**

11     Q.    Among what -- which other --?

12     **A.    There was multiple drafts.  We had to make sure**

13   **that a factoring agreement would work within the D.O.H.**

14   **regulations.**

15     Q.    So what attorneys other than Mr. Salazar

16   participated in that drafting?

17     **A.    I think it was Tenzer (phonetic spelling).**

18     Q.    The Tenzer Firm?

19     **A.    Yeah.**

20     Q.    Any -- any others?

21     **A.    I don't remember.**

22     Q.    Mr. Klein, to your knowledge, has there ever been

23   an e-mail communication between you and your brother on one

24   hand and Troutman on the other that refers to Caring?

25     **A.    I don't think so.**

Page 31

1      Q.    Are you aware of any e-mail communication between

2    you and your brother on one hand and Troutman on the other

3    hand that refers to Trade Fame Group?

4      A.    No.

5      Q.    Are you aware of any e-mail communication between

6    you or your brother and Troutman that refers to any contract

7    or proposed contract between Caring and any other parties?

8      A.    No.

9      Q.    Are you aware of any e-mail communication between

10   you or your brother and Troutman that refers to any transfer

11   made by Caring to Trade Fame Group?

12     A.    No.

13     Q.    Are you aware of any e-mail communication between

14   you or your brother and Troutman that refers to Christine

15   Persaud?

16     A.    I don't think so.

17     Q.    Mr. Klein, I'd like to direct your attention to

18   Troutman Exhibit A, which is a copy of the engagement letter.

19   It's in the binder that -- that I provided.  You can -- you

20   can look at it either now or as I ask questions.  I just have

21   a few questions about it.  First, is there any reference in

22   the engagement letter to Caring?

23     A.    No.

24     Q.    Is there any reference in the engagement letter to

25   Trade Fame Group?

Page 32

1    **A.    No.**

2    Q.    Is there any reference to any contract or proposed

3    contract between Caring and any other party?

4    **A.    No.**

5    Q.    Is there any reference to Christine Persaud in the

6    engagement letter?

7    **A.    No.**

8    Q.    Is there any reference in that engagement letter

9    to providing services relating to obtaining financing for the

10   China Project?

11   **A.    No.**

12   Q.    Did you -- to your knowledge, did you or your

13   brother ever ask Troutman Sanders to add something to its

14   engagement letter that would cover potential financings for

15   the China project?

16   **A.    I don't believe so.**

17   Q.    Mr. Klein, I'm going to refer you to an affidavit

18   that you submitted in connection with your objection.  It's

19   Trustee Exhibit O in the binder.  First, Mr. Klein, could you

20   confirm that you signed this affidavit on the -- the last

21   page?

22   **A.    Yeah, it's my signature.**

23   Q.    Mr. Klein, I'd like to refer you now to paragraph

24   thirty-eight of your affidavit.  I don't think the pages are

25   numbered, but it is paragraph thirty-eight.  This paragraph

Page 33

1    reads, quote, "It is clear that my expectation was that the

2    Troutman firm continued to represent us in the ongoing matter

3    of the China project, and that, if anything, as of December

4    2008, the China Project was picking up momentum as evidenced

5    by the Troutman firm's very words and actions that the

6    Troutman firm believed that it was important at that precise

7    point in time, December 2008, to have the retention agreement

8    executed."

9          Now Mr. Klein, as you sit here today under oath, do

10   you believe that the China project was picking up momentum as

11   of the end of December 2008?

12         MR. KRINSKY:  Objection.  Form.  Improper

13   impeachment.  There's been no inconsistency, and the witness

14   hasn't said he doesn't remember.

15         MR. STREMBA:  I'm asking him --.

16         THE COURT:  Overruled.  It's cross examination.

17   This is the witness's statement under affirmation.  I think

18   it's an appropriate question.  You had a wide berth on

19   direct.

20         MR. KRINSKY:  Is the document in --?

21         THE COURT:  I think a wide berth is appropriate.

22         MR. KRINSKY:  Is the document in evidence?

23         THE COURT:  I don't think --.

24         MR. STREMBA:  It isn't now, but if you'd like it to

25   be, it can be.

Page 34

1          THE COURT:  It -- it is an affidavit that you filed

2     in the case.  Do you object to its use?

3          MR. KRINSKY:  No.  In fact, I would offer -- I would

4     then ask that it be offered into evidence and therefore it be

5     a part of the record --

6          THE COURT:  Okay.

7          MR. KRINSKY:  -- as opposed to simply a pleading.

8          MR. STREMBA:  Your Honor, that's fine with me.

9     We'll move the -- the -- it's --.

10         THE COURT:  It's admitted without objection.  It

11    will be admitted.

12         (Trustee Exhibit O is admitted in evidence.)

13    **A.    Yes, it was picking up momentum.**

14    BY MR. STREMBA:  (Cont'g.)

15    Q.    And how can you say that it was picking up

16    momentum at the end of December 2008?

17    **A.    Until we were told that the developers were**

18    **putting it on hold for a while due to the economic turmoil**

19    **worldwide, it was picking up momentum.**

20    Q.    The developer indicated that he was putting the

21    project on hold on December 31, 2008, isn't that correct?

22    **A.    Correct.**

23    Q.    And so as of the end of December 2008, in your

24    view, was the project picking up momentum?

25    **A.    Until we were told that it wasn't.**

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 35

1      Q.    But as of December 31, 2008, it was no longer

2  picking up momentum is that your testimony now?

3      **A.    As of December 31 when the Troutman Sanders firm**

4  **told us that the developer had put it on hold, that's when we**

5  **were notified that it was no longer picking up momentum.**

6  **That is correct.**

7      Q.    So in your affidavit in paragraph thirty-eight

8  when you say that the project was picking up momentum, you're

9  referring to the period before December 31, 2008?

10     **A.    It was the end of December, correct.**

11     Q.    And not to the period since?

12     **A.    Not since that time, correct.**

13     Q.    Has the China project ever proceeded?

14     **A.    No.**

15     Q.    Mr. Klein, I'd like to refer you next to an

16  affidavit -- another affidavit that you submitted in this

17  matter.  It's Trustee Exhibit N in the binder.  This is an

18  affidavit dated August 15, 2011.  I'd like you to look at the

19  last page and confirm, if you can, that you signed this

20  affidavit.

21     **A.    Yes.**

22          MR. STREMBA:  I'd like to move this exhibit into

23  evidence, Your Honor.

24          THE COURT:  Any objection?

25          MR. KRINSKY:  No objection.

Page 36

1           THE COURT:  Without objection, it will be

2    received.

3           (Trustee Exhibit N is admitted in evidence.)

4    BY MR. STREMBA:  (Cont'g.)

5       Q.    Mr. Klein, please look at paragraph seven of your

6    affidavit, which reads, quote, "While the actual work on the

7    China project has been temporarily suspended because of the

8    economic downturn, et cetera, the representation by Troutman

9    Sanders, L.L.P., is still ongoing."  Mr. Klein, as you sit

10   here today under oath, would you say that the China project

11   has been temporarily suspended?

12      A.    **I would still say so, yes.**

13      Q.    How many years would it take you to say that the

14   project was no longer temporarily suspended?

15           MR. KRINSKY:  Objection.  Argumentative.

16           THE COURT:  Overruled.

17      A.    **The project still exists.  The economy didn't turn**

18   **much around.  And would the right time come for the project**

19   **to be a viable project, it would still exist.**

20   BY MR. STREMBA:  (Cont'g.)

21      Q.    Mr. Klein, since December 2008, have you made any

22   attempt to keep up with developments regarding the Chinese

23   economy?

24      A.    **Just as much as it pertains to me and my general**

25   **business.**

Page 37

1    Q.    Okay.  And how do you keep up with the Chinese

2    economy?

3    **A.    Just from the information that I get in general**

4    **business, which I do with China on a daily basis.**

5    Q.    Would that include regularly reading any

6    newspapers like the Wall Street Journal?

7    **A.    No.**

8    Q.    Do you regularly read the New York Times business

9    section?

10    **A.    No.**

11    Q.    Have you -- strike that.  Withdrawn.

12          What is your general understanding of how the

13    Chinese economy has been faring since December 2008?

14    **A.    From the information that I have, I guess it had**

15    **ups and downs, but better than the U.S. economy to a degree.**

16    **That's the best of -- of my information.**

17    Q.    Is anybody -- withdrawn.

18          Have you ever read or heard reports that the

19    Chinese economy has been in a boom state during the last few

20    years?

21    **A.    I can't say that I did.**

22    Q.    Have you ever read or heard reports that real

23    estate prices have risen so much in the last few years that

24    there is a potential real estate bubble in China?

25    **A.    In certain areas, I did hear about that, yes.**

Page 38

1      Q.    Do you believe that there is still a temporary --

2    strike -- withdrawn.

3            Do you believe that there is still an economic

4    downturn in China?

5      A.    There is definitely an economic downturn

6    worldwide.  And this is really why this project was put on

7    hold as of uncertainty because it had a certain window of

8    sell through.  And if that window of sell through wouldn't --

9    wouldn't be met, that would mean additional investment in

10   that project.  And therefore, from the developer's

11   perspective -- and I wasn't making the decisions -- from the

12   developer's perspective, he felt that it's a risk of this

13   project going out of that twenty-four month or so window.

14     Q.    Well, that twenty-four month window is now past,

15   right?

16     A.    No, it's a twenty-four month window from when this

17   -- the project actually starts until it's completed.

18     Q.    So during the last three years, have you looked at

19   any other potential investments in China?

20           MR. KRINSKY:  Objection.  Relevance.

21           THE COURT:  Well, you've -- it seems to me in your

22   examination you've asked a number of questions that go to

23   the bigger picture of Mr. Klein's investment interests.  I

24   don't think a long inquiry on this is likely to be

25   productive, but I'm going to overrule the objection for now.

Page 39

1      I think the door's been opened.  You may inquire.

2          **A.    Can you repeat the question again, please?**

3    BY MR. STREMBA:  (Cont'g.)

4          Q.    During the last three years, have you considered

5    investing in any other project in China?

6          **A.    No real estate projects, no.**

7          Q.    Has the developer of the China project done --

8    proceeded with the project to any extent?

9          **A.    Not with that project.**

10         Q.    I'd like to direct your attention now to paragraph

11   eleven C of the same affidavit.  This paragraph states,

12   quote, "As my interests in China intersected with my

13   interests in Caring Home Care in the attempt to arrange for

14   financing, and Christine Persaud raised certain allegations,

15   which I deny, it is reasonable to assume that there is a

16   possibility that Troutman Sanders, L.L.P., will, on behalf of

17   the Chapter 7 Trustee, investigate and/or litigate matters,

18   the very same matters for which I have retained them to

19   represent me."

20              Mr. Klein, in that paragraph where you refer to

21   the attempt to arrange for financing, are you referring to

22   the proposed factoring agreement that you testified to

23   earlier?

24         **A.    All right.  It's in reference to all the**

25   **information that I gave to Troutman Sanders' firm in**

800.523.7887            11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 40

1    **reference to my interests in Caring and my financing in**

2    **Caring and the -- and my -- interests and ownership rights**

3    **and everything that I told them about it.**

4        Q.    And the reference to the certain allegations made

5    by Christine Persaud, what allegations are you referring to

6    there?

7        **A.    She made a whole bunch of allegations.**

8        Q.    Which ones are you referring to here, "certain

9    allegations"?  Are you referring to the allegation that there

10   were improper transfers made between Caring and Trade Fame

11   Group?

12       **A.    That could be one of them.**

13       Q.    What other ones could there be?

14       **A.    Any and all allegations that she would have made.**

15       Q.    Are you saying you don't remember any others?

16       **A.    I can't recall in detail all of them, no.**

17       Q.    Did you refer to any other allegations in your

18   affidavit or in the other affidavit that we looked at?

19       **A.    I wouldn't recall.  I can read it.**

20           THE COURT:  It would be helpful to you to take a

21   moment to read your affidavit.  You should do so.

22       **A.    (Cont'g.)  I've read it.  What was the question**

23   **again?**

24   BY MR. STREMBA:  (Cont'g.)

25       Q.    Well, the question is, when you referred to

Page 41

1  certain allegations in paragraph eleven C of your affidavit,

2  weren't you referring to the allegation that there were

3  improper transfers made by Caring to Trade Fame Group

4  Limited?

5      A.    I guess that would be one of the allegations -- or

6  in this -- in --.

7      Q.    And what were the other allegations that you were

8  referring to?  Withdrawn.

9          Let me refer you back to paragraph nine of your --

10  of the same affidavit, Exhibit N, in which you refer to an

11  affidavit of Christine Persaud.  In that paragraph, you refer

12  to allegations that Ms. Persaud made.  Is there any

13  allegation referred to there, other than improper transfers

14  made by Caring to Trade Fame Group?

15      A.    No.

16      Q.    And looking up at paragraph eight where you

17  reference your approach to Christine Persaud to obtain an

18  agreement, quote, "to allow me to attempt to secure favorable

19  financing," end quote.  Is that the agreement that you were

20  referring to in paragraph eleven C when you talk about the

21  attempt to arrange for financing?

22      A.    Yes.

23      Q.    Now Mr. Klein, you've testified that you did not

24  engage Troutman Sanders to represent you in connection with

25  the factoring agreement, and you've testified that you did

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 42

1    not engage Troutman Sanders with respect to any transfers

2    between Caring and Trade Frame Group -- Fame Group.  I ask

3    you, therefore, as you sit here today under oath, how you can

4    reconcile that with your statement that these are the very

5    same matters for which I have retained them to represent me?

6         **A.    I retained Troutman Sanders for my China project.**

7    **In conjunction with the China project, I have disclosed to**

8    **Troutman Sanders all this information relating to Caring Home**

9    **Care, my financing Caring Home Care, the need to transfer**

10   **funds out of Caring Home Care, and different ways of how --**

11   **creative ways of how I was thinking of getting it done.  All**

12   **that was in relation to the China project, and that is**

13   **exactly what I -- that is what I hired the Troutman Sanders**

14   **for -- firm -- was for the China Project, and which I**

15   **disclosed all that information to them.**

16        MR. STREMBA:  Your Honor, may -- may I just take two

17   minutes to look at my --

18        THE COURT:  Yes, you may.

19        MR. STREMBA:  -- my notes?  Your Honor, no more

20   questions.

21        THE COURT:  All right.  Redirect?

22        MR. KRINSKY:  Yes, Your Honor.

23        THE COURT:  Proceed.  Please proceed.  I understand

24   some of the other attorneys may be attending at some point.

25   I'm just trying to be sure we know -- have the most current

Page 43

1    information.  Please proceed.

2                    REDIRECT EXAMINATION

3    BY MR. KRINSKY:

4        Q.    Opposing counsel asked you a number of questions

5    regarding documents and whether or not you turned over

6    certain documents to the Troutman Sanders firm in connection

7    with certain business entities.  Do you remember those

8    questions?

9        **A.    Yes.**

10       Q.    When, if at all, did you turn over stock

11   certificates for G.R.V. to the Troutman Sanders firm?

12       **A.    Never did.**

13       Q.    When, if at all, did you turn over tax returns for

14   G.R.V. to the Troutman Sanders firm?

15       **A.    I didn't.**

16       Q.    When, if at all, did you turn over accounting

17   documents relating to G.R.V. to the Troutman Sanders firm?

18       **A.    I didn't.**

19       Q.    When, if at all, did you turn over profit and loss

20   statements of G.R.V. to the Troutman Sanders firm?

21       **A.    I didn't.**

22       Q.    When, if at all, did you turn over cash flow

23   statements relating to G.R.V. to the Troutman Sanders firm?

24       **A.    I didn't.**

25       Q.    When, if at all, did you turn over ownership

Page 44

1    certificates or documents relating to G.R.V. to the Troutman

2    Sanders firm?

3        A.    I didn't.

4        Q.    When, if at all, did you turn over balance sheets

5    or income statements regarding G.R.V. to the Troutman Sanders

6    firm?

7        A.    I didn't.

8        Q.    Referring your attention specifically to the tab

9    that is marked Exhibit Eight or Eight in your binder.  In the

10   large binder, please.

11       A.    Okay.

12             MR. KRINSKY:  May I ask you to turn -- I'm going

13   to ask you to turn to that tab and then please look up.

14             THE COURT:  I'm sorry.  Which tab?

15             MR. KRINSKY:  Tab number eight.

16             THE COURT:  Eight.

17   BY MR. KRINSKY:  (Cont'g.)

18       Q.    Mr. Klein, do you recognize that document?

19       A.    Yes, I do.

20       Q.    How do you recognize that document?

21       A.    I recognize that from my e-mail.

22       Q.    Okay.  And what is that document?

23       A.    That's the document that gives the outline of the

24   China real estate project development.

25       Q.    And you said that was -- I think you said that was

Page 45

1    your e-mail?

2       A.    No, I recognize it from my e-mail.

3            MR. KRINSKY:  Okay.  I offer into evidence what

4    was previously marked as Klein Exhibit Eight for

5    identification as Klein Exhibit Eight.

6            MR. STREMBA:  No objection, Your Honor.

7            THE COURT:  Without objection, the document marked

8    as Exhibit Eight, which appears to be a one page e-mail

9    followed by a page labeled Attachment One, followed by a page

10   unaccompanied by translations, a several page document in

11   Chinese, and concluding with a spreadsheet in English.  Is

12   this the document?

13           MR. KRINSKY:  It is, Your Honor.

14           THE COURT:  In order to -- any sense of this

15   document, of course, I'll need to have a certified

16   translation of the portion in Chinese.

17           MR. KRINSKY:  Of course.  And -- and Your Honor, to

18   the extent that we're not going to be referring to that

19   document, I can -- for the Court's ease and for moving this

20   along, I can offer to remove that portion of the Chinese

21   document because we're not going to be referring it.  So

22   rather than avoid expense and time and effort in going

23   through having that translation, with Your Honor's

24   permission, I would offer to re-offer this document simply

25   referring to or including within it the first page of the e-

Page 46

1    mail and the last page, which is the Excel spreadsheet.

2          THE COURT:  The document begins, "Please see

3    attached docs."  The document is directed to an individual

4    you've indicated in your argument and in your affirmation

5    plays a significant role.

6          MR. KRINSKY:  Very well.

7          THE COURT:  I'm concerned that accepting an

8    incomplete document may be a problem.  At the same time, I'm

9    going to rely on the adversary process.  If there's no

10   objection to receiving what I'll call Exhibit Eight --.

11         MR. STREMBA:  Your Honor, I object to receiving --.

12         THE COURT:  -- Eight A as an incomplete document, we

13   can receive the document.

14         MR. KRINSKY:  Your Honor, if -- if that's the case,

15   then if Your Honor will keep open the record, I will have a

16   certified -- I will have a certified translation provided to

17   the Court.

18         THE COURT:  For the moment, I'm going to take the

19   proffer as an -- as the document before me.  I cannot admit

20   that which is not before me.  So any objection to receiving

21   the document within the framework described?

22         MR. STREMBA:  No, Your Honor, as a complete document

23   now.

24         THE COURT:  Document is admitted as reflected in the

25   record.

Page 47

1          (Klein Exhibit Eight is admitted in evidence.)

2          THE COURT:  An incomplete document including a

3     several-page attachment in Chinese.  Thank you.  Please

4     proceed.

5     BY MR. KRINSKY:  (Cont'g.)

6          Q.    We're referring specifically to the last page of

7     the document, which appears to be an Excel spreadsheet.

8               Mr. Klein, does this Excel spreadsheet indicate

9     what your role was going to be in the China project in terms

10    of investing?

11         A.    I -- I was going to be a forty-percent partner in

12    the joint venture.

13         Q.    Where specifically -- please identify for the

14    record specifically where in this document it indicates that

15    you'd be a forty-percent investor?

16         A.    Somewhere down in the middle of the document, like

17    the third group of cells.

18         Q.    Okay.  You're referring to the center of the page,

19    third box from the top?

20         A.    Correct.

21         Q.    Okay.  And specifically, what does that say?

22    Because again, you have the document; we need the record to

23    accurately reflect what you're referring to.

24         A.    It explains the split on the joint venture, sixty

25    percent Zhang (phonetic spelling), forty percent Klein, joint

Page 48

1    venture.  **And then further, it breaks down of how the**

2    **approximate money investment from Zhang and Klein as sixty**

3    **percent/forty percent, as well as the income on the**

4    **investment as sixty percent Zhang and forty percent Klein.**

5        Q.   Mr. Klein, did you ever have subsequent

6    conversations with the Troutman Sanders firm regarding your

7    forty percent investment in the China project?

8        **A.   Yes.**

9            MR. KRINSKY:  Specifically, did you have discussions

10   with the Troutman firm regarding where that forty percent

11   interest would come from?

12           MR. STREMBA:  Your Honor, this has been asked and

13   answered about ten times.

14           MR. KRINSKY:  I ask for a small amount of latitude,

15   and I think, Your Honor, very quickly, I'm going to get to

16   where I'm going right now.

