Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    EASTERN DISTRICT OF NEW YORK

4    Case No. 10-44815(ESS)

5

6    - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8

9    CHRISTINE PERSAUD,

10

11              Debtor.

12

13   - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              Conrad B. Duberstein U.S. Bankruptcy Courthouse

17              271 Cadman Plaza East - Suite 1595

18              Brooklyn, NY

19

20              November 14, 2011

21              9:26 AM

22

23   B E F O R E:

24   HON. ELIZABETH S. STONG

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2   Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

3   Adv. Proc.:  1-10-01228 Klein v. Persaud, et al.:

4   [1] ADJOURNED PRE-TRIAL CONFERENCE re Complaint

5   Adjourned from:  10/19/10, 11/4/10, 12/14/10, 1/5/11, 2/2/11,

6   3/10/11, 4/7/11, 5/20/11, 6/17/11, 8/16/11, 9/27/11, 10/28/11,

7   11/8/11

8

9   Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

10  [187, 228] ADJOURNED HEARING (RE: related document(s)[182]

11  Application to Employ Troutman Sanders LLP

12  Adjourned from:  9/27/11, 10/28/11, 11/8/11

13

14  Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

15  [204] ADJOURNED HEARING on Application for Order to Show Cause

16  (RE: related document(s)[195] Motion for 2004 Examination of

17  Melquisedec Escobar

18  Adjourned from:  9/8/11, 9/13/11, 9/20/11, 9/22/11, 10/28/11,

19  11/8/11

20

21  Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

22  [293] HEARING on the Reconsideration of the Order to Show Cause

23  Application (RE: related document(s)[195] Motion for 2004

24  Examination of Melquisedec Escobar

25

Page 3

1

2  Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

3  [214] ADJOURNED HEARING on Application for Order to Show Cause

4  (RE: related document(s)[196] Motion for 2004 Examination of

5  Philip Gotterher

6  Adjourned from:  9/8/11, 9/13/11, 9/20/11, 9/22/11, 10/28/11,

7  11/8/11

8

9  Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

10 [295] HEARING on the Reconsideration of the Order to Show Cause

11 Application (RE: related document(s)[272] Order to Schedule

12 Hearing (Generic), [196] Motion for 2004 Examination of Philip

13 Gottehrer

14

15 Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

16 [203] ADJOURNED HEARING on Application for Order to Show Cause

17 (RE: related document(s)[197] Motion for 2004 Examination of

18 Joel Klein

19 Adjourned from:  9/8/11, 9/13/11, 9/20/11, 10/28/11, 11/8/11

20

21 Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

22 [292] HEARING on the Reconsideration of the Order to Show Cause

23 Application (RE: related document(s)[197] Motion for 2004

24 Examination of Joel Klein

25

Page 4

1

2  Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

3  [201] ADJOURNED HEARING on Application for Order to Show Cause

4  (RE: related document(s)[198] Motion for 2004 Examination of

5  Caring Home Agency

6  Adjourned from:  9/8/11, 9/13/11, 9/20/2011, 9/22/11, 10/28/11,

7  11/8/11

8

9  Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

10  [296] HEARING on the Reconsideration of the Order to Show Cause

11  Application (RE: related document(s)[198] Motion for 2004

12  Examination of Caring Home Care Agency

13

14  Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

15  [202] ADJOURNED HEARING on Application for Order to Show Cause

16  (RE: related document(s)[199] Motion for 2004 Examination of

17  Abraham Klein

18  Adjourned from:  9/8/11, 9/13/11, 9/20/11, 9/22/11, 10/28/11,

19  11/8/11

20

21  Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

22  [294] HEARING on the Reconsideration of the Order to Show Cause

23  Application (RE: related document(s)[199] Motion for 2004

24  Examination of Abraham Klein

25

Page 5

1

2    Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

3    [179] ADJOURNED MOTION for Violation of Automatic Stay and to

4    Void Certain Decisions of the State Supreme Court Issued in

5    Violation Thereof

6    Adjourned from:  9/27/11, 10/28/11, 11/8/11

7

8    Main Case:  1-10-44815-ess Christine Persaud, Chapter 7

9    Adv. Proc.:  1-11-01456 Klein v. Pereira

10   [1] PRE-TRIAL CONFERENCE re Complaint

11   Adjourned from:  10/28/11, 11/8/11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 6

```
 1
 2     A P P E A R A N C E S :
 3     LAW OFFICE OF STEPHEN N. PREZIOSI P.C.
 4          Of Counsel to Samuel J. Landau on behalf of Debtor,
 5           Christine Persaud
 6          370 Seventh Avenue
 7          Ninth Floor
 8          New York, NY 10018
 9
10     BY:   STEPHEN N. PREZIOSI, ESQ.
11
12     TROUTMAN SANDERS LLP
13          Proposed Counsel for Chapter 7 Trustee, John S. Pereira
14          The Chrysler Building
15          405 Lexington Avenue
16          New York, NY 10174
17
18     BY:   LEE W. STREMBA, ESQ.
19          JOHN P. CAMPO, ESQ.
20
21
22
23
24
25
```

1

2    PEREIRA & SINISI, LLP

3            Chapter 7 Trustee

4            The Chrysler Building

5            405 Lexington Avenue

6            7th Floor

7            New York, NY 10174

8

9    BY:    JOHN S. PEREIRA, ESQ.

10

11    MENDEL ZILBERBERG & ASSOCIATES, P.C.

12            Attorneys for Creditor Abraham Klein

13            6619 Thirteenth Avenue

14            Brooklyn, NY 11219

15

16    BY:    MENDEL ZILBERBERG, ESQ.

17            JOEL LEWITTES, ESQ.

18            SARA MOSKOWITZ, ESQ.

19

20

21

22

23

24

25

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 8 of 99 PageID #: 935

Page 8

```
 1

 2    KRINSKY PLLC

 3         Of Counsel for Creditor Abraham Klein

 4         Woolworth Building

 5         233 Broadway

 6         Suite 707

 7         New York, NY 10279

 8

 9    BY:   PERY D. KRINSKY, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CHRISTINE PERSAUD

Page 9

1                    P R O C E E D I N G S

2           THE COURT:  Let's get your appearances for the record,

3      please.

4           MR. STREMBA:  Your Honor, Lee Stremba of Troutman

5      Sanders for the trustee and the firm.

6           MR. CAMPO:  John Campo of Troutman Sanders, Your

7      Honor, for the trustee and the firm.

8           MR. PEREIRA:  John S. Pereira, the Chapter 7 trustee.

9           MR. ZILBERBERG:  Mendel Zilberberg for Creditor Klein

10     with of counsel, Joe Lewittes, and of counsel, Perry Krinsky,

11     as well as Sara Moskowitz.  Thank you, Your Honor.

12          MR. KRINSKY:  Good morning, Your Honor.

13          THE COURT:  Thank you.  And I apologize for the later

14     than expected start.  I had some unanticipated matters that had

15     to be taken care of first thing this morning.  So I believe we

16     are here to resume the testimony of Mr. Klein, is that right,

17     first and foremost?

18          MR. KRINSKY:  Yes, Your Honor.

19          THE COURT:  Okay.  Mr. Klein, you can take the stand.

20        (Pause)

21          THE COURT:  All right.

22          MR. KRINSKY:  May I inquire, Your Honor?

23          THE COURT:  Yes, you may.  I remind you that you

24     have -- your affirmation continues.

25     RESUME DIRECT EXAMINATION

Page 10

BY MR. KRINSKY:

Q.   Good morning, Mr. Klein.

A.   Good morning.

Q.   Mr. Klein, did there come a point in time in the summer of

2008 that you contemplated investing in China?

A.   Yes.  In July of 2008, we were thinking of possibly

investing in a real estate development in China.

Q.   And did there come a point in time that you sought to

retain and did retain counsel in connection with that project?

A.   Yeah.  Right around the same time, in July of 2008, we

reached out to Troutman Sanders for potential representation in

the matter of the real estate investment in China.

Q.   Did there come a point in time that you actually did

retain the Troutman Sanders firm in connection with the China

project?

        MR. STREMBA:  Your Honor, it's a leading question.

        THE COURT:  Did there come a time?  Overruled.  You

may answer.

A.   In July -- end of July, beginning of August, we retained

Troutman Sanders in connection with the project in China.

Q.   In connection with that retention, what, if any, services,

legal services, did the Troutman firm agree to provide to you

in connection with the China project?

A.   They agreed to provide legal due diligence, project due

diligence, negotiations, contract negotiations, finance related

1   services and as well as possibly also raising capital.  That's

2   the general categories.

3   Q.   And specifically, with respect to those services, who, if

4   anyone, from the Troutman Sanders firm provided those services

5   to you in connection with the China project?

6   A.   Mr. Epstein.  We discussed those issues on July 30th on

7   the conference call.  We also basically discussed that later

8   on.  And it was Mr. Epstein and, I guess, Aurora Cassirer.

9   Q.   Beginning in the summer of 2008 until December of 2008,

10  did you have discussions with Mr. Epstein or other members of

11  the Troutman Sanders firm regarding the China project?

12  A.   Yeah.  We had discussions with Mr. Epstein and Mr. Wang in

13  reference to the China project and we discussed the different

14  categories that we originally discussed.

15  Q.   When you refer to Mr. Wang, who is -- just for all of our

16  benefit, who is Mr. Wang?

17  A.   Mr. Wang is an attorney in the Troutman Sanders firm in

18  Shanghai and he seemed to be doing a lot of the work on the

19  project.

20  Q.   After you retained the Troutman Sanders firm, what were

21  the subject matters that were discussed with the Troutman

22  Sanders firm regarding the China project?

23  A.   We discussed the legal due diligence, the project due

24  diligence.  We discussed contract negotiations.  We discussed

25  financing related matters.  That was the general categories.

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 12 of 99 PageID #: 939

CHRISTINE PERSAUD

Page 12

1    Q.    Okay.  First, I'd like to talk to you briefly.  With

2    respect to the issue of legal due diligence, what were the

3    issues discussed with the Troutman Sanders firm regarding the

4    China project?

5    A.    China, I guess, being somewhat different than our general

6    understanding, we needed to make sure that whatever was being

7    presented to us from the developer's side on the project would

8    actually fit within the China legal system.  We needed to also

9    make sure that monies invested, specifically because of being

10   foreign currencies, that it would be able to be legally

11   invested into the country and eventually repatriated into

12   original currencies.  And we had to make sure that it would fit

13   into the legal system.

14   Q.    You mentioned a moment ago also the issue of corporate

15   structuring.  Generally speaking, what were the issues

16   discussed with respect to corporate structuring with the

17   Troutman Sanders firm in connection with the China project?

18   A.    Very similar, in order to make the investment, we would

19   have to set up a corporate structure that would fit within the

20   legal system that would allow for foreign currencies

21   specifically to be injected into the company and later on

22   repatriated into its original currencies.

23   Q.    You also mentioned a moment ago, contract negotiations.

24   What were the discussions that you had generally about contract

25   negotiations with the Troutman Sanders firm in connection with

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 13 of 99 PageID #: 940
CHRISTINE PERSAUD

Page 13

1    the China project?

2    A.    One example is we were working on a letter of

3    understanding with the developer.  And that was a big part of

4    the negotiations of making sure that the whole understanding is

5    right.

6    Q.    And lastly, you mentioned the issue of injecting currency.

7    What were, if any, the discussions that you had with the

8    Troutman Sanders firm about with respect to financing of the

9    China project?

10   A.    There is a, I guess in the China system, somewhat there is

11   more than just making a company and investing money through the

12   company into the project.  There are many rules of how to fund

13   the company or funding that needs to be done within a certain

14   amount of time not even related to the actual funding of the

15   project.  And because of that, we needed to make sure that the

16   funding is there in order to make the company work as well as

17   structure the company according to whatever funding was

18   actually available and what we still would need to raise.

19   Q.    Did there come a point in time that you discussed with the

20   Troutman Sanders firm a company called Caring?

21   A.    Yes.  It was in relation to the different vehicles that we

22   discussed that we were thinking of we would be able to invest

23   funds through those different vehicles.

24   Q.    By the way, when I say discussions with the Troutman

25   Sanders firm, specifically in connection with Caring in those

Page 14

1   discussions, who did you have those discussions with about

2   Caring?

3   A.   With Mr. Epstein and Mr. Wang.

4   Q.   And a moment ago, you mentioned different vehicles,

5   financial vehicles.  What were, if any, the different financial

6   vehicles that were discussed as possibilities for investing in

7   China?

8   A.   Flexo Craft, which is one of the companies I'm affiliated

9   with, was a potential vehicle as a public company and being

10  able to possibly raise funds.  Venture Capital that we

11  discussed with Troutman Sanders was a potential vehicle as well

12  as my personal finances or my personal monies which a big

13  portion of that was in Caring.

14  Q.   In discussing your ownership interest in Caring, without

15  telling us specifically what was said --

16       MR. STREMBA:  Objection, Your Honor.  There's no such

17  testimony.

18       THE COURT:  Well, let's have a complete question.  It

19  will help me assess an objection.

20  Q.   You mentioned a moment ago your ownership interest in

21  Caring.  Without telling us specifically what you said, what

22  categories of information did you provide to the Troutman firm

23  regarding that ownership interest?

24       THE COURT:  You may answer.

25  A.   I discussed with them my investment in Caring.  I

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 15 of 99 PageID #: 942
CHRISTINE PERSAUD

Page 15

```
 1    discussed with them -- which was at that time I accrued profits

 2    in Caring, my ownership rights and I discussed with them

 3    different -- a way that I would have to get the money out from

 4    Caring in order to invest in the China project.

 5    Q.   Mr. Klein, when you say different ways to get your money

 6    out of Caring to invest in the China project, what specifically

 7    do you mean?

 8    A.   I was working on a factoring agreement in order to

 9    leverage my ownership rights and equity in Caring, therefore

10    being able to invest in China.

11    Q.   Mr. Klein, putting aside for a moment the factoring

12    agreement, when, if ever, did you have discussions with the

13    Troutman firm regarding simply liquidating your interest and

14    investing in the China project yourself?

15          MR. STREMBA:  Your Honor, objection.  Where was that

16    from?

17          THE COURT:  I have to say, that question seems to me

18    to go beyond the boundaries of what's been the witness'

19    testimony.  I'm going to encourage you to ask questions in the

20    nature -- questions seeking direct testimony and not to provide

21    information not previously set forth in the witness' testimony

22    and your answers.  Will you rephrase that question, please?

