UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re | : Chapter 7 |
| | : |
| CHRISTINE PERSAUD, | : Case No. 10-44815 (ESS) |
| Debtor. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## APPELLEE'S DESIGNATION OF ADDITIONAL
## ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Appellee, Troutman Sanders LLP ("Troutman" or "Appellee"), in its capacity as counsel

for John S. Pereira, Chapter 7 Trustee of the estate of Christine Persaud (the "Trustee"), hereby

designates, pursuant to Federal Rule of Bankruptcy Procedure 8006 and Local Bankruptcy Rule

8006-1, the following additional items to be included in the record on appeal noticed by

Abraham Klein [Docket No. 407] as follows[1]:

| DATE | DOCKET NO. | DOCKET TEXT |
|---|---|---|
| 02/23/12 | 385 | Stipulated List of Admitted Exhibits * <br><br> **\*Copies of exhibits marked by the Court and admitted into evidence.** |
| 03/5/12 | 387 | Memorandum Decision on Trustee's Application to Employ Troutman Sanders LLP |

---

[1] The Appellant has designated various docket items to be included in the record on appeal. See *Appellants' Statement of Issues and Designation of Record on Appeal* [Docket No. 412]. To the extent not deemed included within the Appellant's designation, the Appellee designates for inclusion in the record on appeal all exhibits and attachments filed under the various docket items and all documents associated with the various docket items.

Dated: New York, NY
      June 5, 2012

**TROUTMAN SANDERS LLP**

By: _____*s/Lee W. Stremba*_____
      Lee W. Stremba
      John P. Campo
      Brett D. Goodman
      The Chrysler Building
      405 Lexington Avenue
      New York, New York 10017
      Tel: (212) 704-6075

*Counsel for Appellee*

**TRUSTEE'S EXHIBIT**

| A | Troutman Sanders LLP engagement letter dated November 24, 2008 to Mr. Abraham Klein re: engagement by Global Realty Ventures-Project Juancheng |
|---|---|

*received 9/20/2011*

# TROUTMAN SANDERS LLP

ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

BANK OF AMERICA PLAZA
600 PEACHTREE STREET, N.E. · SUITE 5200
ATLANTA, GEORGIA 30308-2216
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Edward Epstein
edward.epstein@troutmansanders.com

Direct Dial: +86-21-6133-8998
Direct Fax: +86-21-6137-8998

November 24, 2008

Mr. Abraham Klein
1260 57th Street,
Brooklyn, NY 11219,
USA

Dear Abe,

RE:   Engagement of Troutman Sanders LLP by
      Global Realty Ventures ("GRV")
      Retainer Letter –
      Project Juancheng

This letter will confirm our agreement for the provision of legal services by Troutman Sanders LLP (the "Firm") to you and secure your approval of the fee arrangement and other conditions of our representation.   We are very pleased that you have retained us and will, of course, answer any specific questions that you may have about these arrangements.

1.   Scope of Legal Services

The Firm has been retained by you to provide legal services in connection with your proposed investment in a real estate project in Juancheng, Shandong Province (the "Project"), such representation may include:

(a)   preliminary due diligence on the Project and the Chinese party that you are going to cooperate with, including but not limited to:

   ▪   a site visit, inspection of the land of the Project;

   ▪   reviewing all documents relevant to the Project and the Chinese party that are available to us;

   ▪   arranging local agent(s) to make independent searches for all information of the Project and the Chinese party that are publicly accessible; and

   ▪   preparing a preliminary due diligence report and legal advice.

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 2 of 7

(b)   advising on the feasibility of the Project under PRC laws;

(c)   preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;

(d)   assisting in forming the joint venture and obtaining all necessary licenses and permits; and

(e)   other matters ancillary to the above.

2.   Fees and Payment Provisions

The Firm's fees will be charged on an hourly basis for all time actually expended, and will be billed monthly. The hourly rates assigned to the attorneys in our Firm will vary according to the level of experience and expertise of the attorney. The work will be primarily handled by our commercial attorneys in our Representative Office in Shanghai, under my supervision; and assisted by our colleagues in US (if necessary). Set forth below are the 2008 rates for various levels of timekeepers who will be responsible for assisting the Target with its legal affairs in China:

| Position | 2008 RMB Rate |
|---|---|
| Partner | ¥4,000 - ¥5,500 |
| Associate | ¥2,800 - ¥3,500 |
| Senior Legal Consultant | ¥2,200 - ¥2,800 |
| Legal Consultant | ¥1,600 - ¥1,800 |
| Legal Assistant/Paralegal | ¥1,100 - ¥1,200 |
| Legal Translator | ¥950 - ¥1,100 |

We would recommend a budget of between USD 25,000 and USD 35,000 for our fees for

50217-1                    2

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 3 of 7

services to GRV for the Project set out in 1.(a) and (b) above, and these fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of USD 2,000 to USD 5,000), travel to and accommodation in Juancheng (estimated to be in the range of USD 600 to USD 1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into English (which will be quoted separately if required).

We would recommend a budget of between USD 100,000 and USD 150,000 for our fees for services to GRV for the Project set out in 1.(c) and 1. (d) above, and these fees will also not include any government fees, local agent's fees, travel to and accommodation in Juancheng or other places, or translation of any government documents into English.

The fees for the Project are based on the current state of law and policy and local practices in China, which are liable to change quickly and without prior notice. If the services we have undertaken to supply based on this estimate become impossible, more difficult or expensive due to changes in law, policy or practices, we will inform you. You will have the option to terminate our services based on the work already completed on a time-cost basis at our current billing rates (not to exceed the quoted fee) or to request us to provide additional services based on what is required by the changes in the law, policy and/or practices. If we agree to provide such services, and we shall be under no obligation to do so, we shall provide such additional services on a time cost basis at our current billing rates or on an agreed fee basis. Additional government fees, agent's fees and disbursements shall be billed and paid by you separately. Where such additional services are required in these circumstances, we do not guarantee an outcome within a specific time frame, or that the outcome will be successful at all. In such circumstances, you shall be entitled to terminate such additional services at any time with prior written notice and your liability for fees will be limited to the time-costs incurred by us in providing the additional services to you at our current billing rates up to the date you notify us in writing, as well as any applicable government fees, agent's fees and disbursements incurred as of such date of notice.

You will find that our rates are quite competitive in this market.  Hourly rates are reviewed and, when appropriate, adjusted to reflect increases in seniority and experience as well as inflationary factors. Such increases are ordinarily made on an annual basis, effective as of the beginning of each calendar year. We do not generally send any notice of a change in hourly rates.

You will be responsible for reimbursement of costs incurred on its behalf and invoiced to the Firm by third parties. Costs billed to the Firm by parties who supply goods or services related to our work on your behalf will be billed to you at the actual out-of-pocket cost

50217-1                                          3

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 4 of 7

that the Firm pays to the third party on your behalf. We will use our best professional judgment in determining when to seek your permission prior to incurring expenses with third parties. You will not be billed for any internal Firm costs incurred on your behalf, such as telephone (including long distance charges), telecopy charges, word processing, secretarial overtime, firm couriers, postage (including FedEx, UPS or similar overnight delivery services), printing and photocopying performed in-house, and access to computer legal research.

We will bill you on a monthly basis for both fees and disbursements with the understanding that the bills will be paid in full upon receipt.   Unless otherwise agreed, our billing statements will contain an itemized description of the services rendered and costs invoiced to us during the period covered by the statement.

You may pay us in China in RMB in which case we will add any local taxes (including business tax) to the billed amount to be paid by you and we will issue you a local tax invoice (fapiao). If you choose to pay us in the United States, we expect payment of the full amount billed in US dollars at the exchange rate prevailing at the time of payment in available currency.

Please review our bills carefully when rendered.   You agree that all questions and disputes will be brought to our attention promptly so that they can be addressed and resolved to our mutual satisfaction. Billing mistakes may occur on occasion, and we will be pleased to correct any that you might identify. Please feel free to discuss with me any questions regarding our statements.

3.    <u>Conflict Provisions</u>

Our Firm's policies and applicable professional rules of conduct concerning conflicts of interest are designed to protect the confidences, rights and interests of our clients, while permitting the Firm to advise and represent many different people and organizations.   In order to assure that you and the Firm have the same understanding of the effects of our engagement concerning potential conflicts of interest, we include below relevant considerations and understandings.

As we have discussed, neither you nor this Firm is aware of any actual conflict of interest in our representing the Target at this time. Our Firm is, however, a large one with offices in more than one location, and we represent many other companies and individuals, some of whom we have represented for many years in connection with a great variety of matters. As with your engagement of the Firm in this matter, our ongoing relationships with those clients are important to us and to them. It is possible that some of our present

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Global Realty Ventures
Nov 24, 2008
Page 5 of 7

or future clients will have disputes or transactions with you during the time that we are representing you. You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse including, for example, representing adverse parties in litigation, arbitration, or other forms of dispute resolution. We agree, however, that your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a non-public nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage, unless we have screened our lawyers, paralegals and staff who have such information from any involvement in the adverse representation.

For the purposes of determining whether a conflict of interest exists, it is only GRV we will represent and not other entities in your corporate family, stockholders, officers, directors, employees or agents ("**affiliates**"). You have agreed that you will not give us confidential information regarding your affiliates. While we recognize that to act adversely to any affiliate could jeopardize your continuing engagement of the Firm to handle matters on your behalf, which we would naturally be reluctant to see happen, for conflict of interest purposes, we reserve the right to represent another client with interests adverse to any affiliate without obtaining consent from you or your affiliates.

4.    Termination of Engagement

Upon our completion of the services for which you have engaged us, our attorney-client relationship will be terminated. If you should thereafter engage us to perform further or additional services, our attorney-client relationship will be revived, subject to these and any supplemental terms of engagement. Further, either of us may terminate the engagement at any time for any reason by written notice, subject on our part to applicable Rules of Professional Conduct. In the event that we terminate the engagement, we will take such steps as are reasonably practicable to protect your interests in the above matter.

You are engaging the Firm to provide legal services in connection with a special matter. After completion of the matter, changes may occur in the applicable laws or regulations that could have an impact on your future rights and liabilities. Unless you engage us to provide additional advice, the Firm has no continuing obligation to advise you with respect to future legal developments. Further, the fact that we may inform you from time to time of developments in the law which may be of interest to you, by newsletter or otherwise, should not be understood as a revival of an attorney-client relationship. Moreover, we have no obligation to inform you of such developments in the law unless

50217-1

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Global Realty Ventures
Nov 24, 2008
Page 6 of 7

we are engaged in writing to do so.

Except to the extent other arrangements are specifically made for this matter, our document retention practice will be as follows: We will retain your papers and property provided to us until termination of this engagement. Following termination of the engagement, we will return those of your papers and property which you may request within thirty (30) days of termination. With respect to all other material, including documents and data created by us and received from others, we reserve the right to retain or dispose of such material as we determine appropriate.

5.    PRC Legal Opinions, Certifications and Representation in Proceedings

In common with all foreign law firms licensed in China, we are permitted to provide information on the influence of the PRC legal environment and we do so only in our capacity as international, multi-jurisdictional lawyers experienced in international business transactions. If you require a formal PRC legal opinion or certification on a specific application of PRC law to conduct or events, we shall be pleased to refer you to any one of the several PRC law firms who work with us for this purpose or engage one on your behalf. We will provide you with our specialist understanding of the relevant law and wealth of our experience in representing foreign companies in China. However, as PRC law is still in a state of evolution and because of the highly regulated nature of the Chinese system of foreign investment, our views may require confirmation from the relevant PRC authorities. In common with all foreign law firms licensed in China, we are required by law to inform you that we are not permitted to engage in Chinese legal business and although some of our employees may have PRC lawyer qualifications they cannot practice as licensed PRC lawyers.

Although it is possible for us to represent you as an agent *ad litem* in a Chinese litigation, because of the nature of the Chinese civil process we always work together with PRC lawyers in litigation involving our clients in China. In Chinese international arbitration proceedings, however, we can and do represent our clients without the participation of a PRC law firm.

6.    Acceptance

This letter constitutes the entire understanding between you and Troutman Sanders LLP with respect to this matter and supersedes all prior understandings, written or oral, as to its subject matter. Any change must be made or confirmed in writing. If this letter correctly reflects your understanding of the terms and conditions of our engagement, we request that you have an appropriate authorized officer of the corporation indicate its consent by having the duplicate originals of this letter executed in the space provided

50217-1                                            6

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 7 of 7

below. You should retain one of these duplicate originals for your records and return the other to me for our records.

We look forward to working with you. I hope that you will let me know if at any time you feel that the service we are rendering or the manner or promptness with which we are responding to your requests for service can be improved. On behalf of Troutman Sanders LLP, I want to sincerely thank you for the opportunity to be of service.

Very truly yours,

TROUTMAN SANDERS LLP

By:  *Edward J Epstein*

Edward J. Epstein

**Global Realty Ventures**    agrees to the foregoing terms

Date: 12/29/08

50217-1                                    7

**TRUSTEE'S EXHIBIT**

| N | Affidavit of Creditor Klein in opposition to the retention of Troutman Sanders LLP dated and notarized August 15, 2011 with supporting exhibits entered on docket and filed on August 15, 2011 (Doc. No. 186-2) |
|---|---|

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                        Chapter 7
                                                              Case No: 10-44815
          CHRISTINE PERSAUD,

                                                              **AFFIDAVIT OF**
                                                              **CREDITOR KLEIN**

                    Debtor.
-------------------------------------------------------------x

          Abraham Klein, an Orthodox Jew, for religious reasons hereby affirms the following

under penalties of perjury:

   1.      I am a Creditor of Debtor Christine Persaud, and unless stated otherwise, I have

           personal knowledge of the facts set forth herein.

   2.      I submit this Affidavit in opposition to the retention of Troutman Sanders, LLP as

           substitute general and bankruptcy counsel for the Chapter 7 Trustee.

   3.      On or about November 24, 2008 I retained the law firm of Troutman Sanders LLP

           to provide legal services to me in connection with a proposed real estate project

           named as Global Realty Ventures. (Attached hereto as Exhibit 1 is the retainer).

   4.      I am the Owner of Global Realty Ventures.

   5.      I have had numerous communications with Troutman Sanders, LLP in

           conjunction with my retention of the firm.

   6.      My primary point of contact at Troutman Sanders LLP was Aurora Cassirer, Esq.

           who I believe is the managing partner of the Troutman Sanders LLP New York

           office.

   7.      While the actual work on the China project has been temporarily suspended

           because of the economic downturn, etc., the representation by Troutman Sanders

LLP is still ongoing. (Attached hereto as <u>Exhibit</u> 2 is correspondence between Troutman Sanders LLP, Knight Frank, and myself).

8.    In addition, at a certain point in dealing with Christine Persaud, prior to the arbitration, I approached Christine Persaud to obtain her agreement to allow me to attempt to secure favorable financing for the benefit of Caring Home Care, in conjunction with my attempt to finance the China deal, this offer was rejected by Christine Persaud's attorney, Samuel Reiff, Esq. (Attached hereto as <u>Exhibit</u> 3).

9.    In a sworn affidavit made by Christine Persaud to the Supreme Court of the County of Kings dated April 21, 2009, Ms. Persaud swore that, "That it has only recently come to my attention through a forensic accountant that Mr. Klein and his agents have misappropriated hundreds of thousands of dollars from the account of 'Caring' to a company owned by Mr. Klein known as Trade Fame Group Ltd. Without my knowledge permission or authority. The reports giving these findings can be presented to the court at a hearing to dismiss the 'arbitrators' award." (Attached hereto as <u>Exhibit</u> 4).

10.   Trade Fame Group Ltd., is an entity related to my dealings in China.

11.   I am concerned and believe that Troutman Sanders, LLP should not be approved as the Chapter 7 Trustee's counsel for a number of reasons.

      a.  It appears that they will be initiating litigation against me while at the same time representing my interests;

      b.  Because the point person on my China representation, Aurora Cassirer, Esq., is the managing partner of the New York office, I believe that she

         will be involved at some level with the representation of the Chapter 7 Trustee in the instant action;

    c.  As my interests in China intersected with my interests in Caring Home Care, in the attempt to arrange for financing, and Christine Persaud raised certain allegations, which I deny, it is reasonable to assume that there is a possibility that Troutman Sanders LLP will, on behalf of the Chapter 7 Trustee investigate and/or litigate matters, the very same matters for which I have retained them to represent me;

    d.  Conversely, if they choose not to investigate the China matters, as I believe there is no basis for Christine Persaud's allegations, other creditors of Debtor Persaud may feel that the reason the China issues were not investigated was because of Troutman Sanders. LLP's loyalty to me as a client.

12.    For the foregoing reasons I believe that Troutman Sanders, LLP should not be approved as counsel for the Chapter 7 Trustee.

WHEREFORE, I respectfully request that this Court deny the Chapter 7 Trustee's

Application for an Order Authorizing Retention of Troutman Sanders LLP as Substitute General

and Bankruptcy Counsel for the Chapter 7 Trustee.

Dated: Brooklyn, New York

August 15, 2011

Abraham Klein

Affirmed before me this
15th date of August 2011

Notary Public

MORDECHAI FREUND
Notary Public State of New York
No. 01FR6098424
Qualified in Kings County
My Commission Expires Sept 8, 2011

$Exhibit\ 1$

# TROUTMAN SANDERS LLP

A T T O R N E Y S   A T   L A W
A LIMITED LIABILITY PARTNERSHIP

BANK OF AMERICA PLAZA
600 PEACHTREE STREET, N.E. · SUITE 5200
ATLANTA, GEORGIA 30308-2216
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Edward Epstein                                                      Direct Dial:  +86-21-6133-8998
edward.epstein@troutmansanders.com                                 Direct Fax:  +86-21-6137-8998

November 24, 2008

Mr. Abraham Klein
1260 57th Street,
Brooklyn, NY 11219,
USA

Dear Abe,

**RE:    Engagement of Troutman Sanders LLP by**
**Global Realty Ventures ("GRV")**
**Retainer Letter –**
**Project Juancheng**

This letter will confirm our agreement for the provision of legal services by Troutman Sanders
LLP (the "Firm") to you and secure your approval of the fee arrangement and other conditions
of our representation.   We are very pleased that you have retained us and will, of course, answer
any specific questions that you may have about these arrangements.

1.    <u>Scope of Legal Services</u>

The Firm has been retained by you to provide legal services in connection with your
proposed investment in a real estate project in Juancheng, Shandong Province (the
"Project"), such representation may include:

(a)    preliminary due diligence on the Project and the Chinese party that you are going
to cooperate with, including but not limited to:

▪    a site visit, inspection of the land of the Project;

▪    reviewing all documents relevant to the Project and the Chinese party that are
available to us;

▪    arranging local agent(s) to make independent searches for all information of
the Project and the Chinese party that are publicly accessible; and

▪    preparing a preliminary due diligence report and legal advice.

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 2 of 7

    (b)    advising on the feasibility of the Project under PRC laws;

    (c)    preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;

    (d)    assisting in forming the joint venture and obtaining all necessary licenses and permits; and

    (e)    other matters ancillary to the above.

2.    <u>Fees and Payment Provisions</u>

The Firm's fees will be charged on an hourly basis for all time actually expended, and will be billed monthly. The hourly rates assigned to the attorneys in our Firm will vary according to the level of experience and expertise of the attorney. The work will be primarily handled by our commercial attorneys in our Representative Office in Shanghai, under my supervision; and assisted by our colleagues in US (if necessary). Set forth below are the 2008 rates for various levels of timekeepers who will be responsible for assisting the Target with its legal affairs in China:

| Position | 2008 RMB Rate |
|---|---|
| Partner | ¥4,000 - ¥5,500 |
| Associate | ¥2,800 - ¥3,500 |
| Senior Legal Consultant | ¥2,200 - ¥2,800 |
| Legal Consultant | ¥1,600 - ¥1,800 |
| Legal Assistant/Paralegal | ¥1,100 - ¥1,200 |
| Legal Translator | ¥950 - ¥1,100 |

We would recommend a budget of between USD 25,000 and USD 35,000 for our fees for

50217-1                  2

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Global Realty Ventures
Nov 24, 2008
Page 3 of 7

services to GRV for the Project set out in 1.(a) and (b) above, and these fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of USD 2,000 to USD 5,000), travel to and accommodation in Juancheng (estimated to be in the range of USD 600 to USD 1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into English (which will be quoted separately if required).

We would recommend a budget of between USD 100,000 and USD 150,000 for our fees for services to GRV for the Project set out in 1.(c) and 1. (d) above, and these fees will also not include any government fees, local agent's fees, travel to and accommodation in Juancheng or other places, or translation of any government documents into English.

The fees for the Project are based on the current state of law and policy and local practices in China, which are liable to change quickly and without prior notice. If the services we have undertaken to supply based on this estimate become impossible, more difficult or expensive due to changes in law, policy or practices, we will inform you. You will have the option to terminate our services based on the work already completed on a time-cost basis at our current billing rates (not to exceed the quoted fee) or to request us to provide additional services based on what is required by the changes in the law, policy and/or practices. If we agree to provide such services, and we shall be under no obligation to do so, we shall provide such additional services on a time cost basis at our current billing rates or on an agreed fee basis. Additional government fees, agent's fees and disbursements shall be billed and paid by you separately. Where such additional services are required in these circumstances, we do not guarantee an outcome within a specific time frame, or that the outcome will be successful at all. In such circumstances, you shall be entitled to terminate such additional services at any time with prior written notice and your liability for fees will be limited to the time-costs incurred by us in providing the additional services to you at our current billing rates up to the date you notify us in writing, as well as any applicable government fees, agent's fees and disbursements incurred as of such date of notice.

You will find that our rates are quite competitive in this market. Hourly rates are reviewed and, when appropriate, adjusted to reflect increases in seniority and experience as well as inflationary factors. Such increases are ordinarily made on an annual basis, effective as of the beginning of each calendar year. We do not generally send any notice of a change in hourly rates.

You will be responsible for reimbursement of costs incurred on its behalf and invoiced to the Firm by third parties. Costs billed to the Firm by parties who supply goods or services related to our work on your behalf will be billed to you at the actual out-of-pocket cost

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 4 of 7

that the Firm pays to the third party on your behalf. We will use our best professional judgment in determining when to seek your permission prior to incurring expenses with third parties. You will not be billed for any internal Firm costs incurred on your behalf, such as telephone (including long distance charges), telecopy charges, word processing, secretarial overtime, firm couriers, postage (including FedEx, UPS or similar overnight delivery services), printing and photocopying performed in-house, and access to computer legal research.

We will bill you on a monthly basis for both fees and disbursements with the understanding that the bills will be paid in full upon receipt.   Unless otherwise agreed, our billing statements will contain an itemized description of the services rendered and costs invoiced to us during the period covered by the statement.

You may pay us in China in RMB in which case we will add any local taxes (including business tax) to the billed amount to be paid by you and we will issue you a local tax invoice (fapiao). If you choose to pay us in the United States, we expect payment of the full amount billed in US dollars at the exchange rate prevailing at the time of payment in available currency.

Please review our bills carefully when rendered.   You agree that all questions and disputes will be brought to our attention promptly so that they can be addressed and resolved to our mutual satisfaction. Billing mistakes may occur on occasion, and we will be pleased to correct any that you might identify. Please feel free to discuss with me any questions regarding our statements.

3.    <u>Conflict Provisions</u>

Our Firm's policies and applicable professional rules of conduct concerning conflicts of interest are designed to protect the confidences, rights and interests of our clients, while permitting the Firm to advise and represent many different people and organizations.   In order to assure that you and the Firm have the same understanding of the effects of our engagement concerning potential conflicts of interest, we include below relevant considerations and understandings.

As we have discussed, neither you nor this Firm is aware of any actual conflict of interest in our representing the Target at this time. Our Firm is, however, a large one with offices in more than one location, and we represent many other companies and individuals, some of whom we have represented for many years in connection with a great variety of matters. As with your engagement of the Firm in this matter, our ongoing relationships with those clients are important to us and to them. It is possible that some of our present

50217-1                                                  4

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 5 of 7

or future clients will have disputes or transactions with you during the time that we are representing you. You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse including, for example, representing adverse parties in litigation, arbitration, or other forms of dispute resolution. We agree, however, that your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a non-public nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage, unless we have screened our lawyers, paralegals and staff who have such information from any involvement in the adverse representation.

For the purposes of determining whether a conflict of interest exists, it is only GRV we will represent and not other entities in your corporate family, stockholders, officers, directors, employees or agents ("affiliates").   You have agreed that you will not give us confidential information regarding your affiliates. While we recognize that to act adversely to any affiliate could jeopardize your continuing engagement of the Firm to handle matters on your behalf, which we would naturally be reluctant to see happen, for conflict of interest purposes, we reserve the right to represent another client with interests adverse to any affiliate without obtaining consent from you or your affiliates.

4.    Termination of Engagement

Upon our completion of the services for which you have engaged us, our attorney-client relationship will be terminated. If you should thereafter engage us to perform further or additional services, our attorney-client relationship will be revived, subject to these and any supplemental terms of engagement. Further, either of us may terminate the engagement at any time for any reason by written notice, subject on our part to applicable Rules of Professional Conduct. In the event that we terminate the engagement, we will take such steps as are reasonably practicable to protect your interests in the above matter.

You are engaging the Firm to provide legal services in connection with a special matter. After completion of the matter, changes may occur in the applicable laws or regulations that could have an impact on your future rights and liabilities. Unless you engage us to provide additional advice, the Firm has no continuing obligation to advise you with respect to future legal developments. Further, the fact that we may inform you from time to time of developments in the law which may be of interest to you, by newsletter or otherwise, should not be understood as a revival of an attorney-client relationship. Moreover, we have no obligation to inform you of such developments in the law unless

50217-1                                         5

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 6 of 7

we are engaged in writing to do so.

Except to the extent other arrangements are specifically made for this matter, our document retention practice will be as follows:   We will retain your papers and property provided to us until termination of this engagement.   Following termination of the engagement, we will return those of your papers and property which you may request within thirty (30) days of termination.   With respect to all other material, including documents and data created by us and received from others, we reserve the right to retain or dispose of such material as we determine appropriate.

5.    PRC Legal Opinions, Certifications and Representation in Proceedings

In common with all foreign law firms licensed in China, we are permitted to provide information on the influence of the PRC legal environment and we do so only in our capacity as international, multi-jurisdictional lawyers experienced in international business transactions. If you require a formal PRC legal opinion or certification on a specific application of PRC law to conduct or events, we shall be pleased to refer you to any one of the several PRC law firms who work with us for this purpose or engage one on your behalf. We will provide you with our specialist understanding of the relevant law and wealth of our experience in representing foreign companies in China. However, as PRC law is still in a state of evolution and because of the highly regulated nature of the Chinese system of foreign investment, our views may require confirmation from the relevant PRC authorities. In common with all foreign law firms licensed in China, we are required by law to inform you that we are not permitted to engage in Chinese legal business and although some of our employees may have PRC lawyer qualifications they cannot practice as licensed PRC lawyers.

Although it is possible for us to represent you as an agent *ad litem* in a Chinese litigation, because of the nature of the Chinese civil process we always work together with PRC lawyers in litigation involving our clients in China. In Chinese international arbitration proceedings, however, we can and do represent our clients without the participation of a PRC law firm.

6.    Acceptance

This letter constitutes the entire understanding between you and Troutman Sanders LLP with respect to this matter and supersedes all prior understandings, written or oral, as to its subject matter. Any change must be made or confirmed in writing. If this letter correctly reflects your understanding of the terms and conditions of our engagement, we request that you have an appropriate authorized officer of the corporation indicate its consent by having the duplicate originals of this letter executed in the space provided

50217-1                                                    6

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 7 of 7

below. You should retain one of these duplicate originals for your records and return the other to me for our records.

We look forward to working with you. I hope that you will let me know if at any time you feel that the service we are rendering or the manner or promptness with which we are responding to your requests for service can be improved. On behalf of Troutman Sanders LLP, I want to sincerely thank you for the opportunity to be of service.

Very truly yours,

TROUTMAN SANDERS LLP

By: _Edward J Epstein_

Edward J. Epstein

**Global Realty Ventures**    agrees to the foregoing terms

_____

Date:

50217-1                              7

# TROUTMAN SANDERS LLP

| Payment Remittance Address | ATTORNEYS AT LAW | Office Address |
|---|---|---|
| Troutman Sanders LLP | A LIMITED LIABILITY PARTNERSHIP | 23rd Floor, Citic Square |
| P.O. Box 933652 | FEDERAL ID No. 58-0946915 | 1168 Nanjing West Rd |
| Atlanta, Georgia 31193-3652 | | Shanghai 200041 |
| | | CHINA |

BILLING INQUIRIES:
LOCAL 86-21-6133-8989
USA (404) 885-2508

| | | |
|---|---|---|
| Global Realty Ventures | Invoice Date | 10 December 2008 |
| Attn: Abraham Klein | Submitted by | E Epstein |
| 1260 57th Street | Direct Dial | 404-885-2646 |
| Brooklyn, NY 11219 | Invoice No. | 957931 |
| | File No. | 234545.000001 |

RE:    **Project Juan Cheng**

| | |
|---|---|
| Fees for Professional Services Rendered Through 11/30/08 | $10,573.50 |
| **Total Amount of This Invoice** | **$10,573.50** |

## Troutman Sanders Operating Account Wire Instructions

**For Payments Made inside USA**
| | |
|---|---|
| Beneficiary's Name: | Troutman Sanders LLP |
| Bank's Address: | 600 Peachtree Street |
| | Atlanta, Georgia 30308 |
| Bank Name: | Wachovia |
| Bank Address: | 999 Peachtree Street |
| | Atlanta Georgia 30309 |
| Account Number: | 2052700305792 |
| ABA Number: | 061000227 |
| Reference Attorney: | Epstein |
| Reference Client: | 234545 |

**For Payments Made outside USA**
| | |
|---|---|
| Beneficiary's Name: | Troutman Sanders LLP |
| Bank's Address: | 600 Peachtree Street |
| | Atlanta, Georgia 30308 |
| Bank Name: | Wachovia |
| Bank Address: | 999 Peachtree Street |
| | Atlanta Georgia 30309 |
| Account Number: | 2052700305792 |
| Swift Address/Code: | PNBP US 33 |
| Reference Attorney: | Epstein |
| Reference Client: | 234545 |

# TROUTMAN SANDERS LLP

| | | |
|---|---|---|
| **Payment Remittance Address** | ATTORNEYS AT LAW | **Office Address** |
| Troutman Sanders LLP | A LIMITED LIABILITY PARTNERSHIP | 23rd Floor, Citic Square |
| P.O. Box 933652 | FEDERAL ID No. 58-0946915 | 1168 Nanjing West Rd |
| Atlanta, Georgia 31193-3652 | | Shanghai 200041 |
| | | CHINA |

BILLING INQUIRIES:
LOCAL 86-21-6133-8989
USA (404) 885-2508

| | | |
|---|---|---|
| Global Realty Ventures | Invoice Date | 15 January 2009 |
| Attn: Abraham Klein | Submitted by | E  Epstein |
| 1260 57th Street | Direct Dial | 404-885-2646 |
| Brooklyn, NY 11219 | Invoice No. | 964438 |
| | File No. | 234545.000001 |

RE:    **Project Juan Cheng**

| | |
|---|---|
| Fees for Professional Services Rendered Through 12/31/08 | $6,075.50 |
| Costs and Expenses Through 12/31/08 | $292.80 |
| **Total Amount of This Invoice** | **$6,368.30** |

## Troutman Sanders Operating Account Wire Instructions

**For Payments Made inside USA**

| | |
|---|---|
| Beneficiary's Name: | Troutman Sanders LLP |
| Bank's Address: | 600 Peachtree Street |
| | Atlanta, Georgia 30308 |
| Bank Name: | Wachovia |
| Bank Address: | 999 Peachtree Street |
| | Atlanta Georgia 30309 |
| Account Number: | 2052700305792 |
| ABA Number: | 061000227 |
| Reference Attorney: | Epstein |
| Reference Client: | 234545 |

**For Payments Made outside USA**

| | |
|---|---|
| Beneficiary's Name: | Troutman Sanders LLP |
| Bank's Address: | 600 Peachtree Street |
| | Atlanta, Georgia 30308 |
| Bank Name: | Wachovia |
| Bank Address: | 999 Peachtree Street |
| | Atlanta Georgia 30309 |
| Account Number: | 2052700305792 |
| Swift Address/Code: | PNBP US 33 |
| Reference Attorney: | Epstein |
| Reference Client: | 234545 |

Exhibit 2

| From: | Epstein, Edward J. |
|-------|--------------------|
| To: | abe@flexocraft.com |
| Cc: | hershel@flexocraft.com; Cassirer, Aurora |
| Subject: | Heze Project |
| Date: | Friday, August 01, 2008 7:42:43 AM |
| Attachments: | company brochure.pdf |
| | Shandong (2.62 MB).msg |
| | Master Case Studies China Focus 20071212 small (NXPowerLite).pdf |
| | Real Estate Experience in Mainland China Brochure.pdf |

<<company brochure.pdf>> <<Shandong>> <<Master Case Studies China Focus 20071212 small (NXPowerLite).pdf>> <<Real Estate Exoerience in Mainland China Brochure.pdf>>

Dear Abe:

It was very nice to talk to you and Hershel yesterday about the real estate project in Heze Shandong China, which you may be interested in pursuing, subject to preliminiary due diligence into the land development issues and pricing.

Real estate M&A and financing are key areas of our practice in Shanghai.  I have attached a brochure which sets out our capability in this area and representative transactions.

I have also spoken to Knight Frank, which is one of the international real estate consultancies we work with in China on real estate valuations and project assessments. I have also attached their particulars and recommend that you work with them on assessing the project. They can offer a range of services in this regard but it seems from our call that at this preliminary stage you would only need them to send a team to Heze backed by office based researchers. This team would discreetly collect information on the proposed masterplanning for the area, recent land sales, comparable property transactions and the general development environment. The deliverables would be a summary of this information together with a commentary on the overall viability of the project. Their fees for this service would be RMB40,000 ($6,000 approx.) plus RMB10,000 in expenses ($1,500 approx.) The can also deliver you a comprehensive project analysis, the details and fees for which are set out in the attached e-mail from Andrew Slevin, who is the Managing Director of their Shanghai office. I have also attached Knight Frank China's company brochure and a slide presentation on their methodology in China.

As for the legal due diligence, we estimate that our fees for a preliminary legal due diligence into the site at Heze and advice on the feasibility of the project as proposed by your potential joint venture partner will be in the range of $25,000 to $35,000. Our fees will include a site visit, inspection of Heze government land and planning records, review of current ownership records and records of existing corporate owners (if any), preparation of a preliminary due diligence report and legal advice. These fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of $2,000 to $5,000), travel and accommodation to Heze (estimated to be in the range of $600 to $1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into Chinese (which will be quoted separately if required).

Therefore, including Knight Frank's report, we would recommend that you budget between $45,000 to $50,000 to determine the feasibility of the Heze project. We realize that this budget is considerably higher than you might budget for a similar project in the US but as you have considerable experience in doing business in China, you will appreciate that China

is far less transparent and its legal system is still developing so that these tasks all require a higher level of difficulty in China than in the US.

Please let us know if you would like to proceed on this basis

Best regards.

Edward

---

**Edward J. Epstein** | Managing Partner, Shanghai | **Troutman Sanders LLP** | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

---

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited

| From: | Abe |
| --- | --- |
| To: | "Ken Yip" |
| Subject: | RE: Shandong Juancheng Investment |
| Date: | Friday, March 06, 2009 9:45:14 AM |

I met Mr. Zhang in the USA two weeks ago, and basically, it's on hold now, due to the economic turmoil in the world, just to play safe

**From:** Ken Yip [mailto:ken.yip@cn.knightfrank.com]
**Sent:** Friday, March 06, 2009 3:57 AM
**To:** abe@flexocraft.com
**Subject:** RE: Shandong Juancheng Investment

Dear Abe,

Haven't spoken to you for a while, how is your project with SIG progressing along?