17           THE COURT:  You may proceed.

18           MR. KRINSKY:  At the point in time that this

19   spreadsheet was sent to the Troutman Sanders firm --

20           THE COURT:  May I -- may I pose a clarifying

21   question?  Did you send this e-mail?

22           THE WITNESS:  This e-mail was sent by my brother.

23           THE COURT:  You may continue.

24   BY MR. KRINSKY:  (Cont'g.)

25       Q.   Rephrase.  At the point in time that this document

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 49

1    was sent by Herschel (phonetic spelling) Klein, was Herschel

2    Klein -- in what capacity was Herschel Klein sending the

3    document?

4         A.    **He was acting on my behalf.**

5         Q.    And at the point in time that this document was

6    transmitted to the Troutman Sanders firm, were there any

7    discussions at this point in time regarding G.R.V.?

8         A.    **No.**

9         Q.    So let's talk then about your specific investment

10   of forty percent -- your specific investment of forty

11   percent.  At the time that this document was transmitted to

12   Troutman Sanders, or thereafter, did you ever provide your

13   individual tax returns to Troutman Sanders?

14        A.    **No.**

15        Q.    Did you ever provide your individual profit and

16   loss statements for your --

17        A.    **No.**

18        Q.    -- own individual income to Troutman Sanders?

19        A.    **No.**

20        Q.    Did you ever provide a personal cash flow statement

21   to Troutman Sanders for your own individual finances?

22        A.    **No.**

23        Q.    Did you ever provide any sort of balance sheet for

24   your personal finances to Troutman Sanders?

25        A.    **No.**

Page 50

1      Q.   Did you ever provide any personal income statements

2    to Troutman Sanders?

3      **A.   No.**

4      Q.   There were certain -- there were certain questions

5    asked of you with respect to the ongoing nature of the China

6    project.   To your knowledge, after January of '09 -- to your

7    knowledge, were there any restrictions placed on the real

8    estate market going forward with respect to investments?

9      **A.   Yeah, there was a change.   There was a -- there was**

10   **a change in the China law to a degree of -- before that time,**

11   **people -- a lot of the real estate was built for inventory.**

12   **People just bought it, flipped it, and that's really what was**

13   **driving a lot of the prices up.   And due to some, I guess,**

14   **market overheating and the government trying to take some**

15   **precautions of -- for it not to overheat, they changed the**

16   **laws whereby somebody buying real estate -- they would have**

17   **to hold onto it for a certain period of time whereby it would**

18   **become -- the attraction of buying just to flip became less**

19   **--.**

20     Q.   Going back for a moment, Mr. Stremba asked you a

21   series of questions regarding what, if any, advice you

22   received from the Troutman Sanders firm regarding the

23   financing of this deal.   Do you recall those questions?

24     **A.   Yes.**

25          MR. STREMBA:   That's not what I asked, Your Honor.

Page 51

1          MR. KRINSKY:  He --.

2          COURTROOM DEPUTY:  You have to talk closer to the

3    mic.

4          THE COURT:  And it's a good idea to stand up.  It

5    helps me see who's here, and that is the practice here.

6          MR. STREMBA:  Your Honor, the questions and answers

7    concern what Mr. Klein asked Troutman Sanders to do.  This is

8    going beyond the scope of all of the examination.

9          THE COURT:  You know, this is redirect, generally

10   confined to the scope of the cross, to the extent that it's

11   appropriate to bring up a new document, for example.  I'm --

12   I'm giving you some leeway there, but I remind you that it is

13   not necessary to repeat questions that were put to the

14   witness in cross --

15         MR. KRINSKY:  Right.

16         THE COURT:  -- as I think perhaps maybe you did in

17   your last series of questions.  Though the record will speak

18   for itself, and there was no objection, I also note for the

19   record that the record will speak for itself as to what the

20   questions and answers were.  We don't yet have the benefit of

21   the transcript.  We shall have one shortly.  In all events, I

22   -- I urge you to be as productive as possible.  We are -- I

23   am -- I am determined to finish this testimony this morning

24   and can give this another fifty minutes or so, but that is

25   the timeframe I have in mind.

Page 52

1          Mr. Klein, it is my greatest -- in -- in presiding

2     over this hearing this morning, one of my many goals is that

3     you shall be able to complete your testimony.  I'm sure

4     that's in the lawyers' interests as well as yours and even

5     the Court's to have this testimony be concluded today.

6          Please, you may continue.

7     BY MR. KRINSKY:  (Cont'g.)

8          Q.    Mr. Stremba asked you certain questions regarding

9     certain allegations made by Ms. Persaud against you.  Do you

10    recall those questions?

11         **A.    Yes.**

12         Q.    Mr. Klein, are you aware that Ms. Persaud says that

13    her dispute with you began when you approached her in October

14    of 2008 for a seven million dollar line of credit through

15    Caring Home Caring to finance expansion of a business you

16    said you were operating in China?

17         **A.    Yes, I'm aware.**

18         Q.    With respect to those allegations and those

19    statements, what specifically, to your knowledge, was Ms.

20    Persaud referring to when she said the dispute arose

21    regarding a line of credit through Care -- Caring Home Care

22    with respect to the expansion of a China business?

23         **A.    She was talking about the factoring agreement and**

24    **the project in China -- the real estate development project**

25    **in China.**

Page 53

1      Q.    Is this the same financing structure vehicle that

2   you spoke with and confided with in the Troutman Sanders

3   firm?

4      MR. STREMBA:   Objection, Your Honor.   It's a leading

5   question.

6      MR. KRINSKY:   Your Honor, may I respond?

7      THE COURT:   Yes, you may.

8      MR. KRINSKY:   Technically, it's not -- a leading

9   question would be "isn't it true" where it actually

10   presupposes the answer built into it.   If it's a yes or no

11   question, that wouldn't make it leading in and of itself.

12      MR. STREMBA:   This one is, Your Honor.

13      MR. KRINSKY:   I can rephrase, Your Honor.

14      THE COURT:   I'm -- I'm going to -- perhaps you can

15   rephrase it in a general way.   I will not sustain the

16   objection, although you are going to rephrase the question,

17   and that may address some of the concerns.   I'll remind all

18   of the parties, as I have from time to time, that substance

19   contained in a lawyer's question is much less helpful to the

20   Court as finder of fact than substance contained in a

21   witness' answer.   And so when a series of questions elicits

22   answers in the nature of yes or yes or no or no when we are

23   on direct of any witness, it is simply less helpful and --

24   and -- and may well be less persuasive to me as finder of

25   fact.

Page 54

1         But it's -- I'll -- I'll -- you know, I'll do my

2    best to rule on the objections as they come up.  To the

3    extent that there's a way to move this forward in the most

4    productive way, I may offer guidance from time to time, but

5    it is absolutely the lawyer's job and not mine to decide how

6    this record is presented to the Court.  All right.  You can -

7    -

8         MR. KRINSKY:  Mr. Klein --

9         THE COURT:  -- restate or revise the question as you

10   see fit.

11        MR. KRINSKY:  Sure.

12        THE COURT:  I've overruled the objection.

13   BY MR. KRINSKY:  (Cont'g.)

14      Q.  Mr. Klein, with respect to Ms. Persaud's

15   allegations against you, how, if at all, are those

16   allegations related to the legal advice that you were

17   receiving from Troutman Sanders in connection with the China

18   project?

19      **A.  The -- the allegations that Christine Persaud is**

20   **making is in reference to the precise information that I**

21   **provided to Troutman Sanders in relation to financing of the**

22   **China project.  That's -- in order to structure the China**

23   **deal, that was important information that they needed to know**

24   **-- whether we would be able to pull this thing off when --**

25   **and if we would, how it would happen.**

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud    Associated Reporters Int'l., Inc.

Page 55

1      **So that was a lot of confidential information that they**

2      **got, and that is directly related to the issue of Caring and**

3      **what Christine is accusing me of.**

4           MR. KRINSKY:  And the --.

5                          EXAMINATION

6      BY THE COURT:

7           Q.   Mr. Klein, you've just indicated that the

8      information you have in mind is the, quote -- or this is more

9      or less a quote.  My notes may be inaccurate.  The record

10     will speak for itself.  Is the precise information that I

11     provided in -- to Troutman Sanders in connection with the

12     China project.  Now you've been shown a number of documents,

13     and your counsel has presented over one hundred and twenty

14     exhibits.  I'd like you to indicate to me any document that

15     you've been shown, and you may take the time you need, that

16     includes the precise information, your phrase, that you

17     provided to Troutman Sanders in connection with the China

18     project that was of this financial and confidential nature.

19     Are you aware of any documents, including printouts of e-

20     mails -- so I'm including electronic documents -- that set

21     forth such information?

22          If you're not, that's fine.  If you are, I'd like

23     you to tell me with specificity where they are.

24          **A.   A lot of information was on -- done verbally on**

25     **phone calls.**

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud Associated Reporters Int'l., Inc.

Page 56

1     Q.    So no documents that you can describe or point to

2     presently -- and I note that there is before you, it's a

3     binder, approximately six inches thick, of the one hundred

4     and twenty-plus exhibits that have been identified in this

5     hearing over many -- over many weeks now by your counsel.

6     Any documents?  That was my question.  I'll next give you an

7     opportunity to indicate with respect to verbal, but let's

8     stay on documents for the moment.

9     A.    It's not in the documents.

10    Q.    All right.  You can't identify a single document in

11    which what you've described as the precise information was

12    provided.

13          Let's turn to the verbal communications that you've

14    just referenced.  Can you tell me when the first one was?

15    A.    In July.

16    Q.    Who was involved?

17    A.    Aurora Cassirer and Edward Epstein.

18    Q.    And yourself?

19    A.    And myself.

20    Q.    Was it --?

21    A.    And Herschel.

22    Q.    Was it on the telephone?

23    A.    Yes.

24    Q.    Are you certain?

25    A.    Yeah.

Page 57

1      Q.    Do you recall it or do you reconstruct it to be

2    then?

3      **A.    I believe it was then, I recall.**

4      Q.    What did you say?

5      **A.    The question was  --.**

6      Q.    Okay.  Let me rephrase that.  What was the precise

7    information of a financial nature that you provided to

8    Troutman Sanders in connection with the China project?

9      **A.    The information was of my holdings or my money in**

10   **Caring and the raising of -- of funds through Flexocraft.**

11     Q.    I'm looking for the precise information.  Was that

12   as precise as it was, what you just said?

13     **A.    The exact words?**

14     Q.    The information.  You had --.

15     **A.    The information was in --.**

16     Q.    You've described two topics, it seems to me.  I'm

17   looking for the precise information that you provided to

18   Troutman Sanders in connection with the China project.

19     **A.    The information was in relation to my money at**

20   **Caring, my partnership rights in Caring, and what it would**

21   **take -- or the possibilities of what it would take to get the**

22   **money out of Caring.**

23     Q.    What did you say with respect to your money at

24   Caring?

25     **A.    That I haven't -- how much money I invested in**

Page 58

1    **there, approximately how much --.**

2          Q.    Do you remember what you said?

3          **A.    Not word for word.**

4          Q.    Do you remember what you said?  Not the subject,

5    but the -- and you can answer this question yes or no, and

6    we'll consider whether it's -- whether we can go beyond that,

7    but I -- I -- do you recall what you said in this

8    conversation.  And I -- let me step back.  When in July?

9          **A.    July 30 -- July 30th, I believe, or July 31st.**

10         Q.    Do you recall that it was on July 30th, or are you

11   speculating or reconstruction that it was on July 30t?

12         **A.    It was on -- a phone call on July 30th.**

13         THE COURT:  All right.  Tell me everything you

14   recall about that phone call.

15         MR. KRINSKY:  Your Honor, I'm going to object at

16   this point.  Other than the general information, if you are

17   going to ask the witness about specific information that was

18   revealed, then I ask, as law of the Second Circuit and this

19   court requires, that it be done in camera ex parte.

20         THE COURT:  I'm not going to take testimony --.

21         MR. KRINSKY:  Otherwise, it defeats the very

22   purpose.  He cannot --.

23         THE COURT:  All right.  Well, I'll -- I will -- I --

24   your counsel has asked me no longer to inquire.  I shall

25   decline the -- I -- I shall stop at this point.  Your answers

Page 59

1    have been helpful to me, and I thank you for them.

2              You may proceed.  Do you have any further questions

3    on redirect?

4              MR. KRINSKY:  I have no further questions.

5              THE COURT:  Recross, please.

6              MR. STREMBA:  Just -- just about two questions, Your

7    -- Your Honor.

8                        RECROSS EXAMINATION

9    BY MR. STREMBA:

10        Q.   On this spreadsheet that -- that you were looking

11   at in the exhibit that was just -- just marked, Exhibit

12   Eight, in the box that you were looking at, there's an

13   indication, I think, that the investment that would be

14   required by you would be approximately five point eight

15   million dollars, is that correct?

16        A.   Correct.

17        Q.   Is there any indication on this sheet as to where

18   those funds would be acquired?

19        A.   No.

20             MR. STREMBA:  Thank you.  I have no more, Your

21   Honor.

22             THE COURT:  All right.  Mr. Klein, I -- any further

23   -- any further questions from any counsel?  Would you like a

24   moment to confer with your colleagues?  I'll give you that

25   moment.  We are complete through the recross, so it may well

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 60

1    be that there should be no further questions.  But if you

2    wish to make an application further to inquire, I'll hear

3    you.

4            MR. KRINSKY:  No, Your Honor.

5            THE COURT:  All right.  Thank you.  Mr. Klein, I

6    believe that your -- your examination is complete.  I thank

7    you for your time and your patience.  And in particular, with

8    the number of days it's taken us to make this record and also

9    with the questions of counsel and the Court.

10           All right.  We're going to take a very short recess,

11   and we'll be back in just a moment.  We have a little -- we

12   have -- we're going to aim to complete this proceeding by

13   eleven thirty.  I'll be back in about five minutes.  And as

14   the parties are aware, I've entered some additional orders

15   granted on Thursday in response to an application for an

16   order to show cause, and I will let you know whether I think

17   there's anything further we need to take up today when I

18   return.  Thank you so much.

19           COURTROOM DEPUTY:  All rise.

20           COURT OFFICER:  All rise.

21           THE COURT:  Thank you.  Be seated.

22           COURT OFFICER:  Second call in all Christine Persaud

23   matters.

24           THE COURT:  All right.  How many more witnesses

25   does -- do the objectors have?

Page 61

1          MR. KRINSKY:  Bruce Green (phonetic spelling), and

2   that's it, Your Honor.

3          THE COURT:  Okay, and when is Mr. Green --

4   Professor Green, anticipated to -- well, let's talk about

5   scheduling, briefly.  How much time do we anticipate for

6   Professor Green's testimony?

7          MR. KRINSKY:  Your Honor, in terms of direct, I

8   think I need probably less than an hour.  Though certainly, if

9   the Court and opposing counsel are okay, we would rest on his

10  affidavit itself as direct, and subject -- and then subject him

11  to cross, but we'll work -- whatever the Court thinks is best

12  and easiest.

13         THE COURT:  I think we can begin with cross -- it

14  would be acceptable to me to accept the direct testimony in

15  affidavit form and then take -- and then begin with cross

16  examination.

17         SEC MAN:  Your Honor, in the first instance --.

18         THE COURT:  Oh, and this is expert testimony, is

19  that right?  That would be only if the parties can agree and

20  stipulate to his qualification and proffer as an expert.

21         MR. KRINSKY:  Of course.

22         THE COURT:  All right?

23         SEC MAN:  Your Honor --.

24         THE COURT:  Do you have that agreement yet?

25         SEC MAN:  Your Honor, the qualifications are not

Page 62

1   the issue.  We can stipulate that he's qualified.  My objection

2   is to the admission of expert testimony of the nature

3   proffered.

4            THE COURT:  Okay, so it sounds like we will need to

5   -- to make a record on that and I'll need to determine that.

6   I'm looking at an opportunity -- I'll say unexpected, it arises

7   from a cancellation of another matter, or a rescheduling of

8   another matter, on the afternoon of November 22nd at about two

9   o'clock?  Something like that?

10           THIRD MAN:  Your Honor?

11           THE COURT:  It comes after a full morning of

12  hearings.  We'll do our best to be able to start at two.  Is

13  that a convenient time for the parties and for Professor Green?

14           MR. KRINSKY:  Your Honor, unfortunately --.

15           THE COURT:  If it doesn't work for the witness, it

16  doesn't work.

17           MR. KRINSKY:  Your Honor, the challenge I face,

18  beginning November 21st, I'm on trial for approximately, I --

19  seven days to ten days.

20           THE COURT:  All right, I'm looking at a table full

21  of counsel, and able counsel each and all of them is.  If your

22  presence is necessary, we'll work around that trial schedule.

23  Do you think that the prospect of that trial proceeding is

24  highly likely?

25           MR. KRINSKY:  We're being called out on the 21st.

Page 63

1    It's been on the calendar three months now.  We're being called

2    out on the 21st to actually go to a judge.  It is not --.

3                THE COURT:  State court, I take it?

4                MR. KRINSKY:  State court, correct.  It is possible

5    that we may not get straight days, but I'm hesitant because I

6    won't know until the morning of the 21st -- I'll know the

7    morning of the 21st the schedule for the next two weeks,

8    essentially, but I won't know until the 21st.

9                SECOND MAN:  Your Honor, I -- I have a - a calendar

10   issue as well, the week of the 21st.  Not -- not quite as -- as

11   extensive it sounds like Mr. Krinsky's, but I have a trial

12   commencing in Central Islip at nine-thirty on Monday, the 21st,

13   and --

14               THE COURT:  So let's look for a different --.

15               SECOND MAN:  -- and I'm not sure if -- it could

16   very well be over in a day, Your Honor, but I'm not -- I'm not

17   positive.

18               THE COURT:  Those are too many uncertainties on

19   each side of the aisle.  Let's look for a different day.

20               SECOND MAN:  But -- on -- however -- on Mr. Green's

21   issue?

22               THE COURT:  Yes?

23               SECOND MAN:  I'm sorry -- on the issue of Mr.

24   Green, I don't need to be here if it's only going to be Mr.

25   Green.  Mr. Stremba could do it, so even if I couldn't make it

Page 64

1    in the afternoon, it wouldn't matter.

2                THE COURT:  Any other -- any other witnesses?

3                MR. KRINSKY:  That's all we anticipate.

4                THE COURT:  So -- so you're not able to commit at

5    this point to proceed on the 22nd.  Let's look at the week of

6    the 28th.  It looks like midday on Monday the 28th may be

7    possible.  I'm giving you all my open time, but it's not --.

8                MR. KRINSKY:  I believe, Your Honor, that -- that

9    would work.  At least it gives me advance notice to be able to

10   say to the state court judge that there's another matter, and

11   I'm sure they'll work around me once I -- I sort of give them

12   at least a couple day notice.

13               THE COURT:  Okay.

14               SEC MAN:  Would midday mean two o'clock?

15               THE COURT:  Well, let's say a little earlier than

16   that, because I have a -- a class to teach at four o'clock, but

17   Ms. Jackson, what would you like?  Would you like the morning

18   or afternoon?  Let's say nine o'clock.  We'll actually do it in

19   the morning.  Okay?

20               MAN:  Nine a.m.?

21               THE COURT:  Nine o'clock on the 28th.

22               MAN:  Mr. Zilberberg has indicated that although he

23   will be overseas, I will proceed if it's just going to be

24   Professor Green, that I will proceed on my own that day without

25   Mr. Zilberberg's presence.

Page 65

1          THE COURT:  Okay.  So we'll -- an -- any witnesses

2     beyond that?

3          MR. KRINSKY:  No, Your Honor.

4          THE COURT:  Okay.  Do you anticipate -- I know it's

5     -- you don't need to tell me yet, you don't need to know if you

6     have a rebuttal case planned, but if you are aware of any

7     rebuttal case you'll be putting in following the objectors,

8     it'll help me plan to know that.

9          THIRD MAN:  We haven't planned any, Your Honor.

10          THE COURT:  Okay.  All right.  If that changes, you

11     should contact Mr. Krinsky and also the Court.

12          THIRD MAN:  Yes, Your Honor.

13          SEC MAN:  We will, Your Honor.

14          THE COURT:  So let's see if we can do our best to

15     complete this record on the morning of the 28th with testimony

16     of Professor Green to the extent that you may stipulate -- and

17     I say that with -- with an open mind to whatever issues you

18     raise as whether we need the testimony, but I can also say that

19     in the context where there is no jury, but only the Court, and

20     as you say, it appears that there would not be a dispute as to

21     the objective qualifications of -- of the witness to be an

22     expert, it may be that the most efficient thing to do from the

23     standpoint of the trustee's administration of this Chapter 7

24     case, the presentation of the case by the objectors and -- and

25     the Court's time is simply to take testimony for what it's

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 66

1    worth, and your arguments can go to the -- to the weight, to

2    the persuasiveness, perhaps, those of course will all be

3    preserved.  All right.  So what we'll see, we'll see on the

4    morning of the 28th --.