23    Q.   Did there come a point in time where you had discussions

24    with Troutman Sanders regarding how to invest monies in the

25    China project?
```

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 16 of 99 PageID #: 943
CHRISTINE PERSAUD

Page 16

1    A.    We discussed that in the beginning, in July.  And in

2    August, we discussed it -- of how we would invest monies in

3    Caring -- I'm sorry -- in China where the money would be coming

4    from.

5    Q.    And did you discuss with Troutman Sanders --

6         THE COURT:  Excuse me for one second.  I have to

7    confer with my deputy.

8       (Pause)

9         THE COURT:  May we go briefly off the record?

10      (Off the record)

11        THE COURT:  Mr. Krinsky, for the sake of the smooth

12   record, I'm going to ask you to restate your pending

13   question -- or state again, I should say, your pending

14   question.

15   Q.    Did there come a point in time --

16        MR. KRINSKY:  Withdrawn.

17   Q.    During the period of the summer of '08 to December of '08,

18   did you have occasion to discuss with the Troutman Sanders firm

19   the possible financial investment vehicles for the China

20   project?

21   A.    Yes.  I discussed it with them in July.  I discussed it

22   with them -- you know, basically, it was part of the discussion

23   every time we spoke, November, December, every time we spoke

24   about this.

25   Q.    Let's go back for a moment.  And specifically, what was

CHRISTINE PERSAUD

Page 17

1  the financial investment vehicle that was discussed during

2  these conversations with Troutman Sanders?

3  A.    There were a couple of financial investment vehicles.  And

4  one of them was my personal monies that I had in Caring which I

5  needed to get out from Caring in order to invest in China.

6  Q.    When you say get out of Caring, what do you mean?

7  A.    It wasn't that simple.  I needed to find a creative way to

8  do that.  And so, I came up with this factoring -- idea of a

9  factoring agreement in order to leverage my equity in the

10  company.

11  Q.    Again, without telling us specifically what was said, with

12  respect to the factoring agreement, what, if any, discussions

13  did you have with the Troutman Sanders firm regarding your

14  financial interest in Caring?

15  A.    I discussed with them my ownership rights.  I discussed

16  with them the money that I invested in the company.  I

17  discussed with them my accrued profits at that time and what

18  it -- would be the potential profit at the time that we would

19  get to the point of closing the China deal.  I discussed with

20  them issues that I had at that moment whereby I couldn't just

21  simply write a check from the company in order to invest in the

22  China project.

23  Q.    Mr. Klein, with respect to this factoring agreement, did

24  the Troutman Sanders firm have any direct involvement in the

25  drafting or negotiating of this factoring agreement you refer

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 18 of 99 PageID #: 945
CHRISTINE PERSAUD

Page 18

```
 1    to?

 2    A.   No.

 3    Q.   Well, if they didn't have any direct involvement in

 4    drafting or the negotiating of it, what was the nature then of

 5    the discussions with the Troutman Sanders firm about the

 6    factoring agreement?

 7    A.   They needed to know where monies were coming from.  They

 8    needed to know the time frame of any and all monies in order to

 9    be able to, number one, I guess, structure the -- do the

10    corporate structure in order to work along with the financial

11    abilities and as well as they needed to know where it was

12    coming from because investment -- investing foreign funds as

13    well as repatriation of funds was an issue in a China company

14    structure.

15    Q.   I'd like to focus a little bit more on that for a moment.

16    If you would please turn to the exhibit book to tab 124 -- in

17    the Klein exhibit book, 124.

18         (Pause)

19    Q.   Mr. Klein, I'd like you to briefly look down at that

20    document, briefly look through it.  And when you're done

21    flipping through it, please look up.

22         (Pause)

23    Q.   When you're done flipping through it, if you would, just

24    look up just so we know you're ready.