Regards,
Ken Yip

**From:** abe@flexocraft.com [mailto:abe@flexocraft.com]
**Sent:** 2008年12月8日 10:38
**To:** Ken Yip
**Subject:** Re: Shandong Juancheng Investment

Finishing off the LOI, and then you are good to go, few more days

From: Ken Yip
Date: Mon, 8 Dec 2008 09:47:10 +0800
To: <abe@flexocraft.com>
Subject: Shandong Juancheng Investment
Hi Abe,

We haven't heard from you for a while. How is the project progressing at your end?

Regards,
Ken Yip
Senior Manager APIA
Professional Services

Knight Frank
Unit 1208,Evergo Tower, 1325 Middle Huai Hai Road
Shanghai 200031, PRC
Tel: +86 21 6445 9968 ext 839
Fax: + 86 21 6445 9965
Mobile: 159 2125 1735
www.knightfrank.com.cn

Click here to download our research reports.
Check with Knight Frank before distributing.
Please consider the environment before printing this email.

| From: | Ken Yip |
| To: | abe@flexocraft.com |
| Cc: | "Andrew Slevin"; kevin.yuan@cn.knightfrank.com |
| Subject: | RE: Juancheng Project |
| Date: | Friday, November 28, 2008 3:48:10 AM |

Unfortunately I will be in Suzhou tomorrow for work. However, do keep us in the loop with the result of that meeting.

Thanks and regards,
Ken Yip
Senior Manager APIA
Professional Services

Knight Frank
Unit 1208, Evergo Tower, 1325 Middle Huai Hai Road
Shanghai 200031, PRC
Tel: +86 21 6445 9968 ext 839
Fax: + 86 21 6445 9965
Mobile: 159 2125 1735
www.knightfrank.com.cn

Click here to download our research reports.
Check with Knight Frank before distributing.
Please consider the environment before printing this email.

---

**From:** abe@flexocraft.com [mailto:abe@flexocraft.com]
**Sent:** 2008年11月28日 16:39
**To:** Ken Yip
**Subject:** Re: Juancheng Project

Just the I was going to write an email to.

The people from Troutman Sanders, and me will have a meeting with Mr. Zhang on Monday afternoon in Jinan. This meeting was just confirmed a few minutes ago. I set it up, since I am china now, and can hopefully get through the legal framework while here, rather that the email sessions that has been going on for the last two weeks.

I was going to write to you if you fell it would be beneficial to join in the meeting, so as to be able to have. .Clear understanding of what is being covered, and therefore help in your DD going forward.

We are trying to create the framework of the deal, which will be the basis of the legal DD, which might effect the financial part as well. And based on this framework if as we hope it makes legal sense, we will have you continue with all that in mind.

The meeting will be in Jinan Crown Plaza at 2pm monday.

Regards
Abe

---

From: Ken Yip <ken.yip@cn.knightfrank.com>

Case 1:12-cv-03874815-ess-Doc-1869    Filed-08/55/21    Entered-08/35/Page435f10392

| From: | Wang, Tian |
|---|---|
| To: | abe@flexocraft.com |
| Cc: | Epstein, Edward J.; Wang, Tian |
| Subject: | RE: Project Juancheng-Letter of Intent-EN (3) |
| Date: | Wednesday, December 31, 2008 2:32:40 AM |

Abe,

I called Mr. Zhang early this afternoon but he did not answer the phone, so I called Ms. Wang. Ms. Wang told me that they are basically fine with the LOI, but Mr. Zhang wants to hold up this deal for another two or three months due to the current economic downturn. We agreed to pass this information along to you.

Please let us know if you need us to do anything.

Regards.

_____

Tian Wang | Legal Consultant | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8955 | Fax: +86-21-6137-8188

> -----Original Message-----
> From: Abe [mailto:abe@flexocraft.com]
> Sent: Wednesday, December 31, 2008 4:19 AM
> To: Wang, Tian
> Cc: Epstein, Edward J.
> Subject: RE: Project Juancheng-Letter of Intent-EN (3)
>
> OK, Thanks, please explain to him, that we are trying to have this complete so as to be able to give this framework to Knight Frank, so that they should be able to right away resume their work and complete their DD, so we should not hold anything up.
>
> From: Wang, Tian [mailto:Tian.Wang@troutmansanders.com]
> Sent: Tuesday, December 30, 2008 4:54 AM
> To: abe@flexocraft.com
> Cc: Epstein, Edward J.; Wang, Tian
> Subject: RE: Project Juancheng-Letter of Intent-EN (3)
>
> Abe,
>
> I talked to Mr. Zhang this afternoon, and he promised to review the LOI and get back to me as soon as possible. I will call him to check the status tomorrow if I did not receive any response by today.
>
> Regards.

_____

Tian Wang | Legal Consultant | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai

| | |
|---|---|
| **From:** | Ken Yip |
| **To:** | abe@flexocraft.com |
| **Subject:** | RE: Contact mr zhang |
| **Date:** | Monday, February 02, 2009 10:56:32 PM |

hi abe, happy new year to you.

we spoke to Mr Zhang yesterday, he reckons that he needs 2 to 3 more months
to observe the market before he moves further to the next step. He said that
since he has good support/relationship from the government, he is in no
hurry to rush into this project and would rather not make a rash decision.

for your info, i think he is flying to america today.

Regards,
Ken Yip

-----Original Message-----
From: Abe [mailto:abe@flexocraft.com]
Sent: 2009年2月3日 11:34
To: Ken Yip
Subject: Contact mr zhang

Ken, happy new year.

Did you ever contact Mr. Zhang before CNY? Any response?

This email is sent on behalf of Knight Frank.  Any files transmitted are intended solely for the use of the
individual or entity to whom they are addressed.  The contents are confidential and may be legally
privileged.

Any unauthorised access, disclosure, use or copying is strictly prohibited and may be unlawful.  If you
have received this email in error, please notify the originator. For more information about Knight Frank,
please visit www.knightfrank.com.

PRIVACY: It may be necessary to monitor emails sent and/or received through the Knight Frank mail
servers to ensure their efficient operation.

| From: | Cassirer, Aurora |
|---|---|
| To: | abe@flexocraft.com; hershel@flexocraft.com |
| Subject: | Re: |
| Date: | Wednesday, July 30, 2008 9:04:41 PM |

I have asked my partner Edward Klein to get back to me as soon as possible. I will let you know as soon as I hear from him. R
-------------------------
Sent from my BlackBerry Wireless Handheld

**From:** Abe
**To:** 'Hershel Klein' ; Cassirer, Aurora
**Sent:** Wed Jul 30 20:32:54 2008
**Subject:** RE:

Land purchase is 150mm, it shows in the excel sheet as 120mm, and there is a reason. But the contract calls for 150mm

**From:** Hershel Klein [mailto:hershel@flexocraft.com]
**Sent:** Wednesday, July 30, 2008 5:42 PM
**To:** 'Cassirer, Aurora'
**Cc:** abe@flexocraft.com
**Subject:**

Aurora,

Please see attached docs.

Highlights of project;

City gives the land -- 710,000 sq meters and we need to pay 150,000,000 RMB
we need to pay relocate residents and demolish for a total of 260,000,000 RMB
total construction costs is 458,000,000 RMB
Total cost 838,000,000 rmb

Total revenue from selling apartments/shops is 1,302,000,000 rmb
Government pays us back 150,000,000 rmb for infrastructure
Total revenue 1,452,000,000 rmb

Total cost to invest is 100,000,000 rmb
Mr Zheng (Chinese guy) is looking for us to invest 40% and get 40% of the profit and he will invest 60% and get 60% of the profit

Mr Zheng claims that project will pre-sell and therefore only 100,000,000 rmb is needed to take this project to completion
Mr Zheng claims that we can force the residents to relocate for a cost included in excel sheet
Mr Zheng claims that the total cost and sell numbers are accurate based on current market conditions and demand

We need Due diligence to be done to verify **all** the expense and revenue numbers are accurate
We need due diligence to be done to verify that all the logistical things are correct that all the details that need to happen to make this project happen in reality actually can happen.
And last but not least we will need the legal structure to be set up in a way that it will work and have everybody protected.

Best regards,
Hershel

~~~~~~~~~~~~~~~~~~~~
*Hershel Klein*
*Flexo Craft Prints*
*1000 First St.*
*Harrison NJ 07029*
*800-785-2737 ext 125*
*Fax: 973-482-9574*
*Private Fax: 800-599-2334*
~~~~~~~~~~~~~~~~~~~~

---

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

Exhibit 3

**EXHIBIT 3**

Case 1:12-cv-03557-UG · Document 1-69 · Filed 07/05/11 · Page 36 of 234 PageID #: 397

| From: | Sam Rieff |
|---|---|
| To: | abe@flexocraft.com |
| Subject: | [SPAM] RE: Bank line |
| Date: | Tuesday, September 16, 2008 2:58:43 PM |

Abe,   To use the vernacular: "It ain't happening."

Sam

---

From: abe@flexocraft.com
To: samrieff@hotmail.com
Subject: Bank line
Date: Tue, 16 Sep 2008 14:40:51 -0400

HI Sam

No wanting to bother you with many phone calls, I figured to just write a quick note.

Any updates? Can we make something happen?

Thanks

Abe

---

Get more out of the Web. Learn 10 hidden secrets of Windows Live. Learn Now
<http://windowslive.com/connect/post/jamiethomson.spaces.live.com-Blog-
cns!550F681DAD532637!5295.entry?ocid=TXT_TAGLM_WL_getmore_092008>

| From: | Abe |
|---|---|
| To: | "samrieff@hotmail.com" |
| Subject: | Bank line |
| Date: | Thursday, September 11, 2008 3:41:45 PM |

Sam

It was nice talking to you.

I will explain the deal we discussed on the phone as brief as possible.

When Christine & I joined as partners in May of 07, Caring did just about 3 million a year (pro-rated).
12 months later, Caring did over 5 Million
As of August, Caring is did 6.5 Million, and growing.
At growth rate I figure Caring will be doing a minimum of 12 Million by May 09.

Not bad at all.

As of today I have over 1.5 million in cash in the company, which means that according to our growth rate, we will need to have at least 3 million by the time we reach 12 million in billing, which I expect to be happening before April 09. Now with the addition of JCAHO accreditation, it would make it possible to accelerate the growth with new opportunities.

 Needless to say, to do all this we will need more $$$$$ in the company.

Therefore, I am working to get a line of credit with extremely favorable rates to help caring grow. After all research, a line of credit seems to be the most economic way to go, as we can use it only as needed, therefore reducing unnecessary interest payments, which I am responsible for.

I now have an opportunity with a bank, (actually favorable offers from two), that because of other business I have, will make money available for Caring to sustain the continuous growth.

The calculation of 12% on the document is as follows;
The 1.5 million is made up of the actual cash I deposited into the company, as well as the reinvestment of any revenues derived from it. This amounts to close to 13% of gross. This percentage will go up as the business grows, therefore causing the overhead (which I pay) to go down as a percentage, by amortizing it over more billing.

In order to make sure that this document for the purpose we need it, does not in anyway leverage anything but only my equity, I lowered the percentage to only 12%.

This is somewhat time sensitive, and to make this all happen, I need to get the document signed after you go over it with Christine.

The sooner this is done the sooner I can move ahead to the next step with the bank.

Exhibit 4

**EXHIBIT  4**

SUPREME COURT OF THE STATE OF NEW YORK        Index No. 8007/09
COUNTY OF KINGS
--------------------------------------------------------X

In the Matter of the
Arbitration of
ABRAHAM KLEIN,

                    Plaintiff,

          v.

CHRISTINE PERSAUD and CARING
HOME CARE AGENCY

               Defendant,
--------------------------------------------------------X

AFFIDAVIT IN SUPPORT OF
AN ORDER TO SHOW CAUSE
To  Vacate a Default
Judgment

State of New York,
County of Queens ss.:

CHRISTINE PERSAUD, being duly sworn, deposes and says:

1. I am the defendant in the above matter , sole owner of Caring Home Care Agency and I am making this affidavit in support of the Order to Show Cause to vacate a default judgment in this case.

2. 1 did not appear on April 17,2009 because of the following reasons:

    a.  My attorney Mr. Levy advised me that his office had contacted this court with regard to a scheduling conflict he had with another matter also scheduled for the same date and time and been advised that the matter would be adjourned to June 19,2009.

    b.  My attorney advised me that his office had contacted Mr. Klein's attorney Mendel Zilberberg and advised them by leaving several messages on their voice mail of his scheduling conflict. That he had served an Affirmation of Engagement on Mr. Klein's attorney giving several dates for the adjournment with an affidavit of service provided to this court

c. I was told that the Court granted a judgment on default.

I am requesting that the Court vacate this default judgment to prevent a fraud being

perpetrated by the Petitioner Abraham Klein and his associates.

3. I have the following meritorious defenses:

a. The agreements put forth by Mr. Abraham Klein were not signed by me and on April

19, 2009, I received a report from ALR Forensic Document Solutions verifying that

fact. (See Exhibit __A__ )

b. The very basis of the underlying action is based on this fraud.

c. Caring Home Care Agency, is licensed by the State of New York and I am the only

person who has been authorized to own and operate this home health care agency.

d. The Petitioner and his agents have never applied for or received clearance from the

New York State Department of Health to own any interest in Caring Home Care Agency.

e. Without such approvals the Petitioner and his agents cannot own operate or have

control over a company whose mission is the care of the elderly and infirm.

f. It would be a violation of Health Insurance Portability and Accountability Act (HIPAA)

regulations to give Mr. Klein and his agents access to patient files which contain their

health records, treatment plans and other personal information.

g. That it has only recently come to my attention through a forensic accountant that Mr.

Klein and his agents have misappropriated hundreds of thousands of dollars from the

accounts of "Caring" to a company owned by Mr. Klein, known as Trade Fame Group

Ltd. without my knowledge, permission or authority. (See Exhibit __B__ ) The reports

giving these findings can be presented to the court at a hearing to dismiss the

"arbitrators" award.

FURTHERMORE, I would never enter into an Agreement and have any disputes resolved by arbitration, conducted by an individual with a personal and/or business relationship with the other party and his attorney.

WHEREFORE, I request that the court vacate the default judgment, allow an Answer to be filed within twenty (20) days of the signing of an Order, and for the court to issue an Order temporarily restraining Petitioner from:

a. Interfering with the daily operation of "Caring"

b. Having any financial control over the assets, accounts, checking accounts and other financial records of "Caring".

c. That Mr. Klein and his agents be restrained from contacting the Certified Home Health Care Agencies who provide patient assignments for "Caring"which he has done prior to court order,

d. Removing any patient records from the "Caring" offices,

and for such other, additional and further relief as to this court my seem just and proper.

Dated: Kew Gardens, New York

April 21, 2009

CHRISTINE PERSAUD

Sworn to before me this 2( day of April, 2009

Notary

EUGENE P. LEVY, ESQ.
NOTARY PUBLIC, State of New York
No. 4603871
Qualified in Nassau County
Commission Expires May 31, 2010

Exhibit B      Exhibit C      Exhibit D      Exhibit E      Exhibit

Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

Case 1:12-cv-03337-JG   Document 1-55   Filed 07/03/12   Page 43 of 234 PageID #: 404





Exhibit E Exhibit D Exhibit C

CARING 3439

INTEREST EXPENSE 125,000.00

| | | | |
|---|---|---|---|
| 12/31/07 | 3439 | TRADEFAME GROUP LTD | $125,000.00 |

DELUXE BUSINESS FORMS 1+800-328-0304 www.deluxeforms.com

3 4 4 3

42,000.00

$42,000.00

TRADEFAME GROUP LTD

INTEREST EXPENSE

3443

12/31/07

CARING

Exhibit C          Exhibit D          Exhibit E

INTEREST EXPENSE

TRADEFAME GROUP LTD

3442

12/31/07

DELUXE BUSINESS FORMS    1-800-328-0304    www.deluxeforms.com

CARING

INTEREST EXPENSE

TRADEFAME GROUP LTD

3441

12/31/07

DELUXE BUSINESS FORMS    1-800-328-0304    www.deluxeforms.com

**TRUSTEE'S EXHIBIT**

| O | Supplemental Affidavit of Abraham Klein annexed Creditor Abraham Klein's further objection to the retention of Troutman Sanders LLP, dated and notarized September 5, 2011 with supporting exhibits entered on docket and filed on September 6, 2011 (Doc. No. 220) |
|---|---|

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                          Chapter 7
                                                                Case No: 10-44815
        CHRISTINE PERSAUD,
                                                                **SUPPLEMENTAL
                                                                AFFIDAVIT OF
                                                                ABRAHAM KLEIN**

                        Debtor.
-------------------------------------------------------------x

        Abraham Klein, an Orthodox Jew, for religious reasons hereby affirms the following to

be true under penalties of perjury:

1.      I am a Creditor of Debtor Christine Persaud, and unless stated otherwise, I have

        personal knowledge of the facts set forth herein.

2.      I submit this Affidavit in further opposition to the retention of Troutman Sanders,

        LLP as substitute general and bankruptcy counsel for the Chapter 7 Trustee.

3.      As set forth in my affidavit dated August 15, 2011, in 2008 I became interested in

        a joint venture in China relating to the development of certain land (hereinafter

        referred to as the "China Project").

4.      I formed Global Realty Venture, LLC (hereinafter referred to as "GRV") in

        anticipation of various potential deals, including the China Project.

5.      I sought to obtain legal representation in connection with the China Project, and

        specifically sought to retain a law firm that would be in a position to work and

        communicate directly with me and others on my behalf with respect to all issues

        relating to the China Project; and therefore, I believed it was necessary to

        ultimately retain a law firm that had an understanding of American law and

        American and Chinese business norms, as I am a United States resident and

subject to United States taxation; accordingly, I also needed the representation of a law firm that would be able to guide me as a United States taxpayer.

6.    Their came a point in time where I needed representation in both the United States and China and my brother, Hershel Klein, was in an airport and saw an advertisement for Troutman Sanders LLP.

7.    Shortly thereafter, I (or someone on my behalf) contacted the New York based office of the Troutman Sanders LLP (hereinafter referred to as the "Troutman Firm") to discuss the possibility of the Troutman Firm's representation in connection with the GRV China Project.

8.    A telephone conference was held between myself, my brother, and Aurora Cassirer, Esq., of the Troutman Firm's New York based office, about my needs both in China and the reasons why it was crucial for us to have a United States based law firm representing my needs in the China Project, and why it was crucial to retain a United States based law firm, but which law firm had the capabilities to provide legal representation in both the United States and China.

9.    At that time it was clear to the Troutman Firm , that while the name GRV was given to the Troutman Firm, I and/or family members were the beneficial client of this representation, and that it was not even certain that GRV would be the entity that would ultimately complete the deal.

10.    As reflected in the Troutman Firm's Retainer Agreement (attached hereto as "Exhibit 1"), the Troutman Firm agreed to provide legal representation in connection with the China Project, which legal services included:

"(a)    preliminary due diligence on the Project and the Chinese party that you are going to cooperate with, including but not limited to:

- a site visit, inspection of the land of the Project;

- reviewing all documents relevant to the Project and the Chinese party that are available to us;

- arranging local agent(s) to make independent searches for all information of the Project and the Chinese party that are publicly accessible; and

- preparing a preliminary due diligence report and legal advice.

(b)    advising on the feasibility of the Project under PRC laws;

(c)    preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;

(d)    assisting in forming the joint venture and obtaining all necessary licenses and permits; and

(e)    other matters ancillary to the above."

11.    I asked my brother Hershel to deal with the day to day details of the China Project and asked to be advised of and consulted regarding important aspects of the China Project.

12.    After numerous discussions and/or electronic communications with the Troutman Firm's New York based office, the Troutman Firm's China based office was brought in for the on-the-ground work in China.

13.    In terms of confidentiality, this real estate development deal was based on unique connections that I developed in my travels to China.

14.    I understood (and the Troutman Firm apparently knew by virtue of the hurdles that foreign law firms have to jump through to operate in China and the Troutman

representation of other United States based entities seeking to do business in China), that for the China Project to move forward, the deal required having the "right" Chinese partner.

15. With respect to land development, the "right" partner is typically someone who is politically connected and chooses to (using their political clout) align with a person that they trust.

16. As with the China Project and as with all Chinese deals, it was of paramount importance that knowledge of the potential development deal not be disseminated before the deal was signed, sealed and delivered.

17. On July 30, 2008, an email was sent between my brother, myself, and Ms. Cassirer which outlined various financial needs relating to the China Project.

18. On, approximately July 30, 2008 Ms. Cassirer initiated a telephone conference where she introduced me to Edward Epstein, Esq., an attorney from the Troutman Firm's China office. At that time, Ms. Cassirer explained to Mr. Epstein the basic contours of the deal that I was pursuing in connection with the China Project and my needs in general, from the Troutman Firm, and my needs more specifically from the Troutman Firm's China office.

19. To that end, I furnished the Troutman Firm with confidential and secret information with respect to the development opportunity, and through various emails and telephone calls sensitive financial information was disclosed to the Troutman Firm.

20. Thereafter, on August 1, 2008 I received an email from Mr. Epstein from Troutman Firm's China based office with a recommendation as to how the China

part of the representation should proceed and how the initial due diligence would be undertaken.

21. Mr. Epstein suggested that Real Estate M&A and financing are key areas of the Troutman China practice, and recommended that we use Knight Frank for limited initial work, including the discrete collection of information on the proposed master planning of the area, recent land-sales, comparable property transactions, and the general environment.

22. Apparently the Troutman Firm's China based office had discussed this matter in sufficient detail with Knight Frank to allow the Troutman Firm's China based office to quote us an approximate price for the Knight Frank work to be performed in connection with the China Project.

23. Thereafter, the same communication furnishes an estimate for the legal due diligence to be conducted by the Troutman Firm.

24. It was, and is, my understanding that Knight Frank was brought in by the Troutman Firm to do certain preliminary work and that the bulk of the Troutman Firm work would be performed after Knight Frank completed its assignment.

25. The idea that the work of Knight Frank would be front loaded and the Troutman Firm work would take place thereafter was suggested directly to Ms. Cassirer in an August 4, 2008 email by Hershel Klein, to which Ms. Cassirer, herself, promptly responded with her agreement and queried of us if we would like Mr. Epstein of the Troutman Firm's China based office to coordinate this activity. Ms. Cassirer further suggested that Mr. Epstein should weigh in on this issue as he is "on the ground" in China.

26. Thereafter on August 5, 2008, Mr. Epstein replied in the affirmative to our request and endorsement of Ms. Cassirer, of August 4, 2008.

27. It is clear to me from these and other confidential and secret communications between the client and the Troutman Firm that the bulk of the Troutman Firm work was only to occur after Knight Frank had completed its work, and until that time, the Troutman Firm was still retained and I was still a client of the Troutman's Firm.

28. It was also clear to me that Ms. Cassirer was in the loop on any and all significant issues that arose even after Mr. Epstein was brought into this matter, and that I was Ms. Cassirer's client and she was overseeing all of the Troutman Firm's activities relating to the representation. In addition, Ms. Cassirer was the partner involved in seeing that the bills were ultimately paid as evidenced by the various emails she was copied on with respect to outstanding balances owed to Troutman Firm in connection with its legal representation.

29. For purposes of clarity, I ask the Court to note that after Mr. Epstein came on board, he apparently delegated significant portions of the day-to-day activity to Mr. Tian Wang, a China based attorney for Troutman's Firm, who in his various communications with us also thought it appropriate to copy Ms. Cassirer on important email correspondence.

30. Per the outlined plan, the Troutman Firm initially waited on the Knight Frank work to be underway and therefore for a period of time there was limited communication between us and the Troutman Firm.

31.  However, during the first half of November 2008 I communicated directly with Mr. Epstein requesting a telephone conference with respect to the anticipated Memorandum of Understanding, a crucial step in the China Project. I did not include Ms. Cassirer in that request, as I felt that at this particular stage of the Memorandum of Understanding, Ms. Cassirer's personal involvement or participation at this specific point in time, was not warranted or otherwise necessary.

32.  Apparently, Mr. Epstein thought otherwise as in his response, he felt it appropriate to copy Ms. Cassirer.

33.  There are approximately twenty four emails that were exchanged between us and the Troutman Firm which range in dates from July 30, 2008 to December 31, 2008 – and Ms. Cassirer was included in those communications.

34.  Mr. Campo, in his Supplemental Declaration dated August 19, 2011 states that, "Ms Cassirer never billed attorney time to the matter, never actually met Klein, and never spoke to Klein after putting him in contact with Edward Epstein, Esq., the managing partner in [the] Troutman's [Firm's] Shanghai office." (¶ 8).

35.  I respectfully submit that Mr. Campo's statement is lacking in candor and to my mind is deceptive.

    a.  While I may not have met in person with Ms. Cassirer, I also did not meet in person with Mr. Epstein—a fact that is conspicuously omitted from Mr. Campo's Supplemental Declaration- and therefore I do not think that the question of who I retained is determined by who I met.

b. The participation of Ms. Cassirer, both passively and actively, after the initial introduction to Mr. Epstein is supported by documentary evidence that renders Mr. Campo's Declaration to be, at a minimum, less than candid, and to my mind deceptive and not true.

36.   Mr. Campo's Initial and Supplemental Declaration to the Court sets forth that, "Troutman [Firm] ceased work on the Global Realty Matter in *December 2008* and the matter is closed." ( ¶ 6 emphasis added). It is interesting to note that the Retainer Agreement for this representation was signed by the client and returned to the Troutman Firm on *December 29, 2008* based on requests by the Troutman Firm to have the retainer executed and returned, the latest the Troutman Firm request was on *December 19, 2008*.

37.   From my perspective, the request by Troutman for a signed retainer further evidences an ongoing representation, not, as Mr. Campo would have this Court believe, the closing of a file.

38.   It is clear that my expectation was that the Troutman Firm continued to represent us in the ongoing matter of the China Project; and that, if anything, as of December 2008, the China Project was picking up momentum as evidence by the Troutman Firm's very words and actions that the Troutman Firm believed that it was important at that precise point in time, December 2008, to have the Retention Agreement executed.  Apparently, Mr. Campo wants this Court to believe that the manner in which he and the Troutman Firm close a file and terminate and conclude representation is by stressing the importance to the client of having the client execute a Retainer Agreement (thereby confirming the representation).

39.    In addition, if for whatever reason the Troutman Firm in fact understood that it was closing its file in connection with the China Project and at that point in time only then discovered that it was missing the executed Retainer Agreement, the least that I, as a client should expect from their attorneys' is a letter explaining that although the representation was ending, it was nevertheless important to have a signed retainer on file. However, this was not the case.

40.    Furthermore, there were numerous queries from Knight Frank to the developer during 2009 questioning when the developer expected the project to resume. I was thereafter kept abreast of the Knight Frank communication with the developer.

41.    It is clear to me that not only did I reasonably understand that the China Project and related representation were ongoing, but independent of that belief, Knight Frank also shared that same reasonable belief that the China Project and related representation were ongoing.

42.    Mr. Campo's statement in his Supplemental Declaration paragraph 9 dated August 24, 2001, that, "During the course of the prior representation, [the] Troutman [Firm] did not become privy to any confidential information that would have any bearing on this case and the disputes herein,"  necessitates Mr. Campo having discussed all of the details of the Caring case with the Troutman Firm's staff who know all of the details of the China Project and related representation to enable Mr. Campo  to address the totality of both cases in his Declarations to the Court.

43.    It is respectfully submitted that the question before the Court is how, while seeking to be retained as counsel for the Chapter 7 Trustee, was Mr. Campo

permitted to delve into the particular circumstances of the China Project once the issue of at least a potential conflict was raised.

44.    Alternatively, if Mr. Campo did not obtain, or was otherwise not knowledgeable as to all of the details of both the China Project and the Caring Case, then how can Mr. Campo properly submit Affirmations and/or Declarations about matters that he does not possess the requisite knowledge to affirm or declare, as he does in paragraph 8 of his Supplemental Declaration dated August 24, 2011 that, "the prior representation of Global Realty was completely unrelated to Klein's current disputes with the Debtor and the Trustee on behalf of the Debtor's estate."

45.    With respect to the relation between Caring and the China Project, I respectfully ask the Court to take notice that I proposed a financial arrangement to Ms. Persaud wherein GRV would purchase the receivables of Caring. This agreement went through several draft revisions, at least a portion of which was forwarded to Debtor Persaud's attorney for review. These proposals were rejected by Debtor Persaud and her counsel.

46.    While it is clear to me that the proposed claim between Caring and the China Project was in Debtor Persaud's opinion a significant event relating to the disputes between Creditor Klein and Debtor Persaud with particular emphasis on the Caring dispute. To wit, Debtor Persaud stated in an interview with the Examiner.com which was published on October 22, 2009 that:

> "In October, 2008, I was at a festival in New Jersey. I got a
> phone call from Mr. Klein, and he told me that he wants to see me.
> I told him that I am in New Jersey at a family outing and I don't

want to meet to discuss any business, but he insisted to see me. He told me that he is leaving to China in a few hours but he must see me before he leave. He came to meet me. He bought a two page document from First Republic Bank in Manhattan; he had a paper for me to sign. He wants me to sign a seven million dollar document a lien on my company Caring. He stated that he needs the money to build some houses in China and he must get this money. I did not sign the paper. Since then, Mr. Klein has been very upset with me."

47.    While I do not agree with many of the details in the statements Persaud (set forth above and below), it is clear that Debtor Persaud feels that the proposed deal between GRV and Caring was at least in part a reason for the Caring issues.

48.    If there is any doubt regarding Debtor Persaud's position with respect to the issues she has with me and how GRV is involved and/or responsible for the issues, Debtor Persaud further clarified her stated position in the Black Star News which was published on May 10, 2010 and stated that,

"Persaud says her dispute with Klein began when he approached her in October 2008, for a $7 million line of credit through Caring Home Care, to finance expansion of a business he said he operated in China. Since she knew nothing about the business, she declined, she says."

49. It is clear to me that GRV and Caring are inter-related matters both from the perspective of the Debtor and by virtue of the fact that there was a contemplated deal between both entities.

50. Once again, in a sworn affidavit made by Debtor Persaud to the Supreme Court of the County of Kings dated April 21, 2009, Debtor. Persaud swore that:

> "That it has only recently come to my attention through a forensic accountant that Mr. Klein and his agents have misappropriated hundreds of thousands of dollars from the account of 'Caring' to a company owned by Mr. Klein known as Trade Fame Group Ltd. Without my knowledge permission or authority. The reports giving these findings can be presented to the court at a hearing to dismiss the 'arbitrators' award."

51. Trade Fame Group Ltd., is an offshore entity related to my dealings in China.

52. I do not understand how the Troutman Firm can, as the attorney of the Chapter 7 Trustee, claim that there is no conflict if (as I understand it), the Troutman Firm would have a duty to pursue, or at least investigate all potential claims on behalf of the Chapter 7 Trustee, presumably, that duty would clearly extend to investigating Debtor Persaud's allegation of improper monies transferred from Caring to Trade Fame Group, an entity that is related to my dealings in China.

53. I believe:, (1) that there is ample evidence that my representation by Troutman did not end on December 31, 2008 notwithstanding the Troutman Firm's assertions to the contrary, (2) that the China Project and its related representation is ongoing until I am notified that the Troutman Firm is ending its representation in

connection with the China Project, which I presume the Affirmations and Declarations of Mr. Campo would indicate as of August 2011, (3) that it is inappropriate for a firm to end the representation of a client because they feel that there is a new client waiting in the wings that is more advantageous or profitable to the firm, (4) that Ms. Cassirer was involved in the China Project and related representation   after the introduction of Mr. Epstein notwithstanding the Troutman Firm' assertions to the contrary, (5) that there is a nexus between GRV and Caring despite Troutman's assertions to the contrary, (6) that confidential and secret information was transmitted and otherwise provided to the Troutman Firm notwithstanding the Troutman Firm's assertions to the contrary, and (7) new client, particularly one with adverse interest, where there is ample evidence of such, it was my reasonable expectation that the Troutman Firm's New York office would be involved in the China Project representation.

54.    In summary, I believe that there are real issues of conflict and separate and apart from the issues of conflict there are issues relating to, at a minimum, the lack of candor by Troutman and Mr. Campo in their affirmation and declaration to the Court which are, individually and collectively, ample reason for this Court to deny their application for retention.

WHEREFORE, I respectfully request that this Court deny the Chapter 7 Trustee's

Application for an Order Authorizing Retention of Troutman Sanders LLP as Substitute General

and Bankruptcy Counsel for the Chapter 7 Trustee.

Dated: Brooklyn, New York

September 5, 2011

Abraham Klein

Affirmed before me this

___5___ date of September 2011

Notary Public

MENDEL ZILBERBERG
NOTARY PUBLIC, State of New York
No. 01ZI5049141
Qualified in Kings County
Commission Expires March 19, 2014

Exhibit 1

DEC-29-2008  17:19          FLEXOCRAFT                                              P.01

# TROUTMAN SANDERS LLP

A T T O R N E Y S   A T   L A W
A LIMITED LIABILITY PARTNERSHIP

BANK OF AMERICA PLAZA
600 PEACHTREE STREET, N.E. · SUITE 5200
ATLANTA, GEORGIA 30308-2216
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Edward Epstein
edward.epstein@troutmansanders.com

Direct Dial:  +86-21-6133-8998
Direct Fax:   +86-21-6137-8998

November 24, 2008

Mr. Abraham Klein
1260 57th Street,
Brooklyn, NY 11219,
USA

Dear Abe,

**RE:    Engagement of Troutman Sanders LLP by
         Global Realty Ventures ("GRV")
         Retainer Letter –
         Project Juancheng**

This letter will confirm our agreement for the provision of legal services by Troutman Sanders LLP (the "Firm") to you and secure your approval of the fee arrangement and other conditions of our representation.   We are very pleased that you have retained us and will, of course, answer any specific questions that you may have about these arrangements.

1.    <u>Scope of Legal Services</u>

The Firm has been retained by you to provide legal services in connection with your proposed investment in a real estate project in Juancheng, Shandong Province (the "Project"), such representation may include:

(a)    preliminary due diligence on the Project and the Chinese party that you are going to cooperate with, including but not limited to:

- a site visit, inspection of the land of the Project;

- reviewing all documents relevant to the Project and the Chinese party that are available to us;

- arranging local agent(s) to make independent searches for all information of the Project and the Chinese party that are publicly accessible; and

- preparing a preliminary due diligence report and legal advice.

DEC-29-2008  17:19        FLEXOCRAFT                                    P.02

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 2 of 7

     (b)    advising on the feasibility of the Project under PRC laws;

     (c)    preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;

     (d)    assisting in forming the joint venture and obtaining all necessary licenses and permits; and

     (e)    other matters ancillary to the above.

2.    <u>Fees and Payment Provisions</u>

The Firm's fees will be charged on an hourly basis for all time actually expended, and will be billed monthly. The hourly rates assigned to the attorneys in our Firm will vary according to the level of experience and expertise of the attorney. The work will be primarily handled by our commercial attorneys in our Representative Office in Shanghai, under my supervision; and assisted by our colleagues in US (if necessary). Set forth below are the 2008 rates for various levels of timekeepers who will be responsible for assisting the Target with its legal affairs in China:

| Position | 2008 RMB Rate |
|---|---|
| Partner | ¥4,000 - ¥5,500 |
| Associate | ¥2,800 - ¥3,500 |
| Senior Legal Consultant | ¥2,200 - ¥2,800 |
| Legal Consultant | ¥1,600 - ¥1,800 |
| Legal Assistant/Paralegal | ¥1,100 - ¥1,200 |
| Legal Translator | ¥950 - ¥1,100 |

We would recommend a budget of between USD 25,000 and USD 35,000 for our fees for

50217-1                                    2

DEC-29-2008   17:19        FLEXOCRAFT                                    P.03

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 3 of 7

services to GRV for the Project set out in 1.(a) and (b) above, and these fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of USD 2,000 to USD 5,000), travel to and accommodation in Juancheng (estimated to be in the range of USD 600 to USD 1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into English (which will be quoted separately if required).