5              FOURTH MAN:  Your Honor?  Just one other quick

6    matter.  Mr. Krinsky filed papers last week, a -- a -- a -- I

7    guess it was a reply in connection with their motion to compel

8    production of documents.  As we understood it, there wouldn't

9    be any further papers filed unless Troutman Sanders first saw

10   the need to supplement the record, but papers have been filed.

11             THE COURT:  I'm -- is -- could you indicate which

12   number on the docket?  There were quite a number of things

13   filed, there were -- there --.

14             FIFTH MAN:  Your Honor, it's document -- I'm sorry,

15   Your Honor.  I apologize for the frog in my throat.  It's

16   document number 287.  It was filed on 11/8.

17             THE COURT:  Is this the order to show --?

18             FIFTH MAN:  No, this is the --

19             THE COURT:  -- or, excuse me, application for the

20   entry of an order to show?

21             FIFTH MAN:  No, Your Honor.  This is -- this is --

22   the document is entitled, attorney reply affirmation.

23             THE COURT:  All right, well, we'll be sure --.

24             FIFTH MAN:  And it's a writ -- it's an affirmation

25   of Mr. Krinsky.

Page 67

1              THE COURT:  Would you like an opportunity to

2      respond?

3              MAN:   If -- if Your Honor is going to entertain the

4      -- the matter, then we would like an opportunity --

5              THE COURT:  How much --.

6              MAN:   -- either on paper or when we come back on

7      the --

8              FIFTH MAN:  -- on the -- on the 28th.

9              THE COURT:  I'll give you -- I'll give you time to

10     put in papers in response.  It's helpful to the Court to have

11     papers.  If you think there are things that need to be said, in

12     order for me to give them the attention they deserve, it's --

13     I'll leave it to you.  But you can file something any time this

14     week.

15              FIFTH MAN:  And Your Honor, if we were to -- just

16     -- if it's okay, Your Honor, since this is a bad week, could we

17     -- could we put that -- anything we were going to put in in

18     reply, could we have until next week?

19              THE COURT:  I'm going to ask you to work out a

20     schedule, and submit it in -- in the proposed stipulation to

21     the Court.  Because that -- you're -- you should not be

22     required to describe all of the different matters you're

23     managing around on the record.  This is something I -- I -- I'm

24     sure that good lawyers can work out between each other and

25     submit it to the Court.

800.523.7887        11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 68

1          MR. KRINSKY:  Whatever additional time they need,

2    Your Honor.  We have no -- we have no objections.

3          THE COURT:  All right.  You can work that out.  And

4    submit something so everyone knows what to expect.  I -- I'll

5    -- I expect that I will so order any reasonable schedule that

6    the parties submit.  There's the question of the 2004 issues

7    that have been raised again by -- on behalf of the entities --

8    the entity and individuals as to whom such orders were entered.

9    I read with care the papers that were submitted and it seemed

10   to me appropriate, based on the suggestion that the 2004 orders

11   -- very limited 2004 orders that I entered seemed to require a

12   certain kind of production, that it was not my intention to

13   require issued orders that clarify and correct and -- amend,

14   perhaps correct, those orders.  They do conform them to what I

15   intended.  And to the extent that the earlier versions were not

16   as clear as they should be.  I apologize to the parties.  In

17   view of the ambiguity, though not raised until last week, it

18   did seem also appropriate to me to extend the time from today,

19   which was the initial date for first -- for the commencement of

20   production of documents, to -- until later this week, and I

21   think I put it out to Thursday or Friday, is that right?  So, I

22   will -- understanding that we only have a few minutes, we do

23   have all these matters on the calendar.  I remain satisfied that

24   based on the entire record, there is a basis for at least some

25   preliminary documentary inquiry, and I've tried to provide a --

Associated Reporters Int'l., Inc.11-14-2011, New York, NY, In the Matter of C. Persaud        800.523.7887

Page 69

1    a limited, and now clarified template as to what should be

2    produced, and to the extent that there is a need to go beyond,

3    as there well may be, this very initial production of

4    documents.  And to the extent that the parties -- that the

5    trustee may seek oral exam -- oral examination, as opposed to

6    just examination via the production of documents -- you know,

7    all those matters remain before me.  I will hear, very briefly,

8    anything further in response to the clarified orders that were

9    entered, but I must emphasize that we really only have a few

10   minutes for this.  I gave a lot of care to the matter at first,

11   I've heard extensive argument on it.  I have reconsidered all

12   of those issues in the context of the applications that were

13   filed and entered further and clarifying orders, amended

14   orders, that provide -- that this really is quite limited

15   initial production, indeed, and seeks, for example, as to the

16   Escobar order, documents related to loans or business

17   arrangements between, on the one hand, Mr. Kline and his

18   related entities, and on the other hand, the debtor and any

19   related entities.  It may well be that these individuals have

20   no such documents, in which case, it cannot be produced what

21   does not exist.  But I think it's a logical first step.  It's

22   difficult to imagine circumstances where such production would

23   not be supported by the record and the very, very broad scope

24   that is the scope of Rule 2004.  And, you know -- hindsight, I

25   proceeded with the opportunity to clarify as I did, and in the

Page 70

1    absence of a response, which I would typically very much seek.

2    If I enter an order that can be improved, and I see that myself

3    I'll do it, if it's brought to my attention by parties.  I'm

4    not -- I'll -- I'll be as responsive as I can be under the

5    circumstances.  I want to add, I guess, finally, that I -- I do

6    not view this as simply the latest front in the long-running

7    battle between these parties, nor do I expect counsel to treat

8    it as such.  You may proceed.  I emphasize (unintelligible).

9            MR. LEWITTIS:  Good morning, Your Honor.  Joel

10   Lewittis of counsel to Mr. Zilberberg.  Listening to the last

11   few minutes of Your Honor's statements, I feel rather bad that

12   apparently what I set forth in my order to show cause and

13   motion, did not properly communicate itself to the Court.

14           THE COURT:  The papers were very helpful.  I

15   studied them with care, and I thank you for them.  They led to

16   the entry of amended orders, so there's nothing whatsoever

17   about which to be sorry.  I thank you for your input, as I

18   indicated.  When I can improve an order, especially in a

19   complicated document production description context, I am keen

20   to do so.

21           MR. LEWITTIS:  I thank you for the additional four

22   days which was granted in order to produce the documents, I

23   believe on Friday rather than today.

24           THE COURT:  To be clear, to commence the production

25   of documents.

Page 71

1          MR. LEWITTIS:  But, to me, that does not really

2    focus upon my motion for reconsideration.  Now, you and I know

3    that technically, in the federal courts, there is nothing like

4    a motion for reconsideration, but we look to, and we were

5    inspired by federal rules civil procedure, Rule 59 to alter or

6    amend judgments on the grounds that a -- an important matter of

7    law has been overlooked clear error, and manifest error.  The

8    first question that any federal judge must confront is, do I

9    have subject matter jurisdiction?  Because if we look at 28

10   USC, 1334 (E1), the district court and via the automatic

11   reference of this court, exclusive jurisdiction is given to the

12   Court over property of the debtor at the time of the filing of

13   the petition.  We have set forth and the Court will permit,

14   give me a few minutes, to set forth orally, why this Court does

15   not have a jurisdiction to hear this matter the applications

16   with respect to 2004, because we submit that we have made at

17   least -- at least a prima facie showing that the debtors --

18   there's no property interest and therefore the trustee and the

19   estate have no property interest in order to pursue a 2004.

20   And we say that unless and until this court, adjudicates that

21   issue as to whether or not this estate has any interest,

22   whether legal or equitable, we cannot and we should not, and I

23   think the law does not permit us to go farther.  There are

24   several ground rules we have to deal with, and that is, if in

25   fact we can demonstrate, and I believe we can, that the

Page 72

1    debtor's estate has no property interest in Caring.  Then it

2    doesn't matter whether the Court cites to, as it did, in its

3    autogranting in part 2004 examinations.  Doesn't matter,

4    because I don't disagree that bankruptcy code section 704

5    (a)(4) directs the trustee to investigate the financial affairs

6    of the debtor.  What that is based upon a shown fact that the

7    estate has some property interest.

8            THE COURT:  Isn't that argument a bit circular?

9    How could a trustee make that showing, in the absence of some

10   kind of showing, or some kind of opportunity to gather the

11   relevant information?  Now isn't that precisely what 2004 is

12   intended to do, and in so many cases does?  I see many

13   situations where trustees seek relief under 2004, and conclude

14   there is, in fact, no interest, or no interest worth pursuing,

15   in the trustee's business judgment.  But it seems to me that

16   your argument asks me to assume away the process that the

17   trustee is required by fiduciary duty, including on behalf of

18   this creditor to pursue.

19           MR. LEWITTIS:  He has no fiduciary duty if there's

20   no interest here.  And it is not circular.

21           THE COURT:  Not to you, but perhaps to me.

22           MR. LEWITTIS:  Well, I -- I'm here not to spend too

23   much time, but I am here to try -- try and convince you --.

24           THE COURT:  You have been overwhelmingly successful

25   in your opposition to this application.  I have entered the

Page 73

1    most minimal relief in response.

2              MR. LEWITTIS:  It doesn't --.

3              THE COURT:  Carefully circumscribed in order to

4    minimize the burdens on the parties.

5              MR. LEWITTIS:  To me --.

6              THE COURT:  Though I -- though I should say again,

7    and I -- I -- I credit your arguments to this extent.  You have

8    persuaded me that the most modest steps, the smallest steps, or

9    the small steps reflected, perhaps they could be even smaller,

10   but the small steps reflected were the appropriate steps at

11   this time without prejudice to what further relief I might

12   enter.

13             MR. LEWITTIS:  If not -- I'm not mistaken, I

14   believe that we cited a bank -- an eastern district case, which

15   says, in essence that, if there is property interest, there can

16   be no 2004.  And the answer is not that you have to find out

17   the property interest.  The determination has to be made first.

18   This is not the kind of case which I had indicated the last

19   time I had the opportunity to approach this lectern.  This is

20   not a run-of-the-mill, garden variety type of case, which of

21   course we know, certain powers are granted to the trustee --.

22             THE COURT:  I need to clarify something about my

23   approach to these things for your benefit.  I do not view any

24   one of the cases before me, or that has ever been before me as

25   either run-of-the-mill or garden variety.

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud Associated Reporters Int'l., Inc.

Page 74

1              MR. LEWITTIS:  What -- this -- what I was saying

2     was not meant --.

3              THE COURT:  Not this one, not any other.

4              MR. LEWITTIS:  Not meant to be personal, Your

5     Honor.

6              THE COURT:  I do not take it personally.  I think

7     it is important clarification.  Your argument, I take it, is

8     that this is not a run-of-the-mill, garden variety case.  My

9     response to you is, no case is a run-of-the-mill or garden

10    variety case in my view.  And I -- and I --.

11             MR. LEWITTIS:  In that case --.

12             THE COURT:  -- trustees in counsel to bring that

13    professionalism to their efforts.

14             MR. LEWITTIS:  I will with -- I'll withdraw that.

15             THE COURT:  That might -- I think that would be

16    helpful.  There's not one special set of code and rules for the

17    Christine Persaud/Abraham Klein dispute.

18             MR. LEWITTIS:  Correct.

19             THE COURT:  Thank you.

20             MR. LEWITTIS:  And that is why I'm here.

21             THE COURT:  Yes?

22             MR. LEWITTIS:  Because I don't want to have a

23    special code of rules.  What I am asking for is a code of rules

24    that complies --.

25             THE COURT:  Code or rules, I said.

Page 75

1              MR. LEWITTIS:  -- the subject matter jurisdiction

2      of this court, and I'm not bringing in the cart before the

3      horse.  The fact of the matter is, that is the one question

4      this court has to deal with.  Now, it's -- it's a very simple

5      issue, if the Court is willing to grapple with it.  We have

6      helped, I believe the Court, in reaching that decision, by

7      pointing to several matters.  Number one is the award by the

8      arbitrator which sets forth with particularity the fact that

9      these two parties, Persaud and Klein, could not get together,

10     that it was the finding of the arbitrator that, although

11     originally Mr. Klein had a fifty percent interest, the Court

12     found that in the event and when a transfer of the permits and

13     what-have-you would be forthcoming, then Mr. Klein would have a

14     hundred percent interest.  The trustee often takes the

15     position, he reads the word fifty percent and says, ah-ha.  But

16     that was a prelude to the final conclusion that once certain

17     things had done -- that is, transfer of the licenses, et

18     cetera, in conformity with the regulations and rules of the

19     Department of Health of the State of New York, then Mr. Klein

20     gets the hundred percent of the ownership.  And the finale ends

21     with the following.  It is further ordered that if Persaud

22     works at, and for the benefit of Caring, during the pendency of

23     the license transfer, for and at offices of Caring, for a

24     minimum of thirty hours per week, she will be entitled to

25     compensation of a thousand dollars per week, and no more for

Page 76

1    any reason until the provisions of this award are fully

2    complied with, and thereafter she has no residual interest or

3    rights in Caring.  If Ms. Persaud has no residual interest or

4    rights in Caring, must we not inquire as to what rights or

5    interests the Trustee's estate has?

6          THE COURT:  And isn't an appropriate way to do that

7    to provide with the clarification that was needed, as I learned

8    from the papers, that to the extent that, for example, any of

9    these parties has information showing --.

10         MR. LEWITTIS:  Right.

11         THE COURT:  Speak with precision -- let me get my

12   order in front of me, one of the orders -- that anything

13   concerning a loan or business arrangement between Mr. Klein on

14   the one hand and the debtor on the other.

15         MR. LEWITTIS:  My --.

16         THE COURT:  That's something that makes sense to

17   produce?  I -- if there is such a document, it seems to me that

18   it is within a sensible scope, narrowly construed, of a 2004

19   examination.  If there is not, then there's nothing to produce.

20         MR. LEWITTIS:  Your Honor --.

21         THE COURT:  And I -- I -- I -- strikes me to say --

22         MR. LEWITTIS:  Your Honor, I have a --.

23         THE COURT:  -- as an interesting -- as a sensible

24   measured -- in the first step, and the opportunity to

25   reconsider that determination leaves me satisfied that it is --

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 77

1    that it is that.

2            MR. LEWITTIS:  Your Honor, the way it works in my

3    understanding and view, is that once there is an objection to a

4    2004, the burden then shifts to this Trustee to show great

5    cause why he is entitled to the 2004.  Your Honor has --.

6            THE COURT:  His applications were first heard in

7    September, the record is quite complete.  Hearings on these

8    applications, according to my docket, have been held on

9    September 8th, 13th, 20th, 22nd, October 28th, and November

10   8th, so the record is a full record and not only the record on

11   reconsideration.  And it is amplified by many proceedings that

12   took place, and I say this with the greatest respect and

13   deference, before you were involved and in which you've had no

14   involvement.  So there's an entire record before this court,

15   including of the Chapter 11 proceeding, that informs the

16   determinations that I've made.  You -- you need to -- because

17   of my obligations to -- because of other obligations, we will

18   need to bring this to closure fairly soon.

19           MR. LEWITTIS:  Your Honor, I -- I beg --.

20           THE COURT:  I'm trying to be as deferential as I

21   can to your desire to add to what you've said in your papers.

22   There is no need to refute it, you can probably tell I studied

23   your papers with great care.

24           MR. LEWITTIS:  No -- the -- the only cause -- we

25   have a -- we have the application of the trustee.  The only

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 78 of 119 PageID #: 886

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 78

1    cause discernable, if one can call that cause, is a bald

2    statement, a naked statement, that -- that the Trustee owns

3    Caring.  That is not fulfillment of the burden of showing

4    cause.  That is a conclusory statement that has absolutely no

5    basis in fact.  He doesn't even present any basis for saying

6    that he has ownership.  That is not cause shown.  I without

7    going into this matter -- we have that award.  That award,

8    whether it is confirmed or not, has been determined to be as a

9    matter of law subject to the rules of collateral estoppel and

10   Res Judicata.  And we have cited a Second Circuit decision to

11   that effect, which is Jacobson against Fireman's Fund.  So I

12   have that.  He has a single statement that says he owns it.  We

13   can go beyond that.  We have statements by former counsel of

14   Ms. Persaud, admitting judicial admissions that she does not

15   own Caring and/or Liberty.  And the last week we were here, we

16   had another submission that it, by Persaud, indicating that she

17   doesn't own Caring or Liberty, it's a trust that owns --

18   separate trust.  So there is no cause shown, or can there be

19   any cause shown, at this moment.  And so I return to my initial

20   statement, and that is, this court should determine first, not

21   afterwards, because there's nothing for the trustee to check

22   out.  We have shown him this, and that, and his response is, I

23   own Caring.  This court, as a matter of subject matter

24   jurisdiction in my view, this court must determine first who

25   owns the property Caring?  And once you get --.

Page 79

1          THE COURT:  I would be uncomfortable with putting

2     the trustee to that proof without permitting an inquiry,

3     whether it happens in the context of the discovery tools in an

4     adversary proceeding, or the tools available in the Chapter 7

5     process.  I -- I -- I think expecting the litigant to prove

6     something without the ability to inquire as our system permits,

7     through discovery of whatever type, would be a -- would be a

8     mistake.

9          MR. LEWITTIS:  Your Honor --.

10          THE COURT:  It would be a mistake of law, it would

11     be a mistake of case management, it would be a --.

12          MR. LEWITTIS:  Your Honor, you did not hear me --

13          THE COURT:  I -- I-- now, you may see that

14     differently, I -- but --

15          MR. LEWITTIS:  -- you didn't hear me use the word

16     proof -- I didn't --

17          THE COURT:  If -- if -- if it were your decision to

18     make, I'm satisfied you would reach a decision consistent with

19     the decision desired by the client who has retained you.  That

20     being said, I -- I -- I --

21          MR. LEWITTIS:  You -- Your Honor, I did -- I never

22     -- I never --

23          THE COURT:  -- appreciate your position, I -- I --

24     I already modified to great extent my orders in response to

25     what you put in to clarify them.

800.523.7887          11-14-2011, New York, NY, In the Matter of C. PersaudAssociated Reporters Int'l., Inc.

Page 80

1          MR. LEWITTIS:  With all due respect, I never said

2     the trustee has to prove -- I never used the word prove.  I

3     said, how about a little good cause?  That's something quite

4     less than prove, and he hasn't done it.

5          THE COURT:  Let -- let -- let's hear from the

6     trustee.  Thank you.

7          MR. PEREIRA:  Your Honor, if I may.

8          THE COURT:  Mr. Pereira, I need to remind you, as

9     I've reminded counsel for the objector --

10          MR. PEREIRA:  Good morning, Your Honor.  John S.

11     Pereira --.

12          THE COURT:  -- that there are going to be some time

13     constraints here.

14          MR. PEREIRA:  I'm sorry, Your Honor.  John S.

15     Pereira, the Chapter 7 trustee.  Mr. Lewittis talks about cause

16     or -- and -- and connection.  Your Honor, these are the facts,

17     whether the -- Mr. Klein and his counsel, many counsel, want to

18     hide them or not.  Mr. Klein claims to be out two million

19     dollars, based on a default judgment which he obtained.  He

20     went to arbitration.  The arbitration that he went to, he

21     obtained an arbitration award on default.  The arbitration

22     award itself starts with a very telling statement from the

23     arbitrator, where it says, Mr. Klein was looking to the benefit

24     of his bargain.  He sued Mrs. Persaud to be a partner in

25     Caring.  He never -- it was never alleged that he owned fifty

Page 81

1    percent before the arbitration award.  He alleged that he had

2    -- he'd given and lent a lot of money to -- to Caring and

3    evidently, was allegedly to Liberty, and as a result of the

4    default arbitration award, because Ms. Persaud did not appear,

5    the arbitrator somehow awarded him not fif -- there -- wound up

6    saying that he owned part of Liberty -- not only Caring, but

7    also Liberty.  The award, there's no nexus.  Let me see if I

8    can give you a connection.  In the arbitration award, Mr.

9    Lewittis has no problem quoting the para -- the second

10   paragraph.  The first para -- one of the -- the paragraph above

11   that which was quoted says, creditor Klein has a fifty percent

12   ownership interest in both Caring and Liberty.  There's a -- in

13   accordance with the terms of the agreement, subject to the

14   approvals of the agency with jurisdiction, which interest in

15   Liberty shall cease.  By the way, Liberty was never even a

16   party to the arbitration, yet the arbitrator gave him fifty

17   percent of Liberty.  But that's another issue.  Shall -- which

18   -- at which interest in Liberty shall cease as soon as he or

19   his designee is approved by the agencies with jurisdiction to

20   be the sole operator of Caring.  It doesn't say -- it says he's

21   a -- in the same paragraph, it says he's a fifty percent owner

22   of -- of Caring, and he's to be the sole operator of Caring.