25         (Pause)
```

Page 19

1    A.    Just the first page or all of it?

2    Q.    When you're done flipping through the document, if you

3    would please look up.

4        (Pause)

5    Q.    Mr. Klein, do you recognize that document?

6    A.    Yes.

7    Q.    How do you recognize that document?

8    A.    That's one of the e-mails from -- which that was written

9    to me.

10   Q.    Okay.  And what do you recognize that document to be?

11   A.    It's a letter from Mr. Wang on November 24.

12   Q.    Okay.  And Mr. Wang is, just so the record's clear?

13   A.    From Troutman Sanders.

14        MR. KRINSKY:  Your Honor, I offer into evidence what

15   was previously marked as Klein Exhibit 124 as identification as

16   Klein Exhibit 124.

17        MR. STREMBA:  No objection, Your Honor.

18        THE COURT:  Without objection, it will be received in

19   evidence.  The copy that I have is two-page e-mail -- excuse

20   me -- a three-page e-mail followed by the November 28th, 2008

21   seven-page letter, is that correct?

22        MR. KRINSKY:  It is, Your Honor.

23        THE COURT:  Thank you.  Please proceed.

24   (Klein Exhibit 124, 3-page e-mail from Mr. Wang to Mr. Klein

25   dated 11/24/08, was hereby received into evidence as of this

1      date.)

2      Q.   Mr. Klein, a moment ago, you had mentioned that you had

3      been discussing with the Troutman Sanders firm issues of

4      investing in China.  Please take us through, if you would, this

5      e-mail very briefly noting to the Court where, if at all, those

6      discussions are reflected in this particular e-mail.

7           (Pause)

8      A.   Something very specific?  That's all -- it's all about

9      investing in China.

10     Q.   Well, specifically, can you cite some examples for us

11     specifically where you're discussing GRV and the issues of

12     investing in China?

13     A.   About -- paragraph 3, we're discussing the GRV and the

14     investment in China and how it worked for foreign investments.

15     Q.   So, for example, referring to the paragraph that begins TS

16     about halfway down on the page, do you see that?

17     A.   Yes.

18     Q.   Okay.  Specifically, referring your attention to line 4.

19     This document's already in evidence.  Specifically, where it

20     begins to discuss, "The China law does not permit a guaranty

21     for the fixed return under a Sino-foreign investment

22     corporation."  Did I read that correctly?

23     A.   Correct.

24          THE COURT:  Could you say again what paragraph you're

25     reading from?

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 21 of 99 PageID #: 948
CHRISTINE PERSAUD

Page 21

1          MR. KRINSKY:  This is under the paragraph that's

2    labeled "To".  It is the paragraph that begins "TS" --

3          THE COURT:  Yes.  Okay.

4          MR. KRINSKY:  Okay.  Specifically, referring to the

5    fourth line down, approximately four words from the left of the

6    page, "The China law".

7    A.   Yes, I see.

8    Q.   Okay.  In your discussions with the Troutman Sanders firm,

9    what, if anything, did you discuss with respect to difficulties

10   in China and investments?

11   A.   There is different rules and regulations in the China law

12   which we were not very familiar with.  And we were looking for

13   them -- for Troutman to advise us.  And what we discussed in

14   general were that -- where the funds would be coming from,

15   through which vehicles we might be bringing the funds to this

16   project and how that would be able to be injected as foreign

17   currencies into this China project as well as being able to get

18   it back out in the same currencies.

19   Q.   Let me refer your attention to the last sentence of that

20   same paragraph that begins "After obtaining more information".

21   Do you see that?  Same paragraph that begins "TS:", very last

22   sentence, beginning "After obtaining more information".  See

23   where I am?  Okay.  I'd like you to read that out loud for us.

24   A.   "After obtaining more information about this project and

25   Mr. Zang's company, we will advise you whether there are any

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 22 of 99 PageID #: 949
CHRISTINE PERSAUD

Page 22

1    possibilities to lawfully set up an effective guaranty

2    structure.  And we are, of course, open to any suggestions from

3    Mr. Zang."

4    Q.    In connection with this e-mail or other communications

5    that you had, did you discuss other possibilities with the

6    Troutman Sanders firm of how to structure a deal in China using

7    your monies?

8         (Pause)

9    A.    I don't understand the question.

10   Q.    Sure.  During your discussions with the Troutman Sanders

11   firm, did you have a dialogue regarding the possible vehicles

12   to invest in China?

13   A.    Yes.

14   Q.    In addition to this e-mail, did you have other

15   communications with either Mr. Wang or Mr. Epstein regarding

16   those possible vehicles?

17   A.    Yes, we did.

18   Q.    And what was the form of those communications, for

19   example, in writing, verbally or otherwise?

20   A.    Much -- a lot of it verbally.

21   Q.    And those verbal communications, were they by telephone or

22   in person?  What was the actual form of those conversations?

23   A.    By telephone and in person.

24        THE COURT:  Mr. Krinsky, in a general way, I will note

25   that your questions have included many components of potential

Page 23

1    answers.  It will help me more if the questions are more open-

2    ended in the nature of what happened next, what did you do,

3    things like that.  It simply will give me a better record upon

4    which to assess the facts and also the witness' credibility.

5    But you -- the questions aren't objected and, of course, I'm

6    not objecting.  I'm offering some general guidance.  Please

7    continue.  And I will say, in a general way, that applies to

8    any attorney questioning any witness who performs direct.

9    Q.   In November 2008, take us through, if you would, the

10   discussions you had, generally, with the Troutman Sanders firm

11   regarding the investment in the China project.

12   A.   There were -- in general, there was this China project

13   where company structures needed to be set up.  The company

14   structure needed to be set up in a way that would work within

15   the realities of our existing financing as well as any

16   additional financing -- or additional funds as well as any

17   additional financing that we would have to raise one way or

18   another.  One had an effect on the other.  So that was a

19   continuous conversation of what funds we have, the timing of

20   the funds, where the funds are coming from.  So as to be able

21   to build or set up the company structure in a way that would

22   fit those realities.

23        In addition to that, there were potential different

24   avenues or different vehicles through which we would be able to

25   potentially raise funds.  And they -- those -- all of those

would have to fit into the same eventual corporate structure.

All that had to fit in within the China legal system which has, I guess, a whole bunch of restrictions that had to be taken into account.

All that had to be worked in within the letter of intent that was basically the framework of something the real estate developer would have to agree with and which would work within the realities of what existed on my side.

Q. When you say into the realities of what existed on your side, what specifically are you referring to?

A. Funding. A significant portion of the funding, roughly thirty percent of it as I calculated at that time, would have come from my investment in Caring. And there was an issue of getting the money out as well as the timing of getting that issue resolved. And that was an important and significant part in this investment. Without that -- this whole potential China deal, it's a possibility we wouldn't be able to pull it off.

Q. In connection with the Troutman Sanders firm representing you, what, if any, discussions did you have with the Troutman Sanders firm regarding specific investment vehicles?

A. I discussed with them that Flexo Craft was an investment vehicle as well as my funds in Caring that we needed to get out of Caring into a -- somehow into an intermediate vehicle in order for us to -- so I should be able to leverage those funds and be able to get money or a loan based on what I -- based on

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 25 of 99 PageID #: 952

CHRISTINE PERSAUD

Page 25

 1    the equity that I would leverage into this intermediary company

 2    which was -- we tried to use GRV.

 3    Q.    Now, specifically, without telling us what you said and

 4    what they said to you, what were the general categories of

 5    information that you provided to Troutman Sanders and Troutman

 6    Sanders asked you for with respect to Caring?

 7    A.    The general information was in reference to my ownership

 8    rights, the issues that I was having of why I can't simply just

 9    take the money out, the delay in the licensing which was part

10    of the issue, or the issue actually, my profits, my investments

11    in the company and even the point of how the money would accrue

12    or accrues and how it would get to a particular 2.2 million or

13    something at a particular point in time.

14    Q.    You mentioned a moment ago GRV.  During this period of

15    time that you were discussing, Caring and the China project

16    with the Troutman firm, what was the value of the company GRV?

17    A.    GRV had no value.

18    Q.    Mr. Klein, help us to understand.  If GRV had no value,

19    how could GRV be used as an investment vehicle to invest in

20    China?

21    A.    Without the factoring agreement, they wouldn't be able to.

22    Q.    And the factoring agreement that you're referring to

23    specifically relates to what company and what ownership

24    interest?

25    A.    The factoring agreement relates to my ownership interest

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 26 of 99 PageID #: 953
CHRISTINE PERSAUD

Page 26

1    in Caring at that time.

2    Q.   During what period of time were you engaged --

3         MR. KRINSKY:  Withdrawn.

4    Q.   You mentioned a moment ago that you were engaged in

5    negotiations over a factoring agreement.  During what period of

6    time did those negotiations take place?

7    A.   From the summer of '08 until about January '09, I think,

8    end of January '09, I believe.

9    Q.   That had to do with the factoring agreement.  Now during

10   what period of time was Troutman Sanders actively pursuing your

11   interests in connection with the China project that you

12   referred to?

13   A.   Same time frame, from summer of '08 till end of December.

14        (Pause)

15   Q.   To your knowledge, did Ms. Persaud know about the China

16   project that you were negotiating or working on during this

17   period of time?

18   A.   Yes, she did.  I told her about it.

19   Q.   What did you say to her, generally, and what did she say

20   to you, generally?

21   A.   In general, it was about negotiating with her in reference

22   to the factoring agreement that I wanted her to sign and

23   therefore be able to leverage my equity in Caring in order to

24   be able to use it for the China project.  I basically told her

25   that I am looking to get a loan or line of credit based on my

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 27 of 99 PageID #: 954
CHRISTINE PERSAUD

Page 27

1    equity in Caring.  And therefore I would need to make a

2    factoring agreement in order to be able to do that.

3    Q.    Were the discussions that you had with Ms. Persaud

4    regarding your ownership in Caring to be used for China, was

5    that the same information that you provided to Troutman Sanders

6    during confidential communications?

7    A.    Pretty much the same.

8              MR. STREMBA:  Objection, Your Honor.  I can't tell --

9              THE COURT:  It's sustained.  You can restate that

10   question.  It contains a number of conclusions.  I think if you

11   break it down, it will be more helpful.

12             MR. KRINSKY:  Your Honor, may I have a moment to

13   confer with co-counsel?

14             THE COURT:  If you're unable to restate the question,

15   I'll give you an opportunity to respond.  It seemed to me a

16   situation best addressed by a restated question.

17   Q.    You testified earlier regarding confidential information

18   that you provided to the Troutman Sanders firm.  Do you recall

19   those questions?

20   A.    Yes.

21   Q.    Mr. Klein, as you sit here today, why is it that you don't

22   want the Troutman Sanders firm representing the trustee?

23   A.    During the Troutman Sanders representation and me working

24   with them, I gave them a lot of information, a lot of

25   confidential information in relation to my dealings, my

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 28 of 99 PageID #: 955
CHRISTINE PERSAUD

Page 28

1    finance, my thinking.  Essentially, I gave them a roadmap to

2    everything about my finances specifically related to Caring.

3    If they would be allowed to represent the trustee, they would

4    be able to use that information to help the trustee try to take

5    away my rights or ownership rights in Caring.  I don't think

6    that's right.

7            MR. KRINSKY:  I have no further questions.

8            THE COURT:  Thank you.  You may inquire.

9    CROSS-EXAMINATION

10   BY MR. STREMBA:

11   Q.   Mr. Klein, did you ever provide to Troutman Sanders a

12   personal balance sheet?

13   A.   No.

14   Q.   Did you ever provide Troutman Sanders with a personal

15   income statement or other financial statement?

16   A.   No.

17   Q.   Did you ever provide Troutman Sanders with any personal

18   tax returns?

19   A.   No.

20   Q.   Did you ever provide Troutman Sanders with any personal

21   bank statements, brokerage statements or credit card

22   statements?

23   A.   No.

24   Q.   Did you ever provide Troutman Sanders with any balance

25   sheet for Caring Home Care Agency?

Page 29

1    A.    No.

2    Q.    Did you ever provide Troutman Sanders with any income

3    statements or other financial statements of Caring?

4    A.    No.

5    Q.    Any tax returns of Caring?

6    A.    No.

7    Q.    Any bank statements, brokerage statements, credit card

8    statements of Caring?

9    A.    No.

10   Q.    Any accounting records of Caring?

11   A.    No.

12   Q.    Any contracts to which Caring was a party?

13   A.    No.

14   Q.    Did you provide Troutman with any list of transfers that

15   were made by Caring to any other party?

16   A.    Did you provide any documentation of any transfers made by

17   Caring to any other party?

18   A.    No.

19   Q.    Did you provide Troutman Sanders with copies of any

20   proposed contracts between Caring and any other party?

21   A.    No.

22   Q.    Specifically, did you provide Troutman Sanders with a copy

23   of any proposed factoring agreement with Caring?

24   A.    I don't believe so.

25   Q.    Did you provide Troutman Sanders with any documentation of

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 30 of 99 PageID #: 957
CHRISTINE PERSAUD

Page 30

1    the ownership of Caring?

2    A.    No.

3    Q.    Did you provide Troutman Sanders with any balance sheet

4    for Trade Fame Group Ltd.?

5    A.    No.

6    Q.    Did you provide any income statement or other financial

7    statements of Trade Fame Group?

8    A.    No.

9    Q.    Any tax returns of Trade Fame Group?

10    A.    No.

11    Q.    Any bank statements, brokerage statements, credit card

12    statements?

13    A.    No.

14    Q.    Any accounting records?

15    A.    No.

16    Q.    Any contracts to which Trade Fame Group was a party?

17    A.    No.

18    Q.    Any lists of transfers made by Trade Fame Group to any

19    other party?

20    A.    No.

21    Q.    Documentation of any transfers made to Trade Fame Group by

22    any other party?

23    A.    No.

24    Q.    Any proposed contracts between Trade Fame Group and any

25    other party?

1    A.    Documentation?

2    Q.    Yes.

3    A.    No.

4    Q.    Mr. Klein, did you ever ask Troutman Sanders to assist you

5    in obtaining financing for the China project?

6    A.    Yes.

7    Q.    And how -- what did you ask them to do?

8    A.    We explained to them our financial position and they

9    offered that they do financing related Venture Capital raising

10   funds and that they might be able to help us in that regard.

11            MR. STREMBA:  I move to strike the answer.

12   Q.    Mr. Klein, what did you ask Troutman Sanders to do in

13   connection with obtaining financing?

14            THE COURT:  There's no jury.  I'm going to let the

15   answer stand.  You can follow up.

16   Q.    Specifically, Mr. Klein, what services did you ask

17   Troutman Sanders to render in connection with obtaining

18   financing for the China project?

19   A.    They actually offered us that they would be able to --

20   Q.    Mr. Klein --

21   A.    Yes?

22   Q.    What did you ask Troutman Sanders to do?

23   A.    Based on our existing financing, if they would be able to

24   raise capital in order to essentially fill in the gap if there

25   would be, in fact, a gap.

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 32 of 99 PageID #: 959
CHRISTINE PERSAUD

Page 32

1   Q.  Did you ask Troutman Sanders to review any draft contracts

2   between Caring and any other party?

3   A.  No.

4   Q.  Did you ask Troutman to communicate on your behalf with

5   anyone with respect -- I'm sorry -- with anyone on behalf of

6   Caring?

7   A.  No.

8   Q.  You indicated that you were having discussions during the

9   summer and into -- through December with Caring with regard to

10   a possible factoring agreement, correct?

11   A.  Correct.

12   Q.  With whom were you communicating with regard to the

13   possible factoring agreement?

14   A.  On my side or --

15   Q.  Yeah --

16   A.  -- or the Troutman side?

17   Q.  No.  Not with Troutman.  With whom on behalf of Caring

18   were you communicating?

19   A.  Christine Persaud.

20   Q.  Were you also having communications with an attorney

21   representing Caring?

22   A.  Yes.

23   Q.  And who was that?

24   A.  Sam Reiff.

25   Q.  And did you ask Troutman to speak to Mr. Reiff on your

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 33 of 99 PageID #: 960
CHRISTINE PERSAUD

Page 33

1    behalf with respect to a factoring agreement?

2    A.    No.

3    Q.    Were you represented by any counsel in connection with

4    your proposed factoring agreement?

5    A.    The factoring agreement was drafted by counsel, yes.

6    Q.    And which counsel was that?

7    A.    Paul Salazar among others.

8    Q.    Among what others?

9    A.    There was multiple drafts.  We had to make sure the

10    factoring agreement would work within the DOH regulations.

11    Q.    So what attorneys other than Mr. Salazar participated in

12    that drafting?

13    A.    I think it was Tenzer.

14    Q.    The Tenzer firm?

15    A.    Yeah.

16    Q.    Any others?

17    A.    Don't remember.

18    Q.    Mr. Klein, to your knowledge, has there ever been an

19    e-mail communication between you and your brother, on one hand,

20    and Troutman, on the other, that refers to Caring?

21    A.    I don't think so.

22    Q.    Are you aware of any e-mail communication between you and

23    your brother, on one hand, and Troutman, on the other hand,

24    that refers to Trade Fame Group?

25    A.    No.

1    Q.    Are you aware of any e-mail communication between you or

2    your brother and Troutman that refers to any contract or

3    proposed contract between Caring and any other party?

4    A.    No.

5    Q.    Are you aware of any e-mail communication between you or

6    your brother and Troutman that refers to any transfer made by

7    Caring to Trade Fame Group?

8    A.    No.

9    Q.    Are you aware of any e-mail communication between you or

10    your brother and Troutman that refers to Christine Persaud?

11    A.    I don't think so.

12    Q.    Mr. Klein, I'd like to direct your attention to Troutman

13    Exhibit A which is a copy of the engagement letter.  It's in

14    the binder that I provided.  You can look at it either now or

15    as I ask questions.  I just have a few questions about it.

16        First, is there any reference in the engagement letter to

17    Caring?

18    A.    No.

19    Q.    Is there any reference in the engagement letter to Trade

20    Fame Group?

21    A.    No.

22    Q.    Is there any reference to any contract or proposed

23    contract between Caring and any other party?

24    A.    No.

25    Q.    Is there any reference to Christine Persaud in the

CHRISTINE PERSAUD

1    engagement letter?

2    A.    No.

3    Q.    Is there any reference in that engagement letter to

4    providing services relating to obtaining financing for the

5    China project?

6         (Pause)

7    A.    No.

8    Q.    To your knowledge, did you or your brother ever ask

9    Troutman Sanders to add something to its engagement letter that

10   would cover potential financings for the China project?

11   A.    I don't believe so.

12   Q.    Mr. Klein, I'm going to refer you to an affidavit that you

13   submitted in connection with your objection.  It's Trustee

14   Exhibit O in the binder.  First, Mr. Klein, can you confirm

15   that you signed this affidavit on the last page?

16   A.    Yeah.  It's my signature.

17   Q.    Mr. Klein, I'd like to refer you now to paragraph 38 of

18   your affidavit.  I don't think the pages are numbered but it is

19   paragraph 38.  This paragraph reads:  "It is clear that my

20   expectation was that the Troutman firm continue to represent us

21   in the ongoing matter of the China project and that, if

22   anything, as of December 2008, the China project was picking up

23   momentum as evidenced by the Troutman firm's very words and

24   actions that the Troutman firm believed that it was important

25   at that precise point in time, December 2008, to have the

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 36 of 99 PageID #: 963
CHRISTINE PERSAUD

Page 36

1    retention agreement executed."

2        Now, Mr. Klein, as you sit here today under oath, do you

3    believe that the China project was picking up momentum as of

4    the end of December 2008?

5            MR. KRINSKY:  Objection.  Form.  Improper impeachment.

6    There's been no inconsistency and the witness hasn't said he

7    doesn't remember.

8            MR. STREMBA:  I'm asking him --

9            THE COURT:  Overruled.  It's cross-examination.  This

10   is the witness' statement under affirmation.  I think it's an

11   appropriate question.  You had a wide berth on direct.  I think

12   a wide berth is appropriate.

13           MR. KRINSKY:  Is the document in evidence?

14           MR. STREMBA:  It isn't now but if you'd like it to

15   be --

16           THE COURT:  It is an affidavit that you filed in the

17   case.  Do you object to its use?

18           MR. KRINSKY:  No.  In fact, I would then ask that it

19   be offered into evidence and therefore be part of the record as

20   opposed to simply a pleading.

21           MR. STREMBA:  Your Honor, that's fine with me.  We

22   move the --

23           THE COURT:  It's admitted.  Without objection, it will

24   be admitted.

25   (Trustee's Exhibit O, affidavit of Abraham Klein, was hereby

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 37 of 99 PageID #: 964
CHRISTINE PERSAUD

Page 37

1    received into evidence as of this date.)

2    A.    Yes.  It was picked up momentum.

3    Q.    And how can you say that it was picking up momentum at the

4    end of December 2008?

5    A.    I'm told -- we were told that the developers are putting

6    it on hold for a while due to the economic turmoil worldwide.

7    It was picking up momentum.

8    Q.    The developer indicated that he was putting the project on

9    hold on December 31, 2008, isn't that correct?

10    A.    Correct.

11    Q.    And so, as of the end of December 2008, in your view, was

12    the project picking up momentum?

13    A.    I'm told -- we were told that it wasn't.

14    Q.    But as of December 31, 2008, it was no longer picking up

15    momentum?  Is that your testimony now?

16    A.    As of December 31 when the Troutman Sanders firm told us

17    that the developer has put it on hold, that's when we were

18    notified that it was no longer picking up momentum, that is

19    correct.

20    Q.    So in your affidavit, in paragraph 38, when you say that

21    the project was picking up momentum, you're referring to the

22    period before December 31, 2008?

23    A.    It was the end of December, correct.

24    Q.    And not to the period since?

25    A.    Not since that time, correct.

CHRISTINE PERSAUD

Page 38

1    Q.   Has the China project ever proceeded?

2    A.   No.

3         (Pause)

4    Q.   Mr. Klein, I'd like to refer you next to an affidavit,

5    another affidavit that you submitted in this matter.  It's

6    Trustee Exhibit N in the binder.  This is an affidavit dated

7    August 15, 2011.  I'd like you to look at the last page and

8    confirm, if you can, that you signed this affidavit?

9    A.   Yes.

10        MR. STREMBA:  I'd like to move this exhibit into

11   evidence, Your Honor.

12        THE COURT:  Any objection?

13        MR. KRINSKY:  No objection.

14        THE COURT:  Without objection it will be received.

15   (Trustee's Exhibit N, affidavit of Mr. Klein dated August 15,

16   2011, was hereby received into evidence as of this date.)

17   Q.   Mr. Klein, please look at paragraph 7 of your affidavit,

18   which reads, quote, "While the actual work on the China project

19   has been temporarily suspended because of the economic

20   downturn, etcetera, the representation by Troutman Sanders LLP

21   is still ongoing".  Mr. Klein, as you sit here today under

22   oath, would you say that the China project has been temporarily

23   suspended?

24   A.   I would still say so, yes.

25   Q.   How many years would it take you to say that the project

Page 39

```
 1    was no longer temporarily suspended?

 2            MR. KRINSKY:  Objection.  Argumentative.

 3            THE COURT:  Overruled.

 4    A.    The project still exists.  The economy didn't turn much

 5    around, and would the right time come for the project to be a

 6    viable project it would still exist.

 7    Q.    Mr. Klein, since December, 2008 have you made any attempt

 8    to keep up with developments regarding the Chinese economy?

 9    A.    Just as much as it pertains to me in my general business.

10    Q.    And how do you keep up with the Chinese economy?

11    A.    Just from the information that I get in general business,

12    which I do with China on a daily basis.

13    Q.    Would that include regularly reading any newspapers like

14    The Wall Street Journal?

15    A.    No.

16    Q.    Do regularly read The New York Times business section?

17    A.    No.

18    Q.    Have you --

19            MR. STREMBA:  Strike that.  Withdrawn.

20    Q.    What is your general understanding of how the Chinese

21    economy has been fairing since December, 2008?

22    A.    From the information that I have it -- I guess it had ups

23    and downs but better than the U.S. economy to a degree is the

24    best of my information.