We would recommend a budget of between USD 100,000 and USD 150,000 for our fees for services to GRV for the Project set out in 1.(c) and 1. (d) above, and these fees will also not include any government fees, local agent's fees, travel to and accommodation in Juancheng or other places, or translation of any government documents into English.

The fees for the Project are based on the current state of law and policy and local practices in China, which are liable to change quickly and without prior notice. If the services we have undertaken to supply based on this estimate become impossible, more difficult or expensive due to changes in law, policy or practices, we will inform you. You will have the option to terminate our services based on the work already completed on a time-cost basis at our current billing rates (not to exceed the quoted fee) or to request us to provide additional services based on what is required by the changes in the law, policy and/or practices. If we agree to provide such services, and we shall be under no obligation to do so, we shall provide such additional services on a time cost basis at our current billing rates or on an agreed fee basis. Additional government fees, agent's fees and disbursements shall be billed and paid by you separately. Where such additional services are required in these circumstances, we do not guarantee an outcome within a specific time frame, or that the outcome will be successful at all. In such circumstances, you shall be entitled to terminate such additional services at any time with prior written notice and your liability for fees will be limited to the time-costs incurred by us in providing the additional services to you at our current billing rates up to the date you notify us in writing, as well as any applicable government fees, agent's fees and disbursements incurred as of such date of notice.

You will find that our rates are quite competitive in this market.  Hourly rates are reviewed and, when appropriate, adjusted to reflect increases in seniority and experience as well as inflationary factors. Such increases are ordinarily made on an annual basis, effective as of the beginning of each calendar year. We do not generally send any notice of a change in hourly rates.

You will be responsible for reimbursement of costs incurred on its behalf and invoiced to the Firm by third parties. Costs billed to the Firm by parties who supply goods or services related to our work on your behalf will be billed to you at the actual out-of-pocket cost

50217-1                                3

DEC-29-2008  17:19        FLEXOCRAFT                                    P.04

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 4 of 7

that the Firm pays to the third party on your behalf. We will use our best professional judgment in determining when to seek your permission prior to incurring expenses with third parties. You will not be billed for any internal Firm costs incurred on your behalf, such as telephone (including long distance charges), telecopy charges, word processing, secretarial overtime, firm couriers, postage (including FedEx, UPS or similar overnight delivery services), printing and photocopying performed in-house, and access to computer legal research.

We will bill you on a monthly basis for both fees and disbursements with the understanding that the bills will be paid in full upon receipt.    Unless otherwise agreed, our billing statements will contain an itemized description of the services rendered and costs invoiced to us during the period covered by the statement.

You may pay us in China in RMB in which case we will add any local taxes (including business tax) to the billed amount to be paid by you and we will issue you a local tax invoice (fapiao). If you choose to pay us in the United States, we expect payment of the full amount billed in US dollars at the exchange rate prevailing at the time of payment in available currency.

Please review our bills carefully when rendered.    You agree that all questions and disputes will be brought to our attention promptly so that they can be addressed and resolved to our mutual satisfaction. Billing mistakes may occur on occasion, and we will be pleased to correct any that you might identify. Please feel free to discuss with me any questions regarding our statements.

3.    <u>Conflict Provisions</u>

Our Firm's policies and applicable professional rules of conduct concerning conflicts of interest are designed to protect the confidences, rights and interests of our clients, while permitting the Firm to advise and represent many different people and organizations.    In order to assure that you and the Firm have the same understanding of the effects of our engagement concerning potential conflicts of interest, we include below relevant considerations and understandings.

As we have discussed, neither you nor this Firm is aware of any actual conflict of interest in our representing the Target at this time. Our Firm is, however, a large one with offices in more than one location, and we represent many other companies and individuals, some of whom we have represented for many years in connection with a great variety of matters. As with your engagement of the Firm in this matter, our ongoing relationships with those clients are important to us and to them. It is possible that some of our present

50217-1                                    4

DEC-29-2008  17:19        FLEXOCRAFT                                          P.05

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 5 of 7

or future clients will have disputes or transactions with you during the time that we are
representing you. You agree that we may continue to represent or may undertake in the
future to represent existing or new clients in any matter that is not substantially related to
our work for you even if the interests of such clients in those other matters are directly
adverse including, for example, representing adverse parties in litigation, arbitration, or
other forms of dispute resolution. We agree, however, that your prospective consent to
conflicting representation contained in the preceding sentence shall not apply in any
instance where, as a result of our representation of you, we have obtained proprietary or
other confidential information of a non-public nature, that, if known to such other client,
could be used in any such other matter by such client to your material disadvantage,
unless we have screened our lawyers, paralegals and staff who have such information
from any involvement in the adverse representation.

For the purposes of determining whether a conflict of interest exists, it is only GRV we
will represent and not other entities in your corporate family, stockholders, officers,
directors, employees or agents ("affiliates").   You have agreed that you will not give us
confidential information regarding your affiliates. While we recognize that to act
adversely to any affiliate could jeopardize your continuing engagement of the Firm to
handle matters on your behalf, which we would naturally be reluctant to see happen, for
conflict of interest purposes, we reserve the right to represent another client with interests
adverse to any affiliate without obtaining consent from you or your affiliates.

4.      Termination of Engagement

Upon our completion of the services for which you have engaged us, our attorney-client
relationship will be terminated. If you should thereafter engage us to perform further or
additional services, our attorney-client relationship will be revived, subject to these and
any supplemental terms of engagement. Further, either of us may terminate the
engagement at any time for any reason by written notice, subject on our part to applicable
Rules of Professional Conduct. In the event that we terminate the engagement, we will
take such steps as are reasonably practicable to protect your interests in the above matter.

You are engaging the Firm to provide legal services in connection with a special matter.
After completion of the matter, changes may occur in the applicable laws or regulations
that could have an impact on your future rights and liabilities. Unless you engage us to
provide additional advice, the Firm has no continuing obligation to advise you with
respect to future legal developments. Further, the fact that we may inform you from time
to time of developments in the law which may be of interest to you, by newsletter or
otherwise, should not be understood as a revival of an attorney-client relationship.
Moreover, we have no obligation to inform you of such developments in the law unless

50217-1                                5

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 6 of 7

we are engaged in writing to do so.

Except to the extent other arrangements are specifically made for this matter, our document retention practice will be as follows:   We will retain your papers and property provided to us until termination of this engagement.   Following termination of the engagement, we will return those of your papers and property which you may request within thirty (30) days of termination.   With respect to all other material, including documents and data created by us and received from others, we reserve the right to retain or dispose of such material as we determine appropriate.

5.     PRC Legal Opinions, Certifications and Representation in Proceedings

In common with all foreign law firms licensed in China, we are permitted to provide information on the influence of the PRC legal environment and we do so only in our capacity as international, multi-jurisdictional lawyers experienced in international business transactions. If you require a formal PRC legal opinion or certification on a specific application of PRC law to conduct or events, we shall be pleased to refer you to any one of the several PRC law firms who work with us for this purpose or engage one on your behalf. We will provide you with our specialist understanding of the relevant law and wealth of our experience in representing foreign companies in China. However, as PRC law is still in a state of evolution and because of the highly regulated nature of the Chinese system of foreign investment, our views may require confirmation from the relevant PRC authorities. In common with all foreign law firms licensed in China, we are required by law to inform you that we are not permitted to engage in Chinese legal business and although some of our employees may have PRC lawyer qualifications they cannot practice as licensed PRC lawyers.

Although it is possible for us to represent you as an agent *ad litem* in a Chinese litigation, because of the nature of the Chinese civil process we always work together with PRC lawyers in litigation involving our clients in China. In Chinese international arbitration proceedings, however, we can and do represent our clients without the participation of a PRC law firm.

6.     Acceptance

This letter constitutes the entire understanding between you and Troutman Sanders LLP with respect to this matter and supersedes all prior understandings, written or oral, as to its subject matter. Any change must be made or confirmed in writing. If this letter correctly reflects your understanding of the terms and conditions of our engagement, we request that you have an appropriate authorized officer of the corporation indicate its consent by having the duplicate originals of this letter executed in the space provided

50217-1                                6

DEC-29-2008   17:19          FLEXOCRAFT                                        P.07

## TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 7 of 7

below. You should retain one of these duplicate originals for your records and return the
other to me for our records.

We look forward to working with you. I hope that you will let me know if at any time
you feel that the service we are rendering or the manner or promptness with which we are
responding to your requests for service can be improved. On behalf of Troutman Sanders
LLP, I want to sincerely thank you for the opportunity to be of service.

Very truly yours,

TROUTMAN SANDERS LLP

By: _Edward J. Epstein_

Edward J. Epstein

**Global Realty Ventures**   agrees to the foregoing terms

Date: 12/29/08

50217-1                                7

**TRUSTEE'S EXHIBIT**

| 182 | Declaration of John P. Campo in Accordance with Federal Rule of Bankruptcy Procedure 2014, dated August 9, 2011 |
|---|---|

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re                                                : Chapter 7
                                                     :
CHRISTINE PERSAUD,                                   : Case No. 10-44815 (ESS)
                                                     :
                                                     :
                   Debtor.                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JOHN P. CAMPO IN ACCORDANCE WITH
## FEDERAL RULE OF BANKRUPTCY PROCEDURE 2014

JOHN P. CAMPO, a licensed attorney, declares under penalty of perjury, the following:

1.      I am an attorney duly licensed to practice law in the State of New York.  I am admitted to practice before the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second Circuit.

2.      I am a partner with the firm of Troutman Sanders LLP ("Troutman") which maintains an office at The Chrysler Building, 405 Lexington Avenue, New York, New York 10174.

3.      I make this affidavit in support of the Trustee's application for entry of an order authorizing the employment and retention of Troutman to represent the Trustee and the estate as substitute general and bankruptcy counsel in the above-captioned case, effective as of July 27, 2011.

4.      Troutman is a large firm with extensive experience representing debtors, trustees, creditors committees and equity committees in large and complex bankruptcy cases involving litigation, corporate, partnership, real estate, environmental, tax and other areas of law and is well qualified to represent the Trustee in this case. In particular, Troutman anticipates rendering

1460284v2

advice and services to the Trustee in, *inter alia*, the areas of bankruptcy, litigation, corporate, regulatory and tax.

5. In compliance with the disclosure requirements of Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Troutman has investigated its relationships, if any, with the Debtor, the creditors and any parties in interest to whom Troutman will be adverse in this case. The results of Troutman's searches, which are based on the information currently available (*i.e.,* the Debtor's petition and schedules, and facts which came to light in connection with the Trustee's investigation of the Debtor's affairs ), shows the following:

(a) Troutman is not a creditor, equity security holder of the Debtor interest and has no direct or indirect relationship to, connection with, or interest in the Debtor.

(b) Troutman, does not have, to the best of my present knowledge and belief, any connection with the United States Trustee or any professional employed in the Office of the United States Trustee for this district that is assigned to this case.

(c) Troutman is not and has not been an insider of the Debtor.

(d) Troutman does not represent the Debtor in this matter or any other matters.

(e) Troutman does not represent any of the creditors or parties in interest to whom Troutman will be adverse in this case.

6. Troutman is a firm with a diverse client base. Troutman may, from time to time, represent, or may have represented in the past, clients that may be creditors or adverse parties of the Debtor's estate in matters unrelated to this case.

7. Troutman does not, has not, and shall not represent any entity other than the Trustee in connection with this case.

3

1460284v2

8.      For the foregoing reasons, Troutman has determined that, based on a review of information currently available, no conflict exists in connection with its proposed retention by the Trustee.  In the event that any additional information comes to Troutman's attention, Troutman will make a supplemental disclosure.

9.      Troutman does not itself have, nor does it represent, any interest materially adverse to the interests of the Trustee in matters upon which Troutman is to be engaged, and is a "disinterested person" within the meaning of Section 101(14) of Title 11, United States Code.

10.     Troutman proposes to charge for services rendered to the Trustee at Troutman's usual and customary based rates pursuant to the terms and provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of this Court pertaining to the payment of retained professionals.  Troutman will maintain detailed records describing the services rendered and the time spent, and any necessary expenses incurred in rendering such professional services on behalf of the Trustee.  The customary and current hourly rates charged by Troutman for the services to be rendered by the professionals and paraprofessionals who will render services in this case to the Trustee are as follows:

| Partners and Of Counsels | Between $290.00 and $900.00 |
|---|---|
| Associates | Between $185.00 and $525.00 |
| Paralegals | Between $135.00 and $290.00 |

These hourly charges are those in effect as of the date of this Declaration and may be increased in the ordinary course from time to time during the pendency of this case.  Troutman agrees that any requests for fees and reimbursable expenses will be subject to noticing and approval by the Bankruptcy Court, in accordance with the application provisions of 11 U.S.C. §§ 330 and 331 of the United States Bankruptcy Code.

4

1460284v2

11.     No agreement exists between Troutman and any third party for sharing of compensation received by Troutman in this case, except as allowed in Bankruptcy Code section 504(b) and Bankruptcy Rule 2016 with respect to the sharing of compensation among the members or associates of Troutman.

12.     To the best of my knowledge and belief, Troutman's proposed employment is not prohibited or improper under Bankruptcy Rule 5002.

13.     I make this declaration under penalty of perjury in accordance with Bankruptcy Rules 2014(a) and 9011(b).

Dated:  New York, New York
        August 9, 2011

                                           _____
                                                  *s/John P. Campo*
                                                  John P. Campo

# TRUSTEE'S EXHIBIT

| 190 | Supplemental Declaration of John P. Campo in Accordance with Federal Rule of Bankruptcy Procedure 2014, dated August 19, 2011. |
|-----|---|

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re                                              : Chapter 7
                                                   :
CHRISTINE PERSAUD,                                 : Case No. 10-44815 (ESS)
                                                   :
                                                   :
                    Debtor.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### SUPPLEMENTAL DECLARATION OF JOHN P. CAMPO IN ACCORDANCE WITH FEDERAL RULE OF BANKRUPTCY PROCEDURE 2014

JOHN P. CAMPO, a licensed attorney, declares under penalty of perjury, the following:

1.      I am an attorney duly licensed to practice law in the State of New York.  I am admitted to practice before the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second Circuit.

2.      I am a partner with the firm of Troutman Sanders LLP ("Troutman") which maintains an office at The Chrysler Building, 405 Lexington Avenue, New York, New York 10174.

3.      I make this supplemental declaration in further support of the Trustee's application for entry of an order authorizing the retention and employment of Troutman as substitute counsel to represent the Trustee in this case (the "Application") and to reply to the alleged conflict issues raised by creditor Abraham Klein ("Klein") in his objections to the Application.

4.      Klein alleges that there is a conflict (or a potential conflict) in Troutman's representation of the Trustee based on work done by Troutman in 2008 for Global Realty Ventures ("Global Realty"), a company in which Klein is, or was, a director/officer.  As set forth

below, there is neither a conflict of interest nor a potential for a conflict of interest in this case as a result of Troutman's prior representation of Global Realty.

5.      The client in Troutman's prior representation was not Klein personally (the capacity in which he asserts his claim in this case).  Troutman has never represented Klein personally.  Rather, Troutman's previous client was the entity, Global Realty.  As set forth below, Troutman's Shanghai lawyers represented Global Realty in only one matter involving a potential investment in real estate in the People's Republic of China ("China").

6.      Contrary to Klein's assertions, Troutman's prior representation has been concluded, and Troutman no longer represents Global Realty.  Troutman ceased work on that matter in December 2008, and the matter is closed.  Troutman has not had any contact with Global Realty and/or Klein in more than two years.

7.      Troutman's prior representation of Global Realty will not affect Troutman's representation of the Trustee in this case, including Troutman's ability and willingness to be adverse to Klein.  Contrary to Klein's assertions, Troutman's duty of loyalty only existed with respect to Global Realty in the matter in which Global Realty was represented by Troutman, and that matter is now closed.  Troutman owes no duty of loyalty to Klein.

8.      In addition, the prior representation of Global Realty was completely unrelated to Klein's current disputes with the Debtor and the Trustee on behalf of the Debtor's estate.  That prior representation involved advice and assistance in connection with a potential investment by Global Realty in certain real property located in China, and was handled exclusively through the Troutman office in Shanghai.  Contrary to Klein's assertions, Aurora Cassirer, the managing partner of Troutman's New York office, was not the "point person" on the Global Realty matter.  Ms. Cassirer never billed attorney time to the matter, never actually met Klein, and never spoke

to Klein after putting him in contact with Edward Epstein, Esq., the managing partner in Troutman's Shanghai office.

9.      Moreover, during the course of the prior representation, Troutman did not become privy to any confidential information that would have any bearing on this case and the disputes herein.  Except for Global Realty's potential real estate investment in China some three years ago, which was the subject of Troutman's prior engagement by Global Realty, Troutman never became privy to, and has no knowledge of, any of Klein's business dealings in China, including his apparent interests in "Trade Fame Group Ltd.," the entity set forth in Klein's objections. Troutman's prior representation of Global Realty can have no conceivable overlap with the Trustee's investigation of the facts pertaining to this case and the services to be rendered on behalf of the Trustee, including the investigation and pursuit of the estate's potential claims against Klein.

10.     I make this declaration under penalty of perjury in accordance with Bankruptcy Rule 2014(a) and 9011(b).

Dated:  New York, New York
        August 19, 2011

                                        /s/ John P. Campo
                                            John P. Campo

**TRUSTEE'S EXHIBIT**

| 191 | Affirmation of John P. Campo in Response to the Objection of Abraham Klein to the Trustee's Application to Retain Troutman Sanders LLP, dated August 19, 2011. |
|-----|------------------------------------------------------------------------------------------------------------------------------------------------------------------|

1464618v1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re                                             :    Chapter 7
                                                  :
CHRISTINE PERSAUD,                                :    Case No. 10-44815 (ESS)
                                                  :
                                                  :
                          Debtor.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFRIMATION OF JOHN P. CAMPO IN RESPONSE TO THE OBJECTION OF ABRAHAM KLEIN TO THE TRUSTEE'S APPLICATION TO RETAIN TROUTMAN SANDERS LLP

**TO THE HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

JOHN P. CAMPO, an attorney admitted to the bar of the State of New York, affirms as follows:

1.       I am a partner with the firm of Troutman Sanders LLP ("Troutman"), and I make this declaration in response to the objection (the "Objection") of Abraham Klein ("Klein") to the Trustee's application for entry of an order authorizing the retention and employment of Troutman as substitute counsel to the Trustee in this case (the "Application").

2.       The alleged basis of Klein's Objection is that Troutman has a conflict of interest in representing the Trustee as a result of Troutman's prior representation of Global Realty Ventures ("Global Realty"), a company in which Klein either is or was a director/officer.  For the reasons set forth herein, there is no conflict of interest, or potential for a conflict of interest, in this case.

3.       By way of background, in a telephone conversation on August 1, 2011 with Klein's attorney, Mendel Zilberberg ("Zilberberg"), regarding the Trustee's request for certain financial information and access to Caring Home Care Agency ("Caring"), Zilberberg raised an issue regarding a potential conflict.  Specifically, Zilberberg told me that Troutman "may" have a

1462064v1

conflict in the case because Klein thought Troutman may be representing him in an unrelated matter. I advised Zilberberg that I had run Klein's name in the Troutman conflict and client database, and had found no conflicts or representations. I asked Zilberberg whether he was referring to an ongoing or prior matter, and Zilberberg replied that he "did not know", but that his client "thought it may be ongoing." I told Zilberberg that I would go back and check our database again to make sure that we did not have any ongoing representation of Klein. I also suggested that Zilberberg confirm with Klein whether or not the matter was ongoing. Finally, I advised Zilberberg that if the representation he was referring to wasn't an ongoing matter, then there wouldn't be any conflict, and Zilberberg agreed with me on this point.

4.       I then contacted Troutman's conflict department again and requested that they re-run Klein's name in the firm's database, including both open and closed matters. The database did not reflect any representation of Klein, either past or present. The database did pick up a prior closed representation of Global Realty, and listed Klein as a director/officer of that entity. I made further inquiry in Troutman and confirmed that the matter was closed. I advised the Trustee of my conversation with Zilberberg and the results of the updated conflicts search, and we both concluded, for the reasons set forth below, that there was no conflict.[1]

Troutman Has No Conflict of Interest in this Case

5.       As set forth above, the client in Troutman's prior representation was not Klein personally (the capacity in which he asserts his claim in this case). Troutman has never represented Klein personally. Rather, Troutman's previous client was Global Realty, which was

---

[1] The Court should note that, after my conversation with Zilberberg, and after Troutman determined that the prior representation was not of Klein and that it was closed, I never heard from Zilberberg again regarding the alleged conflict until the filing of the Objection. In fact, on August 4, 2011, I was served with a copy of Klein's motion in this Court for an order declaring void and of no effect the Appellate Division's decision reversing the prior arbitration award. That motion specifically lists Troutman as counsel for the Trustee. At that point I presumed that Zilberberg and Klein, like Troutman, had confirmed that the prior unrelated matter was closed and that there was no conflict.

represented by lawyers in Troutman's Shanghai office in one matter involving a potential investment in real estate in the People's Republic of China ("China").

6.     Even more importantly, and contrary to Klein's assertions, Troutman's prior representation has been concluded, and Troutman no longer represents Global Realty. Troutman ceased work on the Global Realty matter in December 2008, and the matter is closed. Troutman has not had any contact with Global Realty and/or Klein in more than two years.

7.     Additionally, Troutman's prior representation of Global Realty in an unrelated matter will not affect Troutman's representation of the Trustee in this case, including Troutman's ability and willingness to be adverse to Klein. Contrary to Klein's assertions, Troutman's duty of loyalty only existed with respect to Global Realty in the matter in which Global Realty was represented by Troutman, and that matter is now closed. Troutman owes no duty of loyalty to Klein.

8.     Furthermore, the prior representation of Global Realty was completely unrelated to Klein's current disputes with the Debtor and the Trustee on behalf of the Debtor's estate. That prior representation involved advice and assistance in connection with a potential investment by Global Realty in certain real property located in China, and was handled exclusively through the Troutman office in Shanghai. Contrary to Klein's assertions, Aurora Cassiere, the managing partner of Troutman's New York office, was not the "point person" on the Global Realty matter. Ms. Cassiere never billed attorney time to the Global Realty matter, never actually met Klein, and never spoke to Klein after putting him in contact with Edward Epstein, Esq., the managing partner in Troutman's Shanghai office.

9.     Moreover, during the course of the prior representation, and, again, contrary to Klein's assertions, Troutman did not become privy to any confidential information that would

have any bearing on this case and the disputes herein. Except for Global Realty's potential investment in a real estate project in China, Troutman never became privy to, and has no knowledge of, any of Klein's business dealings in China, including his apparent interests in "Trade Fame Group Ltd.," the entity set forth in Klein's objections. It is inconceivable that Troutman's prior representation of Global Realty will have any overlap with the Trustee's investigation of the facts pertaining to this case and the services to be rendered on behalf of the Trustee, including the investigation and pursuit of the estate's potential claims against Klein.

<u>Klein's "Objection" is Really an "Obfuscation"</u>

10.     Klein's Objection, which is premised on the alleged nonexistent conflict, is really an attempt by Klein to obfuscate what is really at issue in this case; namely, that Klein's possession of and control over Caring Home Care Agency ("Caring"), which he obtained under the prior arbitration award, should be turned over to the Trustee as the representative of the Debtor's estate.

11.     Although he uses the alleged conflict as the premise to file the Objection, Klein is really attempting to convince this Court that, notwithstanding his complete participation in the Debtor's appeal that led to the reversal of the state court judgment confirming the arbitration award, this Court should now rule that that the prosecution of the appeal was in violation of the stay, and that the Appellate Division reversal is of no force and effect.

12.     As set forth in the Trustee's Memorandum of Law in support of this response, and in opposition to Klein's motion for an order declaring the Appellate Division decision void, Klein cannot now be heard to argue that the automatic stay should be used to void the reversal and keep Klein in possession of Caring. Even if this Court were to determine that the Debtor should have filed a motion or relief from the automatic stay in this case, there is more than a

sufficient factual and legal basis for the Court to determine that the stay should be lifted retroactively.  Not only did Klein and the Debtor apprise this Court that the appeal was going forward post-petition, Klein himself actively participated in the appeal, including filing of a motion to reargue after the lower court reversal.  Moreover, Klein himself was actively violating the automatic stay post-petition through the enforcement of the state court judgment.

13.     Notwithstanding the Trustee's good faith attempts to get Klein to cooperate in the administration of the Debtor's estate, including giving the Trustee access to Caring's business and its financial records, Klein has failed to cooperate, causing the Trustee to now file separate motions, by order to show cause, for 2004 examinations of Klein, Caring and other individuals associated with Caring.  Klein attempts to use the Objection, and his motion regarding the automatic stay, to obfuscate the Court from the fact that the prior arbitration award, which was both issued and confirmed on default, is of no force and effect.  Klein attempts to use the automatic stay to maintain possession of Caring, after he himself knowingly and willfully violated that stay.  This Court, as a court of equity, should not tolerate this action.

<u>Conclusion</u>

14.     For the reasons set forth herein, Klein's Objection should be overruled.

Dated:  New York, New York
        August 19, 2011

<div align="right">

*/s/ John P. Campo*
John P. Campo
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, NY  10174
(212) 704-6075

</div>

"KLEIN EXHIBIT 1."
EXPERT AFFIRMATION OF PROFESSOR BRUCE GREEN.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

*In re:*

CHRISTINE PERSAUD,                                         **Chapter 7**
                                                          **Case No: 10-44815 (ESS)**
                            Debtor.

-------------------------------------------------------------------x

        BRUCE A. GREEN, an attorney admitted to the bar of the State of New York, affirms as

follows:

        1.        I am the Stein Professor of Law at Fordham University School of Law, where I

serve as Director of the Louis Stein Center for Law and Ethics.

        2.        I have been retained as an expert on behalf of Abraham Klein to provide an expert

opinion in connection with his objection to the Trustee's application to retain Troutman Sanders

LLP ("Troutman Sanders").

                                        **Qualifications**

        3.        My qualifications to provide expert opinions on questions of lawyers'

professional conduct are set forth more fully in my curriculum vitae (Exhibit A).

        4.        Since 1987, I have been a member of the full-time faculty of Fordham University

School of Law.  I previously served as a law clerk to Judge James L. Oakes of the United States

Court of Appeals for the Second Circuit, as a law clerk to Justice Thurgood Marshall of the

Supreme Court of the United States, and as an Assistant United States Attorney for the Southern

District of New York.  I am admitted to practice law in New York, the United States District

Courts for the Southern and Eastern Districts of New York, the United States Court of Appeals

for the Second Circuit, and the Supreme Court of the United States.

                                                        **KLEIN EXHIBIT 1**

KRINSKY PLLC

5.      I have regularly taught courses in legal ethics at Fordham and elsewhere since 1987. I speak frequently at CLE programs and have written extensively on this subject.  I have written and spoken extensively, in particular, on conflicts of interest in litigation.

6.      I have engaged in various other professional work relating to legal ethics. Nationally, I serve on the Multistate Professional Responsibility Examination drafting committee and recently completed three years of service on the ABA Standing Committee on Ethics and Professional Responsibility.  I have also previously chaired the ethics committees of both the ABA Litigation Section and the ABA Criminal Justice Section, served on the ABA Litigation Section's Task Force on Settlement Ethics, served as reporter to the ABA Commission on Multijurisdictional Practice and to the ABA Task Force on Attorney-Client Privilege, and chaired the Section on Professional Responsibility of the Association of American Law Schools.

7.      On the state and local level, I currently serve as a member and past chair of the New York State Bar Association's Committee on Professional Ethics, as a member of the New York State Bar Association's Committee on Standards of Attorney Conduct, on the board of advisors of the Ethics Institute of the New York County Lawyers' Association and as a member of that association's ethics committee.  I previously served on the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Department, and on the Committee on Professional and Judicial Ethics of the New York City Bar Association.  As a current member of the executive committee of the New York City Bar Association, my responsibilities include serving as a liaison to the three committees responsible for legal ethics and professional discipline.  I render opinions in this action in my individual capacity and do not speak on behalf of any of these or other entities.

2

## Relevant Facts

8.      Abraham Klein objects to Troutman Sanders's representation of the Trustee with regard to matters on which the Trustee will be adverse to Mr. Klein that are substantially related to the law firm's work for Mr. Klein in the second half of 2008 – that is, work relating to an unconsummated real estate transaction in China that Mr. Klein sought to undertake.  Troutman Sanders argues, in response, that it did not represent Mr. Klein, but represented only his wholly-owned company, Global Realty Venture, LLC ("GRV").  I have been asked to render an opinion regarding whether Troutman Sanders established an attorney-client relationship with Mr. Klein and rendered legal assistance to him personally in connection with the proposed transaction in China.

9.      For purposes of rendering this opinion, counsel for Mr. Klein has provided me the following: (1) the various submissions made by the parties to date in connection with Abraham Klein's objection to the Trustee's application to retain Troutman Sanders; (2) e-mail correspondence of Abraham Klein and his brother Hershel Klein with representatives of the law firm of Troutman Sanders; (3) e-mail correspondence of Abraham Klein and his brother Hershel Klein with representatives of Knight Frank; and (4) several additional assumptions as reflected herein.  In summarizing the facts that I regard as relevant, I have taken care to avoid disclosing confidential communications between Troutman Sanders and Abraham and Hershel Klein except to the limited extent relevant to the question of whether Troutman Sanders represented Abraham Klein.

10.      The relevant facts on which I rely are, in summary, as follows.

3

11.    As of July 30, 2008, Abraham Klein and his brother Hershel Klein were principals of Flexo Craft Prints, a company located in Harrison, New Jersey, that was owned by Laser Master International, Inc., a public company in which the Klein family were majority shareholders.  Prior to that date, Abraham Klein developed an interest in pursuing a joint venture relating to the development of land in China, and he determined to obtain legal assistance with regard to the proposed transaction.  Toward that end, he and his brother, as his representative, sought assistance from Troutman Sanders.

12.    Hershel Klein contacted Troutman Sanders on July 30, 2008 and spoke with Aurora Cassirer, a partner of the firm.  Later that day, he sent her an e-mail stating: "I will be emailing you the info. [¶] Is it necessary to do a confidently [sic] agreement before I send the info to you? we are very conscious about keeping this project confidential."  In a prior email, Hershel Klein identified his affiliation with Flexo Craft Prints and used an e-mail address associated with that business.

13.    Hershel Klein followed that day with an e-mail, on which he cc'd his brother, describing the proposed transaction, which would involve a commercial and residential real estate investment with a Chinese national, Mr. Zheng.  An attachment to the e-mail indicated that the arrangement would be a "60% Zhang/40% Klein Joint Venture," that Klein would invest more than $5 million, and that Klein's anticipated income was more than $35 million.  The e-mail concluded: "We need Due diligence to be done to verify **all** the expense and revenue numbers are accurate [¶] We need due diligence to be done to verify that all the logistical things are correct that all the details that need to happen to make this project happen in reality actually

can happen. [¶] And last but not least we need the legal structure to be set up in a way that it will work and have everybody protected."

14.     Ms. Cassirer responded by e-mail that day to Hershel Klein's earlier e-mail regarding confidentiality, as follows: "*I do not believe that you need a confidentiality agreement with your attorney since we are bound to keep your communications with us confidential.*" (Emphasis added.)

15.     There followed additional e-mails on July 30, 2008, including several from Abraham Klein, regarding the proposed transaction. Arrangements were made by e-mail to discuss the transaction with Edward Epstein, a partner of the law firm's China office. None of the e-mail correspondence that day made any reference to GRV.

16.     A conversation that included Abraham Klein, Ms. Cassirer and Mr. Epstein took place on the night of July 30. Thereafter, Mr. Epstein sent an e-mail to Abraham Klein, with a "cc" to Hershel Klein and Ms. Cassirer, proposing that Knight Frank, a real estate consultancy firm in China, be engaged to assess the proposed project. The e-mail provided the Troutman Sanders firm's estimate of its fees "for a preliminary legal due diligence . . . and advice on the feasibility of the project . . .." On August 4, Hershel Klein requested Ms. Cassirer's thoughts on whether to obtain Knight Frank's assessment before Troutman Sanders addressed the legal issues. After further correspondence, it was agreed on August 5 that the law firm, working at its hourly rate, would set up the relationship between Abraham Klein and Knight Frank and that the Kleins would then deal directly with the consultancy firm. As of that date, there was still no mention of GRV in the correspondence that I was provided.

17.    Mr. Epstein communicated with Andrew Slevin, Knight Frank's executive

director, after which Mr. Slevin contacted Hershel Klein by e-mail dated August 8, 2008. There

followed a proposed agreement, dated August 12, 2008, addressed to Hershel Klein of Flexo

Craft Prints, providing for Knight Frank to assess the proposed investment opportunity in

Shandong, China.

18.    On November 11, 2008, after Knight Frank had provided consultancy services,

Abraham Klein emailed Edward Epstein to request assistance in establishing a memorandum of

understanding with Mr. Zhang. The email included an attachment reflecting that "GRV" would

be the investing entity. Chronologically, this appears to be the first document in the

correspondence I have reviewed to refer to GRV. On November 12, 2008, Troutman Sanders

provided a draft Letter of Intent for the Kleins' review. The draft provided that the agreement

was between Mr. Zhang and "[Flexo Craft Prints]." The law firm added the following

Comments in brackets following this provision: "Normally, the foreign investor will use one of

its offshore subsidiaries registered in BVI, Mauritius, etc. instead of itself to enter into the LOI,

or even to be the signing party to the definitive agreements of the transaction."

19.    Abraham Klein then returned a version of the document with answers and

comments. The next day, which was November 13, 2008, the law firm e-mailed a revised Letter

of Intent reflecting, as the U.S. transacting party, "Global Realty Ventures, a company registered

and existing under the laws of U.S.A. with its principal place of business at 1260 57th Street,

Brooklyn, NY 11219 ('GRV')." Paragraph 1.3 of the draft provided that "GRV or its affiliate

will make a contribution in cash of 40% of the registered capital of the Joint Venture . . ., which

will ensure that GRV or its affiliate will own 40% of the equity interests in the Joint Venture . . .."

20.    I have been asked to assume that Abraham Klein believed that Troutman Sanders represented him personally and owed a confidentiality duty to him personally and that, although he intended to undertake the China transaction through an entity in which he had an ownership interest, it was unresolved which entity would be used.

21.    Troutman Sanders provided further assistance in connection with the Letter of Intent through late December 2011. On December 24, 2008, Abraham Klein approved final changes to the Letter of Intent, and Troutman Sanders sent the Chinese version to Mr. Zhang. On December 31, 2008 a Troutman Sanders legal consultant reported back to Abraham Klein that Mr. Zhang was "basically fine with the LOI, but Mr. Zhang wants to hold up this deal for another two or three months due to the current economic downturn."

22.    Troutman Sanders sent two invoices for its work. By e-mail dated December 10, 2008, the  firm sent an invoice in the amount of $10,573.50 for 36.7 hours of services rendered through November 30, 2008. By e-mail dated January 16, 2009, the firm sent an invoice in the amount of $6,368.30 for 22.5 hours of services rendered through December 31, 2008. The invoices were addressed to "Global Realty Ventures, Attn: Abraham Klein, 1260 57th Street, Brooklyn, NY 11219."