23   That does not mean that he owns a hundred percent or Caring.

24           THE COURT:  Mr. Pereira, I'm looking for any

25   insights you have on a practical response to this situation.  I

Page 82

1    remain concerned, deeply concerned, that the administration of

2    this case is -- poses significant risk of being quite

3    unproductive from a creditor's standpoint.  I'm always

4    concerned, as I'm sure any trustee is, when the great majority

5    of the actions that the trustee proposes to take seem to be

6    opposed by the primary creditor.  Now, I'm further concerned

7    when the bankruptcy court seems to be used as the next front in

8    a litigation battle.  It's unproductive in the bankruptcy

9    process to use this process that way.  So, I say, stepping

10   back, looking at the bigger picture, I would like to hear from

11   you, not only in the question of cause, and subject matter

12   jurisdiction, which is a full-stop question that must command a

13   court's full attention whenever it is raised and even when --

14   if it is not, but also on the question of a practical approach

15   here.  I do see I have 2004 requests that have been pending

16   before me for a long time --

17              MR. PEREIRA:  Since August, Your Honor.

18              THE COURT:  -- inconsistent with the need to move

19   this case forward.  And I will say that even upon a rethinking

20   of all of the grounds and everything I had in mind in

21   proceeding as I did, I remain satisfied that with clarification

22   to be sure that my orders say what I wished them to say, as

23   clearly as I can do that, that it is still a sensible way to

24   proceed.  But Mr. Pereira, you --

25              MR. PEREIRA:  I -- I agree, Your Honor.

Page 83

1          THE COURT:  -- pressed B here. I -- I -- I -- well,

2     they were entered on Thurs -- Thursday?

3          MR. PEREIRA:  I have not seen the order, but I

4     agree that if we can proceed, even on the amended orders, it

5     will be helpful.  Your Honor, also, Mr. Klein and -- and

6     counsel --

7          THE COURT:  Hold on -- the -- the question was, I'm

8     looking for views you may have as trustee in this case, on a

9     practical approach to proceed here.  And I need them very

10    promptly because we do have a meeting downstairs of our bar and

11    court that begins in approximately five minutes, as I

12    previously advised the parties, we had intended on this hearing

13    ending at eleven and we had to start late, there were

14    circumstances quite beyond my control, but now we do only have

15    a few minutes.

16         MR. PEREIRA:  Your Honor, we have been through

17    examinations of Ms. Persaud at the Section 341 meeting, and

18    other conferences with her and her many counsel along the way.

19    We have been told that Caring is probably ten times the size of

20    Liberty, and that it is worth, according to published reports

21    that have been in various local papers, and the testimony of

22    Ms. Persaud, is worth between ten and thirty million dollars.

23    We know that there are allegations that while Ms. Persaud owned

24    Caring, and we believe she still owns Caring, by the virtue of

25    what counsel doesn't tell you, which is that the appellate

Page 84

1    division has -- has reversed -- has vacated the judgment that

2    confirmed the arbitration award.

3              THE COURT:  But not reversed the arbitration award,

4    Mr. Pereira?

5              MR. PEREIRA:  But the arbitration award was

6    obtained by default, Your Honor.

7              THE COURT:  Does that make it any diff -- an order

8    obtained from this court on default is still an order of this

9    court.

10             MR. PEREIRA:  By a private arbitrator, Your Honor.

11   And --.

12             THE COURT:  Pursuant to a valid arbitration clause?

13   I realize that's before the state court, but -- Mr. Pereira, I

14   -- I -- I urge you not to overstate your position.

15             MR. PEREIRA:  I don't, I don't, Your Honor, if you

16   -- the appellate division not only vacated the judgment, but

17   took the extraordinary step of saying that a valid defense to

18   the arbitration had been raised and ignored.

19             THE COURT:  All right.  Well, let me ask you this

20   question.  Do you think it makes sense to permit the parties to

21   litigate to closure that issue in a state court where it is

22   presently pending, and to defer all these proceedings until

23   that is complete?  I -- it seems to me that you're a true and

24   first battlefront may be the state court, and I would be

25   prepared to consider a joint request to proceed that way.  It

Page 85

1    might significantly cut down on the costs of administration of

2    this case.  At the same time, in the absence of consent, I'm

3    prepared to keep this case moving on a fast track here in the

4    bankruptcy court.  So --.

5          MR. PEREIRA:  Your Honor, I -- fast track.  A fast

6    track, we will proceed --.

7          THE COURT:  Right.  Tell me the status of the state

8    court proceedings?  I need to know the status of the state

9    court proceedings.

10          MR. PEREIRA:  There -- I am not aware of the status

11    of the state court proceedings.

12          THE COURT:  I think you need to be aware of those

13    proceedings, Mr. Pereira.  Don't you?

14          MR. PEREIRA:  Say again?

15          THE COURT:  Don't you think you need to be aware of

16    those proceedings?

17          MR. PEREIRA:  I'm sorry, Your Honor, I --.

18          THE COURT:  You need to know that.  I'm surprised

19    you don't.  Would you like to confer with --?

20          MR. PEREIRA:  No, Your -- Your Honor, the reason I

21    don't know it is, there was a motion made before a -- by miss,

22    again, one of Mr. Klein's motions to say that the -- to vacate

23    this, the -- vacator of the confirmation of the judgement.  He

24    says that --.

25          THE COURT:  Do they -- is that in appellate

Page 86

1    division, or is that in the -- in New York Supreme?

2              MR. PEREIRA:  It's appellate division rendered the

3    decision.  They took an appeal to the Court of Appeals.  That

4    appeal was not -- was -- court of appeals refused to hear the

5    appeal.

6              THE COURT:  Yes.

7              MR. PEREIRA:  You have the appellate division is

8    fine -- is a final judgement, vacating -- vacating the

9    confirmation of the arbitration award.

10             THE COURT:  When is the Court --?

11             MR. PEREIRA:  They then made -- they, Mr. Klein,

12   then made in this court another motion, a motion to have Your

13   Honor declare that the appellate division judgement is null and

14   void.

15             THE COURT:  Mr. Pereira, I'm familiar with the

16   record before me.  My question is the record in the state

17   court.  Are you aware of what is presently pending in the state

18   court?

19             MR. PEREIRA:  To my knowledge, there are none --

20   there is nothing scheduled in the state court.

21             THE COURT:  The matter is -- the matter has been

22   remanded to New York Supreme, isn't that correct?

23             MR. PEREIRA:  Yes, I -- that's what the order said,

24   Your Honor.

25             THE COURT:  And what is now happening in response

Page 87

1    to that remand?

2              MR. PEREIRA:  As far as I know, nothing has been

3    done.

4              THE COURT:  Would you like to confer with your

5    counsel?  With your -- with -- with the debtor's -- with the

6    debtor's counsel?  Who is standing up?

7              MAN:  Judge, very quickly, it's -- it's waiting to

8    see what happens in this court.  Everything is stayed there,

9    that has been remanded to Supreme --

10             THE COURT:  Has there been --.

11             MAN:  -- with the confirmation hearings and the

12   arbitration award --.

13             THE COURT:  All right.  All right.  Well, let's --

14   all right.  It's eleven fifty eight, we need to bring this to

15   closure today.  I'm going to note with respect to the adversary

16   proceeding, the appearance of the plaintiff and defendant,

17   we'll have an adjourn date.  We have, of course, the continued

18   hearing in the application to employ counsel.  We have the

19   applications for orders to show cause.  To the extent that they

20   seek reconsideration of the orders for reasons specified at

21   very -- at various paragraphs and on grounds that they --

22   orders as entered seek the production of documents that do not

23   make sense in the context of the case.  Am I not stating as

24   nearly as effectively as was stated in the document, in the

25   argument, for example, this seems to require, with respect to

Page 88

1    Joel Klein, Joel Klein to produce financial information

2    regarding three different situations.  Namely A, entities owned

3    or controlled -- under control by Abraham Klein, B, entities

4    owned or controlled by Abraham Klein and the debtor, and C,

5    entities owned or controlled by the debtor.  I trust that the

6    orders as amended address that ambiguity to the extent the

7    orders had that, and I let the orders speak -- the amended

8    orders speak for themselves.  But that issue, I think, has been

9    addressed.  So to that extent, the request for relief is

10   responded to.  Likewise, the concern or argument made in

11   paragraph fourteen, reconsider why the subject of the

12   application should be ordered to produce financial information

13   of entities owned or controlled by Mr. Klein, despite the fact

14   that these entities have no connection to the debtor.  Not my

15   intention, not, I believe what the order reflected, clearly not

16   with the amended order reflect.  So again, that issue's been

17   addressed.  Next paragraph, fifteen, there is a question

18   concerning punctuation.  I have reviewed with care the

19   punctuation and I hope I have improved it.  Thank you for the

20   opportunity.  With respect to the arguments set forth in the --

21   the final paragraph of paragraph fifte -- sixteen, any concern

22   about needing to proceed on November 14th, that being today, I

23   took that to be indirectly a request for a little more time.  I

24   accommodated that request so each and all of those points has

25   been responded to.  There is separately a question as to

Page 89

1    subject matter jurisdiction.  I do not see on careful initial

2    reflection and further reflection, a subject matter

3    jurisdiction presented here.  But the cause of subject matter

4    jurisdiction is so very important, I invite you to proceed with

5    further briefing on that issue, and you can do that on an

6    ordinary schedule.  I do not think that it -- given the pace at

7    which this matter is proceeding, it does not seem to me that

8    order to show cause pace is required.  If you'd like an

9    expedited briefing schedule, you may negotiate it and submit it

10   to the Court consentually.  I take you are -- whatever you may

11   disagree on, you've been able to work together on things like

12   that.  And so, the -- I'll say your application for the entry

13   of an order to show cause has been granted in part as reflected

14   in the orders previously entered and denied without prejudice

15   in part as reflected in the record.  That is to say, you may

16   renew it as indicated.  You deem it appropriate and

17   concentrating on those issues that are so very important.  I --

18   I'll make a similar notation on each of these applications for

19   order to show cause.  I will remind the parties that that is a

20   very special kind of tool and should be used absolutely

21   whenever it's supported by the record and in compliance with

22   our rules and procedures.  I think that brings us to the 2004

23   application (unintelligible) and we have would have been

24   denominated as the reconsideration orders.  I will make a

25   similar entry there.  I have reconsidered them.  I --

Page 90

1          MR. LEWITTIS:  Your Honor --

2          THE COURT:  -- have already entered amended orders,

3    and to the extent that I am not granting further relief you

4    seek, you may work on a briefing schedule.  Advise the Court by

5    a submission and we'll take it from there.  I am now

6    constrained to bring this hearing to closure and because of the

7    scheduling requirements that I've noted previously, all other

8    matters on the Court's calendar will be carried to our next

9    date, and that is again, Ms. Jackson --?

10          COURT OFFICER:  The 28th at nine o'clock.

11          THE COURT:  28th at nine o'clock.  I know you each

12   and all have many further things to say.  In order to

13   accommodate each of you in fairness, I would have to

14   accommodate all of you, and so I shall simply bring this to

15   closure and wish you a good day.  Thank you so much.

16          MR. LEWITTIS:  I just wish -- Your Honor -- I have

17   to know if --

18          THE COURT:  We are concluded.

19          MR. LEWITTIS:  -- about the discovery -- is it

20   stayed now until we deal with subject matter jurisdiction?

21          THE COURT:  I've indicated to you that you -- you

22   may proceed as referenced in the record.  The amended orders

23   are on file.  Thank you so much.

24          COURT OFFICER:  All rise.

25          (The proceeding concluded.)

Page 91

1                              CERTIFICATE

2          I certify that the foregoing is a correct transcript

3     from the electronic sound recording of the proceedings in the

4     above-entitled matter.

5     _Judith Spriggs_

6     Judith Spriggs                    15 November, 2011

7     Transcriptionist                  Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## A

**abilities** 14:10
**ability** 79:6
**able** 8:1 9:16 10:3 11:6 14:8
 17:18,20 20:4,8 21:2,11,11
 22:11 23:13,14,17 24:24 28:8
 28:20 29:1 52:3 54:24 62:12
 62:21 64:4,9 89:11
**above-entitled** 91:4
**Abraham** 2:8,11 5:5 88:3,4
**absence** 70:1 72:9 85:2
**absolutely** 54:5 78:4 89:20
**accept** 61:14
**acceptable** 61:14
**accepting** 46:7
**accommodate** 90:13,14
**accommodated** 88:24
**account** 20:13
**accounting** 26:5 27:11 43:16
**accrue** 21:24
**accrued** 10:21
**accrues** 21:24
**accurately** 47:23
**accusing** 55:3
**acquired** 59:18
**acting** 49:4
**actions** 33:5 82:5
**actively** 22:25
**actual** 9:7 19:1 36:6
**add** 32:13 70:5 77:21
**addition** 18:17 20:7
**additional** 19:24,24,25 38:9
 60:14 68:1 70:21
**address** 53:17 88:6
**addressed** 24:8 88:9,17
**adjourn** 87:17
**ADJOURNED** 1:9,10,11,12,13,14,18
 1:19,23,24 2:3,4,7,12,13,14
 2:14,15,16
**adjudicates** 71:20
**administration** 65:23 82:1 85:1
**admission** 62:2
**admissions** 78:14
**admit** 46:19
**admitted** 15:17 34:10,11,12 36:3
 46:24 47:1
**admitting** 78:14
**advance** 64:9
**adversary** 1:3 46:9 79:4 87:15

**advice** 50:21 54:16
**advise** 17:15 18:4 90:4
**advised** 83:12
**affairs** 72:5
**affidavit** 32:17,20,24 34:1 35:7
 35:16,18,20 36:6 39:11
 40:18,18,21 41:1,10,11 61:10
 61:15
**affiliated** 10:2
**affirmation** 5:4 33:17 46:4
 66:22,24
**afternoon** 62:8 64:1,18
**agencies** 81:19
**agency** 2:4,6 25:20 81:14
**ago** 8:5,15 9:22 10:14 15:25
 22:2,19
**agree** 6:7 20:16 61:19 82:25
 83:4
**agreed** 6:9
**agreement** 11:4,8 13:8,11,23,25
 14:5 22:10,12,15,20,24 23:12
 23:17 26:20 29:12,15 30:3,6,7
 30:13 33:7 39:22 41:18,19,25
 52:23 61:24 81:13
**ah-ha** 75:15
**aim** 60:12
**aisle** 63:19
**allegation** 40:9 41:2,13
**allegations** 39:14 40:4,5,7,9,14
 40:17 41:1,5,7,12 52:9,18
 54:15,16,19 83:23
**alleged** 80:25 81:1
**allegedly** 81:3
**allow** 8:12 41:18
**allowed** 24:23
**alter** 71:5
**ambiguity** 68:17 88:6
**amend** 68:13 71:6
**amended** 69:13 70:16 83:4 88:6,7
 88:16 90:2,22
**amount** 9:6 48:14
**amplified** 77:11
**and/or** 39:17 78:15
**answer** 6:1 10:18 28:10,14 53:10
 53:21 58:5 73:16
**answered** 48:13
**answers** 11:19 19:6 51:6,20
 53:22 58:25
**anticipate** 61:5 64:3 65:4
**anticipated** 61:4

800.523.7887                11-14-2011, New York, NY, In the Matter of C. Persaud        Associated Reporters Int'l., Inc.

Page 93

anybody 37:17
apologize 4:6,19  66:15  68:16
apparently 70:12
appeal 86:3,4,5
appeals 86:3,4
appear 81:4
appearance 87:16
appearances 2:18  4:7
appears 45:8  47:7  65:20
appellate 83:25  84:16  85:25
  86:2,7,13
application 1:12,13,16,18,21,23
  2:3,6,7,9  60:2,15  66:19  72:25
  77:25  87:18  88:12  89:12,23
applications 69:12  71:15  77:6,8
  87:19  89:18
APPLICATION(RE 2:10
applies 19:15
appreciate 79:23
approach 41:17  73:19,23  82:14
  83:9
approached 52:13
appropriate 33:18,21  51:11
  68:10,18  73:10  76:6  89:16
approvals 81:14
approved 81:19
approximate 48:2
approximately 17:7  56:3  58:1
  59:14  62:18  83:11
arbitration 80:20,20,21,21  81:1
  81:4,8,16  84:2,3,5,12,18  86:9
  87:12
arbitrator 75:8,10  80:23  81:5
  81:16  84:10
areas 37:25
argument 46:4  69:11  72:8,16
  74:7  87:25  88:10
Argumentative 36:15
arguments 66:1  73:7  88:20
arises 62:6
arose 52:20
arrange 39:13,21  41:21
arrangement 76:13
arrangements 69:17
aside 11:7
asked 21:18  38:22  43:4  48:12
  50:5,20,25  51:7  52:8  58:24
asking 33:15  74:23
asks 72:16
assess 10:12  19:9

assist 28:3
Associated 3:20
ASSOCIATES 2:19
assume 39:15  72:16
attached 46:3
attachment 45:9  47:3
attempt 36:22  39:13,21  41:18,21
attending 42:24
attention 16:18  17:22  31:17
  39:10  44:8  67:12  70:3  82:13
attorney 7:6  19:15  29:23  66:22
attorneys 30:15  42:24
attraction 50:18
August 6:2  12:1  35:18  82:17
Aurora 6:19  56:17
autogranting 72:3
automatic 2:12  71:10
available 9:10  79:4
Avenue 2:20  3:2,6
avenues 20:8
avoid 45:22
award 75:7  76:1  78:7,7  80:21,22
  81:1,4,7,8  84:2,3,5  86:9
  87:12
awarded 81:5
aware 31:1,5,9,13  52:12,17
  55:19  60:14  65:6  85:10,12,15
  86:17
a.m 1:5  4:1  64:20

---

**B**

B 83:1  88:3
back 12:23  17:20  41:9  50:20
  58:8  60:11,13  67:6  82:10
bad 67:16  70:11
balance 25:7,20  26:25  44:4
  49:23
bald 78:1
bank 25:16  26:2  27:8  73:14
bankruptcy 1:1,8  72:4  82:7,8
  85:4
bar 83:10
bargain 80:24
based 21:12,12  23:16  28:25
  68:10,24  72:6  80:19
basically 6:18  12:20  20:14
  23:15
basis 37:4  68:24  78:5,5
battle 70:7  82:8
battlefront 84:24

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 94

**beg** 77:19
**began** 52:13
**beginning** 6:2,21 11:25 17:25
  62:18
**begins** 16:15,19 17:2,23,25 46:2
  83:11
**behalf** 29:6,8,19 30:3 39:16
  49:4 68:7 72:17
**believe** 4:22 22:23 26:21 32:16
  33:10 38:1,3 57:3 58:9 60:6
  64:8 70:23 71:25 73:14 75:6
  83:24 88:15
**believed** 33:6
**benefit** 7:5 51:20 73:23 75:22
  80:23
**berth** 33:18,21
**best** 24:8 37:16 54:2 61:11
  62:12 65:14
**better** 19:9 37:15
**beyond** 11:15 51:8 58:6 65:2
  69:2 78:13 83:14
**big** 8:21 10:6
**bigger** 38:23 82:10
**binder** 31:19 32:19 35:17 44:9
  44:10 56:3
**bit** 14:14 72:8
**book** 14:15,16
**boom** 37:19
**bought** 50:12
**boundaries** 11:15
**box** 3:21 47:19 59:12
**break** 24:3
**breaks** 48:1
**briefing** 89:5,9 90:4
**briefly** 7:17 12:7 14:17,18 16:3
  61:5 69:7
**bring** 51:11 74:12 77:18 87:14
  90:6,14
**bringing** 17:17 75:2
**brings** 89:22
**broad** 69:23
**Broadway** 2:24
**brokerage** 25:16 26:2 27:8
**Brooklyn** 2:21 4:1
**brother** 30:23 31:2,6,10,14
  32:13 48:22
**brought** 70:3
**Bruce** 61:1
**bubble** 37:24
**build** 20:4

**Building** 2:23 3:2,5
**built** 50:11 53:10
**bunch** 20:12 40:7
**burden** 77:4 78:3
**burdens** 73:4
**business** 36:25 37:4,8 43:7
  52:15,22 69:16 72:15 76:13
**buying** 50:16,18

---

**C**

**C** 39:11 41:1,20 88:4
**calculated** 20:21
**calendar** 63:1,9 68:23 90:8
**call** 6:18 46:10 58:12,14 60:22
  78:1
**called** 9:13 62:25 63:1
**calls** 55:25
**camera** 58:19
**Campo** 3:5 4:3,10,10
**cancellation** 62:7
**can't** 21:20
**capacity** 49:2
**capital** 6:12 10:3 28:8 29:1
**card** 25:17 26:3 27:9
**care** 2:6 4:21 25:20 39:13 42:9
  42:9,10 52:21,21 68:9 69:10
  70:15 77:23 88:18
**careful** 89:1
**Carefully** 73:3
**Caring** 2:4,6 9:13,18,20 10:6,8
  10:15,19,21,23 11:2,5 12:2
  13:3,3,5,13 20:22 21:8,9,18
  22:3,16 23:13,16,20 24:22,25
  25:20,23,25 26:3,5,7,10,14,17
  26:20,23 29:4,8,11,20,23
  30:24 31:7,11,22 32:3 39:13
  40:1,2,10 41:3,14 42:2,8,9,10
  52:15,15,21 55:2 57:10,20,20
  57:22,24 72:1 75:22,23 76:3,4
  78:3,15,17,23,25 80:25 81:2,6
  81:12,20,22,22,23 83:19,24,24
**carried** 90:8
**cart** 75:2
**case** 1:2 34:2 46:14 65:6,7,24
  65:24 69:20 73:14,18,20 74:8
  74:9,10,11 79:11 82:2,19 83:8
  85:2,3 87:23
**cases** 72:12 73:24
**cash** 43:22 49:20
**Cassirer** 6:20 56:17

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 95 of 119 PageID #: 903

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud       Associated Reporters Int'l., Inc.