25    Q.    Is anybody --
```

1           MR. STREMBA:  Withdrawn.

2    Q.   Have you ever read or heard reports that the Chinese

3    economy has been in a boom state during the last few years?

4    A.   Can't say that I did.

5    Q.   Have you ever read or heard reports that real estate

6    prices have risen so much in the last few years that there is a

7    potential real estate bubble in China?

8    A.   In certain areas I did hear about that, yes.

9    Q.   Do you believe that there is still a temporary --

10          MR. STREMBA:  Withdrawn.

11   Q.   Do you believe that there is still an economic downturn in

12   China?

13   A.   There is definitely an economic downturn worldwide, and

14   this is, really, why this project was put on hold as of

15   uncertainty, because it had a certain window of sell through,

16   and if that window of sell through wouldn't be met that would

17   mean additional investment in the project and, therefore, from

18   the developer's perspective, and I wasn't making the decisions,

19   from the developer's perspective he felt that it's a risk of

20   this project going out of that twenty-four month or so window.

21   Q.   Well, that twenty-four month window has now passed, right?

22   A.   No, it's a twenty-four month window from when this -- the

23   project actually starts until it's completed.

24   Q.   So during the last three years have you looked at any

25   other potential investments in China?

Case 1-10-44815-ess   Doc 302   Filed 11/16/11   Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 41 of 99 PageID #: 968
CHRISTINE PERSAUD

Page 41

1            MR. KRINSKY:  Objection.  Relevance.

2            THE COURT:  Well, you've -- it seems to me in your

3     examination you asked a number of questions that go to the

4     bigger picture of Mr. Klein's investment interests.  I don't

5     think a long inquiry in this is likely to be productive, but

6     I'm going to overrule the objection for now.  I think the

7     door's been opened.  You may inquire.

8     A.    Can you repeat the question again, please?

9     Q.    During the last three years have you considered investing

10    in any other project in China?

11    A.    No real estate projects, no.

12    Q.    Has the developer of the China project proceeded with the

13    project to any extent?

14    A.    Not with that project.

15    Q.    I'd like to direct your attention now to paragraph 11(c)

16    of the same affidavit.  This paragraph states, quote, "As my

17    interests in China intersected with my interests in Caring Home

18    Care in the attempt to arrange for financing, and Christine

19    Persaud raised certain allegations, which I deny, it is

20    reasonable to assume that there is a possibility that Troutman

21    Sanders LLP will, on behalf of the Chapter 7 Trustee,

22    investigate and/or litigate matters, the very same matters for

23    which I have retained them to represent me."

24            Mr. Klein, in that paragraph where you refer to the

25    attempt to arrange for financing, are you referring to the

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 42 of 99 PageID #: 969
CHRISTINE PERSAUD

Page 42

1    proposed factoring agreement that you testified to earlier?

2    A.   It's in reference to all the information that I gave the

3    Troutman Sanders firm in reference to my interest in Caring and

4    my financing in Caring and the -- and my interest and ownership

5    rights and everything that I told them about it.

6    Q.   And the reference to the certain allegations made by

7    Christine Persaud, what allegations are you referring to there?

8    A.   She made a whole bunch of allegations.

9    Q.   Which ones are you referring to here?  "Certain

10   allegations".  Are you referring to the allegation that there

11   were improper transfers made between Caring and Trade Fame

12   Group?

13   A.   That could be one of them.

14   Q.   What other ones could there be?

15   A.   Any and all allegations that she would have made.

16   Q.   Are you saying you don't remember any others?

17   A.   I can't recall in detail all of them, no.

18   Q.   Did you refer to any other allegations in your affidavit

19   or in the other affidavit that we looked at?

20   A.   I wouldn't recall.  I can read it.

21        THE COURT:  It would be helpful to you to take a

22   moment to read your affidavit you should do so.

23        (Pause)

24   A.   I've read it.  What was the question again?

25   Q.   Well, the question is when you referred to certain

1    allegations in paragraph 11(c) of your affidavit weren't you

2    referring to the allegation that there were improper transfers

3    made by Caring to Trade Fame Group, Ltd.?

4    A.    I guess that would be one of the allegations or in this --

5    in --

6    Q.    What were the other allegations that you were referring

7    to?

8            MR. STREMBA:  Withdrawn.

9    Q.    Let me refer you back to paragraph 9 of this same

10   affidavit, Exhibit N, in which you refer to an affidavit of

11   Christine Persaud.  In that paragraph you refer to allegations

12   that Ms. Persaud made.  Is there any allegation referred to

13   there other than improper transfers made by Caring to Trade

14   Fame Group?

15   A.    No.

16   Q.    And looking up at paragraph 8 where you reference your

17   approach to Christine Persaud to obtain an agreement, quote,

18   "to allow me to attempt to secure favorable financing", is that

19   the agreement that you were referring to in paragraph 11(c)

20   when you talk about the attempt to arrange for financing?

21   A.    Yes.

22   Q.    Now, Mr. Klein, you've testified that you did not engage

23   Troutman Sanders to represent you in connection with the

24   factoring agreement and you've testified that you did not

25   engage Troutman Sanders with respect to any transfers between

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36  Filed 07/05/12   Page 44 of 99 PageID #: 971
CHRISTINE PERSAUD

Page 44

1    Caring and Trade Fame Group.  I ask you, therefore, as you sit

2    here today under oath, how you can reconcile that with your

3    statement that these are the very same matters for which I have

4    retained them to represent me?

5    A.   I retained Troutman Sanders for my China project.  In

6    conjunction with the China project I have disclosed to Troutman

7    Sanders all this information relating to Caring Home Care, my

8    financing in Caring Home Care, the need to transfer funds out

9    of Caring Home Care, and different ways of how -- greater ways

10   of how I was thinking of getting it done.  All that was in

11   relation to the China project, and that is exactly what I --

12   that is what I hired the Troutman Sanders for -- firm was for

13   the China project, and which I disclosed all that information

14   to them.

15        (Pause)

16        MR. STREMBA:  Your Honor, may I just take two minutes

17   to look at my notes?

18        THE COURT:  Yes, you may.

19        (Off the record)

20        MR. STREMBA:  Your Honor, no more questions.

21        THE COURT:  All right.  Redirect?

22        MR. KRINSKY:  Yes, Your Honor.

23        (Pause)

24        THE COURT:  Please proceed.  We understand some of the

25   other attorneys may be attending at some point.  I'm just

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 45 of 99 PageID #: 972
CHRISTINE PERSAUD

Page 45

1    trying to be sure we now have the most current information.

2    Please proceed.

3    REDIRECT EXAMINATION

4    BY MR. KRINSKY:

5    Q.    Opposing counsel asked you a number of questions regarding

6    documents and whether or not you turned over certain documents

7    to the Troutman Sanders firm in connection with certain

8    business entities.  Do you remember those questions?

9    A.    Yes.

10    Q.    When, if at all, did you turn over stock certificates for

11    GRV to the Troutman Sanders firm?

12    A.    Never did.

13    Q.    When, if at all, did you turn over tax returns for GRV to

14    the Troutman Sanders firm?

15    A.    I didn't.

16    Q.    When, if at all, did you turn over accounting documents

17    relating to GRV to the Troutman Sanders firm?

18    A.    I didn't.

19    Q.    When, if at all, did you turn over profit and loss

20    statements of GRV to the Troutman Sanders firm?

21    A.    I didn't.

22    Q.    When, if at all, did you turn over cash flow statements

23    relating to GRV to the Troutman Sanders firm?

24    A.    I didn't.

25    Q.    When, if at all, did you turn over ownership certificates

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 46 of 99 PageID #: 973
CHRISTINE PERSAUD

Page 46

1    or documents relating to GRV to the Troutman Sanders firm?

2    A.   I didn't.

3    Q.   When, if at all, did you turn over balance sheets or

4    income statements regarding GRV to the Troutman Sanders firm?

5    A.   I didn't.

6    Q.   Referring your attention specifically to the tab that is

7    marked Exhibit 8 or 8 in your binder, in the large binder,

8    please.  I'm going to ask you to turn to that tab and then

9    please look up.

10            THE COURT:  I'm sorry.  Which tab?

11            MR. KRINSKY:  Tab number 8.

12            THE COURT:  Eight.

13        (Pause)

14    Q.   Mr. Klein, do you recognize that document?

15    A.   Yes, I do.

16    Q.   How do you recognize that document?

17    A.   I recognize that from my e-mail.

18    Q.   And what is that document?

19    A.   That's the document that gives the outline of the China

20    real estate project development.

21    Q.   And you said that was -- I think you said that was your e-

22    mail.

23    A.   No.  I recognize it from my e-mail.

24    Q.   Okay.

25            MR. KRINSKY:  I offer into evidence what was

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 47 of 99 PageID #: 974
CHRISTINE PERSAUD

Page 47

1    previously marked as Klein Exhibit 8 for identification as

2    Klein Exhibit 8.

3              MR. STREMBA:  No objection, Your Honor.

4              THE COURT:  Without objection the document marked as

5    Exhibit 8, which appears to be a one-page e-mail, followed by a

6    page labeled attachment 1, followed by a page unaccompanied by

7    a translation and a several page document in Chinese, and

8    concluding with a spreadsheet in English.  Is this the

9    document?

10             MR. KRINSKY:  It is, Your Honor.

11             THE COURT:  In order to make any sense of this

12   document of course I'll need to have a certified translation of

13   the portion in Chinese.

14             MR. KRINSKY:  Of course.  And, Your Honor, to the

15   extent that we're not going to be referring to that document I

16   can, for the Court's ease and for moving us along, I can offer

17   to remove that portion of the Chinese document, because we're

18   not going to be referring it, so rather than -- avoid expense

19   and time and effort in going through having that translation,

20   with Your Honor's permission I would offer to reoffer this

21   document simply referring to, or including within it, the first

22   page of the e-mail and the last page, which is the Excel

23   spreadsheet.

24             THE COURT:  The document begins "Please see attached

25   docs".  The document is directed to an individual you've

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 48 of 99 PageID #: 975
CHRISTINE PERSAUD

Page 48

 1    indicated in your argument and in your affirmation plays a

 2    significant role.

 3            MR. KRINSKY:  Very well.

 4            THE COURT:  I'm concerned that accepting an incomplete

 5    document may be a problem.  At the same time I'm going to rely

 6    on the adversary process, if there's no objection, to receiving

 7    what I'll call Exhibit 8 --

 8            MR. STREMBA:  Your Honor, I don't object to

 9    receiving --

10            THE COURT: -- 8-A as an incomplete document.  We can

11    proceed that way.

12            MR. KRINSKY:  Your Honor, if that's the case then if

13    Your Honor will keep open the record I will have a certified

14    translation provided to the Court.

15            THE COURT:  At the moment I'm going to take the

16    proffer as the document before me.  I cannot admit that which

17    is not before me, so any objection to receiving a document

18    within the framework described?

19            MR. STREMBA:  No Your Honor.

20            THE COURT:  All right.  I'll mark --

21            MR. STREMBA:  As a complete document, no.

22            THE COURT:  I'll mark it as admitted as reflected in

23    the record.  It's an incomplete document including a several

24    page attachment in Chinese.  Thank you.  Please proceed.

25            (Klein's Exhibit 8-A, e-mail outlining China real estate

1    project development with several attachments, was hereby

2    received into evidence as of this date.)

3    BY MR. KRINSKY:

4    Q.   Referring specifically to the last page of the document,

5    which appears to be an Excel spreadsheet, Mr. Klein, does this

6    Excel spreadsheet indicate what your role is going to be in the

7    China project in terms of investing?

8    A.   I -- I was going to be a forty percent partner in the

9    joint venture.

10   Q.   Where, specifically, please identify through record

11   specifically where in this document it indicates that you'd be

12   a forty percent investor.

13   A.   Somewhere down in the middle of the document, like, the

14   third group of cells.

15   Q.   Okay.  You're referring to the center of the page, third

16   box from the top?

17   A.   Correct.

18   Q.   Okay.  And, specifically, what does that say, because,

19   again, you have the document.  We need the record to accurately

20   reflect what you're referring to.

21   A.   It explains the split on the joint venture, sixty percent

22   Zhang, forty percent Klein, joint venture, and then it further

23   breaks down of how the approximate money investment from Zhang

24   and Klein, sixty percent, forty percent, as well as the income

25   on the investment as sixty percent Zhang and forty percent

Page 50

1    Klein.

2    Q.   Mr. Klein, did you ever have subsequent conversations with

3    the Troutman Sanders firm regarding your forty percent

4    investment in the China project?

5    A.   Yes.

6    Q.   Specifically, did you discussions with the Troutman firm

7    regarding where that forty percent interest would come from?

8         MR. STREMBA:  Your Honor, this has been asked and

9    answered about ten times.

10        MR. KRINSKY:  Ask for a small amount of latitude, and

11   I think, Your Honor, very quickly I'm going to get to where I'm

12   going right now.

13        THE COURT:  You may proceed.

14   Q.   At the point in time that this spreadsheet was sent to the

15   Troutman Sanders firm --

16        THE COURT:  May I pose a clarifying question?  Did you

17   send this e-mail?

18        THE WITNESS:  This e-mail was sent by my brother.

19        THE COURT:  You may continue.

20        MR. KRINSKY:  Let me rephrase.

21   Q.

     .   At the point in time that this document was sent by

22   Hershel Klein in what capacity was Hershel Klein sending the

23   document?

24   A.   He was acting on my behalf.

25   Q.   And at the point in time that this document was

Page 51

1    transmitted to the Troutman Sanders firm were there any

2    discussions, at this time point in time, regarding GRV?

3    A.    No.

4    Q.    So let's talk, then, about your specific investment of

5    forty percent.  Your specific investment of forty percent.  At

6    the time that this document was transmitted to Troutman

7    Sanders, or thereafter, did you ever provide your individual

8    tax returns to Troutman Sanders?

9    A.    No.

10   Q.    Did you ever provide your individual profit and loss

11   statements for your own --

12   A.    No.

13   Q.    -- individual income to Troutman Sanders?

14   A.    No.

15   Q.    Did you ever provide a personal cash flow statement to

16   Troutman Sanders for your own individual finances?

17   A.    No.

18   Q.    Did you ever provide any sort of balance sheet for your

19   personal finances to Troutman Sanders?

20   A.    No.

21   Q.    Did you ever provide any personal income statements to

22   Troutman Sanders?

23   A.    No.

24   Q.    There were certain questions asked of you with respect to

25   the ongoing nature of the China project.  To your knowledge,

1    after January of '09, to your knowledge, were there any

2    restrictions placed on the real estate market going forward

3    with respect to investments?

4    A.   Yeah, there was a change.  There is a -- there was a

5    change in the China law to a degree of before that time people,

6    a lot of the real estate was built for inventory.  People just

7    bought it, flipped it, and that's, really, what was driving a

8    lot of the prices up, and due to some, I guess, market

9    overheating and the government trying to take some precautions

10   of -- for it not to overheat they changed the laws whereby

11   somebody buying real estate, they would have to hold on to it

12   for a certain period of time whereby it would become a -- the

13   attraction of buying just to flip became less.

14   Q.   Going back for a moment, Mr. Stremba asked you a series of

15   questions regarding what, if any, advice you received from the

16   Troutman Sanders firm regarding the financing of this deal.  Do

17   you recall those questions?

18   A.   Yes.

19            MR. STREMBA:  That's not what I asked him, Your Honor.

20            MR. KRINSKY:  He --

21            THE COURT REPORTER:  Excuse me.  You have to talk

22   closer to the mic.

23            THE COURT:  And it's a good idea to stand up.  It

24   helps me see who's here and that is the practice here.