23.    On December 29, 2008, on behalf of his brother, Hershel Klein singed a seven-page engagement agreement dated November 24, 2008. The agreement was addressed to Abraham Klein, but it regarded "Engagement of Troutman Sanders LLP by Global Realty Ventures ('GRV') Retainer Letter – Project Juancheng." The letter, at pages 4-5, included three

paragraphs under the heading, "Conflict Provisions." The second paragraph included a provision that the law firm may represent clients "in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse." The third paragraph provided:

> For the purposes of determining whether a conflict of interest exists, it is only GRV we will represent and not other entities in your corporate family, stockholders, officers, directors, employees or agents (**"affiliates"**). You have agreed that you will not give us confidential information regarding your affiliates. While we recognize that to act adversely to any affiliate could jeopardize your continuing engagement of the Firm to handle matters on your behalf, which we would naturally be reluctant to see happen, for conflict of interest purposes, we reserve the right to represent another client with interests adverse to any affiliate without obtaining consent from you or your affiliates.

### Analysis

*Preliminary observations*

24.     I have been asked to focus on the question of whether Troutman Sanders entered into an attorney-client relationship with Abraham Klein or whether, as the law firm contends, its relationship was with GRV and only GRV. To put my analysis in context, however, I offer the following preliminary observations.

25.     For disciplinary purposes, Troutman Sanders's conduct in late 2008 was governed by the New York Code of Professional Responsibility ("New York Code"). Currently, its conduct is governed by the New York Rules of Professional Conduct ("New York Rules"), which went into effect on April 1, 2009. Although my analysis will refer to the relevant disciplinary rules, I recognize that the federal courts of the Second Circuit, in ruling on disqualification motions and comparable motions, do not consider themselves obligated strictly to apply the relevant disciplinary rules, but often look to the disciplinary rules for guidance.

8

26.    That said, the applicable rules and decisions largely run parallel to each other.  In fact, the rules were derived from prior case law.  Rule 1.9(a) of the New York Rules provides that: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  For purposes of this rule,

> Matters are "substantially related" . . . if they involve the same transaction or legal dispute or if, under the circumstances, a reasonable lawyer would conclude that there is otherwise a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.  For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce.

New York Rules, Rule 1.9, Comment [3].

27.    Further, under Rule 1.10(a) of the New York Rules, the conflict of interest arising out of a substantially related representation adverse to a former client is imputed throughout the lawyer's firm.  It cannot be avoided through the use of screening, because of the presumption that client confidences are shared among lawyers of a law firm.  The New York Code included essentially the same provisions.  *See* New York Code, Disciplinary Rules 5-105(D) & 5-108(A) (effective prior to April 1, 2009).

28.    The objective of the former-client disqualification rule is to prevent the misuse of a former client's confidences, and to protect both former and future clients against the apprehension that their lawyers may later misuse their confidences against them and for the benefit of other clients.  Although the Second Circuit case law is more flexible at the margins, it incorporates essentially the same restrictions as the disciplinary rules against representations

9

adverse to a law firm's former clients in substantially related matters. *See, e.g., Pierce & Weiss,*
*LLP v. Subrogation Partners LLC*, 701 D. Supp. 2d 245, 255-56 (E.D.N.Y. 2010) (summarizing
case law).

      29.    Neither the rules nor the case law call for an inquiry into precisely what
confidential information was acquired by the former client's lawyer. Rather, if there is a
"substantial relationship" between the prior and current matters, it is presumed that relevant
confidential information was acquired. That is, in part, because a judicial inquiry into what
confidences were acquired would require the disclosure of the very confidences that the law firm
is obligated to preserve. Nor do either the rule or the case law call for an inquiry into the length
of the attorney-client representation and the amount of relevant confidential information learned
during that time. Even very brief representations (as well as brief meetings in the context of
prospective representations) have resulted in disqualification when they were substantially
related to the new matter against the former client (or former prospective client).

      30.    If the Court were to hold that Troutman Sanders previously represented Abraham
Klein in a matter substantially related to its potential work for the Trustee, that does not mean
that the law firm is entirely forbidden from representing the Trustee. A law firm may limit the
scope of its representation. *See* New York Rules, Rule 1.2(c). As discussed in New York City
Bar Association, Opinion 2001-3 (2001), a firm may do so for the precise purpose of avoiding a
conflict of interest. *See also* New York City Bar Association, Opinion 2005-02 (2005) (when a
law firm possesses confidential information of one client that may be relevant to another client,
the conflict of interest that results may be resolved by "limit[ing] the scope of the representation
of the affected client going forward"). Thus, the solution to the problem would be to limit the

scope of Troutman Sanders's representation and for the Trustee to retain other counsel to handle

matters adverse to Abraham Klein, at least insofar as those matters are substantially related to the

matter on which Troutman Sanders represented Mr. Klein.

*Formation of an attorney-client relationship*

31.    The rules of professional conduct do not set forth a standard for establishing when

someone is a "client" for purposes of Rule 1.9 and other rules. *Compare* New York Rules, Rule

1.18(a) (providing that for purposes of the confidentiality duty and the Rule's conflict of interest

restrictions, "[a] person who discusses with a lawyer the possibility of forming a client lawyer

relationship with respect to a matter is a 'prospective client.'"). Rather, the rules look to relevant

case law, which has developed in the context of breach of malpractice cases, contract cases,

disqualification cases, and the like.

32.    In general, both the existence of an attorney-client relationship and the scope of

the representation, if any, are determined by agreement between a lawyer and a prospective

client.  Typically, the relationship is established by express agreement:  a party asks the lawyer

to provide specific legal services and the lawyer agrees to do so, in which case the lawyer

assumes a responsibility to provide the legal services on which the client and lawyer have

expressly agreed.  However, an agreement between a lawyer and a prospective client may also be

implied by, or inferred from, their conduct.  Section 14(1) of the Restatement (Third) of the Law

Governing Lawyers ("Restatement") provides that "[a] relationship of client and lawyer arises

when . . . a person manifests to a lawyer the person's intent that the lawyer provide legal services

for the person; and either (a) the lawyer manifests to the person consent to do so; or (b) the

lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should

11

know that the person reasonably relies on the lawyer to provide the services." Bar association

opinions have looked to this provision as a codification of the relevant standard. *See, e.g.*, ABA

Formal Op. 07-448 (2007), at n. 16; ABA Formal Op. 07-445 (2007), at n. 9; N.Y.S. Op. 761

(2003) ("A contract for legal services need not be explicit; if an attorney leads an individual to

reasonably believe that a lawyer-client relationship exists, then such a relationship indeed

exists.").

33.    Under the Restatement, the question in this case of whether Troutman Sanders

represented Abraham Klein as opposed to, or in addition to, an entity that he owned or with

which he was affiliated, is thus governed by Mr. Klein's reasonable expectations: "Whether the

lawyer is to represent [an] organization, a person or entity associated with it, or more than one

such persons or entities is a question of fact to be determined based on reasonable expectations

in the circumstances," and "a lawyer's failure to clarify whom the lawyer represents in

circumstances calling for such a result might lead a lawyer to have entered into client-lawyer

representations not intended by the lawyer." Restatement § 14, cmt. f.  The case law is

consistent with this approach. *See, e.g., Rosman v. Shapiro*, 653 F. Supp. 1441, 1445 (S.D.N.Y.

1987) ("It is clear that Rosman reasonably believed that Zisman was representing him. . . .

Although, in the ordinary corporate situation, corporate counsel does not necessarily become

counsel for the corporation's shareholders and directors, . . . where, as here, the corporation is a

close corporation consisting of only two shareholders with equal interests in the corporation, it is

indeed reasonable for each shareholder to believe that the corporate counsel is in effect his own

individual attorney.").

*Troutman Sanders represented Abraham Klein personally*

34.    Based on the material that I have reviewed, it was reasonable for Abraham Klein to believe that Troutman Sanders represented him personally with regard to the prospective transaction in China, for the following reasons.

35.    Although Troutman Sanders's retainer agreement identifies GRV as its exclusive client, that agreement was dated November 24, 2008 and not signed until December 29, 2008, by which time the work that Troutman Sanders actually performed was virtually completed. The attorney-client relationship was expressly established on July 30, 2008, almost four months before the date on the letter, as evidenced by Ms. Cassirer's e-mail to Hershel Klein, stating: "I do not believe that you need a confidentiality agreement with your attorney since we are bound to keep your communications with us confidential." Thus, the engagement letter did not establish the terms of the initial retention.  Nor could it have had any effect on Abraham Klein's reasonable understandings either at the time the attorney-client relationship was established or during the ensuing period before he received and first reviewed the letter, by which time the law firm's representation was well under way if not nearing completion.  Mr. Klein's expectation that he was seeking legal assistance for his own benefit, and not primarily or exclusively for the benefit of an entity, was conveyed to the firm at the outset, when the proposed transaction was described as a "60% Zhang/40% *Klein* Joint Venture" (emphasis added), and the firm took no steps to contradict Mr. Klein's evident understanding that he was the client.

36.    Until November 11, 2008, the correspondence made no mention of GRV, and it certainly did not identify GRV (or any other entity) as the client.  Further, the first draft of Letter of Intent reflected the law firm's assumption that the named entity in the Letter of Intent would

be Flexo Craft Prints.  Thus, the firm evidently did not convey that it regarded GRV as its

exclusive client, or even as one of its clients, when the attorney-client relationship began or at

any time through November 12, 2008.

37.    As of November 12, 2008, Abraham Klein and the law firm apparently shared the

understanding that the deal was to be done by Mr. Klein through an entity in which he had an

ownership interest, that the particular entity had not yet been identified with certainty, and that it

might not yet exist.  In a Comment in its first draft of the Letter of Intent, the firm advised

Abraham Klein that whatever entity it included would be just a placeholder: it might be

preferable for Mr. Klein to identify an offshore entity through which to do the transaction;

further, whatever entity was identified in the Letter of Intent could be different from the one that

would later be "the signing party to the definitive agreements of the transaction."  The next draft

identified "GRV *or its affiliate*" (emphasis added) as the entity that would contribute funds to the

joint venture.  This was consistent with the understanding that Abraham Klein was the client and

that he had not yet determined through which of his entities he would conduct the transaction.

*The engagement agreement was not effective to abrogate the pre-existing lawyer-client*
*relationship with Abraham Klein or to authorize the firm to undertake adverse representations in*
*substantially related matters*

38.    The engagement agreement that Hershel Klein signed on December 29, 2008, a

few days after Troutman Sanders completed the Letter of Intent, did not memorialize the

understanding in July 2008 when the attorney-client relationship was formed but sought to

change the then-existing understanding between the law firm and Abraham Klein.  Until the

letter was signed, Troutman Sanders owed duties of confidentiality and loyalty to Mr. Klein.

Further, insofar as the letter purported to describe the earlier relationship, it would have been

14

misleading. The letter recites that "[y]ou" – meaning GRV – "have agreed that you will not give us confidential information regarding your affiliates." In fact, prior to November 12, 2008, the information provided to the firm apparently related entirely to GRV's "affiliates." The letter apparently sought, in effect, to terminate the firm's existing representation of Mr. Klein (in favor of GRV as the sole client) and to secure Mr. Klein's advance waiver of the conflict of interest that would arise in the future under Rule 1.9(a) if Troutman Sanders undertook a substantially related representation adverse to Mr. Klein. If so, the letter was less than candid about its intent and effect.

39.    For any or all of the following reasons, the engagement agreement is ineffective as a mid-representation means of re-defining the client and avoiding future conflicts of interest.

40.    First, changes in the terms of a representation that disfavor a client are generally viewed skeptically, because of the risk that they are the product of pressure or coercion, and enforced only when they are fair and reasonable to the client. *See generally* ABA Formal Op. 11-458 (2011) ("'The courts are generally in accord that once the initial contract has been formed and the fiduciary relationship of client and lawyer has begun, any change in the contract will be regarded with great suspicion.'") (quoting Charles W. Wolfram, *Modern Legal Ethics* § 9.2.1, at 503 (1986)). There is nothing to suggest that it was fair and reasonable for Mr. Klein to forgo the right to Troutman Sanders's ongoing loyalty and confidentiality, or that he received anything in return.

41.    Second, there is nothing to suggest that, as of late November 2008, while it was in the middle of drafting the Letter of Intent, Troutman Sanders had permissible grounds under

15

Rule 1.16 of the New York Rules to withdraw from representing Mr. Klein personally.

Certainly, the engagement letter does not recite any such grounds.

42.    Third, the agreement does not, by its terms, apply *nunc pro tunc* to Troutman

Sanders's work prior to December 29, 2008, when it was signed.  By that time, the firm had

already established an attorney-client relationship with him and conducted virtually all of its

actual work.  To the extent there is any ambiguity about whether the agreement applies

retrospectively, the ambiguity should be read against the lawyer-drafters.  *Cf. GSI Commerce

Solutions, Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 212-14 (2d Cir. 2010).

43.    Fourth, there is no authority to suggest that a lawyer may enter into a *nunc pro

tunc* agreement with a client to regard their lawyer-client relationship as if it never existed in the

first place.  Once a lawyer forms a lawyer-client relationship, he undertakes agency and

disciplinary obligations that cannot be eviscerated through the pretense that the client was never

a client.  If there is an agreement at the outset of a representation that a lawyer will not represent

an individual, that agreement may later be ratified, but that is very different from attempting to

erase the history of a lawyer-client relationship that has already been formed.   *Cf.* Arizona Op.

02-06 (2002) (if individuals consult with a lawyer about forming an entity, they may give

informed consent at the outset to the lawyer's representation of only the yet-to-be-formed entity,

but the lawyer must clarify at the outset of the representation, and regularly caution the

constituents when they consult with counsel, that they are not clients).

44.    Finally, assuming that the agreement could be regarded as a waiver of conflicts of

interest that might later arise, then-effective Disciplinary Rule 5-108(A) required the client to

provide "consent after full disclosure."  Ordinarily, that means that counsel must explain the

16

circumstances giving rise to the conflict of interest, the risks, and the alternatives. In the case of

a waiver of future conflicts, information must be given at least in general terms about "the nature

of the anticipated conflict and the adverse consequences to the client that may ensue"; the level

of necessary detail depends on the client's sophistication about legal matters generally and about

lawyer conflicts of interest in particular. New York Rules, Rule 1.7, Comment [22]. Here, there

is no evidence that the law firm provided *any* information to enable Abraham Klein to make an

informed decision. On the contrary, it did not advise him that he was, until then, a client of the

firm to whom the firm owed duties of loyalty and confidentiality that he would be forgoing.


Dated: New York, New York
       September 14, 2011


Bruce A. Green


17

# EXHIBIT A
# ATTACHMENT
# TO
# GREEN AFFIDAVIT

**BRUCE A. GREEN**
**Louis Stein Professor of Law**
**Fordham University School of Law**
**140 West 62nd Street**
**New York, NY 10023**
**(212) 636-6851; (212) 636-6899 (FAX)**
**bgreen@law.fordham.edu**

## Bar Admissions

New York State (since 1982)
U.S. District Courts for the Southern and Eastern Districts of New York
U.S. Court of Appeals for the Second Circuit
U.S. Supreme Court

## Education

**Columbia University School of Law**: J.D. 1981
      Honors: James Kent Scholar; Harlan Fiske Stone Scholar
      Associate Editor, *Columbia Law Review*

**Princeton University**: A.B. 1978, *summa cum laude*

## Current Legal Employment

**Fordham University School of Law**:
      Louis Stein Professor of Law, since 1997
      Professor, 1996-97; Associate Professor, 1987-96
      Director, Louis Stein Center for Law and Ethics, since 1997
      Director, Stein Center for Ethics and Public Interest Law, 1992-97
      Responsible for teaching courses in the areas of legal ethics, criminal law and criminal
procedure, and for overseeing the Stein Scholars Program

## Prior Full-time Legal Employment

**New York University School of Law**: Visiting Professor: January-May 2007

**Office of the United States Attorney for the Southern District of New York**:
      October 1983 to August 1987, Assistant United States Attorney
      Deputy Chief Appellate Attorney, 1986-87; Chief Appellate Attorney, 1987

**U.S. Supreme Court**: Law clerk to Justice Thurgood Marshall, 1982-83

**U.S. Court of Appeals for the Second Circuit**: Law clerk to Judge James L. Oakes, 1981-82

## Other Legal Positions

**Departmental Disciplinary Committee, App. Div., 1st Department**: Member, 1997-2002

**New York City Conflicts of Interest Board**: Member, Nov. 1995 to March 2005

**Handschu Authority**: Civilian member, July 1994 to Nov. 1995

**Office of Investigations Officer (U.S. v. I.B.T.)**: Special Counsel (part-time), 1991

**Office of Independent Counsel Lawrence Walsh**, Associate Counsel (part-time), 1988-91

**N.Y.S. Commission on Government Integrity**: Consultant and special investigator, 1988-90

**Columbia University School of Law**: Adjunct Professor (part-time), 1990

**Office of the United States Attorney for the Southern District of New York**: Special Assistant United States Attorney (part-time), September 1987 to June 1988

**Fordham University School of Law**: Adjunct Assoc. Professor (part-time), 1985-87

## Professional Service

**American Bar Association:**
    Commission on the American Jury Project: member, 2006-2008
    Commission on Multijurisdictional Practice: reporter, 2000-2002
    Coordinating Group on Bioethics and the Law: member, 1997-2003
    Criminal Justice Section:
        Chair: 2010-2011
        Chair-elect: 2009-2010
        First Vice Chair: 2008-2009
        Ethics, Gideon and Professionalism Committee: co-chair, 2006-09
    Death Penalty Representation Project: member, 2006-09
    Section of Litigation:
        Task Force on the Litigation Research Fund: Chair, 2007-2011
        Division VII (Task Forces): Co-Director, 2007-2008
        Council member, 2004-07
        Committee on Law Faculty Involvement: co-chair, 1998-2001, 2003-2004
        Civil Justice Institute: member, 2001-03
        Task Force on Ethical Guidelines for Settlement Negotiations: member, 2000-02
        Ethics 2000 Task Force: member, 1999-2000
        Committee on Ethics and Professionalism: co-chair, 1995-1998
        Task Force on the Independent Counsel Act: reporter, 1997-1999

**American Bar Association (continued):**
>    Section of Litigation (continued):
>>    Rep. to Sec./Div. Committee on Professionalism and Ethics, 1996-2003
>>    Committee on Amicus Curiae Briefs: chair, 1991-1995
>    Standing Committee on Ethics and Professional Responsibility: 2008-2011
>    Standing Committee on Professionalism: reporter, 2000-2001
>    Steering Committee for the Symposium on the Multijurisdictional Practice of Law: reporter, 1999-2000
>    Task Force on the Attorney-Client Privilege: reporter, 2004-2010
>    Task Force on Law Schools and the Profession: consultant, 1991-1992

**Association of American Law Schools:** Chair, Section of Professional Responsibility, 1999

**Association of the Bar of the City of New York:**
>    Executive Committee: 2010 to present
>    Council on Criminal Justice: member, 2009 to present
>    Delegate to NYS Bar Association, 2003-07
>    Committee on Professional and Judicial Ethics: member, 1994-1997, 2003-2006
>    Nominating Committee: member, 2005
>    Ethics 2000 Committee: member, 1999-2001
>    Jt. Committee on the Legal Referral Service: chair, 1993-96; member, 1996-2000
>    Committee on International Access to Justice: member,1999-2000
>    Committee on Disaster Plan: member, 1996-1997
>    Marden Lecture Committee: member, 1991-1994
>    Criminal Law Committee: member, 1991-1994
>    Task Force on Lawyer Training: member, 1992-1994
>    Corrections Committee: member, 1988-1991

**Criminal Law Bulletin:** Contributing editor, 1988-1998

**Evan B. Donaldson Adoption Institute:** Ethics Advisory Committee: member, 1998-2001

**Federal Bar Council:**
>    Second Circuit Courts Committee: member, 1994-1997; chair, Subcommittee on Criminal Law and Ethics
>    *Federal Bar Council News:* member of the Editorial Board, 1995-2005
>    Inn of Court: master, 2000-2002

**Fund for the City of New York:** Member of Advisory Committee for the New York Housing Court Online Preparation System (COPE), 1999

**International Association of Legal Ethics:** Director, 2010 to present

**Legal Ethics:** Member of Advisory Board, 2008 to present

3

**National Conference of Bar Examiners:** Member of MPRE Drafting Committee, 2001 to present

**New York County Lawyers' Association:**
      Director, 2004-2007, 2008 to present
      Delegate to NYS Bar Association, 2009 to present
      Member of Justice Center advisory board, 2003 to present
      Member of the Ethics Institute board of advisors, 2008 to present

**New York State Bar Association:**
      House of Delegates member, 2003-2007, 2009 to present
      Committee on Professional Ethics: Chair, 1998-2001; member, 1991 to present
      Committee on Standards of Attorney Conduct (formerly Special Committee to Review the Code of Professional Responsibility): member, 1997 to present
      Task Force on Attorney Client Privilege, 2006-2008
      Task Force on "Pay to Play" Concerns, member, 1998-2000

**New York State Continuing Legal Education Board:** Member, 2008 to present

**New York State Task Force on Attorney Professionalism and Conduct:** Member, 1996-1998

<u>Awards</u>

Powell Pierpont Award, given by the N.Y.C. Conflicts of Interest Board "for outstanding service to the New York City Conflicts of Interest Board," May 23, 2006

New York State Bar Association Criminal Justice Section Award for "outstanding contribution in the field of criminal law education," Jan. 23, 2003

Sanford D. Levy Award, given by New York State Bar Association Committee on Professional and Judicial Ethics, 1990

## PUBLICATIONS

### Articles in Law Journals

Developing Standards of Conduct for Prosecutors and Criminal Defense Lawyers, 62 Hastings L.J. 1093 (2011)

Prosecutors' Ethical Duty of Disclosure *In Memory of Fred Zacharias*, 48 San Diego L. Rev. 57 (2011)

The Legal Ethics Scholarship of Ted Schneyer: The Importance of Being Rigorous, 53 Ariz. L. Rev. 365 (2011)

The Civil Government Lawyer: A View From the Jury Box, 38 Hofstra L. Rev. 883 (2010) (with Karen Bergreen).

Beyond Training Prosecutors About Their Disclosure Obligations: Can Prosecutors' Offices Learn From Their Lawyers' Mistakes, 31 Cardozo L. Rev. 2161 (2010)

Ethically Representing a Lying Cooperator: Disclosure as the Nuclear Deterrent, 7 Ohio St. J. of Crim. L. 639 (2010)

Fear of the Unknown: Judicial Ethics After *Caperton*, 60 Syracuse L. Rev. 229 (2010)

ABA Ethics Reform from "MDP" to "20/20": Some Cautionary Reflections, 2009 Journal of the Professional Lawyer 1 (2009)

Rationalizing Judicial Regulation of Lawyers, 70 Ohio St. L.J. 73 (2009) (with Fred C. Zacharias)

Regulating Federal Prosecutors: Let There Be Light, 118 Yale L.J. Pocket Part TK (2009), http://thepocketpart.org/2009/TK/TK/green.html.

The Duty to Avoid Wrongful Convictions: A Thought Experiment in the Regulation of Prosecutors, 89 Boston University L. Rev. 1 (2009) (with Fred C. Zacharias)

"Public Service Must Begin at Home": The Lawyer as Civics Teacher in Everyday Practice, 50 Wm. & Mary L. Rev. 1207 (2009) (with Russell Pearce)

Regulating Discourtesy on the Bench: A Study in the Evolution of Judicial Independence, 64 NYU Annual Survey of American Law 497 (2009) (with Rebecca Roiphe) (symposium on judicial transparency)

Prosecutorial Discretion and Post-Conviction Evidence of Innocence, 6 Ohio St. J. of Crim. L. 467 (2009) (with Ellen Yaroshefsky)

Foreword, The Lawyer's Role in a Contemporary Democracy, 77 Fordham L. Rev. 1229 (2009)

Remembering Mary Daly: A Legal Ethicist Par Excellence, 83 St. John's L. Rev. 23 (2009)

The Market for Bad Legal Scholarship: William H. Simon's Experiment in Professional Regulation, 60 Stanford L. Rev. 1605 (2008)

"The U.S. Attorneys Scandal" and the Allocation of Prosecutorial Power, 69 Ohio St. L.J. 187 (2008) (with Fred C. Zacharias)

Some Realism About Bar Associations, 57 DePaul L. Rev. 425 (2008)  (with Elizabeth Chambliss)

Criminal Defense Lawyering at the Edge – A Look Back, 36 Hofstra Law Rev. 353 (2007)

Teaching Lawyers Ethics, 51 St. Louis L.J. 1091 (2007)

Permissive Rules of Professional Conduct, 91 Minn. L. Rev. 265 (2006) (with Fred C. Zacharias)

Taking Cues: Inferring Legality from Others' Conduct, 75 Fordham L. Rev. 1429 (2006)

The Religious Lawyering Critique, 21 J. of Law & Religion 283 (2006)

Representing Children in Families – Foreword, 6 Nevada L. Rev. 571 (2006) (with Annette R. Appell)

"Anything Rather Than a Deliberate and Well-Considered Opinion"–Henry Lord Brougham, Written by Himself, 19 Georgetown J. Legal Ethics 1221 (2006) (with Fred C. Zacharias)

Reconceptualizing Advocacy Ethics, 74 George Washington L. Rev. 1 (2005) (with Fred C. Zacharias)

Foreword, Professional Challenges in Large Firm Practices, 33 Fordham Urb. L.J. 7 (2005)

Prosecutorial Neutrality, 2004 Wisconsin L. Rev. 837  (with Fred C. Zacharias)

Foreword, Colloquium, Deborah Rhode's *Access to Justice*, 73 Fordham L. Rev. 841 (2004)

Federal Court Authority to Regulate Lawyers: A Practice in Search of a Theory, 56 Vand. L. Rev. 1303 (2003) (with Fred C. Zacharias)

Prosecutorial Ethics as Usual, 2003 Illinois L. Rev. 1573

Criminal Neglect: Indigent Defense from an Ethics Perspective, 52 Emory Law Review 1169 (2003)

Regulating Federal Prosecutors' Ethics, 55 Vand. L. Rev. 381 (2002) (with Fred C. Zacharias)

Bar Association Ethics Committees: Are They Broken?, 30 Hofstra L. Rev. 731 (2002)

May Judges Attend Privately Funded Educational Programs?  Should Judicial Education Be Privatized?: Questions of Judicial Ethics and Policy, 29 Fordham Urb. L.J. 941 (2002)

John D. Feerick: The Dean of Ethics and Public Service, 70 Fordham L. Rev. 2165 (2002)

Judicial Rationalizations for Rationing Justice: How Sixth Amendment Doctrine Undermines Reform, 70 Fordham L. Rev. 1729 (2002)

Thoughts About Corporate Lawyers After Reading *The Cigarette Papers*: Has the "Wise Counselor" Given Way to the "Hired Gun"?, 51 DePaul L. Rev. 407 (2001)

Reflections on the Ethics of Legal Academics: Law Schools as MDPs; or, Should Law Professors Practice What They Teach?, 42 S. Tex. L. Rev. 301 (2001)

Public Declarations of Professionalism, 52 S. Car. L. Rev. 729 (2001)

The Disciplinary Restrictions on Multidisciplinary Practice: Their Derivation, Their Development, and Some Implications for the Core Values Debate, 84 Minn. L. Rev. 1115 (2000)

The Uniqueness of Federal Prosecutors, 88 Georgetown L.J. 207 (2000) (with Fred C. Zacharias)

Must Government Lawyers "Seek Justice" in Civil Litigation?, 9 Widener J. Pub. L. 235 (2000)

There But for Fortune: Real-Life vs. Fictional "Case Studies" in Legal Ethics, 64 Fordham L. Rev. 977 (2000)

Rationing Lawyers: Ethical and Professional Issues in the Delivery of Legal Services to Low-Income Clients, 67 Fordham L. Rev. 1713 (1999)

Why Should Prosecutors "Seek Justice"?, 26 Fordham Urb. L.J. 609 (1999)

The Criminal Regulation of Lawyers, 67 Fordham L. Rev. 327 (1998)

Lawyers as Nonlawyers in Child-Custody and Visitation Cases: Questions From a "Legal Ethics" Perspective, 73 Ind. L.J. 665 (1998)

Lawyer Discipline: Conscientious Noncompliance, Conscious Avoidance, and Prosecutorial Discretion, 66 Fordham L. Rev. 1307 (1998)

Less is More: Teaching Legal Ethics in Context, 39 Wm. & Mary L. Rev. 357 (1998)

Conflicts of Interest in Legal Representation: Should the Appearance of Impropriety Rule Be Eliminated in New Jersey--Or Revived Everywhere Else?, 28 Seton Hall L. Rev. 315 (1997)

The Role of Personal Values in Professional Decisionmaking, 11 Geo. J. of Legal Ethics 19 (1997)

Conflicts of Interest in Litigation: The Judicial Role, 65 Fordham L. Rev. 71 (1996)

Whose Rules of Professional Conduct Should Govern Lawyers in Federal Court and How Should the Rules Be Created?, 64 George Washington L. Rev. 460 (1996)

Foreword: Children and the Ethical Practice of Law, in Ethical Issues in the Legal Representation of Children, 64 Fordham L. Rev. 1281 (1996) (with Bernardine Dohrn)

Contextualizing Professional Responsibility: A New Curriculum for a New Age, 58 Law & Contemp. Probs. 193 (1995) (with Mary Daly & Russell Pearce)

Policing Federal Prosecutors: Do Too Many Regulators Produce Too Little Enforcement?, 8 St. Thomas L. Rev. 69 (1995)

Of Laws and Men: An Essay on Justice Marshall's View of Criminal Procedure, 26 Ariz. St. L.J. 369 (1994) (with Daniel Richman)

Foreword, Ethical Issues in Representing Older Clients, 62 Fordham L. Rev. 961 (1994) (with Nancy Coleman)

Foreword, Urban Environmental Equity, 21 Fordham Urb. L.J. 425 (1994)

Lethal Fiction: The Meaning of "Counsel" in the Sixth Amendment, 78 Iowa L. Rev. 433 (1993) [reprinted in 6 Crim. Prac. L. Rev. 183 (1994)]

"The Whole Truth?": How Rules of Evidence Make Lawyers Deceitful, 25 Loyola of Los Angeles L. Rev. 699 (1992)

"Power, Not Reason": Justice Marshall's Valedictory and the Fourth Amendment in the Supreme Court's 1990-91 Term, 70 N.C.L. Rev. 373 (1992)

After the Fall: The Criminal Law Enforcement Response to the S&L Crisis, 59 Fordham L. Rev. S155 (1991)

8

Zealous Representation Bound: The Intersection of the Ethical Codes and the Criminal Law, 69 N.C.L. Rev. 687 (1991) [reprinted in 4 Crim. Prac. L. Rev. 323 (1992)]

"Hare and Hounds": The Fugitive Defendant's Constitutional Right to Be Pursued, 56 Brooklyn L. Rev. 439 (1990) [reprinted in 4 Crim. Prac. L. Rev. 67 (1992)]

The Good-Faith Exception to the Fruit of the Poisonous Tree Doctrine, 26 Crim. L. Bull. 509 (1990)

Doe v. Federal Grievance Committee: On the Interpretation of Ethical Rules,  55 Brooklyn L.Rev. 485 (1989)

"Through a Glass, Darkly": How the Court Views Motions to Disqualify Criminal Defense Lawyers, 89 Colum. L. Rev. 1201 (1989) [reprinted in 2 Crim. Prac. L. Rev. 551 (1990)]

Her Brother's Keeper: The Prosecutor's Responsibility When Criminal Defense Counsel Has a Conflict of Interest, 16 Am. J. Crim. L. 323 (1989)

"Package" Plea Bargaining and the Prosecutor's Duty of Good Faith, 25 Crim. L. Bull. 507 (1989)

Limits on a Prosecutor's Communications With Prospective Defense Witnesses, 25 Crim. L. Bull. 139 (1989)

A Prosecutor's Communications With Represented Defendants: What Are the Limits?, 24 Crim. L. Bull. 283 (1988)

The Ethical Prosecutor and the Adversary System, 24 Crim. L. Bull. 126 (1988)

Note, Court Appointment of Attorneys in Civil Cases: The Constitutionality of Uncompensated Legal Assistance, 81 Colum. L. Rev. 366 (1981)

Note, A Functional Analysis of the Effective Assistance of Counsel, 80 Colum. L. Rev. 1053 (1980)

## Articles in Legal Periodicals

"Criminal Justice: There's Always More to Learn," Criminal Justice, Summer 2011, p. 1

"What Use Are Legal Academics?," Criminal Justice, Spring 2011, p. 1

"Criminal Justice–What's Ahead?  Roadblocks and New Directions," Criminal Justice, Winter 2011, p. 1

"Thinking About White-Collar Crime and Punishment," Criminal Justice, Fall 2010, p. 1

"Question of the Week – Unauthorized Practice of Law," BNA's Corporate Counsel Weekly 372 (Dec. 9, 2009) [reprinted in BNA, "Legal Ethics for In-House Corporate Counsel," B-2601 (2010)]

Book Review [Peter A. Joy & Kevin C. McMunigal, Do No Wrong  - Ethics for Prosecutors and Defense Lawyers], The Champion 59-60 (Feb. 2009)

"Prosecutors' Professional Independence: Reflections on *Garcetti v. Ceballos*," Criminal Justice, Summer 2010, p. 4

"Deceitful Silence," Litigation, Winter 2007, p. 24

"Feeling a Chill," ABA Journal, Dec. 2005, p. 61 (with David C. Clifton)

"Prosecuting Means More Than Locking Up Bad Guys," Litigation, Fall 2005, p. 12

Articles in *Federal Bar Council News*: "Privileges in the Corporate Context," vol. 12, no. 1, p. 4 (2005); "Ethics Reform in New York," vol. 11, no. 2, p. 11 (2004); "MJP for Litigators," vol. 10, no. 4, p. 14 (2003); "Privately-Funded Seminars for Judges," vol. 9, no. 5, p. 1 (2002); "Multijurisdictional Issues," vol. 7, no. 4, p. 11 (2000); "Moral Ambiguity/Ambiguous Morals: Morgan Stanley and the $10,000 Payment," vol. 6, no. 4, p. 1 (1999); "When Prosecutors Accuse Criminal Defense Lawyers of Wrongdoing," vol. 5, no. 5, p. 1 (1998); "Prosecuting Lawyers," vol. 5, no. 4, p. 11 (1998); "A View From The 'Ethics' Front," vol. 5, no. 3, p. 7 (1998); "Professional Detachment," vol. 4, no. 4, p. 8 (1997); "The Philosophy of Our Ethical Rules," vol. 4, no. 3, p. 23 (1997); "The President vs. Mrs. Jones," vol. 4, no. 1, p. 11 (1997); "Should Judges Promote Professionalism?," vol. 3, no. 4, p. 4 (1996); "Bad Arguments," vol. 3, no. 1, p. 7 (1996); "The Sins of the Lawyer (and the Procedural Consequences)," vol. 2, no. 4, p. 9 (1995); "Attorney Discipline in the Second Circuit," vol. 2, no. 2, p. 11 (1995)

"Interviewing Corporate Client Officers and Employees: Ethical Considerations," ABA Section of Litigation, Committee on Corporate Counsel Newsletter, vol. 19, no. 1, p. 1 (Fall 2004) [reprinted in ABA Section of Litigation, Professional Liability Litigation [Newsletter], vol. 3, no. 1, p. 1 (Winter 2005)]

Client Confidences: Should Lawyers Be Allowed to Reveal Them to Prevent Death or Serious Bodily Harm?: Yes, New York Lawyer, Oct. 2001, p. 20

Adventures in the Mortgage Trade: A Case Study in Legal Ethics, 27 N.Y. Real Property Law Journal 49 (Spring, 1999) (with Joshua Stein) [also published in Commercial Real Estate Financing: What Borrowers and Lenders Need to Know 1999 vol. 2, p. 749 (PLI 1999)]

Lying Clients: An Age-Old Problem, Litigation, Fall 1999, p. 19 [updated and reprinted in Priscilla Anne Schwab, ed., *The Litigation Manual, First Supplement* 1105 (2007)]

When Conflicts of Interest Arise Unexpectedly, Litigation Ethics, Spring/Summer 1998, p. 11

The "No-Contact" Rule in New York State--Some Less Contentious Questions, N.Y. Professional Responsibility Report, Aug. 1998, p.1

The Ten Most Common Ethical Violations, Litigation, Summer 1998, p. 48 [reprinted in Trial (March 1999), p. 70; updated and reprinted in Priscilla Anne Schwab, ed., *The Litigation Manual, First Supplement* 1077 (2007)]

Teaching Legal Ethics in Context, 70 N.Y.S.B.J. 6 (May/June 1998) (with Mary Daly)

Ethical Issues in Representing Children, 7 The Professional Lawyer 9 (1996)

Federal Prosecutors' Ethics: Who Should Draw the Lines?, 7 The Professional Lawyer 1 (1995)

Ethical Issues in Representing Older Clients, 5 The Professional Lawyer 18 (1994)

Crime and Punishment After the S&L Crisis, 46 Consumer Finance L.Q. Rep. 195 (1992)

Conflicts of Interest in Corporate Criminal Cases, 1 Corp. Crim. & Const'l L. Rptr. 98 (1990)

"Judge Kennedy Might Not Meet Expectations of Administration," Nat'l L.J., Dec. 21, 1987, p. 20

## Books

*Professional Responsibility: A Contemporary Approach* (West, 2011) (with Russell G. Pearce & Daniel J. Capra)

*Tax Fraud and Money Laundering* (The John Marshall Publ. Co., 1993) (with Robert H. Hishon & Richard A. Westin)

Editor, *Government Ethics for the 1990's: The Collected Reports of the New York State Commission on Government Integrity* (Fordham Univ. Press, 1991)

## Book Chapters

"Rule 1.10: Imputation of Conflicts of Interest," <u>in</u> The New York Rules of Professional Conduct: Rules and Commentary 235-66 (2010) (NYCLA Ethics Inst., ed.)