Page 95

**categories** 6:12 7:2,16 10:16
  21:16
**cause** 1:13,16,18,21,23 2:1,3,5
  2:7,9,10 60:16 70:12 77:5,24
  78:1,1,4,6,18,19 80:3,15
  82:11 87:19 89:3,8,13,19
**cease** 81:15,18
**cells** 47:17
**center** 47:18
**Central** 63:12
**certain** 2:12 9:6 37:25 38:7
  39:14 40:4,8 41:1 43:6,7 50:4
  50:4,17 52:8,9 56:24 68:12
  73:21 75:16
**certainly** 61:8
**CERTIFICATE** 91:1
**certificates** 43:11 44:1
**certified** 45:15 46:16,16
**certify** 91:2
**cetera** 36:8 75:18
**challenge** 62:17
**change** 50:9,10
**changed** 50:15
**changes** 65:10
**Chapter** 3:1 4:12 39:17 65:23
  77:15 79:4 80:15
**check** 13:20 78:21
**China** 5:11,13,20,23 6:4,8,16,23
  7:1,11,20,21,24 8:8,18 9:1,2
  9:25 10:23 11:2,6,10,24 12:2
  12:18 13:4,19,21 14:13 16:2,7
  16:10,12,19 17:8,12,14,19
  18:11,15 19:19,21 20:11 21:1
  22:3,4,9 23:1,6,14,21 28:3,19
  32:10,15 33:3,4,10 35:13 36:7
  36:10 37:4,24 38:4,19 39:5,7
  39:12 42:6,7,12,14 44:24 47:9
  48:7 50:5,10 52:16,22,24,25
  54:17,22,22 55:12,17 57:8,18
**Chinese** 36:22 37:1,13,19 45:11
  45:16,20 47:3
**Christine** 1:4 29:21 31:14 32:5
  39:14 40:5 41:11,17 54:19
  55:3 60:22 74:17
**Chrysler** 3:2,5
**Circuit** 58:18 78:10
**circular** 72:8,20
**circumscribed** 73:3
**circumstances** 69:22 70:5 83:14
**cite** 16:8

**cited** 73:14 78:10
**cites** 72:2
**civil** 71:5
**claims** 80:18
**clarification** 74:7 76:7 82:21
**clarified** 69:1,8
**clarify** 68:13 69:25 73:22 79:25
**clarifying** 48:20 69:13
**class** 64:16
**clause** 84:12
**clear** 15:9 33:1 68:16 70:24
  71:7
**clearly** 82:23 88:15
**client** 79:19
**closer** 51:2
**closing** 13:18
**closure** 77:18 84:21 87:15 90:6
  90:15
**code** 72:4 74:16,23,23,25
**collateral** 78:9
**colleagues** 59:24
**colon** 17:25
**come** 5:10,14,21,25 9:12 11:22
  12:14 20:22 36:18 48:11 54:2
  67:6
**comes** 62:11
**coming** 12:3 14:6,11 17:17 20:4
**command** 82:12
**commence** 70:24
**commencement** 68:19
**commencing** 63:12
**commit** 64:4
**communicate** 29:6 70:13
**communicating** 29:14,20
**communication** 30:23 31:1,5,9,13
**communications** 18:9,18,22,25
  23:22 29:22 56:13
**companies** 10:1
**company** 8:13 9:3,4,5,9,10,13
  10:2 13:9,16,21 14:13 18:4
  19:21,22 20:5 21:13,23 22:5
  22:13
**compel** 66:7
**compensation** 75:25
**COMPLAINT** 1:9 2:14
**complete** 10:11 46:22 52:3 59:25
  60:6,12 65:15 77:7 84:23
**completed** 38:17
**compliance** 89:21
**complicated** 70:19

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 96

**complied** 76:2
**complies** 74:24
**components** 19:5
**concentrating** 89:17
**concern** 51:7 88:10,21
**concerned** 46:7 82:1,1,4,6
**concerning** 76:13 88:18
**concerns** 53:17
**conclude** 72:13
**concluded** 52:5 90:18,25
**concluding** 45:11
**conclusion** 75:16
**conclusions** 24:2
**conclusory** 78:4
**confer** 12:7 24:5 59:24 85:19
  87:4
**conference** 1:9 2:14,15 6:18
**conferences** 83:18
**confided** 53:2
**confidential** 23:22 24:11,20
  55:1,18
**confined** 51:10
**confirm** 32:20 35:19
**confirmation** 85:23 86:9 87:11
**confirmed** 78:8 84:2
**conform** 68:14
**conformity** 75:18
**confront** 71:8
**conjunction** 42:7
**connection** 5:15,22 6:3,6,8,15
  6:16 8:8,18 9:18 18:8 21:3
  23:1 28:11,18 30:5 32:18
  41:24 43:6 54:17 55:11,17
  57:8,18 66:7 80:16 81:8 88:14
**consent** 85:2
**consentually** 89:10
**consider** 58:6 84:25
**considered** 39:4
**consistent** 79:18
**constrained** 90:6
**constraints** 80:13
**construed** 76:18
**contact** 65:11
**contained** 53:19,20
**contains** 24:2
**contemplated** 5:11
**context** 65:19 69:12 70:19 79:3
  87:23
**continue** 19:13 48:23 52:6
**continued** 33:2 87:17

**continues** 5:4
**continuous** 20:2
**contract** 6:10 7:14 8:15,17 31:6
  31:7 32:2,3
**contracts** 26:7,17 27:13,22 29:4
**control** 83:14 88:3
**controlled** 88:3,4,5,13
**Cont'g** 6:5 10:13,25 11:21 12:13
  15:24 17:5 19:16 24:10 28:16
  34:14 36:4,20 39:3 40:22,24
  44:17 47:5 48:24 52:7 54:13
**convenient** 62:13
**conversation** 20:3 58:8
**conversations** 12:25 19:2 48:6
**convince** 72:23
**copies** 26:16
**copy** 15:19 26:20 31:18
**corporate** 8:6,7,11 14:9 20:10
**corporation** 16:21
**correct** 15:21 16:23 29:12,13
  34:21,22 35:6,10,12 47:20
  59:15,16 63:4 68:13,14 74:18
  86:22 91:2
**correctly** 16:22
**costs** 85:1
**couldn't** 13:20 63:25
**counsel** 2:20 4:15,15 5:15 30:5
  30:7,9 43:4 55:13 56:5 58:24
  59:23 60:9 61:9 62:21,21 70:7
  70:10 74:12 78:13 80:9,17,17
  83:6,18,25 87:5,6,18
**country** 8:2
**couple** 13:1 64:12
**course** 18:6 19:12 45:15,17
  61:21 66:2 73:21 87:17
**court** 1:1 2:12 4:2,6,17,19,25
  5:3,25 10:11,18 11:14 12:6,9
  15:15,19,23 16:4,24 17:3 19:4
  24:1,6 25:3 28:13 33:16,21,23
  34:1,6,10 35:24 36:1,16 38:21
  40:20 42:18,21,23 44:14,16
  45:7,14 46:2,7,12,17,18,24
  47:2 48:17,20,23 51:4,9,16
  53:7,14,20 54:6,9,12 55:6
  58:13,19,20,23 59:5,22 60:5,9
  60:20,21,22,24 61:3,9,11,13
  61:18,22,24 62:4,11,15,20
  63:3,3,4,14,18,22 64:2,4,10
  64:13,15,21 65:1,4,10,11,14
  65:19 66:11,17,19,23 67:1,5,9

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 97

67:10,19,21,25 68:3 70:13,14
70:24 71:10,11,12,13,14,20
72:2,8,21,24 73:3,6,22 74:3,6
74:12,15,19,21,25 75:2,4,5,6
75:11 76:6,11,16,21,23 77:6
77:14,20 78:20,23,24 79:1,10
79:13,17,23 80:5,8,12 81:24
82:7,18 83:1,7,11 84:3,7,8,9
84:12,13,19,21,24 85:4,7,8,9
85:11,12,15,18,25 86:3,4,6,10
86:10,12,15,17,18,20,21,25
87:4,8,10,13 89:10 90:2,4,10
90:11,18,21,24
**COURTROOM** 51:2 60:19
**courts** 71:3
**Court's** 45:19 52:5
**court's** 65:25 82:13 90:8
**cover** 32:14
**co-counsel** 24:5
**creative** 13:7 42:11
**credibility** 19:10
**credit** 23:16 25:16 26:2 27:8
52:14,21 73:7
**creditor** 2:19,22 4:14 72:18
81:11 82:6
**creditor's** 82:3
**cross** 33:16 51:10,14 61:11,13
61:15
**currencies** 8:1,3,13,14 17:19,21
**currency** 8:24
**current** 42:25
**cut** 85:1

--------

**D**

**daily** 37:4
**date** 68:19 87:17 90:9 91:7
**dated** 35:18
**day** 63:16,19 64:12,24 90:15
**days** 60:8 62:19,19 63:5 70:22
**deal** 13:19 18:11 21:1 50:23
54:23 71:24 75:4 90:20
**dealings** 24:20
**debtor** 69:18 71:12 72:6 76:14
88:4,5,14
**debtors** 71:17
**debtor's** 72:1 87:5,6
**December** 6:21 12:15,21 23:4
29:11 33:3,7,11 34:16,21,23
35:1,3,9,10 36:21 37:13
**decide** 54:5

**decision** 75:6 78:10 79:17,18,19
86:3
**decisions** 2:12 38:11
**declare** 86:13
**decline** 58:25
**deem** 89:16
**deeply** 82:1
**default** 80:19,21 81:4 84:6,8
**defeats** 58:21
**defendant** 87:16
**defense** 84:17
**defer** 84:22
**deference** 77:13
**deferential** 77:20
**definitely** 38:5
**degree** 37:15 50:10
**delay** 21:21,21
**demonstrate** 71:25
**denied** 89:14
**denominated** 89:24
**deny** 39:15
**Department** 75:19
**deputy** 12:7 51:2 60:19
**describe** 56:1 67:22
**described** 46:21 56:11 57:16
**description** 70:19
**deserve** 67:12
**designee** 81:19
**desire** 77:21
**desired** 79:19
**despite** 88:13
**detail** 40:16
**determination** 73:17 76:25
**determinations** 77:16
**determine** 62:5 78:20,24
**determined** 51:23 78:8
**developer** 8:20 20:15 34:20 35:4
39:7
**developers** 34:17
**developer's** 7:23 38:10,12
**development** 5:13 44:24 52:24
**developments** 36:22
**dialogue** 18:14
**didn't** 14:2 79:15,16
**diff** 84:7
**different** 7:2,21 9:14,16,22,24
10:22 11:1 17:13 20:7,8 42:10
63:14,19 67:22 88:2
**differently** 79:14
**difficult** 69:22

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 98

**difficulties** 17:12
**diligence** 7:18
**direct** 5:6  11:17  13:23  14:2
  19:15  31:17  33:19  39:10  53:23
  61:7,10,14
**directed** 46:3
**directly** 55:2
**directs** 72:5
**disagree** 72:4  89:11
**discernable** 78:1
**disclosed** 42:7,15
**discovery** 79:3,7  90:19
**discuss** 11:25  12:4,16  16:19
  17:11  18:9
**discussed** 6:17,18  7:2,3,11,13
  7:14,15,19  8:7  9:12,15,24
  10:4,19,20,22  12:1,19,20,24
  13:14,15,16,19  17:16  21:7
**discussing** 10:7  16:1,9,12  22:3
**discussion** 12:21
**discussions** 6:22,25  8:16,24
  9:17,19,19  11:9,23  13:12  14:4
  16:4  17:10  18:13  19:18  21:4
  23:19  29:10  48:9  49:7
**dispute** 52:13,20  65:20  74:17
**district** 1:1  71:10  73:14
**division** 84:1,16  86:1,2,7,13
**docket** 66:12  77:8
**docs** 46:3
**document** 14:18,23,25  15:2,5
  33:20,22  44:18,20,22,23  45:7
  45:10,12,15,19,21,24  46:2,3,8
  46:12,13,19,21,22,24  47:2,7
  47:14,16,22  48:25  49:3,5,11
  51:11  55:14  56:10  66:14,16,22
  70:19  76:17  87:24
**documentary** 68:25
**documentation** 26:13,23  27:19,24
**documents** 43:5,6,17  44:1  55:12
  55:19,20  56:1,6,8,9  66:8
  68:20  69:4,6,16,20  70:22,25
  87:22
**DOCUMENTS(S)** 1:18,24
**DOCUMENT(S)** 1:11,16,21  2:1,3,6
  2:8,10
**DOCUMENT(S)[195** 1:14
**document's** 16:18
**doesn't** 62:15,16  72:2,3  73:2
  78:5,17  81:20  83:25
**doing** 7:7

**dollar** 52:14
**dollars** 59:15  75:25  80:19  83:22
**don't** 18:12  24:16,25  26:21
  30:21,25  31:16  32:16,24  33:23
  63:24  65:5,5  72:4  74:22  84:15
  84:15  85:13,15,19,21
**door's** 39:1
**downs** 37:15
**downstairs** 83:10
**downturn** 36:8  38:4,5
**draft** 29:3
**drafted** 30:7
**drafting** 13:24  14:3  30:16
**drafts** 30:12
**driving** 50:13
**due** 7:18  34:18  50:13  80:1
**due-diligence** 6:9,10  7:13,14
**duty** 72:17,19
**D.O.H** 30:13

---

### E

**e** 15:19  45:25  55:19
**earlier** 24:11  39:23  64:15  68:15
**ease** 45:19
**easiest** 61:12
**eastern** 1:1  73:14
**economic** 34:18  36:8  38:3,5
**economy** 36:17,23  37:2,13,15,19
**Edward** 56:17
**effect** 5:4  20:2  78:11
**effective** 18:6
**effectively** 87:24
**efficient** 65:22
**effort** 45:22
**efforts** 74:13
**eight** 41:16  44:9,9,15,16  45:4,5
  45:8  46:10,12  47:1  59:12,14
  87:14
**either** 18:18  31:20  67:6  73:25
**electronic** 3:24  55:20  91:3
**eleven** 39:11  41:1,20  60:13
  83:13  87:14
**elicits** 53:21
**ELIZABETH** 1:7
**emphasize** 69:9  70:8
**employ** 1:12  87:18
**encourage** 11:16
**ends** 75:20
**engage** 41:24  42:1
**engaged** 22:17,19

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 99 of 119 PageID #: 907

800.523.7887            11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 99

**engagement** 31:18,22,24 32:6,8
  32:14
**English** 45:11
**enter** 70:2 73:12
**entered** 60:14 68:8,11 69:9,13
  72:25 83:2 87:22 89:14 90:2
**entertain** 67:3
**entire** 68:24 77:14
**entities** 43:7 68:7 69:18,19
  88:2,3,5,13,14
**entitled** 66:22 75:24 77:5
**entity** 68:8
**entry** 66:20 70:16 89:12,25
**Epstein** 6:17,19,22,25 9:21
  18:18 56:17
**equitable** 71:22
**equity** 11:5 13:9 21:12 23:13,16
**error** 71:7,7
**Escobar** 1:14,17 69:16
**especially** 70:18
**essence** 73:15
**essentially** 24:21 63:8
**estate** 5:13,19 20:15 37:23,24
  39:6 44:24 50:8,11,16 52:24
  71:19,21 72:1,7 76:5
**estoppel** 78:9
**et** 36:8 75:17
**event** 75:12
**events** 51:21
**eventual** 20:10
**eventually** 8:2
**evidence** 15:11,16,18 16:18
  33:22 34:4,12 35:23 36:3 45:3
  47:1
**evidenced** 33:4
**evidently** 81:3
**ex** 58:19
**exact** 57:13
**exactly** 42:13
**exam** 69:5
**EXAMINAITON** 2:1
**examination** 1:14,17,18,22,24
  2:3,6,8,11 5:6 25:4 33:16
  38:22 43:2 51:8 55:5 59:8
  60:6 61:16 69:5,6 76:19
**examinations** 72:3 83:17
**example** 8:19 16:14 18:22 51:11
  69:15 76:8 87:25
**examples** 16:8
**Excel** 46:1 47:7,8

**exclusive** 71:11
**excuse** 12:6 15:20 66:19
**executed** 33:8
**exhibit** 14:15,16 15:12,13,17
  31:18 32:19 34:12 35:17,22
  36:3 41:10 44:9 45:4,5,8
  46:10 47:1 59:11,11
**exhibits** 55:14 56:4
**exist** 36:19 69:21
**existed** 20:17,18
**existing** 19:23 28:25
**exists** 36:17
**expansion** 52:15,22
**expect** 68:4,5 70:7
**expectation** 33:1
**expecting** 79:5
**expedited** 89:9
**expense** 45:22
**expert** 61:18,20 62:2 65:22
**explained** 28:6
**explains** 47:24
**extend** 68:18
**extensive** 63:11 69:11
**extent** 39:8 45:18 51:10 54:3
  65:16 68:15 69:2,4 73:7 76:8
  79:24 87:19 88:6,9 90:3
**extraordinary** 84:17
**e-mail** 15:20 16:3,5 18:8,17
  30:23 31:1,5,9,13 44:21 45:1
  45:2,8 48:21,22
**e-mails** 15:3
**E1** 71:10

---

**F**

**face** 62:17
**facie** 71:17
**fact** 29:2 34:3 53:20,25 71:25
  72:6,14 75:3,8 78:5 88:13
**factoring** 11:4,8 13:8,8,11,22
  13:24 14:5 22:10,12,15,20,24
  23:12,17 26:20 29:12,15 30:3
  30:6,7,13 39:22 41:25 52:23
**facts** 19:9 80:16
**fairly** 77:18
**fairness** 90:13
**Fame** 27:1,4,6,13,17,19,22 31:3
  31:11,25 40:10 41:3,14 42:2
**familiar** 17:14 86:15
**far** 87:2
**faring** 37:13

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud          Associated Reporters Int'l., Inc.

**farther** 71:23
**fast** 85:3,5,5
**favorable** 41:18
**federal** 71:3,5,8
**feel** 70:11
**felt** 38:12
**fiduciary** 72:17,19
**fif** 81:5
**fifte** 88:21
**fifteen** 88:17
**FIFTH** 66:14,18,21,24 67:8,15
**fifty** 51:24 75:11,15 80:25
  81:11,16,21 87:14
**file** 67:13 90:23
**filed** 34:1 66:6,9,10,13,16
  69:13
**filing** 71:12
**fill** 29:1
**final** 75:16 86:8 88:21
**finale** 75:20
**finally** 70:5
**finance** 24:21 52:15
**finances** 10:5 24:22 49:21,24
**finance-related** 6:11
**financial** 9:23,24 12:17,24 13:1
  13:13 14:10 25:10,23 27:4
  28:6 55:18 57:7 72:5 88:1,12
**financing** 9:1 19:23,24,25 28:3
  28:12,19,25 32:9 39:14,21
  40:1 41:19,21 42:9 50:23 53:1
  54:21
**financings** 32:14
**financing-related** 7:15 28:7
**find** 13:7 73:16
**finder** 53:20,24
**finding** 75:10
**fine** 34:8 55:22 86:8
**finish** 51:23
**Fireman's** 78:11
**firm** 4:9,11 5:22 6:7,14,23 7:7
  7:10,11,19 8:8,18,25 9:13,18
  10:17 11:9 12:17 13:12,23
  14:4 16:2 17:11 18:10,14
  19:19 21:3,5 22:4 24:12,16
  30:18 33:2,6 35:3 39:25 42:14
  43:6,11,14,17,20,23 44:2,6
  48:6,10,19 49:6 50:22 53:3
**firm's** 33:5
**first** 4:21,23 7:17 14:22 31:21
  32:19 45:25 56:14 61:17 66:9

68:19 69:10,21 71:8 73:17
  76:24 77:6 78:20,24 81:10
  84:24
**fit** 7:24 8:4,11 20:5,10,11
  54:10
**five** 59:14 60:13 83:11
**fixed** 16:20
**Flexocraft** 10:1 21:7 57:10
**flip** 50:18
**flipped** 50:12
**flipping** 14:19,20,23
**flow** 43:22 49:20
**Flr** 3:2
**focus** 14:14 71:2
**follow** 28:15
**followed** 15:20 45:9,9
**following** 65:7 75:21
**foregoing** 91:2
**foreign** 8:1,12 14:12 16:13
  17:19
**foremost** 4:23
**form** 18:21 19:1 33:12 61:15
**former** 78:13
**forth** 11:18 55:21 70:12 71:13
  71:14 75:8 88:20
**forthcoming** 75:13
**forty** 47:25 48:4,7,10 49:10,10
**forty-percent** 47:11,15
**forward** 50:8 54:3 82:19
**found** 75:12
**four** 14:16,16 16:18 17:7,7
  64:16 70:21
**fourteen** 88:11
**fourth** 17:6 66:5
**Frame** 27:16 42:2
**framework** 20:15 46:21
**Friday** 68:21 70:23
**frog** 66:15
**front** 70:6 76:12 82:7
**fulfillment** 78:3
**full** 62:11,20 77:10 82:13
**fully** 76:1
**full-stop** 82:12
**fund** 9:5 78:11
**funding** 9:5,7,8,10 20:20,20
**funds** 9:16 10:3 14:12,12 17:16
  17:18 19:24 20:3,3,4,9 21:8
  21:11 28:8 42:10 57:10 59:18
**further** 25:2 48:1 59:2,4,22,23
  60:1,2,17 66:9 69:8,13 73:11

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 101 of 119 PageID #: 909

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud          Associated Reporters Int'l., Inc.