25            MR. STREMBA:  Your Honor, the questions and answers

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 53 of 99 PageID #: 980

CHRISTINE PERSAUD

Page 53

1    concerned what Mr. Klein asked Troutman Sanders to do.  This is

2    going beyond the scope of all of the examination.

3              THE COURT:  You know this is redirect, generally

4    confined to the scope of the cross.  To the extent that it's

5    appropriate to bring up a new document, for example, I'm giving

6    you some leeway there, but I remind you that it is not

7    necessary to repeat questions that were put to the witness in

8    cross --

9              MR. KRINSKY:  Right.

10             THE COURT: -- as, I think, perhaps, maybe you did in

11   your last series of questions, though the record will speak for

12   itself, and there was no objection.  I also note for the record

13   that the record will speak for itself as to what the questions

14   and answers were.  We don't yet have the benefit of the

15   transcript.  We shall have one shortly.  In all events, I urge

16   you to be as productive as possible.  I am determined to finish

17   this testimony this morning and can give this another fifty

18   minutes or so, but that is the timeframe I have, and, Mr.

19   Klein, it is my greatest -- I mean, in presiding over this

20   hearing this morning one of my many goals is that you shall be

21   able to complete your testimony.  I'm sure that's in the

22   lawyers' interests as well as yours, and even the Court's, to

23   have this testimony be concluded today.  You may continue.

24   BY MR. KRINSKY:

25   Q.   Mr. Stremba asked you certain questions regarding certain

Case 1-10-44815-ess   Doc 302   Filed 11/16/11   Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 54 of 99 PageID #: 981
CHRISTINE PERSAUD

Page 54

1    allegations made by Ms. Persaud against you.  Do you recall

2    those questions?

3    A.   Yes.

4    Q.   Mr. Klein, are you aware that Ms. Persaud says that her

5    dispute with you began when you approached her in October of

6    2008 for a seven million dollar line of credit through Caring

7    Home Care to finance expansion of a business you said you were

8    operating in China?

9    A.   Yes, I'm aware.

10   Q.   With respect to those allegations and those statements

11   what, specifically, to your knowledge, was Ms. Persaud

12   referring to when she said the dispute arose regarding a line

13   of credit through Caring Home Care with respect to the

14   expansion of a China business?

15   A.   She was talking about the factoring agreement and the

16   project in China, the real estate development project in China.

17   Q.   Is this the same financing structured vehicle that you

18   spoke with and confided with in the Troutman Sanders firm?

19        MR. STREMBA:  Objection, Your Honor.  It's a leading

20   question.

21        MR. KRINSKY:  Your Honor, may I respond?

22        THE COURT:  Yes, you may.

23        MR. KRINSKY:  Technically it's not.  A leading

24   question would be isn't it true or it actually presupposes the

25   answer built into it.  If it's a yes or no that wouldn't make

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 55 of 99 PageID #: 982
CHRISTINE PERSAUD

Page 55

1   it leading in and of itself.

2        MR. STREMBA:  This one is, Your Honor.

3        MR. KRINSKY:  I can rephrase, Your Honor.

4        THE COURT:  I'm going -- perhaps you can rephrase it

5   in a general way.  I will not sustain the objection, although

6   you are going to rephrase the question and that may address

7   some of the concerns.  I'll remind all of the parties, as I

8   have from time to time, that substance contained in a lawyer's

9   question is much less helpful to the Court as finder of fact

10  than substance contained in a witness's answer.  And, so, when

11  a series of questions elicits answers in the nature of yes or

12  yes or no or no when we are on direct of any witness it is

13  simply less helpful and may well be less persuasive to me as

14  finder of fact.  But I'll do my best to rule on the objections

15  as they come up.  To the extent that there's a way to move this

16  forward in the most productive way I may offer guidance from

17  time to time, but it is absolutely the lawyer's job and not

18  mine to decide how this record is presented to the Court.  All

19  right.  You can --

20  BY MR. KRINSKY:

21  Q.  Mr. Klein --

22       THE COURT:  -- restate or revise the question as you

23  see fit.  I've overruled the objection.

24  Q.  Mr. Klein, with respect to Ms. Persaud's allegations

25  against you, how, if, at all, are those allegations related to

1    the legal advice that you were receiving from Troutman Sanders

2    in connection with the China project?

3    A.    The allegations that Christine Persaud is making is in

4    reference to the precise information that I provided to

5    Troutman Sanders in relation to financing of the China project.

6    That's -- in order to structure the China deal that was

7    important information that they needed to know, whether we

8    would be able to pull this thing off, and, if we would, how it

9    will happen.  So that was a lot of confidential information

10   that they got, and that is directly related to the issue at

11   Caring and what Christine is accusing me of.

12   Q.   And the --

13             THE COURT:  Mr. Klein, you've just indicated that the

14   information you have in mind is the, quote -- or this is more

15   or less a quote.  My notes may be inaccurate.  The record will

16   speak for itself --is the precise information that I provided

17   to Troutman Sanders in connection with the China project.  Now,

18   you've been shown a number of documents and your counsel has

19   presented over 120 exhibits.  I'd like you to indicate to me

20   any document that you've been shown, and you may take the time

21   you need, that includes the precise information, your phrase,

22   that you provided to Troutman Sanders in connection with the

23   China project that was of this financial and confidential

24   nature.  Are you aware of any documents, including printouts of

25   e-mails, including the electronic documents, that set forth

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 57 of 99 PageID #: 984
CHRISTINE PERSAUD

Page 57

1    such information?  If you're not, that's fine.  If you are, I'd

2    like you to tell me with specificity where they are.

3            THE WITNESS:  A lot of information was on -- done

4    verbally on phone calls.

5            THE COURT:  So no documents that you can describe or

6    point to presently, and I note that there is before you the

7    binder approximately six inches thick, of the 120 plus exhibits

8    that have been identified in this hearing over many weeks now

9    by your counsel.  Any documents?  That was my question.  Next

10   I'll give you an opportunity to indicate with respect to

11   verbal, but let's stay on documents for the moment.

12           THE WITNESS:  It's not in the documents.

13           THE COURT:  All right.  You can't identify a single

14   document in which what you've described as the precise

15   information was provided.  Let's turn to the verbal --

16           THE WITNESS:  Not --

17           THE COURT: -- communications that you've just

18   referenced.  Can you tell me when the first one was?

19           THE WITNESS:  In July.

20           THE COURT:  Who was involved?

21           THE WITNESS:  Aurora Cassirer and Edward Epstein.

22           THE COURT:  And yourself?

23           THE WITNESS:  And myself.

24           THE COURT:  Was it on --

25           THE WITNESS:  And Hershel.

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 58 of 99 PageID #: 985
CHRISTINE PERSAUD

Page 58

1            THE COURT:  Was it on the telephone?

2            THE WITNESS:  Yes.

3            THE COURT:  Are you certain?

4            THE WITNESS:  Yes.

5            THE COURT:  Do you recall it or do you reconstruct it

6     to be done?

7            THE WITNESS:  I believe it was done and I recall.

8            THE COURT:  What did you say?

9            THE WITNESS:  The question was --

10           THE COURT:  Let me rephrase that.

11           THE WITNESS: -- what --

12           THE COURT:  What was the precise information of a

13    financial nature that you provided to Troutman Sanders in

14    connection with the China project?

15           THE WITNESS:  The information was of my holdings or my

16    money in Caring and the raising of funds through Flexo Craft.

17           THE COURT:  I'm looking for the precise information.

18    Was that as precise as it was what you just said?

19           THE WITNESS:  The exact words?

20           THE COURT:  The information.

21           THE WITNESS:  The information wasn't written.

22           THE COURT:  You described two topics, it seems to me.

23    I'm looking for the precise information that you provided to

24    Troutman Sanders in connection with the China project.

25           THE WITNESS:  Information was in relation to my money

1    at Caring, my partnership rights in Caring and what it would

2    take or the possibilities of what it would take to get the

3    money out of Caring.

4            THE COURT:  What did you say with respect to your

5    money at Caring?

6            THE WITNESS:  That I have -- how much money I invested

7    in there, approximately how much, approximate --

8            THE COURT:  Do you remember what you said?

9            THE WITNESS:  Not word for word.

10            THE COURT:  Do you remember what you said?  Not the

11    subject but the, and you can answer this question yes or no and

12    we'll consider whether we can go beyond that, but do you recall

13    what you said in this conversation.  Let me step back.  When in

14    July?

15            THE WITNESS:  July 30.  July 30th, I believe.  Or July

16    31st.

17            THE COURT:  Do you recall that it was on July 30th or

18    are you speculating or reconstructing that it was on July 30th?

19            THE WITNESS:  It was on a phone call on July 30th.

20            THE COURT:  All right.  Tell me everything you recall

21    about that phone call.

22            MR. KRINSKY:  Your Honor, I'm going to object at this

23    point.  Other than the general information, if you were going

24    to ask the witness about specific information that was revealed

25    than I ask, as law, the Second Circuit in this court requires

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 60 of 99 PageID #: 987
CHRISTINE PERSAUD

Page 60

1    that it be done in camera ex parte.

2              THE COURT:  I'm not going to take testimony.

3              MR. KRINSKY:  Otherwise it defeats the very purpose.

4              THE COURT:  All right.

5              MR. KRINSKY:  He cannot --

6              THE COURT:  Well, I will -- your counsel's asked me no

7    longer to inquire.  I shall stop at this point.  Your answers

8    have been helpful to me, and I thank you for them.  You may

9    proceed.

10              Do you have any further questions on redirect?

11              MR. KRINSKY:  I have no further questions.

12              THE COURT:  Recross, please.

13              MR. STREMBA:  Just about two questions, Your Honor.

14    RECROSS-EXAMINATION

15    BY MR. STREMBA:

16    Q.   On this spreadsheet that you were looking at in the

17    exhibit that was just marked, Exhibit 8, in the box that you

18    were looking at there's an indication, I think, that the

19    investment that would be required by you would be approximately

20    5.8 million dollars.  Is that correct?

21    A.   Correct.

22    Q.   Is there any indication on this sheet as to where those

23    funds would be acquired?

24    A.   No.

25              MR. STREMBA:  Thank you.  I have no more, Your Honor.

CHRISTINE PERSAUD

Page 61

1          THE COURT:  All right.  Mr. Klein, any further

2     questions from any counsel?  Would you like a moment to confer

3     with your colleagues?  I'll give you that moment.  We are

4     complete through recross, so it may well be that there should

5     be no further questions, but if you wish to make an application

6     further to inquire I'll hear you.

7          MR. KRINSKY:  No, Your Honor.

8          THE COURT:  All right.  Thank you.  Mr. Klein, I

9     believe that your examination is complete.  I thank you for

10    your time and your patience and, in particular, with the number

11    of days it's taken us to make this record and also with the

12    questions of counsel and the Court.

13          All right.  We're going to take a very short recess

14    and we'll be back in just a moment.  We have a little -- we're

15    going to aim to conclude this proceeding by 11:30.  I'll be

16    back in about five minutes, and, as the parties are aware, I've

17    entered some additional orders.  They were entered on Thursday

18    in response to an application for an order to show cause, and I

19    will let you know whether I think there's anything further we

20    need to take up today when I return.  Thank you so much.

21          THE CLERK:  All rise.

22     (Recess from 11:07 a.m. until 11:19 a.m.)

23          THE CLERK:  All rise.

24          THE COURT:  Thank you.  Please be seated.

25          THE CLERK:  Second call on all Christine Persaud

1    matters.

2            THE COURT:  All right.  How many more witnesses do the

3    objectors have?

4    Q.   Bruce Green, and that's it, Your Honor.

5            THE COURT:  Okay.  And when is Professor Green

6    anticipated to -- well, let's talk about scheduling briefly.

7    How much time do we anticipate for Professor Green's testimony?

8            MR. KRINSKY:  Your Honor, in terms of direct I think I

9    need, probably, less than an hour, though, certainly, if the

10   Court and opposing counsel are okay we would rest on his

11   affidavit itself as direct and then subject him to cross but

12   whatever the Court thinks is best and easiest.

13           THE COURT:  I think we can begin with cross.  It would

14   be acceptable to me to accept the direct testimony in affidavit

15   form and then begin with cross-examination.

16           MR. STREMBA:  Your Honor, in the first instance --

17           THE COURT:  And this is expert testimony.  Is that

18   right?  That would be only if the parties can agree and

19   stipulate to his qualification and proffer as an expert.

20           MR. KRINSKY:  Of course.

21           THE COURT:  All right?

22           MR. STREMBA:  Your Honor --

23           THE COURT:  Do you have that agreement yet?

24           MR. STREMBA:  Your Honor, the qualifications are not

25   the issue.  We can stipulate that he's qualified.  My objection

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 63 of 99 PageID #: 990
CHRISTINE PERSAUD

Page 63

1    is to the admission of expert testimony of the nature

2    proffered.

3            THE COURT:  Okay.

4            MR. STREMBA:  And I --

5            THE COURT:  So it sounds like we will need to make a

6    record on that and I'll need to determine that.  I'm looking at

7    an opportunity, I'll say unexpected; it arises from a

8    cancellation of another matter or a rescheduling of another

9    matter, on the afternoon of November 22nd at about 2:00,

10    something like that.

11            MR. KRINSKY:  Your Honor?

12            THE COURT:  It comes after a full morning of hearings.

13    We'll do our best to be able to start at 2.  Is that a

14    convenient time for the parties and for Professor Green?

15            MR. KRINSKY:  Your Honor, unfortunately --

16            THE COURT:  If it doesn't work for the witness it

17    doesn't work.

18            MR. KRINSKY:  Your Honor, the challenge I face,

19    beginning November 21st I'm on trial for approximately seven

20    days to ten days.

21            THE COURT:  All right.  I'm looking at a table full of

22    counsel, and able counsel each and all of them is.  If your

23    presence is necessary we'll work around that trial schedule.

24    Do you think that the prospect of that trial proceeding is

25    highly likely?

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 64 of 99 PageID #: 991
CHRISTINE PERSAUD

Page 64

1          MR. KRINSKY:  We're being called out on the 21st.  It's

2     been on the calendar for three months now.  We're being called

3     out on the 21st to actually go to a judge.  It is not --

4               THE COURT:  State court, I take it.

5               MR. KRINSKY:  State court.  Correct.

6               THE COURT:  Okay.

7               MR. KRINSKY:  It is possible that we may not get

8     straight days, but I'm hesitant because I won't know until the

9     morning of the 21st.  I'll know the morning of the 21st the

10    schedule for the next two weeks, essentially, but I won't know

11    until the 21st.

12              MR. CAMPO:  Your Honor, I have a calendar issue as

13    well the week of the 21st.  Not quite as extensive, it sounds

14    like, Mr. Krinsky's, but I have a trial commencing in Central

15    Islip at 9:30 on Monday the 21st.

16              THE COURT:  So let's look for a different --

17              MR. CAMPO:  And I'm not sure if -- it very well could

18    be over in a day, Your Honor, but I'm not positive.

19              THE COURT:  Those are too many uncertainties on

20    each --

21              MR. CAMPO:  But on --

22              THE COURT:  -- side of the aisle.

23              MR. CAMPO:  However --

24              THE COURT:  Let's look for a different day.

25              MR. CAMPO:  On Mr. Green's issue --

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 65 of 99 PageID #: 992
CHRISTINE PERSAUD

Page 65