"Rule 1.11: Special Conflicts of Interest for Former and Current Government Officers and Employees," <u>in</u> The New York Rules of Professional Conduct: Rules and Commentary 267-86 (2010) (NYCLA Ethics Inst., ed.)

"Rule 1.12: Specific Conflicts of Interest for Former Judges, Arbitrators, Mediators or Other Third-Part Neutrals," <u>in</u> The New York Rules of Professional Conduct: Rules and Commentary 287-95 (2010) (NYCLA Ethics Inst., ed.)

"Ethical Issues in Dealing with Experts," <u>in</u> *Litigators on Experts* 126 (ABA 2010) (with Lawrence J. Fox)

"Ethics in Criminal Advocacy," <u>in</u> *The State of Criminal Justice* 181 (2009) (with Ellen Yaroshefsky)

"Ethics in Criminal Advocacy," <u>in</u> *The State of Criminal Justice* 123 (2007-2008) (with Ellen Yaroshefsky)

"The Ethics of Marketing Legal Services," <u>in</u> *Effective Marketing for Lawyers* (N.Y.S. Bar Ass'n 1996) (with Russell Pearce), and *Effective Marketing for Lawyers* (N.Y.S. Bar Ass'n 2d ed. 2005) (with Russell Pearce)

Reporter to *Evidence in America: The Federal Rules in the United States* (1989-91 supp., Fed. R. Evid. 801, 802, and 804)

## Other Legal Writings

"Interviewing Corporate Client Officers and Employees: Ethical Considerations," in ABA Section of Litigation, 2004 Annual Conference.

Report of the Commission on Multijurisdictional Practice (Aug. 2002)

"Representing Corporations Under Fire: Ethical Considerations – A Hypothetical," and "Representing Corporations Under Fire: Ethical Considerations," in MCLE Marathon 2002 521, 527 (PLI 2002)

Interim Report of the Commission on Multijurisdictional Practice (Nov. 2001)

"A Guide to Professionalism Commissions" report of the ABA Standing Committee on Professionalism (2001)

"Recent Federal Court Decisions in Professional Responsibility," in Current Developments in Federal Civil Practice 2001 413 (PLI 2001) (with Mary Lu Bilek)

Editor, *Litigation Ethics: Course Materials for Continuing Legal Education* (ABA Section of Litigation 2000) (with John Q. Barrett)

"Assisting Clients with Multi-State and Interstate Legal Problems: The Need to Bring the Professional Regulation of Lawyers into the 21st Century" (report summarizing the proceedings of the Symposium on the Multijurisdictional Practice of Law) (June 2000)

"Recent Federal Court Decisions in Professional Responsibility," in Current Developments in Federal Civil Practice 1999 311 (PLI 1999)

"The Duty to Report Ethical Misconduct," in ABA Section of Family Law, *1998 Annual Meeting* 17 (July 31-Aug. 3, 1998)

"Local Rules Limiting Attorney Speech in Criminal Proceedings" (Federal Bar Council, June 1996) (principal author)

"Establishing Ethical Standards for Federal Prosecutors and Defense Attorneys," 49 The Record of the Assn. of the Bar of the City of New York 21 (1994) (principal author)

"Ex Parte Contacts With Employees of a Corporate Party in Civil Litigation," in ABA Section of Litigation, *Best Evidence Seminar* 41 (Apr. 19, 1991)

"Use of an Attorney's Statements Against His or Her Client," in ABA Section of Litigation, *Best Evidence Seminar* 35 (Mar. 9-10, 1990)

<u>**Participation in Professional and Academic Programs**</u>  (since January 2000)

Panelist, "The Ethical and Practical Challenges of Representing a Controversial Client," Federal Bar Council & Stein Center, E.D.N.Y. federal courthouse, June 29, 2011

Panelist, "What is Good Lawyering?," Conference on Padilla and the Future of the Defense Function, NACDL, Cardozo Law School, June 20, 2011

Luncheon speaker, "Staying Ahead of the Curve: What Every Criminal Defense Lawyer Needs to Know," NYSBA, Albany, NY, June 17, 2011

Panelist, "Tackling Ethical Issues Arising in Criminal Cases," NYCLA, June 16, 2011

Panelist, "Third Party Funding of International Arbitration Claims: The Newest "New New Thing, NYSBA Dispute Resolution Section & Fordham Law School ADR and Conflict Resolution Program, June 15, 2011

Panelist, "How the Rules of Professional Conduct Apply to Government Lawyers," Seventeenth Annual Seminar on Ethics in New York City Government, NYC COIB & Center for New York City Law, New York Law School, May 17, 2011

Panelist, "Hypothetically Speaking II: Issues in the Attorney-Client Relationship under the Rules of Professional Conduct," Association of the Bar of the City of New York, May 16, 2011

Moderator, "Ethics Update: Perspectives from the Federal and State Judiciary," N.Y.S. Federal Judicial Council - Advisory Group, E.D.N.Y. federal courthouse, May 11, 2011

Moderator, "Ethics Update: Perspectives from the Federal and State Judiciary," N.Y.S. Federal Judicial Council - Advisory Group, S.D.N.Y. federal courthouse, May 10, 2011

Panelist, "An Overview of Attorney Error: Malpractice, Breach of Ethical Rules and Ineffective Assistance of Counsel," Mental Hygiene Legal Service, May 3, 2011 (videotape)

Panelist, "The Top Five Ethical Violations and Resulting Claims for Legal Malpractice," Spring 2011 National Legal Malpractice Conference, ABA Standing Committee on Lawyers' Professional Liability, Boston, MA, April 28, 2011

Panelist, "Anatomy of a Trial: Young Lawyer Trial Skills Training," ABA Section of Litigation & Criminal Justice Section Annual CLE Conference," Miami, Florida, April 14, 2011

Panelist, "Ethics," IP Enforcement and Litigation 2011: Civil and Criminal Update, PLI, March 30, 2011

Panelist, "Ethical Implications of Legal Aid and Pro Se Assistance," Legal Aid Society, March 18, 2011

Speaker, "Criminal Defense Ethics," 25th Annual Metropolitan New York Trainer, NYS Defenders Ass'n, March 12, 2011

Moderator, "Criminal Defense?: The Ethical and Legal Line Between Zealous Advocacy and Obstruction of Justice ," 25th National Institute on White Collar Crime, ABA Criminal Justice Section, Mar. 3, 2011, San Diego, CA

Panelist, "2011 Ethical Issues," 2011 Winter Bench & Bar Conference, Federal Bar Council, Los Cabos, Mexico, Feb. 21, 2011

Keynote Speaker, "Ted Schneyer's Impact on Legal Ethics Scholarship," The Ted Schneyer Ethics Symposium: Lawyer Regulation for the 21st Century, Univ. Of Arizona, James E. Rogers College of Law, Jan. 28, 2011

Panelist, "Ethical Pitfalls for Business Lawyers," Business Law Section, NYSBA Annual Meeting, Jan. 26, 2011

Co-speaker, "Legal Ethics & Professionalism," Nineteenth Annual London MCLE Fair, CLE Europe Limited, Jan. 15, 2011

Chair and moderator, "Ethical Issues in Pro Bono Representation 2010," PLI, Dec. 21, 2010

Moderator, "Ethical and Privilege Issues for Pharmaceutical Whistleblowers Counsel," Institutional Investor Educational Foundation, New York, NY, Dec. 9. 2010

Moderator, program on ethics and professionalism in criminal prosecution and defense, Multnomah County Courthouse, Portland, OR, Dec. 3, 2010

Panelist, "Ethics and the Construction Lawyer," NYCLA, Nov. 30, 2010

Speaker, "Ethical Practices for the Modern Prosecutor," Brooklyn District Attorney's Office. Oct. 26, 2010

Speaker, "Prosecutive Ethics," annual conference, National Association of Former United States Attorneys, Oct. 9, 2101

Moderator, "A Prosecutor's Brady/Discovery Obligations For Production of Documents," ABA Criminal Justice Section White Collar Crime Mid-Atlantic Regional Committee, Widener Law School, Wilmington, DE, Oct. 7, 2010

Panelist, ""Ethics and Litigation for Today's Trial Counsel," 2nd Annual Litigation Summit, Oct. 6, 2010

Panelist, "Ethical Considerations for Corporate Investigations: Updates 2010," Association of the Bar of the City of New York, September 15, 2010

Panelist, "Hot Ethics Issues for Young Trial Lawyers (and the Young at Heart)," ABA ANNUAL Meeting 2010, San Francisco, CA, August 7, 2010

Speaker, "Criminal; Defense Ethics," New York State Defenders Association 43rd Annual Meeting & Conference, Saratoga Springs, NY, July 27, 2010

Panelist, "Lawyers in Context: Ethical Decision Making in Practice," International Legal Ethics Conference IV, Stanford Law School, July 17, 2010

Moderator, "Prosecutors and their Disclosure Duties: A Regulatory Conundrum," 36rd National Conference on Professional Responsibility, ABA, June 3, 2010

Panelist, "Hypothetically Speaking: Considering Issues for the Practitioner under the New Rules of Professional Conduct,"Association of the Bar of the City of New York, May 17, 2010

Panelist, "Bloomberg Corporate Internal Investigations: Ethical Considerations Seminar 2010," Bloomberg, NY, March 11, 2010

Panelist, "Protecting the Attorney-Client Privilege and Attorney Work Product," 24th Annual National Institute on White Collar Crime, Miami, Florida, Feb. 25, 2010

Panelist, "Half a Century of Advice," Committee on Professional Ethics, NYSBA Annual Meeting, Jan. 29, 2010

Chair, Ethical Issues in Pro Bono Representation 2009, PLI, NY, Dec.22, 2009

Panelist, "Ethics and the Role of Counsel at a Troubled Institution," Banking Law Update 2009: Shaping the Future of the Financial Services System, PLI, NY, Dec. 9, 2009

Moderator, "Ethics: 'Getting it Right and Wrong,'" Criminal Law, Procedure & Evidence Seminar, Brooklyn Law School, Dec. 5, 2009

Panelist, Decoding the New Rules of Professional Conduct: The Changes That Matter, Federal Bar Council, Dec. 3, 2009

Moderator and discussion leader, "New Perspectives on Brady and Other Disclosure Obligations: What Really Works?," Cardozo Law School, Nov. 15-16, 2009

Panelist, "Town Hall Meeting: Brady Practices in State and Federal Jurisdictions," ABA Criminal Justice Section, Washington, D.C., Nov. 5, 2009

Co-speaker, "How to Avoid Lateral Hire Conflicts under Rule 1.10," PLI teleconference, Nov. 3, 2009

Panelist, "Attorney-Client Privilege Issues Confronting General Counsel," N.Y.S. Judicial Institute on Professionalism in the Law, Oct. 30, 2009

Panelist, "Ethics and Professionalism: The Basics and Beyond," Accredited Provider Conference, NYS Continuing Legal Education Board, Oct. 29, 2009

Co-speaker, "The Civil Government Litigator: A View from the Jury Box," 2009 Hofstra Legal Ethics Conference, Power, Politics & Public Service: The Legal Ethics of Lawyers in Government, Oct. 20, 2009

Panelist, "Shyster, Sharks and Saviors: Are Legal Ethics Immoral," NYCLA, Oct. 14, 2009

Panelist, "Professionalism for Criminal Law Practitioners," Multnomah County Bar Association, Portland, OR, Oct. 9, 2009

Panelist, "Choppy Waters – The Ethics of Privilege and Disclosure," 5th Annual Defending the White Collar Crime Case – In and Out of Court, NACDL & the Stein Center for Law and Ethics, Oct. 1, 2009

Presenter and panelist, "Ethics for Breakfast: The New Rules of Professional Conduct and the Revised Power of Attorney Statute – Are You Ready?," Sixth Annual Trusts & Estates Conference, Calvary Hospital, Sept. 22, 2009

Panelist, "Ethical Considerations for Corporate Investigations: Updates 2009," Association of the Bar of the City of New York, September 17, 2009

Panelist, "Avoiding Ethical Minefields When Preparing and Examining Witnesses," ABA Annual Meeting, Chicago, IL, July 30, 2009

Panelist, "Roundtable on Ethical Issues in Class Action Litigation," Class Action Litigation 2009: Prosecution and Defense Strategies, PLI, July 10, 2009

Panelist, "Standards for Prosecuting Corporate Fraud by Federal & State Agencies: The Impact of the Revised Justice Department Charging Guidelines," Association of the Bar of the City of New York, June 23, 2009

Panelist, "Ethics in the Wake of the New Rules of Professional Conduct, NYSBA, June 9, 2009

17

Panelist, "Making Pro Bono *Work*: Sustaining Corporate Pro Bono in an Economic Downturn," ACC-GNY, June 2, 2009

Panelist, "The Year in Review in Confidentiality and Attorney-Client Privilege," 35th ABA National Conference on Professional Responsibility, Chicago, IL. May 28, 2009

Speaker, "Ethics in Criminal Discovery: What Does/Should *Brady* Mean?," West LegalEdcenter (teleconference), May 14, 2009

Luncheon Speaker, "Hot Topics in Ethics and Professionalism," ABA Section of Litigation Committee on Ethics and Professionalism, ABA Section of Litigation Annual Conference, Atlanta, GA, April 30, 2009

Panelist, "Corporate Counsel's Guide to the New Disciplinary Rules," NYCLA, April 22, 2009

Speaker, "Legal Ethics for Customs and International Trade Practitioners," Customs and International Trade Bar Association, April 21, 2009

Panelist, Ethics panel, "Future Perspectives on Affordable Housing and Economic Development in New York City, Stimulus & Beyond,  Association of the Bar of the City of New York, March 27, 2009

Speaker, "New Professional Responsibilities and Ethics Rules," Office of the N.Y.S. Attorney General, March 20, 2009

Panelist, "The False Defense: How Far Can a Criminal Lawyer Go?," Lawline.com (on-line CLE), recorded on March 17, 2009

Panelist, "Choices, Choices: Legal Ethics and Choice of Law," Association of Professional Responsibility Lawyers Midyear Meeting, Boston, Mass., Feb. 13, 2009

Speaker, Ethics CLE, "Pro Bono Opportunities Day 2009," Association of the Bar of the City of New York, Feb. 10, 2009

Moderator, "Pretexting in Investigations: Is it Ethical?," NYSBA Annual Meeting 2009, Jan. 28, 2009

Commentator, Access to Justice Symposium, ABA Section of Litigation, Atlanta, Georgia, Dec. 4, 2008

Speaker, "The Role of Ethics Rules in Reducing the Risk of Wrongful Convictions," Lewis & Clark Law School, Nov. 6, 2008

Speaker, "When Good Ethics Go Bad," The Copyright Society of the U.S.A., NY, NY, Sept. 12, 2008

Panelist, "Ethical Considerations for Corporate Investigations: Updates 2008," Association of the Bar of the City of New York, September 10, 2008

Moderator, "Attorney Client Privilege of Corporations: Vital Component of Due Process or Obsolete Vestige of Corporate Power and Influence?," APRL Annual Meeting, NY, NY, Aug. 9, 2008

Panelist, "Issues in Judicial Ethics," New Appellate Judges Seminar, NYU School of Law, July 16, 2008

Panelist, "Handling Fee Disputes in the U.S. and France," NYCLA, May 21, 2008

Panelist, "You Be the Legal Ethicist: Drawing Lines in Areas of Ethical Ambiguity," New York American Inn of Court, May 19, 2008

Speaker, prosecutorial ethics, meeting of the NJ County Prosecutors Association, Silver Lake, NJ, May 14, 2008

Moderator, "Attorney-Client Confidentiality in the Corporate Setting: Europe and the United States," APRL's Fifth International Meeting, Amsterdam, NE, May 7, 2008

Panelist, "Seeking Justice: Making Sense of the Special Responsibility of the Prosecutor," New York City Bar Bi-Annual Justice Retreat, A Summit on the Prosecution Function, April 12, 2008

Moderator, "Transparency Outside the Courtroom," symposium on Tradeoffs of Candor: Does Judicial Transparency Erode Legitimacy?, NYU Annual Survey of American Law, March 11, 2008

Moderator, "Ethical Responsibilities for Lawyers Negotiating and Settling Claims," Claims Management, Torts and Litigation of Claims - Current Developments and the International Context, Union Internationale des Avocats, Vail, CO, Feb. 29, 2008

Panelist, "Significant Rule Changes that will Change the Face of the Profession," NYSBA Annual Meeting, Jan. 30, 2008

Speaker, "Ethics Within and Beyond the Rules: Examples from Criminal Advocacy," Duke Law Leadership Experience, Duke Law School, Jan. 18, 2008

Panelist, "The City and the World," AALS 2008 Annual Meeting, NY, NY,  Jan. 5, 2007

Panelist, "Technology and Ethical Issues for Lawyers," ABA-CLE Teleconference, Dec. 12, 2007

Speaker, "Criminal Defense Lawyering at the Edge: A Look Back," 2007 Legal Ethics Conference, Lawyering at the Edge: Unpopular Clients, Difficult Cases, Zealous Advocates, Hofstra Univ. School of Law, Oct. 15, 2007

Panelist, "Ethics for Corporate Counsel – The Changing Face of the Attorney-Client Privilege," Second Corporate Counsel Institute, NYSBA, Oct. 12, 2007

Moderator, "Corporate Representation after DOJ's McNulty Memo: The Implications of DOJ Policy for White Collar Defenders, Internal Investigators, Civil Litigators and Everyday Business Advisors," ABA-CLE Teleconference, Oct. 3, 2007

Panelist, "Ethical Considerations for Corporate Investigations: Update 2007," Association of the Bar of the City of New York, September 18, 2007

Panelist, "Issues in Judicial Ethics," Appellate Judges Seminar – New Judges Series, NYU Univ. School of Law, July 12, 2007

Panelist, Professional Ethics Workshop, Securities Indus. and Financial Markets Assn., June 12, 2007

Panelist, "Legal Industry Outsourcing," The American Lawyer, Corporate Counsel & Law Firm Inc., New York, NY, May 23, 2007

Speaker, "Ethical Limits on Informal Discovery," program on Winning Cases in Federal Court – Day 2, New York County Lawyers' Ass'n, May 22, 2007

Panelist, "After Hewlett Packard: Methods & Ethics of Conducting Corporate Investigations," Association of the Bar of the City of New York, May 17, 2007

Trainer, "Ethical Issues in Legal Services Practice," Legal Services of New York, May 7, 2007

Speaker, "Inquiring, Prying, Snooping and Spying -- The Use and Misuse of Private Investigators," American Academy of Matrimonial Lawyers, New York Chapter, May 4, 2007, NY, NY

Panelist, "Technology and Ethical Issues," Technology in the Practice & Workplace Committee Midwinter Meeting, ABA Section of Labor & Employment Law, NYU School of Law, April 27, 2007

Co-presenter, "The Private Bar and the Public Interest: Structuring Deliberation within Professional Associations," 13th Annual Clifford Symposium on Tort Law and Social Policy, DePaul Univ. College of Law, April 19, 2007

Panelist, "When the Ends Justify the Means: Use of Dissembling in Investigations in Aid of Civil and Criminal Litigation," NYCLA Inn of Court, March 22, 2007

Speaker, "Prosecutorial Ethics," Goldstock Criminal Law Lunch Seminar, N.Y.U. School of Law, March 8, 2007

Panelist, "Ethics and Mediation – Where There's Smoke, There's Fire!," Goliath vs. Goliath - Organizing the Construction Case for Mediation, ABA Section of Dispute Resolution, Feb. 23, 2007

Moderator, The Executive Branch's Legal Response to the Post 9-11 World: Unconstitutional Overreach or Necessary Precaution?, Fordham Law School, Feb. 22, 2007

Panelist, "The Prosecution and Defense of American White Collars - An Ethical Quagmire," Federal Bar Council Inn of Court, Jan. 25, 2006

Moderator, "Legal Ethics CLE in the Law School Setting: Can It Be Practical, Academic, and Interesting at the Same Time?," AALS 2007 Annual Meeting, Washington, D.C., Jan. 4, 2007

Co-panelist, Ethics in Criminal Practice, "2006 Legislative Program, Part I," Office of the NYS Attorney General, Dec. 7, 2006

Panelist, "Ethics and Professionalism," N.Y. State Bar Ass'n, Dec. 7, 2006

Speaker and moderator, "Ethics for Government Lawyers," Wisconsin Department of Justice, Office of the Attorney General, Madison, WI, Dec. 5, 2006

Co-panelist, "Ethical Issues Raised by Internal & Governmental Investigations," Mealey's Corporate Liability & Compliance Conference," Miami, Fla., Nov. 14, 2006

Panelist, "The Seventh Annual 'Ethics for Corporate Counsel' Program: Corporations in Crisis," N.Y. State Bar Ass'n, Oct. 13, 2006

Panelist, "NYCLA Retreat: Ethics," N.Y. County Lawyers' Association, Oct. 9, 2006

Response, "When Conscience Clashes with State Law & Policy: Distinctions between the Roles of Lawyers and Judges," Inst. on Religion, Law and Lawyer's Work, Fordham Law School, Sept. 22, 2006

Panelist, "Ethical Considerations for Corporate Investigations: Update 2006," Association of the Bar of the City of New York, Sept. 12, 2006

Panelist, "Assault on the Attorney-Client Privilege: What Every Lawyer Needs to Know," Fall 2006 National Legal Malpractice Conference, ABA Standing Committee on Lawyers' Professional Liability, Chicago, IL, Sept. 8, 2006

Panelist, "Avoiding Inadvertent Production of Privileged Documents," ABA TeleConference and Audio Webcast, August 8, 2006

Speaker, "Choice of Ethics Rules in Arbitration," Transatlantic Perspectives on ADR, St. John's Univ. School of Law & Chartered Institute of Arbitrators, London, England, July 27, 2006

Panelist, "Privileges in Regulatory & Criminal Investigations: Legal & Ethical Issues," Association of the Bar of the City of New York, June 27, 2006

Panelist, "Common Conflicts of Interest in Transactional Law Settings," ABA TeleConference and Audio Webcast, June 27, 2006

Panelist, "Emerging Issues: Money and Government," Twelfth Citywide Seminar on Ethics in New York City Government, N.Y.C. Conflicts of Interest Board/New York Law School, May 23, 2006

Panelist, "Preparing or Coaching the Witness: Where is the Ethical Line?," New York County Lawyers' Association, May 16, 2006

Keynote speaker, "The Conversation Between Law and Medicine," Student Physician Awareness Day, New York Medical College, Mt. Kisco, NY, April 27, 2006

Panelist, "Common Conflicts of Interest in Transactional Law Settings," Spring 2006 National Legal Malpractice Conference, NY, NY, April 6, 2006

Trainer, "Ethical Issues in Legal Services Practice," Legal Services for New York City, March 30, 2006

Co-speaker, "Ethics and Public Interest Law: Discussion of Current Issues (2006)," N.Y. Lawyers for the Public Interest, March 30, 2006

Panelist, "Ethical Considerations of an In-House Lawyer," Annual Seminar of the Securities Industry Association Compliance and Legal Division, Hollywood, Florida, March 20, 2006

Moderator, "Ethical Issues in Private Funds Practice," 7th Annual International Conference on Private Investment Funds, International Bar Ass'n & ABA Section of Business Law, London, England, Feb. 27, 2006

Panelist, "Ethics in Commercial Mortgage Practice," Commercial Real Estate Financing 2006, PLI, Feb. 17, 2006

Panelist, "Government Requests for Corporate Waivers of the Attorney-Client Privilege," NYSBA Annual Meeting, Jan. 25, 2006

Facilitator, "Conference on Representing Children in Families: Children's Advocacy and Justice Ten Years After Fordham," William S. Boyd School of Law, Las Vegas, NV, Jan. 12-14, 2006

Commentator, "Professional Responsibility and the Religious Traditions," AALS Annual Meeting, Washington, D.C., Jan. 4, 2006

Panelist, "Checking the Pulse of the Attorney-Client Privilege," ABA Connection teleconference, Dec. 21, 2005

Moderator, "Litigation Ethics: Problems of Conflicts, Confidentiality and Candor," Federal Bar Council 2005 Fall Bench & Bar Retreat, Nov. 6, 2005

Panelist, "Le secret Professionnel des Avocats en France et aux USA" [Attorney-Client Privilege in France and the U.S.], La Barreau de Lille & New York County Lawyers' Association, Lille, France, Oct. 28, 2005

Panelist, "Le Plaider coupable" [The Guilty Plea], La Barreau de Lille & New York County Lawyers' Association, Lille, France, Oct. 27, 2005

Panelist, "Corporate Crimes: Investigating and Prosecuting the Entity and its Employee," New York Council of Defense Lawyers Retreat, Oct. 15, 2005

Panelist, "Zealous Advocacy: Ethics for the Criminal Defense Attorney," Fordham Univ. School of Law, Oct. 11, 2005

Panelist, "Ethical Considerations for Corporate Investigations," Association of the Bar of the City of New York, September 14, 2005

Moderator, "The Attorney-Client Privilege from Cradle to Grave: An Examination of the Role, Implications, and Viability of the Attorney-Client Privilege," ABA Annual Meeting, Chicago, IL, Aug. 7, 2005

Moderator, "Ethical Issues in Pro Bono," Association of the Bar of the City of New York, June 28, 2005

Panelist, "Ethical Dilemmas for Financial Services Attorneys," SIA Compliance & Legal Division, June 21, 2005

Panelist, "Civility & Zealous Advocacy – Building Blocks to Success: The American College of Trial Lawyers Codes of Pre-Trial & Trial Conduct," Association of the Bar of the City of New York, June 20, 2005

Presenter, Symposium: "Should There Be an Effort to Develop Uniform Statewide Attorney Disciplinary Rules?", NYCLA, May 13, 2005

Panelist, "The Efficacy of Unbundling Legal Services," Partners in Justice: A Colloquium on Developing Collaborations Among Courts, Law School Clinical Programs and the Practicing Bar, New York State Judicial Institute, May 9, 2005

Panelist, "You're Fired! Conflicts of Interest and Disqualification of Counsel," Federal Bar Council, April 26, 2005

Speaker, "Ethical Issues in Legal Services Practice," Legal Services of New York, March 15, 2005

Panelist, "Rising to the Challenge: How Should a Civil Practitioner Deal with Liars, Cheaters, Suicide Threateners, and Other Difficult Clients?," Fordham Univ. School of Law, March 14, 2005

Panelist, "Ethical Considerations in Commercial Mortgage Practice," Commercial Real Estate Financing 2005, PLI, Feb. 18, 2005

Speaker, "United States Regulation of Multijurisdictional Practice," Conference on Liabilities of Lawyers in Crossborder Transactions and Disputes, Center for International Legal Studies, Kitzbuhel, Austria, Jan. 25, 2005

Panelist, "New Developments in Ethical Considerations for the Business Attorney," in MCLE Marathon 2004, PLI, Dec. 16, 2004

Panelist, "Waivers That Work - Managing Conflicts Effectively," NYLJ & Stein Center, Dec. 6, 2004

Moderator, "Practical Problems in Litigation Ethics," Trial Evidence in the Courts: Problems and Solutions, ALI-ABA, Dec. 2, 2004

Panelist, "'Acceptable Lies?' - The Ethics of Negotiation, and Legal Duties of Disclosure," NYLJ & Stein Center, Dec. 1, 2004

Moderator, "Ethical and Professional Issues in Litigation," Marilyn Stein Bellet Conference on Law and Ethics, Hilton Head, SC, Nov. 13, 2004

Panelist, "Ethical Considerations for Corporate Investigations: Updates 2004," Association of the Bar of the City of New York, Sept. 14, 2004

Moderator, "Tattletales or Crimestoppers: Disclosure Ethics Under Model Rules 1.6 and 1.13," ABA Annual Meeting, Atlanta, GA, Aug. 7, 2004

Panelist, "Representing Clients with Diminished Capacity," NYSBA Legal Assistance Partnership Conference, Albany, NY, June 15, 2004

Panelist, "Avoiding Potholes: Discovery and Ethics on the Highway to Trial," ABA Section of Litigation Annual Meeting, Phoenix, AZ, May 6, 2004

Panelist, "Confronting Possible Client Fraud: Is 'Don't Ask, Don't Tell' an Ethically Acceptable Approach?," Brooklyn Bar Ass'n, Apr. 14, 2004

Panelist, "Ethical Issues in Pro Bono," Association of the Bar of the City of New York, Feb. 25, 2004

Panelist, "Ethical Considerations in Commercial Mortgage Practice," Commercial Real Estate Financing 2004, PLI, Feb. 24, 2004

Panelist, "Should New York Adopt the Model Rules of Professional Conduct?," NYSBA 2004 Annual Meeting, Jan. 28, 2004

Panelist, "Ethical Challenges in Employment Law," ABCNY, Jan. 16, 2004

Moderator, "Ethics in Action: The Role of Intergenerational Differences in Setting a Lawyer's Moral Compass," Northeast NALP, Jan. 15, 2004

Panelist, "The Attorney-Client Privilege and the Potential Abuse of Public and Private Power," AALS Annual Meeting, Atlanta, Ga., Jan. 5, 2004

Panelist, "Conflict of Interest Issues in Corporate Representation," PLI, Dec. 19, 2003

Panelist, "New Developments in Ethical Considerations for the Business Attorney," PLI, Dec. 18, 2003

Panelist, "Should Criminal Defense Lawyers Be Constrained by the Truth?: The Limits of Zealous Advocacy," Fordham Univ. School of Law, Nov. 25, 2003

Speaker, "Government Attorney Conduct from the Ethics Committees' Perspective," 2003 Ethics for Government Attorneys, Office of the NYS Attorney General, Nov. 14, 2003

Panelist, "Ethical Dilemmas Faced During the Defense of a Criminal Case," co-sponsored by the Legal Aid Society and the Stein Center, Fordham Univ. School of Law, Nov. 13, 2003

Panelist, "Ethics for Corporate Counsel," N.Y.S. Bar Ass'n Corporate Counsel Section, Oct. 27, 2003

Panelist, "Thorny Ethical Issues in Litigation," Federal Bar Council 2003 Fall Bench & Bar Retreat, CT, Oct. 18, 2003

Panelist, "Legal Ethics vs. Personal Morality: How to Resolve the Unresolvable," co-sponsored by the Legal Aid Society and the Stein Center, Fordham Univ. School of Law, Sept. 29, 2003

Commentator, conference on "Judging Judges' Ethics," Hofstra University School of Law, Sept. 14-15, 2003

Panelist, "Ethical Considerations for Corporate Investigation: Updates 2003," ABCNY, September 11, 2003

Panelist, panel on Ethics for program on "Real Estate Titles and Transfers, N.Y. State Bar Ass'n, June 19, 2003

Moderator, "Conflicts of Interest in Criminal Practice," ABA National Conference on Professional Responsibility, Chicago, IL, May 29, 2003

Co-panelist, "Ethical Considerations of Asset Protection," Estate Planners Day, Estate Planning Council of NYC, May 9, 2003

Panelist, "Plenary Session: Coming Soon to a State Rules Committee Near You: How Will Ethics 2000 Affect Lawyer Liability?," ABA National Legal Malpractice Conference, New Orleans, Apr. 24, 2003

Moderator, "Ethics for Litigators," Assoc. of the Bar of the City of New York, Apr. 14, 2003

Moderator, "Top Ten Reasons Why You Should Read the 2002 Model Rules of Professional Conduct," ABA Section of Litigation Annual Meeting, Houston, TX, April 12, 2003

Panelist, "Collaborations Between Lawyers and Social Workers: Avoiding Ethical Minefields," Fordham Univ. School of Law, April 7, 2003

Moderator, "Effect of Present Wartime Legislation on Practicing Attorneys: A Discussion of Future Implications," conference on American Democracy in Times of War, Benjamin N. Cardozo School of Law, March 24, 2003

26

Speaker, "Criminal Neglect: Non-diligent Criminal Defenders, Under-funded Public Defense Systems, and the Disciplinary Non-response," What Do Clients Want? Emory Conference on Ethics and Professionalism, Emory Univ. School of Law, March 14, 2003

Speaker, "Ethical Issues and the Practice of Public Interest Law," Brennan Center for Justice, March 6, 2003

Panelist, "The Ethics of Helping Clients Who Cannot Help Themselves," Fordham Univ. School of Law, March 3, 2003

Speaker, "Criminal Neglect: Non-Diligent Criminal Defenders, Under-funded Public Defender Systems, and the Disciplinary Non-response," Association for Practical and Professional Ethics annual meeting, Charlotte, N.C., Feb. 28, 2003

Panelist, "Benchmarks of Ethics Center Excellence: Funding Strength," Ethics Center Colloquium: Strategic Planning for Ethics Centers, Association for Practical and Professional Ethics, Charlotte, N.C., Feb. 27, 2003

Panelist, "Ethical Considerations in Commercial Mortgage Practice," Commercial Real Estate Financing 2003, PLI, Feb. 25, 2003

Moderator, panel on "Integrity in the Practice of Law," Conference on Integrity in the Law, Fordham Univ. School of Law, Feb. 7, 2003

Co-presenter, Asset Protection – Ethical Considerations, UJA Federation of NY, Feb. 4, 2003

Trainer, "Disciplinary Procedures and Overview of Issues Relevant to MELS' Practice," Legal Services for New York City, Feb. 3, 2003

Panelist, "New Developments in Ethical Considerations for the Business Attorney," PLI, December 19, 2002