Page 101

75:21 82:6 89:2,5 90:3,12

**G**

**gap** 29:2,2
**garden** 73:20,25 74:8,9
**gather** 72:10
**general** 6:12,12 7:15,22 17:16
  19:4,12,14,20 21:16,19 23:11
  36:24 37:3,12 53:15 58:16
**generally** 8:6,17 19:18 23:9,10
  51:9
**GENERIC** 1:22
**getting** 20:23,24 42:11
**give** 19:9 24:7 51:24 56:6 59:24
  64:11 67:9,9,12 71:14 81:8
**given** 71:11 81:2 89:6
**gives** 44:23 64:9
**giving** 24:21 51:12 64:7
**go** 11:15 12:7,23 38:22 58:6
  63:2 66:1 69:2 71:23 78:13
**goals** 52:2
**going** 11:16 12:10 17:22 28:14
  28:14 32:17 38:13,25 44:12
  45:18,21,22 46:9,18 47:9,11
  48:15,16 50:8,20 51:8 53:14
  53:16 58:15,17,20 60:10,12
  63:24 64:23 67:3,17,19 78:7
  80:12 87:15
**good** 4:3,4,5,18 5:8,9 51:4
  67:24 70:9 80:3,10 90:15
**GOTTEHRER** 1:19,22
**government** 50:14
**granted** 60:15 70:22 73:21 89:13
**granting** 90:3
**grapple** 75:5
**great** 77:4,23 79:24 82:4
**greatest** 52:1 77:12
**Green** 61:1,3,4 62:13 63:24,25
  64:24 65:16
**Green's** 61:6 63:20
**ground** 71:24
**grounds** 71:6 82:20 87:21
**group** 27:1,4,6,13,17,20,22 31:3
  31:11,25 40:11 41:3,14 42:2,2
  47:17
**guarantee** 16:20 18:6
**guess** 6:19 7:21 9:2 14:8 20:12
  37:14 41:5 50:13 66:7 70:5
**guidance** 19:13 54:4
**G.R.V** 16:9,12 21:14 22:2,5,6,7

22:8 43:11,14,17,20,23 44:1,5
49:7

**H**

**halfway** 16:15
**hand** 30:24 31:2,3 69:17,18
  76:14
**happen** 54:25
**happened** 19:7
**happening** 86:25
**happens** 79:3 87:8
**hasn't** 33:14 80:4
**haven't** 65:9
**Health** 75:19
**hear** 37:25 60:2 69:7 71:15
  79:12,15 80:5 82:10 86:4
**heard** 37:18,22 69:11 77:6
**hearing** 1:11,13,16,18,21,22,23
  2:1,3,5,7,9,9 52:2 56:5 83:12
  87:18 90:6
**hearings** 62:12 77:7 87:11
**held** 77:8
**help** 10:12 19:6 22:7 24:24 28:8
  65:8
**helped** 75:6
**helpful** 24:3 40:20 53:19,23
  59:1 67:10 70:14 74:16 83:5
**helps** 51:5
**Herschel** 49:1,1,2 56:21
**hesitant** 63:5
**he'd** 81:2
**he's** 62:1 81:20,21,22
**hide** 80:18
**highly** 62:24
**hindsight** 69:24
**hired** 42:13
**hold** 34:18,21 35:4 38:7 50:17
  83:7
**holdings** 57:9
**Home** 2:4,6 25:20 39:13 42:8,9
  42:10 52:15,21
**Honor** 4:8,11,16,18,24 5:2,24
  10:9 11:12 15:11,14,22 23:24
  24:4 34:8 35:23 42:16,19,22
  45:6,13,17 46:11,14,15,22
  48:12,15 50:25 51:6 53:4,6,12
  53:13 58:15 59:7,21 60:4 61:2
  61:7,17,23,25 62:10,14,17
  63:9,16 64:8 65:3,9,12,13
  66:5,14,15,21 67:3,15,16 68:2

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28
Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 102 of 119 PageID #: 910
800.523.7887                11-14-2011, New York, NY, In the Matter of C. Persaud        Associated Reporters Int'l., Inc.

Page 102

70:9 74:5 76:20,22 77:2,5,19
79:9,12,21 80:7,10,14,16
82:17,25 83:5,16 84:6,10,15
85:5,17,20 86:13,24 90:1,16
**HONORABLE** 1:7
**Honor's** 45:23
**Honor's** 70:11
**hope** 88:19
**horse** 75:3
**hour** 61:8
**hours** 75:24
**hundred** 55:13 56:3 75:14,20
81:23

---

**I**

**idea** 13:8 51:4
**identification** 15:13 45:5
**identified** 56:4
**identify** 47:13 56:10
**ignored** 84:18
**imagine** 69:22
**impeachment** 33:13
**important** 20:25 33:6 54:23 71:6
74:7 89:4,17
**improper** 33:12 40:10 41:3,13
**improve** 70:18
**improved** 70:2 88:19
**inaccurate** 55:9
**inches** 56:3
**include** 37:5
**included** 19:5
**includes** 55:16
**including** 45:25 47:2 55:19,20
72:17 77:15
**income** 25:10,23 27:3 44:5 48:3
49:18 50:1
**incomplete** 46:8,12 47:2
**inconsistency** 33:13
**inconsistent** 82:18
**indicate** 47:8 55:14 56:7 66:11
**indicated** 29:10 34:20 46:4 55:7
64:22 70:18 73:18 89:16 90:21
**indicates** 47:14
**indicating** 78:16
**indication** 59:13,17
**indirectly** 88:23
**individual** 46:3 49:13,15,18,21
**individuals** 68:8 69:19
**information** 10:16 11:18 17:24
18:1,3 21:17,19 23:21 24:12

24:19,20,24 37:3,14,16 39:25
42:8,15 43:1 54:20,23 55:1,8
55:10,16,21,24 56:11 57:7,9
57:11,14,15,17,19 58:16,17
72:11 76:9 88:1,12
**informs** 77:15
**initial** 68:19 69:3,15 78:19
89:1
**injected** 8:13 17:19
**injecting** 8:23
**input** 70:17
**inquire** 5:2 25:3 39:1 58:24
60:2 76:4 79:6
**inquiry** 38:24 68:25 79:2
**insights** 81:25
**inspired** 71:5
**instance** 61:17
**intended** 68:15 72:12 83:12
**intent** 20:14
**intention** 68:12 88:15
**interest** 10:7,14,17 11:10 22:16
23:20 48:11 71:18,19,21 72:1
72:7,14,14,20 73:15,17 75:11
75:14 76:2,3 81:12,14,18
**interesting** 76:23
**interests** 13:13 22:14 23:1
38:23 39:12,13 40:1,2 52:4
76:5
**intermediary** 21:13
**intermediate** 21:10
**intersected** 39:12
**Int'l** 3:20
**inventory** 50:11
**invest** 9:16 10:23 11:2,6,23
12:1 13:4,21 18:15 22:9
**invested** 7:25 8:2 13:15 57:25
**investigate** 39:17 72:5
**investing** 5:11,13 9:4,25 11:10
14:11 16:2,7,10 39:5 47:10
**investment** 5:19 8:10 10:19
12:17,24 13:1 14:11 16:12,21
19:19 20:22,25 21:5,8 22:8
38:9,23 48:2,4,7 49:9,10
59:13
**investments** 16:13 17:12 21:23
38:19 50:8
**investor** 47:15
**invite** 89:4
**involved** 56:16 77:13
**involvement** 13:24 14:2 77:14

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud        Associated Reporters Int'l., Inc.

Page 103

**Islip** 63:12
**isn't** 34:21 72:8,11 76:6 86:22
**issue** 7:18 8:5,23 14:12 20:23
  20:24 21:22,22 55:2 62:1
  63:10,21,23 71:21 75:5 81:17
  84:21 88:8 89:5
**issued** 2:12 68:13
**issues** 6:17 7:19 8:7 13:19 16:2
  16:9 21:20 65:17 68:6 69:12
  89:17
**issue's** 88:16
**It'll** 10:12
**it'll** 65:8
**it's** 15:7 16:6,11 21:1 63:1,24
  64:7,23 65:4,25 66:14,15,24
  66:24 67:10,12,16 69:21,21
  70:3 75:4,4 78:17 82:8 86:2
  87:7,7,14 89:21
**I'd** 14:14,17 18:2
**I'll** 62:5,6 63:6 67:9,9,13 68:4
  70:3,4,4 74:14 89:12,18
**I'm** 12:10 16:11 17:22 19:12,12
  28:14 32:17 62:6,18,20 63:5
  63:15,16,16,23 64:7,11 66:11
  66:14 67:19,23 70:3 72:22
  73:13 74:20 75:2 77:20 79:18
  80:14 81:24 82:3,4,6 83:7
  85:2,17,18 86:15 87:15
**I've** 68:25 69:11 77:16 80:9
  90:7,21

---

### J

**Jackson** 64:17 90:9
**Jacobson** 78:11
**January** 22:22,23 50:6
**job** 54:5
**Joel** 1:24 2:2,20 4:15 70:9 88:1
  88:1
**John** 3:1,5 4:10,12 80:10,14
**joint** 47:12,24,25 84:25
**Journal** 37:6
**judge** 1:7,8 63:2 64:10 71:8
  87:7
**judgement** 85:23 86:8,13
**judgment** 72:15 80:19 84:1,16
**judgments** 71:6
**Judicata** 78:10
**judicial** 78:14
**Judith** 91:6
**July** 5:12,17 6:2,2,17 11:25

12:19 56:15 58:8,9,9,9,10,11
  58:12
**jurisdiction** 71:9,11,15 75:1
  78:24 81:14,19 82:12 89:1,3,4
  90:20
**jury** 28:14 65:19

---

### K

**keen** 70:19
**keep** 36:22 37:1 46:15 85:3
**kind** 68:12 72:10,10 73:18 89:20
**Klein** 1:2,24 2:2,8,11,19 4:15
  4:23,25 5:5,8,10 11:1,7 13:22
  14:16,17,24 15:12,13,17,25
  22:7 24:15 25:6 28:2,11,17,22
  30:22 31:17 32:17,19,23 33:9
  35:15 36:5,9,21 39:20 41:23
  44:18 45:4,5 47:1,8,25 48:2,4
  48:5 49:1,2,2 51:7 52:1,12
  54:8,14 55:7 59:22 60:5 74:17
  75:9,11,13,19 76:13 80:17,18
  80:23 81:11 83:5 86:11 88:1,1
  88:3,4,13
**Klein's** 38:23
**Klein's** 85:22
**Kline** 2:22 69:17
**know** 12:20 14:6,7,10,20 23:5
  42:25 51:9 54:1,23 60:16 63:6
  63:6,8 65:4,5,8 69:6,24 71:2
  73:21 83:23 85:8,18,21 87:2
  90:11,17
**knowledge** 23:5 30:22 32:12 50:6
  50:7 52:19 86:19
**knows** 68:4
**Krinsky** 2:22,22 4:16,18,24 5:2
  5:7 6:5 10:7,13,25 11:7,21
  12:4,9,13 15:11,22,24 17:1,4
  17:5 19:4,16 24:4,10 25:2
  33:12,20,22 34:3,7 35:25
  36:15 38:20 42:22 43:3 44:12
  44:15,17 45:3,13,17 46:6,14
  47:5 48:9,14,18,24 51:1,15
  52:7 53:6,8,13 54:8,11,13
  55:4 58:15,21 59:4 60:4 61:1
  61:7,21 62:14,17,25 63:4 64:3
  64:8 65:3,11 66:6,25 68:1
**Krinsky's** 63:11

---

### L

**labeled** 17:2 45:9

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

**large** 44:10
**lastly** 8:23
**late** 83:13
**later-than-expected** 4:20
**latest** 70:6
**latitude** 48:14
**law** 16:20 17:8,14 50:10 58:18
  71:7,23 78:9 79:10
**lawfully** 18:5
**laws** 50:16
**lawyers** 52:4 67:24
**lawyer's** 53:19 54:5
**leading** 5:24 53:4,8,11
**learned** 76:7
**leave** 67:13
**leaves** 76:25
**lectern** 73:19
**led** 70:15
**Lee** 3:4 4:8
**leeway** 51:12
**left** 17:7
**legal** 6:7,9 7:13,18,24 8:4,12
  20:11 54:16 71:22
**legally** 8:2
**lent** 81:2
**letter** 8:19,20 15:7,21 20:14
  31:18,22,24 32:6,8,14
**let's** 4:7 10:11 49:9 56:7,13
**let's** 61:4 63:14,19 64:5,15,18
  65:14 80:5 87:13
**leverage** 11:5 13:9 21:11,13
  23:13
**Lewittes** 2:20 4:15
**Lewittis** 70:9,10,21 71:1 72:19
  72:21 73:2,5,13 74:1,4,11,14
  74:18,20,22 75:1 76:10,15,20
  76:22 77:2,19,24 79:9,12,15
  79:21 80:1,15 81:9 90:1,16,19
**Lexington** 3:2,6
**Liberty** 78:15,17 81:3,6,7,12,15
  81:15,17,18 83:20
**license** 75:23
**licenses** 75:17
**licensing** 21:22
**Likewise** 88:10
**limited** 27:1 41:4 68:11 69:1,14
**line** 16:17,18 17:6 23:15 52:14
  52:21
**liquidating** 11:10
**list** 26:9 27:16

**Listening** 70:10
**litigant** 79:5
**litigate** 39:17 84:21
**litigation** 82:8
**little** 14:14 60:11 64:15 80:3
  88:23
**LLP** 3:1,4
**loan** 21:12 23:15 76:13
**loans** 69:16
**local** 83:21
**logical** 69:21
**long** 38:24 82:16
**longer** 35:1,5 36:14 58:24
**long-running** 70:6
**look** 14:17,18,19,20,24 31:20
  35:18 36:5 42:17 44:13 63:14
  63:19 64:5 71:4,9
**looked** 38:18 40:18
**looking** 17:15 23:15 41:16 57:11
  57:17 59:10,12 62:6,20 80:23
  81:24 82:10 83:8
**looks** 64:6
**loss** 43:19 49:16
**lot** 7:7 18:24 24:19,19 50:11,13
  55:1,24 69:10 81:2
**loud** 18:2
**L.L.P** 36:9 39:16

### M

**mail** 15:20 46:1
**mails** 55:20
**majority** 82:4
**making** 8:21 9:3 38:11 54:20
**MAN** 61:17,23,25 62:10 63:9,15
  63:20,23 64:14,20,22 65:9,12
  65:13 66:5,14,18,21,24 67:3,6
  67:8,15 87:7,11
**management** 79:11
**managing** 67:23
**manifest** 71:7
**marked** 15:12 44:9 45:4,7 59:11
**market** 50:8,14
**Massena** 3:21
**matter** 5:19 33:2 35:17 62:7,8
  64:1,10 66:6 67:4 69:10 71:6
  71:9,15 72:2,3 75:1,3 78:7,9
  78:23,23 82:11 86:21,21 89:1
  89:2,3,7 90:20 91:4
**matters** 4:20 7:10,15 39:17,18
  42:5 60:23 67:22 68:23 69:7

Case 1-10-44815-ess   Doc 300   Filed 11/15/11   Entered 11/15/11 10:49:28

Case 1:12-cv-03337-JG   Document 1-35   Filed 07/05/12   Page 105 of 119 PageID #: 913

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 105

75:7 90:8
**mean** 11:3 13:5 38:9 64:14 81:23
**meant** 74:2,4
**measured** 76:24
**MEDIATION** 2:15
**meeting** 83:10,17
**MELQUISEDEC** 1:14,17
**members** 6:23
**Mendel** 2:19,19 4:14
**mentioned** 8:5,15,23 9:22 10:14
  15:25 22:2,19
**met** 38:9
**mic** 51:3
**midday** 64:6,14
**middle** 47:16
**million** 21:25 52:14 59:15 80:18
  83:22
**mind** 51:25 55:8 65:17 82:20
**mine** 54:5
**minimal** 73:1
**minimize** 73:4
**minimum** 75:24
**minutes** 42:17 51:24 60:13 68:22
  69:10 70:11 71:14 83:11,15
**mistake** 79:8,10,11
**mistaken** 73:13
**modest** 73:8
**modified** 79:24
**moment** 8:5,15 10:14 11:7 12:23
  13:20 14:15 15:25 22:2,19
  24:4 40:21 46:18 50:20 56:8
  59:24,25 60:11 78:19
**momentum** 33:4,10 34:13,16,19,24
  35:2,5,8
**Monday** 1:4 4:1 63:12 64:6
**money** 9:4 10:23 11:2 12:3 20:23
  21:11,21,24 48:2 57:9,19,22
  57:23,25 81:2
**monies** 7:25 10:6 11:24 12:1
  13:2,15 14:6,7 18:11
**month** 38:13,14,16
**months** 63:1
**morning** 4:3,4,5,18,21 5:8,9
  51:23 52:2 62:11 63:6,7 64:17
  64:19 65:15 66:4 70:9 80:10
**MORTION** 2:10
**Moskowitz** 4:16
**MOSKOWTIZ** 2:23
**motion** 1:14,16,18,22,24 2:1,3,6
  2:8,12 66:7 70:13 71:2,4

85:21 86:12,12
**motions** 85:22
**move** 28:10 34:9 35:22 54:3
  82:18
**movement** 9:22
**moving** 45:19 85:3
**multiple** 30:12

---

**N**

**N** 35:17 36:3 41:10
**naked** 78:2
**narrowly** 76:18
**nature** 11:17 14:3 19:7 50:5
  53:22 55:18 57:7 62:2
**nearly** 87:24
**necessary** 51:13 62:22
**need** 9:11 12:6 23:17 42:9 45:15
  47:22 55:15 60:17 61:8 62:4,5
  63:24 65:5,5,18 66:10 67:11
  68:1 69:2 73:22 77:16,18,22
  80:8 82:18 83:9 85:8,12,15,18
  87:14
**needed** 7:22,25 9:8 13:3,6 14:6
  14:7,10 19:21,22 21:9 54:23
  76:7
**needing** 88:22
**needs** 9:6
**negotiate** 89:9
**negotiating** 13:24 14:3 23:6,11
**negotiations** 6:10,10 7:14 8:16
  8:17,21 22:20,21
**never** 43:12 79:21,22 80:1,2,25
  80:25 81:15
**new** 1:1,4,4 2:21,24,24 3:3,3,6
  3:6,21 4:1 37:8 51:11 75:19
  86:1,22
**newspapers** 37:6
**nexus** 81:7
**nine** 41:9 64:18,20,21 90:10,11
**nine-thirty** 63:12
**notation** 89:18
**note** 19:5 51:18 56:2 87:15
**noted** 90:7
**notes** 42:19 55:9
**notice** 64:9,12
**notified** 35:5
**noting** 16:3
**November** 1:4 4:1 12:21 15:7,21
  19:17 62:8,18 77:9 88:22 91:6
**null** 86:13