```
 1                THE COURT:  Yes.

 2                MR. CAMPO:  I'm sorry.  I didn't mean -- on the issue

 3      of Mr. Green I don't need to be here.  If it's only going to be

 4      Mr. Green Mr. Stremba could do it, so even if I couldn't make

 5      it --

 6                THE COURT:  Any other --

 7                MR. CAMPO:  -- in the afternoon it wouldn't matter.

 8                THE COURT:  Any other witnesses?

 9                MR. KRINSKY:  That's all we anticipate.

10                THE COURT:  So you're not able to commit at this point

11      to proceed on the 22nd.  Let's look at the week of the 28th.

12      It looks like midday on Monday the 28th may be possible.  I'm

13      giving you all my open time, but it's not --

14                MR. KRINSKY:  I believe, Your Honor, that would work.

15      At least it gives me advance notice to be able to say to the

16      state court judge that there's another matter, and I'm sure

17      they'll work around me once I -- I, sort of, give them at least

18      a couple of day's notice.

19                THE COURT:  Okay.

20                MR. CAMPO:  Would midday mean 2 o'clock, Your Honor?

21      Is that what you meant by midday?

22                THE COURT:  Well, let's say a little earlier than

23      that, because I have a class to teach at 4 o'clock.  Ms.

24      Jackson, what would you like me to -- would you like to do it

25      morning or afternoon?  Let's say 9 o'clock.  We'll let you do
```

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 66 of 99 PageID #: 993
CHRISTINE PERSAUD

Page 66

1    it in the morning.  All right?

2              MR. KRINSKY:  9 a.m.?

3              THE COURT:  9 o'clock on the 28th.

4              MR. KRINSKY:  Mr. Zilberberg has indicated that

5    although he will be overseas I will proceed.  If it's just

6    going to be Professor Green then I will proceed on my own that

7    day without Mr. Zilberberg's presence.

8              THE COURT:  So we'll -- and any witnesses beyond that?

9              MR. KRINSKY:  No, Your Honor.

10             THE COURT:  Okay.  Do you anticipate -- I know it's --

11   you don't need to tell me yet.  You don't need to know if you

12   have a rebuttal case planned, but if you are aware of any

13   rebuttal case you'll be putting in following the objectors

14   it'll help me plan to know that.

15             MR. STREMBA:  We haven't planned any.

16             THE COURT:  Okay.  All right.  If that changes you

17   should contact --

18             MR. STREMBA:  Yes, Your Honor.

19             MR. KRINSKY:  We will, Your Honor.

20             THE COURT:  -- Mr. Krinsky and also the Court.  So

21   let's see if we can do our best to complete this record on the

22   morning of the 28th with testimony of Professor Green.  To the

23   extent that you may stipulate, and I say that with an open mind

24   to whatever issues you raise as to why we need the testimony,

25   but I can also say that in the context where there is no jury

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 67 of 99 PageID #: 994
CHRISTINE PERSAUD

Page 67

1    but only the Court, and, as you say, it appears that there

2    would not be a dispute as to the objective qualifications of

3    the witness to be an expert, it may be that the most efficient

4    thing to do from the standpoint of the trustee's administration

5    of this Chapter 7 case, the presentation of the case by the

6    objectors and the Court's time, is simply to take testimony for

7    what it's worth and your arguments can go to the weight, to the

8    persuasiveness, perhaps.  Those, of course, will be preserved.

9    All right.  But we'll see on the morning of the 28th.

10          MR. STREMBA:  Your Honor, let me just -- one other

11   quick matter.  Mr. Krinsky filed papers last week; I guess it

12   was a reply in connection with their motion to compel

13   production of documents.  As we understood it there wouldn't be

14   any further papers filed unless Troutman Sanders first saw the

15   need to supplement the record, but papers have been filed.

16          THE COURT:  I'm sorry.  Could you indicate which

17   number on the docket?  There were quite a number of things

18   filed.

19          MR. CAMPO:  Your Honor, it's --

20          THE COURT:  There were the --

21          MR. CAMPO:  It's document -- I'm sorry, Your Honor.  I

22   apologize for the --

23          THE COURT:  It's all right.

24          MR. CAMPO:  -- the frog in my throat.  It's document

25   number 287.  It was filed on 11/08.

1            THE COURT:  Is this is the order to show --

2            MR. CAMPO:  No, this is the --

3            THE COURT:  Or -- excuse me.  Application for the

4    entry of an order to show --

5            MR. CAMPO:  No, Your Honor.  This is -- the document

6    is entitled "Attorney Reply Affirmation".

7            THE COURT:  All right.

8            MR. CAMPO:  And it's a written --

9            THE COURT:  Well, we'll be sure --

10           MR. CAMPO:  It's an affirmation of Mr. Krinsky.

11           THE COURT:  Would you like an opportunity to respond?

12           MR. STREMBA:  If Your Honor is --

13           MR. KRINSKY:  If --

14           MR. STREMBA: -- going to entertain the matter then we

15   would like an opportunity --

16           THE COURT:  How much?

17           MR. STREMBA: -- either on papers or when we come back

18   on the --

19           MR. KRINSKY:  On the 8 --

20           MR. STREMBA:  The 28th.

21           MR. KRINSKY:  On the 28th.

22           THE COURT:  I'll give you time to put in papers in

23   response.  It's helpful to the Court to have papers if you

24   think there are things that need to be said in order for me to

25   give them the attention they deserve it's -- I'll leave it to

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 69 of 99 PageID #: 996
CHRISTINE PERSAUD

Page 69

1    you, but you can file something any time this week and I'll

2    sign it.

3              MR. CAMPO:  And, Your Honor, if we were to -- just, if

4    it's okay, Your Honor, since this is a bad week, could we put

5    that -- anything we were going to put it in reply could we have

6    until next week?

7              THE COURT:  I'm going to ask you to work out a

8    schedule and submit it in a --

9              MR. CAMPO:  Sure.

10             THE COURT: -- proposed stipulation to the Court.

11             MR. STREMBA:  But --

12             THE COURT:  Because that, you should not be required

13   to describe all of the different matters you're managing around

14   on the record.

15             MR. STREMBA:  No.

16             THE COURT:  This is something I'm sure that good

17   lawyers can work out between each other

18             MR. STREMBA:  No, we appreciate that.

19             MR. KRINSKY:  Whatever additional time they need, Your

20   Honor.

21             THE COURT:  All right.

22             MR. KRINSKY:  We have no objection.

23             THE COURT:  You can work that out.

24             MR. KRINSKY:  All right.

25             THE COURT:  And submit something so everyone knows

1   what to expect.  I expect that I will so order any reasonable

2   schedule that the parties submit.

3           There's the question of the 2004 issues that have been

4   raised again on behalf of the entity and individuals as to whom

5   such orders were entered.  I read with care the papers that

6   were submitted, and it seemed to me appropriate, based on the

7   suggestion that the 2004 orders, very limited 2004 orders that

8   I entered, seemed to require a certain kind of production, that

9   it was not my intention to require issued orders that clarify

10  and amend, perhaps correct, those orders.  They do -- conform

11  them to what I intended.  And to the extent that the earlier

12  versions were not as clear as they should be I apologize to the

13  parties.  In view of the ambiguity, though not raised until

14  last week, it did seem also appropriate to me to extend the

15  time from today, which was the initial date for the

16  commencement of production of documents, until later this week,

17  and I think I put it out to Thursday or Friday.  Is that right?

18  So I will, understanding that we only have a few minutes.  We

19  do have all these matters on the calendar.

20          I remain satisfied that based on the entire record

21  there is a basis for at least some preliminary documentary

22  inquiry, and I've tried to provide a limited, and now

23  clarified, template as to what should be produced, and to the

24  extent that there is a need to go beyond, as there well may be,

25  this very initial production of documents, and to the extent

1    that the parties, that the trustee may seek oral examination,

2    as opposed to just examination via the production of documents,

3    you know, all those matters remain before me.  I will hear very

4    briefly anything further in response to the clarified orders

5    that were entered, but I must emphasize that we really only

6    have a few minutes for this.  I gave a lot of care to the

7    matter at first.  I've heard extensive argument on it.  I have

8    reconsidered all of those issues in the context of the

9    applications that were filed and entered further and clarifying

10   orders, amended orders, that provide that this really is quite

11   limited initial production, indeed, and seeks, for example,

12   next to the Escobar order, documents related to loans or

13   business arrangements between, on the one hand, Mr. Klein and

14   his related entities and, on the other hand, the debtor and any

15   related entities.  That is it may well be that these

16   individuals have no such documents, in which case it cannot be

17   produced what does not exist.  But I think it's a logical first

18   step.  It's difficult to imagine circumstances where such

19   production would not be supported by the record and the very,

20   very broad scope that is the scope of Rule 2004, and hence I

21   proceed with the opportunity to clarify, as I did, and in the

22   absence of a response, which I would typically very much seek,

23   if I enter an order that can be improved and I see that myself

24   I'll do it.  If it's brought to my attention by parties I'll be

25   as responsive as I can be under the circumstances.

Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 72 of 99 PageID #: 999

CHRISTINE PERSAUD

1    I want to add, I guess finally, that I do not view

2    this as simply the latest front in the long running battle

3    between these parties, nor do I expect counsel to treat it as

4    such.  You may proceed.  I emphasize --

5    MR. LEWITTES:  Good morning, Your Honor.  Joel

6    Lewittes, of counsel to Mr. Zilberberg.  Listening to the last

7    few minutes of Your Honor's statements I feel rather bad that

8    apparently what I set forth in my order to show cause and

9    motion did not properly communicate itself to the Court.

10    THE COURT:  The papers were very helpful.  I studied

11    them with care, and I thank you for them.  They led to the

12    entry of amended orders, so there's nothing whatsoever about

13    which to be sorry.  I thank you for your input.  As I

14    indicated, if I can improve an order, especially in a

15    complicated document production description context, I am keen

16    to do so.

17    MR. LEWITTES:  I thank you for the additional four

18    days, which was granted in order to produce the documents, I

19    believe, on Friday rather than today.

20    THE COURT:  To be clear to commence the production of

21    documents.

22    MR. LEWITTES:  But to me that does not really focus

23    upon my motion for reconsideration.  Now, you and I know that

24    technically in the federal courts there is nothing like a

25    motion for reconsideration, but we looked to and we were

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 73 of 99 PageID #: 1000
CHRISTINE PERSAUD

Page 73

1    inspired by Federal Rule of Civil Procedure Rule 59, to alter

2    or amend judgments on the grounds that an important matter of

3    law has been overlooked, clear error and manifest error.

4         The first question that any federal judge must

5    confront is do I have subject matter jurisdiction, because if

6    we look at 28 U.S.C. 1334(e)(1) a district court and via the

7    automatic reference of this court, exclusive jurisdiction is

8    give to the Court over property of the debtor at the time of

9    the filing of the petition.  We have set forth, and if the

10   Court will permit -- give me a few minutes to set forth orally

11   why this Court does not have a jurisdiction to hear this

12   matter, the applications with respect to 2004, because we

13   submit that we have made at least -- at least -- a prima facie

14   showing that the debtor, there's no property interests, and

15   therefore the trustee and the estate have no property interest

16   in order to pursue a 2004.  And we say that unless and until

17   this Court adjudicates that issue as to whether or not this

18   estate has any interests, whether legal or equitable, we cannot

19   and we should not, and I think the law does not permit us to go

20   farther.

21        There are several ground rules that we have to deal with

22   and that is if, in fact, we can demonstrate, and I believe we

23   can, that the debtor's estate has no property interest in

24   Caring then it doesn't matter whether the Court cites to, as it

25   did, in its order granting, in part, 2004 examinations, it

1    doesn't matter, because I don't disagree that Bankruptcy Code

2    Section 704(a)(4) directs the trustee to investigate financial

3    affairs of the debtor.  But that is based upon a shown fact

4    that the estate has some property interest.

5            THE COURT:  Isn't that argument a bit circular?  How

6    could a trustee make that showing in the absence of some kind

7    of showing of some kind of opportunity to gather the relevant

8    information, and isn't that precisely what 2004 is intended to

9    do and in some many cases does?  I see many situations where

10   trustees seek relief under 2004 and conclude there is in fact

11   no interest or no interest worth pursuing in the trustee's

12   business judgment.

13           But it seems to me --

14           MR. LEWITTES:  I believe --

15           THE COURT:  -- that your argument asks me to assume

16   away the process that the trustee is required by fiduciary

17   duty, including on behalf of this creditor --

18           MR. LEWITTES:  He has no --

19           THE COURT:  -- to pursue.

20           MR. LEWITTES:  -- fiduciary duty if there's no

21   interest here.  And it is not circular.

22           THE COURT:  Not to you, but perhaps to me.

23           MR. LEWITTES:  Well, I'm here not to spend too much

24   time, but I am here to try --

25           THE COURT:  You have been overwhelmingly --

Case 1-10-44815-ess   Doc 302   Filed 11/16/11   Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 75 of 99 PageID #: 1002
CHRISTINE PERSAUD

Page 75

1             MR. LEWITTES:  -- and con --

2             THE COURT:  -- successful in --

3             MR. LEWITTES:  -- try and convince you --

4             THE COURT:  -- your opposition to this application.  I

5    have entered the most minimal relief and response.

6             MR. LEWITTES:  It doesn't --

7             THE COURT:  Carefully circumscribed --

8             MR. LEWITTES:  I --

9             THE COURT:  -- in order to minimize the burdens on the

10   parties.

11            MR. LEWITTES:  To me --

12            THE COURT:  So I should say, again -- and I credit

13   your arguments to this extent.  You have persuaded that the

14   most modest steps, the smallest steps or the small steps

15   reflected, perhaps they could be even smaller, but the small

16   steps reflected were the appropriate steps at this time without

17   prejudice to what further relief I might enter.

18            MR. LEWITTES:  If not -- I'm not mistaken, I believe

19   that we cited a bank proceed -- eastern district case which

20   says, in essence, that if there is no property interest there

21   can be no 2004.  And the answer's not that you have to find out

22   the property interest.  The determination has to be made first.

23   This is not the kind of case which I had indicated the last

24   time I had the opportunity to approach this lectern.  This is

25   not the run of the mill, garden variety type of case, which of

Page 76

1  course we know certain powers are granted to the trustee.  But

2  both --

3          THE COURT:  I need to clarify something about my

4  approach to these things, for your benefit.  I do not view any

5  one of the cases before me or that has ever been before me as

6  either run of the mill of garden variety.

7          MR. LEWITTES:  What I was saying is not --

8          THE COURT:  Not this one, not any other.

9          MR. LEWITTES:  -- meant to be personal, Your Honor.

10         THE COURT:  I do not take it personally.  I think it

11 is important clarification here.

12         MR. LEWITTES:  I just --

13         THE COURT:  Your argument, I take it, is that this is

14 not a run of the mill, garden variety case.  My response to you

15 is no case is a run of the mill or garden variety case in my

16 view.  And I --

17         MR. LEWITTES:  In that case --

18         THE COURT:  -- stress these in council to bring that

19 professionalism to their efforts.

20         MR. LEWITTES:  I'll withdrawal that --

21         THE COURT:  But my -- but I think that --

22         MR. LEWITTES:  -- that phrase.

23         THE COURT:  -- would help.

24         MR. LEWITTES:  But in any --

25         THE COURT:  There's not one special set of Code and

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 77 of 99 PageID #: 1004
CHRISTINE PERSAUD

Page 77

1    rules for the Christine Persaud/Abraham Klein dispute.

2            MR. LEWITTES:  Correct.

3            THE COURT:  Thank you.

4            MR. LEWITTES:  And that is why I'm here.

5            THE COURT:  Yes.

6            MR. LEWITTES:  Because I don't want to have a special

7    code of rules.  What I am asking for is a code of rules that

8    complies --

9            THE COURT:  Code or rules, I said.

10            MR. LEWITTES:  -- the subject matter jurisdiction of

11    this Court.  And I'm not bringing the cart before the horse.

12    The fact of the matter is that is the one question this Court

13    has to deal with.

14            Now, it's a very simple issue if the Court is willing

15    to grapple with it.  We have helped, I believe, the Court in

16    reaching that decision by pointing to several matters.  Number

17    one is the award by the arbitrator, which sets forth with

18    particularity the fact that these two parties, Persaud and

19    Klein, could not get together; that it was the finding of the

20    arbitrator that although originally Mr. Klein had a fifty-

21    percent interest the Court found that in the event and when a

22    transfer of the permits and what have you would be forthcoming

23    then Mr. Klein would have a hundred percent interest.

24            The trustee often takes the position -- he reads the

25    word fifty percent and says aha.  But that was a prelude to the

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 78 of 99 PageID #: 1005
CHRISTINE PERSAUD

Page 78