Panelist, "Ethical Issues in Representing a Corporation Under Investigation," Fordham Univ. School of Law, November 19, 2002

Luncheon speaker, "Ethical Issues for Government Lawyers in Dealing with Witnesses," Professional Responsibility Officers' Conference, U.S. Department of Justice, Washington, D.C., November 13, 2002

Panelist, "Talking to the Media: Practical & Ethical Considerations Lawyers Need to Know about the Big, Bad World of TV & Radio," Association of the Bar of the City of New York, November 12, 2002

Moderator, "Moral Philosophy and the Practice of Justice," Federal Bar Council, Kerhonkson, NY, October 26, 2002

Panelist, "Representing the Corporation in Crisis," New York State Bar Association, Business Law Section Fall Meeting, St. Thomas, October 11, 2002

Panelist, "Seminars for Judges: Should Judges Attend Seminars Funded by Private Organizations, and if so, How Should Such Programs Be Funded?,"Association of the Bar of the City of New York, October 9, 2002

Speaker, ABA National Legal Malpractice Conference, Chicago, IL, Sept. 13, 2002

Panelist, "Keeping to the Straight and Narrow: Ethical Issues for Civil Litigators," N.Y. State Bar Ass'n, June 7, 2002

Panelist, "Teaching Professional Responsibility: 'Woodshedding' or Coaching the Witness and Impeaching the Honest Witness," plenary session of AALS Conference on Evidence, Alexandria, Va., June 1, 2002

Moderator, "Law Practice at the Crossroads: How Far Should We Go in Changing Rules Governing Cross-Border Practice and Bar Admission?," N.J. State Bar Ass'n annual meeting, May 22, 2002

Panelist, "The New York Lawyer Practicing Delaware Law" (program on "The Delaware-New York Nexus 2002"), N.Y. County Lawyers' Ass'n, May 3, 2002

Speaker, "Prosecutorial Ethics as Usual," conference on ABA Model Rules of Professional Conduct, University of Illinois School of Law, April 5, 2002

Moderator, "Ethical Issues for the Lawyer in Dealing with Mentally Ill Clients," Association of the Bar of the City of New York, March 23, 2002

Moderator, "Legal Issues Arising from Acts of Terrorism and Anti-Terrorist Efforts," U.S. Judicial Conference for the District of New Jersey, March 20, 2002

Co-panelist, "Ethical Issues in Transactional Practice," Fordham Law School, March 6, 2002

Trainer, "Selected Topics in Legal Ethics," Legal Services for New York City, March 5, 2002

Speaker, "Ethical Considerations," program on "Commercial Real Estate Finance," PLI, February 26, 2002

Panelist, "Legal Ethics in the Practice of Criminal Law," Association of the Bar of the City of New York, February 21, 2002

28

Panelist, "Ethics Issues in Multijurisdictional Practice," ABA Connection, February 20, 2002 and February 21, 2002 (teleconference)

Panelist, "Dialogue Regarding the Issue: Justice Monitors Attorney/Client Communications," Joint program of APRL and ABA Center for Professional Responsibility, ABA Midyear Meeting, Philadelphia, Jan. 31, 2002

Panelist, "Preparing and Presenting Experts: Practical and Ethical Issues," N.Y.S. Bar Ass'n annual meeting, Antitrust Law Section, Jan. 24, 2002

Speaker, "Ethical Issues and the Practice of Public Interest Law," Brennan Center for Justice at NYU School of Law, Dec. 11, 2001

Panelist, New Developments in Ethical Considerations for the Business Lawyer, MCLE Marathon 2001, PLI, Dec. 7, 2001

Speaker, "Ethics and Professionalism," program titled "Update 2001," N.Y.S. Bar Ass'n, Nov. 2, 2001

Panelist, "Ethics and Discovery," Federal Bar Council, Oct. 14, 2001

Co-presenter, "Ethics for Transactional Lawyers," Fordham Law School, Oct. 10, 2001

Speaker, 2001 Legal Ethics Conference: "Legal Ethics: What Needs Fixing?," Hofstra University School of Law, Sept. 10, 2001

Panelist, "Ethics and Criminal Procedure," Israeli Ministry of Justice (in conjunction with the Stein Center), Jerusalem, Israel, July 5, 2001

Panelist, ethics issues in real estate practice, "Real Estate Titles and Transfers," N.Y.S. Bar Ass'n, June 14, 2001

Co-chair and speaker, "Ethics and Professionalism," N.Y.S. Bar Ass'n, June 13, 2001

Panelist, "Ethical Issues in Welfare Advocacy," The Legal Aid Society, June 11, 2001 Panelist, "Ethics in Government," State of New York Office of the Attorney General, June 9, 2001

Panelist, "What Every New Attorney Must Know About Ethics, Part II," PLI, May 29, 2001

Panelist, "Training the Advocate," ABA Section of Litigation Annual Meeting, Phoenix, AZ, May 10, 2001

Presenter, ethics issues in commercial real estate finance, program on "Commercial Real Estate Finance," PLI, May 4, 2001

29

Panelist, program on Ethics in Litigation, New York County Lawyers' Assn., April 30, 2001

Presenter, Clifford Symposium on Tort Law and Social Policy ("Smoke Signals: The Changing Landscape of the Practice, Financing and Ethics of Civil Litigation in the Wake of the Tobacco Wars"), April 5-6, 2001, DePaul College of Law

Moderator, Ethical Issues in Settlement Negotiations, Walter F. George School of Law, Mercer University, March 9-10, 2001

Presenter, CLE program on ethics in criminal defense representation, Brooklyn Defender Services, Jan. 30, 2001

Panelist, Symposium on Unlawful Practice of Law: Toward a Definition of the "Practice of Law," NYSBA annual meeting, Jan. 25, 2001

Panelist, CLE program on legal ethics, PLI, Nov. 21, 2000

Panelist, CLE program on ethics in transactional representation, Fordham Univ. School of Law, Nov. 8, 2000

Panelist, CLE program on ethics in criminal advocacy, Fordham Univ. School of Law, Nov. 1, 2000

Panelist, CLE program on ethics in real estate transactions, Chicago Title, Oct. 30, 2000

Panelist, CLE program on witness preparation, Federal Bar Council, Oct. 25, 2000

Panelist, symposium on professionalism sponsored by S. Carolina Univ. School of Law, Savannah, Ga., Oct. 21, 2000

Panelist, CLE program on ethical issues for legal services lawyers, LSNY, Oct. 11, 2000

Presenter, symposium on ethics issues for law professors, S. Tex. College of Law, Oct. 6, 2000

Presenter, faculty workshop, ethics issues for law professors, Fordham Univ. School of Law, Sept. 28, 2000

Panelist, "Ethical Considerations in Asset Protection – Views from the Bench and Bar," ABA annual meeting, July 10, 2000

Panelist, "Lawyer vs. Client: Avoiding Ethical Pitfalls When the Attorney-Client Relationship Becomes Rocky," ABA annual meeting, July 9, 2000

Panelist, program on corporate internal investigations and cooperation, titled "I'm from the Government and I'm Here to Help You," ACCA, June 27, 2000

Panelist, program titled "Ethical Considerations for Criminal Practitioners," NYCLA, June 27, 2000

Speaker, "The Blurring Line Between Law & Business – Maintaining Ethical Standards," NYLJ General Counsel Conference, June 16, 2000

Panelist, panel on Ethics and the Newsgathering Process, for PLI program on "Newsgathering & Libel Litigation 2000," June 15, 2000

Member of planning committee, Partnerships Across Borders: A Global Forum on Access to Justice, ABCNY, Apr. 6-8, 2000.

Speaker, Symposium on "Prosecutorial Misconduct: Discretion, Remedies, and Ethics," Georgetown Law School, Mar. 30, 2000

Speaker, CLE program on legal ethics, Appellate Division, First Department, Mar. 27, 2000

Speaker, Symposium on "Legal Ethics for Government Lawyers: Straight Talk for Tough Times," Widener Univ. School of Law (Harrisburg), March 23, 2000

Organizer and participant, Symposium on the Multijurisdictional Practice of Law, Mar. 10-11, 2000

Speaker, CLE program on current topics in legal ethics, Fordham Law School, March 7, 2000

Panelist, "The Ethics, Tactics and the Law of Witness Preparation," Federal Bar Council annual winter meeting, Feb. 29, 2000

Panelist, "Lawyers Under Investigation: Are Prosecutors and Defense Lawyers Simply 'Doing Their Jobs'?", Federal Bar Counsel annual winter meeting, Feb. 28, 2000

Speaker, "The Future of the Legal Profession: A Symposium on Multidisciplinary Practice," Minnesota Law School, Feb. 26, 2000

Moderator, workshop program for deans and bar leaders, ABA Mid-Year Meeting, Feb. 11, 2000

Organizer and speaker, CLE program on ethics in litigation, Fordham Law School, Feb. 8, 2000

Invited guest, meeting of the Subcommittee on Attorney Conduct Rules, Committee on Rules of Practice and Procedure, Judicial Conference of the United States, Feb. 4, 2000

Organizer and introducer, program on "Ethics in Criminal Advocacy," AALS Annual
Conference, Jan. 6, 2000

"KLEIN EXHIBIT 7."
EMAIL DATED JULY 30, 2008 SENT TO AURORA CASSIRER,
ESQ.

**Hershel Klein**

| | |
|---|---|
| **From:** | Hershel Klein [hershel@flexocraft.com] |
| **Sent:** | Wednesday, July 30, 2008 4:20 PM |
| **To:** | Cassirer, Aurora |
| **Subject:** | RE: profile |

Aurora,

I will be emailing you the info.
Is it necessary to do a confidently agreement before I send the info to you? we are very conscious about keeping this project confidential.

Best,
HK

> -----Original Message-----
> **From:** Cassirer, Aurora [mailto:Aurora.Cassirer@troutmansanders.com]
> **Sent:** Wednesday, July 30, 2008 4:03 PM
> **To:** Hershel Klein
> **Subject:** RE: profile
>
> My phone number is 212 704 6249.
>
> > -----Original Message-----
> > **From:** Hershel Klein [mailto:hershel@flexocraft.com]
> > **Sent:** Wednesday, July 30, 2008 4:02 PM
> > **To:** Cassirer, Aurora
> > **Subject:** profile
> >
> >
> >
> > Best regards,
> > Hershel
> >
> > ~~~~~~~~~~~~~~~~~~~~~~
> > *Hershel Klein*
> > *Flexo Craft Prints*
> > *1000 First St.*
> > *Harrison NJ 07029*
> > *800-785-2737 ext 125*
> > *Fax: 973-482-9574*
> > *Private Fax: 800-599-2334*
> > ~~~~~~~~~~~~~~~~~~~~~~

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

**KLEIN EXHIBIT 7**

KRINSKY PLLC

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

"KLEIN EXHIBIT 8-A."
EMAIL AS TO CHINA REAL ESTATE PROJECT.

## Abe Klein

**From:** Hershel Klein [hershel@flexocraft.com]
**Sent:** Wednesday, July 30, 2008 5:42 PM
**To:** 'Cassirer, Aurora'
**Cc:** abe@flexocraft.com
**Attachments:** Binder1.pdf; Zheng project.xls

Aurora,

Please see attached docs.

Highlights of project;

City gives the land – 710,000 sq meters and we need to pay 120,000,000 RMB
we need to pay relocate residents and demolish for a total of 260,000,000 RMB
total construction costs is 458,000,000 RMB
Total cost 838,000,000 rmb

Total revenue from selling apartments/shops is 1,302,000,000 rmb
Government pays us back 150,000,000 rmb for infrastructure
Total revenue 1,452,000,000 rmb

Total cost to invest is 100,000,000 rmb
Mr Zheng (Chinese guy) is looking for us to invest 40% and get 40% of the profit and he will invest 60% and get 60% of the profit

Mr Zheng claims that project will pre-sell and therefore only 100,000,000 rmb is needed to take this project to completion
Mr Zheng claims that we can force the residents to relocate for a cost included in excel sheet
Mr Zheng claims that the total cost and sell numbers are accurate based on current market conditions and demand

We need Due diligence to be done to verify all the expense and revenue numbers are accurate
We need due diligence to be done to verify that all the logistical things are correct that all the details that need to happen to make this project happen in reality actually can happen.
And last but not least we will need the legal structure to be set up in a way that it will work and have everybody protected.

Best regards,
Hershel

~~~~~~~~~~~~~~~~~~~
**Hershel Klein**
**Flexo Craft Prints**
**1000 First St.**
**Harrison NJ 07029**
**800-785-2737 ext 125**
**Fax: 973-482-9574**
**Private Fax: 800-599-2334**
~~~~~~~~~~~~~~~~~~~

1

**KLEIN EXHIBIT 8**

# Attachment 1

# 鄄城县千年古城项目
# 开发合同

甲方：鄄城县人民政府

乙方：山东锦绣投资集团有限公司

为充分发挥鄄城千年古县的资源优势，挖掘区域特色的历史文化，发展特色经济，培育新的经济增长点，优化产业结构，推动区域经济快速发展，鄄城县委、县政府决定开发建设鄄城古城综合旅游项目，由山东锦绣投资集团实施开发。经友好协商，甲、乙双方制定如下合同条款，双方共同遵守：

一、项目内容

项目以鄄城原古城为基础，以汉代建筑风格为主要特色、以千年古县为主打品牌、以旅游业为主导产业，集文化、旅游、商贸、饮食、娱乐、住宿多功能为一体，建设性恢复鄄城古城。项目名称暂定为"鄄城县千年古城综合开发项目"，项目开发单位为乙方，建设地址在现鄄城县城。项目内容由三个主要功能园区组成，即护城景观河、四个城门楼及广场和汉代古建筑风格的商品房。项目总开发面积约 1500 亩，总拆迁面积约 36 万平方米、总建筑面积 50 万平方米，道路、广场约 20 万平方米，总投资预计为 亿元人民币。

二、项目用地

项目土地作为项目开发建设用地供乙方进行开发建设。乙方按国家规定的法律程序（即招、拍、挂）取得土地使用权，乙方按国家规定交纳土

地出让金，土地出让金全部用于该开发项目基础设施的建设，委托乙方组织实施。基础设施建设的内容包括景区主要道路的修建，电线、电缆、管道的铺设、路灯及其他公共照明设备的安装、环城公园的改造、污水治理、公共绿地和温泉水入户工程建设等。基础设施建设投资不低于 1.5 亿元。

三、项目建设

1、总开发项目分两期进行，一期工程规模为总项目的 1/2，总投资 3 亿元人民币，自本合同签订之日起一月内实施，一年内完成。一期工程完成后三个月内，二期工程开工建设，总投资 3 亿元人民币，一年半完成。

2、项目开发地块内所有被拆迁单位及个人的拆迁补偿和安置全部由乙方负责，拆迁补偿标准按国家有关规定执行。

3、整个项目工程的规划、设计、承发包、建设、施工由乙方全面负责，自筹资金、自主经营、自行管理。

4、乙方必须严格按照县政府批准的项目建设详细规划方案施工，按规划设计要求完成门前路面硬化、供电、排水、消防、绿化等基础设施及公用配套设施的建设。乙方保证公共设施不低于如下标准：

（1）修建四座古城门楼。五处文化景点：陈王府、读书台、舜王府、点将台及古泉广场。建造 16 个公厕、60 个垃圾转台、12 个景观亭、公共广场不少于 8 个、各类雕塑 160 个、假山、喷泉 30 处、景观桥梁 8 座、环城公园码头 4 处、15 米宽的公共道路 6 公里、8 米宽的公共道路 40 公里，（公共道路全部采用青石板铺设）。排污管道 30 公里、雨水管道 22 公里。供水管道 32 公里、主电缆 15 公里、次电缆 30 公里、主电缆沟 15 公里、

次电缆沟 30 公里。各式路灯 3000 个。各类绿化景观树 30000 株。绿地 80000 平方米。各式装饰灯台 6000 组。环城公园景观河最宽处 120 米，其余 80 米、60 米各种造型不等。各式廊榭 20 处。温泉井及有关配套设施。

（2）项目的建设与必要的配套要同步进行。项目的建设与配套由县政 府各职能部门代表县政府检查落实督促实施。

5、开发项目的工程质量必须符合设计要求和国家有关标准，工程一次 性质量验收合格率要达到 100%。

6、项目完成后，乙方向甲方提交综合验收申请报告，甲方接到报告后 30 日内，会同有关部门进行验收。

7、验收合格后，由房产管理部门办理房产确权手续证。

四、项目管理

1、甲方成立项目开发建设领导小组，配合乙方搞好开发项目的拆迁、 补偿和项目建设。

2、优惠政策：项目建设期间各项行政性收费全免（上缴省、市收费项 目除外），服务性收费按最低标准交纳。该项目所产生的全部税收在鄄城缴 纳。征地契税和前三年的所得税（除县及县以下部分）全部奖励给乙方， 用于文化旅游设施的建设。

3、甲方对乙方的开发给予大力支持，负责协调解决开发中的有关问题。 未经开发建设领导小组批准，任何单位和个人不得乱收费，不得进行不正 当的运输、装卸、材料采购等，确保良好的建设经营环境。

4、甲方按政策和合同规定的内容对乙方的开发工程负责监督检查。在

检查中，乙方应主动提供合同履行情况以及有关资料。

5、项目开工前，乙方要将拆迁补偿资金存入指定专户，并接受甲方监管。

五、乙方责任

1、在符合郸城县旅游总体发展规划的前提下进行项目开发建设。项目建设的详细规划设计方案必须公示并经甲方审核批准后，报甲方存档。

2、在规划、建设、经营过程中，严格执行国家有关规定，自觉接受有关部门的管理和监督，自觉承担文物保护的责任和义务。

3、为保证本合同依法全面履行，乙方必须向甲方提供开户银行的名称，开户帐号及银行出具的资金证明。

4、乙方擅自变更规划设计、项目性质及建设计划，甲方有权责令限期改正，乙方还应按开发项目投资总额的百分之一向甲方支付违约金。

5、开发项目未经综合验收或验收不合格不得交付使用，否则，按国家有关规定处理。

6、除本可抗拒因素外，乙方不按期完成拆迁安置任务，不按开工期限开发建设，不按期交付使用，甲方责令限期改正，逾期不改正，按《城市房地产管理法》处理；若属客观原因造成开发项目不能如期完成，乙方应提前写出延期竣工报告，经甲方批准后执行。

7、乙方要完善安全生产措施，建设施工过程中出现的一切人身、财产安全事故，由乙方承担全部责任，甲方不负任何责任。

六、合同生效、补充、终止

Case 1:12-cv-03337-JG   Document 1-59   Filed 07/05/12   Page 146 of 234 PageID #: 1507

1、本合同由双方签字、盖章之日起生效。

2、本合同未尽事宜，经甲、乙双方协商同意，订签补充协议。补充协议与本合同具有同等法律效力。

3、本合同一式四份，甲、乙双方各执两份。

三方：

法人代表：_____（签字）

乙方：山东锦绣投资集团有限公司（盖章）

法定代表人：_____（签字）

| Project | Land Area (Sq Metre) |
|---|---|
| Description | |
| Total land under buildings | 180,000 |
| Total area of Public Facilities | 500,000 |
| Total land area of project. | 710,960 |

| 1st Stage of Project Include | Unit (Sq Metre) |
|---|---|
| Apartments | |
| Shops | 86,000 |
| Public Facilities | 200,000 |
| Others | |

| 2nd Stage of Project Include | Unit (Sq Metre) |
|---|---|
| Apartments | |
| Shops | 84,000 |
| Public Facilities | 200,000 |
| Others | |

**Sell**

| | SQ Meter | SQ Meter Sell Price | Income | | Today exchange rate (profit in USD will increase according to exchange rate) | 6.885 |
|---|---|---|---|---|---|---|
| Apartments | | ¥ 1,500 | | ¥ 690,000,000 | $100,217,865 | Potential increase to RMB2,000 for Phase Two |
| Shops | 170,000 | ¥ 3,600 | | ¥ 612,000,000 | $88,888,889 | Potential increase to RMB 7,777 for Phase Two |
| Government Inflow | | | | ¥ 150,000,000 | $21,786,492 | |
| | | | Total revenue | ¥ 1,452,000,000 | $210,893,246 | |

¥1,302,000,000

**Buy**

| | | Demolition and relocation expense | Income | | | Building cost sq meter? |
|---|---|---|---|---|---|---|
| | | | | ¥ 760,000,000 | $27,763,253 | Potential up to 10% increase |
| | | Apartment Building Cost | | ¥ 312,000,000 | $46,768,337 | Fixed Cost | 700 | $501.67 |
| | | Public area cost Government Outflow | | ¥ 120,000,000 | $17,429,194 | Fixed Cost |
| | | Shops building Cost | | ¥ 136,000,000 | $19,753,086 | Fixed Cost | 800 | $116.19 |
| | | Others | | | | Tax free |
| | | Gross profit before tax ¥ | | 614,000,000 | $89,179,375 | |

¥458,000,000

| 50% Zhang/40% Klein Joint Venture | | | | | | |
|---|---|---|---|---|---|---|
| Total Investment | | | ¥ 100,000,000 | $14,524,328 | |
| Invest | Zhang | 0.6 | ¥ | 60,000,000 | $9,714,597 | After the initial investment to start the project, the |
| Invest | Klein | 0.4 | ¥ | 40,000,000 | $5,809,731 | commercial and residential is being presold (at a |
| Income | Zhang | 0.6 | ¥ | 368,400,000 | $53,507,625 | discount) and paid for in cash by buyers, which sustains |
| Income | Klein | 0.4 | ¥ | 245,600,000 | $35,671,750 | the project. With a healthy cash flow, pre-selling can stop. |

Selling finished units, increases the sell price.

**Timing**
Two months to prepare demolition and relocation
6 months demolition project
1 year building phase 1
Phase 2 can overlap, depending on demand    Total of 20 Months
As demand increases, prices will rise, project can be slowed down for Phase 2 to cause further price increases

Government gives property
people from poorly get evicted

State to Pay land transfer 150,000,000 RMB? Used for all infrastructure???
Relocation compensation by state regulation? What is it?

Why is he looking for a partner to invest? Why not the bank?
Need to work out the Joint Venture Logistics, and protection.

What is the discount offered for pre selling?
The special loan arrangement with the government to help people buy, is that also for pre sell?
What percent of sale will government finance? What is the special interest rate?
Do the people need to buy at the time of taking the loan or when they move?

**Phase 1**

¥142,320,000.00 Apartment
¥309,662,000.00 Shops
¥75,000,000.00 Gov Inflow
¥526,700,000.00

¥130,000,000 Dom
¥66,000,000 apartment
¥68,000,000 Shops
¥60,000,000 half Public. Gov Overflow
¥627,000,000

¥199,800,000 Net Phase 1
¥28,946,980.20 Net Phase 1 USD

| 460,000 | ¥ 700 |
|---|---|
| 170,000 | ¥ 800 |

"KLEIN EXHIBIT 9."
EMAIL DATED JULY 30, 2008 SENT BY AURORA CASSIRER,
ESQ.

## Hershel Klein

**From:**     Cassirer, Aurora [Aurora.Cassirer@troutmansanders.com]
**Sent:**     Wednesday, July 30, 2008 6:56 PM
**To:**       Hershel Klein
**Subject:**  RE: profile

Hershel,
I do not believe that you need a confidentiality agreement with your attorney since we are bound to keep your
communications with us confidential.
Rori

> -----Original Message-----
> **From:** Hershel Klein [mailto:hershel@flexocraft.com]
> **Sent:** Wednesday, July 30, 2008 4:20 PM
> **To:** Cassirer, Aurora
> **Subject:** RE: profile
>
> Aurora,
>
> I will be emailing you the info.
> Is it necessary to do a confidently agreement before I send the info to you? we are very conscious about keeping
> this project confidential.
>
> Best,
> HK
>
> > -----Original Message-----
> > **From:** Cassirer, Aurora [mailto:Aurora.Cassirer@troutmansanders.com]
> > **Sent:** Wednesday, July 30, 2008 4:03 PM
> > **To:** Hershel Klein
> > **Subject:** RE: profile
> >
> > My phone number is 212 704 6249.
> >
> > > -----Original Message-----
> > > **From:** Hershel Klein [mailto:hershel@flexocraft.com]
> > > **Sent:** Wednesday, July 30, 2008 4:02 PM
> > > **To:** Cassirer, Aurora
> > > **Subject:** profile
> > >
> > >
> > >
> > > Best regards,
> > > Hershel
> > >
> > > ~~~~~~~~~~~~~~~~~~~
> > > *Hershel Klein*
> > > *Flexo Craft Prints*
> > > *1000 First St.*
> > > *Harrison NJ 07029*
> > > *800-785-2737 ext 125*
> > > *Fax: 973-482-9574*
> > > *Private Fax: 800-599-2334*
> > > ~~~~~~~~~~~~~~~~~~~

**KLEIN EXHIBIT 9**

KRINSKY PLLC

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

"KLEIN EXHIBIT 15."
EMAIL DATED JULY30, 2008 FROM ABRAHAM KLEIN.

**Abe Klein**

| | |
|---|---|
| **From:** | Cassirer, Aurora [Aurora.Cassirer@troutmansanders.com] |
| **Sent:** | Wednesday, July 30, 2008 9:40 PM |
| **To:** | abe@flexocraft.com; hershel@flexocraft.com |
| **Cc:** | Epstein, Edward J. |
| **Subject:** | Re: |

Let us all call in at 9:45 or in about seven minutes to 1-800-2401720 passcode 77540063.
------------------------
Sent from my BlackBerry Wireless Handheld

---

**From:** Abe
**To:** Cassirer, Aurora; hershel@flexocraft.com
**Sent:** Wed Jul 30 21:35:55 2008
**Subject:** RE:
Absolutely I can be reached on my cell 646-261-3803 or I can call him if you can give me the number

**From:** Cassirer, Aurora [mailto:Aurora.Cassirer@troutmansanders.com]
**Sent:** Wednesday, July 30, 2008 9:29 PM
**To:** abe@flexocraft.com; hershel@flexocraft.com
**Subject:** Re:


Are you available now for a conference call with Edward Epstein in Shanghai?
------------------------
Sent from my BlackBerry Wireless Handheld

---

**From:** Abe
**To:** Cassirer, Aurora; hershel@flexocraft.com
**Sent:** Wed Jul 30 21:22:09 2008
**Subject:** RE:
I just wanted to make that note so as when the documents are read, you won't be puzzled as to why you read in one place 150mm and below 120mm. that's it.

**From:** Cassirer, Aurora [mailto:Aurora.Cassirer@troutmansanders.com]
**Sent:** Wednesday, July 30, 2008 9:05 PM
**To:** abe@flexocraft.com; hershel@flexocraft.com
**Subject:** Re:


I have asked my partner Edward Klein to get back to me as soon as possible. I will let you know as soon as I hear from him. R
------------------------
Sent from my BlackBerry Wireless Handheld

---

**From:** Abe
**To:** 'Hershel Klein' ; Cassirer, Aurora
**Sent:** Wed Jul 30 20:32:54 2008
**Subject:** RE:
Land purchase is 150mm, it shows in the excel sheet as 120mm, and there is a reason. But the contract calls for 150mm

**KLEIN EXHIBIT 15**

KRINSKY PLLC

**From:** Hershel Klein [mailto:hershel@flexocraft.com]
**Sent:** Wednesday, July 30, 2008 5:42 PM
**To:** 'Cassirer, Aurora'
**Cc:** abe@flexocraft.com
**Subject:**

Aurora,

Please see attached docs.

Highlights of project;

City gives the land – 710,000 sq meters and we need to pay 150,000,000 RMB
we need to pay relocate residents and demolish for a total of 260,000,000 RMB
total construction costs is 458,000,000 RMB
Total cost 838,000,000 rmb

Total revenue from selling apartments/shops is 1,302,000,000 rmb
Government pays us back 150,000,000 rmb for infrastructure
Total revenue 1,452,000,000 rmb

Total cost to invest is 100,000,000 rmb
Mr Zheng (Chinese guy) is looking for us to invest 40% and get 40% of the profit and he will invest 60% and get 60% of the profit

Mr Zheng claims that project will pre-sell and therefore only 100,000,000 rmb is needed to take this project to completion
Mr Zheng claims that we can force the residents to relocate for a cost included in excel sheet
Mr Zheng claims that the total cost and sell numbers are accurate based on current market conditions and demand

We need Due diligence to be done to verify **all** the expense and revenue numbers are accurate
We need due diligence to be done to verify that all the logistical things are correct that all the details that need to happen to make this project happen in reality actually can happen.
And last but not least we will need the legal structure to be set up in a way that it will work and have everybody protected.

Best regards,
Hershel

~~~~~~~~~~~~~~~~~~~~
*Hershel Klein*
*Flexo Craft Prints*
*1000 First St.*
*Harrison NJ 07029*
*800-785-2737 ext 125*
*Fax: 973-482-9574*
*Private Fax: 800-599-2334*
~~~~~~~~~~~~~~~~~~~~

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

---

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

---

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

"KLEIN EXHIBIT 19."
EMAIL DATED AUGUST 1, 2008 FROM EDWARD EPSTEIN,
ESQ.

## Abe Klein

| | |
|---|---|
| **From:** | Epstein, Edward J. [Edward.Epstein@troutmansanders.com] |
| **Sent:** | Friday, August 01, 2008 7:40 AM |
| **To:** | abe@flexocraft.com |
| **Cc:** | hershel@flexocraft.com; Cassirer, Aurora |
| **Subject:** | Heze Project |
| **Attachments:** | company brochure.pdf; Shandong (2.62 MB); Master Case Studies China Focus 20071212 small (NXPowerLite).pdf; Real Estate Exoerience in Mainland China Brochure.pdf |

<<company brochure. pdf>> <<Shandong>> <<Master Case Studies China Focus 20071212 small (NXPowerLite). pdf>> <<Real Estate Exoerience in Mainland China Brochure. pdf>>

Dear Abe:

It was very nice to talk to you and Hershel yesterday about the real estate project in Heze Shandong China, which you may be interested in pursuing, subject to preliminiary due diligence into the land development issues and pricing.

Real estate M&A and financing are key areas of our practice in Shanghai. I have attached a brochure which sets out our capability in this area and representative transactions.

I have also spoken to Knight Frank, which is one of the international real estate consultancies we work with in China on real estate valuations and project assessments. I have also attached their particulars and recommend that you work with them on assessing the project. They can offer a range of services in this regard but it seems from our call that at this preliminary stage you would only need them to send a team to Heze backed by office based researchers. This team would discreetly collect information on the proposed masterplanning for the area, recent land sales, comparable property transactions and the general development environment. The deliverables would be a summary of this information together with a commentary on the overall viability of the project. Their fees for this service would be RMB40,000 ($6,000 approx.) plus RMB10,000 in expenses ($1,500 approx.) The can also deliver you a comprehensive project analysis, the details and fees for which are set out in the attached e-mail from Andrew Slevin, who is the Managing Director of their Shanghai office. I have also attached Knight Frank China's company brochure and a slide presentation on their methodology in China.

As for the legal due diligence, we estimate that our fees for a preliminary legal due diligence into the site at Heze and advice on the feasibility of the project as proposed by your potential joint venture partner will be in the range of $25,000 to $35,000. Our fees will include a site visit, inspection of Heze government land and planning records, review of current ownership records and records of existing corporate owners (if any), preparation of a preliminary due diligence report and legal advice. These fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of $2,000 to $5,000), travel and accommodation to Heze (estimated to be in the range of $600 to $1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into Chinese (which will be quoted separately if required).

Therefore, including Knight Frank's report, we would recommend that you budget between $45,000 to $50,000 to determine the feasibility of the Heze project. We realize that this budget is considerably higher than you might budget for a similar project in the US but as you have considerable experience in doing business in China, you will appreciate that China is far less transparent and its legal system is still developing so that these tasks all require a higher level of difficulty in China than in the US.

Please let us know if you would like to proceed on this basis

1

**KLEIN EXHIBIT 19**

KRINSKY PLLC

Best regards.

Edward

_____
**Edward J. Epstein** | Managing Partner, Shanghai | **Troutman Sanders LLP** | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China
| Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

---

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely
for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and
delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is
strictly prohibited

# Attachment 1

# Company Brochure

# Attachment 2

# Shandong

# ATTACHMENTS
# 1 & 2
# OMITTED

## Abe Klein

**From:**        Andrew.Slevin [andrew.slevin@cn.knightfrank.com]
**Sent:**         Friday, August 01, 2008 3:47 AM
**To:**           Epstein, Edward J.
**Subject:**      Shandong
**Attachments:**  company brochure.pdf

**Importance:**   High

Dear Edward

Many thanks for the call earlier and for thinking of Knight Frank for this assignment.

As discussed I suggest that we separate the project into two phases, phase one where we carry out a very high level analysis of the site and the area to arrive at some basic thoughts on the overall viability of the project and phase two where we prepare detailed research and analysis of the financials of the proposed development.

**Phase One**

For this phase we propose to send a team to the subject location backed by office based researchers. This team would discreetly collect information on the proposed masterplanning for the area, recent land sales, comparable property transactions and the general development environment. The deliverables would be a summary of this information together with a commentary on our thoughts on the overall viability of the project.

Our fees for such an exercise would be **RMB 40,000** plus expenses (estimated at RMB 10,000)

**Phase Two**

For this phase we would carry out a detailed research and consultancy exercise on the proposed development including an independent valuation of the site. The research report would include:

A)    Market Overview

- Macroeconomic data of city, including demographic and employment data (past, present and projected GDP, GDP Growth, FDI, disposable income, population and growth etc). Comment on competing cities or other cities experience
- Macroeconomic data of District including past, present and projected GDP, GDP Growth, FDI, disposable income, population and growth etc
- Market characteristics analysis by different product types in the proposed development i.e. offices, retail, residential, and hotel
- District and city real estate market fundamental analysis, including historical performance and trends
- City infrastructure overview;
- Relevant governmental, legal, and bank policies and regulations related to the real estate market (including, but not limited to, critical issues regarding acquisition, operation, and disposition of real properties);

For each product type, the analysis will include:

i.    Demand and supply situation, price level, vacancy rate, absorption rate, tenant/buyer profile at both historical and forecast level;
ii.   Identification of product criteria/standard and the current distribution within the area;
iii.  Historical and future expected changes in the distribution with possible reasons;
iv.   Other comments on the product markets and their outlooks.

B)    Project-Level Market Analysis

- City Government's development plan as a whole and the subject site, more specifically;
- Location and site analysis (including, but not limited to, accessibility, permeability and visibility);
- Public infrastructure and supporting facilities in the sub-market;

- Sub-market competitive supply analysis - comments on existing supply and supply trends for offices, retail, residential and hotel market within the immediate vicinity;
- Analyze how the related government policies, regulations and planned development could affect the Project;
- Sub-market demand analysis - comments on existing demand and demand trends for offices, retail, residential, and hotel market within the immediate vicinity;
- Comments on the suitability of the Project for the demand drivers and the hypothetical tenant and buyer profile in relationship to pricing and the market.
- Examine case studies of other large scale mixed-use projects in the surrounding area

C)    Valuation

Full valuation of the subject property based on a series of appraisal approaches. In arriving at our opinion of market value, we will follow the guidelines issued by the Royal Institution of Chartered Surveyors for the valuation of land and buildings as appropriate. Our valuation will be our opinion of the Market Value, which we would define as intended to mean:

"the estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arm's-length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently and without compulsion."

Typically, we assess real estate values using a number of analysis techniques. For the purposes of this valuation, we will mainly adopt:
- Comparison Method
- Discounted Cash Flow Analysis (DCF)

In adopting the DCF, we will consider the possible revenues and expected costs to be expended.

Our fees for Phase Two would be **RMB 350,000** plus expenses (estimated at RMB 30,000).