**number** 14:8  24:2  38:22  43:4
  44:15  55:12  60:8  66:12,12,16
  75:7
**numbered** 32:25

**O**

**O** 32:19  34:12
**oath** 33:9  36:10  42:3
**object** 34:2  46:11  58:15
**objecting** 19:12
**objection** 10:9,12  11:12  15:14
  15:15  23:24  32:18  33:12  34:10
  35:24,25  36:1,15  38:20,25
  45:6,7  46:10,20  51:18  53:4,15
  54:12  62:1  77:3
**objections** 54:2  68:2
**objective** 65:21
**objector** 80:9
**objectors** 60:25  65:7,24
**obligations** 77:17,17
**obtain** 41:17
**obtained** 80:19,21  84:6,8
**obtaining** 17:23  18:1,3  28:3,12
  28:18  32:9
**occasion** 12:16
**October** 52:13  77:9
**offer** 15:11  34:3  45:3,20,24
  54:4
**offered** 28:7,20  34:4
**offering** 19:12
**OFFICER** 60:20,22  90:10,24
**offices** 75:23
**Oh** 61:18
**okay** 4:25  6:13  7:17  12:9  14:14
  15:5,8  16:17  17:3,4,10  18:1
  18:17,21  34:6  37:1  44:11,22
  45:3  47:18,21  57:6  61:3,9
  62:4  64:13,19  65:1,4,10  67:16
**once** 64:11  75:16  77:3  78:25
**ones** 40:8,13
**ongoing** 33:2  36:9  50:5
**open** 18:6  46:15  64:7  65:17
**opened** 39:1
**open-ended** 19:7
**operating** 52:16
**operator** 81:20,22
**opportunity** 24:7  56:7  62:6  67:1
  67:4  69:25  72:10  73:19  76:24
  88:20
**opposed** 34:7  69:5  82:6

**opposing** 43:4  61:9
**opposition** 72:25
**oral** 69:5,5
**orally** 71:14
**order** 1:13,16,18,21,21,23  2:1,3
  2:5,7,9,10  8:10  9:9  10:23
  11:4  13:4,8,21  14:8,9  21:10
  23:14,17  29:1  45:14  54:22
  60:16  66:17,20  67:12  68:5
  69:16  70:2,12,18,22  71:19
  73:3  76:12  83:3  84:7,8  86:23
  88:15,16  89:8,13,19  90:12
**ordered** 75:21  88:12
**orders** 60:14  68:8,10,11,13,14
  69:8,13,14  70:16  76:12  79:24
  82:22  83:4  87:19,20,22  88:6,7
  88:7,8  89:14,24  90:2,22
**ordinary** 89:6
**original** 8:3,14
**originally** 7:2  75:11
**outline** 44:23
**overheat** 50:15
**overheating** 50:14
**overlooked** 71:7
**overrule** 38:25
**overruled** 5:25  33:16  36:16
  54:12
**overseas** 64:23
**overstate** 84:14
**overwhelmingly** 72:24
**owned** 80:25  81:6  83:23  88:2,4,5
  88:13
**owner** 81:21
**ownership** 10:7,14,17,21  11:5
  13:14  21:20  22:13,15  23:20
  24:25  26:23  40:2  43:25  75:20
  78:6  81:12
**owns** 78:2,12,17,25  81:23  83:24
**o'clock** 62:9  64:14,16,18,21
  90:10,11

**P**

**pace** 89:6,8
**page** 15:19,20,21  16:15  17:7
  32:21  35:19  45:8,9,9,10,25
  46:1  47:6,18
**pages** 32:24
**paper** 67:6
**papers** 66:6,9,10  67:10,11  68:9
  70:14  76:8  77:21,23  83:21

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 107

**para** 81:9,10
**paragraph** 16:11,14,24 17:1,2,23
  17:24 32:23,25,25 35:7 36:5
  39:10,11,20 41:1,9,11,16,20
  81:10,10,21 88:11,17,21,21
**paragraphs** 87:21
**part** 8:21 12:20 14:22 20:25
  21:22 34:5 72:3 81:6 89:13,15
**parte** 58:19
**participated** 30:16
**particular** 16:5 21:25 22:1 60:7
**particularity** 75:8
**parties** 31:7 53:18 60:14 61:19
  62:13 68:6,16 69:4 70:3,7
  73:4 75:9 76:9 83:12 84:20
  89:19
**partner** 47:11 80:24
**partnership** 57:20
**party** 26:7,11,14,17 27:14,17,20
  27:23 29:4 32:3 81:16
**patience** 60:7
**Paul** 30:10
**pendency** 75:22
**pending** 12:10,11 82:15 84:22
  86:17
**people** 50:11,12
**percent** 20:21 47:25,25 48:3,4,4
  48:7,10 49:10,11 75:11,14,15
  75:20 81:1,11,17,21,23
**percent/forty** 48:3
**Pereira** 3:1,1 4:5,12,12 80:7,8
  80:10,11,14,15 81:24 82:17,24
  82:25 83:3,16 84:4,5,10,13,15
  85:5,10,13,14,17,20 86:2,7,11
  86:15,19,23 87:2
**period** 12:15 22:3,17,21,25 23:7
  35:9,11 50:17
**permission** 45:24
**permit** 16:20 71:13,23 84:20
**permits** 75:12 79:6
**permitting** 79:2
**Persaud** 1:4 23:5,19 29:21 31:15
  32:5 39:14 40:5 41:11,12,17
  52:9,12,20 54:19 60:22 75:9
  75:21 76:3 78:14,16 80:24
  81:4 83:17,22,23
**Persaud's** 54:14
**Persaud/Abraham** 74:17
**person** 19:1,3
**personal** 10:5,5 13:2 25:7,10,13

  25:16 49:20,24 50:1 74:4
**personally** 74:6
**perspective** 38:11,12
**persuaded** 73:8
**persuasive** 53:24
**persuasiveness** 66:2
**pertains** 36:24
**Pery** 2:22 4:15
**petition** 71:13
**PHILIP** 1:19,22
**phone** 55:25 58:12,14
**phonetic** 7:1 30:1,10,17 47:25
  49:1 61:1
**phrase** 55:16
**picking** 33:4,10 34:13,15,19,24
  35:2,5,8
**picture** 38:23 82:10
**place** 22:21 77:12
**placed** 50:7
**plaintiff** 87:16
**plan** 65:8
**planned** 65:6,9
**plays** 46:5
**pleading** 34:7
**please** 4:2,7 11:20 14:15,19,24
  15:23 16:2 19:13 36:5 39:2
  42:23 43:1 44:10,13 46:2 47:3
  47:13 52:6 59:5
**PLLC** 2:22
**point** 5:14,21 9:12 11:22 12:14
  13:18 21:24,25 22:1 33:7
  42:24 48:18,25 49:5,7 56:1
  58:16,25 59:14 64:5
**pointing** 75:7
**points** 88:24
**portion** 10:6 20:20 45:16,20
**pose** 48:20
**poses** 82:2
**position** 28:6 75:15 79:23 84:14
**positive** 63:17
**possibilities** 9:25 18:5,10
  57:21
**possibility** 21:2 39:16
**possible** 12:17 18:14,19 29:12
  29:15 51:22 63:4 64:7
**possibly** 5:12 6:11 10:3
**potential** 5:18 10:2,4 13:17
  19:6 20:7 21:1 32:14 37:24
  38:19
**potentially** 20:9 29:1

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 108

**powers** 73:21
**practical** 81:25 82:14 83:9
**practice** 51:5
**precautions** 50:15
**precise** 33:6 54:20 55:10,16
  56:11 57:6,11,12,17
**precisely** 72:11
**precision** 76:11
**prejudice** 73:11 89:14
**preliminary** 68:25
**prelude** 75:16
**prepared** 84:25 85:3
**presence** 62:22 64:25
**present** 78:5
**presentation** 65:24
**presented** 7:23 54:6 55:13 89:3
**presently** 56:2 84:22 86:17
**preserved** 66:3
**presiding** 52:1
**pressed** 83:1
**presupposes** 53:10
**Pretty** 23:23
**previously** 5:5 11:18 15:12 45:4
  83:12 89:14 90:7
**PRE-TRIAL** 1:9 2:14
**prices** 37:23 50:13
**prima** 71:17
**primary** 82:6
**printouts** 55:19
**private** 84:10
**probably** 61:8 77:22 83:19
**problem** 46:8 81:9
**procedure** 71:5
**procedures** 89:22
**proceed** 15:23 42:23,23 43:1
  47:4 48:17 59:2 64:5,23,24
  70:8 82:24 83:4,9 84:25 85:6
  88:22 89:4 90:22
**proceeded** 35:13 39:8 69:25
**proceeding** 60:12 62:23 77:15
  79:4 82:21 87:16 89:7 90:25
**proceedings** 3:24 77:11 84:22
  85:8,9,11,13,16 91:3
**process** 46:9 72:16 79:5 82:9,9
**produce** 70:22 76:17,19 88:1,12
**produced** 3:24 69:2,20
**production** 66:8 68:12,20 69:3,6
  69:15,22 70:19,24 87:22
**productive** 38:25 51:22 54:4
**professionalism** 74:13

**Professor** 61:4,6 62:13 64:24
  65:16
**proffer** 46:19 61:20
**proffered** 62:3
**profit** 13:17 43:19 49:15
**profits** 10:21 13:16 21:23
**project** 5:16,23 6:3,8,9,16,24
  7:1,8,12,13,20,24 8:9,18 9:1
  9:4,7 10:24 11:2,10,24 12:18
  13:21 17:18,20 18:4 19:19,21
  22:4 23:1,6,14 28:3,19 32:10
  32:15 33:3,4,10 34:21,24 35:8
  35:13 36:7,10,14,17,18,19
  38:6,10,13,17 39:5,7,8,9 42:6
  42:7,12,14 44:24 47:9 48:7
  50:6 52:24,24 54:18,22 55:12
  55:18 57:8,18
**projects** 39:6
**promptly** 83:10
**proof** 79:2,16
**properly** 70:13
**property** 71:12,18,19 72:1,7
  73:15,17 78:25
**proposed** 26:17,20 27:22 30:6
  31:7 32:2 39:22 67:20
**proposes** 82:5
**prospect** 62:23
**prove** 79:5 80:2,2,4
**provide** 6:8,9 10:16 11:18 25:6
  25:9,12,15,19,22 26:9,13,16
  26:19,22,25 27:3 49:12,15,20
  49:23 50:1 68:25 69:14 76:7
**provided** 6:15 21:17 23:21 24:12
  31:19 46:16 54:21 55:11,17
  56:12 57:7,17
**providing** 32:9
**provisions** 76:1
**public** 10:2
**published** 83:20
**pull** 21:2 54:24
**punctuation** 88:18,19
**purpose** 58:22
**Pursuant** 84:12
**pursue** 71:19 72:18
**pursuing** 23:1 72:14
**put** 35:4 38:6 51:13 67:10,17,17
  68:21 79:25
**putting** 11:7 34:18,20 65:7 79:1
**P.O** 3:21
**P202** 2:7

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 109

## Q

**qualification** 61:20
**qualifications** 61:25 65:21
**qualified** 62:1
**question** 5:24 10:11 11:14,19
 12:11,12 18:12 24:2,7,9 33:18
 39:2 40:22,25 48:21 53:5,9,11
 53:16,19 54:9 56:6 57:5 58:5
 68:6 71:8 75:3 82:11,12,14
 83:7 84:20 86:16 88:17,25
**questioning** 19:15
**questions** 11:16,17 19:5,6,11
 24:13 25:2 31:20,21 38:22
 42:20 43:4,8 50:4,21,23 51:6
 51:13,17,20 52:8,10 53:21
 59:2,4,6,23 60:1,9
**quick** 66:5
**quickly** 48:15 87:7
**quite** 63:10 66:12 69:14 77:7
 80:3 82:2 83:14
**quote** 16:19 33:1 36:6 39:12
 41:18,19 55:8,9
**quoted** 81:11
**quoting** 81:9

## R

**R** 3:5
**raise** 9:11 10:3 19:25 20:9 29:1
 65:18
**raised** 39:14 68:7,17 82:13
 84:18
**raising** 6:12 28:8 57:10
**reach** 79:18
**reached** 5:18
**reaching** 75:6
**read** 16:21 18:2 37:8,18,22
 40:19,21,22 68:9
**reading** 16:25 18:3 37:5
**reads** 33:1 36:6 75:15
**ready** 14:21
**real** 5:13,19 20:15 37:22,24
 39:6 44:24 50:7,11,16 52:24
**realities** 19:23 20:6,16,18
**realize** 84:13
**really** 38:6 50:12 69:9,14 71:1
**reason** 76:1 85:20
**reasonable** 39:15 68:5
**reasons** 87:20
**rebuttal** 65:6,7

**recall** 24:13 40:16,19 50:23
 52:10 57:1,3 58:7,10,14
**receive** 46:13
**received** 15:15 36:2 50:22
**receiving** 46:10,11,20 54:17
**recess** 60:10
**recognize** 14:24 15:2,5 44:18,20
 44:21 45:2
**reconcile** 42:4
**reconsider** 76:25 88:11
**RECONSIDERATIO** 2:1
**reconsideration** 1:16,21 2:5,10
 71:2,4 77:11 87:20 89:24
**reconsidered** 69:11 89:25
**reconstruct** 57:1
**reconstruction** 58:11
**record** 4:7 12:7,8,10 19:9 34:5
 46:15,25 47:14,22 51:17,19,19
 54:6 55:9 60:8 62:5 65:15
 66:10 67:23 68:24 69:23 77:7
 77:10,10,10,14 86:16,16 89:15
 89:21 90:22
**recorded** 3:24
**recording** 3:24 91:3
**records** 26:5 27:11
**record's** 15:8
**recross** 25:4 59:5,8,25
**redirect** 42:21 43:2 51:9 59:3
**refer** 7:4 13:25 17:22 32:17,23
 35:15 39:20 40:17 41:9,10,11
**reference** 7:1 21:19 23:12 31:21
 31:24 32:2,5,8 39:24 40:1,4
 41:17 54:20 71:11
**referenced** 56:14 90:22
**referred** 23:2 40:25 41:13
**referring** 16:14,17 17:6 20:19
 22:12 35:9 39:21 40:5,8,9
 41:2,8,20 44:8 45:18,21,25
 47:6,18,23 52:20
**refers** 30:24 31:3,6,10,14
**reflect** 47:23 88:16
**reflected** 16:4 46:24 73:9,10
 88:15 89:13,15
**reflection** 89:2,2
**refused** 86:4
**refute** 77:22
**regard** 28:9 29:12,14
**regarding** 6:23 7:11,19 10:17
 11:9,23 13:13 18:14,19 19:19
 21:5 23:20 24:11 36:22 43:5

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 110 of 119 PageID #: 918

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud    Associated Reporters Int'l., Inc.

Page 110

44:5 48:6,10 49:7 50:21,22
52:8,21 88:2
**regularly** 37:5,8
**regulations** 17:13 30:14 75:18
**Reif** 30:1,2
**related** 1:14,16,18,21,24 2:1,3
2:6,8,10 9:7 24:22 54:16 55:2
69:16,18,19
**relates** 22:13,15
**relating** 32:9 42:8 43:17,23
44:1
**relation** 9:14 24:20 42:12 54:21
57:19
**Relevance** 38:20
**relevant** 72:11
**relief** 72:13 73:1,11 88:9 90:3
**rely** 46:9
**remain** 68:23 69:7 82:1,21
**remand** 87:1
**remanded** 86:22 87:9
**remember** 30:21 33:14 40:15 43:7
58:2,4
**remind** 5:3 51:12 53:17 80:8
89:19
**reminded** 80:9
**remove** 45:20
**render** 28:18
**rendered** 86:2
**renew** 89:16
**repatriated** 8:3,14
**repatriation** 14:12
**repeat** 39:2 51:13
**rephrase** 11:19 48:25 53:13,15
53:16 57:6
**reply** 66:7,22 67:18
**Reporters** 3:20
**reports** 37:18,22 83:20
**represent** 24:23 33:2 39:19
41:24 42:5
**representation** 5:19 24:18 36:8
**represented** 30:5
**representing** 21:4 24:16 29:23
**request** 84:25 88:9,23,24
**requests** 82:15
**require** 68:11,13 87:25
**required** 59:14 67:22 72:17 89:8
**requirements** 90:7
**requires** 58:19
**Res** 78:10
**rescheduling** 62:7

**residual** 76:2,3
**resolved** 20:24
**respect** 6:13 7:18 8:7,25 13:11
13:22 17:11 21:18 29:7 30:3
42:1 50:5,8 52:18,22 54:14
56:7 57:23 71:16 77:12 80:1
87:15,25 88:20
**respond** 24:7 53:6 67:2
**responded** 88:10,25
**response** 60:15 67:10 69:8 70:1
73:1 74:9 78:22 79:24 81:25
86:25
**responsive** 70:4
**rest** 61:9
**restate** 12:10 24:1,6 54:9
**restated** 24:8
**restrictions** 20:12 50:7
**result** 81:3
**resume** 4:22
**retain** 5:15,15,22
**retained** 6:3 7:9,9 39:18 42:5,6
79:19
**retention** 6:6 33:7
**rethinking** 82:19
**return** 16:20 60:18 78:19
**returns** 25:13,25 27:6 43:13
49:13
**revealed** 58:18
**reversed** 84:1,3
**review** 29:3
**reviewed** 88:18
**revise** 54:9
**re-offer** 45:24
**RE:RELATED** 1:11
**right** 4:17,23 5:1,17 8:22 25:1
36:18 38:15 39:24 42:21 48:16
51:15 54:6 56:10 58:13,23
59:22 60:5,10,24 61:19,22
62:20 65:10 66:3,23 68:3,21
76:10 84:19 85:7 87:13,13,14
**rights** 10:21 11:5 13:14 21:20
24:25,25 40:2 57:20 76:3,4,4
**rise** 60:19,20 90:24
**risen** 37:23
**risk** 38:12 82:2
**roadmap** 24:21
**role** 46:5 47:9
**roughly** 20:21
**rule** 54:2 69:24 71:5
**rules** 9:5 17:13 71:5,24 74:16

74:23,23,25 75:18 78:9 89:22
**run-of-the-mill** 73:20,25 74:8,9

---

**S**

**S** 3:1 4:12 80:10,14
**sake** 12:9
**Salazar** 30:10,15
**Sam** 30:1
**Sanders** 1:12 3:4 4:9,10 5:18,22
  6:3,14,23 7:6,10,11,19 8:8,18
  8:25 9:13,18 10:4 11:23 12:5
  12:17,25 13:12,23 14:4 15:10
  16:2 17:11 18:10,14 19:18
  21:3,5,17,18 22:25 23:22
  24:12,16,18 25:7,9,12,15,19
  25:22 26:16,19,22,25 28:2,11
  28:18,24 29:3 32:13 35:3 36:9
  39:16,25 41:24 42:1,6,8,13
  43:6,11,14,17,20,23 44:2,5
  48:6,19 49:6,12,13,18,21,24
  50:2,22 51:7 53:2 54:17,21
  55:11,17 57:8,18 66:9
**Sarah** 2:23 4:16
**satisfied** 68:23 76:25 79:18
  82:21
**saw** 66:9
**saying** 40:15 74:1 78:5 81:6
  84:17
**says** 52:12 73:15 75:15 78:12
  80:23 81:11,20,21 85:24
**schedule** 1:21 62:22 63:7 67:20
  68:5 89:6,9 90:4
**scheduled** 86:20
**scheduling** 61:5 90:7
**scope** 51:8,10 69:23,24 76:18
**seated** 4:2 5:1 60:21
**SEC** 61:17,23,25 64:14 65:13
**second** 12:6 58:18 60:22 63:9,15
  63:20,23 78:10 81:9
**section** 37:9 72:4 83:17
**secure** 41:18
**see** 16:15 17:9,24 18:1 46:2
  51:5 54:10 65:14 66:3,3 70:2
  72:12 79:13 81:7 82:15 87:8
  89:1
**seek** 69:5 70:1 72:13 87:20,22
  90:4
**seeking** 11:17
**seeks** 69:15
**seen** 83:3

**sell** 38:8,8
**send** 48:21
**sending** 49:2
**sense** 45:14 76:16 84:20 87:23
**sensible** 76:18,23 82:23
**sent** 48:19,22 49:1
**sentence** 17:23,25
**separate** 78:18
**separately** 88:25
**September** 77:7,9
**series** 50:21 51:17 53:21
**service** 3:20,24
**services** 6:7,7,11,14,15 28:17
  32:9
**set** 8:11 11:18 18:5 19:21,22
  20:5 55:20 70:12 71:13,14
  74:16 88:20
**sets** 75:8
**seven** 15:21 36:5 52:14 62:19
**several-page** 47:3
**Shanghai** 7:7
**sheet** 25:7,20 27:1 49:23 59:17
**sheets** 44:4
**shifts** 77:4
**short** 60:10
**shortly** 51:21
**show** 1:13,16,18,21,23 2:1,3,5,7
  2:9,10 60:16 66:17,20 70:12
  77:4 87:19 89:8,13,19
**showing** 71:17 72:9,10 76:9 78:3
**shown** 55:12,15 72:6 78:6,18,19
  78:22
**side** 7:23 20:17,19 29:16,18
  63:19
**sign** 23:13
**signature** 32:22
**signed** 32:20 35:19
**significant** 20:20,25 46:5 82:2
**significantly** 85:1
**similar** 8:10 89:18,25
**simple** 13:6 75:4
**simply** 11:9 13:20 19:8 34:7
  45:24 53:23 65:25 70:6 90:14
**single** 56:10 78:12
**SINISI** 3:1
**Sino-foreign** 16:21
**sit** 24:15 33:9 36:9 42:3
**situation** 24:8 81:25
**situations** 72:13 88:2
**six** 56:3