```
 1    final conclusion that once certain things have done, that is,

 2    the transfer of the licenses, et cetera, in conformity with the

 3    regulations and rules of the Department of Health, the State of

 4    New York, then Mr. Klein gets the hundred percent of the

 5    ownership.  And the finality ends with the following:  "It is

 6    further ordered that if Persaud works at and for the benefit of

 7    Caring during the pendency of the license transfer for and at

 8    office of Caring for a minimum of thirty hours per week, she

 9    will be entitled to compensation of one thousand dollars per

10    week and no more for any reason until the provisions of this

11    award are fully complied with and thereafter she has no

12    residual interest or rights in Caring."

13            If Ms. Persaud has no residual interest or rights in

14    Caring, must we not inquire as to what rights or interest the

15    trustee's estate has?

16            THE COURT:  And isn't an appropriate way to do that to

17    provide with the clarification that was needed and, I think,

18    learned in your papers that to the extent that, for example,

19    any of these parties has information showing --

20            MR. LEWITTES:  Wait a minute.

21            THE COURT:  Speak with precision.  Let me get my order

22    in front of me -- one of the orders.  That anything concerning

23    a loan or business arrangement between Mr. Klein, on the one

24    hand, and the debtor, on the other --

25            MR. LEWITTES:  My --
```

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 79 of 99 PageID #: 1006
CHRISTINE PERSAUD

Page 79

1           THE COURT:  -- is something that makes sense --

2           MR. LEWITTES:  No.

3           THE COURT:  -- to produce.  I -- if there such a

4    document, it seems to me that it is within a sensible scope,

5    narrowly construed, of a 2004 examination.  If there is not,

6    then there's nothing to produce.

7           MR. LEWITTES:  Your Honor --

8           THE COURT:  And I -- it strikes me to say --

9           MR. LEWITTES:  -- Your Honor, I have a --

10          THE COURT:  There's an interesting -- as a sensible --

11   measured --

12          MR. LEWITTES:  I --

13          THE COURT:  -- the first step and the opportunity to

14   reconsider that determination leaves me satisfied that it is

15   that.

16          MR. LEWITTES:  Your Honor, the way it works, in my

17   understanding and view, is that once there is an objection to a

18   2004 the burden then shifts to this trustee to show good cause

19   why he is entitled to the 2004.  Your Honor has --

20          THE COURT:  His applications --

21          MR. LEWITTES:  -- the respon --

22          THE COURT:  -- were first heard in September.  The

23   record is quite complete.  Hearings on these applications,

24   according to my docket, have been held on September 8th, 13th,

25   20th, 22nd, October 28th and November 8th.  So the record is a

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 80 of 99 PageID #: 1007
CHRISTINE PERSAUD

Page 80

1    full record, and not only the record on reconsideration.  And

2    it is amplified by many proceedings that took place, and I say

3    this with the greatest respect and deference, before you were

4    involved and in which you've no involvement.

5           So there's an entire record before this Court,

6    including of a Chapter 11 proceeding, that informs the

7    determinations that I've made.  You need to --

8           MR. LEWITTES:  But --

9           THE COURT:  -- because of my obligations to a --

10   because of other obligations, we will need to bring this to

11   closure fairly soon.

12          MR. LEWITTES:  Your Honor --

13          THE COURT:  I will be as deferential as I can to your

14   desire to add to what you said in your papers.  There is no

15   need to refute.  You can probably tell I've studied your papers

16   with great care.

17          MR. LEWITTES:  Your Honor, the only cause -- we have

18   a -- we have the application of the trustee.  The only cause

19   discernible, if one can call that cause, is a bald statement, a

20   naked statement that the trustee owns Caring.  That is not

21   fulfillment of the burden of showing cause.  That is a

22   conclusory statement that has absolutely no basis in fact.  He

23   doesn't even present any basis for saying that he has

24   ownership.  That is not cause shown.

25          And without going into this matter, we have that

Case 1-10-44815-ess   Doc 302   Filed 11/16/11   Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 81 of 99 PageID #: 1008

CHRISTINE PERSAUD

Page 81

1    award.  That award, whether it is confirmed or not, has been

2    determined to be, as a matter of law, subject to the rules of

3    collateral estoppel and res judicata.  And we have cited a

4    Second Circuit decision to that effect, which is Jacobson

5    against Firemen's Fund.  So I have that.

6         He has a single statement that says he owns it.  We

7    can go beyond that.  We have statements by former counsel of

8    Ms. Persaud admitting judicial admissions that she does not own

9    Caring and/or Liberty.  And the last week we were here we had

10   another submission that it, by Persaud, indicating that she

11   doesn't own Caring or Liberty.  It's a trust that owns them,

12   separate trust.  So there is no cause shown or can there be any

13   cause shown at this moment.

14        And so, I return to my initial statement.  And that

15   is, this Court should determine first, not afterwards, because

16   there's nothing for the trustee to check out.  We have shown

17   him this and that, and his response is I own Caring.  This

18   Court -- as a matter of subject matter jurisdiction, in my

19   view, this Court must determine first who owns a property

20   Caring.  And once --

21        THE COURT:  It would be uncomfortable --

22        MR. LEWITTES:  -- we get to that --

23        THE COURT:  -- with putting the trustee to that proof

24   without permitting an inquiry, whether it happens in the

25   context of the discovery tools in an adversary proceeding or

Case 1-10-44815-ess   Doc 302   Filed 11/16/11   Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 82 of 99 PageID #: 1009
CHRISTINE PERSAUD

Page 82

1    the tools available in the Chapter 7 process.  I think

2    expecting the litigant to prove something without the ability

3    to inquire, as our system permits through discovery of whatever

4    type, would be a mistake.

5                MR. LEWITTES:  Your Honor --

6                THE COURT:  It would be a mistake of law.  It would be

7    a mistake of case management.  It would be --

8                MR. LEWITTES:  -- Your Honor, you did not --

9                THE COURT:  -- inefficient.

10               MR. LEWITTES:  -- hear me --

11               THE COURT:  I --

12               MR. LEWITTES:  -- use the word --

13               THE COURT:  You may see that differently.  I -- but --

14               MR. LEWITTES:  You didn't hear me use the word --

15               THE COURT:  -- and if your -- your decision to make --

16               MR. LEWITTES:  -- "prove".

17               THE COURT:  -- I'm satisfied --

18               MR. LEWITTES:  I didn't --

19               THE COURT:  -- you would reach a decision consistent

20   with the decision desired by the client who has retained you.

21               MR. LEWITTES:  Your --

22               THE COURT:  That being said, I --

23               MR. LEWITTES:  Your Honor, I didn't --

24               THE COURT:  -- I appreciate your position.  I --

25               MR. LEWITTES:  I never said --

1        THE COURT:  I have already modified to a great extent

2    my orders in response to what you've put in to --

3        MR. LEWITTES:  With all due respect --

4        THE COURT:  -- clarify them.

5        MR. LEWITTES:  -- I never said the trustee has to

6    prove.  I never used the word "prove".  I said how about a

7    little good cause.  That's something quite less than "prove".

8        THE COURT:  All right.  Let's --

9        MR. LEWITTES:  And he hasn't done that.

10       THE COURT:  -- let's hear from the trustee.  Thank

11   you.

12       MR. PEREIRA:  Your Honor, if I may?

13       THE COURT:  Mr. Pereira, I need to remind you, as I've

14   reminded counsel for the objector that --

15       MR. PEREIRA:  Good morning, Your Honor.  John S.

16   Per --

17       THE COURT:  -- there are some time constraints here.

18       MR. PEREIRA:  I'm sorry, Your Honor.

19       THE COURT:  Please proceed.

20       MR. PEREIRA:  John S. Pereira, the Chapter 7 trustee.

21   Mr. Lewittes talks about cause and connection.  Your Honor,

22   these are the facts whether the -- Mr. Klein and his counsel --

23   many counsel -- want to hide them or not.  Mr. Klein claims to

24   be owed two million dollars based on a default judgment which

25   he obtained.  He went to arbitration. The arbitration that he

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG   Document 1-36   Filed 07/05/12   Page 84 of 99 PageID #: 1011
CHRISTINE PERSAUD

Page 84

1        went to, he obtained an arbitration award on default.

2              The arbitration award itself starts with a very

3        telling statement from the arbitrator where it says Mr. Klein

4        was looking for the benefit of his bargain.  He sued Ms.

5        Persaud to be a partner in Caring.  He never -- it was never

6        alleged that he owned fifty percent before the arbitration

7        award.  He alleged that he had given and lent a lot of money to

8        caring and evidently or allegedly to Liberty and as a result of

9        the default arbitration award, because Ms. Persaud did not

10       appear, the arbitrator somehow awarded him not -- would up

11       saying that he owned part of Liberty, not only Caring but also

12       Liberty.

13             The award.  There's no nexus -- let me see if I can

14       give you a connection. In the arbitration award, Mr. Lewittes

15       has no problem quoting the second paragraph.  The first

16       paragraph -- the paragraph above that which was quoted says

17       "Creditor Klein has a fifty percent ownership interest in both

18       Caring and in Liberty" -- there's a -- "in accordance with the

19       terms of the agreement, subject to the approvals of the agency

20       with jurisdiction which interest in Liberty shall cease."

21             By the way, Liberty was never even a party to the

22       arbitration yet the arbitrator gave him fifty percent of

23       Liberty but that's another issue.  "Which interest in Liberty

24       shall cease as soon as he or his designee is approved by the

25       agencies with jurisdiction to be the sole operator of Caring."

Page 85

1    It doesn't say -- he says he's a -- in the same paragraph it

2    says he's a fifty percent owner of Caring and he's to be the

3    sole operator of Caring.  That does not mean that he owns a

4    hundred percent of Caring.

5              THE COURT:  Mr. Pereira, I'm looking for any insights

6    you have in a practical response to this situation.  I remain

7    concerned, deeply concerned, that the administration of this

8    case is -- poses significant risk of being quite unproductive

9    from a creditors standpoint.  I'm always concerned, as I'm sure

10   any trustee is, when the great majority of the actions that the

11   trustee proposes to take seem to be opposed by the primary

12   creditor.   Now I'm further concerned when the Bankruptcy Court

13   seem to be used as the next front in a litigation battle.  It's

14   unproductive in the bankruptcy process to use this process that

15   way.

16             So I say, stepping back, looking at the bigger

17   picture, I would like to hear from you, not only in the

18   question of cause and subject matter jurisdiction, which is a

19   full stop question that must command a court's full attention

20   whenever it is raised and even when it is not.  But also, on

21   the question of a practical approach here.  I do see I have

22   2004 requests that have been pending before me for a long

23   time --

24             MR. PEREIRA:  Since August.

25             THE COURT:  -- inconsistent with the need to move this

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 86 of 99 PageID #: 1013
CHRISTINE PERSAUD

Page 86

1    case forward.  And I will say that even upon a rethinking of

2    all of the grounds and everything I had in mind in proceeding

3    as I did, I remain satisfied that with clarification to be sure

4    that my orders say what I wished them to say, as clearly as I

5    can do that, that it is still a sensible way to proceed.  But

6    Mr. Pereira --

7            MR. PEREIRA:  I agree, Your Honor.

8            THE COURT:  -- you're the trustee here.  And I --

9            MR. PEREIRA:  I have not seen the order but I agree

10    that --

11            THE COURT:  Well, they were entered on --

12            MR. PEREIRA:  -- if we can proceed --

13            THE COURT:  -- Thursday?

14            MR. PEREIRA:  -- even on the amended orders, it will

15    be helpful.  Your Honor, also, Mr. Klein and counsel --

16            THE COURT:  But the question was -- I'm looking for --

17            MR. PEREIRA:  Go ahead.

18            THE COURT:  -- views you may have as trustee in this

19    case on a practical approach to proceed here and I need them

20    very promptly because we do have a meeting downstairs of our

21    bar and court that begins in approximately five minutes, as I

22    previously advised the parties.  We had intended on this

23    hearing ending at 11 and we had to start late.  There were

24    circumstances quite beyond my control but now we do only have a

25    few minutes.

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 87 of 99 PageID #: 1014
CHRISTINE PERSAUD

Page 87

1          MR. PEREIRA:  Your Honor, we have been through

2     examinations of Ms. Persaud at the Section 341 meeting and

3     other conferences with her and her many counsel along the way.

4     We have been told that Caring is probably ten times the size of

5     Liberty and that it is worth, according to published reports

6     that have been in various local papers and the testimony of Ms.

7     Persaud, is worth between ten and thirty million dollars.

8          We know that there are allegations that while Ms.

9     Persaud owned Caring -- and we believe she still owns Caring by

10    the virtue of what counsel doesn't tell you which is that the

11    Appellate Division has reversed -- has vacated the judgment

12    that confirmed the arbitration award.

13         THE COURT:  But not reverse the arbitration award, Mr.

14    Pereira.

15         MR. PEREIRA:  But the arbitration award was obtained

16    by default, Your Honor --

17         THE COURT:  Does that make it any diff -- an order

18    obtained from this Court on default is still an order of this

19    Court.

20         MR. PEREIRA:  By a private arbitrator, Your Honor.

21    And --

22         THE COURT:  Pursuant to a valid arbitration clause?  I

23    realize that's before the state court but, Mr. Pereira, I --

24         MR. PEREIRA:  Your Honor, the Appellate Division --

25         THE COURT:  I urge you not to overstate your position.

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 88 of 99 PageID #: 1015
CHRISTINE PERSAUD

Page 88

1          MR. PEREIRA:  I don't.  I don't, Your Honor.  The

2     Appellate Division not only vacated the judgment but took the

3     extraordinary step of saying that a valid defense to the

4     arbitration had been raised and ignored.

5          THE COURT:  All right.

6          MR. PEREIRA:  And that they --

7          THE COURT:  Well, let me ask you this question.  Do

8     you think it makes sense to permit the parties to litigate to

9     closure that issue in the state court where it is presently

10    pending and to defer all of these proceedings until that is

11    complete?  It seems to me that your true and first battlefront

12    may be the state court and I would be prepared to consider a

13    joint request to proceed that way.  It might significantly cut

14    down on the costs of administration of this case.

15          At the same time, in the absence of consent, I'm

16    prepared to keep this case moving on a fast track here in the

17    Bankruptcy Court.

18          MR. PEREIRA:  Your Honor, I --

19          THE COURT:  So --

20          MR. PEREIRA:  -- fast track.  A fast track we will

21    proceed --

22          THE COURT:  Tell me the status of the state court

23    proceedings?  I need to know the status of the state court

24    proceedings.

25          MR. PEREIRA:  I am not aware of the status of the

Page 89

1    state court proceedings.

2          THE COURT:  I think you need to aware of those

3    proceedings, Mr. Pereira, don't you?

4          MR. PEREIRA:  Say again?

5          THE COURT:  Don't you think you need to be aware of

6    those proceedings?

7          MR. PEREIRA:  I'm sorry, Your Honor.  I --

8          THE COURT:  I need to know that.  I'm surprised you

9    don't.  Would you like to confer with nonbankruptcy counsel?

10          MR. PEREIRA:  No.  Your Honor, the reason I don't know

11    it is there was a motion made before -- by Ms. -- again, one of

12    Mr. Klein's motions to say that the -- to vacate this -- the

13    vacator of the confirmation of the judgment.  He says that --

14          THE COURT:  Is that in the appellate division or is

15    that in the New York Supreme?

16          MR. PEREIRA:  It's appellate division rendered the

17    decision.  They took an appeal to the court of appeals.  That

18    appeal was not -- they --

19          THE COURT:  Yes.

20          MR. PEREIRA:  The court of appeals refused to hear the

21    appeal.

22          THE COURT:  Yes.

23          MR. PEREIRA:  You have the appellate division is -- as

24    a final judgment, vacating -- vacating the confirmation of the

25    arbitration award --

Page 90