I would be happy to prepare a formal proposal once we have more information on the location and development but I hope that the above information is helpful.

I attach a copy of our general brochure and will forward shortly some examples of similar consultancy and valuation projects.

Kind regards

Andrew

Andrew W Slevin FRICS MHKIS
Executive Director

Knight Frank
Unit 1208, Evergo Tower, 1325 Middle Huai Hai Road
Shanghai 200031, PRC
Tel: +86 21 6445 9968 ext 818
Fax: + 86 21 6445 9965
Mobile +86 138 181 88824
www.knightfrank.com.cn

Click here to download our Chengdu research report
Check with Knight Frank before distributing

**Knight Frank** 莱坊

Please consider the environment before printing this email.

# Attachment 3

# Master Case Studies China Focus 20071212 small (NXPowerLite)

# Attachment 4

# Real Estate Experience in Mainland China Brochure

# ATTACHMENTS
# 3 & 4
# OMITTED

**Abe Klein**

| | |
|---|---|
| From: | Epstein, Edward J. [Edward.Epstein@troutmansanders.com] |
| Sent: | Friday, August 01, 2008 7:40 AM |
| To: | abe@flexocraft.com |
| Cc: | hershel@flexocraft.com; Cassirer, Aurora |
| Subject: | Heze Project |
| Attachments: | company brochure.pdf; Shandong (2.62 MB); Master Case Studies China Focus 20071212 small (NXPowerLite).pdf; Real Estate Exoerience in Mainland China Brochure.pdf |

<<company brochure.pdf>> <<Shandong>> <<Master Case Studies China Focus 20071212 small (NXPowerLite).pdf>> <<Real Estate Exoerience in Mainland China Brochure.pdf>>

Dear Abe:

It was very nice to talk to you and Hershel yesterday about the real estate project in Heze Shandong China, which you may be interested in pursuing, subject to preliminiary due diligence into the land development issues and pricing.

Real estate M&A and financing are key areas of our practice in Shanghai. I have attached a brochure which sets out our capability in this area and representative transactions.

I have also spoken to Knight Frank, which is one of the international real estate consultancies we work with in China on real estate valuations and project assessments. I have also attached their particulars and recommend that you work with them on assessing the project. They can offer a range of services in this regard but it seems from our call that at this preliminary stage you would only need them to send a team to Heze backed by office based researchers. This team would discreetly collect information on the proposed masterplanning for the area, recent land sales, comparable property transactions and the general development environment. The deliverables would be a summary of this information together with a commentary on the overall viability of the project. Their fees for this service would be RMB40,000 ($6,000 approx.) plus RMB10,000 in expenses ($1,500 approx.) The can also deliver you a comprehensive project analysis, the details and fees for which are set out in the attached e-mail from Andrew Slevin, who is the Managing Director of their Shanghai office. I have also attached Knight Frank China's company brochure and a slide presentation on their methodology in China.

As for the legal due diligence, we estimate that our fees for a preliminary legal due diligence into the site at Heze and advice on the feasibility of the project as proposed by your potential joint venture partner will be in the range of $25,000 to $35,000. Our fees will include a site visit, inspection of Heze government land and planning records, review of current ownership records and records of existing corporate owners (if any), preparation of a preliminary due diligence report and legal advice. These fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of $2,000 to $5,000), travel and accommodation to Heze (estimated to be in the range of $600 to $1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into Chinese (which will be quoted separately if required).

Therefore, including Knight Frank's report, we would recommend that you budget between $45,000 to $50,000 to determine the feasibility of the Heze project. We realize that this budget is considerably higher than you might budget for a similar project in the US but as you have considerable experience in doing business in China, you will appreciate that China is far less transparent and its legal system is still developing so that these tasks all require a higher level of difficulty in China than in the US.

Please let us know if you would like to proceed on this basis

Best regards.

Edward

**Edward J. Epstein** | Managing Partner, Shanghai | **Troutman Sanders LLP** | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited

# Attachment 1

# Company Brochure

# Attachment 2

# Shandong

# ATTACHMENTS
# 1 & 2
# OMITTED

## Abe Klein

| | |
|---|---|
| **From:** | Andrew.Slevin [andrew.slevin@cn.knightfrank.com] |
| **Sent:** | Friday, August 01, 2008 3:47 AM |
| **To:** | Epstein, Edward J. |
| **Subject:** | Shandong |
| **Attachments:** | company brochure.pdf |
| **Importance:** | High |

Dear Edward

Many thanks for the call earlier and for thinking of Knight Frank for this assignment.

As discussed I suggest that we separate the project into two phases, phase one where we carry out a very high level analysis of the site and the area to arrive at some basic thoughts on the overall viability of the project and phase two where we prepare detailed research and analysis of the financials of the proposed development.

**Phase One**

For this phase we propose to send a team to the subject location backed by office based researchers. This team would discreetly collect information on the proposed masterplanning for the area, recent land sales, comparable property transactions and the general development environment. The deliverables would be a summary of this information together with a commentary on our thoughts on the overall viability of the project.

Our fees for such an exercise would be **RMB 40,000** plus expenses (estimated at RMB 10,000)

**Phase Two**

For this phase we would carry out a detailed research and consultancy exercise on the proposed development including an independent valuation of the site. The research report would include:

A)    Market Overview

- Macroeconomic data of city, including demographic and employment data (past, present and projected GDP, GDP Growth, FDI, disposable income, population and growth etc). Comment on competing cities or other cities experience
- Macroeconomic data of District including past, present and projected GDP, GDP Growth, FDI, disposable income, population and growth etc
- Market characteristics analysis by different product types in the proposed development i.e. offices, retail, residential, and hotel
- District and city real estate market fundamental analysis, including historical performance and trends
- City infrastructure overview;
- Relevant governmental, legal, and bank policies and regulations related to the real estate market (including, but not limited to, critical issues regarding acquisition, operation, and disposition of real properties);

For each product type, the analysis will include:
- i.     Demand and supply situation, price level, vacancy rate, absorption rate, tenant/buyer profile at both historical and forecast level;
- ii.    Identification of product criteria/standard and the current distribution within the area;
- iii.   Historical and future expected changes in the distribution with possible reasons;
- iv.    Other comments on the product markets and their outlooks.

B)    Project-Level Market Analysis

- City Government's development plan as a whole and the subject site, more specifically;
- Location and site analysis (including, but not limited to, accessibility, permeability and visibility);
- Public infrastructure and supporting facilities in the sub-market;

- Sub-market competitive supply analysis - comments on existing supply and supply trends for offices, retail, residential and hotel market within the immediate vicinity;
- Analyze how the related government policies, regulations and planned development could affect the Project;
- Sub-market demand analysis - comments on existing demand and demand trends for offices, retail, residential, and hotel market within the immediate vicinity;
- Comments on the suitability of the Project for the demand drivers and the hypothetical tenant and buyer profile in relationship to pricing and the market.
- Examine case studies of other large scale mixed-use projects in the surrounding area

C)    Valuation

Full valuation of the subject property based on a series of appraisal approaches. In arriving at our opinion of market value, we will follow the guidelines issued by the Royal Institution of Chartered Surveyors for the valuation of land and buildings as appropriate. Our valuation will be our opinion of the Market Value, which we would define as intended to mean:

"the estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arm's-length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently and without compulsion."

Typically, we assess real estate values using a number of analysis techniques. For the purposes of this valuation, we will mainly adopt:
- Comparison Method
- Discounted Cash Flow Analysis (DCF)

In adopting the DCF, we will consider the possible revenues and expected costs to be expended.

Our fees for Phase Two would be **RMB 350,000** plus expenses (estimated at RMB 30,000).


I would be happy to prepare a formal proposal once we have more information on the location and development but I hope that the above information is helpful.

I attach a copy of our general brochure and will forward shortly some examples of similar consultancy and valuation projects.

Kind regards

Andrew

Andrew W Slevin FRICS MHKIS
Executive Director

Knight Frank
Unit 1208, Evergo Tower, 1325 Middle Huai Hai Road
Shanghai 200031, PRC
Tel: +86 21 6445 9968 ext 818
Fax: + 86 21 6445 9965
Mobile +86 138 181 88824
www.knightfrank.com.cn


Click here to download our Chengdu research report
Check with Knight Frank before distributing

**Knight
Frank** 莱坊

Please consider the environment before printing this email.

# Attachment 3

# Master Case Studies China Focus 20071212 small (NXPowerLite)

# Attachment 4

# Real Estate Experience in Mainland China Brochure

# ATTACHMENT 3
# OMITTED

# Attachment 4

# Real Estate Experience in Mainland China Brochure



# TROUTMAN SANDERS

## Troutman Sanders' Real Estate Investment and Real Estate Development

## Capability in China

### April 2008

ATLANTA
HONG KONG
LONDON
NEW YORK
NEWARK
NORFOLK
RALEIGH
RICHMOND
SHANGHAI
TYSONS CORNER
VIRGINIA BEACH
WASHINGTON, DC

**Prepared by**

**Edward EPSTEIN (Shanghai Office Managing Partner)**

**Troutman Sanders**

Shanghai Office
23/F, CITIC Square
1168 Nanjing West Road
Shanghai 200041
86.21.6133.8989

www.troutmansanders.com

# Contents

Executive Summary ................................................................... 1

About the Firm ......................................................................... 2

Greater China and Asia Practice ............................................. 3

Our Real Estate Services in China .......................................... 4

Representative Real Estate Transactions............................... 6


**Appendix**

I.  Our Core Team ................................................................. 9



## Overview

### The Firm

Troutman Sanders is an international law firm with over 650 attorneys and 12 offices in Asia, Europe and North America. It was established in Atlanta in 1897. With over 40 areas of legal practice, the firm is defined by its considerable knowledge base and proactive approach of addressing business and legal challenges. Our network enables us to offer multi-jurisdictional practice with in-depth international experience and legal knowledge for delivering effective, high quality and the best services to our clients.

### Reputation for Excellence

Troutman Sanders consistently ranks among the best law firms internationally. In 2007, BTI Consulting Group, an independent market research and management company, ranked Troutman Sanders as a "National Power Player," "Go-To Law Firm," and both a "Primary Law Firm" and "Recommended" Law Firm for Fortune 1000 and Global 500 companies based on individual interviews with 376 corporate counsels of privately held companies and Fortune 1000 corporations.

### Our Core Team

Our Greater China Practice Team has extensive experience in handling various legal affairs on a multi-jurisdictional basis. We have a team of legal professionals qualified in many countries, including the PRC, Hong Kong, the US, Canada, Australia, and the UK. Most of our team members can speak fluent Mandarin, Cantonese, Shanghainese and other Chinese dialects in addition to English.

### Our Clients and Our Services

Most of our clients are multinational companies based in the US and Europe in a wide range of industries, including real estate, distribution and services, manufacturing and chemicals. We assist them with setting up operations in China, M&A, corporate restructuring, intellectual property, technology services licensing as well as a broad range of corporate and commercial issues such as employment and benefits law, distribution and marketing, customs administration and taxation. We provide clients with regulatory advice to assess risk and practical legal strategies to manage risk that benefit of our experience in government relations, negotiations and networking capabilities.

It is our philosophy to develop and maintain a close working relationship with our clients. We emphasize the importance of being proactive in China's highly regulated economy as well as responsive to the needs of our clients so that we can assist them to achieve their business objectives in China. With strong emphasis on local knowledge, our specialist lawyers understand and possess a complete command of the regulatory framework governing the many different investment vehicles and business structures available to companies doing business in China. We also have individually and collectively built excellent relationships with a wide range of central and local government agencies and semi-official organizations in North, South and East China.

SH #47761v1



# Greater China and Asia Practice

### Overview

Troutman Sanders' lawyers have been serving clients doing business in Asia for over 20 years. Our Shanghai office was opened in early 2007 while the Hong Kong office was established in 1997, enhancing our presence in Asia to meet the increasing market demands. Our Asia team has over 40 legal professionals, including six partners, qualifying in many countries, including the PRC, Hong Kong, the US, Canada, Australia, and the UK. Most of our team members can speak fluent Mandarin, Cantonese, Shanghainese and other Chinese dialects in addition to English.

Our Asia team primarily focuses on a list of practice areas including real estate; mergers and acquisitions; foreign direct investment; private equity and venture capital; securities and capital markets; intellectual property; IT, Telecommunications and Media.

The Greater China Practice Team consists of our Asia team and US lawyers providing a wide range of professional legal advice to clients throughout the world. We have extensive experience in assisting clients in consummating complicated cross-border or foreign investment transactions by providing our clients with seamless, multi-jurisdictional legal advice and service. We represent North American and European-based clients to invest and do business in Asia. We also represent Asia-based clients with their US and Asian investments and operations. Our clients have relied on our legal professionals to help successfully consummate transactions in China, Hong Kong, Malaysia, India, Indonesia, Korea, Thailand, Taiwan, Singapore and the Philippines.

Our clients operate in a wide array of industries, including real estate, manufacturing, distribution and logistics, petrochemicals, transportation, telecommunications, IT, e-commerce, media and entertainment, mining, oil and gas, construction materials, steel, forestry, pulp and paper, pharmaceuticals, bio-technology, healthcare, cosmetics, food and beverages, hospitality and financial institutions.

### Approval Authority Experience

With our strong emphasis on local knowledge, we have individually and collectively sought to build excellent working relations with a wide range of central and local government and semi-official organisations in Shanghai, Beijing, Tianjin, Suzhou, and Nanjing and surrounding areas. Even as the investment approval system in China is simplified, the cooperation of local officials is still essential and contacts in semi-official organisations such as state monopoly companies and the banking system are extremely important.

In Shanghai, we have developed excellent working relations with the Shanghai Foreign Investment Commission, SAFE, various real estate exchanges, the four previously so-called "specialised banks", and the Wai Gao Qiao Bonded Area.

In Beijing, we have also built excellent relations with the Central Government, particularly in MOFCOM and the State Development Planning Commission, through our experience with projects requiring central government approvals.

2

SH #47761v1



## Our Real Estate Services in China

In China, we have more than ten years of experience in foreign-invested real property projects. These include both single-purpose and multi-purpose developments, principally in Shanghai, Beijing and Suzhou. In connection with representing multinational clients in China and throughout Asia, the lawyers in our Shanghai office have handled a wide range of sophisticated industrial and commercial property acquisitions, investments, leases, disposals and related financing and construction issues.  We have intimate knowledge of:

- legal and regulatory issues relevant to all aspects of property development in China, including investment approvals, planning approvals, environmental issues, foreign exchange issues, employment and other agreements and liability issues

- legal due diligence on all aspects of the land and land use

- local contracting practices

- appointments of design and supervision professionals and contractors

- construction contracts

- pre-lease and pre-sale

- lease and sale

- development agreements

- management covenants

- financing structures and agreements

- build to suit industrial facilities

- logistics and distribution centres

- "large-tract" developments

- commercial, residential and industrial property acquisitions and development

- major corporate financings, including the use of limited recourse finance techniques

- secured and unsecured bank lending, public offerings and private placements of debt securities

- project finance and asset securitizations

3

SH #47761v1

**TROUTMAN
SANDERS**

Our involvement in multi-purpose developments includes the Shanghai Racquet Apartments, which is a luxury residential and recreational development next to the Shanghai American School and the Shanghai Links Executive Community, a multi-purpose, North American style, suburban community of 757,333 square metres along the Pudong seaboard, comprising residential, recreational (including a PGA golf course) and educational units.

The above required us to adapt extensive agreements, including management covenants, which the US developer originally applied to similar developments in the US. These conditions were foreign to and in many respects incompatible with the Chinese legal system but the developer insisted that they were the only guarantee of the quality of the project in the long-term. For example, we re-wrote the covenants, conditions and restrictions in Chinese to adapt them to local law and practice as well as local usage and custom. This required us to have unique experience in the form and substance of Chinese domestic property law.

We also have extensive experience in the largest of "large-tract" multi-purpose community developments in Shanghai.

In addition, we have negotiated and documented numerous single-purpose real property transactions in China. These include greenfield and developed site acquisitions for leading investors. This has given us close familiarity with the issues relating to industrial users and greenfield developments. We have acted for developers on the continued leasing and sale activities of their developments, together with incidental and ongoing general commercial advice.

Our team has and is advising on numerous single-purpose residential and office developments in Beijing and Shanghai, some of which have required Central Government approvals. In this regards, we have extensive government contacts at both the local and central levels.

A list of our representative real estate transactions follows.

4

SH #47761v1



# Representative Real Estate Transactions

### 1.    Acquisition of Distressed Real Estate Assets

We represented:

- an investor in acquisition of Grade A office building in central Shanghai and related negotiations with major Chinese bank asset management company.

- a developer in due diligence and acquisition of a foreign-invested residential development in Beijing.

- a multi-national real estate investor in acquisition of an office building in central Shanghai and related negotiation with major Chinese bank.

### 2.    Acquisition of Industrial Sites and Logistics Facilities

We represented:

- a UK-based real estate developer in its acquisition of a 100,000 sq m site for the development of a logistics facility in Kunshan, Jiangsu and a 130,000 sq m site for the development of a logistics facility in Jiaxing, a suburb of Shanghai.

- a Japan-based real estate development and investment group in the purchase and financing of a 22.3 million sq ft bonded logistics and warehousing facility in Shanghai's Wai Gao Qiao Bonded Logistics Park.

- a leading provider of distribution facilities and services in connection with the establishment of joint ventures and other projects in Shanghai and Suzhou for the construction and operation of purposed-built logistics and warehouse facilities.

- a world-leading logistics developer in establishment of joint venture for acquisition and development of a 265,000 m2 logistics center in Tianjin.

- a developer in acquisition and development of a one million m2 logistics park site in Zhejiang.

- a logistics multinational in establishing their national distribution centre in Shanghai, including negotiations on lease terms and conditions and contracts for engineering and other works at the site.

- investor/manufacturer in connection with its acquisition of a factory site in Shanghai and an agreement with the local land authority to construct public utility infrastructure.

SH #47761v1

TROUTMAN
SANDERS

- investor/manufacturer in the acquisition of land use rights to a factory site in Suzhou for the expansion of its manufacturing operations.

- investor/manufacturer in the pre-lease of a purpose-built factory accommodation in Suzhou with an option to purchase.

- investor/manufacturer in site selection, valuation and design build and lease of manufacturing facility in Minhang district, Shanghai for its joint venture with Shanghai Electric Corporation.

- an investor in acquisition and redevelopment of an industrial site in west Shanghai.

3.    **Industrial and Commercial Leasehold**

We represented:

- lessee with regard to a long-term lease of a factory and its fixed equipment and facilities for industrial use in Shanghai.

- lessee with respect to a long-term lease of land and factory buildings for the establishment of a wholly owned foreign enterprise in the Shanghai Industrial Development Zone.

- lessee with respect to its acquisition of a factory premises in Shanghai.

- lessee on lease negotiations for various commercial premises throughout China.

4.    **Acquisition of Residential Real Estate and Mixed-Use Development**

We represented:

- purchaser in connection with the purchase of seventy-five apartments in a residential project for staff housing and bank financing of the purchase in local currency.

- a leading golf course design and construction firm on various luxury residential and resort development projects in China and throughout Asia, including Tomson Golf Villa Project in Pudong, Spring City and Yunnan Highlands in Kunming, Ya Long Bay in Hainan Island and several ongoing projects in Korea, the Philippines and the Middle East.

- boutique hotels developer/manager in negotiations with developers for potential hotel projects in Shanghai and Korea.

- a developer in the establishment of foreign invested joint venture real estate development company to develop mixed use development (residential, office, retail and entertainment centre) in central Huai Hai Road, central Shanghai.

6

**TROUTMAN SANDERS**

- a developer in establishment of foreign invested joint venture real estate development company to develop mixed use development (serviced apartment, office and retail centre) in Pudong overlooking Huang Pu River & the Bund.

## 5.    Other

We represented:

- a real estate merchant banking and investment management firm headquartered in Tokyo to enter into an equity transfer deal as to a local company which owns the land use rights of a parcel of the land in the area of 66,667.4 sq m.

- a US-based real estate development in the arrangement of construction finance for a joint venture condominium, serviced apartment and hotel development in Shanghai.

- a Japan-based real estate developer and investment group in the purchase of a 100 percent equity interest in a private company that holds land use rights for three sites in Kunshan, Jiangsu.

- a major creditor in dispute related to the Shanghai Links luxury residential and golf course project in Pudong, including issues related to land use rights.

- a number of architects and project managers related to various projects and establishment of operations in China.

SH #47761v1



# **Appendix I**

## **Our Core Team**

The key members of our China real estate team:



**Edward Epstein: edward.epstein@troutmansanders.com**
**Managing Partner**
**Shanghai**

Edward is the Managing Partner in Shanghai office. He has over 20 years' experience in China and has assisted numerous multinationals to establish and to acquire joint ventures and wholly foreign owned enterprises in China in a wide variety of industries, including automotive components, manufacturing operations, chemicals, petrochemicals, insurance and packaging. He has also assisted clients' to acquire and develop real estate as well as establish and acquire business in the services, retail and distribution sectors in China. He is adept at designing strategies for investing and doing business in China. He is fluent in English, Mandarin and German.



**Tian Wang: tian.wang@troutmansanders.com**
**Legal Consultant**
**Shanghai**

Tian specializes in corporate and real estate law. His practice focuses on real estate transaction, foreign direct investment, corporate mergers and acquisitions. He received his B.A. from East China University of Politics and Law and LL.M. from the University of Manchester in the United Kingdom. He is fluent in English, Mandarin Chinese and Shanghainese.



**Shaun Gao: shaun.gao@troutmansanders.com**
**Legal Consultant**
**Shanghai**

Shaun's practice focuses on commercial law involving foreign direct investment in the People's Republic of China. He specializes in advising multinationals on real estate, M&A transactions, market entry strategy formulation, FDI, as well as general commercial contracts. Shaun received his LL.B. from East China University of Politics and Law and LL.M. from the University of Sheffield in the United Kingdom. He is fluent in English, Mandarin Chinese and Shanghainese.

SH #47761v1





**John Xia: john.xia@troutmansanders.com**
**Senior Legal Consultant**
**Shanghai**

John represents clients establishing greenfield projects and in connection with merger and acquisition transactions in China, as well as a variety of corporate commercial issues, including employment, commercial lease, intellectual property rights and dispute resolution. John received his LL.B. from Zhejiang University and LL.M. degrees from the East China University of Politics and Law and the University of Ghent. He is fluent in English, Mandarin Chinese and North Zhejiang dialect.



**Jiehuan "Ralph" Xu: ralph.xu@troutmansanders.com**
**Associate**
**Shanghai**

Ralph is a corporate and M&A lawyer whose practice encompasses a broad range of transactions, including mergers and acquisitions, corporate restructuring, FDI, as well as general corporate matters. His previous extensive in-house role with two Fortune 500 multinational companies focused on FDI, M&A, distribution, business restructuring and daily operations in China, such as employment or contract dispute settlement. Ralph holds a B.A. from Shanghai International Studies University and an LL.M. from the University of Washington School of Law in Seattle. Ralph is fluent in English and Mandarin Chinese.



**Wendy Wang: wendy.wang@troutmansanders.com**
**Legal Consultant**
**Shanghai**

Wendy's experience includes foreign direct investment and M&A in China. Wendy attended East China University of Politics and Law, where she received her LL.B. and LL.M. She is fluent in English, Mandarin Chinese and Shanghainese.

SH #47761v1



# TROUTMAN SANDERS



**Kim Tung: kim.tung@troutmansanders.com**
**Associate**
**Shanghai**

Kim Tung focuses his practice on mergers and acquisitions, real estate, private equity and venture capital in China. He also has extensive experience in bankruptcy, litigation and corporate reorganization. He has advised and worked closely with clients of multinational background including Fortune 500 and PRC corporations in the legal aspects of their businesses.

Kim is admitted to The State Bar of California and holds a J.D. from the University of California, Hastings College of the Law. Kim received an Economics degree from the University of California at Berkeley. Kim is fluent in English and Mandarin Chinese.

SH #47761v1

"KLEIN EXHIBIT 24."
EMAIL DATED AUGUST 5, 2008 FROM EDWARD EPSTEIN,
ESQ.

## Abe Klein

| | |
|---|---|
| **From:** | Epstein, Edward J. [Edward.Epstein@troutmansanders.com] |
| **Sent:** | Tuesday, August 05, 2008 3:21 AM |
| **To:** | abe@flexocraft.com |
| **Cc:** | Cassirer, Aurora; Hershel Klein |
| **Subject:** | RE: Heze Project |

Abe: I would be happy to coordinate this for you. I will charge you at our hourly rates to do so. If Knight Frank's report is positive, we can then go ahead with the preliminary legal due diligence. I trust that Mr. Zheng will give Knight Frank his full support and necessary access to the site and relevant records. Please let me know if you would like me to move ahead. Best regards, Edward

**Edward J. Epstein** | Managing Partner, Shanghai | **Troutman Sanders LLP** | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

-----Original Message-----
**From:** Cassirer, Aurora
**Sent:** Tuesday, August 05, 2008 5:19 AM
**To:** 'Hershel Klein'; Epstein, Edward J.; abe@flexocraft.com
**Subject:** RE: Heze Project

I believe so.

-----Original Message-----
**From:** Hershel Klein [mailto:hershel@flexocraft.com]
**Sent:** Monday, August 04, 2008 4:39 PM
**To:** Cassirer, Aurora; Epstein, Edward J.; abe@flexocraft.com
**Subject:** RE: Heze Project

OK. SO we should hear tonight?

-----Original Message-----
**From:** Cassirer, Aurora [mailto:Aurora.Cassirer@troutmansanders.com]
**Sent:** Monday, August 04, 2008 12:11 PM
**To:** Hershel Klein; Epstein, Edward J.; abe@flexocraft.com
**Subject:** RE: Heze Project

Sounds right. Would you like Edward to coordinate that for you or would you like to deal with Knight Frank directly? I would like Edward to weigh in on this since he is there on the ground. Best regards,
Rori

-----Original Message-----
**From:** Hershel Klein [mailto:hershel@flexocraft.com]
**Sent:** Monday, August 04, 2008 11:37 AM
**To:** Epstein, Edward J.; abe@flexocraft.com
**Cc:** Cassirer, Aurora
**Subject:** RE: Heze Project

Aurora,

Based on the numbers below it seems that from a economical point of view it may make more sense to do the $$ Due diligence first so to rule out the potential issues on that end for a lower cost and then if that part checks out OK we can move forward on the legal end.

1

**KLEIN EXHIBIT 24**

KRINSKY PLLC

What do you think?

HK

-----Original Message-----
**From:** Epstein, Edward J. [mailto:Edward.Epstein@troutmansanders.com]
**Sent:** Friday, August 01, 2008 7:40 AM
**To:** abe@flexocraft.com
**Cc:** hershel@flexocraft.com; Cassirer, Aurora
**Subject:** Heze Project

```
<<company brochure.pdf>> <<Shandong>> <<Master Case Studies China Focus
20071212 small (NXPowerLite).pdf>> <<Real Estate Exoerience in Mainland
China Brochure.pdf>>
```

Dear Abe:

It was very nice to talk to you and Hershel yesterday about the real estate project in Heze Shandong China, which you may be interested in pursuing, subject to preliminiary due diligence into the land development issues and pricing.

Real estate M&A and financing are key areas of our practice in Shanghai. I have attached a brochure which sets out our capability in this area and representative transactions.

I have also spoken to Knight Frank, which is one of the international real estate consultancies we work with in China on real estate valuations and project assessments. I have also attached their particulars and recommend that you work with them on assessing the project. They can offer a range of services in this regard but it seems from our call that at this preliminary stage you would only need them to send a team to Heze backed by office based researchers. This team would discreetly collect information on the proposed masterplanning for the area, recent land sales, comparable property transactions and the general development environment. The deliverables would be a summary of this information together with a commentary on the overall viability of the project. Their fees for this service would be RMB40,000 ($6,000 approx.) plus RMB10,000 in expenses ($1,500 approx.) The can also deliver you a comprehensive project analysis, the details and fees for which are set out in the attached e-mail from Andrew Slevin, who is the Managing Director of their Shanghai office. I have also attached Knight Frank China's company brochure and a slide presentation on their methodology in China.

As for the legal due diligence, we estimate that our fees for a preliminary legal due diligence into the site at Heze and advice on the feasibility of the project as proposed by your potential joint venture partner will be in the range of $25,000 to $35,000. Our fees will include a site visit, inspection of Heze government land and planning records, review of current ownership records and records of existing corporate owners (if any), preparation of a preliminary due diligence report and legal advice. These

fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of $2,000 to $5,000), travel and accommodation to Heze (estimated to be in the range of $600 to $1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into Chinese (which will be quoted separately if required).

Therefore, including Knight Frank's report, we would recommend that you budget between $45,000 to $50,000 to determine the feasibility of the Heze project. We realize that this budget is considerably higher than you might budget for a similar project in the US but as you have considerable experience in doing business in China, you will appreciate that China is far less transparent and its legal system is still developing so that these tasks all require a higher level of difficulty in China than in the US.

Please let us know if you would like to proceed on this basis

Best regards.

Edward

**Edward J. Epstein** | Managing Partner, Shanghai | **Troutman Sanders LLP** | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited

"KLEIN EXHIBIT 107."
RETENTION DOCUMENT OF TROUTMAN SANDERS LLP.

## CLIENT INFORMATION

| | |
|---|---|
| **Name:** | Global Realty Ventures |
| **Client ID:** | 234545 |
| **Responsible Attorney:** | Cassirer, Rori |
| **Handling Office:** | New York |
| **Start Date:** | 11/17/2008 12:00:00 AM |
| **Structure:** | Estate |
| **Nature of Relationship:** | |
| **Business Classification:** | General |
| **Address:** | 1260 57th Street |
| | Brooklyn, NY 11219 |
| **Work Phone:** | 800 785 2737 ext.125 |
| **Fax:** | |
| **Web Site:** | |

## CONTACT INFORMATION

| | |
|---|---|
| **Name:** | Klein, Abraham |
| **Title:** | |
| **Home Phone:** | |
| **Email:** | abe@flexocraft.com |

## CLIENT RELATED PARTIES

| Name | Type Description |
|---|---|
| • Global Realty Ventures | Client |

## BILLING INFORMATION

| | |
|---|---|
| **Bill Script:** | STD-Standard Bill Format |
| **Bill Cycle:** | |
| **Special Billing Instructions:** | |

## QUESTIONS

| | |
|---|---|
| Does the client have annual legal needs of at least $25,000? | Yes |
| Is this matter expected to generate at least $5K in fees? | Yes |
| Is Client or Affiliate engaged in the Marketing of Energy Commodities? | No |
| To the extent known is any Firm Lawyer an Officer, Director, Partner or Fiduciary of the client or its affiliate, or does any Firm Lawyer have any personal business, financial or compensatory relationship with the Client or Affiliates? | No |

**KLEIN EXHIBIT 107**

KRINSKY PLLC

about:blank

11/18/2008

"KLEIN EXHIBIT 110."
HANDWRITTEN NOTES FROM TROUTMAN SANDERS LLP.

Client Response P_____ ( _____ _____ _____)

Handles Money: Wang Tian

→ Edward Epstein

Client: Flexo ~~Craft~~ Prints ✓

✓ Global - Reatly Ventures ✓

Project Juancheng        Abbe Klein
                          Consu___

Mr. Zheng

Contact person.

KLEIN EXHIBIT 110

KRINSKY PLLC

## Tong, Michelle

*refer to da.*

**Subject:** FW: MOU

-----Original Message-----
**From:** Wang, Tian
**Sent:** Monday, November 17, 2008 4:00 PM
**To:** 'Hershel Klein'; abe@flexocraft.com
**Cc:** Epstein, Edward J.; Wang, Tian
**Subject:** RE: MOU

Hershel,

Please find my answers to your question and Abe's comments as follows:

1. The JV must be governed by Chinese law because the JV is a company that will be incorporated and exist under Chinese law.

2. FedEx issue. After Mr. Zhang provides his contact info, we can verify whether the FedEx service is available to his address. I think Qingdao will have a greater possibility.

3. Item 9 of Appendix I. I guess Abe was actually referring to Item 8? Does the external control mean the "trustee arrangement"? If yes, as said, we could explore various scenarios when we know more about this project.

4. Clause 1.1 (a). Did Able mean that Mr. Zhang has won the public auction procedure for the grant of the Land but has yet to pay the land premium? We assume the answer is yes. We amended the Clause 1 (a) accordingly, please see the attached.

5. Clause 1.1 (b). We will leave our comments thereto and wait for Mr. Zhang's explanation.

Attached please find the clean and redline version of the LOI (the redline is against the version we circulated on last Friday).

Regards.

---

Tian Wang | Legal Consultant | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China |
Direct: +86-21-6133-8955 | Fax: +86-21-6137-8188

    -----Original Message-----
    **From:** Hershel Klein [mailto:hklein@flexocraft.com]
    **Sent:** Saturday, November 15, 2008 5:13 AM
    **To:** abe@flexocraft.com
    **Cc:** Wang, Tian
    **Subject:** RE: MOU

    Wang,

    Please see Abrahams comments below. I have one more question, why does the JV need to be
    governed by Chinese law? Can it not be governed by NY state law?

    hk

11/18/2008

**Tong, Michelle**

Subject: FW: MOU

-----Original Message-----
**From:** Wang, Tian
**Sent:** Saturday, November 15, 2008 12:08 PM
**To:** Epstein, Edward J.
**Cc:** Wang, Tian
**Subject:** FW: MOU

Edward,

Please find Hershel e-mail below.

I have drafted Reponses in the attached e-mail, please review.

Thanks.

Wang Tian

-----Original Message-----
**From:** Hershel Klein [mailto:hklein@flexocraft.com]
**Sent:** Saturday, November 15, 2008 5:13 AM
**To:** abe@flexocraft.com
**Cc:** Wang, Tian
**Subject:** RE: MOU

Wang,

Please see Abrahams comments below. I have one more question, why does the JV need to be governed by Chinese law? Can it not be governed by NY state law?

hk

**From:** Abe [mailto:abe@flexocraft.com]
**Sent:** Friday, November 14, 2008 7:04 AM
**To:** 'Hershel Klein'
**Subject:** RE: MOU

After you finish your review you can respond to everything together.

1) FedEx: Mr Zhang's office is located in "Heze Fangshan Tourist Area" Heze might very well have FEDEX, although I am not sure where he lives should it be done personal. I think he also has an office in Qingdao.  His contact phone number as I have it is 011-86-530-220-1666, 011-137-9199-3999
2) According to what he response to the item 9 of appendix, it sounds like it throws off my idea of external control, which I spoke to you yesterday, I guess we will have to see what they come up with.
3) 1.1, (a) where it states land has been paid for, is wrong, and I don't thing it should be written this way when presenting it, since we know it is not so. He has obtained the rights for the rights, meaning he won the property, and is waiting to complete the transaction for the JVC to be formed. Wang's question in (c) is still a very valid question.
4) 1.1, (b) once verified that it is zoned commercial and only 40 years use rights, would present a question to Knight Frank, if the value does not drop in relation to residential, since would it be residential zoned, the use rights would have been 70 years.

11/18/2008

Please review everything and let's send back one email. once done, I will need to send an email to Malcolm that this LOI is coming to Zhang in advance

11/18/2008

**Tong, Michelle**

*refer to don.*

Subject: FW: MOU

-----Original Message-----
**From:** Wang, Tian
**Sent:** Friday, November 14, 2008 4:44 PM
**To:** 'Hershel Klein'
**Cc:** Epstein, Edward J.; abe@flexocraft.com; Wang, Tian
**Subject:** RE: MOU

Hershel,

Please find the updated English version as attached. The redline version is against the version we circulated yesterday.

Given that this LOI will be signed in English and Chinese, we add a "language" clause at the end of the LOI. We will try our best to send you the Chinese version by the end of next Tuesday.