**sixteen** 88:21
**sixty** 47:24 48:2,4
**size** 83:19
**small** 48:14 73:9,10
**smaller** 73:9
**smallest** 73:8
**smooth** 12:10
**sole** 81:20,22
**somebody** 50:16
**somewhat** 7:21 9:3
**soon** 77:18 81:18
**sorry** 12:2 29:7 44:14 63:23
  66:14 70:17 80:14 85:17
**sort** 49:23 64:11
**sought** 5:14
**sound** 3:24 91:3
**sounds** 62:4 63:11
**speak** 30:2 51:17,19 55:10 76:11
  88:7,8
**speaking** 8:6
**special** 74:16,23 89:20
**specific** 16:6 21:5 49:9,10
  58:17
**specifically** 6:13 7:25 8:13
  9:18 10:8,15 11:3 12:23 13:10
  16:8,9,17,19 17:6 20:19 21:15
  22:13 24:22 26:19 28:17 44:8
  47:6,13,14,21 48:9 52:19
**specificity** 55:23
**specified** 87:20
**speculating** 58:11
**spelling** 7:1 30:1,10,17 47:25
  49:1 61:1
**spend** 72:22
**split** 47:24
**spoke** 12:21,22 53:2
**spreadsheet** 45:11 46:1 47:7,8
  48:19 59:10
**Spriggs** 91:6
**stand** 5:1 28:14 51:4
**standing** 87:6
**standpoint** 65:23 82:3
**start** 4:20 62:12 83:13
**starts** 38:17 80:22
**state** 2:12 12:11 37:19 63:3,4
  64:10 75:19 84:13,21,24 85:7
  85:8,11 86:16,17,20
**stated** 87:24
**statement** 25:10,10 27:3 33:17
  42:4 49:20 78:2,2,4,12,20

**80:22**
**statements** 25:16,16,17,23,23
  26:2,2,3 27:4,8,8,9 43:20,23
  44:5 49:16 50:1 52:19 70:11
  78:13
**states** 1:1,8 39:11
**stating** 87:23
**status** 85:7,8,10
**stay** 2:12 56:8
**stayed** 87:8 90:20
**step** 58:8 69:21 76:24 84:17
**stepping** 82:9
**steps** 73:8,8,9,10,10
**stipulate** 61:20 62:1 65:16
**stipulation** 67:20
**stock** 43:10
**STONG** 1:7
**stop** 58:25
**straight** 63:5
**Street** 37:6
**Stremba** 3:4 4:4,8,8 5:24 10:9
  11:12 15:14 23:24 25:5 28:10
  28:16 33:15,24 34:8,14 35:22
  36:4,20 39:3 40:24 42:16,19
  45:6 46:11,22 48:12 50:20,25
  51:6 52:8 53:4,12 59:6,9,20
  63:25
**strike** 28:10 37:11 38:2
**strikes** 76:21
**structure** 8:11 9:9 14:8,9,13
  18:6,11 19:22 20:5,10 53:1
  54:22
**structures** 19:21
**structuring** 8:6,7
**studied** 70:15 77:22
**subject** 7:10 58:4 61:10,10 71:9
  75:1 78:9,23 81:13 82:11
  88:11 89:1,2,3 90:20
**submission** 78:16 90:5
**submit** 67:20,25 68:4,6 71:16
  89:9
**submitted** 32:18 35:16 68:9
**subsequent** 48:5
**substance** 53:18,20
**successful** 72:24
**sued** 80:24
**suggestion** 68:10
**suggestions** 18:7
**Suite** 2:24
**summer** 5:10 6:21 12:15 22:22

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28
Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 113 of 119 PageID #: 921
800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud    Associated Reporters Int'l., Inc.

Page 113

23:3 29:11
**supplement** 66:10
**supported** 69:23 89:21
**Supreme** 2:12 86:1,22 87:9
**sure** 7:22,25 8:4,21 9:8 17:1
  18:13 30:12 42:25 52:3 54:11
  63:15 64:11 66:23 67:24 82:4
  82:22
**Surely** 24:6
**surprised** 85:18
**suspended** 36:7,11,14
**sustain** 53:15
**Sustained** 24:1
**sworn** 5:5
**system** 7:24 8:4,12 9:2 20:11
  79:6

**T**

**tab** 14:16 44:8,13,14,15
**table** 62:20
**take** 4:25 16:2 19:17 21:21
  22:21 24:25 36:13 40:20 42:16
  46:18 50:14 55:15 57:21,21
  58:20 60:10,17 61:15 63:3
  65:25 74:6,7 82:5 89:10 90:5
**taken** 4:21 20:13 60:8
**takes** 75:14
**talk** 7:17 41:20 49:9 51:2 61:4
**talking** 52:23
**talks** 80:15
**tax** 25:13,25 27:6 43:13 49:13
**TE** 2:5
**teach** 64:16
**technically** 53:8 71:3
**telephone** 19:1,3 56:22
**tell** 55:23 56:14 58:13 65:5
  77:22 83:25 85:7
**telling** 10:8,15 13:10 21:15
  80:22
**template** 69:1
**temporarily** 36:7,11,14
**temporary** 38:1
**ten** 48:13 62:19 83:19,22
**Tenzer** 30:17,18
**terms** 47:9 61:7 81:13
**testified** 24:11 39:22 41:23,25
**testimony** 4:22 10:10 11:16,17
  11:19 35:2 51:23 52:3,5 58:20
  61:6,14,18 62:2 65:15,18,25
  83:21

**th** 3:2
**thank** 4:16,19 15:23 25:3 47:3
  59:1,20 60:5,6,18,21 70:15,17
  70:21 74:19 80:6 88:19 90:15
  90:23
**that's** 15:3 16:6 17:2 61:2 64:3
  76:16 80:3 81:17 84:13 86:23
**there's** 64:10 68:6 70:16 71:18
  72:19 74:16 76:19 77:14 78:21
  81:7,12
**they'll** 64:11
**thick** 56:3
**thing** 4:21 54:24 65:22
**things** 19:8 66:12 67:11 73:23
  75:17 89:11 90:12
**think** 22:23 24:2 25:1 30:17,25
  31:16 32:24 33:17,21,23 38:24
  39:1 44:25 48:15 51:16 59:13
  60:16 61:8,13 62:23 67:11
  68:21 69:21 71:23 74:6,15
  79:5 84:20 85:12,15 88:8 89:6
  89:22
**thinking** 5:12 9:15 24:21 42:11
**thinks** 61:11
**third** 47:17,19 62:10 65:9,12
**Thirteenth** 2:20
**thirty** 20:21 60:13 75:24 83:22
**thirty-eight** 32:24,25 35:7
**thousand** 75:25
**three** 15:20 16:11 38:18 39:4
  63:1 88:2
**throat** 66:15
**Thurs** 83:2
**Thursday** 60:15 68:21 83:2
**time** 5:10,14,17,21,25 9:6,12
  10:20 11:22 12:14,21,22 13:16
  13:18 20:22 22:1,3,16,17,21
  22:25 23:7 33:7 35:12 36:18
  45:22 46:8 48:18,25 49:5,7,11
  50:10,17 53:18,18 54:4,4
  55:15 60:7 61:5 62:13 64:7
  65:25 67:9,13 68:1,18 71:12
  72:23 73:11,19 80:12 82:16
  85:2 88:23
**timeframe** 14:7 23:3 51:25
**times** 37:8 48:13 83:19
**timing** 20:3,24
**today** 24:15 33:9 36:10 42:3
  52:5 60:17 68:18 70:23 87:15
  88:22

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud          Associated Reporters Int'l., Inc.

Page 114

**told** 23:8,15 34:17,25 35:4 40:3
  83:19
**tool** 89:20
**tools** 79:3,4
**top** 47:19
**topics** 57:16
**track** 85:3,5,6
**Trade** 27:1,4,6,13,16,16,19,22
  31:3,11,25 40:10 41:3,14 42:2
**transcript** 3:24 51:21 91:2
**transcription** 3:20,24
**Transcriptionist** 91:7
**transfer** 31:10 42:9 75:12,17,23
**transfers** 26:10,13 27:16,19
  40:10 41:3,13 42:1
**translation** 45:16,23 46:16
**translations** 45:10
**transmitted** 49:6,11
**treat** 70:7
**trial** 62:18,22,23 63:11
**tried** 21:14 68:25
**Troutman** 1:12 3:4 4:8,10 5:18
  5:22 6:3,7,14,23 7:6,9,11,19
  8:8,17,25 9:13,18 10:4,17
  11:9,23 12:4,16,25 13:12,23
  14:4 15:10 16:1 17:10,15
  18:10,13 19:18 21:3,5,17,18
  22:4,25 23:22 24:12,16,18
  25:6,9,12,15,19,22 26:9,16,19
  26:22,25 28:2,11,18,24 29:3,6
  29:19 30:2,24 31:2,6,10,14,18
  32:13 33:2,5,6 35:3 36:8
  39:16,25 41:24 42:1,6,8,13
  43:6,11,14,17,20,23 44:1,5
  48:6,10,19 49:6,12,13,18,21
  49:24 50:2,22 51:7 53:2 54:17
  54:21 55:11,17 57:8,18 66:9
**Troutman's** 29:18
**true** 53:9 84:23
**trust** 78:17,18 88:5
**trustee** 3:1,4 4:9,11,13 24:17
  24:23,24 32:19 34:12 35:17
  36:3 39:17 69:5 71:18 72:5,9
  72:17 73:21 75:14 77:4,25
  78:2,21 79:2 80:2,6,15 82:4,5
  83:8
**trustees** 72:13 74:12
**trustee's** 65:23 72:15 76:5
**try** 24:24 72:23,23
**trying** 42:25 50:14 77:20

**turmoil** 34:18
**turn** 14:15 36:17 43:10,13,16,19
  43:22,25 44:4,12,13 56:13
**turned** 43:5
**twenty** 55:13
**twenty-four** 15:12,13,17 38:13
  38:14,16
**twenty-plus** 56:4
**two** 14:16,16 15:19 17:2 21:25
  21:25 42:16 57:16 59:6 62:8
  62:12 63:7 64:14 75:9 80:18
**type** 73:20 79:7
**typically** 70:1
**T-S** 16:15 17:2,25

---
**U**
---

**unable** 24:6
**unaccompanied** 45:10
**Unanticipated** 4:20
**uncertainties** 63:18
**uncertainty** 38:7
**uncomfortable** 79:1
**understand** 18:12 22:7 42:23
**understanding** 7:22 8:20,22
  37:12 68:22 77:3
**understood** 66:8
**unexpected** 62:6
**unfortunately** 62:14
**unintelligible** 70:8 89:23
**UNITED** 1:1,8
**unobjected** 19:11
**unproductive** 82:3,8
**ups** 37:15
**urge** 51:22 84:14
**USC** 71:10
**use** 21:14 23:14 24:24 34:2
  79:15 82:9
**U.S** 37:15

---
**V**
---

**v** 1:3
**vacate** 85:22
**vacated** 84:1,16
**vacating** 86:8,8
**vacator** 85:23
**valid** 84:12,17
**value** 22:5,6,8
**variety** 73:20,25 74:8,10
**various** 83:21 87:21
**vehicle** 10:2,5 12:24 21:8,10

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 115 of 119 PageID #: 923

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud          Associated Reporters Int'l., Inc.

Page 115

22:8 53:1
**vehicles** 9:14,16,23,23,24 12:17
  13:2 17:17 18:15,19 20:8 21:6
**venture** 10:3 28:7 47:12,24 48:1
**verbal** 18:25 56:7,13
**verbally** 18:22,24 55:24
**versions** 68:15
**viable** 36:19
**view** 34:24 68:17 70:6 73:23
  74:10 77:3 78:24
**views** 83:8
**VIOLATION** 2:12,13
**virtue** 83:24
**voice** 4:6
**void** 2:12 86:14

---

**W**

**W** 3:4
**Wait** 28:13
**waiting** 87:7
**Wall** 37:6
**Wang** 7:1,4,5,6 9:21 15:7,8
  18:18
**want** 24:16 70:5 74:22 80:17
**wanted** 23:12
**wasn't** 38:11
**wasn't** 13:6,6 34:25
**way** 9:17 10:22 13:7 19:4,14,22
  19:25 20:5 53:15 54:3,4 76:6
  77:2 81:15 82:9,23 83:18
  84:25
**ways** 11:1 42:10,11
**week** 63:10 64:5 66:6 67:14,16
  67:18 68:17,20 75:24,25 78:15
**weeks** 56:5 63:7
**weight** 66:1
**went** 80:20,20
**weren't** 41:2
**we'll** 34:9 58:6 60:11
**we're** 45:18,21 47:6 60:10
**we'd** 13:18
**we'll** 61:11 62:12,22 64:18 65:1
  66:3,3,23 87:17 90:5
**we're** 16:12 60:12 62:25 63:1
**whatsoever** 70:16
**what-have-you** 75:13
**wide** 33:18,21
**willing** 75:5
**window** 38:7,8,13,14,16
**wish** 60:2 90:15,16

**wished** 82:22
**withdraw** 74:14
**withdrawn** 12:14 22:18 37:11,17
  38:2 41:8
**witness** 11:15,18 19:10,15 33:13
  48:22 51:14 53:21,23 58:17
  62:15 65:21
**witnesses** 60:24 64:2 65:1
**witness's** 33:17
**won't** 63:6,8
**Woolworth** 2:23
**word** 58:3,3 75:15 79:15 80:2
**words** 17:7 33:5 57:13
**work** 7:7 9:9 14:9 19:23 20:16
  30:13 36:6 61:11 62:15,16,22
  64:9,11 67:19,24 68:3 89:11
  90:4
**worked** 20:13
**working** 4:6 8:19 11:4 23:6
  24:19
**works** 16:13 75:22 77:2
**worldwide** 34:19 38:6
**worth** 66:1 72:14 83:20,22
**wouldn't** 38:8,9 40:19 53:11
**wouldn't** 21:2 22:10 64:1 66:8
**wound** 81:5
**writ** 66:24
**write** 13:20
**writing** 18:22
**written** 15:4

---

**Y**

**Yeah** 5:17 6:25 29:17 30:19
  32:22 50:9 56:25
**years** 36:13 37:20,23 38:18 39:4
**York** 1:1,4,4 2:21,24,24 3:3,3,6
  3:6,21 4:1 37:8 75:19 86:1,22
**you'd** 89:8
**you'll** 65:7
**you're** 14:18,19,21,23 16:9,25
  22:12 64:4 67:21,22 84:23
**you've** 77:13,21 89:11

---

**Z**

**Zhang** 18:7 47:25 48:2,4
**Zhang's** 18:4
**ZILBERBER** 2:19
**Zilberberg** 2:19 4:14,14 64:22
  70:10
**Zilberberg's** 64:25

Case 1-10-44815-ess    Doc 300    Filed 11/15/11    Entered 11/15/11 10:49:28

Case 1:12-cv-03337-JG    Document 1-35    Filed 07/05/12    Page 116 of 119 PageID #: 924

800.523.7887                 11-14-2011, New York, NY, In the Matter of C. Persaud        Associated Reporters Int'l., Inc.

Page 116

---

**0**

**08** 12:15,16  22:22  23:3
**09** 22:22,23  50:6

---

**1**

**1** 1:9  2:14
**1/5/11** 1:10
**10-01228** 1:2
**10-44815** 1:3
**10/19/10** 1:10
**10/25/11** 2:16
**10/28/11** 1:10,12,15,19  2:4,13
   2:14
**10174** 3:3,6
**10279** 2:24
**1028/11** 1:24
**11** 77:15
**11/4/10** 1:10
**11/8** 66:16
**11/8/11** 1:10,12,15,19,24  2:4,13
   2:14
**11219** 2:21
**12/14/10** 1:10
**13th** 77:9
**1334** 71:10
**13662** 3:21
**14** 1:4  4:1
**14th** 88:22
**15** 35:18  91:6
**165** 3:21
**179** 2:12
**182** 1:11
**187,228** 1:11
**195** 1:16
**196** 1:18,22
**197** 1:24  2:1
**198** 2:3,6
**199** 2:8,10

---

**2**

**2/2/11** 1:10
**20th** 77:9
**2004** 1:14,16,18,22,24  2:1,3,6,8
   2:10  68:6,10,11  69:24  71:16
   71:19  72:3,11,13  73:16  76:18
   77:4,5  82:15  89:22
**2008** 5:11,12,17  6:21,22  15:21
   19:17  33:4,7,11  34:16,21,23
   35:1,9  36:21  37:13  52:14
**2012** 2:3

---

**2011** 1:4  4:1  35:18  91:6
**203** 1:23
**204** 1:13
**21st** 62:18,25  63:2,6,7,8,10,12
**214** 1:18
**22nd** 62:8  64:5  77:9
**233** 2:24
**24** 15:7
**272** 1:21
**28** 71:9
**28th** 15:21  64:6,6,21  65:15  66:4
   67:8  77:9  90:10,11
**287** 66:16
**292** 2:1
**293** 1:16
**294** 2:9
**295** 1:21
**296** 2:5

---

**3**

**3/10/11** 1:10
**30** 58:9
**30t** 58:11
**30th** 6:18  58:9,10,12
**31** 34:21  35:1,3,9
**31st** 58:9
**315** 3:22
**341** 83:17

---

**4**

**4** 72:5
**4/7/11** 1:10
**405** 3:2,6

---

**5**

**5/20/11** 1:10
**59** 71:5

---

**6**

**6/17/11** 1:10
**6/28/11** 2:16
**6619** 2:20

---

**7**

**7** 3:1,2  4:12  39:17  65:23  79:4
   80:15
**7/27/11** 2:16
**7/5/11** 2:16
**7/7/11** 2:16
**704** 72:4

---

800.523.7887          11-14-2011, New York, NY, In the Matter of C. Persaud      Associated Reporters Int'l., Inc.

Page 117

**707** 2:24
**769-6429** 3:22

---
**8**
---

**8th** 77:9,10
**8/16/11** 1:10

---
**9**
---

**9/13/11** 1:14,19,24  2:4
**9/20/11** 1:14,24  2:4
**9/22/11** 1:15,19  2:4
**9/27/11** 1:10,12  2:13
**9/28/11** 2:16
**9/7/11** 2:16
**9/8/11** 1:14,19,24  2:4
**9:26** 1:5  4:1

# United States Bankruptcy Court

Eastern District of New York
271 Cadman Plaza East, Suite 1595
Brooklyn, NY 11201–1800

---

IN RE:                                                                  CASE NO: 1–10–44815–ess

Christine Persaud

SSN/TAX ID:                                                                          CHAPTER: 7

xxx–xx–0247

DEBTOR(s)

---

## NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

Notice is hereby given that:

A transcript of the proceeding held on November 14, 2011 was filed on November 15, 2011 .

The following deadlines apply:

The parties have until November 22, 2011 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a Transcript Redaction Request is December 6, 2011.

If a Transcript Redaction Request is filed, the redacted transcript is due December 16, 2011.

If no such Notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is February 13, 2012 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber Associated Reporters International, Inc (315) 769–6429 or you may view the document at the public terminal at the Office of the Clerk.

Dated: November 16, 2011

For the Court, Robert A. Gavin, Jr., Clerk of Court

**BLnftrans.jsp** [Notice of Filing Transcript and Deadlines to Restriction and Redaction rev. 11/21/08]

# Notice Recipients

District/Off: 0207−1                    User: btaylor                    Date Created: 11/16/2011
Case: 1−10−44815−ess                    Form ID: 296                    Total: 7

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | |
|---|---|---|
| tr | John S. Pereira | Pereira &Sinisi    The Chrysler Building    405 Lexington Avenue    7th Floor    New York, NY 10174 |
| aty | John P Campo | Troutman Sanders LLP    The Chrysler Building    405 Lexington Avenue    New York, NY 10174 |
| aty | Mendel Zilberberg | 6619 13th Avenue    Brooklyn, NY 11219 |
| aty | Stephen Preziosi | 570 Seventh Ave    6th Floor    New York, NY 10018 |
| | Joel Lewittes | Mendel Zilberberg &Associates    6619 Thirteenth Avenue    Brooklyn, NY 11219 |
| | Pery Krinsky | Krinsky PLLC    Woolworth Building    233 Broadway, Suite 707    New York, NY 10279 |
| | Lee W Stremba | Troutman Sanders, LLP    The Chrysler Building    405 Lexington Avenue    New York, NY 10174 |

                                                                TOTAL: 7