```
 1              THE COURT:  What is the current --

 2              MR. PEREIRA:  They then made -- they -- Mr. Klein then

 3    made, in this Court, another motion, a motion to have Your

 4    Honor declare  that he Appellate Division judgment is null and

 5    void.

 6              MR. PEREIRA:  Mr. Pereira, I'm familiar with the

 7    record before me.  My question is the record in the state

 8    court.  Are you aware of what is presently pending in the state

 9    court?

10              MR. PEREIRA:  To my knowledge, there is nothing

11    scheduled in the state court.

12              THE COURT:  The matter has been remanded to New York

13    Supreme, isn't that correct?

14              MR. PEREIRA:  Yes.  That's what the order said, Your

15    Honor.

16              THE COURT:  And what is now happening in response to

17    that remand?

18              MR. PEREIRA:  As far as I know, nothing has been done

19    with it.

20              THE COURT:  Would you like to confer with your

21    counsel?  With the debtor's counsel?  Who is standing up.

22              MR. PREZIOSI:  Judge, just very quickly.  It's waiting

23    to see what happens in this Court.  Everything is stayed there.

24    It has been remanded to Supreme --

25              THE COURT:  Has there been --
```

Page 91

1            MR. PREZIOSI:  -- for the confirmation hearings --

2            THE COURT:  All right.

3            MR. PREZIOSI:  -- of the arbitration award --

4            THE COURT:  All right.  Well, let's --

5            MR. PREZIOSI:  -- and --

6            THE COURT:  All right.  It's 11:58.  We need to bring

7    this to closure today.  I'm going to note with respect to the

8    adversary proceeding, the appearance of the plaintiff and the

9    defendant will have an adjourned date.  We have, of course, the

10   continued hearing on the application to employ counsel.  We

11   have the applications for orders to show cause.  To the extent

12   that these seek reconsideration of the orders for reasons

13   specified at various paragraphs and on grounds that they,

14   orders as entered, seek the production of documents that do not

15   make sense in the context of the case.

16           And I'm not stating nearly as effectively as was

17   stated in the document -- in the argument.  For example, this

18   seems to require, with respect to Joel Klein, Joel Klein to

19   produce financial information regarding three different

20   situations; namely (a) entities old or controlled -- owned or

21   controlled by Abraham Klein; (b) entities owned or controlled

22   by Abraham Klein and the debtor; and (c) entities owned or

23   controlled by the debtor.  I trust that the orders as amended

24   address that ambiguity to the extent the orders had that and I

25   let the orders speak -- the amended orders speak for

```
 1    themselves.  But that issue, I think, has been addressed.  So

 2    to that extent, the request for relief is responded to.

 3            Likewise, the concern or argument made in paragraph

 4    14, we consider why the subject of the application should be

 5    ordered to produce financial information of entities owned or

 6    controlled by Mr. Klein, despite the fact that these entities

 7    have no connection to the debtor.  Not my intention, not, I

 8    believe, what the order reflected.  Clearly not what the

 9    amended order reflects.  So, again, that issue's been

10    addressed.

11            Next paragraph 15, there is a question concerning

12    punctuation.  I have reviewed with care the punctuation and I

13    hope I have improved it.  Thank you for the opportunity.  With

14    respect to the arguments set forth in the "Finally" paragraph

15    of -- paragraph 15 -- 16, a concern about needing to proceed on

16    November 14th, that being today, I took that to be, indirectly,

17    a request for a little more time.  I accommodated that request.

18    So each and all of those points has been responded to.

19            There is separately a question as to subject matter

20    jurisdiction.  I do not see, on careful initial reflection and

21    further reflection, a subject matter jurisdiction presented

22    here.  But because subject matter jurisdiction is so very

23    important, I invite you to proceed with further briefing on

24    that issue and you can do that on an ordinary schedule.  I

25    don't not think that given the pace at which this matter's
```

Case 1-10-44815-ess    Doc 302    Filed 11/16/11    Entered 11/16/11 15:40:25
Case 1:12-cv-03337-JG    Document 1-36    Filed 07/05/12    Page 93 of 99 PageID #: 1020
CHRISTINE PERSAUD

Page 93

1    proceeding, it does not seem to me that order to show cause

2    pace is required.  If you'd like an expedited briefing

3    schedule, you may negotiate it and submit it to the Court

4    consensually.  I take it you are -- whatever you may disagree

5    on, you've been able to work together on things like that.

6            And so -- and I'll say your application for the entry

7    of an order to show cause has been granted in part as reflected

8    in the orders previously entered and denied without prejudice,

9    in part as reflected in the record.  That is to say you may

10   renew it as indicated.  You deem it appropriate and

11   concentrating on those issues that are so very important.  I'll

12   make a similar notation on each of these applications for order

13   to show cause.  I will remind the parties that that is a very

14   special kind of tool and should be used absolutely whenever

15   it's supported by the record and in compliance with our rules

16   and procedures.

17           I think that brings us to the 2004 applications.  We

18   have what has been denominated as the reconsideration orders.

19   I will make a similar entry there.  I have reconsidered them. I

20   have --

21           MR. LEWITTES:  Your Honor --

22           THE COURT:  -- already entered amended orders and to

23   the extent that I am not granting further relief you seek, you

24   may work on a briefing schedule.  Advise the Court by

25   submission and we'll take it from there.  I am now constrained

Page 94

1    to bring this hearing to closure and because of the scheduling

2    requirements that I've noted previously.  All other matters on

3    the Court's calendar will be carried to our next date and that

4    is, again -- Ms. Jackson?

5             THE CLERK:  The 28th at 9:00.

6             THE COURT:  The 28th at 9:00.  I know you each and all

7    have many further things to say.  In order to accommodate each

8    of you in fairness, I would have to accommodate all of you and

9    so I shall simply bring this to closure and wish you a good

10   day.

11            MR. LEWITTES:  I just -- Your Honor, I have to know

12   if --

13            THE COURT:  We are concluded.

14            MR. LEWITTES:  -- about the discovery.  Is -- they're

15   stayed now until we deal with subject matter jurisdiction?

16            THE COURT:  I've indicated to you that you may proceed

17   as referenced in the record.  The amended orders are on file.

18   Thank you so much.

19            THE CLERK:  All rise.

20       (Whereupon these proceedings were concluded at 12:03 p.m.)

21

22

23

24

25

Page 95

1

2                          I N D E X

3

4                       T E S T I M O N Y

5

6    WITNESS                 EXAM BY              PAGE      LINE

7    Abraham Klein           Mr. Krinsky            9        25

8    Abraham Klein           Mr. Stremba           28         9

9    Abraham Klein           Mr. Krinsky           45         3

10   Abraham Klein           Mr. Stremba           60        14

11

12

13                        E X H I B I T S

14   KLEIN      DESCRIPTION                        ID.      EVID.

15   124        3-page e-mail from Mr. Wang to Mr.           19

16              Klein dated 11/24/08

17   8-A        E-mail outlining China real estate          48

18              project development with several

19              attachments

20

21   TRUSTEE    DESCRIPTION                        ID.      EVID.

22   O          Affidavit of Abraham Klein                  36

23   N          Mr. Klein's affidavit dated August          38

24              15, 2011

25

Page 96

1

2                          I N D E X, cont'd

3

4                            R U L I N G S

5

6    DESCRIPTION                                    PAGE      LINE

7    Application for the entry of an order to show    93        6

8    cause has been granted in part as reflected

9    in the orders previously entered and denied

10   without prejudice, in part as reflected in

11   the record

12   Requests for reconsideration on motions for      93        22

13   2004 examinations granted as amended

14

15

16

17

18

19

20

21

22

23

24

25

Page 97

1

2                    C E R T I F I C A T I O N

3

4     I, Lisa Bar-Leib, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7

8     _____

9     LISA BAR-LEIB (CET**D-486)

10    AAERT Electronic Certified Transcriber

11

12    Veritext

13    200 Old Country Road

14    Suite 580

15    Mineola, New York 11501

16

17    Date:  November 16, 2011

18

19

20

21

22

23

24

25

# United States Bankruptcy Court

### Eastern District of New York
271 Cadman Plaza East, Suite 1595
Brooklyn, NY 11201–1800

---

IN RE:                                                                    CASE NO: 1–10–44815–ess

   Christine Persaud

SSN/TAX ID:                                                               CHAPTER: 7

   xxx–xx–0247

          DEBTOR(s)

---

## NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

Notice is hereby given that:

A transcript of the proceeding held on November 14, 2011 was filed on November 16, 2011 .

The following deadlines apply:

The parties have until November 23, 2011 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a Transcript Redaction Request is December 7, 2011.

If a Transcript Redaction Request is filed, the redacted transcript is due December 19, 2011.

If no such Notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is February 14, 2012 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber Veritext (888–706–4576) or you may view the document at the public terminal at the Office of the Clerk.


 Dated: November 17, 2011


                            For the Court, Robert A. Gavin, Jr., Clerk of Court


**BLnftrans.jsp** [Notice of Filing Transcript and Deadlines to Restriction and Redaction rev. 11/21/08]

# Notice Recipients

District/Off: 0207−1                    User: btaylor                    Date Created: 11/17/2011
Case: 1−10−44815−ess                    Form ID: 295                    Total: 8

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
db          Christine Persaud          86−25 Van Wyck Expressway, Apt. 506          Jamaica, NY 11435
tr          John S. Pereira          Pereira &Sinisi          The Chrysler Building          405 Lexington Avenue          7th
            Floor          New York, NY 10174
aty         John P Campo          Troutman Sanders LLP          The Chrysler Building          405 Lexington Avenue          New
            York, NY 10174
aty         Mendel Zilberberg          6619 13th Avenue          Brooklyn, NY 11219
aty         Samuel J. Landau          250 West 57th Street          New York, NY 10107
aty         Stephen Preziosi          570 Seventh Ave          6th Floor          New York, NY 10018
            Lee W Stremba, Esq.          Troutman Sanders LLP          The Chrysler Building          405 Lexington
            Avenue          New York, NY 10174
            Pery D Krinsky, Esq.          Krinsky PLLC          Woolworth Building          233 Broadway          Suite
            707          New York, NY 10279

                                                                                            TOTAL: 8