Please find our comments to your questions below.

_____

**Tian Wang** | Legal Consultant | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8955 | Fax: +86-21-6137-8188

-----Original Message-----
**From:** Hershel Klein [mailto:hklein@flexocraft.com]
**Sent:** Friday, November 14, 2008 5:15 AM
**To:** Wang, Tian; abe@flexocraft.com
**Cc:** Epstein, Edward J.
**Subject:** RE: MOU

Wang,

We reviewed the revised LOI. All seems to be in order accept for one minor typo in Paragraph 1.4 ( c ) pre-sold to ~~the~~ meet the.

In response to your comments below, please see our response;

- Governing Law. It seems that you put in a "binding" clause to protect GRV so Governing USA Law should be OK now. Is this correct? IS there a advantage in general in any governing law versus the other?
  TS: Yes, if you choose US law , we will need that "binding" clause. We would assume that the Singapore Arbitration Centre is more familiar with US law than the Chinese law.

- Item 9 of Appendix I (Commercial Terms for Development of Land). You claim that "if Mr. Zhang provide more funds in the form of increasing registered capital, your equity ratio will inevitably be diluted". Please explain if this is Chinese law?, USA law?, or practical business practice?
  TS:  It is according to the Chinese law because the Joint Venture will be governed by the Chinese law.

11/18/2008

- Trustee issue: I guess we relay mean a oversight person or organization that will have control of all monetary transactions to comply to a predetermined business plan.
  TS: Understood. We will consider the most appropriate arrangement to support your intention in the next step.

Please also advise if you will finalize the LOI in English and Chinese.

Best regards,
HK

---

11/18/2008

**Tong, Michelle**

*Refer to Ja.*

Subject: FW: MOU

-----Original Message-----
**From:** Wang, Tian
**Sent:** Thursday, November 13, 2008 6:30 PM
**To:** 'abe@flexocraft.com'
**Cc:** 'hklein@flexocraft.com'; Epstein, Edward J.; Wang, Tian
**Subject:** RE: MOU

Dear Abe,

Attached please find an updated version of the LOI for your review (the redline version is against the version attached your e-mail below). We would also like to draw your attention to our following comments:

1. Governing Law.

    PRC law and US law are both acceptable to the Singapore International Arbitration Center. But the difference is if you choose US law as the governing law, GRV's proposal to make the RMB 40 million investment could be deemed a binding commitment. Therefore, if you would like to choose US law, we will need a clause (i.e Clause 6 (Binding)) to make it clear that GRV's proposal under Clause 1 does not create a legally binding obligation to GRV. The same concern does not exist under PRC law, so if you choose PRC law as governing law, Clause 6 (Binding) is not necessary.

2. Item 9 of Appendix I (Commercial Terms for Development of Land).

    Although we reflect your hope in that paragraph, please note that if Mr. Zhang provide more funds in the form of increasing registered capital, your equity ratio will inevitably be diluted.

3. Item 13 of Appendix I (Commercial Terms for Development of Land).

    After reviewing the e-mails at the end of the Appendix I, we believe that the "trustee" hereto is actually referring to an "escrow account agent". If our understanding is correct, we wonder whether this "escrow arrangement" is legally necessary. It is because all project funds, no matter in the form of registered capital or a loan, will be paid into the account(s) of the Joint Venture. Therefore, if the signatory(ies) to such account(s) is/are someone that GRV can control (e.g. the CFO of the Joint Venture designated by GRV), it seems to us there is no need to have an independent escrow agent. Another option is GRV can make its capital contributions to the Joint Venture in installments depending on the progress of the construction, but please note that GRV is required to make 15% of its contribution within three months after the issuance of the business license of the Joint Venture, and the residual amount shall be contributed within two years after the issuance of the business license of the Joint Venture. For the time being, we can leave this general wording here and discuss such arrangement in detail when we have more knowledge about this project.

4. Those highlighted comments left in Clause 1 are for Mr. Zhang's review after you are satisfied with our draft.

5   In Article 7.1. we put FEDEX into a bracket because we were advised by FEDEX that its service is not stretching to Juancheng. Therefore, if Mr. Zhang's contact address is in Juancheng, we have to find another delivery service provider.

Regards.

11/18/2008

Tian Wang | Legal Consultant | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China |
Direct: +86-21-6133-8955 | Fax: +86-21-6137-8188

-----Original Message-----
**From:** Abe [mailto:abe@flexocraft.com]
**Sent:** Thursday, November 13, 2008 5:09 AM
**To:** Wang, Tian; 'Hershel Klein'
**Cc:** Epstein, Edward J.
**Subject:** RE: MOU

Please find attached your document with our answers and comments in Blue.

We did not fill in any of what we think Mr. Zhang should fill in, due to the lack of accuracy of that information on our part. We can provide you with basic information like phone number etc. from Mr. Chang as well as his office address. Once the framework of this document will be complete, We'll introduce you to him, so you can get that detail from him.

And the project is actually in JuanCheng City

11/18/2008

**Tong, Michelle**                                                    *refer to doc.*

**Subject:** FW: MOU

-----Original Message-----
**From:** Abe [mailto:abe@flexocraft.com]
**Sent:** Thursday, November 13, 2008 5:09 AM
**To:** Wang, Tian; 'Hershel Klein'
**Cc:** Epstein, Edward J.
**Subject:** RE: MOU

Please find attached your document with our answers and comments in Blue.

We did not fill in any of what we think Mr. Zhang should fill in, due to the lack of accuracy of that information on our part. We can provide you with basic information like phone number etc. from Mr. Chang as well as his office address. Once the framework of this document will be complete, We'll introduce you to him, so you can get that detail from him.

 And the project is actually in JuanCheng City

**From:** Wang, Tian [mailto:Tian.Wang@troutmansanders.com]
**Sent:** Wednesday, November 12, 2008 7:08 AM
**To:** abe@flexocraft.com; Hershel Klein
**Cc:** Cassirer, Aurora; Epstein, Edward J.; Wang, Tian
**Subject:** RE: MOU
**Importance:** High

Dear Abe and Hershel,

As discussed in today's con-call, we prepared the first draft of the Letter of Intent for your review only.

Please DO NOT forward this draft to Mr. Zhang or any other third parties because this draft needs further amendments.

Please assist in providing those information left in blank or confirming those contents in brackets, or if you can, please answer our comments highlighted in yellow.

Please feel free to contact us if you need any clarification.

Regards and thanks.

---

Tian Wang | Legal Consultant | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China |
Direct: +86-21-6133-8955 | Fax: +86-21-6137-8188

11/18/2008

refer to doc.

## Sun, Zoe

| | |
|---|---|
| **From:** | Wang, Tian |
| **Sent:** | Wednesday, November 12, 2008 8:08 PM |
| **To:** | 'abe@flexocraft.com'; Hershel Klein |
| **Cc:** | Cassirer, Aurora; Epstein, Edward J.; Wang, Tian |
| **Subject:** | RE: MOU |
| **Attachments:** | Project Heze-Letter of Intent.DOC |

| | |
|---|---|
| **Importance:** | High |

Dear Abe and Hershel,

As discussed in today's con-call, we prepared the first draft of the Letter of Intent for your review only.

Please DO NOT forward this draft to Mr. Zhang or any other third parties because this draft needs further amendments.

Please assist in providing those information left in blank or confirming those contents in brackets, or if you can, please answer our comments highlighted in yellow.

Please feel free to contact us if you need any clarification.

Regards and thanks.

**Tian Wang | Legal Consultant | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8955 | Fax: +86-21-6137-8188**

-----Original Message-----
**From:** abe@flexocraft.com [mailto:abe@flexocraft.com]
**Sent:** Wednesday, November 12, 2008 9:29 AM
**To:** Epstein, Edward J.
**Cc:** Hershel Klein; Wang, Tian; Cassirer, Aurora
**Subject:** Re: MOU

I should call you or you will call me?

**From:** "Epstein, Edward J." <Edward.Epstein@troutmansanders.com>
**Date:** Wed, 12 Nov 2008 09:25:20 +0800
**To:** <abe@flexocraft.com>
**CC:** <hklein@flexocraft.com>; Wang, Tian<Tian.Wang@troutmansanders.com>; Cassirer, Aurora<Aurora.Cassirer@troutmansanders.com>
**Subject:** Re: MOU

Abe: that will be 11:30am in China. No problem. Speak to you then. Regards, Edward

-----Original Message-----
**From:** Abe <abe@flexocraft.com>
**To:** Epstein, Edward J.
**CC:** 'Hershel Klein' <hklein@flexocraft.com>
**Sent:** Wed Nov 12 03:59:57 2008
**Subject:** MOU

**Tong, Michelle**

Subject: FW: Juan Country Ancient City Project

-----Original Message-----
From: Abe [mailto:abe@flexocraft.com]
Sent: Wednesday, November 12, 2008 1:17 PM
To: 'Ken Yip'; hklein@flexocraft.com
Cc: 'Andrew Slevin'; Epstein, Edward J.
Subject: Juan Country Ancient City Project

Ken

Just to keep you posted. We have asked for Edward from Troutman Sanders, to put together a MOU, which he will have a draft of it hopefully today. Once approved we will have it presented to Mr. Zhang. at that point you will go ahead into phase 2 of the DD.

Thanks. We'll be in touch.
Abe



11/13/2008

**Tong, Michelle**

**Subject:** FW: MOU

-----Original Message-----
**From:** abe@flexocraft.com [mailto:abe@flexocraft.com]
**Sent:** Wednesday, November 12, 2008 9:29 AM
**To:** Epstein, Edward J.
**Cc:** Hershel Klein; Wang, Tian; Cassirer, Aurora
**Subject:** Re: MOU

I should call you or you will call me?

---

**From:** "Epstein, Edward J." <Edward.Epstein@troutmansanders.com>
**Date:** Wed, 12 Nov 2008 09:25:20 +0800
**To:** <abe@flexocraft.com>
**CC:** <hklein@flexocraft.com>; Wang, Tian<Tian.Wang@troutmansanders.com>; Cassirer,
Aurora<Aurora.Cassirer@troutmansanders.com>
**Subject:** Re: MOU

Abe: that will be 11:30am in China. No problem. Speak to you then. Regards, Edward

-----Original Message-----
From: Abe <abe@flexocraft.com>
To: Epstein, Edward J.
CC: 'Hershel Klein' <hklein@flexocraft.com>
Sent: Wed Nov 12 03:59:57 2008
Subject: MOU

Edward,

We would like to set up a MOU (or whatever the Chinese legal terminology is for this document) with Mr. Zhang with
the following terms;

Because we will invest a certain amount of funds in legal and professional fees, therefore Mr. zhang will not offer this
project to any other party.

If it turns out that the 31 points mentioned in attached doc that was presented to us is correct, we would be interested to
invest into this project.

If all turns out to be correct we will invest the required funds of RMB 40 million in 12 weeks.

In actuality I would like to get a 6 month window but I am not sure if it will fly with Mr. Zhang. The most important
point I need to verify asap is if Zhang can guarantee the principal investment and if he can guarantee the overrun.

I would like to set up a conference call tonight at 10:30PM US EST.

11/13/2008

Please advise if this works.


Best,

Abe

---

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited

11/13/2008

"KLEIN EXHIBIT 111."
EMAIL DATED SEPTEMBER 1, 2008 FROM EDWARD
EPSTEIN, ESQ.

**Tong, Michelle**

Subject:                        FW: Flexocraft Project in Heze

-----Original Message-----
From: Epstein, Edward J.
Sent: Monday, September 01, 2008 7:59 PM
To: 'andrew.slevin@cn.knightfrank.com'
Subject: Fw: Flexocraft Project in Heze



rry to waste your time. I will buy you lunch sometime.

-----Original Message-----
From: Cassirer, Aurora
To: Epstein, Edward J.
Sent: Mon Sep 01 19:37:17 2008
Subject: Re: Flexocraft Project in Heze

No. It looks like they may have lost interest in the project.
------------------------
Sent from my BlackBerry Wireless Handheld

From: Epstein, Edward J.
: Cassirer, Aurora
Sent: Mon Sep 01 05:26:38 2008
Subject: RE: Flexocraft Project in Heze

Did they get back to you?

Edward J. Epstein | Managing Partner, Shanghai | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168
West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US
Direct: +1-404-885-2646

**KLEIN EXHIBIT 111**

KRINSKY PLLC

## Tong, Michelle

**Subject:** FW: Flexocraft Project in Heze

-----Original Message-----
**From:** Epstein, Edward J.
**Sent:** Monday, September 01, 2008 5:27 PM
**To:** Cassirer, Aurora
**Subject:** RE: Flexocraft Project in Heze

Did they get back to you?

Edward J. Epstein | Managing Partner, Shanghai | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

-----Original Message-----
**From:** Cassirer, Aurora
**Sent:** Thursday, August 21, 2008 8:43 PM
**To:** Epstein, Edward J.
**Subject:** RE: Flexocraft Project in Heze

No. I will check.

-----Original Message-----
**From:** Epstein, Edward J.
**Sent:** Thursday, August 21, 2008 12:14 AM
**To:** Cassirer, Aurora
**Subject:** FW: Flexocraft Project in Heze

Hi Rori. Just to let you know that this was followed through but Knight Frank never got a response. Do you know the status? Regards, Edward

Edward J. Epstein | Managing Partner, Shanghai | Troutman Sanders LLP | CITIC Square - 3rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

11/13/2008

"KLEIN EXHIBIT 112."
EMAIL DATED AUGUST 13, 2008 FROM EDWARD EPSTEIN,
ESQ.

**Tong, Michelle**

Subject: FW: Flexocraft Project in Heze

-----Original Message-----
**From:** Epstein, Edward J.
**Sent:** Wednesday, August 13, 2008 3:22 PM
**To:** 'Andrew.Slevin'
**Subject:** RE: Flexocraft Project in Heze

Thanks. Please let me know if you need any further assistance and if it comes off.

---

Edward J. Epstein | Managing Partner, Shanghai | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

-----Original Message-----
**From:** Andrew.Slevin [mailto:andrew.slevin@cn.knightfrank.com]
**Sent:** Wednesday, August 13, 2008 3:14 PM
**To:** Epstein, Edward J.
**Subject:** RE: Flexocraft Project in Heze

Dear Edward

Just to keep you up to date. I sent a revised proposal through to Hershel yesterday and am awaiting a response.

Kind regards

Andrew

---

**From:** Epstein, Edward J. [mailto:Edward.Epstein@troutmansanders.com]
**Sent:** 08 August 2008 15:33
**To:** Andrew W Slevin
**Subject:** Flexocraft Project in Heze

Dear Andrew:

Further to our previous correspondence and calls, please send your engagement letter for the stage one assessment of the feasibility directly to Mr. Klein as follows:

Mr. Hershel Klein
Flexo Craft Prints
1000 First St.
Harrison NJ 07029
800-785-2737 ext 125
Fax: 973-482-9574
Private Fax: 800-599-2334
Hershel Klein [mailto:hershel@flexocraft.com]

Please copy me.

Many thanks.

Edward

**KLEIN EXHIBIT 112**

11/13/2008

KRINSKY PLLC

**Edward J. Epstein | Managing Partner, Shanghai | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646**

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited

Knight Frank is the leading independent global property consultancy with a network of over 16
This email is sent on behalf of Knight Frank. Any files transmitted are intended solely for the

Any unauthorised access, disclosure, use or copying is strictly prohibited and may be unlawful.

PRIVACY: It may be necessary to monitor emails sent and/or received through the Knight Fra

11/13/2008

"KLEIN EXHIBIT 113."
EMAIL DATED AUGUST 1, 2008 FROM EDWARD EPSTEIN,
ESQ.

**Tong, Michelle**                                           *Refer to dloc.*

| | |
|---|---|
| **From:** | Epstein, Edward J. |
| **Sent:** | Friday, August 08, 2008 5:46 PM |
| **To:** | Cassirer, Aurora |
| **Subject:** | FW: Flexocraft Project in Heze |

For your information.

Edward J. Epstein | Managing Partner, Shanghai | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

-----Original Message-----
**From:** Andrew.Slevin [mailto:andrew.slevin@cn.knightfrank.com]
**Sent:** Friday, August 08, 2008 4:47 PM
**To:** hershel@flexocraft.com
**Cc:** Epstein, Edward J.
**Subject:** RE: Flexocraft Project in Heze

Dear Mr Klein

I refer to my conversations with Edward Epstein of Troutman Sanders. Please see attached our proposals for a preliminary review of the development scheme in Shandong Province, China. Please let me know immediately if I have omitted anything or if you have any queries on our approach.

Thank you for your interest in using the services of Knight Frank.

Regards

Yours sincerely

Andrew W Slevin FRICS MHKIS
Executive Director

Knight Frank
Unit 1208, Evergo Tower, 1325 Middle Huai Hai Road
Shanghai 200031, PRC
Tel: +86 21 6445 9968 ext 818
Fax: + 86 21 6445 9965
Mobile +86 138 181 88824
www.knightfrank.com.cn

Click here to download our Chengdu research report
Check with Knight Frank before distributing

Knight
Frank  莱坊

Please consider the environment before printing this email.

**KLEIN EXHIBIT 113**

11/13/2008

KRINSKY PLLC

"KLEIN EXHIBIT 114."
EMAIL DATED AUGUST 8, 2008 FROM EDWARD EPSTEIN,
ESQ.

**Tong, Michelle**

| | |
|---|---|
| **From:** | Epstein, Edward J. |
| **Sent:** | Friday, August 08, 2008 3:33 PM |
| **To:** | 'Andrew W Slevin' |
| **Subject:** | Flexocraft Project in Heze |

Dear Andrew:

Further to our previous correspondence and calls, please send your engagement letter for the stage one assessment of the feasibility directly to Mr. Klein as follows:

Mr. Hershel Klein
Flexo Craft Prints
1000 First St.
...rrison NJ 07029
...0-785-2737 ext 125
Fax: 973-482-9574
Private Fax: 800-599-2334
Hershel Klein [mailto:hershel@flexocraft.com]

Please copy me.

Many thanks.

Edward

Edward J. Epstein | Managing Partner, Shanghai  | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8998 | Fax: +86-21-6133-8198 | US Direct: +1-404-885-2646

**KLEIN EXHIBIT 114**

1



KRINSKY PLLC

**Tong, Michelle**

Subject:                        FW: Heze Project

-----Original Message-----
From: Epstein, Edward J.
Sent: Wednesday, August 06, 2008 9:21 AM
To: 'hershel@flexocraft.com'; Cassirer, Aurora; 'abe@flexocraft.com'
Subject: Re: Heze Project

shel - I am out of the office until Friday. At that time, I will give KF instructions and ask them to contact you directly concerning fees. Regards. Edward

-----Original Message-----
From: Hershel Klein <hershel@flexocraft.com>
To: Cassirer, Aurora; Epstein, Edward J.; abe@flexocraft.com <abe@flexocraft.com>
Sent: Wed Aug 06 06:39:35 2008
Subject: RE: Heze Project

SO I guess I will wait for Edward direction after he set up a communication channel between us and the DD guys. HK

-----Original Message-----
From: Cassirer, Aurora [mailto:Aurora.Cassirer@troutmansanders.com]
Sent: Tuesday, August 05, 2008 6:16 PM
To: Hershel Klein; Epstein, Edward J.; abe@flexocraft.com
Subject: RE: Heze Project

Edward,
I assume that that will work. Hershel, please let us know if there is anything else we can do for you.
Sincerely, Rori

-----Original Message-----
From: Hershel Klein [mailto:hershel@flexocraft.com]
Sent: Tuesday, August 05, 2008 5:25 PM
To: Epstein, Edward J.; abe@flexocraft.com
Cc: Cassirer, Aurora
Subject: RE: Heze Project

Edward,

I think that is a good idea that you set it up with  them but I don't think it is beneficial to filter all back and forth thru you as it would ring up unnecessary legal fees.

1

Lets get it setup and started with the process and then when that checks out we can move forward accordingly,

Best regards,
HK

"KLEIN EXHIBIT 124."
EMAIL DATED NOVEMBER 24, 2008 FROM TIAN
WANG.

## Abe Klein

| | |
|---|---|
| rom: | Wang, Tian [Tian.Wang@troutmansanders.com] |
| Sent: | Monday, November 24, 2008 3:57 AM |
| To: | abe@flexocraft.com; Hershel Klein |
| Cc: | Epstein, Edward J.; Wang, Tian |
| Subject: | RE: Project Juancheng-Letter of Intent-EN (3) |
| Attachments: | Engagement Letter for GRV.pdf |

Abe and Hershel, <<Engagement Letter for GRV.pdf>>

Please find our following responses and suggestions to your comments:

1. Your comments to Clause 1 (c): "So this needs to be verified? Explained? What needs to be done?"

TS: Mr. Zhang's explanation does not convince us that this issue will not create any legal problems. Only official documents from Juancheng government or the government at a higher level, which we will request in our due diligence process, can evidence that such situation is not in breach of the regulations we mentioned. But you shall be prepared that such documents may not exist.

2. Your comments to Clause 1.2 -1.4: "I understand, and thought this is what he will say, and the response can be, that since GRV is only 40% in the JV, Jinxiu has greater power anyway, also Jinxiu being in China will do the management, and it would be difficult for GRV to control, therefore the guarantee is needed. Something along these lines. The important thing it to be able to fish out under what conditions can there be an effective ᵔuarantee? (Interesting, we only wrote about the safety of the Capital and he added "profits")" .

TS: At this stage, it is in favor of GRV if the wording is broad and ambiguous, as it is now. For the purpose of signing this LOI, the comfort to Mr. Zhang is that Clause 1.2- 1.4 are not legally binding on him. The parties can negotiate what is the most effective and lawful guarantee for GRV's capital and profit in the next step. But as we mentioned before, the China law does not permit a guarantee for the fixed return under a sino-foreign investment cooperation, and it also prohibits a Chinese entity (including FIE) from providing guarantee for the registered capital of a FIE. After obtaining more information about this project and Mr. Zhang's company, we will advise you whether there are any possibilities to lawfully set up an effective "guarantee structure", and we are of course open to any suggestions from Mr. Zhang.

3. Your comments to Mr. Zhang's comments at the end of the LOI: "OK, so we see there is level of urgency to closing, but something that can be done unilateral by him without effecting the eventual partnership??? Obviously the guy has the money to close!!!!! Based on this, I am confused as to what he wrote above about that the land cost might not be exactly 150mm. "

TS: So are we. In our conversation with him last Wednesday, he told us that the formal bidding procedure has yet to be completed, but in his written response, he advised that the bidding procedure was completed, and they are now waiting to pay the land premium. We will clarify with him about his inconsistent answers.

4. Your comments to our comments at the end of the LOI: "The decision which direction, would depend on 1) the deadline for paying the land premium 2) if the local land bureau will wait till the JV is formed? Either way, our $$ commitment would depend on have the full DD complete··· would it not?"

TS: We will ask Mr. Zhang about your two questions, and we agree that your commitment to invest shall only be made after you are satisfied with results of due diligence in all respects. Further, your commitment shall only

1

**KLEIN EXHIBIT 124**

become legally binding on you after relevant definitive agreements for this transaction are signed, the most important of which is the joint venture contract.

On a separate note, attached please find the Engagement Letter for GRV. If you are fine with letter, please kindly sign it and scan it back to us.

_____

Tian Wang | Legal Consultant | Troutman Sanders LLP | CITIC Square - 23rd Floor | 1168 West Nanjing Road | Shanghai 200041 - China | Direct: +86-21-6133-8955 | Fax: +86-21-6137-8188

-----Original Message-----
From: Hershel Klein <hklein@flexocraft.com>
To: Epstein, Edward J.
CC: abe@flexocraft.com <abe@flexocraft.com>
Sent: Mon Nov 24 14:07:37 2008
Subject: FW: Project Juancheng-Letter of Intent-EN (3)

Edward,

Please see abe's comments on the right side.

Lest get it finalized so that we can approach Mr. ZHANG to come up with what kind of guarantee he would have for the investment or profits.

Best,

HK

From: Abe [mailto:abe@flexocraft.com]
Sent: Friday, November 21, 2008 8:13 AM
To: 'Hershel Klein'
Subject: Project Juancheng-Letter of Intent-EN (3)

Hershel, you can read my added comments on the right side, and add yours or modify mine if you like.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is trictly prohibited

3

# TROUTMAN SANDERS LLP

### ATTORNEYS AT LAW
#### A LIMITED LIABILITY PARTNERSHIP

BANK OF AMERICA PLAZA
600 PEACHTREE STREET, N.E. - SUITE 5200
ATLANTA, GEORGIA 30308-2216
TELEPHONE: 404-885-3000
FACSIMILE: 404-885-3900

Edward Epstein
edward.epstein@troutmansanders.com

Direct Dial:  +86-21-6133-8998
Direct Fax:  +86-21-6137-8998

November 24, 2008

Mr. Abraham Klein
1260 57th Street,
Brooklyn, NY 11219,
USA

Dear Abe,

**RE:    Engagement of Troutman Sanders LLP by**
**Global Realty Ventures ("GRV")**
**Retainer Letter –**
**Project Juancheng**

This letter will confirm our agreement for the provision of legal services by Troutman Sanders LLP (the "Firm") to you and secure your approval of the fee arrangement and other conditions of our representation.   We are very pleased that you have retained us and will, of course, answer any specific questions that you may have about these arrangements.

1.    <u>Scope of Legal Services</u>

The Firm has been retained by you to provide legal services in connection with your proposed investment in a real estate project in Juancheng, Shandong Province (the "Project"), such representation may include:

(a)    preliminary due diligence on the Project and the Chinese party that you are going to cooperate with, including but not limited to:

  ▪  a site visit, inspection of the land of the Project;

  ▪  reviewing all documents relevant to the Project and the Chinese party that are available to us;

  ▪  arranging local agent(s) to make independent searches for all information of the Project and the Chinese party that are publicly accessible; and

  ▪  preparing a preliminary due diligence report and legal advice.

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 2 of 7

(b)    advising on the feasibility of the Project under PRC laws;

(c)    preparing all transaction documents and attending meetings and negotiations with the Chinese party and/or the local government;

(d)    assisting in forming the joint venture and obtaining all necessary licenses and permits; and

(e)    other matters ancillary to the above.

2.    <u>Fees and Payment Provisions</u>

The Firm's fees will be charged on an hourly basis for all time actually expended, and will be billed monthly. The hourly rates assigned to the attorneys in our Firm will vary according to the level of experience and expertise of the attorney. The work will be primarily handled by our commercial attorneys in our Representative Office in Shanghai, under my supervision; and assisted by our colleagues in US (if necessary). Set forth below are the 2008 rates for various levels of timekeepers who will be responsible for assisting the Target with its legal affairs in China:

| Position | 2008 RMB Rate |
|---|---|
| Partner | ¥4,000 - ¥5,500 |
| Associate | ¥2,800 - ¥3,500 |
| Senior Legal Consultant | ¥2,200 - ¥2,800 |
| Legal Consultant | ¥1,600 - ¥1,800 |
| Legal Assistant/Paralegal | ¥1,100 - ¥1,200 |
| Legal Translator | ¥950 - ¥1,100 |

We would recommend a budget of between USD 25,000 and USD 35,000 for our fees for

50217-1                                           2

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 3 of 7

services to GRV for the Project set out in 1.(a) and (b) above, and these fees will not include government fees (estimated to be nominal), local agent's fees (estimated to be in the range of USD 2,000 to USD 5,000), travel to and accommodation in Juancheng (estimated to be in the range of USD 600 to USD 1,000), meetings or negotiations with the Chinese partner or other third parties (not anticipated at this stage), or translation of records into English (which will be quoted separately if required).

We would recommend a budget of between USD 100,000 and USD 150,000 for our fees for services to GRV for the Project set out in 1.(c) and 1. (d) above, and these fees will also not include any government fees, local agent's fees, travel to and accommodation in Juancheng or other places, or translation of any government documents into English.

The fees for the Project are based on the current state of law and policy and local practices in China, which are liable to change quickly and without prior notice. If the services we have undertaken to supply based on this estimate become impossible, more difficult or expensive due to changes in law, policy or practices, we will inform you. You will have the option to terminate our services based on the work already completed on a time-cost basis at our current billing rates (not to exceed the quoted fee) or to request us to provide additional services based on what is required by the changes in the law, policy and/or practices. If we agree to provide such services, and we shall be under no obligation to do so, we shall provide such additional services on a time cost basis at our current billing rates or on an agreed fee basis. Additional government fees, agent's fees and disbursements shall be billed and paid by you separately. Where such additional services are required in these circumstances, we do not guarantee an outcome within a specific time frame, or that the outcome will be successful at all. In such circumstances, you shall be entitled to terminate such additional services at any time with prior written notice and your liability for fees will be limited to the time-costs incurred by us in providing the additional services to you at our current billing rates up to the date you notify us in writing, as well as any applicable government fees, agent's fees and disbursements incurred as of such date of notice.

You will find that our rates are quite competitive in this market.  Hourly rates are reviewed and, when appropriate, adjusted to reflect increases in seniority and experience as well as inflationary factors. Such increases are ordinarily made on an annual basis, effective as of the beginning of each calendar year. We do not generally send any notice of a change in hourly rates.

You will be responsible for reimbursement of costs incurred on its behalf and invoiced to the Firm by third parties. Costs billed to the Firm by parties who supply goods or services related to our work on your behalf will be billed to you at the actual out-of-pocket cost

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 4 of 7

that the Firm pays to the third party on your behalf. We will use our best professional judgment in determining when to seek your permission prior to incurring expenses with third parties. You will not be billed for any internal Firm costs incurred on your behalf, such as telephone (including long distance charges), telecopy charges, word processing, secretarial overtime, firm couriers, postage (including FedEx, UPS or similar overnight delivery services), printing and photocopying performed in-house, and access to computer legal research.

We will bill you on a monthly basis for both fees and disbursements with the understanding that the bills will be paid in full upon receipt.  Unless otherwise agreed, our billing statements will contain an itemized description of the services rendered and costs invoiced to us during the period covered by the statement.

You may pay us in China in RMB in which case we will add any local taxes (including business tax) to the billed amount to be paid by you and we will issue you a local tax invoice (fapiao). If you choose to pay us in the United States, we expect payment of the full amount billed in US dollars at the exchange rate prevailing at the time of payment in available currency.

Please review our bills carefully when rendered.  You agree that all questions and disputes will be brought to our attention promptly so that they can be addressed and resolved to our mutual satisfaction. Billing mistakes may occur on occasion, and we will be pleased to correct any that you might identify. Please feel free to discuss with me any questions regarding our statements.

3.    Conflict Provisions

Our Firm's policies and applicable professional rules of conduct concerning conflicts of interest are designed to protect the confidences, rights and interests of our clients, while permitting the Firm to advise and represent many different people and organizations.  In order to assure that you and the Firm have the same understanding of the effects of our engagement concerning potential conflicts of interest, we include below relevant considerations and understandings.

As we have discussed, neither you nor this Firm is aware of any actual conflict of interest in our representing the Target at this time. Our Firm is, however, a large one with offices in more than one location, and we represent many other companies and individuals, some of whom we have represented for many years in connection with a great variety of matters. As with your engagement of the Firm in this matter, our ongoing relationships with those clients are important to us and to them. It is possible that some of our present

50217-1                                                4

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

Global Realty Ventures
Nov 24, 2008
Page 5 of 7

or future clients will have disputes or transactions with you during the time that we are representing you. You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse including, for example, representing adverse parties in litigation, arbitration, or other forms of dispute resolution. We agree, however, that your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a non-public nature, that, if known to such other client, could be used in any such other matter by such client to your material disadvantage, unless we have screened our lawyers, paralegals and staff who have such information from any involvement in the adverse representation.

For the purposes of determining whether a conflict of interest exists, it is only GRV we will represent and not other entities in your corporate family, stockholders, officers, directors, employees or agents ("affiliates"). You have agreed that you will not give us confidential information regarding your affiliates. While we recognize that to act adversely to any affiliate could jeopardize your continuing engagement of the Firm to handle matters on your behalf, which we would naturally be reluctant to see happen, for conflict of interest purposes, we reserve the right to represent another client with interests adverse to any affiliate without obtaining consent from you or your affiliates.

4.    Termination of Engagement

Upon our completion of the services for which you have engaged us, our attorney-client relationship will be terminated. If you should thereafter engage us to perform further or additional services, our attorney-client relationship will be revived, subject to these and any supplemental terms of engagement. Further, either of us may terminate the engagement at any time for any reason by written notice, subject on our part to applicable Rules of Professional Conduct. In the event that we terminate the engagement, we will take such steps as are reasonably practicable to protect your interests in the above matter.

You are engaging the Firm to provide legal services in connection with a special matter. After completion of the matter, changes may occur in the applicable laws or regulations that could have an impact on your future rights and liabilities. Unless you engage us to provide additional advice, the Firm has no continuing obligation to advise you with respect to future legal developments. Further, the fact that we may inform you from time to time of developments in the law which may be of interest to you, by newsletter or otherwise, should not be understood as a revival of an attorney-client relationship. Moreover, we have no obligation to inform you of such developments in the law unless

50217-1                                          5

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 6 of 7

we are engaged in writing to do so.

Except to the extent other arrangements are specifically made for this matter, our document retention practice will be as follows:    We will retain your papers and property provided to us until termination of this engagement.    Following termination of the engagement, we will return those of your papers and property which you may request within thirty (30) days of termination.    With respect to all other material, including documents and data created by us and received from others, we reserve the right to retain or dispose of such material as we determine appropriate.

5.    PRC Legal Opinions, Certifications and Representation in Proceedings

In common with all foreign law firms licensed in China, we are permitted to provide information on the influence of the PRC legal environment and we do so only in our capacity as international, multi-jurisdictional lawyers experienced in international business transactions. If you require a formal PRC legal opinion or certification on a specific application of PRC law to conduct or events, we shall be pleased to refer you to any one of the several PRC law firms who work with us for this purpose or engage one on your behalf. We will provide you with our specialist understanding of the relevant law and wealth of our experience in representing foreign companies in China. However, as PRC law is still in a state of evolution and because of the highly regulated nature of the Chinese system of foreign investment, our views may require confirmation from the relevant PRC authorities. In common with all foreign law firms licensed in China, we are required by law to inform you that we are not permitted to engage in Chinese legal business and although some of our employees may have PRC lawyer qualifications they cannot practice as licensed PRC lawyers.

Although it is possible for us to represent you as an agent *ad litem* in a Chinese litigation, because of the nature of the Chinese civil process we always work together with PRC lawyers in litigation involving our clients in China. In Chinese international arbitration proceedings, however, we can and do represent our clients without the participation of a PRC law firm.

6.    Acceptance

This letter constitutes the entire understanding between you and Troutman Sanders LLP with respect to this matter and supersedes all prior understandings, written or oral, as to its subject matter. Any change must be made or confirmed in writing. If this letter correctly reflects your understanding of the terms and conditions of our engagement, we request that you have an appropriate authorized officer of the corporation indicate its consent by having the duplicate originals of this letter executed in the space provided

TROUTMAN SANDERS LLP
ATTORNEYS AT LAW
A LIMITED LIABILITY PARTNERSHIP

**Global Realty Ventures**
Nov 24, 2008
Page 7 of 7

below. You should retain one of these duplicate originals for your records and return the other to me for our records.

We look forward to working with you. I hope that you will let me know if at any time you feel that the service we are rendering or the manner or promptness with which we are responding to your requests for service can be improved. On behalf of Troutman Sanders LLP, I want to sincerely thank you for the opportunity to be of service.

Very truly yours,

TROUTMAN SANDERS LLP

By: _Edward J. Epstein_

Edward J. Epstein

**Global Realty Ventures**    agrees to the foregoing terms

_____

Date:

50217-1                              7